FILED

2013 MAR 18  AM 10: 45

CLERK U.S. DISTRICT COURT
CENTRAL DIST. OF CALIF.
LOS ANGELES

BY_____

1  Barrett S. Litt, SBN 45527
   E-Mail: blitt@kmbllaw.com
2  Ronald O. Kaye, SBN 145051
   Lindsay B. Battles, SBN 262862
3  KAYE, McLANE, BEDNARSKI & LITT
   234 East Colorado Boulevard, Suite 230
4  Pasadena, California 91101
   Telephone: (626) 844-7660
5  Facsimile: (626) 844-7670
6

7  Attorneys for Plaintiff
8  FRANK O'CONNELL

9              UNITED STATES DISTRICT COURT

10           CENTRAL DISTRICT OF CALIFORNIA

11 FRANK O'CONNELL,              CASE NO. CV13-01905 -MAN
12                              COMPLAINT FOR DAMAGES
              Plaintiff,
13                              (1) DEPRIVATION OF CIVIL RIGHTS, 42
14        vs.                        U.S.C. §1983, AGAINST INDIVIDUAL
                                     DEFENDANTS
15 J. D. SMITH; ESTATE OF       (2) DEPRIVATION OF CIVIL RIGHTS, 42
16 GILBERT PARRA; ERIC              U.S.C. §1983, AGAINST ENTITY
   PARRA, COUNTY OF LOS            DEFENDANTS
17 ANGELES AND DOES 1-10.
18                              DEMAND FOR JURY TRIAL.
              Defendants.
19
20
21
22
23
24
25
26
27
28

## I.    INTRODUCTION

1.    On April 6, 1985, Frank O'Connell was convicted of first degree murder in the death of Jay French, a murder he did not commit. He was sentenced to 25 years to life imprisonment. His conviction hinged on the testimony of eyewitnesses Daniel Druecker and Maurice Soucy. Those eyewitnesses made identifications from photospreads prepared and presented to them by Defendant Detectives assigned to the Los Angeles Sheriff's Department. The Defendant Detectives failed to provide critical exculpatory evidence that would have been helpful to the defense regarding the initial identifications by each of these two eyewitnesses and others. Neither representatives of the District Attorney's Officer (hereafter the "prosecution") nor Plaintiff were aware or apprised of this information. Defendant Detectives engaged in activities to induce witnesses to identify Plaintiff, and/or caused false evidence concerning the identifications to be provided to the prosecution and the defense in the police reports they submitted. In addition, Defendant Detective Smith reported that a third eyewitness, Arturo Villareal, initially told him that he could identify Mr. O'Connell as the killer who drove away from the murder scene.  Detective Smith later testified to this although Mr. Villareal himself denied this statement, and insisted that he could not, and never could, identify Mr. O'Connell as the killer.

2.    Defendant Detectives also withheld information regarding a previous attempt on Jay French's life by his former wife and a male associate even though that male associate matched the general description of the person seen shooting Mr. French. That information was also not disclosed to the prosecution.

3.    This conduct by Defendant Detectives set in motion a chain of events that caused Plaintiff to be wrongly convicted and spend 27 years in prison before his release on a writ of habeas corpus.  Plaintiff is, in fact, innocent of Mr. French's murder and had absolutely no involvement in the crime.

1

1       4.     Plaintiff O'Connell spent over 27 years in California prisons due to

2 Defendants' conduct. Although several witnesses testified that he was with them

3 at the time of the murder, the positive identifications allegedly made without

4 hesitation upon the very first viewing of the photospread outweighed this

5 testimony in the mind of the trier of fact. Mr. Druecker has since testified that he

6 was never certain that Mr. O'Connell was the person he saw; that he told the

7 detectives he was not certain and hardly saw the murderer; that he felt pressured

8 by the Detective Defendants to make an immediate and positive identification;

9 and that the Detective Defendants confirmed in his presence that he had identified

10 the right person. None of this information was disclosed by Defendant Detectives

11 to either the prosecution or the defense.  False and misleading information

12 regarding the eyewitness identifications was provided in the police reports

13 submitted to the prosecution, and was relied upon by the prosecution and the

14 defense.

15       5.     Mr. Soucy is deceased.  Notes in the detectives' own handwriting

16 show that  Mr. Soucy, in fact, hesitated in identifying Mr. O'Connell as having

17 driven a car similar to the one seen fleeing the murder scene. These notes were not

18 disclosed to either the prosecution or the defense.

19       6.     Not only were there several witnesses who testified that Mr.

20 O'Connell was with them at the time of the murder, there is now very strong

21 evidence that Jay French's ex-wife orchestrated the murder. She has told several

22 people that Mr. O'Connell was innocent, and that she hired someone to kill Jay

23 French. She repeated this to several individuals on separate occasions, and over

24 many years. She wanted Mr. French dead so that she could regain custody of their

25 son.

26       7.     During his years of unlawful incarceration, Mr. O'Connell was a

27 model prisoner.  He was highly regarded by all sectors of the prisons in which he

28 was held, including the prison staff. Mr O'Connell's son was a young boy when

1     he was convicted. For 27 years, Mr. O'Connell was not able to see him grow, but

2     his son always stood by him, and always believed in his father's innocence.

3          8.     On March 29, 2012, a state court granted Mr. O'Connell's petition for

4     a writ of habeas corpus. He was released from custody on bail on April 22, 2012,

5     after having been in continuous custody since January 12, 1984, the date of his

6     arrest. He spent 27 years, 3 months and 10 days in custody. Although entitled to a

7     retrial, the District Attorney declined to re-prosecute Mr. O'Connell on June 11,

8     2012, and all charges were dismissed. Plaintiff now seeks compensation for the

9     extraordinary damage suffered as a result of his wrongful and unlawful

10     conviction. Since it is impossible to restore Plaintiff's lost years, financial

11     compensation is the only remedy available to him.

12   **II.**     **JURISDICTION AND VENUE**

13          9.     This action is brought by Plaintiff Frank O'Connell (hereafter

14     "Plaintiff" or "O'Connell") pursuant to 42 U.S.C. §1983.

15          10.     This Court has jurisdiction under 28 U.S.C. §1343(4) for violations of

16     the 1871 Civil Rights Enforcement Act, as amended, including 42 U.S.C. §1983,

17     and under 28 U.S.C. §1331.

18          11.     The acts and omissions complained of herein commenced on January

19     5, 1984, and continued until June 11, 2012, within the Central District of

20     California. Therefore, venue lies in this District pursuant to 28 U.S.C. §1391.

21   **III.**     **PLAINTIFF**

22          12.     Plaintiff Frank O'Connell was, at the time of the events described

23     herein, a resident of Los Angeles County. All events described herein occurred in

24     Los Angeles County.

25

26

27

28

## IV.    DEFENDANTS

13.    J.D. Smith, at all times relevant herein, was an employee of Los Angeles County, worked for the Los Angeles County Sheriff's Department, and was a resident of the State of California.

14.    Gilbert Parra is deceased. At times relevant herein, he was an employee of Los Angeles County, worked for the Los Angeles County Sheriff's Department, and was a resident of the State of California. Defendant "Estate of Gilbert Parra, Deceased" is entitled to defense and indemnification by the County of Los Angeles. California Prob. Code §550 et seq. permits claims directly against an indemnified estate without the need to join the decedent's personal representative or successor in interest as a party.

15.    Mr. Parra died testate on October 19, 2003. Mr. Parra's estate was administered in probate. The probate matter was closed on October 6, 2008.

16.    Eric G. Parra was the personal representative of Mr. Parra's probate estate and the recipient of his property, if any. On information and belief, Eric Parra is a resident of the State of California.

17.    Defendant County of Los Angeles is, and at all times herein alleged was, a municipal corporation or political subdivision organized and existing under the laws of the State of California. The County of Los Angeles has a statutory duty to provide legal defense for, and indemnification of, County employees for acts committed within the scope of their official duties, and therefore operates as the indemnity insurer of J.D. Smith and Gilbert Parra. *See* Gov't Code §825, 995. The County's duty to indemnify detectives Smith and Parra is not extinguished by death, and extends to the assets of Mr. Parra's estate. The Los Angeles County Sheriff's Department is, and at all times herein alleged was, an agency of the County of Los Angeles.

4

18.     The true names and capacities of Defendants DOES 1 through 10, inclusive, are presently unknown to Plaintiff who therefore sues said Defendants by such fictitious names. Plaintiff will amend this complaint to set forth the true names and capacities of said Defendants when such has been ascertained. Plaintiff is further informed and believes, and upon such information and belief alleges, that each of the fictitiously named Defendants aided and assisted the named Defendants in committing the wrongful acts alleged herein, and that the damages he has sustained, as alleged herein, were proximately caused by such Defendants.

**V.     FACTS**

19.     On January 5, 1984, Jay French was murdered at the apartment building where he lived and worked as a maintenance man. He had been engaged in a longstanding dispute with his ex-wife, Jeanne Lyon, over the custody of their child, Jay, Jr. Mr. French had custody of his son, but litigation over future custody continued and was hotly contested.

20.     According to Jay French's second wife, Gina French, Jeanne Lyon called their home on the morning January 5. Such a call was unusual.

21.     The detectives assigned to the case by the Los Angeles County Sheriff's Department were J. D. Smith and Gilbert Parra (hereafter the "Detectives"). The Detectives  arrived at the crime scene shortly after the shooting. There were several eyewitnesses to various aspects of the events, whose interactions with the Detectives are described below.

22.     The Detectives interviewed Jeanne Lyon on January 6. After denying that she  was involved with the murder of Mr. French, Ms. Lyon volunteered information regarding Plaintiff. She described Plaintiff as a cousin who had been staying with her and her husband for several months, and had moved out not long ago. She later told the Detectives that Plaintiff was not a cousin, was staying somewhere in LaVerne, and gave them a telephone number. She subsequently told

5

1    the Detectives she had been romantically involved with Plaintiff over the summer.

2    Through these and other actions, Ms. Lyon focused the Detectives' attention on

3    Plaintiff.

4          23.    The cornerstone of the prosecution's case was the testimony of

5    eyewitnesses Druecker, Villareal and Soucy. The Defendant Detectives

6    systematically influenced and distorted, or attempted to influence and distort, their

7    eyewitness identifications. They then systematically failed to disclose their

8    conduct and information that might have undermined the identifications. Thus,

9    Plaintiff was prosecuted and convicted based on a combination of false evidence,

10   evidence improperly influenced by the Defendant Detectives, and the suppression

11   by the Defendant Detectives of exculpatory *Brady* evidence.

12         **A.    *EYEWITNESS DANIEL DRUECKER***

13         24.    The first eyewitness was Daniel Druecker. Mr. Druecker testified at

14   the preliminary hearing, the trial, and the evidentiary hearing held on Plaintiff's

15   Petition for a Writ of Habeas Corpus in 2012. His pre-filing statements to the

16   Defendant Detectives were contained in reports prepared by them, which omitted

17   important information and distorted other information.

18         25.    At trial Mr. Druecker described the shooter as Caucasian, brown

19   shoulder length hair, in his '30's, and tall (6' to 6'3"), although Mr. Druecker

20   indicated he was not a good judge of height. Mr. Druecker had described the

21   shooter at different times as with and without facial hair, and wearing a blue T-

22   shirt versus a collared shirt. He identified Plaintiff as the shooter of Jay French at

23   the Preliminary Hearing and Trial. However, he testified at the Habeas evidentiary

24   hearing that he never could identify Plaintiff as the shooter, and felt intimidated

25   into making such an identification by the Defendant Detectives. He testified to the

26   following at the Habeas evidentiary hearing:

27

28

a. On the day of the murder (1/5/84), Mr. Druecker woke up around 9:00 AM. He decided to work on his car and went to the apartment garage. He retrieved his car vacuum from his roommate's car and put it in the driver's side of his car. Mr. Druecker saw the apartment building's maintenance man working.

b. Mr. Druecker wore glasses and contacts in 1984, and had worn them since his freshman year in college. He was nearsighted and had to wear his glasses or contacts when he drove, and at work to see clearly. He did not usually wear them on his days off. He was not wearing them when he went to the garage.

c. Mr. Druecker was leaning into the driver's side of his car when he heard a loud pop which he thought might be a firecracker. After the pop, he heard yelling and running. He got out of the car, and saw the maintenance man running, screaming that he had been shot.

d. Another man was right behind the maintenance man, going in the same direction. The second man stopped, raised a gun, and pointed it. Mr. Druecker heard another bang.

e. Mr. Druecker was scared and confused. He ducked behind a car. He saw the shooter in left profile only, and never had a view of his full face or his right side. He described the shooter as tall with long, dark hair, and said he had a long barreled gun. He saw the shooter for just seconds. It was "just so quick." He had never seen a gun fired before, and was very focused on the gun.

f. Mr. Druecker went to the stairwell. The maintenance man was lying on the doorstep by the manager's door, yelling. There was a lot of blood. Mr. Druecker was scared and wanted to get away. At some point, he heard the maintenance man say that "fucker in the yellow Pinto" shot me, but Mr. Druecker did not see a yellow Pinto.

7

g. Mr. Druecker went to his apartment, and told his roommate what happened. His roommate later went to the scene, and a short time later Mr. Druecker also went there.

h. An officer on the scene asked if anyone had seen anything. Mr. Druecker's roommate said Mr. Druecker had. Mr. Druecker said he thought he could identify the shooter, but wasn't certain because he saw him only briefly.

i. Detectives came to Mr. Druecker's apartment. They asked for a description of the shooter. He told them he couldn't remember and asked if they could put him under hypnosis. They said they couldn't hypnotize him because it couldn't be used in court.

j. Detectives asked if he would meet with a sketch artist. He agreed although he told them he didn't think it would help.

k. The Detectives kept calling him, but he did not want to return the calls. The Detectives came back, showing up one morning on their own. They showed him six photos. Mr. Druecker took that as an indication they must have found the shooter.

l. After being shown the photos and looking at them for a "good while," he told the Detectives that he had not seen the shooter, only his profile. He asked why the photos weren't in profile, and/or if they had profile photos. He told the Detectives he did not recognize anyone in the photos. The men in all photos he was shown had mustaches., He did not recall the shooter having a mustache.

m. After Mr. Druecker told the Detectives he didn't recognize anyone in the photos, their tone changed. They told him to really look at the photos. He interpreted that to mean they had found the guy, knew who he was, and that he had to be one of the photos. Mr. Druecker felt that

1        he had to pick one of the photos, and that the Detectives wouldn't

2        leave until he did.

3    n.  After that, Mr. Druecker pointed to picture number three and asked

4        "Is this the guy?" They responded by asking if this was the person he

5        was identifying as the shooter. He felt they already knew. After they

6        asked him that, he said "I think that's the guy". They said he had to be

7        certain. Then he said that was the guy. He felt intimidated. The

8        Detectives scared him.

9    o.  Mr. Druecker did not choose Mr. O'Connell because he actually

10       recognized him. He did not, in fact, recognize him. He chose him

11       because the hair looked like what he recalled. It was a guess. After he

12       chose photo number three, one of the Detectives made a phone call in

13       his presence saying that a positive ID was made. He interpreted that to

14       mean they caught the guy and that the photo he pointed out was the

15       shooter.

16    p.  After the phone call, he asked the Detectives what the shooting was

17       about. They said it was a love triangle.

18    q.  When Mr. Druecker testified at the preliminary hearing, he pointed to

19       picture number three and said that was the man he saw shoot Jay

20       French. He didn't tell the judge at the preliminary hearing that he did

21       not recognize Plaintiff. He was afraid, and he thought, based on his

22       interactions with the Detectives, that he had identified the right

23       person. However, although he picked out Mr. O'Connell, his

24       testimony was not true. He was not, in fact, able to identify Mr.

25       O'Connell as the shooter.

26    r.  Before the trial, Mr. Druecker met with a prosecuting attorney and the

27       investigators. It was very intimidating. He told them he couldn't

28       remember, and that he needed to read something. He doesn't

1    remember if he told them at that time that he didn't get a good look at
2    the shooter.

3    s.   At the trial, he again picked out photo number three. He again
4         pointed out O'Connell, but not because he recognized him. He did
5         that because he felt he couldn't back out.

6    t.   Although he testified that he was certain of his identification, he in
7         fact was not, and was not able to identify Plaintiff as the person who
8         shot Jay French.

9    u.   He made the identification because he felt the only way out was to
10        give the police, and later the prosecutor, what he thought they wanted,
11        which was to identify Mr. O'Connell as the shooter. He felt coerced
12        into saying what he did because no one in the system would listen to
13        him. He felt intimidated and afraid. He believed the police had caught
14        the right person, and they wanted him to validate what they had done.

15   **B.   *EYEWITNESSES ALEC SANCHEZ AND ARTURO VILLAREAL, AND THE*
16        *YELLOW PINTO.***

17   26.   Arturo Villareal, a delivery person, and another witness, Alec
18   Sanchez, a flagman in the area, both testified at trial that the shooter left the scene
19   of the crime in a yellow Pinto station wagon with faded wooden sides ("the
20   Pinto"), driven by a woman with blonde hair. The Pinto was never recovered. The
21   Detectives' efforts to locate the Pinto consisted of notifying the police in Azusa,
22   where Ms. Lyon lived, and canvassing Ms. Lyon's neighborhood regarding "the
23   want on the yellow Pinto station wagon". There is no indication they notified other
24   police departments in the area of Azusa or South Pasadena, where the shooting
25   occurred. There is no record they checked DMV records for vehicles matching the
26   Pinto's description registered to owners in the area, parking citations issued to such
27   vehicles, or accidents or insurance claims involving such vehicles.

28

27.   Instead, Detective Smith took a photograph at night of a "look alike" Pinto he found parked on a street somewhere in South El Monte; he did not remember which street. The Detective testified at trial that the Pinto station wagon he photographed probably had a license plate, but he did not know.

28.   Mr. Sanchez reported, and later testified, that he saw a yellow Pinto wagon drive away. He provided a general description of the female driver and her male companion as: female with blond or light brown hair, around 25 years old with a thin face, and male as white, 25-39 years old, 165-75 lbs, with long curly brown hair. He did not identify Plaintiff or anyone else as the person he saw driving away. He pointed to photo number 1 as "possibly a resemblance."

29.   The Detectives' police report stated that Mr. Villareal chose Mr. O'Connell, and said he was "the strongest contender, and I'm sure that's him." That is the full extent of the description of the identification in the police report.

30.   Mr. Villareal testified at trial. He testified that he could not identify Plaintiff as the person he saw the day of the murder. He also testified that, when shown the photo lineup, he identified two photographs and told the Detectives he "couldn't be positive." He testified he told the Detectives that Plaintiff's photograph "looked like the person who was there, but I'm not positive." Detective Smith then contradicted Mr. Villareal and testified, as he had written in the police report, that Mr. Villareal had chosen only one photograph, that of Mr. O'Connell, and said he was "the strongest contender, and I'm sure that's him."

31.   Mr. Villareal's testimony was truthful. He could not identify Plaintiff as the person he saw the day of the murder. The foregoing description contained in the police report and reiterated by Detective Smith at trial was false.

11

C. *EYEWITNESS MAURICE SOUCY*

32.     Maurice Soucy lived in the neighborhood in which Jeanne Lyon, Jay French's ex-wife, lived. Mr. O'Connell had a brief romantic encounter with Ms. Lyon the previous summer.

33.     Investigators showed the photograph of the "look alike" yellow Pinto (described in Section IV (B) above) to Ms. Lyon's neighbors, several of whom recognized it as a car that had been parked in the neighborhood. Detectives canvassed the neighborhood to see if anyone could identify the yellow Pinto and associate it with Plaintiff.

34.     As part of this effort, Detectives interviewed Maurice Soucy and his wife on February 6. The police reported prepared by the Detectives indicated that Mr. Soucy took one look at the photo of the yellow Pinto and indicated he had seen a vehicle matching the description in the area, driven by a white male approximately 30 years old, 6' 2", 180 lbs., slender. He said he had seen the individual with Jeanne Lyon kissing her in the front yard, and that the car had remained there overnight on several occasions. Mr. Soucy had helped this person jump start his car, and discussed with him whether anyone in the neighborhood needed carpentry or plumbing work.

35.     The police report then described the photo ID, and stated that, when Mr. Soucy "viewed the folder, he immediately pointed out photograph number three. He stated that was the person who asked him to jump start the yellow Pinto, and was also the same person he had seen hugging and kissing Jeanne Lyon and driving her red Volkswagen.... He said he was able to recognize the individual right away because he was always having car trouble. He told investigators that he knew that this suspect was the same person who lived with Jeanne for a month during the summer until Jeanne's husband came back home."

12

36.     The Detectives never provided copies to the prosecution or the defense of the notes they took contemporaneously with the Soucy interview, one of which states, regarding Mr. Soucy, "I.D. #3 & poss. #1" and the other of which says he "picked out #3 as poss. [possible] suspect because of face but hair was curlier." Immediately following that statement, the name "Maurice" is noted. In the police report, the Detectives state that it was Ina Soucy who referred to the hair being curlier, not Maurice Soucy, contrary to what the notes indicate. The Detectives never revealed in any police reports that Mr. Soucy made the statements quoted above from the Detectives' notes.

37.     At trial, Mr. Soucy identified Plaintiff in court, and testified he had seen him driving a Pinto like that depicted in the photograph on numerous occasions and had spoken to him twice. The defense briefly cross-examined Mr. Soucy as to his identification of Plaintiff's photograph without the knowledge that, contrary to the police report, Mr. Soucy had not immediately identified Plaintiff's photograph. The previously undisclosed notes of the Detectives were critical to the accuracy of his identification. The notes reveal that Mr. Soucy did not positively identify Plaintiff's photograph. Instead, he chose the same two photographs chosen by Mr. Villareal.

38.     The defense did not have an opportunity to question the accuracy of Mr. Soucy's identification of Plaintiff with information disclosed in the recently discovered notes. Accordingly, there was no evidence available at trial that Mr. Soucy, despite his testimony that he had seen Plaintiff with the Pinto many times and had spoken with him twice, was equivocal in his identification when he viewed the photo lineup.

**D.     SUPPRESSION OF EVIDENCE OF AN ALTERNATIVE SUSPECT.**

39.     The cornerstone of the prosecution's case was the testimony of eyewitnesses Druecker, Villareal and Soucy. The prosecution then bolstered its

13

1    case with the powerful last dying words of the victim. As he lay dying, Mr. French
2    declared that "that fucker in the yellow Pinto shot me" and that "he was going to
3    die and it had to do with something with Jeanne [Lyon], it looked like somebody
4    she hangs around with or somebody she hung around with."

5        40.    The prosecution contended that Mr. French's dying declaration
6    pointed solely to Plaintiff as the former boyfriend of Mr. French's ex-wife.
7    However, the Detectives had obtained information indicating a previous attempt on
8    Jay French's life by Jeanne Lyon and Randy Smith. There is a detective's note
9    never provided to the prosecution or the defense, nor was the information shown in
10   it ever communicated. This information states that Mr. French's "x wife attempted
11   to run over v [victim] while trying to serve her papers for child custody. Jeannie
12   was pres. in her Capri car (green). Another guy was driving. Report of incident
13   made to (June '80) Pas. PD. Randy Smith driver of car." That note indicates that
14   the Detectives were advised by Jay French's attorney of a "previous attempt on
15   vict. [victim]."

16       41.    Another note indicated that, in May 1980, Mr. French was working at
17   Sacred Hearts Girls School in La Canada, and living in Montrose. He was "riding
18   his cycle to work. Jeanne and a man named 'Randy' were waiting at the road
19   where v would be riding. ¶ Randy was driving a green Capri registered to Jeanne
20   Marie Hernandez. ¶ Randy attempted to run v down, a report was filed and
21   attorney Peter Wisner has info on date of occurrence. ¶ Randy Smith is tall with
22   sandy or blond hair."

23       42.    This information regarding the prior attempt on his life gives Mr.
24   French's dying declaration additional meaning, and an alternative interpretation
25   which alone, if known, could well have altered the outcome of this case. Rather
26   than identifying Plaintiff, Mr. French instead may have been identifying someone
27   else. The description of Mr. Smith as tall with sandy or blond hair was similar to
28   the description provided by witnesses of the person at the scene of the murder.

E.   *PLAINTIFF PRESENTED SUBSTANTIAL ALIBI AND OTHER EXCULPATORY EVIDENCE AT THE TRIAL.*

43.   Plaintiff called three witnesses who resided in the neighborhood where Jeanne Lyon was living. Jean Wilson and Brenda Rogers lived next door to Ms. Lyon, and Pamela Wilson lived across the street. All three testified that they had not seen a yellow Pinto station wagon parked on the street in 1983, that they knew Plaintiff from when he had been staying with Ms. Lyon, and that they had never seen him driving a yellow Pinto in the neighborhood. Ms. Wilson testified that Plaintiff drove a brown station wagon with "woody" sides.

44.   Karen Baxter, James Hamilton and Scott Eggerer all testified at trial that Plaintiff was at the house where he was staying with Hamilton and Eggerer in LaVerne on January 5. Hamilton and Eggerer testified that Plaintiff was at the house all morning. Baxter arrived at the house between 1:35-2:00, approximately 20 minutes after she got off work. According to all three, Plaintiff was there when Baxter arrived, and was still there some twenty minutes later when the other three went to lunch. Although not asked at trial, all three would testify that they never saw Plaintiff with a yellow Pinto.

45.   The murder of Mr. French occurred shortly before 1:15 p.m. which is the time the first officer arrived on the scene. Based on the testimony of Plaintiff's roommates and Ms. Baxter, it was impossible for Plaintiff to have committed the murder.

F.   *THE TOTALITY OF THE UNDISCLOSED EVIDENCE WAS MATERIAL TO THE OUTCOME OF THE TRIAL.*

46.   With the undisclosed evidence, the defense would have been able to interview and present witnesses inculpating Ms. Lyon and others and exonerating Plaintiff. In turn, this would have provided greater credence to the three alibi witnesses, substantially undermined the reliability of the eyewitness testimony, and

15

1  given rise to the inference that someone other than Plaintiff was the person Mr.

2  French was referring to when he made his dying declaration.

3      47.    Not only was the same custody battle continuing at the time of the

4  murder that was going on at the time of the previous attempt on his life, but there

5  was a pending court hearing concerning results of psychiatric examinations of Jay

6  French Jr. when Mr. French was killed. Ms. Lyon had a compelling desire for

7  custody of her child and an end to the long custody battle. As with the previous

8  attempt on Mr. French's life, once again a tall, blonde man was the perpetrator, and

9  this time succeeded in killing Mr. French with a gun, rather than a car. Once again,

10  a woman was aiding the effort, not as the passenger, but as the driver of the get-

11  away car. In both instances, the car involved was never recovered.

12      48.    Rather than identifying Plaintiff, Mr. French instead was identifying

13  someone else, as Plaintiff in fact had no involvement in his murder. Declarations

14  from Ms. Lyon's sister, an ex-husband, an ex-boyfriend, a former friend, and a

15  former co-worker, discussed below,  establish that Ms. Lyon has made numerous

16  self-inculpatory statements exonerating Plaintiff. With the withheld evidence of a

17  prior attempt on Mr. French's life, the defense would have known to investigate

18  Ms. Lyon in depth.  They would have discovered and presented witnesses

19  inculpating Ms. Lyon and exonerating Plaintiff. This, in turn, would have

20  permitted the trier of fact to draw a different inference from Mr. French's dying

21  declaration. Even if such new witnesses did not come forward, evidence of the

22  prior attempt, along with the description of Randy Smith, would have seriously

23  undermined the inference that Mr. French was referring to Mr. O'Connell in his

24  dying declaration.

25      **G.**    *THERE IS SUBSTANTIAL NEW EVIDENCE OF PLAINTIFF'S INNOCENCE.*

26      49.    While it was known that Jeanne Lyon was potentially involved in the

27  murder of Mr. French, little was done to fully investigate evidence of her

28

1   involvement. After Plaintiff was convicted and had been incarcerated for many
2   years, all the while protesting his innocence, Centurion Ministries agreed to
3   investigate his case. Centurion Ministries' mission is to free innocent individuals
4   from prison who 1) had absolutely nothing whatsoever to do with the crimes for
5   which they were convicted and 2) were sentenced to either a life sentence or death.
6   In conjunction with and under the supervision of counsel, Centurion Ministries
7   exhaustively investigated this case. In the course of doing so, it interviewed
8   numerous associates, friends and relatives of Jeanne Lyon, including Ms. Lyon's
9   sister, an ex-husband, an ex-boyfriend, a former friend, and a former co-worker. It
10  is beyond reasonable dispute that Ms. Lyon made numerous statements against
11  penal interest to the effect that she had hired an anonymous hit man to murder Jay
12  French, and that Plaintiff was innocent.

13       50.   On two separate occasions separated by several years, Jeanne Lyon
14  told Debbie Zitella, her younger sister, that James Mack, a disbarred attorney,
15  found a hit man for her to murder Jay French, that the hired hit man was the one
16  who killed Jay French, and that the real killer was a married man who did this on
17  the side. On several occasions before Mr. French's murder, Jeanne Lyon had told
18  Ms. Zitella that she wanted to have Mr. French killed so that she could regain
19  custody of their son.

20       51.   Mike Flick is a former husband of Jeanne Lyon. They met in the late
21  1980's when Ms. Lyon moved to Oregon with her sons, Jay Jr. and Ben. Ms. Lyon
22  told Mr. Flick that she arranged to have Mr. French killed. Ms. Lyon said the killer
23  was hired by her former husband, Ed Lyon for the sum of $10,000, and that he met
24  the killer in a bar. Ms. Lyon further told Mr. Flick that a lawyer in her office, Jim
25  Mack, handled the payment. She told Mr. Flick that Plaintiff was innocent and was
26  convicted because he had gone out with her before.

27       52.   Boone Maynard met Jeanne Lyon in the early 1990's. Mr. Maynard is
28  a paraplegic who first met Ms. Lyon in her capacity as a home health care worker

who cared for him. Their relationship became romantic. Ms. Lyon told Mr. Maynard tearfully that she had arranged for Mr. French's murder and felt bad that an innocent man was convicted. She told this to Mr. Maynard on several occasions.

53.    Rebecca Morse is a resident of Oregon who worked for Ms. Lyon in the late 1990's when she was married to Mike Flick. Ms. Lyon told Ms. Morse that her ex-husband had to be killed to prevent him getting custody of her son, and that his murder was set up with the help of a lawyer who worked in same office where she worked.

54.    At the time of the murder, Ms. Lyon was working in the law office of Mary Hilyard. Disbarred attorney James Mack (now deceased) was interviewed before his death. He stated that he heard a discussion between Ms. Lyon and Ed Lyon about hiring someone to kill Mr. French, and that Ms. Lyon told him she had hired someone to kill Mr. French. According to Mr. Mack, Ms. Lyon once introduced him to the hit man when they were having lunch. Plaintiff asserts that Mr. Mack, having realized that information concerning his involvement in the murder had come to light, fabricated the story regarding being introduced to the hit man to account for why his name might have come up in connection with the murder.

55.    Ms. Lyon told Centurion Ministry investigators that Plaintiff is innocent although she denied her own involvement.

56.    There is further evidence of innocence available now as well.

   a. Many people are available to testify that they knew Plaintiff at the time of the murder, that he was not in any kind of relationship with Ms. Lyon at that time, and that that they had never seen him with a yellow Pinto.

   b. Ed Lyon, Ms. Lyon's former husband, has stated that Plaintiff's relationship with Ms. Lyon ended months before the murder.

c. Leslie Haynam, nee Davis, who has a son with Plaintiff, is available to testify that she was awakened between 1:00-2:00 p.m. by a knock on the door at her home in Covina (near LaVerne). She knows the time because a soap opera on at that hour was playing. Plaintiff was at the door; he said his roommates had gone to lunch, and he decided to come over. Plaintiff spent the rest of the day and night at her apartment. She never saw him with a yellow Pinto; he had a tan Galaxy. Plaintiff left for Santa Barbara the next day to look for work. When he returned, she told him the police were looking for him. Though subpoenaed, she was not called as a defense witness.

d. Gary Lewis, a long time friend of Mr. O'Connell, will state that Plaintiff was living with a woman named Jeanne, and that Plaintiff moved out of that situation in 1983. He never saw Plaintiff with a yellow Pinto.

## VI. DEFENDANTS DEPRIVED PLAINTIFF OF HIS DUE PROCESS RIGHT TO A FAIR TRIAL

57. The sole eyewitness to identify Mr. O'Connell as the person who shot Jay French was Daniel Druecker. In the January 10, 1984, police report, the sole information provided regarding Mr. Druecker's identification of Mr. O'Connell as the person who shot Jay French was that Mr. Druecker, after being admonished regarding the identification procedure, "after looking at the folder for approximately one minute he pointed to photograph #3, that of Frank O'Connell, and stated that he was positive he was the man he had seen fire the weapon."

58. The Defendant Detectives withheld from their police reports and subsequently, and from both the prosecution and the defense, exculpatory evidence regarding eyewitness Daniel Druecker's identification of Mr. O'Connell as the person who shot Jay French, including:

19

1  a.  eyewitness Daniel Druecker told the Defendant Detectives he was not

2 certain of his identification;

3  b.  eyewitness Druecker told the Defendant Detectives he could not

4 remember and asked to be placed under hypnosis;

5  c.  eyewitness Druecker told the Defendant Detectives he did not think

6 speaking with a sketch artist would help;

7  d.  eyewitness Druecker initially told the Defendant Detectives he did not

8 recognize any of the any of the photos in the photospread;

9  e.  eyewitness Druecker pointed to photo #3 (Mr. O'Connell) and asked

10 if that was the guy, to which the Defendant Detectives responded that he

11 needed to look really hard;

12  f.  Defendant Detectives told eyewitness Druecker that he had to be

13 certain of his identification, after which Mr. Druecker said he thought that Mr.

14 O'Connell was the guy;

15  g.  only after the foregoing exchange did Mr. Druecker say that Mr.

16 O'Connell was the shooter;

17  h.  Defendant Detectives communicated to eyewitness Druecker that they

18 expected him to make an identification;

19  i.  after eyewitness Druecker identified Mr. O'Connell, one of the

20 Defendant Detectives made a phone call in Mr. Druecker's presence saying a

21 positive ID was made, which communicated to eyewitness Druecker that he

22 had chosen the "right" person;

23  j.  one of the Defendant Detectives told eyewitness Druecker that the

24 murder involved a love triangle;

25  k.  when eyewitness Druecker testified at the preliminary hearing and

26 trial, he did not describe any of the facts set out in ¶¶56(a)-(j), and his

27 testimony left the impression that he was and had always been certain of his

28 identification. Defendant Smith, who was present for the testimony and aware

20

of those facts, did not disclose the omitted information even at that time.  He did not correct the impression that Mr. Druecker was, and always had been, certain of his identification, thereby leaving the trier of fact with the misleading impression that the identification process was uninfluenced and untainted, and that Mr. Druecker was and always had been certain of his identification.

59.    The Defendant Detectives withheld  from their reports and subsequently, and from both the prosecution and the defense, exculpatory evidence regarding eyewitness Maurice Soucy's identification of Mr. O'Connell as the person he saw driving a yellow Pinto in the area where Jay French's ex-wife was living.  This was used to tie Mr. O'Connell to the scene of the murder because a yellow Pinto wagon was identified as the car in which the shooter escaped. The withheld evidence included:

a.      Withholding a detectives' note stating, with regard to Mr. Soucy, "ID #3 & poss #1 & photos of Pinto & put Frank as positive ID with Pinto" indicating that the initial identification was not a positive identification, contrary to the trial testimony;

b.      withholding a second detectives' note stating that Mr. Soucy "pointed out #3 as poss suspect because of face – but hair was curlier,";

c.      when eyewitness Soucy testified at the preliminary hearing and trial, he did not describe any of the facts set out in ¶¶ 57(a)-(b), and his testimony left the impression that he was, and had always been, certain of his identification. Defendant Smith, who was present for the testimony and aware of those facts, did not disclose the omitted information even at that time, and did not correct the impression that Mr. Soucy was and always had been certain of his identification, thereby leaving the trier of fact with the misleading impression that Mr. Soucy was, and always had been certain of his identification.

21

1    60.    The Defendant Detectives further withheld from their reports and
2  subsequently, and from both the prosecution and the defense, exculpatory evidence
3  regarding eyewitness Arturo Villareal's identification of Mr. O'Connell as the
4  person he saw fleeing the scene in a yellow Pinto. The January 10, 1984, police
5  report prepared by the Defendant Detectives stated that Mr. Villareal identified Mr.
6  O'Connell's photograph in the photo lineup as "the strongest contender, and I'm
7  sure that's him." This was false. Mr. Villareal testified at trial that he identified two
8  photographs in the photo lineup (just as Mr. Soucy had) and told the detective he
9  "couldn't be positive." He testified that he said Plaintiff's photograph "looked like
10  the person who was there, but I'm not positive." At trial, Detective Smith offered
11  impeachment testimony of Mr. Villareal, maintaining that Mr. Villareal identified
12  Plaintiff's photograph in the photo lineup as "the strongest contender, and I'm sure
13  that's him." The Defendant Detectives failed to disclose the following exculpatory
14  evidence regarding Mr. Villareal:

15      a.    that Mr. Villareal chose two photographs and stated with reference to
16      Mr. O'Connell that he couldn't be positive;

17      b.    that the statement in the January 10 police report that Mr. Villareal
18      was sure Mr. O'Connell was the person he saw was false;

19      c.    that Defendant Smith's statement at the trial that Mr. Villareal said he
20      was sure Mr. O'Connell was the person he saw was false.

21    61.    The actions of the Defendant Detectives' described above were
22  improperly suggestive and improperly influenced the eyewitness identifications of
23  Plaintiff. On information and belief, the Defendant detectives engaged in
24  improperly suggestive conduct, and conveyed information regarding Plaintiff, not
25  only with regard to witness Druecker, but also with regard to witnesses Soucy and
26  Villareal, thereby improperly influencing, or attempting to influence, their
27  eyewitness identifications.

28

1    62.    The Defendant Detectives further withheld from their reports and

2    subsequently, and from both the prosecution and the defense, exculpatory evidence

3    regarding the existence of a previous attempt on Jay French's life and alternative

4    suspects. Specifically, Defendant Detectives were advised and had notes indicating

5    that Jay French had been riding his motorcycle when his ex-wife, Jeanne, and a

6    white male named Randy Smith were in a green Capri, registered to his ex-wife,

7    waiting at the road he would be riding; Randy Smith was driving and attempted to

8    run Mr. French down; Mr. Smith is tall with sandy blond hair; and a police report

9    on the incident was filed. The description of Mr. Smith provided to the Defendant

10   Detectives was similar to the description of the person who murdered Mr. French.

11   The Defendant Detectives did not provide this information or their notes to either

12   the prosecution or the defense.

13   63.    The Defendant Detectives caused the presentation of false evidence at

14   the trial of Mr. O'Connell by making the following false statements in police

15   reports presented to the prosecution and ultimately the defense:

16   a.    That Mr. Druecker stated he was positive that Mr. O'Connell was the

17   person he saw shoot Jay French, which, when coupled with the omission of

18   Mr. Druecker's other statements regarding the identification and the

19   Defendant Detectives' interactions with Mr. Druecker, falsely communicated

20   that Mr. Druecker had made an unequivocal and untainted identification

21   (January 10, 1984 Police Report).

22   b.    That Mr. Villareal told them he was sure that Mr. O'Connell was the

23   person he saw fleeing the scene (January 10, 1984 Police Report).

24   c.    That, after being shown the photospread, 1) Mr. Soucy immediately

25   pointed out photo #3 and stated that that was the person who asked him to

26   jump start the yellow Pinto, and 2) Mr. Soucy said he was able to recognize

27   the individual right away. (February 8, 1984, police report).

28

23

64.     Through the foregoing conduct, Defendant Detectives put in motion before charges were ever filed against Plaintiff a chain of events resulting in and causing his prosecution and ultimate conviction for a murder he did not commit, and of which he was innocent, based on materially false evidence, the suppression of materially exculpatory evidence, and on improperly suggestive eyewitness identification.

## VII.   PARTICIPATION, STATE OF MIND AND DAMAGES

65.     All Defendants acted illegally under color of law.

66.     Each Defendant Detective participated in the violations alleged herein, and/or directed the violations alleged herein, and/or knew or should have known of the violations alleged herein and failed to act to prevent them. Each Defendant ratified, approved or acquiesced in the violations alleged herein.

67.     As joint actors with joint obligations, each Defendant was and is responsible for the failures and omissions of the other.

68.     Each Defendant acted individually and in concert with the other Defendants and others not named in violating Plaintiff's rights.

69.     Each Defendant acted deliberately, purposefully, knowingly and/or with a deliberate indifference to, or reckless disregard for, an accused's rights, or for the truth, in engaging in the conduct alleged herein.

70.     As a direct and proximate result of the aforesaid acts, omissions, customs, practices, policies and decisions of the Defendants, Plaintiff was wrongfully incarcerated for over 27 years.

71.     Due to the acts of the Defendants, Plaintiff has suffered, and continues to suffer, and is likely to suffer in the future, extreme and severe mental anguish, mental and physical pain and injury, suffering, anguish, fright, nervousness, anxiety, shock, humiliation, indignity, embarrassment, harm to reputation, and

24

1   apprehension. For such injury, Plaintiff has incurred and will continue to incur
2   significant damages.

3       72.   As a further result of the conduct of each of these Defendants,
4   Plaintiff has lost past and future earnings in an amount to be determined according
5   to proof at trial.

6       73.   As a further result of the conduct of each of these Defendants,
7   Plaintiff has been deprived of familial relationships, including his inability to see
8   his son, Nick, who was four years old when his father was convicted, grow up.

9       74.   The aforementioned acts of Defendants, and each of them, was
10  willful, wanton, malicious, oppressive, in bad faith, engaged in knowingly and
11  purposefully, and/or done with reckless disregard or with deliberate indifference to
12  the constitutional rights of the Plaintiff and the truth.

13      75.   Plaintiff is entitled to exemplary and punitive damages from
14  Defendant Smith in an amount to be proven at the trial of this matter. He does not
15  seek punitive damages against any other defendant.

16  **VIII. AS THE RESULT OF THE LOS ANGELES COUNTY SHERIFF'S**
17  **POLICIES, CUSTOMS AND PRACTICES VIOLATING THE RIGHT**
    **TO BE FREE FROM IMPROPER AND SUGGESTIVE**
18  **EYEWITNESS IDENTIFICATIONS, AND WITHHOLDING**
19  **EXCULPATORY EVIDENCE, SUGGESTIVE EYEWITNESS**
    **IDENTIFICATION PROCEDURES WERE EMPLOYED WITH**
20  **EYEWITNESSES IN THIS CASE AND EXCULPATORY EVIDENCE**
21  **WAS WITHHELD.**

22      76.   On information and belief, the Los Angeles County Sheriff's
23  Department ("LASD") had no established or clear policy  regarding the following
24  issues pertaining to eyewitness identification and exculpatory (*Brady*) information:
25  a) ensuring that eyewitness identification procedures complied with the
26  requirements of due process, including those set out in *Manson v. Braithwaite* and
27  *Neil v. Biggers*; b) ensuring that Sheriff's deputies, whether through inadvertence
28  or design, did not provide information to potential eyewitnesses that influenced the

1   identification; c) fully and completely documenting Sheriff's deputies' interactions

2   with eyewitnesses; d) adequately training Sheriff's deputies not to influence

3   eyewitness identifications and to provide exculpatory eyewitness identification

4   information to the prosecutor(s) in the case in which the in which the eyewitness

5   was making an identification; and e) adequately supervising Sheriff's deputies to

6   ensure that eyewitness identifications were not influenced by officers conducting

7   them and to ensure that exculpatory eyewitness identification information was

8   provided to the prosecutor(s) in the case in which the eyewitness was making an

9   identification.

10       77.   To the extent that the LASD had policies regarding the issues set out

11   in the foregoing paragraph, the policies were not adequately implemented by

12   Sheriff's deputies in cases in which an eyewitness was used. Not only were any

13   such titular policies not implemented or followed, but the Los Angeles County

14   Sheriff's Department had a custom and practice of a) providing eyewitness

15   testimony that was the result of suggestive eyewitness identification procedure; b)

16   failing to ensure that eyewitness identification procedures complied with the

17   requirements of due process, including those set out in *Manson v. Braithwaite* and

18   *Neil v. Biggers*; c) failing to ensure that Sheriff's deputies, whether through

19   inadvertence or design, did not provide information to potential eyewitnesses that

20   influenced the identification; d) failing to ensure that Sheriff's deputies fully and

21   completely documented their interactions with eyewitnesses; e) failing to properly

22   or adequately train Sheriff's deputies in how to conduct eyewitness identification

23   in a manner that would not influence the identification; and f) failing to properly or

24   adequately supervise Sheriff's deputies regarding the conduct of eyewitness

25   identification in a manner that would not influence the identification.

26       78.   The policies, practices and customs set forth in the preceding two

27   paragraphs meant that eyewitness testimony provided by witnesses interviewed by

28   LASD personnel was frequently the product of suggestive eyewitness

26

1  identifications and was unreliable. The need for proper policies, training and
2  supervision was obvious.

3      79.  On information and belief, the LASD had no established or clear
4  policy regarding the following issues pertaining to exculpatory evidence: a)
5  maintaining files and information regarding the provision of exculpatory evidence
6  to prosecutors and/or defense counsel; b) ensuring that exculpatory evidence was
7  provided to the prosecutor(s) in the case(s) in which it was relevant; c) training
8  police personnel in the provision of exculpatory evidence; and d) supervising
9  police personnel in the provision of exculpatory evidence.

10      80.  To the extent that the LASD had policies regarding the issues set out
11  in the foregoing paragraph, the policies were not known to, or implemented by,
12  police personnel in cases in which exculpatory evidence existed. Not only were
13  any such titular policies not implemented or followed, but the Los Angeles County
14  Sheriff's Department had a custom and practice of a) failing to maintain files and
15  information regarding the provision of exculpatory evidence to prosecutors and/or
16  defense counsel; b) failing to provide exculpatory evidence to prosecutors; c)
17  failing to adequately train police personnel in the provision of exculpatory
18  evidence; and d) failing to adequately supervise police personnel in the provision
19  of exculpatory evidence.

20      81.  The policies, practices and customs set forth in the preceding two
21  paragraphs meant that certain exculpatory, material information did not reach
22  prosecutors handling the cases regarding which the information was exculpatory,
23  and therefore did not reach defendants who needed the information in order to
24  defend themselves, thereby depriving them of a fair trial. The need for proper
25  policies, training and supervision was obvious.

26      82.  The actions, inactions and/or omissions of the LASD set forth in the
27  preceding six paragraphs were known, or should have been known, to the
28  policymakers responsible for the LASD, and occurred with deliberate indifference

to either the recurring constitutional violations elaborated above, and/or to the strong likelihood that constitutional rights would be violated as a result of failing to train, supervise or discipline in areas where the need for such training was obvious.

**IX.    CLAIM FOR RELIEF AGAINST INDIVIDUAL DEFENDANTS 42 U.S.C. §1983 – INCLUDING VIOLATIONS OF DUE PROCESS, SUPPRESSION OF EXCULPATORY INFORMATION, FABRICATION OF EVIDENCE, SUGGESTIVE EYEWITNESS IDENTIFICATION, RECKLESS INVESTIGATION (Against J.D. Smith, the Estate of Gilbert Parra and Eric Parra)**

83.    Plaintiff re-alleges all foregoing paragraphs, as well as any subsequent paragraphs contained in the complaint, as if fully set forth herein.

84.    Detectives Smith and Parra, while acting under color of law, deprived Plaintiff of his constitutional right to due process of law by, inter alia, 1) failing to memorialize, relay and/or disclose material exculpatory evidence and information to the prosecutors handling his case so that it could, in turn, be provided to Plaintiff's defense counsel, thereby setting in motion a chain of events that resulted in a criminal trial at which material, exculpatory evidence was suppressed by the government; 2) by deliberately fabricating information presented as evidence of Plaintiff's guilt in police reports, statements or other out of court documents thereby setting in motion a chain of events that resulted in the presentation of fabricated evidence at Plaintiff's criminal trial that was material to the outcome; 3) by engaging in suggestive eyewitness identification tactics that resulted in fundamentally unreliable eyewitness identifications that were material to the outcome at trial; and 4) by recklessly disregarding exonerating evidence, recklessly disregarding alternate suspect evidence, and coaching witnesses' testimony to falsely implicate Plaintiff in the face of contrary evidence.

85.    The exculpatory, fabricated and unreliable evidence referred to in the preceding paragraph includes, but is not limited to, the information presented in earlier paragraphs of this Complaint.

28

86. Had the exculpatory evidence been disclosed, there is a reasonable probability that it would have resulted in an outcome more favorable to Plaintiff, or, phrased differently, the withholding of the evidence undermines confidence in the verdict.

87. Had the fabricated evidence presented at trial as a result of Defendants' conduct not been presented, it could have resulted in a different verdict.

88. One or more of the acts and omissions alleged herein were a cause of Plaintiff's conviction.

89. The constitutional source of the violations and obligations asserted herein is primarily the due process clause of the Fifth and Fourteenth Amendments. Plaintiff's due process rights were violated by the conduct alleged herein. Plaintiff brings this claim as both a procedural and a substantive due process violation. To the extent that any Court were to conclude that the source of Plaintiff's right under this claim is any constitutional source other than due process, this claim is brought on those bases as well.

90. Acting under the color of state law, Defendants Smith, Parra and others acted in concert, conspiring and agreeing to deprive Plaintiff of rights, privileges, or immunities secured by the Constitution and laws of the United States.

91. Defendants Smith and Parra were each jointly and severally responsible for the investigation and related activity that resulted in Plaintiff's conviction. Each engaged in, knew, or should have known of the unconstitutional conduct alleged herein and failed to prevent it, which each had a responsibility to do, and each ratified, approved or acquiesced in it.

92. As a result of Defendants Smith and Parra's, and each of their, violations of Plaintiff's rights as alleged herein, Plaintiff was damaged as alleged above.

29

**X.    CLAIM FOR RELIEF AGAINST ENTITY DEFENDANTS 42 U.S.C. §1983 – *MONELL* VIOLATIONS, INCLUDING POLICY/CUSTOM OF FAILURE TO DISCLOSE EXCULPATORY EVIDENCE, FABRICATION OF EVIDENCE, SUGGESTIVE EYEWITNESS IDENTIFICATIONS.**

**(Against Defendants County of Los Angeles and Los Angeles County Sheriff's Department)**

93.    Plaintiff re-alleges all the foregoing paragraphs, as well as any subsequent paragraphs contained in the complaint, as if fully set forth herein.

94.    The particular policies, customs, practices, failures and/or omissions complained of in this cause of action have been set forth in previous paragraphs.

95.    Plaintiff is informed and believes and thereon alleges that, at all times herein mentioned, Defendants County of Los Angeles and Los Angeles County Sheriff's Department, with deliberate indifference, and/or conscious or reckless disregard to the safety, security and constitutional and statutory rights of Plaintiff and others accused of crimes, including the right to due process of law under the Fourteenth Amendment, and with similar indifference to or disregard for the truth, maintained, enforced, tolerated, ratified, permitted, acquiesced in, and/or applied the policies, practices and customs, actions, inactions and omissions set forth in Section IX above, regarding eyewitness identifications, failure to disclose exculpatory evidence and presentation of deliberately fabricated evidence.

96.    One of more of the policies, customs, practices, failures and/or omissions complained of in this cause caused the deprivation of Plaintiff's rights by Detectives Smith and Parra; that is, one of more of them was so closely related to the deprivation of Plaintiff's rights as to be a moving force that played a part in causing the ultimate injury.

97.    As a direct and proximate result of Defendant County of Los Angeles' acts and omissions as alleged herein, Plaintiff was damaged as alleged above.

1      WHEREFORE, Plaintiff Frank O'Connell requests relief on his own behalf as
2  follows and, according to proof, against each Defendant:

3      1.    General and compensatory damages in an amount according to proof;

4      2.    Special damages in an amount according to proof;

5      3.    Exemplary and Punitive damages against Defendant J.D. Smith, in an
6            amount according to proof;

7      4.    Costs of suit, including attorneys' fees, under 42 U.S.C. §1988; and,

8      5.    Such other relief as may be warranted or as is just and proper.

9  DATED: March 18, 2013          Respectfully Submitted,

10                                 KAYE, McLANE, BEDNARSKI & LITT

11

12                                 By _____
13                                    Barrett S. Litt
14                                    Attorneys for Plaintiff

15

16                                **JURY DEMAND**
17

18      Trial by jury of all issues is demanded.

19

20  DATED: March 18, 2013          Respectfully Submitted,

21                                 KAYE, McLANE, BEDNARSKI & LITT

22

23                                 By _____
24                                    Barrett S. Litt
25                                    Attorneys for Plaintiff

26

27

28

                                     31

Name & Address: Barrett S. Litt, SBN 45527
Ronald O. Kaye, SBN145051
Lindsay B. Battles, SBN 262862
Kaye, McLane, Bednarski & Litt
234 East Colorado Boulevard, Suite 230
Pasadena, California 91101

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| FRANK O'CONNELL | CASE NUMBER |
|---|---|
| PLAINTIFF(S) | CV13-01905-MAN |
| v. | |
| J.D. SMITH; ESTATE OF GILBERT PARRA; ERIC PARRA; COUNTY OF LOS ANGELES and DOES 1-10 | SUMMONS |
| DEFENDANT(S). | |

TO:      DEFENDANT(S):

A lawsuit has been filed against you.

Within _30_ days after service of this summons on you (not counting the day you received it), you must serve on the plaintiff an answer to the attached ☑ complaint ☐ _____ amended complaint ☐ counterclaim ☐ cross-claim or a motion under Rule 12 of the Federal Rules of Civil Procedure.  The answer or motion must be served on the plaintiff's attorney, _Barrett S. Litt_____, whose address is _234 East Colorado Boulevard, Suite 230, Pasadena, California 91101_.  If you fail to do so, judgment by default will be entered against you for the relief demanded in the complaint.  You also must file your answer or motion with the court.

Clerk, U.S. District Court

Dated: __MAR 18 2013__

By: _____

MARILYN DA____

Dep____

(Seal of the Court)

*[Use 60 days if the defendant is the United States or a United States agency, or is an officer or employee of the United States. Allowed 60 days by Rule 12(a)(3)].*

**CIVIL COVER SHEET**

**I. (a) PLAINTIFFS** ( Check box if you are representing yourself ☐ )

FRANK O'CONNELL

**DEFENDANTS** ( Check box if you are representing yourself ☐ )

J.D. SMITH; ESTATE OF GILBERT PARRA; ERIC PARRA, COUNTY OF LOS ANGELES and DOES 1-10

**(b) Attorneys (Firm Name, Address and Telephone Number. If you are representing yourself, provide same.)**
Barrett S. Litt, Ronald O. Kaye, Lindsay B. Battles
Kaye, McLane, Bednarski & Litt
234 East Colorado Boulevard, Suite 230, Pasadena, California 91101
Phone: 626-844-7660; E-mail: blitt@kmbllaw.com; Fax: 626-844-7670

**(b) Attorneys (Firm Name, Address and Telephone Number. If you are representing yourself, provide same.)**

**II. BASIS OF JURISDICTION** (Place an X in one box only.)

☐ 1. U.S. Government Plaintiff

☒ 3. Federal Question (U.S. Government Not a Party)

☐ 2. U.S. Government Defendant

☐ 4. Diversity (Indicate Citizenship of Parties in Item III)

**III. CITIZENSHIP OF PRINCIPAL PARTIES**-For Diversity Cases Only
(Place an X in one box for plaintiff and one for defendant)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business in this State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business in Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

**IV. ORIGIN** (Place an X in one box only.)

☒ 1. Original Proceeding
☐ 2. Removed from State Court
☐ 3. Remanded from Appellate Court
☐ 4. Reinstated or Reopened
☐ 5. Transferred from Another District (Specify)
☐ 6. Multi-District Litigation

**V. REQUESTED IN COMPLAINT: JURY DEMAND:** ☒ Yes ☐ No (Check "Yes" only if demanded in complaint.)

**CLASS ACTION under F.R.Cv.P. 23:** ☐ Yes ☒ No  ☒ **MONEY DEMANDED IN COMPLAINT:** $ To Be Determined

**VI. CAUSE OF ACTION** (Cite the U.S. Civil Statute under which you are filing and write a brief statement of cause. Do not cite jurisdictional statutes unless diversity.)
42 U.S.C. Sec. 1983; Deprivation of Civil Rights

**VII. NATURE OF SUIT** (Place an X in one box only.)

| OTHER STATUTES | CONTRACT | REAL PROPERTY CONT. | IMMIGRATION | PRISONER PETITIONS | PROPERTY RIGHTS |
|---|---|---|---|---|---|
| ☐ 375 False Claims Act | ☐ 110 Insurance | ☐ 240 Torts to Land | ☐ 462 Naturalization Application | **Habeas Corpus:** | ☐ 820 Copyrights |
| ☐ 400 State Reapportionment | ☐ 120 Marine | ☐ 245 Tort Product Liability | ☐ 465 Other Immigration Actions | ☐ 463 Alien Detainee | ☐ 830 Patent |
| ☐ 410 Antitrust | ☐ 130 Miller Act | ☐ 290 All Other Real Property | | ☐ 510 Motions to Vacate Sentence | ☐ 840 Trademark |
| ☐ 430 Banks and Banking | ☐ 140 Negotiable Instrument | **TORTS** | **TORTS** | ☐ 530 General | **SOCIAL SECURITY** |
| ☐ 450 Commerce/ICC Rates/Etc. | ☐ 150 Recovery of Overpayment & Enforcement of Judgment | **PERSONAL INJURY** | **PERSONAL PROPERTY** | ☐ 535 Death Penalty | ☐ 861 HIA (1395ff) |
| ☐ 460 Deportation | | ☐ 310 Airplane | ☐ 370 Other Fraud | **Other:** | ☐ 862 Black Lung (923) |
| ☐ 470 Racketeer Influenced & Corrupt Org. | ☐ 151 Medicare Act | ☐ 315 Airplane Product Liability | ☐ 371 Truth in Lending | ☐ 540 Mandamus/Other | ☐ 863 DIWC/DIWW (405 (g)) |
| ☐ 480 Consumer Credit | ☐ 152 Recovery of Defaulted Student Loan (Excl. Vet.) | ☐ 320 Assault, Libel & Slander | ☐ 380 Other Personal Property Damage | ☐ 550 Civil Rights | ☐ 864 SSID Title XVI |
| ☐ 490 Cable/Sat TV | | ☐ 330 Fed. Employers' Liability | ☐ 385 Property Damage Product Liability | ☐ 555 Prison Condition | ☐ 865 RSI (405 (g)) |
| ☐ 850 Securities/Commodities/Exchange | ☐ 153 Recovery of Overpayment of Vet. Benefits | ☐ 340 Marine | **BANKRUPTCY** | ☐ 560 Civil Detainee Conditions of Confinement | **FEDERAL TAX SUITS** |
| ☐ 890 Other Statutory Actions | ☐ 160 Stockholders' Suits | ☐ 345 Marine Product Liability | ☐ 422 Appeal 28 USC 158 | **FORFEITURE/PENALTY** | ☐ 870 Taxes (U.S. Plaintiff or Defendant) |
| ☐ 891 Agricultural Acts | | ☐ 350 Motor Vehicle | ☐ 423 Withdrawal 28 USC 157 | ☐ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 871 IRS-Third Party 26 USC 7609 |
| ☐ 893 Environmental Matters | ☐ 190 Other Contract | ☐ 355 Motor Vehicle Product Liability | **CIVIL RIGHTS** | ☐ 690 Other | |
| ☐ 895 Freedom of Info. Act | ☐ 195 Contract Product Liability | ☐ 360 Other Personal Injury | ☐ 441 Voting | **LABOR** | |
| ☐ 896 Arbitration | ☐ 196 Franchise | ☐ 362 Personal Injury-Med Malpractice | ☐ 442 Employment | ☐ 710 Fair Labor Standards Act | |
| ☐ 899 Admin. Procedures Act/Review of Appeal of Agency Decision | **REAL PROPERTY** | ☐ 365 Personal Injury-Product Liability | ☐ 443 Housing/Accomodations | ☐ 720 Labor/Mgmt. Relations | |
| | ☐ 210 Land Condemnation | ☐ 367 Health Care/Pharmaceutical Personal Injury Product Liability | ☐ 445 American with Disabilities-Employment | ☐ 740 Railway Labor Act | |
| ☐ 950 Constitutionality of State Statutes | ☐ 220 Foreclosure | ☐ 368 Asbestos Personal Injury Product Liability | ☐ 446 American with Disabilities-Other | ☐ 751 Family and Medical Leave Act | |
| | ☐ 230 Rent Lease & Ejectment | | ☐ 448 Education | ☐ 790 Other Labor Litigation | |
| | | | | ☐ 791 Employee Ret. Inc. Security Act | |

(440 Other Civil Rights ☒)

**FOR OFFICE USE ONLY:** Case Number: **CV 13-01905**

AFTER COMPLETING PAGE 1 OF FORM CV-71, COMPLETE THE INFORMATION REQUESTED ON PAGE 2.

**UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA**

## CIVIL COVER SHEET

**VI.(a). IDENTICAL CASES:** Has this action been previously filed in this court and dismissed, remanded or closed?  ☒ NO   ☐ YES

If yes, list case number(s): _____

**VIII(b). RELATED CASES:** Have any cases been previously filed in this court that are related to the present case?  ☒ NO   ☐ YES

If yes, list case number(s): _____

**Civil cases are deemed related if a previously filed case and the present case:**

(Check all boxes that apply)   ☐ A. Arise from the same or closely related transactions, happenings, or events; or

☐ B. Call for determination of the same or substantially related or similar questions of law and fact; or

☐ C. For other reasons would entail substantial duplication of labor if heard by different judges; or

☐ D. Involve the same patent, trademark or copyright, and one of the factors identified above in a, b or c also is present.

**IX. VENUE:** (When completing the following information, use an additional sheet if necessary.)

(a) List the County in this District; California County outside of this District; State if other than California; or Foreign Country, in which **EACH** named plaintiff resides.

☐ Check here if the government, its agencies or employees is a named plaintiff. If this box is checked, go to item (b).

| County in this District:* | California County outside of this District; State, if other than California; or Foreign Country |
|---|---|
| Los Angeles County | |

(b) List the County in this District; California County outside of this District; State if other than California; or Foreign Country, in which **EACH** named defendant resides.

☒ Check here if the government, its agencies or employees is a named defendant. If this box is checked, go to item (c).

| County in this District:* | California County outside of this District; State, if other than California; or Foreign Country |
|---|---|
| Los Angeles County | |

(c) List the County in this District; California County outside of this District; State if other than California; or Foreign Country, in which **EACH** claim arose.
**NOTE: In land condemnation cases, use the location of the tract of land involved.**

| County in this District:* | California County outside of this District; State, if other than California; or Foreign Country |
|---|---|
| Los Angeles County | |

**\*Los Angeles, Orange, San Bernardino, Riverside, Ventura, Santa Barbara, or San Luis Obispo Counties**
**Note:** In land condemnation cases, use the location of the tract of land involved

**X. SIGNATURE OF ATTORNEY (OR SELF-REPRESENTED LITIGANT):** _David J Tos_    DATE:  March 15, 2013

Notice to Counsel/Parties: The CV-71 (JS-44) Civil Cover Sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law. This form, approved by the Judicial Conference of the United States in September 1974, is required pursuant to Local Rule 3-1 is not filed but is used by the Clerk of the Court for the purpose of statistics, venue and initiating the civil docket sheet. (For more detailed instructions, see separate instructions sheet.)

**Key to Statistical codes relating to Social Security Cases:**

| Nature of Suit Code | Abbreviation | Substantive Statement of Cause of Action |
|---|---|---|
| 861 | HIA | All claims for health insurance benefits (Medicare) under Title 18, Part A, of the Social Security Act, as amended. Also, include claims by hospitals, skilled nursing facilities, etc., for certification as providers of services under the program. (42 U.S.C. 1935FF(b)) |
| 862 | BL | All claims for "Black Lung" benefits under Title 4, Part B, of the Federal Coal Mine Health and Safety Act of 1969. (30 U.S.C. 923) |
| 863 | DIWC | All claims filed by insured workers for disability insurance benefits under Title 2 of the Social Security Act, as amended; plus all claims filed for child's insurance benefits based on disability. (42 U.S.C. 405 (g)) |
| 863 | DIWW | All claims filed for widows or widowers insurance benefits based on disability under Title 2 of the Social Security Act, as amended. (42 U.S.C. 405 (g)) |
| 864 | SSID | All claims for supplemental security income payments based upon disability filed under Title 16 of the Social Security Act, as amended. |
| 865 | RSI | All claims for retirement (old age) and survivors benefits under Title 2 of the Social Security Act, as amended. (42 U.S.C. 405 (g)) |