Barrett S. Litt, SBN 45527
E-Mail: blitt@kmbllaw.com
Ronald O. Kaye, SBN 145051
Lindsay B. Battles, SBN 262862
KAYE, McLANE, BEDNARSKI & LITT
234 East Colorado Boulevard, Suite 230
Pasadena, California 91101
Telephone: (626) 844-7660
Facsimile: (626) 844-7670

Attorneys for Plaintiffs
FRANK O'CONNELL, NICHOLAS O'CONNELL

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| FRANK O'CONNELL, NICHOLAS O'CONNELL, <br><br> Plaintiffs, <br><br> vs. <br><br> J. D. SMITH; ESTATE OF GILBERT PARRA; ERIC PARRA, COUNTY OF LOS ANGELES AND DOES 1-10. <br><br> Defendants. | **CASE NO. 13-01905-MAN** <br><br> **FIRST AMENDED COMPLAINT FOR DAMAGES** <br><br> (1) DEPRIVATION OF CIVIL RIGHTS, 42 U.S.C. §1983, AGAINST INDIVIDUAL DEFENDANTS ON BEHALF OF FRANK O'CONNELL <br> (2) DEPRIVATION OF CIVIL RIGHTS, 42 U.S.C. §1983, AGAINST INDIVIDUAL DEFENDANTS ON BEHALF OF NICHOLAS O'CONNELL <br> (3) DEPRIVATION OF CIVIL RIGHTS, 42 U.S.C. §1983, AGAINST ENTITY DEFENDANTS ON BEHALF OF ALL PLAINTIFFS <br><br> DEMAND FOR JURY TRIAL. |

FILED
CLERK, U.S. DISTRICT COURT

APR 23 2013

CENTRAL DISTRICT OF CALIFORNIA
BY                              DEPUTY

# I.     INTRODUCTION

1.     On January 15, 1985, Frank O'Connell was convicted of first degree murder in the death of Jay French, a murder he did not commit. He was sentenced to 25 years to life imprisonment. His conviction hinged on the testimony of eyewitnesses Daniel Druecker and Maurice Soucy. Those eyewitnesses made identifications from photospreads prepared and presented to them by Defendant Detectives assigned to the Los Angeles Sheriff's Department. The Defendant Detectives failed to provide critical exculpatory evidence that would have been helpful to the defense regarding the initial identifications by each of these two eyewitnesses and others. Neither representatives of the District Attorney's Officer (hereafter the "prosecution") nor Plaintiff Frank O'Connell were aware or apprised of this information. Defendant Detectives engaged in activities to induce witnesses to identify Frank, and/or caused false evidence concerning the identifications to be provided to the prosecution and the defense in the police reports they submitted. In addition, Defendant Detective Smith reported that a third eyewitness, Arturo Villareal, initially told him that he could identify Frank as the killer who drove away from the murder scene. Detective Smith later testified to this although Mr. Villareal himself denied this statement, and insisted that he could not, and never could, identify Frank O'Connell as the killer.

2.     Defendant Detectives also withheld information regarding a previous attempt on Jay French's life by his former wife and a male associate even though that male associate matched the general description of the person seen shooting Mr. French. That information was also not disclosed to the prosecution.

3.     This conduct by Defendant Detectives set in motion a chain of events that caused Plaintiff Frank O'Connell to be wrongly convicted and spend 27 years in prison before his release on a writ of habeas corpus. Plaintiff Frank O'Connell

1

1  is, in fact, innocent of Mr. French's murder, and had absolutely no involvement in
2  the crime.

3      4.      Plaintiff Frank O'Connell spent over 27 years in California prisons
4  due to Defendants' conduct. Although several witnesses testified that he was with
5  them at the time of the murder, the positive identifications allegedly made without
6  hesitation upon the very first viewing of the photospread outweighed this
7  testimony in the mind of the trier of fact. Mr. Druecker has since testified that he
8  was never certain that Frank O'Connell was the person he saw; that he told the
9  detectives he was not certain and hardly saw the murderer; that he felt pressured
10  by the Detective Defendants to make an immediate and positive identification;
11  and that the Detective Defendants confirmed in his presence that he had identified
12  the right person. None of this information was disclosed by Defendant Detectives
13  to either the prosecution or the defense. False and misleading information
14  regarding the eyewitness identifications was provided in the police reports
15  submitted to the prosecution, and was relied upon by the prosecution and the
16  defense.

17      5.      Mr. Soucy is deceased. Notes in the detectives' own handwriting
18  show that Mr. Soucy, in fact, hesitated in identifying Frank O'Connell as having
19  driven a car similar to the one seen fleeing the murder scene. These notes were not
20  disclosed to either the prosecution or the defense.

21      6.      Not only were there several witnesses who testified that Frank.
22  O'Connell was with them at the time of the murder, there is now very strong
23  evidence that Jay French's ex-wife orchestrated the murder. She has told several
24  people that Frank was innocent, and that she hired someone to kill Jay French. She
25  repeated this to several individuals on separate occasions, and over many years.
26  She wanted Mr. French dead so that she could regain custody of their son.

27      7.      During his years of unlawful incarceration, Frank O'Connell was a
28  model prisoner. He was highly regarded by all sectors of the prisons in which he

2

1 | was held, including the prison staff. Mr O'Connell's son was a young boy when

2 | he was convicted.

3 |       8.      For over 27 years, Frank O'Connell ("Frank") was rarely able to see

4 | his son, Nicholas O'Connell ("Nick"), who was four years old when his father

5 | was arrested. During those years, Nick was denied the society and companionship

6 | of his father, and Frank was denied the society and companionship of his son.

7 | Nick was only able to see Frank when accompanied by a guardian. On average,

8 | Nick was able to visit Frank only a couple of times per year between the age of

9 | four and eighteen. Nick had conflicts with his step-father over his relationship

10 | with his father. Visiting meant traveling long hours to often remote prison

11 | locations, waiting many hours to process, being treated with minimal courtesy,

12 | being herded through multiple metal detectors and physical searches, all in an

13 | effort to spend a few hours with his father. At age 15, Nick spent a great deal of

14 | time and energy studying Frank's case, and determined for himself that Frank was

15 | innocent. Frank could not attend Nick's high school graduation, which caused

16 | them both great emotional pain. At the age of 18, Nick moved to Sacramento for

17 | the summer, and incurred substantial debt to be near his father. At that time, he

18 | visited Frank several days per week and they were able to forge a close bond.

19 | Nick spent the next several years focusing on freeing his father, deferring his

20 | college graduation as a result and avoiding intimate relationships. At age 23, he

21 | became very depressed when it fully hit him that his whole youth had passed

22 | without his father. He was 31 years old when his father was released. His father's

23 | imprisonment was the centerpiece of his childhood, and obtaining Frank's release

24 | has been his focus since he became an adult.

25 |       9.      On March 29, 2012, a state court granted Frank's petition for a writ of

26 | habeas corpus. He was released from custody on bail on April 21, 2012, after

27 | having been in continuous custody since January 15, 1985, the date of his

28 | conviction. He spent 27 years, 3 months and 7 days in custody post-conviction.

1   (He had been released on bail after his arrest until the date of his conviction.)

2   Although entitled to a retrial, the District Attorney declined to re-prosecute Frank,

3   and, on June 11, 2012, all charges were dismissed. Plaintiff Frank O'Connell now

4   seeks compensation for the extraordinary damage suffered as a result of his

5   wrongful and unlawful conviction. Since it is impossible to restore Frank's lost

6   years, financial compensation is the only remedy available to him. Plaintiff

7   Nicholas O'Connell seeks compensation for the wrongful denial of the society and

8   comfort of, and companionship and familial relationship with, his father as a result

9   of Frank's wrongful conviction and incarceration.

10 **II.    JURISDICTION AND VENUE**

11      10.   This action is brought by Plaintiffs Frank and Nicholas O'Connell

12   pursuant to 42 U.S.C. §1983.

13      11.   This Court has jurisdiction under 28 U.S.C. §1343(4) for violations of

14   the 1871 Civil Rights Enforcement Act, as amended, including 42 U.S.C. §1983,

15   and under 28 U.S.C. §1331.

16      12.   The acts and omissions complained of herein commenced on January

17   5, 1984, and continued until June 11, 2012, within the Central District of

18   California. Therefore, venue lies in this District pursuant to 28 U.S.C. §1391.

19 **III.    PLAINTIFFS**

20      13.   Plaintiffs Frank and Nicholas O'Connell were, at the time of the

21   events described herein resulting in Frank's arrest, residents of Los Angeles

22   County. The events resulting in Frank's arrest and conviction described herein

23   occurred in Los Angeles County.

24 **IV.    DEFENDANTS**

25      14.   J.D. Smith, at all times relevant herein, was an employee of Los

26   Angeles County, worked for the Los Angeles County Sheriff's Department, and

27   was a resident of the State of California.

28

1   15.   Gilbert Parra is deceased. At times relevant herein, he was an
2   employee of Los Angeles County, worked for the Los Angeles County Sheriff's
3   Department, and was a resident of the State of California. Defendant "Estate of
4   Gilbert Parra, Deceased" is entitled to defense and indemnification by the County
5   of Los Angeles. California Prob. Code §550 et seq. permits claims directly against
6   an indemnified estate without the need to join the decedent's personal
7   representative or successor in interest as a party.

8   16.   Mr. Parra died testate on October 19, 2003. Mr. Parra's estate was
9   administered in probate. The probate matter was closed on October 6, 2008.

10   17.   Eric G. Parra was the personal representative of Mr. Parra's probate
11   estate and the recipient of his property, if any. On information and belief, Eric
12   Parra is a resident of the State of California.

13   18.   Defendant County of Los Angeles is, and at all times herein alleged
14   was, a municipal corporation or political subdivision organized and existing under
15   the laws of the State of California. The County of Los Angeles has a statutory duty
16   to provide legal defense for, and indemnification of, County employees for acts
17   committed within the scope of their official duties, and therefore operates as the
18   indemnity insurer of J.D. Smith and Gilbert Parra. *See* Gov't Code §825; 995. The
19   County's duty to indemnify detectives Smith and Parra is not extinguished by
20   death, and extends to the assets of Mr. Parra's estate. The Los Angeles County
21   Sheriff's Department is, and at all times herein alleged was an agency of the
22   County of Los Angeles.

23   19.   The true names and capacities of Defendants DOES 1 through 10,
24   inclusive, are presently unknown to Plaintiffs who therefore sue said Defendants
25   by such fictitious names. Plaintiffs will amend this complaint to set forth the true
26   names and capacities of said Defendants when such has been ascertained.
27   Plaintiffs are further informed and believe, and upon such information and belief
28   allege that each of the fictitiously named Defendants aided and assisted the named

5

1   Defendants in committing the wrongful acts alleged herein, and that the damages

2   Plaintiffs sustained, as alleged herein, were proximately caused by such

3   Defendants.

4   **V.     FACTS**

5          20.     On January 5, 1984, Jay French was murdered at the apartment

6   building where he lived and worked as a maintenance man. He had been engaged

7   in a longstanding dispute with his ex-wife, Jeanne Lyon, over the custody of their

8   child, Jay, Jr. Mr. French had custody of his son, but litigation over future custody

9   continued and was hotly contested.

10         21.     According to Jay French's second wife, Gina French, Jeanne Lyon

11  called their home on the morning January 5. Such a call was unusual.

12         22.     The detectives assigned to the case by the Los Angeles County

13  Sheriff's Department were J. D. Smith and Gilbert Parra (hereafter the

14  "Detectives"). The Detectives arrived at the crime scene shortly after the shooting.

15  There were several eyewitnesses to various aspects of the events, whose

16  interactions with the Detectives are described below.

17         23.     The Detectives interviewed Jeanne Lyon on January 6. After denying

18  that she was involved with the murder of Mr. French, Ms. Lyon volunteered

19  information regarding Plaintiff Frank O'Connell. She described Plaintiff Frank

20  O'Connell as a cousin who had been staying with her and her husband for several

21  months, and had moved out not long ago. She later told the Detectives that Frank

22  was not a cousin, was staying somewhere in LaVerne, and gave them a telephone

23  number. She subsequently told the Detectives she had been romantically involved

24  with Frank over the summer. Through these and other actions, Ms. Lyon focused

25  the Detectives' attention on Frank.

26         24.     The cornerstone of the prosecution's case was the testimony of

27  eyewitnesses Druecker, Villareal and Soucy. The Defendant Detectives

28

6

1    systematically influenced and distorted, or attempted to influence and distort, their

2    eyewitness identifications. They then systematically failed to disclose their conduct

3    and information that might have undermined the identifications. Thus, Frank was

4    prosecuted and convicted based on a combination of false evidence, evidence

5    improperly influenced by the Defendant Detectives, and the suppression by the

6    Defendant Detectives of exculpatory *Brady* evidence.

7         **A.    *EYEWITNESS DANIEL DRUECKER***

8         25.    The first eyewitness was Daniel Druecker. Mr. Druecker testified at

9    the preliminary hearing, the trial, and the evidentiary hearing held on Frank's

10   Petition for a Writ of Habeas Corpus in 2012. His pre-filing statements to the

11   Defendant Detectives were contained in reports prepared by them, which omitted

12   important information and distorted other information.

13        26.    At trial Mr. Druecker described the shooter as Caucasian, brown

14   shoulder length hair, in his '30's, and tall (6' to 6'3"), although Mr. Druecker

15   indicated he was not a good judge of height. Mr. Druecker had described the

16   shooter at different times as with and without facial hair, and wearing a blue T-

17   shirt versus a collared shirt. He identified Frank as the shooter of Jay French at the

18   Preliminary Hearing and Trial. However, he testified at the Habeas evidentiary

19   hearing that he never could identify Frank as the shooter, and felt intimidated into

20   making such an identification by the Defendant Detectives. He testified to the

21   following at the Habeas evidentiary hearing:

22        a.  On the day of the murder (1/5/84), Mr. Druecker woke up around 9:00

23            AM. He decided to work on his car and went to the apartment garage.

24            He retrieved his car vacuum from his roommate's car and put it in the

25            driver's side of his car. Mr. Druecker saw the apartment building's

26            maintenance man working.

27

28

7

b. Mr. Druecker wore glasses and contacts in 1984, and had worn them since his freshman year in college. He was nearsighted and had to wear his glasses or contacts when he drove, and at work to see clearly. He did not usually wear them on his days off. He was not wearing them when he went to the garage.

c. Mr. Druecker was leaning into the driver's side of his car when he heard a loud pop which he thought might be a firecracker. After the pop, he heard yelling and running. He got out of the car, and saw the maintenance man running, screaming that he had been shot.

d. Another man was right behind the maintenance man, going in the same direction. The second man stopped, raised a gun, and pointed it. Mr. Druecker heard another bang.

e. Mr. Druecker was scared and confused. He ducked behind a car. He saw the shooter in left profile only, and never had a view of his full face or his right side. He described the shooter as tall with long, dark hair, and said he had a long barreled gun. He saw the shooter for just seconds. It was "just so quick." He had never seen a gun fired before, and was very focused on the gun.

f. Mr. Druecker went to the stairwell. The maintenance man was lying on the doorstep by the manager's door, yelling. There was a lot of blood. Mr. Druecker was scared and wanted to get away. At some point, he heard the maintenance man say that "fucker in the yellow Pinto" shot me, but Mr. Druecker did not see a yellow Pinto.

g. Mr. Druecker went to his apartment, and told his roommate what happened. His roommate later went to the scene, and a short time later Mr. Druecker also went there.

h. An officer on the scene asked if anyone had seen anything. Mr. Druecker's roommate said Mr. Druecker had. Mr. Druecker said he

8

1     thought he could identify the shooter, but wasn't certain because he

2     saw him only briefly.

3    i.  Detectives came to Mr. Druecker's apartment. They asked for a

4        description of the shooter. He told them he couldn't remember and

5        asked if they could put him under hypnosis. They said they couldn't

6        hypnotize him because it couldn't be used in court.

7    j.  Detectives asked if he would meet with a sketch artist. He agreed

8        although he told them he didn't think it would help.

9    k.  The Detectives kept calling him, but he did not want to return the

10       calls. The Detectives came back, showing up one morning on their

11       own. They showed him six photos. Mr. Druecker took that as an

12       indication they must have found the shooter.

13    l.  After being shown the photos and looking at them for a "good while,"

14       he told the Detectives that he had not seen the shooter, only his

15       profile. He asked why the photos weren't in profile, and/or if they had

16       profile photos. He told the Detectives he did not recognize anyone in

17       the photos. The men in all photos he was shown had mustaches. He

18       did not recall the shooter having a mustache.

19   m. After Mr. Druecker told the Detectives he didn't recognize anyone in

20       the photos, their tone changed. They told him to really look at the

21       photos. He interpreted that to mean they had found the guy, knew who

22       he was, and that he had to be one of the photos. Mr. Druecker felt that

23       he had to pick one of the photos, and that the Detectives wouldn't

24       leave until he did.

25    n.  After that, Mr. Druecker pointed to picture number three and asked

26       "Is this the guy?" They responded by asking if this was the person he

27       was identifying as the shooter. He felt they already knew. After they

28       asked him that, he said "I think that's the guy". They said he had to be

1   certain. Then he said that was the guy. He felt intimidated. The

2   Detectives scared him.

3   o. Mr. Druecker did not choose Frank because he actually recognized

4   him. He did not, in fact, recognize him. He chose him because the hair

5   looked like what he recalled. It was a guess. After he chose photo

6   number three, one of the Detectives made a phone call in his presence

7   saying that a positive ID was made. He interpreted that to mean they

8   caught the guy and that the photo he pointed out was the shooter.

9   p. After the phone call, he asked the Detectives what the shooting was

10   about. They said it was a love triangle.

11   q. When Mr. Druecker testified at the preliminary hearing, he pointed to

12   picture number three and said that was the man he saw shoot Jay

13   French. He didn't tell the judge at the preliminary hearing that he did

14   not recognize Frank. He was afraid, and he thought, based on his

15   interactions with the Detectives, that he had identified the right

16   person. However, although he picked out Frank, his testimony was not

17   true. He was not, in fact, able to identify Frank as the shooter.

18   r. Before the trial, Mr. Druecker met with a prosecuting attorney and the

19   investigators. It was very intimidating. He told them he couldn't

20   remember, and that he needed to read something. He doesn't

21   remember if he told them at that time that he didn't get a good look at

22   the shooter.

23   s. At the trial, he again picked out photo number three. He again

24   pointed out Frank O'Connell, but not because he recognized him. He

25   did that because he felt he couldn't back out.

26   t. Although he testified that he was certain of his identification, he in

27   fact was not, and was not able to identify Frank as the person who

28   shot Jay French.

10

u. He made the identification because he felt the only way out was to give the police, and later the prosecutor, what he thought they wanted, which was to identify Frank as the shooter. He felt coerced into saying what he did because no one in the system would listen to him. He felt intimidated and afraid. He believed the police had caught the right person, and they wanted him to validate what they had done.

**B.    EYEWITNESSES ALEC SANCHEZ AND ARTURO VILLAREAL, AND THE YELLOW PINTO.**

27.    Arturo Villareal, a delivery person, and another witness, Alec Sanchez, a flagman in the area, both testified at trial that the shooter left the scene of the crime in a yellow Pinto station wagon with faded wooden sides ("the Pinto"), driven by a woman with blonde hair. The Pinto was never recovered. The Detectives' efforts to locate the Pinto consisted of notifying the police in Azusa, where Ms. Lyon lived, and canvassing Ms. Lyon's neighborhood regarding "the want on the yellow Pinto station wagon". There is no indication they notified other police departments in the area of Azusa or South Pasadena, where the shooting occurred. There is no record they checked DMV records for vehicles matching the Pinto's description registered to owners in the area, parking citations issued to such vehicles, or accidents or insurance claims involving such vehicles.

28.    Instead, Detective Smith took a photograph at night of a "look alike" Pinto he found parked on a street somewhere in South El Monte. He did not remember which street. The Detective testified at trial that the Pinto station wagon he photographed probably had a license plate, but he did not know.

29.    Mr. Sanchez reported, and later testified, that he saw a yellow Pinto wagon drive away. He provided a general description of the female driver and her male companion as: female with blond or light brown hair, around 25 years old with a thin face, and male as white, 25-39 years old, 165-75 lbs, with long curly

11

1    brown hair. He did not identify Frank or anyone else as the person he saw driving

2    away. He pointed to photo number 1 as "possibly a resemblance."

3         30.    The Detectives' police report stated that Mr. Villareal chose Frank,

4    and said he was "the strongest contender, and I'm sure that's him." That is the full

5    extent of the description of the identification in the police report.

6         31.    Mr. Villareal testified at trial. He testified that he could not identify

7    Frank as the person he saw the day of the murder. He also testified that, when

8    shown the photo lineup, he identified two photographs and told the Detectives he

9    "couldn't be positive." He testified he told the Detectives that Frank's photograph

10   "looked like the person who was there, but I'm not positive." Detective Smith then

11   contradicted Mr. Villareal and testified, as he had written in the police report, that

12   Mr. Villareal had chosen only one photograph, that of Frank, and said he was "the

13   strongest contender, and I'm sure that's him."

14        32.    Mr. Villareal's testimony was truthful. He could not identify Frank as

15   the person he saw the day of the murder. The foregoing description contained in

16   the police report and reiterated by Detective Smith at trial was false.

17   **C.    *EYEWITNESS MAURICE SOUCY***

18        33.    Maurice Soucy lived in the neighborhood in which Jeanne Lyon, Jay

19   French's ex-wife, lived. Frank had a brief romantic encounter with Ms. Lyon the

20   previous summer.

21        34.    Investigators showed the photograph of the "look alike" yellow Pinto

22   (described in Section IV (B) above) to Ms. Lyon's neighbors, several of whom

23   recognized it as a car that had been parked in the neighborhood. Detectives

24   canvassed the neighborhood to see if anyone could identify the yellow Pinto and

25   associate it with Frank.

26        35.    As part of this effort, Detectives interviewed Maurice Soucy and his

27   wife on February 6. The police reported prepared by the Detectives indicated that

28

1   Mr. Soucy took one look at the photo of the yellow Pinto and indicated he had seen

2   a vehicle matching the description in the area, driven by a white male

3   approximately 30 years old, 6' 2", 180 lbs., slender. He said he had seen the

4   individual with Jeanne Lyon kissing her in the front yard, and that the car had

5   remained there overnight on several occasions. Mr. Soucy had helped this person

6   jump start his car, and discussed with him whether anyone in the neighborhood

7   needed carpentry or plumbing work.

8       36.    The police report then described the photo ID, and stated that, when

9   Mr. Soucy "viewed the folder, he immediately pointed out photograph number

10  three. He stated that was the person who asked him to jump start the yellow Pinto,

11  and was also the same person he had seen hugging and kissing Jeanne Lyon and

12  driving her red Volkswagen…. He said he was able to recognize the individual

13  right away because he was always having car trouble. He told investigators that he

14  knew that this suspect was the same person who lived with Jeanne for a month

15  during the summer until Jeanne's husband came back home."

16      37.    The Detectives never provided copies to the prosecution or the

17  defense of the notes they took contemporaneously with the Soucy interview, one of

18  which states, regarding Mr. Soucy, "I.D. #3 & poss. #1" and the other of which

19  says he "picked out #3 as poss. [possible] suspect because of face but hair was

20  curlier." Immediately following that statement, the name "Maurice" is noted. In the

21  police report, the Detectives state that it was Ina Soucy who referred to the hair

22  being curlier, not Maurice Soucy, contrary to what the notes indicate. The

23  Detectives never revealed in any police reports that Mr. Soucy made the statements

24  quoted above from the Detectives' notes.

25      38.    At trial, Mr. Soucy identified Frank in court, and testified he had seen

26  him driving a Pinto like that depicted in the photograph on numerous occasions

27  and had spoken to him twice. The defense briefly cross-examined Mr. Soucy as to

28  his identification of Frank's photograph without the knowledge that, contrary to

13

the police report, Mr. Soucy had not immediately identified Frank's photograph. The previously undisclosed notes of the Detectives were critical to the accuracy of his identification. The notes reveal that Mr. Soucy did not positively identify Frank's photograph. Instead, he chose the same two photographs chosen by Mr. Villareal.

39.     The defense did not have an opportunity to question the accuracy of Mr. Soucy's identification of Frank with information disclosed in the recently discovered notes. Accordingly, there was no evidence available at trial that Mr. Soucy, despite his testimony that he had seen Frank with the Pinto many times and had spoken with him twice, was equivocal in his identification when he viewed the photo lineup.

**D.     *SUPPRESSION OF EVIDENCE OF AN ALTERNATIVE SUSPECT.***

40.     The cornerstone of the prosecution's case was the testimony of eyewitnesses Druecker, Villareal and Soucy. The prosecution then bolstered its case with the powerful last dying words of the victim. As he lay dying, Mr. French declared that "that fucker in the yellow Pinto shot me" and that "he was going to die and it had to do with something with Jeanne [Lyon], it looked like somebody she hangs around with or somebody she hung around with."

41.     The prosecution contended that Mr. French's dying declaration pointed solely to Frank as the former boyfriend of Mr. French's ex-wife. However, the Detectives had obtained information indicating a previous attempt on Jay French's life by Jeanne Lyon and Randy Smith. There is a detective's note never provided to the prosecution or the defense, nor was the information shown in it ever communicated. This information states that Mr. French's "x wife attempted to run over v [victim] while trying to serve her papers for child custody. Jeannie was pres. in her Capri car (green). Another guy was driving. Report of incident made to (June '80) Pas. PD. Randy Smith driver of car." That note indicates that the

14

1  Detectives were advised by Jay French's attorney of a "previous attempt on vict.
2  [victim]."

3      42.      Another note indicated that, in May 1980, Mr. French was working at
4  Sacred Hearts Girls School in La Canada, and living in Montrose. He was "riding
5  his cycle to work. Jeanne and a man named 'Randy' were waiting at the road
6  where v would be riding. ¶ Randy was driving a green Capri registered to Jeanne
7  Marie Hernandez. ¶ Randy attempted to run v down, a report was filed and
8  attorney Peter Wisner has info on date of occurrence. ¶ Randy Smith is tall with
9  sandy or blond hair."

10     43.      This information regarding the prior attempt on his life gives Mr.
11  French's dying declaration additional meaning, and an alternate interpretation
12  which alone, if known, could well have altered the outcome of this case. Rather
13  than identifying Frank, Mr. French instead may have been identifying someone
14  else. The description of Mr. Smith as tall with sandy or blond hair was similar to
15  the description provided by witnesses of the person at the scene of the murder.

16     **E.    *PLAINTIFF FRANK O'CONNELL PRESENTED SUBSTANTIAL ALIBI AND*
17          *OTHER EXCULPATORY EVIDENCE AT THE TRIAL.***

18     44.      Frank called three witnesses who resided in the neighborhood where
19  Jeanne Lyon was living. Jean Wilson and Brenda Rogers lived next door to Ms.
20  Lyon, and Pamela Wilson lived across the street. All three testified that they had
21  not seen a yellow Pinto station wagon parked on the street in 1983, that they knew
22  Frank from when he had been staying with Ms. Lyon, and that they had never seen
23  him driving a yellow Pinto in the neighborhood. Ms. Wilson testified that Frank
24  drove a brown station wagon with "woody" sides.

25     45.      Karen Baxter, James Hamilton and Scott Eggerer all testified at trial
26  that Frank was at the house where he was staying with Hamilton and Eggerer in
27  LaVerne on January 5. Hamilton and Eggerer testified that Frank was at the house
28  all morning. Baxter arrived at the house between 1:35-2:00, approximately 20

1  minutes after she got off work. According to all three, Frank was there when
2  Baxter arrived, and was still there some twenty minutes later when the other three
3  went to lunch. Although not asked at trial, all three would testify that they never
4  saw Frank with a yellow Pinto.

5       46.    The murder of Mr. French occurred shortly before 1:15 p.m. which is
6  the time the first officer arrived on the scene. Based on the testimony of Frank's
7  roommates and Ms. Baxter, it was impossible for Frank to have committed the
8  murder.

9      **F.**    ***THE TOTALITY OF THE UNDISCLOSED EVIDENCE WAS MATERIAL TO***
10           ***THE OUTCOME OF THE TRIAL.***

11     47.    With the undisclosed evidence, the defense would have been able to
12 interview and present witnesses inculpating Ms. Lyon and others and exonerating
13 Frank. In turn, this would have provided greater credence to the three alibi
14 witnesses, substantially undermined the reliability of the eyewitness testimony, and
15 given rise to the inference that someone other than Frank was the person Mr.
16 French was referring to when he made his dying declaration.

17     48.    Not only was the same custody battle continuing at the time of the
18 murder that was going on at the time of the previous attempt on his life, but there
19 was a pending court hearing concerning results of psychiatric examinations of Jay
20 French Jr. when Mr. French was killed. Ms. Lyon had a compelling desire for
21 custody of her child and an end to the long custody battle. As with the previous
22 attempt on Mr. French's life, once again a tall, blonde man was the perpetrator, and
23 this time succeeded in killing Mr. French with a gun, rather than a car. Once again,
24 a woman was aiding the effort, not as the passenger, but as the driver of the get-
25 away car. In both instances, the car involved was never recovered.

26     49.    Rather than identifying Frank, Mr. French instead was identifying
27 someone else, as Frank in fact had no involvement in his murder. Declarations
28 from Ms. Lyon's sister, an ex-husband, an ex-boyfriend, a former friend, and a

1  former co-worker, discussed below, establish that Ms. Lyon has made numerous

2  self-inculpatory statements exonerating Frank. With the withheld evidence of a

3  prior attempt on Mr. French's life, the defense would have known to investigate

4  Ms. Lyon in depth. They would have discovered and presented witnesses

5  inculpating Ms. Lyon and exonerating Frank. This, in turn, would have permitted

6  the trier of fact to draw a different inference from Mr. French's dying declaration.

7  Even if such new witnesses did not come forward, evidence of the prior attempt,

8  along with the description of Randy Smith, would have seriously undermined the

9  inference that Mr. French was referring to Frank in his dying declaration.

10  ### G.   THERE IS SUBSTANTIAL NEW EVIDENCE OF PLAINTIFF FRANK
11  O'CONNELL'S INNOCENCE.

12  50.   While it was known that Jeanne Lyon was potentially involved in the

13  murder of Mr. French, little was done to fully investigate evidence of her

14  involvement. After Frank was convicted and had been incarcerated for many years,

15  all the while protesting his innocence, Centurion Ministries agreed to investigate

16  his case. Centurion Ministries' mission is to free innocent individuals from prison

17  who 1) had absolutely nothing whatsoever to do with the crimes for which they

18  were convicted; and, 2) were sentenced to either a life sentence or death. In

19  conjunction with and under the supervision of counsel, Centurion Ministries

20  exhaustively investigated this case. In the course of doing so, it interviewed

21  numerous associates, friends and relatives of Jeanne Lyon, including Ms. Lyon's

22  sister, an ex-husband, an ex-boyfriend, a former friend, and a former co-worker. It

23  is beyond reasonable dispute that Ms. Lyon made numerous statements against

24  penal interest to the effect that she had hired an anonymous hit man to murder Jay

25  French, and that Frank was innocent.

26  51.   On two separate occasions separated by several years, Jeanne Lyon

27  told Debbie Zitella, her younger sister, that James Mack, a disbarred attorney,

28  found a hit man to murder Jay French, that the hired hit man was the one who

17

1  killed Jay French, and that the real killer was a married man who did this on the
2  side. On several occasions before Mr. French's murder, Jeanne Lyon had told Ms.
3  Zitella that she wanted to have Mr. French killed so that she could regain custody
4  of their son.

5      52.    Mike Flick is a former husband of Jeanne Lyon. They met in the late
6  1980's when Ms. Lyon moved to Oregon with her sons, Jay Jr. and Ben. Ms. Lyon
7  told Mr. Flick that she arranged to have Mr. French killed. Ms. Lyon said the killer
8  was hired by her former husband, Ed Lyon, for the sum of $10,000, and that he
9  met the killer in a bar. Ms. Lyon further told Mr. Flick that a lawyer in her office,
10  Jim Mack, handled the payment. She told Mr. Flick that Frank was innocent and
11  was convicted because he had gone out with her before.

12     53.    Boone Maynard met Jeanne Lyon in the early 1990's. Mr. Maynard is
13  a paraplegic who first met Ms. Lyon in her capacity as a home health care worker
14  who cared for him. Their relationship became romantic. Ms. Lyon told Mr.
15  Maynard tearfully that she had arranged for Mr. French's murder and felt bad that
16  an innocent man was convicted. She told this to Mr. Maynard on several occasions.

17     54.    Rebecca Morse is a resident of Oregon who worked for Ms. Lyon in
18  the late 1990's when she was married to Mike Flick. Ms. Lyon told Ms. Morse that
19  her ex-husband had to be killed to prevent him getting custody of her son, and that
20  his murder was set up with the help of a lawyer who worked in same office where
21  she worked.

22     55.    At the time of the murder, Ms. Lyon was working in the law office of
23  Mary Hilyard. Disbarred attorney James Mack (now deceased) was interviewed
24  before his death. He stated that he heard a discussion between Ms. Lyon and Ed
25  Lyon about hiring someone to kill Mr. French, and that Ms. Lyon told him she had
26  hired someone to kill Mr. French. According to Mr. Mack, Ms. Lyon once
27  introduced him to the hit man when they were having lunch. Plaintiffs assert that
28  Mr. Mack, having realized that information concerning his involvement in the

18

murder had come to light, fabricated the story regarding being introduced to the hit man to account for why his name might have come up in connection with the murder.

56.     Ms. Lyon told Centurion Ministry investigators that Frank is innocent although she denied her own involvement.

57.     There is further evidence of innocence available now as well.

a. Many people are available to testify that they knew Frank at the time of the murder, that he was not in any kind of relationship with Ms. Lyon at that time, and that they had never seen him with a yellow Pinto.

b. Ed Lyon, Ms. Lyon's former husband, has stated that Frank's relationship with Ms. Lyon ended months before the murder.

c. Leslie Haynam, nee Davis, who is Plaintiff Nicholas O'Connor's mother, is available to testify that she was awakened between 1:00-2:00 p.m. by a knock on the door at her home in Covina (near LaVerne). She knows the time because a soap opera on at that hour was playing. Frank was at the door. He said his roommates had gone to lunch, and he decided to come over. Frank spent the rest of the day and night at her apartment. She never saw him with a yellow Pinto. He had a tan Galaxy. Frank left for Santa Barbara the next day to look for work. When he returned, she told him the police were looking for him. Though subpoenaed, she was not called as a defense witness.

d. Gary Lewis, a long time friend of Frank, will state that Frank was living with a woman named Jeanne, and that Frank moved out of that situation in 1983. He never saw Frank with a yellow Pinto.

19

## VI.   DEFENDANTS DEPRIVED FRANK O'CONNOR OF HIS DUE PROCESS RIGHT TO A FAIR TRIAL

58.   The sole eyewitness to identify Frank as the person who shot Jay French was Daniel Druecker. In the January 10, 1984, police report, the sole information provided regarding Mr. Druecker's identification of Frank as the person who shot Jay French was that Mr. Druecker, after being admonished regarding the identification procedure, "after looking at the folder for approximately one minute he pointed to photograph #3, that of Frank O'Connell, and stated that he was positive he was the man he had seen fire the weapon."

59.   The Defendant Detectives withheld from their police reports, and subsequently from both the prosecution and the defense, exculpatory evidence regarding eyewitness Daniel Druecker's identification of Frank as the person who shot Jay French, including:

a.   eyewitness Daniel Druecker told the Defendant Detectives he was not certain of his identification;

b.   eyewitness Druecker told the Defendant Detectives he could not remember and asked to be placed under hypnosis;

c.   eyewitness Druecker told the Defendant Detectives he did not think speaking with a sketch artist would help;

d.   eyewitness Druecker initially told the Defendant Detectives he did not recognize any of the any of the photos in the photospread;

e.   eyewitness Druecker pointed to photo #3 (Frank) and asked if that was the guy, to which the Defendant Detectives responded that he needed to look really hard;

f.   Defendant Detectives told eyewitness Druecker that he had to be certain of his identification, after which Mr. Druecker said he thought that Frank was the guy;

20

g.      only after the foregoing exchange did Mr. Druecker say that Mr. O'Connell was the shooter;

h.      Defendant Detectives communicated to eyewitness Druecker that they expected him to make an identification;

i.      after eyewitness Druecker identified Frank, one of the Defendant Detectives made a phone call in Mr. Druecker's presence saying a positive ID was made, which communicated to eyewitness Druecker that he had chosen the "right" person;

j.      one of the Defendant Detectives told eyewitness Druecker that the murder involved a love triangle;

k.      when eyewitness Druecker testified at the preliminary hearing and trial, he did not describe any of the facts set out in ¶59(a)-(j), and his testimony left the impression that he was and had always been certain of his identification. Defendant Smith, who was present for the testimony and aware of those facts, did not disclose the omitted information even at that time. He did not correct the impression that Mr. Druecker was, and always had been, certain of his identification, thereby leaving the trier of fact with the misleading impression that the identification process was uninfluenced and untainted, and that Mr. Druecker was and always had been certain of his identification.

60.      The Defendant Detectives withheld from their reports, and subsequently from both the prosecution and the defense, exculpatory evidence regarding eyewitness Maurice Soucy's identification of Frank as the person he saw driving a yellow Pinto in the area where Jay French's ex-wife was living. This was used to tie Frank to the scene of the murder because a yellow Pinto wagon was identified as the car in which the shooter escaped. The withheld evidence included:

a.      Withholding a detectives' note stating, with regard to Mr. Soucy, "ID #3 & poss #1 & photos of Pinto & put Frank as positive ID with Pinto"

21

1    indicating that the initial identification was not a positive identification,

2    contrary to the trial testimony;

3    b.       withholding a second detectives' note stating that Mr. Soucy "pointed

4    out #3 as poss suspect because of face – but hair was curlier,";

5    c.       when eyewitness Soucy testified at the preliminary hearing and trial,

6    he did not describe any of the facts set out in ¶60(a)-(b), and his testimony left

7    the impression that he was, and had always been, certain of his identification.

8    Defendant Smith, who was present for the testimony and aware of those facts,

9    did not disclose the omitted information even at that time, and did not correct

10   the impression that Mr. Soucy was and always had been certain of his

11   identification, thereby leaving the trier of fact with the misleading impression

12   that Mr. Soucy was, and always had been certain of his identification.

13          61.     The Defendant Detectives further withheld from their reports and

14   subsequently, and from both the prosecution and the defense, exculpatory evidence

15   regarding eyewitness Arturo Villareal's identification of Frank as the person he

16   saw fleeing the scene in a yellow Pinto. The January 10, 1984, police report

17   prepared by the Defendant Detectives stated that Mr. Villareal identified Frank's

18   photograph in the photo lineup as "the strongest contender, and I'm sure that's

19   him." This was false. Mr. Villareal testified at trial that he identified two

20   photographs in the photo lineup (just as Mr. Soucy had) and told the detective he

21   "couldn't be positive." He testified that he said Frank's photograph "looked like the

22   person who was there, but I'm not positive." At trial, Detective Smith offered

23   impeachment testimony of Mr. Villareal, maintaining that Mr. Villareal identified

24   Frank's photograph in the photo lineup as "the strongest contender, and I'm sure

25   that's him." The Defendant Detectives failed to disclose the following exculpatory

26   evidence regarding Mr. Villareal:

27   a.       that Mr. Villareal chose two photographs and stated with reference to

28   Frank that he couldn't be positive;

22

1    b.    that the statement in the January 10 police report that Mr. Villareal
2         was sure Frank was the person he saw was false;
3    c.    that Defendant Smith's statement at the trial that Mr. Villareal said he
4         was sure Frank was the person he saw was false.
5    62.    The actions of the Defendant Detectives' described above were
6 improperly suggestive and improperly influenced the eyewitness identifications of
7 Frank. On information and belief, the Defendant detectives engaged in improperly
8 suggestive conduct, and conveyed information regarding Frank, not only with
9 regard to witness Druecker, but also with regard to witnesses Soucy and Villareal,
10 thereby improperly influencing, or attempting to influence, their eyewitness
11 identifications.
12    63.    The Defendant Detectives further withheld from their reports and
13 subsequently, and from both the prosecution and the defense, exculpatory evidence
14 regarding the existence of a previous attempt on Jay French's life and alternative
15 suspects. Specifically, Defendant Detectives were advised and had notes indicating
16 that Jay French had been riding his motorcycle when his ex-wife, Jeanne, and a
17 white male named Randy Smith, were in a green Capri registered to his ex-wife,
18 waiting at the road where he would be riding; Randy Smith was driving and
19 attempted to run Mr. French down; Mr. Smith is tall with sandy blond hair; and a
20 police report on the incident was filed. The description of Mr. Smith provided to
21 the Defendant Detectives was similar to the description of the person who
22 murdered Mr. French. The Defendant Detectives did not provide this information
23 or their notes to either the prosecution or the defense.
24    64.    The Defendant Detectives caused the presentation of false evidence at
25 the trial of Frank by making the following false statements in police reports
26 presented to the prosecution and ultimately the defense:
27    a.    That Mr. Druecker stated he was positive that Frank was the person he
28         saw shoot Jay French, which, when coupled with the omission of Mr.

23

Druecker's other statements regarding the identification and the Defendant Detectives' interactions with Mr. Druecker, falsely communicated that Mr. Druecker had made an unequivocal and untainted identification (January 10, 1984 Police Report).

b.      That Mr. Villareal told them he was sure that Frank was the person he saw fleeing the scene (January 10, 1984 Police Report).

c.      That, after being shown the photospread, 1) Mr. Soucy immediately pointed out photo #3 and stated that that was the person who asked him to jump start the yellow Pinto, and 2) Mr. Soucy said he was able to recognize the individual right away. (February 8, 1984, police report).

65.      Through the foregoing conduct, Defendant Detectives put in motion before charges were ever filed against Frank a chain of events resulting in and causing his prosecution and ultimate conviction for a murder he did not commit, and of which he was innocent, based on materially false evidence, the suppression of materially exculpatory evidence, and on improperly suggestive eyewitness identification.

## VII.   PARTICIPATION, STATE OF MIND AND DAMAGES

66.      All Defendants acted illegally under color of law.

67.      Each Defendant Detective participated in the violations alleged herein, and/or directed the violations alleged herein, and/or knew or should have known of the violations alleged herein and failed to act to prevent them. Each Defendant ratified, approved or acquiesced in the violations alleged herein.

68.      As joint actors with joint obligations, each Defendant was and is responsible for the failures and omissions of the other.

69.      Each Defendant acted individually and in concert with the other Defendants and others not named in violating Plaintiffs' rights.

24

70. Each Defendant acted deliberately, purposefully, knowingly and/or with a deliberate indifference to, or reckless disregard for an accused's rights, or for the truth, in engaging in the conduct alleged herein.

71. As a direct and proximate result of the aforesaid acts, omissions, customs, practices, policies and decisions of the Defendants, Frank O'Connell was wrongfully incarcerated for over 27 years, and Plaintiff Nicholas O'Connell was denied the society and companionship of his father.

72. Due to the acts of the Defendants, Plaintiff Frank O'Connell has suffered, and continues to suffer, and is likely to suffer in the future, extreme and severe mental anguish, mental and physical pain and injury, suffering, anguish, fright, nervousness, anxiety, shock, humiliation, indignity, embarrassment, harm to reputation, and apprehension. For such injury, he has incurred and will continue to incur significant damages.

73. Due to the acts of the Defendants, Plaintiff Nicholas O'Connell has suffered, and continues to suffer, and is likely to suffer in the future, extreme and severe mental anguish, pain and injury. For such injury, he has incurred and will continue to incur significant damages.

74. As a further result of the conduct of each of these Defendants, Plaintiff Frank O'Connell has lost past and future earnings in an amount to be determined according to proof at trial.

75. As a further result of the conduct of each of these Defendants, Plaintiff Frank O'Connell has been deprived of familial relationships, including his inability to see his son, Nick, who was four years old when his father was convicted, grow up; and Plaintiff Nicholas O'Connell has been deprived of his familial relationship, society and companionship with his father from the ages four to thirty one.

76. The aforementioned acts of Defendants, and each of them, was willful, wanton, malicious, oppressive, in bad faith, engaged in knowingly and

25

1  purposefully, and/or done with reckless disregard or with deliberate indifference to

2  the constitutional rights of Plaintiff Frank O'Connell and the truth.

3      77.    Plaintiffs are entitled to exemplary and punitive damages from

4  Defendant Smith in an amount to be proven at the trial of this matter. They do not

5  seek punitive damages against any other defendant.

6  **VIII. AS THE RESULT OF THE LOS ANGELES COUNTY SHERIFF'S**

7  **POLICIES, CUSTOMS AND PRACTICES VIOLATING THE RIGHT**
   **TO BE FREE FROM IMPROPER AND SUGGESTIVE**

8  **EYEWITNESS IDENTIFICATIONS, AND WITHHOLDING**

9  **EXCULPATORY EVIDENCE, SUGGESTIVE EYEWITNESS**
   **IDENTIFICATION PROCEDURES WERE EMPLOYED WITH**

10 **EYEWITNESSES IN THIS CASE, AND EXCULPATORY EVIDENCE**

11 **WAS WITHHELD**.

12     78.    On information and belief, the Los Angeles County Sheriff's

13 Department ("LASD") had no established or clear policy regarding the following

14 issues pertaining to eyewitness identification and exculpatory (*Brady*) information:

15 a) ensuring that eyewitness identification procedures complied with the

16 requirements of due process, including those set out in *Manson v. Braithwaite* and

17 *Neil v. Biggers*; b) ensuring that Sheriff's deputies, whether through inadvertence

18 or design, did not provide information to potential eyewitnesses that influenced the

19 identification; c) fully and completely documenting Sheriff's deputies' interactions

20 with eyewitnesses; d) adequately training Sheriff's deputies not to influence

21 eyewitness identifications and to provide exculpatory eyewitness identification

22 information to the prosecutor(s) in the case in which the in which the eyewitness

23 was making an identification; and e) adequately supervising Sheriff's deputies to

24 ensure that eyewitness identifications were not influenced by officers conducting

25 them, and to ensure that exculpatory eyewitness identification information was

26 provided to the prosecutor(s) in the case in which the eyewitness was making an

27 identification.

28

79.   To the extent that the LASD had policies regarding the issues set out in the foregoing paragraph, the policies were not adequately implemented by Sheriff's deputies in cases in which an eyewitness was used. Not only were any such titular policies not implemented or followed, but the Los Angeles County Sheriff's Department had a custom and practice of a) providing eyewitness testimony that was the result of suggestive eyewitness identification procedure; b) failing to ensure that eyewitness identification procedures complied with the requirements of due process, including those set out in *Manson v. Braithwaite* and *Neil v. Biggers*; c) failing to ensure that Sheriff's deputies, whether through inadvertence or design, did not provide information to potential eyewitnesses that influenced the identification; d) failing to ensure that Sheriff's deputies fully and completely documented their interactions with eyewitnesses; e) failing to properly or adequately train Sheriff's deputies in how to conduct eyewitness identification in a manner that would not influence the identification; and f) failing to properly or adequately supervise Sheriff's deputies regarding the conduct of eyewitness identification in a manner that would not influence the identification.

80.   The policies, practices and customs set forth in the preceding two paragraphs meant that eyewitness testimony provided by witnesses interviewed by LASD personnel was frequently the product of suggestive eyewitness identifications and was unreliable. The need for proper policies, training and supervision was obvious.

81.   On information and belief, the LASD had no established or clear policy regarding the following issues pertaining to exculpatory evidence: a) maintaining files and information regarding the provision of exculpatory evidence to prosecutors and/or defense counsel; b) ensuring that exculpatory evidence was provided to the prosecutor(s) in the case(s) in which it was relevant; c) training police personnel in the provision of exculpatory evidence; and d) supervising police personnel in the provision of exculpatory evidence.

27

82.    To the extent that the LASD had policies regarding the issues set out in the foregoing paragraph, the policies were not known to, or implemented by, police personnel in cases in which exculpatory evidence existed. Not only were any such titular policies not implemented or followed, but the Los Angeles County Sheriff's Department had a custom and practice of a) failing to maintain files and information regarding the provision of exculpatory evidence to prosecutors and/or defense counsel; b) failing to provide exculpatory evidence to prosecutors; c) failing to adequately train police personnel in the provision of exculpatory evidence; and d) failing to adequately supervise police personnel in the provision of exculpatory evidence.

83.    The policies, practices and customs set forth in the preceding two paragraphs meant that certain exculpatory, material information did not reach prosecutors handling the cases regarding which the information was exculpatory, and therefore did not reach defendants who needed the information in order to defend themselves, thereby depriving them of a fair trial. The need for proper policies, training and supervision was obvious.

84.    The actions, inactions and/or omissions of the LASD set forth in the preceding six paragraphs were known, or should have been known, to the policymakers responsible for the LASD, and occurred with deliberate indifference to either the recurring constitutional violations elaborated above, and/or to the strong likelihood that constitutional rights would be violated as a result of failing to train, supervise or discipline in areas where the need for such training was obvious.

## IX.    CLAIM FOR RELIEF AGAINST INDIVIDUAL DEFENDANTS 42 U.S.C. §1983 – INCLUDING VIOLATIONS OF DUE PROCESS, SUPPRESSION OF EXCULPATORY INFORMATION, FABRICATION OF EVIDENCE, SUGGESTIVE EYEWITNESS IDENTIFICATION, RECKLESS INVESTIGATION (Against J.D. Smith, the Estate of Gilbert Parra and Eric Parra by Plaintiff Frank O'Connell)

28

85.   Plaintiff Frank O'Connell re-alleges all foregoing paragraphs, as well as any subsequent paragraphs contained in the complaint, as if fully set forth herein.

86.   Detectives Smith and Parra, while acting under color of law, deprived Plaintiff Frank O'Connell of his constitutional right to due process of law by, inter alia, 1) failing to memorialize, relay and/or disclose material exculpatory evidence and information to the prosecutors handling his case so that it could, in turn, be provided to Frank's defense counsel, thereby setting in motion a chain of events that resulted in a criminal trial at which material, exculpatory evidence was suppressed by the government; 2) by deliberately fabricating information presented as evidence of Frank's guilt in police reports, statements or other out of court documents thereby setting in motion a chain of events that resulted in the presentation of fabricated evidence at Frank's criminal trial that was material to the outcome; 3) by engaging in suggestive eyewitness identification tactics that resulted in fundamentally unreliable eyewitness identifications that were material to the outcome at trial; and 4) by recklessly disregarding exonerating evidence, recklessly disregarding alternate suspect evidence, and coaching witnesses' testimony to falsely implicate Frank in the face of contrary evidence.

87.   The exculpatory, fabricated and unreliable evidence referred to in the preceding paragraph includes, but is not limited to, the information presented in earlier paragraphs of this Complaint.

88.   Had the exculpatory evidence described previously been disclosed, there is a reasonable probability that it would have resulted in an outcome more favorable to Frank, or, phrased differently, the withholding of the evidence undermines confidence in the verdict.

89.   Had the fabricated evidence presented at trial as a result of Defendants' conduct not been presented, it could have resulted in a different verdict.

29

1       90.    One or more of the acts and omissions alleged herein were a cause of

2  Frank's conviction.

3       91.    The constitutional source of the violations and obligations asserted

4  herein is primarily the due process clause of the Fifth and Fourteenth Amendments.

5  Frank's due process rights were violated by the conduct alleged herein. Plaintiff

6  Frank O'Connell brings this claim as both a procedural and a substantive due

7  process violation. To the extent that any Court were to conclude that the source of

8  Frank's right under this claim is any constitutional source other than due process,

9  this claim is brought on those bases as well.

10      92.    Acting under the color of state law, Defendants Smith, Parra and

11  others acted in concert, conspiring and agreeing to deprive Frank of rights,

12  privileges, or immunities secured by the Constitution and laws of the United

13  States.

14      93.    Defendants Smith and Parra were each jointly and severally

15  responsible for the investigation and related activity that resulted in Frank's

16  conviction. Each engaged in, knew, or should have known of the unconstitutional

17  conduct alleged herein and failed to prevent it, which each had a responsibility to

18  do, and each ratified, approved or acquiesced in it.

19      94.    As a result of Defendants Smith and Parra's, and each of their,

20  violations of Frank's rights as alleged herein, Frank was damaged as alleged

21  above.

**X.     CLAIM FOR RELIEF AGAINST INDIVIDUAL DEFENDANTS
42 U.S.C. §1983 – INCLUDING VIOLATIONS OF DUE PROCESS,
SUPPRESSION OF EXCULPATORY INFORMATION,
FABRICATION OF EVIDENCE, SUGGESTIVE EYEWITNESS
IDENTIFICATION, RECKLESS INVESTIGATION**
**(Against J.D. Smith, the Estate of Gilbert Parra and Eric Parra by Plaintiff
Nicholas O'Connell)**

30

95.    Plaintiff Frank O'Connell re-alleges all foregoing paragraphs, as well
as any subsequent paragraphs contained in the complaint, as if fully set forth
herein.

96.    Detectives Smith and Parra, while acting under color of law, deprived
Plaintiff Frank O'Connell of his constitutional rights as alleged above. Plaintiff
Nicholas O'Connell had a liberty interest to be free from governmental
interference with the society and comfort of, and companionship and familial
relationship with, his father. As a result of the violations of Frank's rights, Plaintiff
Nicholas O'Connell was deprived of the companionship, comfort, society and
familial relationship with his father, in violation of his due process right to due
process of law.

97.    The constitutional source of the violations and obligations asserted
herein is primarily the due process clause of the Fifth and Fourteenth Amendments.
To the extent that any Court were to conclude that the source of Frank's right
under this claim is any constitutional source other than due process, this claim is
brought on those bases as well.

98.    Acting under the color of state law, Defendants Smith, Parra and
others acted in concert, conspiring and agreeing to deprive Frank of rights,
privileges, or immunities secured by the Constitution and laws of the United
States, thereby harming Nick as well as alleged above.

99.    As a result of Defendants Smith and Parra's, and each of their, actions
as alleged herein, Nick was damaged as alleged above.

**XI.    CLAIM FOR RELIEF AGAINST ENTITY DEFENDANTS
42 U.S.C. §1983 – *MONELL* VIOLATIONS, INCLUDING
POLICY/CUSTOM OF FAILURE TO DISCLOSE EXCULPATORY
EVIDENCE, FABRICATION OF EVIDENCE, SUGGESTIVE
EYEWITNESS IDENTIFICATIONS.**
**(Against Defendants County of Los Angeles and Los Angeles County Sheriff's
Department by Both Plaintiffs)**

31

1    100. Plaintiffs re-allege all foregoing paragraphs, as well as any subsequent

2    paragraphs contained in the complaint, as if fully set forth herein.

3    101. The particular policies, customs, practices, failures and/or omissions

4    complained of in this cause of action have been set forth in previous paragraphs.

5    102. Plaintiffs are informed and believe and thereon allege that, at all times

6    herein mentioned, Defendants County of Los Angeles and Los Angeles County

7    Sheriff's Department, with deliberate indifference, and/or conscious or reckless

8    disregard to the safety, security and constitutional and statutory rights of Plaintiff

9    Frank O'Connell and others accused of crimes, including the right to due process

10   of law under the Fourteenth Amendment, and with similar indifference to or

11   disregard for the truth, maintained, enforced, tolerated, ratified, permitted,

12   acquiesced in, and/or applied the policies, practices and customs, actions, inactions

13   and omissions set forth in Section IX above, regarding eyewitness identifications,

14   failure to disclose exculpatory evidence and presentation of deliberately fabricated

15   evidence.

16   103. One of more of the policies, customs, practices, failures and/or

17   omissions described above caused the deprivation of Plaintiffs' rights by

18   Detectives Smith and Parra; that is, one of more of them was so closely related to

19   the deprivation of Plaintiffs' rights as to be a moving force that played a part in

20   causing the ultimate injury.

21   104. As a direct and proximate result of Defendant County of Los Angeles'

22   acts and omissions as alleged herein, Plaintiffs were damaged as alleged above.

23   WHEREFORE, Plaintiffs request relief as follows and, according to proof,

24   against each Defendant:

25   1.    General and compensatory damages in an amount according to proof;

26   2.    Special damages in an amount according to proof;

27   3.    Exemplary and punitive damages against Defendant J.D. Smith in an

28   amount according to proof;

32

1    4.    Costs of suit, including attorneys' fees, under 42 U.S.C. §1988; and,

2    5.    Such other relief as may be warranted or as is just and proper.

3    DATED: April 19, 2013       Respectfully Submitted,

KAYE, McLANE, BEDNARSKI & LITT

By _____
    Barrett S. Litt
    Attorneys for Plaintiff

**JURY DEMAND**

Trial by jury of all issues is demanded.

DATED: April 19, 2013       Respectfully Submitted,

KAYE, McLANE, BEDNARSKI & LITT

By _____
    Barrett S. Litt
    Attorneys for Plaintiff

33