PAUL B. BEACH, State Bar No. 166265
pbeach@lbaclaw.com
MICHAEL D. ALLEN, State Bar No. 198126
mallen@lbaclaw.com
LAUREN T. KRAPF, State Bar No. 292115
lkrapf@lbaclaw.com
LAWRENCE BEACH ALLEN & CHOI, PC
100 West Broadway, Suite 1200
Glendale, California 91210-1219
Telephone No. (818) 545-1925
Facsimile No. (818) 545-1937

Attorneys for Defendants,
COUNTY OF LOS ANGELES, J.D. SMITH and ERIC PARRA

# UNITED STATES DISTRICT OF COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| FRANK O'CONNELL, NICHOLAS O'CONNELL<br><br>        Plaintiffs,<br><br>     v.<br><br>J.D. SMITH; ESTATE OF GILBERT PARRA; ERIC PARRA, COUNTY OF LOS ANGELES AND DOES 1-10.<br><br>        Defendants. | Case No. 13-CV-01905-MWF (PJWx)<br><br>Honorable Michael W. Fitzgerald<br><br>**NOTICE OF MOTION AND MOTION OF DEFENDANTS FOR SUMMARY ADJUDICATION AS TO PLAINTIFFS' CLAIMS FOR RELIEF UNDER SECTIONS IX AND XI OF THE FIRST AMENDED COMPLAINT TO THE EXTENT THEY ARE BASED ON THE ALLEGED FAILURE TO DISCLOSE "ALTERNATE SUSPECT" INFORMATION RE RANDY SMITH; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF**<br><br>[*Separate Statement of Undisputed Material Facts, Declarations and Exhibits and [Proposed] Order filed concurrently herewith*]<br><br>Date:      January 30, 2017<br>Time:      10:00 a.m.<br>Courtroom: 5A |

1

TO THE HONORABLE COURT AND TO ALL INTERESTED

PARTIES AND THEIR ATTORNEYS OF RECORD:

PLEASE TAKE NOTICE that on January 30, 2017, at 10:00 a.m., or as

soon thereafter as Defendants may be heard, in Courtroom 5A of the above-

entitled Court, located at 350 West First Street, Los Angeles, California 90012,

Defendants County of Los Angeles, J.D. Smith and Eric Parra will, and hereby do

move the Court for summary adjudication in their favor of Plaintiffs' Claims for

Relief under Sections IX and XI of the First Amended Complaint to the extent

they are based on the alleged failure to disclose "alternate suspect" information

regarding Randy Smith.

This Motion is based upon this Notice, the accompanying Memorandum of

Points and Authorities, Separate Statement Undisputed Material Facts,

Declarations of Lauren T. Krapf and Detective Steve Lankford and exhibits

attached thereto, and the pleadings on file herein and upon such further matters as

may be presented at or before the hearing of this Motion.  This Motion is made

following counsel for Defendants' good faith, but unsuccessful attempt to

informally resolve these issues pursuant to Local Rule 7-3.  (Declaration of

Lauren T. Krapf at ¶ 3.)


Dated:  December 30, 2016          LAWRENCE BEACH ALLEN & CHOI PC


                          By:   /s/ Lauren T. Krapf
                                Michael D. Allen
                                Lauren T. Krapf
                                Attorneys for Defendants,
                                COUNTY OF LOS ANGELES, J.D.
                                SMITH and ERIC PARRA

1

**TABLE OF CONTENTS**

2

MEMORANDUM OF POINTS AND AUTHORITIES ........................................ 1

I.    INTRODUCTION. ........................................................................................ 1

II.   STATEMENT OF FACTS .......................................................................... 2

    A.    Detectives Learn That Immediately After The Shooting, Multiple Witnesses Heard Victim Jay French Exclaim The Shooting Had Something To Do With His Ex-Wife Jeanne. ............. 2

    B.    Detectives Learn That, During the Summer of 1983 Prior To The Murder of Victim Jay French, his Ex-Wife Jeanne Lived With Plaintiff Frank O'Connell And Had An Affair With Him. ........ 3

    C.    After Having Minimal Contact With Jeanne After Moving Out Of Her Place In The Summer of 1983, Plaintiff Suddenly Hears From Jeanne Several Days Before They Murder And They Get Together At Which Time Jeanne Tries Handing Him A Gun ................................................................................................ 5

    D.    Detectives Learn About A Prior Attempt On Victim Jay French's Life. ...................................................................................... 6

    E.    Detectives Conduct Follow-Up Investigation After Hearing About The Prior Attempt On Victim Jay French's Life. ................... 7

    F.    Public Defender Adolfo Lara Also Learns About Randy Smith Prior To Trial And Determines He Is A "Dead" Lead. ................... 8

    G.    A Memo, Regarding Richard Stephens and "A Man In Oregon," From The South Pasadena Police Department Is Sent To The District Attorney's Office ...................................................... 10

    H.    In 2012 Plaintiff's Petition For Writ Of Habeas Corpus Is Granted But The Original Public Defender's File For The O'Connell Case Is Missing And The "Duplicate" File Is Determined By Lara To Be Missing Pages. ..................................... 11

III.  STANDARD OF REVIEW ...................................................................... 12

IV.   PLAINTIFFS' SECTION 1983 CLAIM FOR RELIEF FOR "SUPPRESSION OF EVIDENCE OF AN ALTERNATE SUSPECT" UNDER BRADY FAILS AS A MATTER OF LAW, TO THE EXTENT THEY ALLEGE DEFENDANT DETECTIVES SUPPRESSED EXCULPATORY EVIDENCE REGARDING A POSSIBLE PRIOR ATTEMPT ON VICTIM FRENCH'S LIFE BY A PERSON NAMED RANDY SMITH. ................................................... 13

    A.    The Uncontroverted Evidence Shows That The Randy Smith Information Was Not Exculpatory Or Material When It Was A

i

"Dead" Lead Because Randy Smith Was Incarcerated In
Oregon At The Time Of The Murder. ...................................................13

B.    Even Assuming, Arguendo, That Randy Smith Was Not A
"Dead" Lead, And Evidence Regarding The Prior Possible
Attempt Was Therefore Exculpatory Or Material, The
Undisputed Evidence Shows There Was No Meaningful
Suppression, Because The Public Defender Was Not Only
Aware Of Randy Smith Months Before The Underlying
Criminal Trial, But Also Conducted His Own Investigation
Into Randy Smith's Viability As A Suspect. ........................................18

C.    Plaintiffs' Section 1983 Claim For Relief For "Suppression of
Evidence of An Alternative Suspect" Under Brady Also Fails
Because Undisputed Evidence Shows There Was No Prejudice
From The Alleged Suppression When The Public Defender
Determined Randy Smith Was A "Dead" Lead ...................................19

V.    THE INDIVIDUAL DEFENDANTS ARE ENTITLED TO
QUALIFIED IMMUNITY AS TO PLAINTIFFS' SECTION 1983
CLAIM FOR RELIEF UNDER BRADY TO THE EXTENT
PLAINTIFFS ALLEGE DEFENDANTS INTENTIONALLY
SUPPRESSED THE "DEAD" LEAD EVIDENCE REGARDING
RANDY SMITH. ..............................................................................................21

A.    Even Assuming, Arguendo, There Was A Genuine Issue Of
Material Fact With Respect Alleged  Suppression Of Evidence
Regarding Randy Smith, The Law  Determining Whether The
Disclosure Of "Dead" Lead Evidence Was Considered
Exculpatory Under Brady Was Not Clearly Established At The
Time Of The Underlying Investigation. ..............................................22

ii

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## TABLE OF AUTHORITIES

Cases

*Anderson v. Creighton*,
  483 U.S. 635 (1987) ........................................................................... 22

*Anderson v. Liberty Lobby, Inc.*,
  477 U.S. 242 (1986) ..................................................................... 12, 13

*Ashcroft v. al-Kidd*,
  563 U.S. 731 (2011) ........................................................................... 22

*Brady v. Maryland*,
  373 U.S. 83 (1963) ............................................................................. 13

*Celotex Corp. v. Catrett*,
  477 U.S. 317 (1986) ........................................................................... 12

*City and County of San Francisco v. Sheehan*,
  135 S.Ct. 1765 (2015) .............................................................. 21, 22, 23

*Claar v. Burlington*,
  29 F.3d 499 (9th Cir. 1994) ............................................................... 12

*Downs v. Hoyt*,
  232 F.3d 1031 (9th Cir. 2000) ........................................................... 15

*Fabricant v. United States*,
  No. CR 03-01257-RSWL-1, 2015 WL 786981 (C.D. Cal. 2015) ...................... 23

*Fields v. Alaska*,
  524 F.2d 259 (9th Cir. 1975) ......................................................... 23, 24

*Harlow v. Fitzgerald*,
  457 U.S. 800 (1982) ........................................................................... 21

*Hunter v. Bryant*,
  502 U.S. 224 (1991) ............................................................. 21, 22, 24, 25

*Kyles v. Whitley*,
  514 U.S. 419 (1995) ........................................................................... 13

*Lessard v. Dickson*,
    394 F.2d 88 (9th Cir. 1968)........................................................................23, 24

*Malley v. Briggs*,
    475 U.S. 335 (1986) ...............................................................................24, 25

*Moore v. Illinois*,
    408 U.S. 786 (1972) .....................................................................14, 23, 24

*Pearson v. Callahan*,
    555 U.S. 223 (2009) .............................................................................21

*Raley v. Ylst*,
    470 F.3d 792 (9th Cir. 2006).............................................................18, 19

*Runningeagle v. Ryan*,
    686 F.3d 758 (9th Cir. 2012).............................................................15, 16

*Serrano v. Francis*,
    345 F.3d 1071 (9th Cir. 2003)...........................................................22

*Silva v. Brown*,
    416 F.3d 980 (9th Cir. 2005)..............................................................19

*Smith v. Almada*,
    640 F.3d 931 (9th Cir. 2011)...............................................13, 14, 15, 19

*Smith v. Cain*,
    132 S.Ct. 627 (2012) ......................................................................14

*Stanton v. Sims*,
    134 S.Ct. 3 (2013) .........................................................................21

*Strickler v. Greene*,
    527 U.S. 263 (1999) ..................................................................13, 19

*U.S. v. Bagley*,
    473 U.S. 667 (1985) ..................................................................13, 19

*U.S. v. Dupuy*,
    760 F.2d 1492 (9th Cir. 1985)............................................................18

*United States v. Aichele*,

    941 F.2d 761 (9th Cir. 1991)................................................................20

*United States v. Augurs*,

    427 U.S. 97 (1976) ...........................................................................15

*United States v. Gordon*,

    844 F.2d 1397 (9th Cir. 1988)............................................................20

*United States v. Griffin*,

    659 F.2d 932 (9th Cir. 1981)..............................................................20

*Wilson v. Layne*,

    526 U.S. 603 (1999) .........................................................................22

Rules

Fed.R.Civ.P. 56(c) ...............................................................................12

1    <u>**MEMORANDUM OF POINTS AND AUTHORITIES**</u>

2    **I.        INTRODUCTION.**

3        On January 15, 1985, Plaintiff Frank O'Connell[1] ("Plaintiff") was convicted

4    in a bench trial of the January 5, 1984 murder of Jay French ("French") and

5    sentenced to 25-years -to-life imprisonment. Various individuals at and around the

6    scene provided information to the South Pasadena Police Department ("SPPD")

7    and the Los Angeles County Sheriff's Department ("LASD") detectives who

8    investigated the murder. In support of the decision to convict, the Honorable Sally

9    Disco stated on the record that the evidence presented was "overwhelming,"

10   identification evidence was "unusually strong," and evidence connecting Plaintiff

11   to the getaway car was "convincing." (Uncontroverted Fact "UF" 103.)

12       In March of 2012, Plaintiff's conviction was vacated following the filing of a

13   *habeas* petition based on claims of ineffective assistance of counsel, suggestive

14   eyewitness identification procedures, and that evidence of an alternate suspect was

15   suppressed from the defense.  On the night of the murder, LASD Detectives

16   interviewed Gina French ("Gina"), French's widow, who mentioned a possible

17   prior attempt on French's life, roughly five years earlier, by a man named Randy

18   Smith ("R. Smith"). While Plaintiffs claim this information was not disclosed to

19   the defense team and should have been disclosed, materials in the Public

20   Defender's file ("PD's file") indicate that Public Defender Adolfo Lara ("Lara")

21   not only knew about R. Smith, but also considered him a suspect, and determined

22   that he was a "dead" lead as the shooter.

23       As discussed in greater detail below, Defendants move for summary

24   adjudication at this time, limited to Plaintiffs' Section 1983 Claims for Relief

25   

26   ───────────────────

[1] References to "Plaintiff" hereinafter refer to Frank O'Connell only (unless

27   otherwise specified), while references to "Plaintiffs" refer to both Frank and

28   Nicholas O'Connell.

Under Sections IX and XI of their First Amended Complaint ("FAC") for
"Suppression of Evidence of an Alternate Suspect" under *Brady* concerning
Plaintiffs' allegation that Defendants suppressed exculpatory evidence regarding R.
Smith. The undisputed evidence shows that the defense knew about R. Smith
months before trial and considered him a suspect; additionally, the purportedly
suppressed evidence regarding R. Smith's was neither material nor exculpatory
because it was impossible for R. Smith (instead of Plaintiff) to have been the
shooter, because R. Smith was in custody in Oregon on the day of the murder.

## II.   STATEMENT OF FACTS.

On January 5, 1984 at approximately 1:00 p.m., French was murdered in the
parking area of the South Pasadena apartment building where he lived and worked
as a maintenance man. (UF 1.) At the time of his murder, French had been
engaged in what Plaintiffs characterize, in their FAC, as a longstanding dispute
with his ex-wife, Jeanne Lyon ("Jeanne"), over the custody of their child, Jay
French Jr. ("Jay Jr."). (UF 2.) As of the date of his murder, French had custody of
his son, but litigation over future custody continued and was "hotly" contested.
(UF 3.) Because the shooting occurred in South Pasadena, the SPPD responded to
the scene first and then, LASD Sergeant William Gleason ("Det. Gleason")
(deceased) and Detective J.D. Smith ("Det. Smith") (retired) arrived. (UF 4.)
Ultimately, Sergeant Gilbert Parra ("Det. Parra") (deceased) and Det. Smith were
assigned to handle the investigation. (UF 4.)

### A.   Detectives Learn That Immediately After The Shooting, Multiple Witnesses Heard Victim Jay French Exclaim That The Shooting Had Something To Do With His Ex-Wife Jeanne.

According to the January 10, 1984 County of Los Angeles Sheriff's
Department Supplementary Report from the LASD investigation into the January
5, 1984 murder of Jay French ("January 10, 1984 Supplementary Report"), on
January 5, 1984 at approximately 6:30 p.m., the Detectives spoke to a number of
individuals who lived at the apartment building, including Kenneth Dooley

("Dooley"), who lived in one of the apartments at the murder location (UF 6) as well as Gina French, the decedent's then wife. (UF 11.)

Notably, Dooley told the Detectives that, at approximately 1:15 p.m., he was inside his apartment when he heard a male voice yell, "The fucker is going to shoot me." (UF 7.) He then heard a shot followed by footsteps, and heard the male voice say, "The mother fucker shot me." (UF 8.) Dooley also told the Detectives that, after hearing the shots, he went onto his balcony and observed French, who he recognized as the apartment maintenance man, laying in front of the manager's door bleeding, with French's wife bending over him. (UF 9.) Just before French died, Dooley heard him say, "This had something to do with Jeanne." (UF 10.)

Likewise, Gina told the Detectives that, at about 1:15 p.m., she heard a commotion in the building's courtyard, when she ran outside and observed her husband laying, bleeding at the manager's apartment door. (UF 12.) After coming to his side, Gina heard French say, "This had to be somebody or something to do with Jeanne," indicating both Gina and Dooley heard French's dying words about the shooter's connection to Jeanne. (UF 13.)

**B.** **Detectives Learn That, During the Summer of 1983 Prior To The Murder of Victim Jay French, his Ex-Wife Jeanne Lived With Plaintiff Frank O'Connell and Had An Affair With Him.**

The Detectives interviewed Jeanne on January 6, 1984, the day after her ex-husband, French, was murdered. (UF 14.) During this interview, Jeanne denied any involvement in the murder. (UF 15.) Jeanne also told the LASD about a "cousin," by the name of Frank O'Connell (Plaintiff), who had stayed with her and her husband for a period of time over the summer of 1983. (UF 16.) Jeanne told the LASD that the last time she saw Plaintiff was on the night of January 1, 1984, while she, her family, and Plaintiff were cruising Colorado Boulevard, after the Rose Bowl. (UF 17.)

Later that day, on January 6, 1984, the Detectives interviewed Edward

Gerald Lyons, Jr. ("Ed"), Jeanne's then husband, at the Temple City Sheriff's Station. (UF 18.) Jeanne attended Ed's interview and while she was at the Temple City Sheriff's Station, Jeanne told the Detectives that Plaintiff was, in fact, not a cousin and that she only referred to Plaintiff as a cousin for her children's benefit, because Plaintiff had been staying at her residence and slept on the sofa for over one month. (UF 19–20.) Jeanne also advised the Detectives that Plaintiff was staying somewhere in La Verne, and gave them Plaintiff's phone number. (UF 21.)

On January 7, 1984, the Detectives interviewed Jay Jr. and Gina. (UF 22.) During that interview, Jay Jr. told the Detectives that he was familiar with Plaintiff, and that Plaintiff was introduced to him as Ed's cousin. (UF 23.) Jay Jr. said that on occasion Plaintiff stayed overnight with him, his mother (Jeanne), and his younger brother. (UF 24.) Jay Jr. also informed the Detectives that he knew Jeanne had been sleeping with Plaintiff, because he had seen them in bed together, openly embracing, and kissing while Ed (his stepfather) was away. (UF 25.) On January 9, 1984, the Detectives interviewed Jeanne again at the LASD's Temple City Station, where she told the Detectives that she and Plaintiff met at the Colorado River over Memorial Day weekend of 1983. (UF 26.) Jeanne said informed the Detectives that sometime not long after that weekend, Plaintiff stayed with her for approximately six weeks, after her then-husband Ed moved out, and that she had an affair with Plaintiff. (UF 27–29.)

On February 15, 1984, Plaintiff was interviewed at the LASD crime lab. (UF 30.) Plaintiff informed the LASD that he first met Jeanne at the Colorado River over Memorial Day weekend 1983. (UF 31.) Plaintiff also informed the LASD that, when Ed moved out of Jeanne's place in July of 1983, Plaintiff moved in for approximately six weeks and confirmed that he had an affair with Jeanne during that time frame. (UF 32.) Plaintiff also said that he thought Jeanne broke things off after one night when he "shot some coke up," because Jeanne didn't like that

4

Plaintiff would come to her house, shoot up cocaine, and "get weird" and "paranoid off of it." (UF 33.)

During the February 15, 1984 interview, Plaintiff further admitted that he had conversations with Jeanne "quite a few times" where she said, "I'm gonna have to kill - - [*sic*] or I'm gonna kill him," referring to French. (UF 34.) Plaintiff said he told Jeanne, "If you really want him killed . . . I know a guy in San Jose . . . 200 bucks we can have him killed," which Plaintiff characterized as one of those "hey I'll kill him" expressions. (UF 35.)

### C. After Having Minimal Contact With Jeanne After Moving Out of Her Place in the Summer of 1983, Plaintiff Suddenly Hears From Jeanne Several Days Before The Murder And They Get Together, At Which Time Jeanne Tries Handing Him A Gun.

During the February 15, 1984 interview, Plaintiff informed the LASD that after staying with Jeanne in July 1983, he "didn't stay in to [*sic*] much contact with her." (UF 36.) Plaintiff then stated that, "[a]ll of a sudden on . . . New Year's Eve, I got a telephone call by [Jeanne]." (UF 37.) Specifically, Plaintiff informed the LASD that, on January 1, 1984, Jeanne invited him to cruise Colorado Boulevard, but asked that Plaintiff drive "because Ed's got 2,000 worth of warrants out for him[.]" (UF 38.) That night, at approximately 8:00 p.m., Plaintiff went to Jeanne's house and Jeanne showed him "what looked like a little handgun" and tried handing it to him. (UF 39.) At the time of the January 1 conversation with Jeanne about the gun, Plaintiff knew it could be a real gun; however, in the interview, Plaintiff couldn't remember if he ever touched it. (UF 40.) Later that night, on January 1, 1984, Plaintiff went out to dinner with Jeanne, Ed, and Jay Jr., and then drove them down Colorado Boulevard. (UF 41.)

During the February 15, 1984 interview, Plaintiff said that while he, Jeanne, Ed, and Jay Jr. were cruising down Colorado Boulevard, Plaintiff heard Jay Jr. and Jeanne saying they wanted to look for French and Gina. (UF 42.) After Jeanne and Jay Jr. said that they wanted to look for French and Gina, Jay Jr.

explained that French and Gina were "usually out here in a certain area every year." (UF 43.) In response to the LASD's inquiry as to whether he had ever seen French or if he knew whether French had seen him, Plaintiff indicated there was at least one occasion when he and French may have seen each other, when he was picking up Jeanne after a counseling appointment between Jeanne and Jay. (UF 44–49.)

### D.   Detectives Learn About A Prior Attempt On Victim Jay French's Life.

The LASD investigation file contained hand-written notes regarding the interview with Gina that was conducted on the night of the murder. (UF 50.) These notes referenced a possible prior attempt on French's life, indicating that in June of 1980, while French was on his motorcycle home from work, R. Smith was driving with Jeanne and they allegedly tried to run French off the road. (UF 51.)

Plaintiffs contend that the description of R. Smith provided to the LASD Detectives was similar to the description of the shooter. (UF 52.) In fact, R. Smith had brown hair, was only 5'9", and the Detectives' notes indicate he had a full beard from December 28, 1983 thru January 9, 1984. (UF 53.) Notably, none of the eyewitnesses to the murder described the shooter as having a full beard. (UF 54.)

On the day of the murder, Daniel Druecker ("Druecker"), the eyewitness to the shooting, spoke to investigators from both the SPPD and LASD on the day of the murder. (UF 55.) Druecker informed both SPPD and LASD investigators that, after the shooting, and while he was approaching French, he heard French say that a person in a yellow Pinto had shot him. (UF 56.) Druecker said he could possibly identify the shooter and provided the following descriptors: male with no facial hair, white, 30's, 6'+, slim, shoulder length dirty dark brown hear, wearing blue jeans and a blue shirt. (UF 57–59.)

On January 6, 1984, Druecker spoke to LASD Staff Artist Rene Stewart who, based on Druecker's description, drew a composite sketch of the shooter, which the judge in the underlying criminal trial said had a "striking resemblance"

to Plaintiff. (UF 60, 62, 102.) The composite sketch does not depict the shooter as having a full beard. (UF 61.) Additionally, Jeanne, who knew R. Smith personally, admitted she did not see a resemblance between R. Smith and Plaintiff "at all." (UF 63.) She said R. Smith was "much shorter." (UF 64.)

### E.    Detectives Conduct Follow-Up Investigation After Hearing About The Prior Attempt On Victim Jay French's Life.

Det. Smith's routine as part of his investigations entailed maintaining a case file, which would include documents, notebooks, hand-written notes, and other evidence he compiled. (UF 118.) Det. Smith would ensure that either he or his partner interviewed all key witnesses and gathered extensive evidence about the incident and potential suspects. (UF 119.) After all initial interviews were completed, the relevant leads would be investigated and, if there was sufficient evidence of a crime committed by a particular suspect, the pertinent information regarding that suspect's involvement in the crime would be included in a report. (UF 120.) Information that was tangential would not necessarily be included in reports. (UF 121.)

Various materials in the investigation file indicate that Det. Parra traveled to Oregon to follow up on the R. Smith lead, as part of the investigation. (UF 122.) First, the investigation file contained a January 13, 1984 "SH-CR-175" request slip from Det. Parra, also known as a "blue slip," which is commonly used for travel reimbursement, witness relocation, or informant dealings. (UF 123.) Other materials in the investigation file, including a post card from the Shanico Inn in Lebanon, a 1984 "Lebanon Street and Avenue Guide," and a 1984 Edition "City Map and Street Guide for Lebanon Oregon & Rural Routes," indicate that part of the investigation took place in Oregon. (UF 124.) Also, R. Smith, who was in custody in Oregon from late December 1983 through early January 1984, remembers that, while he was still in custody in Oregon, a detective from Los Angeles came to speak with him about the murder. (UF 125.)

Det. Smith would include materials in the homicide book that could lead to

information particularly related to the crime at issue and place all notebooks, memos, documents, and materials, including but not limited to any "dead end" evidence, in an investigation file. (UF 126.) It was common for prosecutors to request detectives' notes and other materials, and Det. Smith would turn over any such requested materials, whether or not he or his partner deemed them pertinent. (UF 127.)  In fact, on May 24, 1984, a letter was sent to Det. Smith by the DA's Office, along with an April 30, 1984 discovery order from the underlying criminal proceedings requiring various materials to be produced, specifically including detectives' notes. (UF 128.) The letter and accompanying discovery order were found in the investigation file; however, nothing else in the LASD file indicates any follow up from the DA's Office regarding the discovery order, or otherwise suggesting that the materials identified in the letter were not, in fact, turned over from the LASD to the DA's Office. (UF 129–30.) Also, during his approximate 15 years as a homicide detective, Det. Smith routinely turned over his notes and/or any other part of his file, especially if there was a discovery request from the defense for the investigation notes and materials. (UF 131.)

      **F.**   **<u>Public Defender Adolfo Lara Also Learns About Randy Smith Prior To Trial And Appears To Determine That He Could Not Have Been The Shooter.</u>**

      Prior to the underlying criminal trial, in mid-August 1984 at the latest, Plaintiff's former public defender, Lara, and his investigator independently obtained information about another potential suspect, R. Smith. (UF 65–66, 68.) During his deposition, Lara agreed that he was "clearly put on notice about the existence of Randy Smith" and that Smith "was an individual worth investigating." (UF 67.) Lara also learned that R. Smith was in custody in late December of 1983 and into January of 1984, for a possession charge that allegedly occurred in the state of Oregon on December 23, 1983. (UF 64, 80–96.)

      Records obtained by the LASD indicate that R. Smith was in custody in Oregon from late December 1983 and into January, 1984 for a possession charge

that allegedly occurred in Oregon on December 23, 1983. (UF 69.) According to records from this criminal matter, R. Smith appeared in court in Linn County, Oregon on a "First Appearance Arraignment" on January 4, 1984 when he was advised of his Constitutional Rights, security in the amount of $10,000 was set, and he was ordered to appear back in court at 9:30 a.m. on January 12, 1984. (UF 70–73.) According to these same records, on January 12, 1984, R. Smith appeared in person in the Linn County Circuit Court, pled "NOT GUILTY" to the possession of controlled substance charge, posted bail and was ordered released. (UF 74–77.) None of the records from this criminal matter indicate that R. Smith was released at any time between his January 4, 1984 appearance and prior to his January 12, 1984 appearance. (UF 78.) Notably, these same court-certified documents, which were also produced by Centurion Ministries (the organization that "investigated" Plaintiff's alleged wrongful conviction) in the instant case, clearly indicate that R. Smith's "First Appearance Arraignment" occurred on January 4, 1984, the day before French's January 5, 1984 murder. (UF 69–71.)

When asked during his deposition if he would have looked into whether or not R. Smith could have made it onto any flights between Oregon and Los Angeles on January 4, 1984 if he "had been provided information that [R. Smith] had a prior attempt on Jay French's life," Lara answered, "Yes." (UF 83.) In addition, an Investigation Request form from Lara's file specifically stated: "It is necessary that we attempt to either locate this Randy Smith, or find out what he looks like." (UF 84–86.)

During his deposition, Lara also identified his handwriting in notes that specifically listed six airlines with corresponding phone numbers, a notation "Huntoon Randall Smith" in the top right corner, as well as notations "Jan 4 Portland – L.A." and "Jan 5 L.A. – Portland" towards the bottom. (UF 90–91). The notes also contained what appears to be contact information for someone from the Western Airlines legal department and a phone message slip from United Airlines

that said, "[R]ecords do not disclose Mr. Hauntoon AKA Randall Smith was on flights in question in January." (UF 88–89, 92–93.)

After reviewing all of these notes, Lara admitted that, based on the documentation, he looked into the flight schedules for these airlines to determine whether it was at all feasible for R. Smith to have flown from Oregon to Los Angeles on January 4, 1985. (UF 94–95.) If R. Smith was, in fact, unable to leave Oregon and be in Los Angeles at the time of the murder, Lara "wouldn't be able to point [R. Smith] out to the jury as being the shooter." (UF 96–97.) Clearly, based on this evidence, Lara not only was aware of R. Smith, but (1) he knew that R. Smith was in Oregon on January 4, 1984 and (2) also considered him prime suspect which is evidenced by his looking into whether he could have been at the scene of the murder on January 5, 1984.

### G. A Memo, Regarding Richard Stephens and "A Man In Oregon," From The South Pasadena Police Department Is Sent To The District Attorney's Office.

After Plaintiff's *habeas* petition was granted in 2012, the investigation into the January 5, 1984 murder of French was re-opened and LASD Homicide Detective Steve Lankford was assigned to the case. (UF 98.) Among the materials Lankford found in the investigation file when he took over the case was a manila envelope addressed **from** the DA's office **to** the LASD that included a South Pasadena Police Department memorandum dated February 8, 1984 ("SPPD memo") with hand-written notes stapled to it. (UF 99.) The SPPD memo is addressed to Lt. Hatfield from Lt. Ryan with the subject line reading, "PC 187 F84-0048 V-French." (UF 100.) According to the SPPD memo, an anonymous tip about the French murder referred to an unnamed woman who "paid to have the V killed when she learned that the V had received custody of the children." (UF 101–02.) The SPPD memo further stated that, according to the anonymous tip, the ex-wife "had paid a male in Oregon 7,000.00, who in turn paid a Richard Stephens to do the job" and that Stephens "is supposed to live at either 727 or 757 N.

Catalina, Pasadena." (UF 103–04.)

A piece of paper with hand-written notes was found stapled to the SPPD memo, and had, *inter alia*, "yellow woodgrain," the name "Richard Stevens," "72 Ford," and "OBS THIS VEH ENTER REAR OF 757 N CATALINA ON 2/22/84 AM HRS" written on it. (UF 105.) Other hand-written notes, which appear to be related to follow-up, regarding the SPPD memo and tip, were found in one of the Detectives' notebooks. (UF 106–07.) Among other things, the notes stated: "Moved to Texas over a year ago according to mgr at apt." (*Id.*) Additionally, documents from the California Law Enforcement Telecommunication System ("CLETS") and documents from the Expanded Traffic Records System with information for "Edward Stevens" and "Edward Richard Stevens" indicate further follow-up and, notably, do not indicate that Richard Stevens had a yellow pinto. (UF 108.) Notably, the February 8, 1984 date of the anonymous tip was just a few weeks after Plaintiff was arrested, and only two days after the Detectives interviewed several witnesses in Jeanne's neighborhood. (UF 110.)

**H.**     **In 2012, Plaintiff's Petition For Writ Of Habeas Corpus Is Granted But The Original Public Defender's File For The O'Connell Case Is Missing And The "Duplicate" File Is Determined by Lara To Be Missing Pages.**

On January 15, 1985, following a bench trial, Plaintiff was convicted of first-degree murder for the murder of French. (UF 111.) In finding Plaintiff guilty, the court noted that the evidence presented by the prosecution was "overwhelming," the I.D. evidence was "unusually strong," the composite sketch bore a "striking resemblance" to Plaintiff, and the evidence connecting Plaintiff to the getaway car was "convincing." (UF 112.) However, during the habeas proceedings, in his closing argument, Plaintiff argued that the outcome of the case would be different if Lara "had known that Randy Smith had been mentioned specifically by name in a prior murder attempt . . . it would have been admissible as third party liability." (UF 113.)

1        Notably, prior to testifying in the habeas proceedings, Lara requested from

2    the Public Defender's Office ("PD's Office") a copy of the original PD's Office

3    file from the Frank O'Connell prosecution ("original file"). (UF 114.) In response,

4    the PD's Office informed Lara that, after an extensive search of the records, the

5    original file couldn't be found. (UF 115.)

6        Therefore, prior to testifying in the 2011 habeas proceeding, Lara was

7    provided with a "duplicate" copy of the PD's Office file that the PD's Office

8    obtained from Centurion Ministries ("duplicate file"). (UF 116.) After having a

9    chance to review the duplicate file, Lara indicated that it was "missing"

10    documents and "incomplete." (UF 117.)

11    ### III.    <u>STANDARD OF REVIEW.</u>

12        Summary judgment is appropriate where "there is no genuine issue as to any

13    material fact and the moving party is entitled to a judgment as a matter of law."

14    Fed.R.Civ.P. 56(c). The moving party discharges its initial burden by showing

15    "that there is an absence of evidence to support the nonmoving [sic] party's case."

16    *See Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). Thereafter, the burden

17    shifts to the non-moving party to designate specific facts showing there is a

18    genuine issue for trial on those claims for which the opposing party will bear the

19    burden of proof at trial. *Id*. at 324. Thus, the non-moving party must offer facts

20    providing sufficient evidence "for a jury to return a verdict for that party."

21    *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986).

22        In ruling on a summary adjudication motion, a court is to view the record in

23    the light most favorable to the non-moving party; however, the non-moving party

24    has the "burden of [pointing] to 'specific facts showing that there is a genuine issue

25    for trial. …'  [I]t is not the district court's job to sift through the record to find

26    admissible evidence in support of a non-moving party's case." *Claar v. Burlington*,

27    29 F.3d 499, 504 (9th Cir. 1994) (quoting *Celotex Corp.*, 477 U.S. at 324 (1986)).

28    Further, "[t]he mere existence of a scintilla of evidence in support of a plaintiff's

position will be insufficient." *Anderson*, 477 U.S. at 252. Therefore, summary adjudication is appropriate if evidence of a material fact is "merely colorable, or is not significantly probative." *Id.* at 249–250 (citation omitted).

**IV.**  **PLAINTIFFS' SECTION 1983 CLAIM FOR RELIEF FOR "SUPPRESSION OF EVIDENCE OF AN ALTERNATE SUSPECT" UNDER *BRADY* FAILS AS A MATTER OF LAW, TO THE EXTENT THEY ALLEGE DEFENDANT DETECTIVES SUPPRESSED EXCULPATORY EVIDENCE REGARDING A POSSIBLE PRIOR ATTEMPT ON VICTIM FRENCH'S LIFE BY A PERSON NAMED RANDY SMITH.**

In their FAC, Plaintiffs contend the Detectives violated *Brady v. Maryland*, 373 U.S. 83 (1963), claiming Defendants suppressed exculpatory evidence regarding a possible prior attempt on French's life by R. Smith. However, the undisputed facts indicate that this evidence was neither material nor exculpatory, because the lead that R. Smith could have been the shooter instead of Plaintiff turned out to be a "dead" lead. (UF 69–78).

"There are three components of a true *Brady* violation: The evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued." *Strickler v. Greene*, 527 U.S. 263, 281–82 (1999); *see Kyles v. Whitley,* 514 U.S. 419, 433 (1995).

**A.**  **The Uncontroverted Evidence Shows That The Randy Smith Information Was Not Exculpatory Or Material Because Randy Smith Was Incarcerated In Oregon At The Time Of The Murder.**

Plaintiffs' *Brady* claim fails because they cannot prove that the information in the purportedly undisclosed notes regarding R. Smith was material or exculpatory because it would have been impossible for R. Smith to have been the shooter. "[S]trictly speaking, there is never a real '*Brady* violation' unless the nondisclosure was so serious that there is a reasonable probability that the suppressed evidence would have produced a different verdict." *Smith v. Almada*, 640 F.3d 931, 939 (9th Cir. 2011); *U.S. v. Bagley*, 473 U.S. 667, 682 (1985) (holding evidence is material

1   only when "the result of the proceeding would have been different" had it been
2   disclosed to the defense); *Smith v. Cain*, 132 S.Ct. 627, 630 (2012) (reasonable
3   probability exists if the likelihood of a different result undermines confidence in the
4   outcome of the trial). Thus, the prosecution has no duty to disclose to the defense an
5   entire summary of the investigation, especially as it relates to any "dead" leads.
6   *Moore v. Illinois*, 408 U.S. 786, 795–96 (1972).

7          In *Moore*, the Supreme Court considered whether information was
8   exculpatory when an early lead became moot. *Id*. During a murder investigation,
9   police received evidence of a potential suspect named "Slick." *Id*. Investigators
10  abandoned their search for Slick, however, once multiple eyewitnesses identified
11  petitioner at the murder scene, and two days later, other witnesses saw petitioner at
12  a bar discussing the murder. *Id*. The Supreme Court determined that the suppressed
13  evidence did not violate petitioner's due process rights, especially when compared
14  to the identifications inculpating petitioner. *Id*. at 797–98. The Court held that there
15  is "no constitutional requirement that the prosecution make a complete and detailed
16  accounting to the defense of all police investigatory work on a case." *Id*. at 795.
17  "Here, the elusive 'Slick' was an early lead the police abandoned when
18  eyewitnesses to the killing and witnesses to [the petitioner's] presence" at the bar
19  were found. *Id*. The Supreme Court concluded, "in light of all of the evidence," the
20  "Slick evidence" was "not material to the issue of guilt." *Id*. at 797.

21         In *Cain*, plaintiff was arrested for setting fire to a furniture store where the
22  fire had been started by five-gallon water bottles stuffed with papers and gasoline,
23  including envelopes with plaintiff's name and address on them. 640 F.3d at 934.
24  Plaintiff was acquitted and subsequently brought Section 1983 claims against the
25  investigating officer because, *inter alia*, the officer did not disclose a series of
26  previous dumpster fires that were set in an area neighboring the furniture store. *Id*.
27  at 935. In investigating the fires, "the investigator received three suspect
28  descriptions that neither matched each other nor matched [plaintiff]." *Id*. at 939.

1      There, the Ninth Circuit determined there was no *Brady* violation because
2   (1) evidence of the alternative dumpster fires did not undermine plaintiff's
3   connection to the instant fire, (2) witness descriptions of the other dumpster fire
4   suspects were all different from each other and, (3) even without the prosecutor's
5   disclosure of the earlier fires, the plaintiff/appellant's counsel otherwise knew
6   about one of the previous fires. *Id*. at 939–40. Thus, the Ninth Circuit held,
7   "[Plaintiff's] *Brady*-based Section 1983 claim fails because he has not shown that
8   the withheld evidence was material." *Id*. at 939; *see also United States v. Augurs*,
9   427 U.S. 97, 109–110 (1976) ("The mere possibility that an item of undisclosed
10  information might have helped the defense, or might have affected the outcome of
11  the trial, does not establish 'materiality' in the constitutional sense.").

12     In *Downs v. Hoyt*, 232 F.3d 1031, 1036 (9th Cir. 2000), the criminal
13  defendant claimed her constitutional rights were violated because the state deprived
14  her of certain hand-written investigatory notes and argued, *inter alia*, that the notes
15  "would have shown that [authorities] focused almost immediately on her rather
16  than conducting a proper investigation." There, the court noted, "The most that can
17  be said of these materials is that they might have provided investigatory leads.
18  *Brady* does not require a prosecutor to turn over files reflecting leads and ongoing
19  investigations where no exonerating or impeaching evidence has turned up." *Id*. at
20  1037. The court further held, "[The criminal defendant's] arguments, moreover, are
21  speculative and fail to point out, as required by [the Supreme Court], how
22  production of these materials would have created a reasonable probability of a
23  different result." *Id*. at 1037.

24     In *Runningeagle v. Ryan*, 686 F.3d 758, 767 (9th Cir. 2012), prosecutors met
25  with a jailhouse informant who had information about a co-defendant. Prosecutors
26  never informed petitioner's counsel of these meetings or provided information
27  about what the informant said; however, petitioner's counsel was on notice that the
28  informant was in communication with prosecutors and that he was a potential

witness against co-defendant. *Id.* at 767–68. The Ninth Circuit held, "While we can infer that [the informant] would have implicated [the co-defendant], we have no way of knowing that his testimony would exculpate [the petitioner]—and even if [it] did tend to exculpate, such testimony by [] a notoriously unreliable source, was unlikely to have changed the outcome of the proceedings [.]" *Id.* at 770. The court noted, "Assuming that [the informant's] statements implicated [the co-defendant], those statements would have added to the evidence supporting [the co-defendant's] conviction, and not materially detracted from the overwhelming evidence of [the petitioner's] guilt." *Id.* at 771.

Here, Plaintiffs' *Brady* claim fails because the information pertaining to R. Smith was neither material nor exculpatory. As in *Moore*, while R. Smith may have been a potential lead initially, given the undisputed facts that R. Smith was incarcerated in Oregon at all relevant times (including on the date of French's murder), R. Smith was a "dead" lead as the shooter. (UF 69–78.)

Additionally, as in *Almada*, where evidence of alternative dumpster fires did not undermine the plaintiff's connection to the incident at issue, here, evidence of R. Smith's alleged prior attempt on French's life did not undermine Plaintiff's connection to the incident at issue, or the investigation at large, because of the evidence that R. Smith was incarcerated in Oregon on the date of the murder. (*Id.*) Also, as in *Almada*, the witness descriptions of the shooter did not match R. Smith's physical characteristics. (UF 53–61.) R. Smith had brown hair, was only 5'9", and had a full beard at the time of the murder. (UF 53.)

Here, none of the eyewitnesses interviewed by the Detectives described the shooter as having a full beard. (UF 54.) Also, on the day of the murder, eyewitness Druecker described the shooter to the Detectives as being between 6'00 and 6'03", and also described the shooter to a sketch artist, whose sketch of the shooter did not have any facial hair. (UF 57–61.) Moreover, Jeanne, who knew both R. Smith and

1  Plaintiff, testified at her deposition that she did not see a resemblance between R.

2  Smith and Plaintiff "at all," and that R. Smith was "much shorter." (UF 55–56.)

3     Finally, like the petitioner's defense attorney in *Almada* knew of the

4  existence of at least one prior fire, Lara not only knew of the existence of R. Smith,

5  but also admitted his investigation proceeded as if he considered R. Smith a

6  suspect. (UF 65–68, 83–86, 88–94.) Lara even looked into flight schedules for six

7  airlines to determine whether it was feasible for R. Smith to have flown from

8  Oregon to Los Angeles on January 4, 1985, showing Lara also knew that R. Smith

9  was in Oregon at least as of January 4, 1984. (UF 88–94.)

10     It is anticipated that Plaintiffs will argue that in light of the SPPD memo,

11  based on the anonymous tip, R. Smith could have, in fact, been included as a

12  "middle man." (UF 93.) Notably, after Plaintiff's *habeas* was granted, the memo

13  was found in an envelope sent **from** the DA's Office **to** the LASD. (UF 99.)

14  Additionally, as stated above, the undisputed facts strongly indicate that R. Smith

15  was incarcerated at the time of the murder and could not have been the shooter.

16  (UF 69–78.) Moreover, even assuming, *arguendo*, evidence of this tip was given

17  directly to the LASD from the SPPD (and not the DA's Office) and not turned over

18  to the defense, as in *Downs*, any argument regarding R. Smith's involvement in the

19  murder is merely speculative, and does not exculpate Plaintiff, because R. Smith

20  could not have been the shooter. (UF 69–78.) Similarly, like the information

21  potentially inculpating the co-defendant in *Runningeagle*, here, suggesting R.

22  Smith could have assisted, as an **accomplice**, in orchestrating the murder does not

23  necessarily undermine evidence of Plaintiff's involvement as the **shooter**. (UF 74–

24  84.) Thus, as a matter of law, the alleged suppression of evidence relating to R.

25  Smith does not rise to a *Brady* violation.

26  ///

27  ///

28  ///

17

**B.    Even Assuming, _Arguendo_, That Randy Smith Was Not A "Dead" Lead As The Shooter, And Evidence Regarding The Prior Possible Attempt Was Therefore Exculpatory Or Material As To Plaintiff, The Undisputed Evidence Shows There Was No Meaningful Suppression, Because The Public Defender Was Not Only Aware Of Randy Smith Months Before The Underlying Criminal Trial, But Also Conducted His Own Investigation Into Randy Smith's Viability As A Suspect.**

There is no meaningful "suppression" within the scope of _Brady_ if the alleged evidence was provided to the defense or "if the means of obtaining the exculpatory evidence has been provided to the defense." _U.S. v. Dupuy_, 760 F.2d 1492, 1502 (9th Cir. 1985); _Sommer v. U.S._, WL 4592788 at *7 (S.D. CA 2011) (holding that no _Brady_ violation occurred where the "defendant knew or should have know[n] the essential facts permitting him to take advantage of any exculpatory information.").

In _Raley v. Ylst_, 470 F.3d 792, 795 (9th Cir. 2006), petitioner was convicted of first-degree murder. There, petitioner argued that the prosecution violated his right to due process under _Brady_, by failing to disclose exculpatory and mitigating evidence contained in the petitioner's medical records from his pretrial confinement. _Id_. at 803–04. The Ninth Circuit held that no _Brady_ violation occurred because petitioner possessed "the salient facts regarding the existence of the records that he claims were withheld," namely that he had visited medical personnel at the jail and was taking the medication they prescribed for him. _Id_. at 804. "Because Petitioner knew of the existence of the evidence, his counsel could have sought the documents through discovery." _Id_.

Here, during the habeas proceedings, in his closing argument, Plaintiff argued that the outcome of the case would be different if Lara "had known that Randy Smith had been mentioned specifically by name in a prior murder attempt . . . it would have been admissible as third party liability." (UF 113.) However, as specified above, Lara and his investigator clearly obtained information about R.

1  Smith, indicating to them that he was the suspect, and investigated whether it was

2  at all feasible for R. Smith to have been in to Los Angeles on January 5, 1985.

3  (UF 83–94.) Like the petitioner in *Raley* knew about the existence of the medical

4  records, Plaintiff's counsel clearly knew about R. Smith, considered his viability

5  as a suspect, and ultimately determined he "wouldn't be able to point him out to

6  the jury as being the shooter." (UF 97.)

7      Based on the notes in Lara's file, it is clear that there was no meaningful

8  suppression of evidence of R. Smith, as required to prove a *Brady* claim.

9  Therefore, there is no basis for a *Brady*-based Section 1983 claim founded on the

10  contention that the defense was not advised of R. Smith as an alternate suspect.

### C.    Plaintiffs' Section 1983 Claim For Relief For "Suppression of Evidence of An Alternative Suspect" Under *Brady* Also Fails Because Undisputed Evidence Shows There Was No Prejudice From The Alleged Suppression When The Public Defender Appeared To Also Determine That Randy Smith Was A "Dead" Lead As The Shooter.

15      The United States Supreme Court has held that, to prevail on a *Brady* claim,

16  Plaintiffs must "establish a reasonable probability of a different result [either at the

17  guilt or sentencing phases.]" *Strickler*, 527 U.S. at 291; *Bagley*, 473 U.S. at 682 (a

18  reasonable probability means a probability sufficient to undermine confidence in

19  the outcome of the criminal trial). Prejudice occurs if the evidence is "material."

20  *Silva v. Brown*, 416 F.3d 980, 985 (9th Cir. 2005). First, as set forth in Section IV

21  (A), the subject evidence pertaining to R. Smith was neither material nor

22  exculpatory. In analyzing *Brady's* "prejudice prong, the Supreme Court has stated

23  that 'strictly speaking, there is never a real '*Brady* violation' unless the

24  nondisclosure was so serious that there is a reasonable probability that the

25  suppressed evidence would have produced a different verdict.'" *Almada*, 640 F.3d

26  at 939 (internal citations omitted).

27      Here, not only did R. Smith not match the description of the shooter, the

28  evidence shows that he was not even in California on the day of the murder. (UF

53–61, 69–78.) There is simply no genuine issue of material fact as to a suppression of evidence, much less a **prejudicial** suppression of evidence, because it relates to a potential alternate suspect who could not have committed the crime in question. *See, e.g., United States v. Griffin*, 659 F.2d 932, 939 (9th Cir. 1981) ("Accordingly, constitutional error has been committed only if the non-disclosed evidence creates a reasonable doubt that otherwise failed to exist; hence, the omission of evidence must be evaluated in the context of the entire record.").

In *United States v. Aichele*, 941 F.2d 761, 764 (9th Cir. 1991), plaintiff claimed the government violated *Brady* in failing to disclose, in a timely manner, impeachment materials relating to a government witness. There, the government provided plaintiff with a transcript of the witness's interview and a copy of the witness's rap sheet before trial. *Id*. "This disclosure was made at a meaningful time because a three-week holiday break in the trial gave Aichele ample opportunity to prepare its in-court examination []." *Id*. The *Aichele* Court held, "When a defendant has the opportunity to present impeaching evidence to the jury, as Aichele did here, there is no prejudice in the preparation of his defense." *Id*. The *Aichele* Court continued, "Even assuming the government's disclosure was incomplete and untimely, there was no *Brady* violation here." *Aichele*, 941 F.2d at 764 (*quoting United States v. Gordon,* 844 F.2d 1397, 1403 (9th Cir. 1988) (holding that the opportunity to use information at trial cures prejudice caused by delayed disclosure)).

In *Aichele*, the Ninth Circuit determined plaintiff had "ample opportunity," with three weeks to prepare its in-court examination after finding out about the witness. Here, on May 24, 1984, a letter was sent to Det. Smith by the DA's Office along with a discovery order, requiring the Detectives to make available for inspection all items detailed in the pleading, specifically including the Detectives' notes. (UF 128.) This order, along with evidence found in the PD's file, further indicates Lara not only found out about R. Smith, but also considered R. Smith a

possible suspect, conducted investigation, and determined, months before trial, that he was in custody in Oregon at the time of the murder. (UF 69–79, 96–97, 128.)

It is clear that Lara had "ample opportunity" to determine whether evidence pertaining to R. Smith could be used as exculpatory material in Plaintiff's criminal trial. Thus, Plaintiff's *Brady* claim fails because no prejudice ensued from the alleged suppression.

## V.   THE INDIVIDUAL DEFENDANTS ARE ENTITLED TO QUALIFIED IMMUNITY AS TO PLAINTIFFS' SECTION 1983 CLAIM FOR RELIEF UNDER *BRADY* TO THE EXTENT PLAINTIFFS ALLEGE DEFENDANTS SUPPRESSED MATERIAL AND/OR EXCULPATORY EVIDENCE REGARDING RANDY SMITH AND THE ALLEGED PRIOR ATTEMPT ON VICTIM FRENCH'S LIFE.

Qualified immunity shields government actors from civil liability under Section 1983 if "their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). To determine whether an officer is entitled to qualified immunity, a court must evaluate: (1) whether the officer's conduct violated a constitutional right, and (2) whether that right was clearly established at the time of the incident. *Pearson v. Callahan*, 555 U.S. 223, 232 (2009).

Qualified immunity "protects all but the plainly incompetent or those who knowingly violate the law.'" *Stanton v. Sims*, 134 S.Ct. 3, 5 (2013) (internal citations omitted). An officer "cannot be said to have violated a clearly established right unless the right's contours were sufficiently definite that any reasonable official in his shoes would have understood that he was violating it, meaning existing precedent placed the statutory or constitutional question beyond debate." *City and County of San Francisco v. Sheehan*, 135 S.Ct. 1765, 1774 (2015) (internal quotation marks omitted).

The Supreme Court has repeatedly "stressed the importance of resolving immunity questions at the earliest possible stage in litigation." *Hunter v. Bryant*, 502 U.S. 224, 227 (1991). "[T]he entitlement is an **immunity from suit** rather than

1  a mere defense to liability." *Id*. (Emphasis added.)  Here, a determination of
2  qualified immunity is particularly appropriate for summary adjudication.

3        As set forth in Section IV (A), there was no constitutional violation because
4  the allegedly suppressed evidence regarding R. Smith was neither exculpatory nor
5  material, because R. Smith was a "dead" lead as the shooter. Also, as set forth in
6  Section IV (B), even based on the limited materials Defendants received from the
7  PD's Office file, along with Lara's own admissions, Plaintiff's defense team not
8  only knew about R. Smith, but considered him a prime suspect, and also knew he
9  was in custody in Oregon at the time of the murder. Therefore, R. Smith could not
10 have been the shooter. (UF 69–78, 96–97.) Thus, because there was no
11 constitutional violation, the individual defendants are entitled to qualified
12 immunity concerning Plaintiffs' allegation that they suppressed evidence regarding
13 R. Smith.

14    **A.    Even Assuming, *Arguendo*, There Was A Genuine Issue Of**
       **Material Fact With Respect To The Materiality And Alleged**
15     **Suppression Of Evidence Regarding Randy Smith, The Law**
16     **Determining Whether The Disclosure Of "Dead" Lead Evidence**
       **Was Considered Exculpatory Under *Brady* Was Not Clearly**
17     **Established At The Time Of The Underlying Investigation.**

18        "A government official's conduct violate[s] clearly established law when, at
19 the time of the challenged conduct, '[t]he contours of [a] right [are] sufficiently
20 clear' that every 'reasonable official would have understood that what he is doing
21 violates that right.'" *Ashcroft v. al-Kidd*, 563 U.S. 731, 739 (2011) (quoting
22 *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)); *Wilson v. Layne*, 526 U.S. 603,
23 617–18 (1999) ("If judges thus disagree on a constitutional question, it is unfair to
24 subject police to money damages for picking the losing side of the controversy.");
25 *Serrano v. Francis*, 345 F.3d 1071, 1077 (9th Cir. 2003).  Relevant to the instant
26 Motion, the Supreme Court has "repeatedly told courts – and the Ninth Circuit in
27 particular – not to define clearly established law at a high level of generality."
28 *Sheehan*, 135 S.Ct. at 1775–76. The law and its application to the specific situation

1   must be so clearly established that the unconstitutionality of the alleged action

2   would be "beyond debate." *Id.* at 1774.  Here, the qualified immunity question at

3   issue is not the broader inquiry as to whether the law was clearly established that

4   material and exculpatory evidence needed to be disclosed, but rather whether the

5   law was clearly established at the time of the underlying 1984 investigation that

6   "dead" lead evidence was considered material and exculpatory.

7          In 1968, the Supreme Court established that there was **no duty** to "make a

8   complete and detailed accounting to the defense of all police investigatory work on

9   a case." *Moore*, 408 U.S. at 795; *see Lessard v. Dickson*, 394 F.2d 88, 91 (9th Cir.

10  1968) ("We cannot find that the prosecution 'deliberately suppressed' evidence

11  which long before they had considered to be unreliable."); *see Fabricant v. United*

12  *States*, No. CR 03-01257-RSWL-1, 2015 WL 786981, at *5 (C.D. Cal. 2015) ("[A]

13  request for **all investigation reports** or any other writings related to the

14  government's contact with [victim's family] is [not material]" when cumulative.).

15         In 1984, it was not clearly established whether unreliable or "dead" lead

16  evidence was exculpatory and had to be turned over to the defense. *See, Lessard*,

17  394 F.2d at 91–92 (where prosecution withheld evidence of alternative suspect

18  because prosecutor felt the witness was "unreliable and the incident unimportant,"

19  did not violate due process, and "could hardly be regarded as being able to have

20  much force against the inexorable array of incriminating circumstances with which

21  [petitioner] was surrounded"). Instead, in determining whether evidence was

22  exculpatory, courts looked to the **nature** of the withheld evidence in relation to the

23  inculpatory evidence against the defendant.  *See, Fields v. Alaska*, 524 F.2d 259

24  (9th Cir. 1975) (undisclosed fingerprints would not have led to other viable

25  suspects and were not exculpatory due to inculpatory evidence against petitioner).

26         Here, the evidence establishes R. Smith was in Oregon at the time of the

27  murder, and therefore, he was a "dead" lead as the shooter. (UF 69–78.) Unlike

28  *Lessard*, where the lead was never pursued, and *Fields*, where several sets of

23

1  fingerprints were never investigated once petitioner was identified as a match,

2  here, evidence indicates the Detectives **did** follow-up and investigate R. Smith.

3  (UF 122–25). Ultimately, however, R. Smith did not match the suspect

4  description and was in custody **in Oregon** at the time of the shooting. (UF 53–61,

5  69–78).

6      Finally, even assuming, *arguendo*, the Detectives failed to disclose

7  information about R. Smith, which is directly undermined by the public defender's

8  notes and the discovery order sent to Det. Smith from the DA's Office, the law was

9  not clearly established in the early 1980's that "dead" lead evidence fell within the

10 parameters of *Brady*, particularly once witnesses identified a viable suspect. *See,*

11 *Moore*, 408 U.S. at 795; *Fields*, 524 F.2d at 259; *Lessard*, 394 F.2d at 91–92.

12     As in *Moore*, if the Detectives determined that R. Smith was not the shooter,

13 they had no duty to turn over the R. Smith information, because there was no

14 clearly established law requiring them to do so. *Moore*, 408 U.S. at 795. Thus,

15 notwithstanding the fact that the evidence shows that the allegedly suppressed

16 notes regarding R. Smith were, in fact, disclosed, even if they were not, the

17 individual Defendants are entitled to qualified immunity.

18     **B.    The Detectives Are Also Entitled To Qualified Immunity**
       **Because, Based On The Undisputed Facts, Their Conduct Was**
19     **Objectively Reasonable (Even If Mistaken) As A Matter Of Law.**

20     The individual Defendants are entitled to qualified immunity on the

21 additional grounds that a reasonable person in the Detectives' position would not

22 have considered the information regarding R. Smith as material and exculpatory

23 because R. Smith was in Oregon at the time of the murder and did not match the

24 eyewitnesses' descriptions of the shooter.  *See Malley v. Briggs*, 475 U.S. 335, 341

25 (1986).

26     In *Hunter*, Secret Service agents arrested a plaintiff because they suspected

27 he authored a letter threatening the President of United States. 502 U.S. 224, 228

28 (1991). There, the Court held that even if the agents lacked probable cause at time

1  of arrest, they "nevertheless would be entitled to qualified immunity because their

2  decision was reasonable, even if mistaken." *Id*. at 228–29. The Court went on to

3  say, "The qualified immunity standard 'gives ample room for mistaken judgments'

4  by protecting 'all but the plainly incompetent or those who knowingly violate the

5  law.'" *Id*. at 229, *quoting Malley*, 475 U.S. at 343.

6      Here, as in *Hunter*, there were copious facts verifying that R. Smith was a

7  "dead" lead and that his alleged involvement in a prior attempt on French's life

8  was neither material nor exculpatory. (UF 53–54, 69–78.) Most notably, R. Smith

9  could not have been at the scene of the murder on January 5, 1984. (UF 119–22.)

10  As for the SPPD memo, not only does it appear that it was in possession of the

11  DA's Office prior to the LASD, notes indicate the Detectives did their due

12  diligence, conducting a thorough follow-up investigation. (UF 105–08.)

13      Thus, even if the Detectives were mistaken and did not turn over information

14  about R. Smith, this purported mistake was unquestionably objectively reasonable

15  based on the information that (1) R. Smith was out of the state on the day of the

16  murder and (2) did not meet the description of the shooter. As such, the individual

17  Defendants are entitled to qualified immunity on this additional basis.

18  **VI.   CONCLUSION.**

19      For all the foregoing reasons, Defendants respectfully request that this Court

20  grant this instant motion and enter judgment in their favor as to Plaintiffs' Claims

21  for Relief under Sections IX and XI of the FAC for "suppression of exculpatory

22  information" under *Brady*, regarding the potential alternate suspect, R. Smith.

23

24  Dated:  December 30, 2016            LAWRENCE BEACH ALLEN & CHOI PC

25                                   By:   /s/ Lauren T. Krapf
                                        Michael D. Allen
26                                      Lauren T. Krapf
                                        Attorneys for Defendants,
27                                      COUNTY OF LOS ANGELES, J.D.
                                        SMITH and ERIC PARRA
28