1  Barrett S. Litt, SBN 45527
2  Email: blitt@kmbllaw.com
   Ronald O. Kaye, SBN 145051
3  Lindsay Battles, SBN 262862
4  KAYE, McLANE, BEDNARSKI & LITT
   234 East Colorado Boulevard, Suite 230
5  Pasadena, California 91101
6  Telephone: (626) 844-7660
   Facsimile: (626) 844-7670
7
8  Attorneys for Plaintiffs
9  Frank and Nicholas O'Connell

10          UNITED STATES DISTRICT COURT
11          CENTRAL DISTRICT OF CALIFORNIA

12  FRANK O'CONNELL,                  CASE NO. 13-01905-MWF (PJWX)
13  NICHOLAS O'CONNELL,
                                      [HONORABLE MICHAEL W.
14   Plaintiffs,                      FITZGERALD]
15
                vs.                   **Plaintiffs' Opposition to**
16                                    **Defendants' Motion for Summary**
                                      **Adjudication Regarding Alternate**
17  J.D. SMITH; ESTATE OF             **Suspect Evidence**
    GILBERT PARRA; ERIC PARRA;
18  COUNTY OF LOS ANGELES
    AND DOES 1-10                     Date:   March 6, 2017
19                                    Time:  10:00 A.M.
20                                    Courtroom:  5A
     Defendants.
21
22
23
24
25
26
27
28

# **Table of Contents**

I.    INTRODUCTION ................................................................................. 1

II.    SUMMARY OF FACTS ...................................................................... 4

    A.    LASD's Homicide Investigation ................................................ 4
    B.    Frank O'Connell's 1985 Trial & Conviction ............................ 6
    C.    Suppressed Exculpatory Evidence ............................................ 8

        1.    Eyewitness Evidence ...................................................... 8
        2.    Alternative Suspect/Alternative Theory Evidence ................. 10
        3.    The Anonymous Tip is Corroborated by Evidence Unearthed During the Habeas Investigation ................................. 13

    D.    The Handwritten Notes & Anonymous Tip Were Suppressed ........... 14

        1.    Prior Attempt ................................................................ 14
        2.    Anonymous Tip ............................................................. 15

III.    ARGUMENT ..................................................................................... 16

    A.    Prejudice Exists Where Material Evidence is Withheld .................... 16
    B.    Evidence Here Was Material and Exculpatory ............................... 17

        1.    The Prior Attempt Was Material & Exculpatory ..................... 17
        2.    The Materiality of the Prior Attempt Must Be Assessed Alongside the Anonymous Tip ............................................... 19
        3.    The Materiality Standard Does Not Require that Suppressed, Exculpatory Evidence be Independently Admissible .............. 20
        4.    Collectively, Brady Violations During Plaintiff's Prosecution Establish Strong Probability of a Different Result. ................. 22
        5.    Defendants' Cases Are Inapposite ........................................ 23
        6.    Defendants May Not Avail Themselves of Qualified Immunity ........................................................................... 24

    C.    Lara's Awareness of Randy Smith Is Unavailing to Defendants. ....... 25

IV.    CONCLUSION ................................................................................. 25

i

# <u>Table of Authorities</u>

**Federal Cases**

*Arizona v. California*,
   460 U.S. 605 (1983) ........................................................................... 19

*Banks v. Dretke*,
   540 U.S. 668 (2004) ........................................................................... 25

*Barker v. Fleming*,
   423 F.3d 1085 (9th Cir. 2005) ......................................................... 17

*Benn v. Lambert*,
   283 F.3d 1040 (9th Cir. 2002) ................................................... 20, 25

*Brady v. Maryland*,
   373 U.S. 83 (1963) ..................................................................... 16, 24

*Carrillo v. Cnty of Los Angeles*,
   798 F.3d 1210 (9th Cir. 2015) ..................................................... 1, 18

*Christianson v. Colt Industries Operating Corp.*,
   108 C.Ct. 2166 , 486 U.S. 800 (1988) ............................................ 18

*DiSimone v. Phillips*,
   461 F.3d 181 (2d Cir. 2006) ............................................................ 18

*Downs v. Hoyt*,
   232 F.3d  (9th Cir. 2000) ................................................................ 24

*D'Ambrosio v. Bagley*,
   2006 WL 1169926 (N.D. Ohio 2006) ............................................ 20

*Ellsworth v. Warden*,
   333 F.3d 1 (1st Cir.2003) ................................................................ 21

*Gantt v. Rose*,
   389 F.3d 908 (9th Cir. 2004) .......................................................... 19

*Gumm v. Mitchell*,
   775 F.3d 345 (6th Cir. 2014) ................................................... 19, 21

*Hayes v. Brown,*
  399 F.3d 972 (9th Cir. 2005) ..................................................................... 17

*Hernandez v. City of El Paso,*
  2009 WL 2096272 (W.D. Tex. 2009) ....................................................... 21

*Hovey v. Ayers,*
  468 F.3d 892 (9th Cir. 2006) ..................................................................... 16

*Kyles v. Whitley,*
  514 U.S. 419 (1995) ..................................................................... 16, 17, 23

*Michigan v. DeFillippo,*
  443 U.S. 31, 99 S.Ct. 2627 (1979) ........................................................... 24

*Paradis v. Arave,*
  130 F.3d 385 (9th Cir. 1997) ..................................................................... 20

*Paradis v. Arave,*
  240 F.3d 1169 (9th Cir. 2001) ............................................................. 21, 22

*Raley v. Ylst,*
  470 F.3d 792 (9th Cir. 2006) ..................................................................... 25

*Robinson v. Cain,*
  510 F.Supp.2d 399 (E.D. La. 2007) ..................................................... 20, 21

*Runningeagle v. Ryan,*
  686 F.3d 758 (9th Cir. 2012) ..................................................................... 24

*Smith v. Almada,*
  640 F.3d 931 (9th Cir. 2011) ............................................................... 23, 24

*Strickler v. Greene,*
  527 U.S. 263 (1999) ................................................................................... 16

*Tennison v. City and Cnty of San Francisco,*
  570 F.3d 1078 ............................................................................................ 18

*U.S. v. Agurs,*
  427 U.S. 97 (1976) ..................................................................................... 17

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

1

2

*U.S. v. Olson*,
   704 F.3d 1172 (9th Cir. 2013) ...................................................................... 21

3

4

*U.S. v. Price*,
   566 F.3d 900 (9th Cir. 2009) ........................................................................ 21

5

6

*United States v. Jernigan*,
   492 F.3d 1050 (9th Cir. 2007) ................................................................ 17, 19

7

8

*US v. Bagley*,
   473 U.S. 667 (1985) .......................................................................... 16, 17, 22

9

10

*Williams v. Ryan*,
   623 F.3d 1258 (9th Cir. 2010) .......................................................... 17, 19, 21

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# MEMORANDUM OF POINTS & AUTHORITIES

## I.   INTRODUCTION

Defendants' motion seeks summary judgment on evidence related to Randy Smith (hereafter "Randy"), Jeanne Lyon's (hereafter "Jeanne") prior attempt to kill Jay French (hereafter "Jay") and (indirectly) evidence of an anonymous tip that Jeanne hired a hit man through an associate in Oregon (where Randy was living in 1983-84).[1] Defendants' position runs contrary to the Ninth Circuit's decision in *this* case. *Carrillo v. Cnty of Los Angeles*, 798 F.3d 1210, 1226 – 1227 (9th Cir. 2015) (denying defendants qualified immunity on claim they did not have to disclose the prior attempt on Jay French's life, regardless of whether detectives considered it a "dead lead").

The Ninth Circuit decision was based solely on the facts alleged in the Complaint. Defendants implicitly attempt to distinguish it decision by emphasizing facts not in the complaint they contend demonstrate that Randy was in custody at the time of the murder. Leaving aside whether Randy was in custody on Jan. 5, 1984, a disputed fact, the exculpatory nature of Randy and Jeanne's joint prior attempt on Jay's life cannot be separated from the anonymous tip received a month after the murder (from a source aware that Jeanne and Jay were locked in a bitter custody dispute) that Jeanne paid "a male in Oregon" $7000, who in turn hired a hit man for $5000. This tip provided a name and local address for the shooter, and made Randy, a known, longtime associate of Jeanne living in Oregon, the leading candidate to have played that "middle man" role in light of his involvement in a prior attempt on Jay's life, all completely unknown to the defense. This evidence directly pointed away from Frank since Jeanne would not have needed a middle man to hire Frank (or, under the prosecution's theory, needed to pay him at all).

Whatever general knowledge the defense had that Randy lived in Oregon and was a person to investigate, it did not know of Randy's prior involvement in an

attempt on Jeanne's life or of an Oregon male hiring the killer. (Evidence that
surfaced years later, but that potentially could have been discovered at the time,
demonstrates that key parts of the anonymous tip were correct because Jeanne told
others that she had hired a hit man to kill Jay.) This combined evidence
indisputably raised Randy's profile and opened up investigative potential that the
defense had little if any reason to pursue without it.

Although it is possible that Randy was in custody on Jan. 5, that is a
disputed fact (and therefore whether Randy could be excluded as the gunman is
disputed). Similarly, Randy could not be excluded based on his physical
appearance. Randy Smith was 5'11 and around 160 lbs. His appearance was not
inconsistent with the varied physical descriptions provided by eyewitnesses.

The Court should not be distracted by Defendants' attempt to treat each
issue in isolation and thereby obscure the fact that exculpatory evidence must be
assessed cumulatively. The combination of the tip, the earlier-supplied information
concerning Jeanne's longtime connection to Randy (from Oregon) and their
previous conspiracy to murder the victim (for the same purpose) was indispensable
information. Each piece is an indispensable part of the tapestry of exculpatory
information of which the defense was deprived. Without knowledge of the prior
attempt, the defense would have little clue as to where to direct their focus among
Jeanne's Oregon contacts, of which there were many since she was from Oregon.

The fact that Frank's public defender, Adolfo Lara, was aware of Randy, and
investigated him as possibly being the shooter, does not change the analysis. Lara
had no evidence concerning the prior attempt, or the anonymous tip. Lara testified
that, had notes concerning the prior attempt been disclosed, he would have used
them to implicate Randy Smith, and to cast doubt on the thoroughness of the police
investigation, regardless of whether Randy Smith could have been excluded as the
gunman. Had the tip been disclosed, it would have supplied the defense with a

---

[1] This anonymous tip had not been disclosed at the time of the habeas or the filing of the

2

plausible alternative to the prosecution's narrative of the case, a basis to further discredit the police investigation and a gold mine of investigative possibilities. Habeas investigators located witnesses to whom Jeanne confessed that she had hired a hitman (not Frank). Because two of these witnesses were available in 1984, the murder-for-hire evidence could have been unearthed much earlier.

The exculpatory value of the prior attempt and tip must be assessed in the context of the relative weakness of the prosecution's case and the impact of the other *Brady* violations. Frank's conviction hinged almost entirely on the testimony of two eyewitnesses, one who identified him as the shooter and another who connected him to a car resembling the getaway car. The shooting eyewitness has testified that he was never sure of his identification, advised detectives that he could not identify the shooter, only selected a photo from the six-pack because he felt pressured by detectives, asked to be hypnotized and heard detectives make a call affirming his identification. None of this was known to the defense. The person connecting Frank to the car was likewise unable to make a positive identification, as reflected in suppressed handwritten notes. These developments undermined the evidence against Mr. O'Connell and raise serious concerns for the integrity of the investigation, reinforced by witnesses who testified in the original trial and in this case that detectives mischaracterized their statements. And there was substantial alibi and other evidence exonerating Frank. The law is clear that *Brady* violations must be assessed cumulatively, which Defendants ignore.

It is undeniable that LASD suppressed both the anonymous tip *and* handwritten notes concerning the prior attempt. Handwritten notes reflecting detectives 1/5/84 interview of Gina French were *not* part of the D.A. file were not contained in the District Attorney's case or appeal files, a fact to which the D.A. *stipulated* at the habeas (as it did regarding the other handwritten notes disclosed pursuant to a subpoena to LASD). The anonymous tip only surfaced in this case

---

instant complaint, and so was not part of the complaint.).

(along with other materials not previously disclosed during the habeas). The habeas Deputy District Attorney responsible for the habeas litigation has testified that it was not in the D.A., file, and he never saw it until it was presented to him in October 2016 (Contrary to defense assertions, the anonymous tip was not in a contemporaneous envelope from the D.A.'s office to LASD; for unknown reasons, it was in a D.A.'s envelope *postmarked 1993,* This is not evidence that the D.A. had it or disclosed it at trial.)

## II.    SUMMARY OF FACTS

### A.    LASD's Homicide Investigation

On January 5, 1984, shortly before 1:16 p.m., Jay French was murdered in the parking structure of the apartment complex where he lived. While waiting for the ambulance, French told his wife, Gina, "This had to be somebody or something to do with Jeanne." UMF 13.[2] From approximately 250 feet away, a delivery-person, Arturo Villareal, observed from the assailant escape in a yellow, Pinto station-wagon with woodgrain sides. AMF 5, 6. He provided responding officers with a physical description: white male, late-20's, approximately 5'10, 160-170 lbs. with shoulder-length, blond hair. AMF 7. Another witness, Alex Sanchez, saw a yellow Pinto speeding away from the murder scene and described the passenger as 25-30 years old with *dark* brown hair. AMF 8. Only one person, Daniel Druecker, observed the shooting. He was not wearing his glasses or contacts. AMF 9. Druecker initially described the shooter as a white man in his 30's, approx.. 6'0 or taller, with shoulder length dark *brown* hair. AMF 10.

Later that evening, Gina French told homicide detectives that Jay French and his ex-wife, Jeanne Lyon, had been embroiled in an on-going child custody dispute concerning their eight-year-old son. (hereafter "Jay French, Jr.").  AMF 11. Ms.

---

[2] Jay French told the first officer to arrive, William Gitmed, that he did not recognize the person who shot him. AMF 1. According to police notes, two other residents, Kimberly Wallach and Carol Gwenn, heard Mr. French say that he did not recognize the shooter. AMF 2. Another neighbor, Kenneth Dooley, heard Jay exclaim "the fucker in the yellow

French provided names of various people connected to Jeanne Lyon, including Jeanne Lyon's sister, Debbie (then Debbie Lopez), Mary Hilyard (one of the attorneys for whom Jeanne worked, and Frank O'Connell, who she described as a "boyfriend." AMF 12. Detectives subsequently learned that O'Connell met Jeanne and her husband, Ed Lyon, during a camping trip on Memorial Day of 1983. AMF 13. In June 1983, Jeanne and Ed separated for approximately six to eight weeks. AMF 14. Frank moved in with Jeanne for approximately six-weeks. Although they had sex, they were not seriously, romantically involved. AMF 15. In early-August, Jeanne reconciled with Ed and Frank moved out. AMF 16. Frank did not often see Jeanne and Ed, but they remained in touch. AMF 17. On January 1, 1984, he accepted their invitation to join them cruising Colorado Blvd. AMF 18.

Detectives identified Frank as a suspect and included his photo in a 6-pack photo lineup. AMF 19. According to police reports, Daniel Druecker and Arturo Villareal positively identified Frank as the assailant. AMF 20. Alex Sanchez identified a photo, not Frank's, as resembling the passenger of the getaway car. AMF 21. Frank was arrested on January 11, 1983.

On January 27, 1984, detectives canvassed Jeanne Lyon's neighborhood, interviewing her neighbors to determine whether they had observed a yellow-Pinto station-wagon.  AMF 23. Thomas Butler told police he observed a yellow-Pinto between January and April 1983. AMF 24. According to the police report, Mr. Butler reported that the vehicle was driven by a white in his mid-20's who was always alone and would go inside for 25 minutes to an hour before leaving. AMF 25. Mr. Butler could not say whether the car remained over the summer because he moved on 4/1/1983. AMF 26. According to police reports, on February 6, 1984, Butler chose Frank's photo from a 6-pack lineup, "immediately" identifying him as the driver of the vehicle. AMF 27, 28.

---

Pinto shot me"; he did not indicate that French recognized the shooter. AMF 3. No one said Jay indicated he recognized the shooter.2 AMF 2, 3, 4.

Police reports also indicated that detectives showed Maurice Soucy and his wife, Ina, photos of a "look alike" Pinto. They reported having seen a similar car during the summer of 1983. (The "look alike" photo is very dark and does not capture distinctive features of a Pinto, seriously undermining the reliability of the identification). According to police reports, they positively identified Frank from the six-pack as the driver of the car. AMFs 29-33. A third neighbor, Michael Lewis, reported having observed a yellow Pinto, but did not identify anyone as the driver. AMF 34.

## B.    Frank O'Connell's 1985 Trial & Conviction

No physical evidence connected Mr. O'Connell to the murder. At trial, the prosecution's theory of the case was that the Jeanne Lyon enlisted Frank O'Connell, with whom she had had an affair, to kill the victim so that she could regain custody of Jay Jr. AMF 36. Gina French testified regarding the custody dispute and that Frank had once accompanied Jeanne to her apartment complex. AMF 37. The only motive evidence was Frank and Jeanne's brief "romance." AMF 38. Gina, testified Jay told her that the shooter "looked like somebody Jeanne hangs around with," despite originally reporting to police that Jay said the murder had to be "somebody or something to do with Jeanne." AMF 39.  The prosecution stipulated that Officer Gitmed heard Jay say he did **not** recognize the shooter. AMF 40.

The centerpiece of the prosecution was Daniel Druecker, the only eyewitness to the shooting. Druecker claimed to have identified Frank as the gunman from a 6-pack photo lineup (and subsequently identified Frank O'Connell in court). AMF 41, 43. During closing, the prosecution characterized Druecker's testimony as the "strongest piece of evidence." AMF 42.

Arturo Villareal testified he saw the shooter escape in a yellow Pinto station wagon with woodgrain side panels. Contrary to the police report, at the preliminary hearing and trial, Villareal testified that could *not* positively identify Frank as the

shooter. AMF 44, 45. Villareal further testified that he told the detective that the photo he selected "looked like the man [he] saw, but [he] couldn't be positive., AMF 46, and that he picked out a person who resembled the assailant but was "not sure" it was the same person. AMF 47. JD Smith subsequently testified that Villareal made a positive identification, despite Mr. Villareal's sworn testimony to the contrary, AMF 48, 49, but also contradictorily stated that, in selecting a photo, Mr. Villareal said "that they all looked a lot a like, he said, but number 3 looked like the person that most likely looked like the person he'd seen." AMF 50. The selection of a photo accompanied by a statement that the photo "looks like" the person that most likely looked like the person" is not a positive identification. [3]

Maurice Soucy's testimony was crucial as it supplied the sole connection between Frank O'Connell and a yellow Pinto. Soucy testified that Frank drove a yellow Pinto station-wagon when he visited Jeanne during the summer of 1983. AMFs 52, 53. In contrast to Soucy, Mike Lewis testified that he saw a yellow Pinto between January and April 1983, but not during the summer of 1983 when Frank lived with Jeanne. AMF 54-56. Butler did not testify.

The defense presented three witnesses, other neighbors, who testified that no yellow Pinto had been parked near Jeanne's house during 1983. Jean Wilson and Brenda Rogers lived next door to Jeanne Lyon; Pamela Wilson lived across the street. AMFs 57, 66, 73. All testified that they were familiar with the appearance of yellow Pintos and did not observe a yellow Pinto on Shepherd Street from January 1983 through August 1983. AMFs 60, 61, 67, 76, 77, 78. Brenda Rogers and Pamela Wilson both testified that they had small children and kept an eye on the street. AMFs 68, 77. They were familiar with Mr. O'Connell, first observed him after Memorial Day 1983, and never saw him driving (or riding in) a yellow Pinto. AMFs 58, 59, 61, 62, 67, 69, 70, 74, 75, 76, Jean Wilson testified that, for some period of time, Mr. O'Connell drove a large brown station wagon (distinguishable

---

[3] Mr. Sanchez testified that he chose two photos; not a positive identification. AMF 51.

from a Pinto and which Mr. O'Connell also told Detectives when interviewed). AMF 63. Significantly, each testified that they had been interviewed by JD Smith and advised him they had never seen a yellow Pinto on Shepherd Street. Their statements were omitted from LASD's police report. AMF 35, 64, 65, 71, 72, 79, 80. In closing, the defense argued that Soucy was mistaken regarding the presence of a yellow Pinto, and may have confused it with a large, brown station wagon Mr. O'Connell owned. AMF 81.

The defense also presented three alibi witnesses who were present with Frank in LaVerne, California, at the time of the murder. Frank's roommates, James Hamilton and Scott Egerer, testified that Frank was home with them the whole morning of the murder. Karen Baxter (Jim's girlfriend) testified she arrived at the house to meet for lunch around 1:30 and Frank was there. AMFs 82-87.

Relying heavily on what it characterized as "unusually strong" eyewitness identifications, the Superior Court found Mr. O'Connell guilty of first degree murder. It characterized Soucy's testimony as convincing evidence that Mr. O'Connell was connected to a yellow Pinto, and found that Frank's motive was his relationship with Jeanne Lyon. The Court characterized the alibi witnesses as credible, but believed their testimony was outweighed by eyewitnesses. AMFs 88-91.

### C.   Suppressed Exculpatory Evidence

In March 2012, Frank's habeas petition was granted because the LASD suppressed material, exculpatory evidence. Below we summarize exculpatory evidence that surfaced during (and after) the habeas litigation.

#### 1.   *Eyewitness Evidence*

##### a)   *Maurice Soucy*

During the habeas, the LASD produced previously undisclosed homicide detectives' handwritten notes revealing that Soucy did not make a positive identification. Detective Smith's notes indicate that Soucy identified <u>two</u> photos

from the six-pack as possibly resembling the person he observed driving the Pinto. AMF 92. Another detective's notes indicate that he identified Frank's photo as the "poss." driver of the Pinto. AMF 93. This information directly contradicts the police report, which state that Soucy "immediately" identified Frank's photo. Contrary to the police report, the notes also indicate that Maurice, not Ina, Soucy, said the driver of the car had "curlier" hair than Frank's photo. AMF 94.

Adolfo Lara testified in this case that, had the notes been available, he would have used them to impeach the reliability of Soucy's identification, which supplied the only purported link between Frank and a yellow Pinto. AMF 95. The notes would also have provided a potential basis to exclude Soucy's later in-court identification. AMF 96. Additionally, defense counsel could have used detectives' misrepresentation of Soucy's statements to bolster the argument that detectives misrepresented Villareal's identification and that the Court should credit Villareal's testimony that he could not make a positive identification over Smith's testimony that he did. AMF 97.

### b)  *Thomas Butler*

Butler has testified in this case that he did not make a positive identification as indicated in the police report. AMF 98.  Though he pointed to a photo that resembled the driver of the car he saw, he "could not make any positive identification of anybody because [he couldn't] determine a face from across the street," and he "absolutely" told detectives that he could not make a positive identification. AMF 99. Had the defense known of the discrepancy between Butler's statements and the police report, it would likely have called him to show the gross unreliability of the police reports, and to reinforce the argument that detectives misrepresented Soucy's and Villareal's statements. AMF 100.

### c)  *Daniel Druecker*

During the habeas, Daniel Druecker testified that he had never been sure of his identification. AMF 101.  When detectives contacted him on the evening of the

murder, he asked to be hypnotized. AMF 102. In response to being shown the six-pack, he told detectives that "he didn't recognize anybody;" that he needed to see side-view profiles and that he didn't see the shooter's face. AMF 103. The police responded by telling him to "really look at the photos;" Druecker believed that he was required to make a selection. AMF 104. Druecker then made a tentative and uncertain identification, asking the detectives "Is that the guy?" The detectives told him he had to be certain. AMF 105. After he selected the photo, one of the detectives made phone call in his presence indicating that he had made a positive identification. AMF 106. At the habeas hearing, Detective Smith could not remember whether such a phone call occurred. AMF 108. Assuming Druecker's testimony is credited, none of this information was reflected in police reports or otherwise relayed to the defense.[4]

Had this information been available, Mr. O'Connell's defense would have used it to seek exclusion of Druecker's subsequent in-court identifications, or at minimum to impeach the validity of Druecker's identification and to cross-examine detectives to demonstrate inaccuracies in their report. AMFs 109, 110.

### 2. *Alternative Suspect/Alternative Theory Evidence*

#### a) *Prior Attempt*

Previously undisclosed handwritten notes produced for the habeas indicate that, on the evening of the murder, Gina French advised detectives that, several years earlier, Jeanne Lyon and a white male, Randy Smith, tried to run over Jay French on his motor cycle. AMF 111. Ms. French provided a physical description of Randy, stating that he was "tall with sandy blonde hair."[5] AMF 113. The prior attempt was not memorialized in police reports, nor is there any document

---

[4] Druecker's current testimony is significantly bolstered by the fact that scientific evidence has shown that his uncorrected eyesight (he was not wearing them when he witnessed the murder, AMF 9, was such that he could not make an identification. AMF 107.

[5] Ms. French provided detailed information concerning the prior attempt, including a description of the vehicle involved (Ms. Lyon's green Capri), the location of the incident

indicating that the police investigated further. AMF 114. Detectives did not promptly investigate Randy's whereabouts on the day of the murder, nor did they investigate whether he and Jeanne had recently been in touch. AMF 115. According to handwritten notes first produced in this case, at least one detective traveled to Oregon in **December 1984** and learned from Randy's probation officer that he failed to report to a mandatory appointment on 1/5/1984. Randy was interviewed did not claim to have been in jail on 1/5/84. AMFs 116-118.

Randy's physical appearance did not exclude him as the shooter. Randy was **5'11** and over 160 lbs., similar to Villareal's initial description of an assailant approximately 5'10 and 160 – 170 lbs. His height is confirmed by a jail booking photo obtained by the Detectives in 1984, which shows Randy Smith standing in front of a height chart. According to the height chart, Randy Smith is between 71 and 72 inches; a note below the chart indicates he was 162 lbs. AMF 119-122. Randy had brown hair, which varied from Villareal's description (blond) yet was consistent with Druecker's and Sanchez's descriptions (brown). AMF 123.  He was 28 years old (generally consistent with Villareal and Sanchez).AMF 122. Smith told detectives that he had a full beard at the time of the murder, but this was never independently verified. AMF 124.

Nor have court records conclusively established an alibi for the day of the murder. Court records, obtained years after the original trial, indicate that Randy was arraigned on 1/4/1984. Bail was set for $10,000. He was ordered to appear on 1/12 (which he did, Ex. 227, p. 4). When he posted bail is unclear.[6] AMF 160-163.

---

(near Sacred Heart Girls School). She also advised that Jay French had reported it to the Pasadena Police Department, and Jay's family law attorney, Peter Wisner. AMF 112.
[6] Court records indicates that, on 1/25/84, Smith assigned his $2,000 interest in bail to the clerk of the court to be applied towards his attorney's fees, indicating that bail was posted at some point. Though Defendants may contend that the entry on pg. 4 that "defendant shall be released on the security amount of $10,000" indicates that he was not out on bail on that date (1/12); the word "(continued") after that makes it ambiguous whether bail was already posted. There is no separate place on the form to indicate whether he remained out on previously posted bail. Had Randy been incarcerated between late-December 1983 and January 12, 1984, his probation officer would likely have known and

### b)    *Anonymous Tip*

During discovery in this case, LASD produced a February 8, 1984 memo memorializing a phone call to the LASD's Altadena substation from an anonymous, male caller. The caller said Jeanne Lyon paid to have Jay French killed when she learned that he received custody of the children; she **paid a male in Oregon $7,000.00**, **who in turn paid someone named Richard Stephens $5,000.00 to do the job**; Stephens supposedly lived at either 727 or 757 N. Catalina, Pasadena, in a rear house; Stephens had a female, Mexican accomplice and a male white or Mexican accomplice by the name of James.[7] AMF 125, 126. The caller's knowledge of the custody dispute and ability to provide detailed information provided inherent indicia of reliability. Police reports, however, contained no reference to the anonymous tip, or to the caller's reference to a "male in Oregon." AMF 134. Upon receiving the tip, detectives did not investigate Jeanne's finances, Randy's finances, or communications between them.

The tip was first relayed to SSPD Lt. Hatfield, who was assigned to assist the LASD in the French murder investigation.  AMF 127-128. A handwritten note, attached to the tip, indicates that, on February 22, 1984, detectives observed a 1972 yellow Ford, license plate 1ADV272, with "wood grain" enter the rear side of 757 N. Catalina. Detectives did not photograph the car (precluding having eyewitnesses determine if it matched the getaway car), and there are no notes indicating neighbors were questioned regarding how used or had access to the car[8] or whether they matched descriptions of the shooter. AMF 129. The note references "Richard Stevens," "Rick?" and "Rosa" "(girlfriend)." AMF 130. None of this was incorporated into police reports. AMF 134.

---

would not have reported to detectives that Randy had missed a mandatory probation appointment on January 5. AMF 117.
[7] There is no question this information was relayed directly to detectives assigned to the French murder investigation. The Altadena substation relayed this information to Lieutenant Hatfield of the South Pasadena Police Department, who was assigned to assist Detectives Smith and Parra on the French homicide investigation.

The tip was contemporaneously relayed to Detectives Smith. His notes show that some follow-up investigation occurred in February 1984 to determine the registered owners of the car. Those notes also list persons with the last name "Stevens," including Mark Fred Stevens in connection with 717 Catalina St. in Pasadena, with a physical description and birth date for Mark Fred Stevens. Mark Fred Stevens would have been 26 in 1984; he was 6-2 and 190 lbs.[9] Detectives obtained no photos of Mark Fred Stevens to confirm whether he matched descriptions of the suspect. Police reports contain no reference to detectives' investigation of the anonymous tip, Richard Stevens/Stephens, the Ford observed on Catalina St., or other leads. AMFs 131-134.

### 3. The Anonymous Tip is Corroborated by Evidence Unearthed During the Habeas Investigation

Although detectives investigated the reference to Richard Stevens,[10] they did not adequately investigate the murder-for-hire theory, an avenue that would have yielded significant evidence. Habeas investigators identified several witnesses to whom Jeanne confessed that she hired a hitman (AMFS 180, 181, 185, 186, 189, 197) – significantly, information regarding Jeanne's confessions came to light years *before* the anonymous tip was produced in the instant litigation. Two of these witnesses were available to investigators at the time of the murder. Deborah Zitella, Jeanne's sister, worked as a legal secretary in the same office as Jeanne.[11] Before the murder, Jeanne Lyon told Deborah that she was going to have an attorney for whom she worked, James Mack, arrange a loan from which she would pay a contract killer. After the murder, Jeanne told Deborah that an innocent man

---

[8] Detectives determined that the car was registered to a Norwalk, California address, though the registered owners had moved to Texas.

[9] Handwritten notes contain the names of various other persons potentially associated with Richard Stevens.

[10] A reasonable investigator would not have limited their efforts to the name supplied by the anonymous caller (because the caller may have been mistaken) and the car observed on Catalina Street. A reasonable investigation would have included all aspects of the murder-for-hire theory. AMF 175.

[11] LASD detectives learned of Deborah from Gina French on the day of the murder. AMF 177.

had been arrested for the murder. AMFS 176-183.  During the habeas, James Mack testified that, prior to the murder, he overheard conversations between Jeanne and Ed Lyon about hiring a hitman for $5,000. At some point, Jeanne told Mack that she had hired a hitman and later pointed out the contract killer to Mack. The contract killer was not Frank O'Connell. AMFS 184-187. Because Detectives knew where Jeanne worked, Mack was readily available.

The habeas investigation also revealed several persons to whom Jeanne confessed after Frank's conviction. During the late-1980's, Jeanne confessed to her then-fiance, Michael Flick, that she paid a hitman to kill her ex-husband. The murder was arranged by Ed Lyon, who met the hitman at a bar, and James Mack, arranged a payment of $10,000. The money came from Jeanne and Ed's joint savings account. Jeanne was concerned that the withdrawal would be traceable if police examined her financial records. AMF 188-194. Detectives had obtained Jeanne and Ed's account number during the 1984 investigation, AMF 165, but did not investigate their financial records. Jeanne also told Flick that the person arrested and convicted was not the person who killed Jay French. AMFS 195. Jeanne later confessed to a boyfriend that she "had somebody take care of" Jay's father and that there was an innocent man in jail. AMFS 196, 197.

### D.    The Handwritten Notes & Anonymous Tip Were Suppressed

#### 1.    *Prior Attempt*

Overwhelming evidence indicates that LASD failed to disclose detectives' handwritten notes, including those reflecting the prior attempt.[12] Deputy District Attorney Juan Mejia, who represented the prosecution at the habeas, "reviewed all of the District Attorney files [he] was able to assemble from the 1985 prosecution and subsequent appeal." Prior to the 2011 habeas hearing, Mr. O'Connell's habeas counsel presented Mr. Mejia with handwritten detectives' notes produced by

---

[12] LASD's 30(b)(6) witness, Mike Bumcrot, confirmed that, during early-1980's, the LASD had no required *Brady* training and  no formal policy or established procedure to

LASD in response to a subpoena. Mr. Mejia's states that the handwritten notes produced by the LASD were **not** part of the district attorney's file for the 1985 prosecution and subsequent appeal. AMFs 136-138. At the evidentiary hearing, Mr. Mejia stipulated to this. AMF 139. The only reasonable inference is that the District Attorney never received the handwritten notes.

Records from the public defender file indicate that Lara learned of Randy when Gina French indicated that Randy may look like Frank. No records, however, indicate that Lara learned of the prior attempt, and Lara so testified in deposition. Although Lara considered Randy a potential "suspect," he had no evidence to suggest Randy was involved in the French murder. AMFs 140-147. Contrary to defendants' contention, Lara's investigation of whether Randy flew from Portland to Los Angeles on January 4, 1984, indicates that Lara did *not* believe Randy was incarcerated and had *not* excluded him as the shooter.

### 2. *Anonymous Tip*

The anonymous tip and investigative notes related to it remained buried during the habeas litigation, and did not surface until discovery in this case.. D.D.A. Juan Mejia has submitted a declaration confirming that the anonymous tip was **not** part of the District Attorney's file he reviewed for the habeas litigation, nor was it produced by LASD during the habeas litigation. Before this case, Mr. Mejia had not seen the tip. AMFs 148, 149. The only reasonable inference is that LASD never forwarded the tip to the District Attorney. Hon. Patrick Walsh reviewed the public defender file to confirm there were no direct or indirect references to Richard Stevens, the anonymous tip or a contract killer. See Dkt. 116. Had the information been available, Lara would have examined Lt. Hatfield and J.D. Smith about the tip and their follow-up investigation. Lara testified that, insofar as he did not examine detectives about the tip, it is fair to infer he did not have the information. AMF 152-154.

---

ensure detectives turned over their notebooks to the district attorney. AMF 198, 199. 205,

It is of no consequence that the tip was purportedly discovered in an envelope from the District Attorney's office. Because the envelope is post-marked February 1, **1993** (nine years after the anonymous tip), that envelope is not evidence that the District Attorney forwarded the tip to the LASD, particularly given notes reflecting a follow-up investigation in February 1984.[13] AMF 155-159.

## III. ARGUMENT

### A.   Prejudice Exists Where Material Evidence is Withheld

*Brady v. Maryland*, 373 U.S. 83 (1963), establishes that the "suppression by the prosecution of evidence favorable to an accused…violates due process where the evidence is material either to guilt or to punishment." *Id.* at 87. There are three essential components to a *Brady* claim. (1) the evidence must be favorable to the accused; (2) it must have been suppressed by the State; (3) prejudice must have ensued. *Strickler v. Greene*, 527 U.S. 263 (1999).

To determine prejudice, courts look to the materiality of the allegedly suppressed evidence. *Hovey v. Ayers*, 468 F.3d 892, 916 (9th Cir. 2006). Evidence is material if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. *US v. Bagley*, 473 U.S. 667, 682 (1985). A "reasonable probability" of a different result exists where evidentiary suppression "undermines confidence in the outcome of the trial." *Kyles v. Whitley*, 514 U.S. 419, 434 (1995) (quoting *Bagley*). The issue is whether, in the absence of the disclosure, the defendant "received a fair trial, understood as a trial resulting in a verdict worthy of confidence". *Id.* A "reasonable probability" may exist even where the remaining evidence would have been sufficient to convict the defendant. *Strickler v. Greene,* 527 U.S. 263, 280 (1999).

---

206 – 209..
[13] Moreover, during a March 2014 physical inspection of the envelope, Detective, Steve Lankford, advised Plaintiffs' counsel that the original file had deteriorated, requiring homicide personnel to replace some folders, indicating that the original organization had been changed. Lankford said he first noticed it in during that inspection. AMF 158.

Materiality is not assessed "item by item," but rather requires cumulative assessment of **all** Brady-violations in view of the entire record. *Kyles*, 514 U.S. at 436; *U.S. v. Agurs*, 427 U.S. 97, 112 (1976) (courts analyze the **totality** of the undisclosed evidence "in the context of the entire record."); *see also Bagley*, 473 U.S. at 682. One "aspect of *Bagley* materiality to be stressed here is its definition in terms of suppressed evidence *considered collectively, not item by item*." *Kyles,* 514 U.S. at 436 (emphasis supplied); *see also Barker v. Fleming*, 423 F.3d 1085 (9th Cir. 2005).

Materiality and prejudice are not separate inquiries. Where suppressed evidence satisfies the materiality standard, prejudice exists. *Hayes v. Brown*, 399 F.3d 972, 984 (9th Cir. 2005) ("When the Supreme Court has declared a materiality standard as it has for this type of constitutional error, there is no need to conduct a separate harmless error analysis").

## B. Evidence Here Was Material and Exculpatory

### 1. The Prior Attempt Was Material & Exculpatory

Alternative suspect evidence is "classic" Brady material. *Williams v. Ryan*, 623 F.3d 1258, 1265 (9th Cir. 2010); *United States v. Jernigan*, 492 F.3d 1050, 1056-1057 (9th Cir. 2007) (en banc). "Withholding knowledge of a second suspect conflicts with the Supreme Court's directive" that it is "the criminal trial" and not "the prosecutor's private deliberations" that ascertain[s] the truth about criminal accusations.'" *Id.* at 1056-1057 (quoting *Kyles*, 514 U.S. at 440, 115 S.Ct. 1555).[14]

Here, evidence of the prior attempt, even standing alone, is exculpatory and material because it raised the possibility of a plausible alternative suspect with longstanding ties to Jeanne, who had been involved in a murder attempt against the same victim, supported by the same motive. Lara has testified that, had he known about the prior attempt, he would have cross-examined investigating officers as to

---

[14] LASD's 30(b)(6) witness, Mike Bumcrot, has testified that alternative suspect evidence and evidence contradicting the detectives' theory of guilt qualifies as *Brady* information

why it had been omitted from police reports and the adequacy of any follow-up investigation. He also would have interviewed persons close to Jay to learn more about the incident and would likely have subpoenaed phone records to determine whether Jeanne and Randy had been in touch. In trial, he would have examined Gina about the incident to show that Jeanne had previously conspired murder with Randy, whom she had known much longer than Frank. AMFs 143-147.

Defendants argue that the prior attempt cannot be material given evidence suggesting Randy was a dead lead *as the shooter*. As a preliminary matter, Plaintiffs do not concede that Randy was excluded as the gunman, as we explained in §C(2)(a) (above). Even if he had been excluded as the gunman, it would not negate detectives' *Brady* obligations. In this very case, the Ninth Circuit rejected Defendants argument that "dead lead" evidence is exempt from *Brady* and squarely found that the State has an obligation to disclose such evidence, regardless of whether detectives consider it a "dead lead,"

> "[I]f there were questions about the reliability of the exculpatory information, it was the prerogative of the defendant and his counsel – and not of the prosecution – to exercise judgment in determining whether the defendant should make use of it," because "[t]o allow otherwise would be to appoint the fox as henhouse guard." *Tennison*, 570 F.3d at 1094 (quoting *DiSimone v. Phillips*, 461 F.3d 181, 195 (2d Cir. 2006)).

*Carrillo v. Cnty of Los Angeles*, 798 F.3d 1210, 1226 – 1227 (9th Cir. 2015) (citing *Tennison v. City and Cnty of San Francisco*, 570 F.3d 1078, 1094 (9th Cir. 2008) [15].

Given the relatively weak prosecution case against Frank, even tenuous evidence pointing to Randy as the shooter would have been valuable. While significant evidence pointed to Jeanne, there was no physical evidence and little circumstantial evidence to suggest Frank's involvement. Evidence suggesting that

---

and would have been recognized as *Brady* information during the early-1980's. AMFS 200-202, 204.

[15] Under the law-of-the-case doctrine, that decision is final. *Christianson v. Colt Industries Operating Corp.*, 108 C.Ct. 2166 , 486 U.S. 800, 815 (1988) ("'the doctrine [of the law of the case] posits that when a court decides upon a rule of law, that decision

Jeanne coordinated with a longtime associate, with whom she had previously lived and whom previously conspired in an effort to kill her ex-husband, could have been more than sufficient to establish reasonable doubt regarding Mr. O'Connell's involvement. *See Williams*, 623 F.3d at 1256-1257 (9th Cir. 2010 (alternative suspect evidence necessarily more valuable where prosecution lacks physical evidence or otherwise rests on weak evidence).[16] Even without the anonymous tip, and even if the prosecution believed Randy was not the shooter, his involvement in a prior attempt put him at the top of the list as of suspects; that investigation could have resulted in looking into his finances and communications with Jeanne.

### 2. The Materiality of the Prior Attempt Must Be Assessed Alongside the Anonymous Tip

While Plaintiffs contend that the prior attempt alone is *Brady* material even absent the anonymous tip, that issue is ultimately academic because the prior attempt must be assessed in conjunction with the suppressed anonymous tip.[17] Any reasonable detective aware of the prior attempt would have appreciated the significance of the tip's reference to a "male in Oregon," would have recognized that Jeanne's connection to Randy potentially corroborated this aspect of the tip, and would have made him a focus for investigation It bolstered the likelihood that Randy, given his prior involvement, participated in the murder, though not necessarily as the actual shooter. The anonymous tip moots Randy's whereabouts

---

should continue to govern the same issues in subsequent stages of the same case,'" *quoting*, *Arizona v. California*, 460 U.S. 605, 618 (1983).
[16] *See also Jernigan*, 492 F. 3d at 1054 - 1056 (assessing the strength of the prosecutor's case in weighing the materiality of suppressed alternative suspect evidence that bolstered probability that five eyewitnesses were mistaken in their identifications); *Gantt v. Rose*, 389 F.3d 908, 913 (9th Cir. 2004) (newly discovered information is material when it undermines a conviction based upon little physical evidence); *Gumm v. Mitchell*, 775 F.3d 345, 370 (6th Cir. 2014) (undisclosed information relating to other suspects material given the prosecution's relatively weak case).
[17] It is unclear what significance Defendants place on their contention that the anonymous tip was in a D.A. envelope. The possibility that the anonymous tip was "found" in a 1993 envelope does not establish that the D.A. had it in 1984, Since the tip and handwritten notes were not in the prosecution file, there is no reason to conclude that they were disclosed pursuant to the discovery order; the reasonable inference is that Smith did not provide his complete file pursuant to the discovery order.

at the time of the murder as dispositive of anything because it would not exclude him as an accomplice.

Defendants insist that Randy's potential involvement as an intermediary does not undermine O'Connell's connection to the murder. This position requires a preposterous reading of the tip. If Jeanne hired the shooter through an Oregon intermediary, then a person unfamiliar to her committed the murder. The tip not only contradicted the state's theory (Jeanne enlisted Frank based on their previous romantic involvement) but also pointed to an alternative narrative and suspect. *See Williams*, 623 F.3d at 1256 (9th Cir. 2010) (withheld information not only was "inconsistent with the State's theory at trial…but [it] also point[ed] to an alternative suspect who may himself have been responsible for the brutal crime.").

Evidence that does not directly exculpate the suspect is material and exculpatory if it undermines the government's narrative of the crime *See, e.g., Paradis v. Arave*, 130 F.3d 385, 392 (9th Cir. 1997) (undisclosed detectives' notes containing medical examiner's conclusion rebutting prosecution's theory of the case were material impeachment evidence where the medical examiner later offered contradictory testimony); *Benn v. Lambert*, 283 F.3d 1040, 1055 (9th Cir. 2002) (undisclosed expert conclusion that a fire was accidental was material evidence; it could have served to rebut state's primary theory of motive, and the aggravating circumstances of common scheme or plan); *Robinson v. Cain*, 510 F.Supp.2d 399, 410 (E.D. La. 2007) (failure to disclose police report referencing **anonymous** witness statements violated *Brady*, as they suggested a motive not easily imputable to the defendant, could have led to finding witnesses with firsthand  knowledge of the crime and fundamentally contradicted the key witness' testimony); *D'Ambrosio v. Bagley*, 2006 WL 1169926 (N.D. Ohio 2006) (suppressed evidence material in part because it could have undercut the state's theory of the case and assisted the defendant in establishing an alternative theory)/

> **3.** ***The Materiality Standard Does Not Require that Suppressed, Exculpatory Evidence be Independently Admissible***

1    Favorable evidence that is not independently admissible is nonetheless

2    material where it can be used to impeach a government witness or where could

3    have led to the discovery of admissible evidence. *U.S. v. Olson*, 704 F.3d 1172,

4    1183 (9th Cir. 2013); *Williams*, 623 F.3d at 1265; *U.S. v. Price*, 566 F.3d 900, 912

5    (9th Cir. 2009); *Paradis* 240 F.3d at 1178-1179 (9th Cir. 2001); s*ee also, Ellsworth*

6    *v. Warden,* 333 F.3d 1, 5 (1st Cir.2003) (inadmissible evidence "could be so

7    promising a lead to strong exculpatory evidence that there could be no justification

8    for withholding it."). Here, the anonymous tip and prior attempt were useful for

9    <u>both</u> purposes.

10    Had the tip and prior attempt ben disclosed, Plaintiffs' defense attorney

11    could have cross-examined the investigating detectives about significant omissions

12    from the police report, their failure to thoroughly investigate the murder-for-hire

13    theory, Randy Smith's potential involvement (including his finances), and the

14    yellow Ford observed on Catalina, demonstrating their bias against Frank and

15    casting doubt on the integrity of the investigation, especially in conjunction with

16    the suppressed eyewitness evidence.[18] *See Gumm v. Mitchell*, 775, F.3d 345, 370

17    (6th Cir. 2014) (had they been disclosed, potentially favorable leads "would have

18    provided compelling counter-narrative to the state's theory and would have called

19    into question thoroughness of the police investigation."); *Robinson*, 510 F.Supp.2d

20    399 (defense counsel could have used suppressed exculpatory witness statements

21    to elicit information from police regarding the integrity of the investigation);

22    *Hernandez v. City of El Paso*, 2009 WL 2096272 (W.D. Tex. 2009) (disclosure of

23    a witness interview contradicting the state's theory would have nullified an

24    eyewitness account, undermined the veracity of other prosecution witnesses, and

25    significantly, discredited the police investigation generally). See AMFs 167-174.

26    Suppression of the anonymous tip and prior attempt also deprived Frank's

27    counsel of the opportunity to pursue their own investigation to explore and

28

possibly confirm the alternative theory. A *Brady* violation exists where suppression causes the defendant to "abandon lines of independent investigation, defenses, or trial strategies that [he] otherwise would have pursued." *Bagley,* 473 U.S. at 683, 105 S.Ct. 3375, *see also, e.g. Gumm*, 775, F.3d at 370 (6th Cir. 2014) (inadmissible, leads and witness statements were material in that they could have led to admissible evidence). Armed with all the suppressed evidence, Plaintiff's defense attorney would have explored all evidence related to the murder-for-hire theory, including: (1) Jeanne and Ed Lyon's bank accounts and other financial information; (2) Randy Smith's bank accounts and communications with Jeanne; (3) Jeanne Lyon's friends, co-workers, and acquaintances; (4) Richard, Stevens, Kathy Stevens, Mark Fred Stevens and their friends and family; (5) the owner of the Ford seen at the Catalina address; (6) any person who had access to the car seen on Catalina/residents of the 700 block of Catalina. AMFs 164, 166.

The likelihood of this investigation leading to admissible evidence is far from mere speculation because we now have evidence corroborating the tip in significant part. Jeanne has admitted to several people that she hired a hitman (see §II, C, 3 *infra* and AMFs 175-197), and has admitted to one witness that she paid using funds from a savings account she shared with Ed Lyon (the number for which was known to detectives). Deborah Zitella and James Mack were available at the time of the murder. (Jeanne told Debbie that she was going to hire a hitman through James Mack, and after the murder said an innocent man had been arrested for it; James Mack, now dead, disclosed that he heard Jeanne and Ed Lyon discuss hiring a hitman and Jeanne pointed out the hitman to him; it was not Frank).

### 4. *Collectively, Brady Violations During Plaintiff's Prosecution Establish Strong Probability of a Different Result.*

*Brady* violations that surfaced during (and since) the habeas investigation have eviscerated the prosecution's case, neutralizing or negating virtually all the

---

[18] Impeachment and bias evidence are unquestionably admissible. *See Paradis v. Arave*, 240 F.3d 1169, 1179 (9th Cir. 2001).

prosecution's evidence, while raising serious questions regarding the competence and integrity of the investigation. Evidence of the prior attempt and anonymous tip would have reinforced concerns with the integrity and competence of the investigation, while presenting a plausible alternative narrative.

Without Druecker, Defendants have no meaningful evidence directly tying Frank to the murder. Daniel Druecker's complete repudiation of his trial testimony, the (suppressed) evidence of his repeated and undisclosed statements indicating that he could not identify the suspect, and scientific evidence showing that his poor vision precluded an accurate identification have completely eliminated Druecker as a witness to establish guilt. Similarly, suppressed handwritten notes indicate that Soucy could not positively identify Frank in connection with a yellow Pinto (see §C(1)a), further undermining the prosecution's only evidence tying Frank to the getaway car (which was heavily contradicted by three neighbors). Disclosure of detectives' mischaracterization of Soucy's statement would have bolstered Villareal's sworn testimony that he could not make an identification and so told the detectives, despite Smith's efforts to discredit him. Evidence of misrepresentations concerning <u>four</u> witnesses – Druecker, Soucy, Villareal, and Butler – could have established a pattern of inaccurate statements, suggesting intentional misconduct or bias against O'Connell. All of this, along with the alternative suspect evidence, would have discredited Smith, and certainly "put[s] the whole case in such a different light as to undermine confidence in the verdict." *Kyles*, 514 U.S. at 435

### 5.    *Defendants' Cases Are Inapposite*

*Smith v. Almada*, 640 F.3d 931 (9th Cir. 2011) (which Defendants' brief erroneously refers to this case as "*Cain*") involved a twice acquitted Plaintiff (charged with arson) who asserted §1983 claims for malicious prosecution. He claimed the arresting officer suppressed evidence of unrelated dumpster fires, and information reflecting negatively on the credibility of a prosecution witness (whose motive testimony was largely cumulative of the suspect's own statements). Such a

§1983 claim is completely distinct from the instant claims. In *Almada* the inquiry was whether the suppressed evidence undermined probable cause to prosecute. Here, the standard is whether suppressed evidence undermines confidence in a guilty verdict that requires proof beyond a reasonable doubt, a significantly more rigorous standard than probable cause, which requires only "facts and circumstances … sufficient to warrant a prudent person, or one of reasonable caution, in believing… that the suspect has committed…an offense." *Michigan v. DeFillippo*, 443 U.S. 31, 37, 99 S.Ct. 2627, 2632 (1979). In any event, the exculpatory value of the evidence does not compare to this case. Unlike the unrelated fires in *Almada*, the prior attempt and tip involved the same victim, same motive (custody dispute) and at least one of the same perpetrators (Jeanne Lyon). And unlike *Almada*, this case does not hinge on physical evidence linking O'Connell to the crime (no such evidence existed).

*Downs v. Hoyt*, 232 F.3d 1020 (9th Cir. 2000) is equally unavailing given the strength of the prosecution's case against the defendant. Physical evidence linked Downs to the crime and her surviving, eight-year-old daughter testified that she witnessed the murder. She alleged that police officers failed to disclose various unspecified leads of indeterminate exculpatory value. The Ninth Circuit held that the claimed unspecified suppressed did not cast doubt on the verdict given the weight of inculpatory information presented. *Runningeagle v. Ryan*, 686 F.3d 758, 767 (9th Cir. 2012) is similarly distinguishable in that it could not be determined whether the suppressed information would have been exculpatory. By contrast, the instant case involves information of known exculpatory value that, viewed collectively, directly undercut the prosecution's theory.

### 6. *Defendants May Not Avail Themselves of Qualified Immunity*

The Ninth Circuit further held **in this case** that Defendants may not avail themselves of qualified immunity:

"Any reasonable police officer in 1984 would have understood that evidence potentially inculpating another person fell within *Brady*'s scope. In *Brady*

24

itself, the Court considered the failure to disclose an accomplice's confession that he had committed the homicide for which he and the defendant were standing trial. The Court held suppression of this evidence violated due process. See 373 U.S. at 86. Here, the officers failed to disclose evidence that another man who resembled the eyewitness description of the killer had previously tried to kill the victim.

## C.    Lara's Awareness of Randy Smith Is Unavailing to Defendants.

Defendants argue that no suppression occurred based on information that Lara knew of Randy Smith and considered him a possible suspect, though he had no knowledge of the prior attempt or anonymous tip. As the Supreme Court explained in *Banks v. Dretke*, 540 U.S. 668, 696 (2004), "[a] rule…declaring [the state] may hide, defendant must seek, is not tenable in a system constitutionally bound to accord defendants due process." *See also*, *Benn v. Lambert*, 283 F.3d at 1061 (9th Cir. 2002) (suppression of expert reports which undermined the prosecution's theory of the case violated *Brady* even though defendant could have independently discovered the expert's conclusions). Awareness of Jeanne's connection to Randy, who may have looked like Frank, was insufficient to alert Lara to the ways in which Randy may have been involved and the high likelihood that he was. Without the additional information, Lara only knew to pursue whether Randy flew to Los Angeles before the murder and would not have been able to effectively cross-examine the detectives concerning their omission of this information from police reports or the adequacy of their investigation. *Raley v. Ylst*, 470 F.3d 792 (9th Cir. 2006) is unavailing. The habeas petitioner there was aware of the medications he took contained in the undisclosed medical records. This has no relevance to the undisclosed evidence here.

## IV.    **CONCLUSION**

For the forgoing reasons, Defendants motion should be denied.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

DATED:                              Respectfully Submitted,
                                    Kaye, McLane, Bednarski & Litt, LLP

                                    By: / s / Lindsay Battles
                                    Barrett S. Litt
                                    Lindsay Battles
                                    Attorneys for Plaintiffs