*Expert Report*
*Gary L. Wells*
*January 5, 2017*

Re: *Frank O'Connell v. J. D. Smith, et al.* CASE NO.13-CV-01905-MWF(PJWx)

I am Gary L. Wells, Ph.D., Distinguished Professor of Psychology at Iowa State University and the Stavish Chair in the Social Sciences at Iowa State University. I am an expert in human memory and judgment in general and eyewitness identification evidence in particular. I pioneered the scientific study of eyewitness identification evidence in 1974. Since that time, I have published over 150 peer-reviewed publications reporting my studies of eyewitness identification and have received several national awards for this work. The National Science Foundation (Washington, DC), the premier scientific research foundation funded by the U.S. Congress, funds my research studies on eyewitness identification. I chaired the national committee of the American Psychology-Law Society that reviewed the scientific literature on eyewitness evidence and published the conclusions in 1998. I was the lead author of the first peer-reviewed article showing that mistaken eyewitness identification is the primary cause of the convictions of the innocent in DNA-based exoneration cases. I was a planning panel member, working group member, and author on the U.S. Department of Justice publication, *Eyewitness Evidence: A Guide for Law Enforcement*, which was published in 1999. I have given workshops and lectures on eyewitness identification evidence to attorneys, prosecutors, police, and judges across the United States. I have worked with prosecutors, law enforcement, or other public officials and policy makers to help reform eyewitness identification procedures in Arizona, North Carolina, Massachusetts, New York, New Jersey, Virginia, the District of Columbia, Colorado, Georgia, Illinois, Iowa, Florida, Louisiana, Minnesota, Wisconsin, Louisiana, Maryland, California, Washington, Texas, and Canada. I co-chaired and co-authored the National Institute of Justice's Training Guide on Eyewitness Evidence for law enforcement, which was published in 2003. I serve on the Research Advisory Board of the Innocence Project. I was a principal architect of the survey instrument administered by the Police Executive Research Forum (Washington, DC) and funded by the National Institute of Justice that assessed eyewitness identification policies and procedures in U.S. law enforcement agencies in 2011. I am on the editorial boards or serve as a reviewer for every major scientific journal that publishes research on eyewitness identification. I am a Fellow of the American Psychological Association, the Association for Psychological Science, and the American Psychology-Law society, among others. I am a past President of the American Psychology-Law Society. My curriculum vita is included with this report, which includes a list of all of my publications.

I was retained by the firm of Kaye, McLane, Bednarski, & Litt, LLP to evaluate the eyewitness issues surrounding this case. I was provided with the documents listed in the index that follows this report.

The opinions that I reach in this report are based on information contained in the documents provided to me and (1) my Ph.D. education and training in social and cognitive psychology, (2) my approximately 40 years of studies on eyewitness identification that I have conducted and published in peer-reviewed scientific psychology journals, (3) my knowledge of the published

**Ex. 700-1**

empirical work of other eyewitness scientists,(4) my studies of eyewitness identification outcomes in police departments of San Diego (CA), Tucson (AZ), Austin (TX), and Charlotte (NC), (5) my study of actual cases of mistaken identification that have been proven through post-conviction DNA testing over the last 20 years, (6) my national work with the U.S. Department of Justice (National Institute of Justice) on eyewitness identification procedures that included a broad cross-section of law enforcement members from across the country, (7) my consultations and discussions with law enforcement across the country on eyewitness identification procedures, (8) my knowledge of policies and practices of U.S. police departments on eyewitness identification procedures and investigative strategies in eyewitness identification cases, and (9) my knowledge of investigation strategies in eyewitness cases across the United States over the last 30 years.

If called as an eyewitness identification expert, I will testify to the contents of this report. The conclusions discussed in this report are made to a reasonable degree of scientific certainty. I reserve the right to amend my conclusions should additional information not yet disclosed to me arise.

<u>Cases in the previous 4 years in which I testified as an expert at trial or by deposition:</u>

- In 2013: Expert testimony in Larry Davis and Alan Northrop *v*. Clark County, Washington and Donald Slagle, No. 3:12-cv-5765
- In 2014: deposition; Mark I. Sokolow, et al. *v*. The Palestine Liberation Organization, et al., Case No:04 cv 397

General Background Information on the Science of
Eyewitness Identification Relevant to This Case

Eyewitness identification of criminal suspects from lineups (both photo and live) can be an important form of evidence against a defendant, especially if it is corroborated by other evidence. Controlled studies in psychological science, however, indicate that people commonly make mistakes in attempting to identify a person they encountered previously. This is true of both controlled laboratory studies as well as in studies of the outcomes of lineups conducted by police[1].

[1] There are now 10 published peer-reviewed studies of the outcomes of lineups with actual witnesses to crimes that were conducted in collaboration with police departments. These studies show that eyewitnesses selected a known-innocent filler an average of 23.4% of the time. Among those who made an identification of someone (35.4% identified no one), 36.2% identified a known-innocent filler. The 10 studies are: Behrman, B.W., & Davey, S.L. (2001). Eyewitness identification in actual criminal cases: An archival analysis. *Law and Human Behavior, 25*, 475-491; Behrman, B. W. & Richards, R. E. (2005). Suspect/foil identification in actual crimes and in the laboratory: A reality monitoring analysis. *Law and Human Behavior, 29*, 279-301; Horry, R., Halford, P., Brewer, N, Milne, R., & Bull, R. (2015). Archival analyses of eyewitness identification test outcomes: What can they tell us about eyewitness memory? *Law and Human Behavior, 38,* 94-108; Horry, R., Memon, A.,

There is no single rate of mistaken identification, but instead mistaken identification rates vary as a function of a large number of variables relating to acquisition, retention, and retrieval. Hence, the reliability of an identification depends critically on factors such as view, attention, stress (acquisition variables), delay before viewing a lineup as well as events that occur between witnessing and attempting to identify (retention variables), and the manner in which the identification test is administered (retrieval variables). There are several published reviews of this voluminous empirical literature on eyewitness identification[2].

**Foundations of Eyewitness Science**

The scientific literature on eyewitness identification, which I am largely credited with pioneering, uses the experimental method to manipulate and control variables using staged crimes in which an individual is taken by surprise to find that she or he has witnessed an event involving what appeared to be a perpetrator (but was actually a confederate/employee of the researchers). The researchers then systematically manipulate and control a focal (independent) variable, such as the view the witness had, or post-witnessing suggestions from another witness, or suggestive behaviors from a lineup administrator, to see how those factors affect the accuracy of the eyewitness identification. Well controlled experiments of this sort that survive rigorous peer review are then published in psychological science journals. An easy-to-read example of an article describing such an experiment was published in the *Journal of Applied Psychology* and can be downloaded at this URL:   https://public.psych.iastate.edu/glwells/Wells%20pdfs/1990-99/Well_Rydell_Seelau_1993_JAP.pdf

Wright, D. B., & Milne, R. (2012). Predictors of eyewitness identification decisions from video lineups in England: A field Study. *Law and Human Behavior, 36*, 257-265; Klobuchar, A., Steblay, N. M., & Caligiuri, H. L. (2006). Improving eyewitness identifications: Hennepin County's blind sequential lineup pilot project. *Cardozo Public Law, Policy, and Ethics Journal*, 2, 381-414; Memon, A., Havard, C., Clifford, B., Gabbert, F., Watt, M. (2011). A field evaluation of the VIPER system: A new technique for eliciting eyewitness evidence. *Psychology, Crime, & Law, 17*, 711-729; Valentine, T., Pickering, A., & Darling, S. (2003). Characteristics of eyewitness identification that predict the outcome of real lineups. *Applied Cognitive Psychology, 17*, 969-993.; Wells, G. L., Steblay, N. K., & Dysart, J. E. (2015). Double-blind photo-lineups using actual eyewitnesses: An experimental test of a sequential versus simultaneous lineup procedure. *Law and Human Behavior, 39*, 1-14; Wright, D.B., & McDaid, A.T. (1996). Comparing system and estimator variables using data from real lineups. *Applied Cognitive Psychology, 10*, 75-84; Wright, D. B. & Skagerberg, E. M. (2007). Post-identification feedback affects real eyewitnesses. *Psychological Science, 18*, 172-178.

[2] E.g., see Cutler, B. L., & Penrod, S. D. (1995). *Mistaken identification: The eyewitness, psychology, and the law*. New York: Cambridge University Press; Wells, G. L. & Loftus, E. F. (2003). Eyewitness memory for people and events. In A. Goldstein, Ed. *Comprehensive handbook of psychology, Volume 11, Forensic psychology*. New York: John Wiley and Sons; Wells, G. L., Memon, A, & Penrod, S. (2006). Eyewitness evidence: Improving its probative value. *Psychological Science in the Public Interest, 7*, 45-75.

Dovetailing on the extant laboratory-based scientific studies that have been published is the study of exonerations that are based on forensic DNA testing. There are (as of 4/10/2016) 337 cases of full exonerations (actual innocence) based on forensic DNA testing (see ongoing totals at http://www.innocenceproject.org/ ). Importantly, 238 of these cases, about 71%, are cases involving mistaken eyewitness identification. In each of these cases, the eyewitnesses were positive in their identifications and in some of these cases there were up to five eyewitnesses who all mistakenly identified the same innocent person. These DNA exoneration cases corroborate important points that have been made from the scientifically-controlled eyewitness identification studies. For example, the scientific studies show that the mistaken identifications tend to occur most often when the actual perpetrator is not in the lineup[3] and, in fact, every DNA exoneration case involving mistaken identification is of that type (i.e., the real perpetrator was not in the lineup). Also, the scientifically-controlled eyewitness identification studies show that eyewitnesses can portray themselves as being positive despite the fact that they are mistaken.  In fact, eyewitness identification eyewitnesses gave extremely positive (high confidence or high certainty) testimony in each of the mistaken identification/DNA exoneration cases. The controlled scientific studies show that even witnesses who claim that they paid close attention and had an excellent view of the perpetrator can be mistaken[4], which virtually all the mistaken eyewitnesses in the DNA exoneration cases had claimed at trial. Controlled scientific studies show that mistaken identification eyewitnesses will often be uncertain initially but their certainty grows with repeated identifications[5], with reinforcement from detectives, and with new "information" provided later by other people[6]. Each of these problems are quite common in the DNA exoneration cases.

A third line of scientific research that feeds our knowledge about eyewitness identification is the study of the outcomes of lineups conducted in actual cases. There are two types of these studies. One type, known generally as archival studies, examines police files over some period of time to find out the outcome of lineups that were conducted in the past. Unlike lab-based studies for which the identity of the culprit is known with certainty, these archival studies focus primarily on the question of how often eyewitnesses make identifications from lineups and, when they do, how often they identify a known-innocent filler. There are now numerous published studies of this type and they show a surprising convergence in their results: Eyewitnesses identify the suspect (who might or might not be the culprit) in a lineup only about 50% of the time and eyewitnesses identify a known-innocent filler (who clearly is not the culprit) about 30% of the time that they make an identification (see Footnote 1). The other type of study of lineups that tracks outcomes in actual cases is the controlled field experiment. Rather than being a retrospective examination of archival data, the controlled field experiment collects outcome

[3] Wells, G. L. (1984). The psychology of lineup identifications. *Journal of Applied Social Psychology, 14,* 89-103.

[4] Wells, G. L., & Bradfield, A.L. (1998). "Good, you identified the suspect:" Feedback to eyewitnesses distorts their reports of the witnessing experience. *Journal of Applied Psychology, 83*, 360-376.

[5] E.g., see Hastie, R., Landsman, R., & Loftus, E. F. (1978). Eyewitness testimony: The dangers of guessing. *Jurimetrics Journal, 19,* 1-8.

[6] Wells, G. L., Olson, E., & Charman, S. (2003). Distorted retrospective eyewitness reports as functions of feedback and delay. *Journal of Experimental Psychology: Applied, 9*, 42-52.

**Ex. 700-4**

information from lineups as they happen. Generally, this type of study manipulates a background variable to see how that affects the outcomes. There are fewer studies of this type because of the expense, effort, and level of coordination involved, but the results tend to comport with the archival studies in showing that 30% or more of all identifications by eyewitnesses are identifications of known-innocent fillers (see Footnote 1 of this report). Like the archival studies, this type of result tends to corroborate the findings on reliability problems that have been identified in controlled lab studies. But these controlled field experiments go even further to show that cause-effect relations, such as the simultaneous/sequential effect and the post-identification feedback effect, apply to actual witnesses to serious crimes in the same manner that they apply in controlled lab studies.

## Relative Judgments

Both controlled lab studies and the DNA exoneration cases show that high levels of coincidental resemblance are not necessary for obtaining mistaken identifications. More than 30 years ago, lab studies first demonstrated that an innocent suspect in a lineup is at risk of being identified if that person simply looked more like the culprit than the remaining members of the lineup[7]. This phenomenon, known as the relative-judgment process, is easily demonstrated in controlled experiments. For example, following a staged crime some witnesses are shown a lineup that contains the culprit and researchers observe what percentage of witnesses pick the culprit (e.g., 60%), what percentage select a lineup filler, and what percentage make no identification (indicate "not there").  Other witnesses to the same staged crime, however, are shown the same lineup but with the culprit removed. For these other witnesses, the dominant tendency is to simply change their choice to the next best lineup member (one of the fillers) rather than shifting to a "not there" response. In other words, when the culprit is absent witnesses tend to select the person who looks most like the culprit *relative* to the other lineup members (hence, the term *relative* judgment process)[8]. This relative-judgment conceptualization remains the dominant explanation for why high levels of coincidental similarity are not necessary for mistaken eyewitness identifications; simply looking more like the witness's memory of the culprit than do the other members of the lineup can be sufficient. This relative-judgment phenomenon is especially pronounced when an eyewitness has a weak memory (e.g., from a poor view, stress or fear).

## Eyewitness Certainty

Triers of fact, such as judges and juries, rely heavily on the certainty[9] that an eyewitness expresses in his or her identification to make judgments about whether to accept the witness's identification as evidence of guilt[10]. Under pristine conditions of testing, there is a meaningful (albeit imperfect) relation between eyewitness identification accuracy and the certainty of the

---

[7] Wells, G. L.  (1984). The psychology of lineup identifications.  *Journal of Applied Social Psychology, 14*, 89-103.

[8] Wells, G. L. (1993). What do we know about eyewitness identification? *American Psychologist, 48*, 553-571.

[9] The terms confidence and certainty are used interchangeably in the scientific literature.

[10] E.g., Wells, G. L., Lindsay, R. C. L., & Ferguson, T. J. (1979). Accuracy, confidence, and juror perceptions in eyewitness identification. *Journal of Applied Psychology 64,* 440-448.

eyewitness at the time of the identification test[11]. In fact, the broad scientific consensus is that if an eyewitness is extremely positive (highly confident, highly certain) at the time of the identification and the testing conditions are "pristine," then there is a high likelihood that the identification is accurate[12]. However, the term "pristine" is critical to this claim of a relation between confidence and accuracy. Pristine conditions of testing mean that the lineup is carefully structured so that the suspected person does not stand out, the witness is properly admonished (e.g., "don't guess," "the person who committed the crime might not be in the lineup"), the lineup administrators do nothing to influence the witness's beliefs about the person identified, and that an objective record of the confidence (certainty) of the eyewitness be carefully documented at the time of the identification. In the absence of these safeguards (pristine testing conditions), high confidence is not a reliable indicator of accuracy. In addition, when confidence is low (e.g., as indicated by hesitations in making the identification, showing preference for more than one person, statements of uncertainty), the reliability of the identification is low.

It is critical to understand that the degree of certainty an eyewitness comes to express in his or her identification is simply a reflection of the extent to which the witness believes that the identified person is the culprit. This *degree of belief strength* that the eyewitness comes to express (certainty, confidence) does not necessarily reflect the extent to which the identified person matches the witness's memory. Instead, certainty and confidence that an eyewitness expresses on the witness stand can also come from external sources (e.g., suggestions from a lineup administrator/detective; being told of other evidence against the accused; detecting a special interest by the lineup administrator/detective in that particular lineup member; learning that police intend to arrest the identified person). Studies conducted in the United States, Australia, Canada, Great Britain, and South Africa converge on the conclusion that the confidence that an eyewitness expresses in his or her identification is readily inflated if an external source suggests to the eyewitness that the person  identified the "right" person[13].

[11] Sporer, S., Penrod, S., Read, D., & Cutler, B. L. (1995). Choosing, confidence, and accuracy: A meta-analysis of the confidence-accuracy relation in eyewitness identification studies. *Psychological Bulletin, 118*, 315-327; Wells, G. L., Small, M., Penrod, S., Malpass, R. S., Fulero, S. M., & Brimacombe, C. A. E. (1998). Eyewitness identification procedures: Recommendations for lineups and photospreads, *Law and Human Behavior, 22*, 603-647.

[12] Wixted, J. T., & Wells, G. L. (2017). The relationship between eyewitness confidence and accuracy: A new synthesis. *Psychological Science in the Public Interest*, in press.

[13] Bradfield, A. L., Wells, G.L., & Olson, E.A. (2002). The damaging effect of confirming feedback on the relation between eyewitness certainty and identification accuracy. *Journal of Applied Psychology, 87,* 112-120; Charman, S. D., & Wells, G. L. (2008). Can eyewitnesses correct for external influences on their lineup identifications? The actual/counterfactual assessment paradigm. *Journal of Experimental Psychology: Applied, 14,* 5–20; Douglass, A. B., & McQuiston-Surrett, D. M. (2006). Post-identification feedback: Exploring the effects of sequential photospreads and eyewitnesses" awareness of the identification task. *Applied Cognitive Psychology, 20*, 991-1007; Douglass, A. B., & Steblay, N. (2006).  Memory distortion in eyewitnesses: A meta-analysis of the post-identification feedback effect.  *Applied Cognitive Psychology, 20*, 859-869; Dixon, S., & Memon, A. (2005). The effect of post-identification feedback on the recall of crime and perpetrator details. *Applied Cognitive Psychology, 19*, 935-951;

Anything during or after an identification from a lineup, either a photographic or live lineup, that suggests to an eyewitness that they identified the person who the police had as a suspect will produce certainty inflation and increase commitment to that identification. During the identification procedure, this suggestion could be a verbal response ("good, that is our suspect"), a nonverbal response (smile, nod), or any other type of behavior that suggests to the witness that they made the right pick.

This certainty inflation effect is stronger for witnesses who are mistaken than for witnesses who are accurate[14]. Importantly, these same studies show that such information also leads witnesses to erroneously report that their view was better than it really was, that they paid more attention than they really did, that they could make out details of the perpetrator's face better than they actually could, and increases their willingness to testify against the person. In some cases, witnesses are able to realize later that they were manipulated and that they would have given a

Hafstad, G. S., Memon, A., & Logie, R. (2004). Post-identification feedback, confidence and recollections of witnessing conditions in child witnesses. *Applied Cognitive Psychology, 18,* 901-912; Lampinen, J.M., Scott, J., Pratt, D., Ledding, J.K., & Arnal, J.D. (2007). 'Good, you identified the suspect…but please ignore this feedback': Can warnings eliminate the effects of post-identification feedback? *Applied Cognitive Psychology, 21,* 1037-1056; Neuscahtz, J. S., Lawson, D. S., Fairless, A. H., Powers, R. A., Neuscahtz, J. S., Goodsell, C. A., & Toglia, M. P. (2007). The mitigating effects of suspicion on post-identification feedback and on retrospective eyewitness memory. *Law and Human Behavior, 31,* 231-247; Neuschatz, J. S., Preston, E. L., Burkett, A. D., Toglia, M. R., Lampinen, J. M., Neuschatz, J. S., Fairless, A. H., Lawson, D. S., Powers, R. A., & Goodsell, C. A. (2005). The effects of post-identification feedback and age on retrospective eyewitness memory. *Applied Cognitive Psychology, 19,* 435-453; Quinlivan, D. S., Neuschatz, J. S., Jimenez, A., Cling, A. D., Douglass, A. B., & Goodsell, C. A. (2009). Do prophylactics prevent inflation? Post-identification feedback and the effectiveness of procedures to protect against confidence-inflation in earwitnesses. *Law & Human Behavior, 33,* 111-121; Semmler, C., & Brewer, N. (2006). Post-identification feedback effects on face recognition confidence: Evidence for metacognitive influences. *Applied Cognitive Psychology, 20,* 895-916; Semmler, C., Brewer, N., & Wells, G. L. (2004). Effects of postidentification feedback on eyewitness identification and nonidentification. *Journal of Applied Psychology, 89,* 334-346; Skagerberg, E. M. (2007). Co-witness feedback in lineups. *Applied Cognitive Psychology, 21,* 489-497; Skagerberg, E. M. & Wright, D. B. (2009). Susceptibility to postidentification feedback is affected by source credibility. *Applied Cognitive Psychology, 23,* 506-523; Smith, S.M., Lindsay, R.C.L., & Pryke, S. (2000). Postdictors of eyewitness errors: Can false identification be diagnosed? *Journal of Applied Psychology, 85,* 542-550; Wells, G.L., & Bradfield, A.L. (1998). "Good, you identified the suspect:" Feedback to eyewitnesses distorts their reports of the witnessing experience. *Journal of Applied Psychology, 83,* 360-376.

[14] Bradfield, A. L., Wells, G.L., & Olson, E.A. (2002). The damaging effect of confirming feedback on the relation between eyewitness certainty and identification accuracy. *Journal of Applied Psychology, 87,* 112-120

different answer (e.g., not made any identification or expressed uncertainty) if the suggestive procedure had not been used[15].

Influence from the lineup administrator (either on the choice made by the witness, or on the confidence that the witness expresses in that choice, or both) is the reason why psychological scientists have been urging double-blind lineup administration for more than 15 years[16]. A double-blind lineup is one in which the person who administers the lineup does not know which person is a suspect and which are merely fillers. Obviously, this person cannot be the case detective. A large number of jurisdictions in the U.S. have now switched to double-blind lineup procedures. And, a recent report from the National Academy of Sciences strongly recommended double-blind lineup procedures[17]. Using the double-blind procedure, a certainty statement can be taken from the witness at the time of the identification and entered into the record so that initial uncertainty in the identification can become a matter of record before any confidence-inflating processes contaminate later expressions of confidence.

**Other Indicators of Uncertainty**

Although a clear statement of certainty at the time of the identification is the primary way to assess the reliability of an identification, there are also behavioral indicators of certainty and uncertainty during the identification procedure. Behavioral indicators of uncertainty include wavering between two or more lineup members, making relative statements (e.g., this person looks "the most" like the culprit), using a question instead of a statement (e.g., "is it number four?"), using an elimination procedure (e.g., "I know it is not any of these people, so it must be this guy"), talking about reasons why memory is weak ("I only saw the profile"), and noting features that do not match (e.g., "his hair was longer"). In fact, reliable eyewitness identifications tend to be largely automatic, unlabored, and fast. Controlled studies show that identifications from lineups that occur in only a few seconds are quite reliable whereas identification decisions that take much longer (e.g., minutes) are generally not reliable[18].

[15] Wells, G.L., & Bradfield, A.L. (1998). "Good, you identified the suspect:" Feedback to eyewitnesses distorts their reports of the witnessing experience. *Journal of Applied Psychology, 83*, 360-376.

[16] Wells, G. L., Small, M., Penrod, S. J., Malpass, R. S., Fulero, S. M., & Brimacombe, C. A. E. (1998). Eyewitness identification procedures: Recommendations for lineups and photospreads. *Law and Human Behavior, 22*, 603-647.

[17] National Research Council (2014). *Identifying the culprit: Assessing eyewitness identification*. Washington, DC, National Academies Press.

[18] Brewer, N., Caon, A., Todd, C., & Weber, N. (2006). Eyewitness identification accuracy and response latency. *Law and Human Behavior, 30,* 31–50; Dunning, D., & Perretta, S. (2002). Automaticity and eyewitness accuracy: A 10- to 12-second rule for distinguishing accurate from inaccurate positive identifications. *Journal of Applied Psychology*, *87*, 951–962; Dunning, D., & Stern, L. B. (1994). Distinguishing accurate from inaccurate eyewitness identifications via inquiries about decision processes. *Journal of Personality and Social Psychology*, *67*, 818–835; Smith, S. M., Lindsay, R. C. L., & Pryke, S. (2000). Postdictors of eyewitness errors: Can false identifications be diagnosed? Journal of Applied Psychology, 85, 542–550; Sauer, J. D., Brewer, N., & Wells, G. L. (2008). Is there a magical time boundary for diagnosing eyewitness identification

**Event Importance, Stress, and Fear**

It is tempting for people to think that when something important happens, such as being threatened or physically victimized, memory for the details of what happened will be incredibly strong and reliable. It is unclear why this myth exists. The most likely explanation is that people are failing to distinguish between gist memory and verbatim memory. For example, if someone stopped an individual and asked for directions, an unimportant, non-stressful event, they might very well forget that the event occurred. In contrast, if someone is robbed at gunpoint and experiences normal fear and stress, they will obviously never forget that it happened. But having a lasting memory that some stressful event happened and having memory for details of that event are two very different things. Fear is a basic human emotion that elicits a "fight or flight" response and automatically directs limited cognitive resources to be directed at survival. This means that cognitive resources that could have been spent on attending to details and transferring information into long-term memory are crowded out. Consistent with this, controlled studies indicate that fear impairs the ability of someone to make an identification of the person who was the source of the stress[19]. Adding to the stress and fear problem is the phenomenon of "weapon focus[20]." The weapon focus effect is a phenomenon in which the presence of a weapon draws attentional focus to the weapon, thereby reducing attentional resources to the face of the person wielding that weapon. And, as memory gets weaker, other problems (e.g., suggestive behaviors of lineup administrators, susceptibility to feedback effects on confidence, propensities toward relative judgments) get stronger.

### The Case of Frank O'Connell

Jay French was murdered on January 5, 1984. On January 15, 1985, Frank O'Connell was convicted of the first degree murder of Jay French. The conviction of O'Connell was largely the result of the testimony of eyewitnesses Dan Druecker, Maurice Soucy, and Detective J. D. Smith's account of the testimony of a third witness, Arturo Villareal.

accuracy in sequential lineups? *Legal and Criminological Psychology, 13,* 123-135; Sporer, S. L. (1992). Post-dicting eyewitness accuracy: Confidence, decision times and person descriptions of choosers and non-choosers. European Journal of Social Psychology, 22, 157–180; Sporer, S. L. (1993). Eyewitness identification accuracy, confidence, and decision times in simultaneous and sequential lineups. Journal of Applied Psychology, 78, 22–33; Sporer, S. L. (1994). Decision times and eyewitness identification accuracy in simultaneous and sequential lineups. In D. F. Ross, J. D. Read, & M. P. Toglia (Eds.), Adult eyewitness testimony: Current trends and developments (pp. 300–327). New York: Cambridge University Press.

[19] Morgan, C. A., Hazlett, G., Doran, A, Garrett, S., Hoyt, G., Thomas, P., Baranoski, M., & Southwick, S. M. (2004) Accuracy of eyewitness memory for persons encountered during exposure to highly intense stress. *International Journal of Psychiatry and the Law, 27*, 265-279.

[20] Steblay, N. M. (1992). A meta-analytic review of the weapon focus effect. *Law and Human Behavior, 16*, 413-424.

**Dan Druecker**

Druecker is the central eyewitness in this case because he saw the shooter in action. Druecker was inside a parking structure near his own car when he heard what turned out to be gunfire coming from outside the parking structure. Druecker reported seeing the victim run by the garage opening and then saw a man with a gun. Druecker estimated the distance between himself and the shooter to be 20 feet. He related he was not a good judge of distance but did not think the distance was a much as 40 feet. He later said the distance could have been over 20 feet. Both the South Pasadena and LA Sheriff's Department Police Reports state the distance was 40 feet. Ex. 11.02-4 (South Pasadena report from the day of the murder that "W's [referring to Mr. Durecker] distance from S [referring to Suspect] was approximately 40'"); Ex. 1.04: 4-5. (Druecker "accompanied Investigators to the parking lot where the incident occurred, and a walk-through was conducted"; Ex. 1.04-6  (estimated distance was 40 feet).[21]

After a second shot, the shooter turned and ran. Druecker reported seeing only the left side of the shooter's face. According to the initial police report, Druecker described the shooter as a white male in his 30s, no facial hair, six feet tall or taller, slim build, shoulder length dirty brown hair, wearing blue jeans and a blue t-shirt. At that point Druecker said he could possibly identify the shooter. At trial, Druecker testified that after the second shot he ducked down behind a vehicle, which blocked his opportunity to further view the shooter. Druecker reported being scared and estimated that he had perhaps no more than a two-second view of the shooter. Druecker also reports having paid a lot of attention to the gun and consistently noted that he had viewed only the left side of the shooter. In his trial testimony, Druecker admitted that he was not wearing his glasses. He originally got prescription glasses because he could not see the chalkboard in college classes and he reported that he always wore the glasses while driving because he needed them to read street signs. He also recently testified in his deposition that in college, he began wearing glasses most of the time and, at the time of the murder, he wore contacts 90% of the time and if the contacts were bothering him, he would wear glasses (Druecker D. Tr., pgs. 159-61, 164.)

All in all, the witnessing conditions for Druecker were very poor. Although there does not appear to be an issue with lighting, the event itself was unexpected and short in duration. By Druecker's own account, he was confused and scared. As noted earlier in this report, fear serves to direct limited cognitive resources at survival. Hence, cognitive resources that could have been spent on attending to details and transferring information into long-term memory are crowded out. Moreover, the presence of a weapon directs attentional resources toward the weapon, which reduces attentional resources directed at the shooter's face. In fact, Druecker's description of the weapon was relatively detailed ("large blue steel-frame revolver, approximately 6-inch barrel"). In contrast, no facial features were described by Druecker (e.g., nothing about the nose, eyes, chin, brow). Druecker's own estimate suggests that his look at the shooter's face might have been as short as two seconds. And, Druecker consistently stated that he never saw anything but a left-side profile of the shooter.

---

[21] During the habeas proceeding, ophthalmologist Paul Michel estimated the distance after inspecting the scene, based on the description at the time, at 36 feet. The distance could not have been under 30 feet because that would place the shooter inside the car garage area.

Druecker worked with a sketch artist to try to create a composite likeness of the shooter. But, the fact that a composite drawing was produced does not mean that Druecker had a memory for any of the details of the shooter's face. Composite drawings are produced by the artist or composite operator regardless of whether the information provided by the eyewitness is accurate or detailed. In other words, the goal is to produce a facial composite and that face needs to have a mouth, nose, eyes, lips, chin, and hair regardless of whether the witness is able to recall those features with any accuracy. Druecker had already stated that the shooter was a white male in his 30s with shoulder length dirty brown hair. The composite drawing is basically consistent with that prior, very general description. But there is nothing about the nose, chin, eyes, lips, or forehead that shows any strong similarities to O'Connell or that would not just as well (or better) fit a large share of the white male with longer brown hair population. Moreover, it is important to note that the science on eyewitness face composites shows that they tend to produce extraordinarily poor likenesses of the individuals they are meant to depict and this is true even if the witness knows the person quite well[22]. Hence, there is no reason to think that the shooter looked very much like the face composite and, even if he did, the face composite does not resemble O'Connell in any unique way.

The very poor view that Druecker had of the shooter is quite important in my analysis of Druecker's alleged identification of O'Connell from a photo-lineup. The relevance of the viewing conditions stems from the fact that *the impact of suggestive identification procedures (i.e., the ability of suggestive procedures to influence eyewitnesses) is inversely proportional to the strength of an eyewitness's memory*. In other words, if an eyewitness had a very strong memory for a perpetrator's face, it would be quite difficult to convince that witness to identify someone other than the actual perpetrator because the strength of their own memory would lead them to resist such suggestions. But, if the eyewitness has a weak memory, it is not at all difficult to convince the witness that someone else is the perpetrator that they saw. In fact, when eyewitnesses have a relatively weak memory, they tend to look to others (e.g., law enforcement) for cues that might help them make an identification.

### January 9, 1984 Photo-Lineup Shown to Druecker

According to a supplementary narrative report written by Sgt. Gilbert Parra and Investigator J. D. Smith, Investigators went to Druecker's residence with the black and white six-pack photo lineup (that investigators called a mug show-up) that included a photograph of O'Connell (in position three). The report says that Druecker was admonished and then shown the photos. According to the narrative, which appears to have been written the next day (January 10, 1984), Druecker looked at the folder for approximately one minute and then pointed to #3 (O'Connell) and "stated that he was positive that he was the man he had seen fire the weapon."

But, there is a huge discrepancy between the account in the police report and the account that Druecker provided at the habeas proceeding. Druecker does not remember being read anything before the detectives pulled out the photos. When asked specifically if the detectives advised him

---

[22] Kovera, M.B., Penrod, S.D., Pappas, C., & Thill, D.L. (1997). Identification of facial composites. *Journal of Applied Psychology, 82*, 235–246.; Wells, G. L. & Hasel, L. E. (2007). Facial composite production by eyewitnesses. *Current Directions in Psychological Science, 16*, 6-16.

that the person he saw might not be among the photos, Druecker says he does not remember them ever saying that. Instead, he states that he believed that they "found the guy. They must have caught him." Druecker said he looked at the photos for a good while but did not see the guy. He then said to the detectives "Why aren't they profiles? I saw the side of the guy. I didn't see his face." Druecker said he told the detectives that he did not recognize anyone. Druecker said that, when he told the detectives that he did not recognize anyone, "their tone changed." Druecker said the detectives told him "to really look at the photos." Druecker says that he believed "I had to make a pick. The way they said it, I had to make a pick. They weren't going to leave that apartment. They weren't going to leave me alone." Hence, he says, I started to look again … I pointed to picture number three. And I asked them 'Is that the guy?'" Druecker says they responded "Is that the guy you are identifying as the shooter?" Druecker said he felt they already knew because they had done their work and had the right guy. So, Druecker said "I think that's the guy." Druecker said he felt intimidated and the detectives scared him..

Druecker also testified that he asked the detectives if he could be hypnotized to determine what he could recall, and that, after he picked Photo #3 (Mr. O'Connell), the detectives made a call in his presence and said a positive ID was made. He interpreted that to mean they caught the guy. It meant to him that the photo he pointed out was who it had to be. Det. Smith testified at the habeas proceeding he did not recall Druecker asking to be hypnotized, and did not recall calling in Druecker's presence and saying an ID had been made but he or his partner could have done that.

Druecker admits in his habeas testimony that he was not being truthful when he testified at a preliminary hearing and at trial that he recognized number three as the shooter. But, in response to questions at the habeas proceeding he insisted "I felt I couldn't back out. The police were supposed to do their job. They were supposed to get the right guy. They were supposed to help me."

**Analysis of Druecker's Identification**
I realize it is not my function as an expert to opine on whether Mr. Druecker's current (habeas) account of the January 9 photo lineup is correct. However, it is within my province to address whether that account is in line with the scientific evidence on eyewitness identification. Druecker's current account, as described in the habeas proceeding, is consistent with what we might expect from an eyewitness who had very poor witnessing conditions (e.g., fear, stress, weapon focus, side view only, very short exposure duration) and then was manipulated during an identification procedure. When eyewitnesses are shown a photo-lineup, witnesses commonly think that the detectives caught the right person and so they help the investigation by picking the person the detectives want them to pick. Druecker's habeas account is consistent with that of an eyewitness who slowly and somewhat tragically begins to realize that the detectives were leading him along. The description of the call being placed in Mr. Druecker's presence and the request to be hypnotized were not disputed by Det. Smith, who limited his reply to not recalling the incidents (and not denying either and, regarding the call, saying he or his partner could have done that).

If Druecker's account of the January 9, 1984 photo lineup is correct, then the procedure used by the detectives was highly suggestive and inappropriate, the identification evidence obtained from

**Ex. 700-12**

it was unreliable, and the narrative report written the next day was a misrepresentation of what actually happened. Consider, for example, that, when an eyewitness views a photo-lineup and says that she or he does not recognize anyone, the procedure should be terminated. The test should be over at that point. The witness should not be told to return to the photos and look again. Doing that strongly suggests that the detectives expect the suspect to pick someone.

And, if Druecker's account is correct, then the report that the detectives wrote in their narrative is a misrepresentation of what happened. If Druecker said that he did not recognize anyone, then that should have been clearly stated in the report. But the report states otherwise. The January 10, 1984 report says that Druecker "pointed to photograph #3, that of Frank O'Connell, and stated that he was positive that he was the man he had seen fire the weapon." There is nothing in the detectives' January 10, 1984 report about Druecker saying he could not recognize anyone. There is nothing in the report saying that the detectives then asked Druecker to "really look at the photos." There is nothing in the report about Druecker asking "why aren't there profiles?" There is nothing in the report that indicates that Druecker asked to be hypnotized (a request that indicates weak memory and uncertainty). There is nothing in the report that indicates Druecker asked if this was the guy. All in all, there is nothing in the detectives' report indicating any uncertainty on the part of Druecker regarding his identification.

If Druecker said that he did not recognize anyone, then this was not an identification at all. In effect, such a statement means that this was a lineup rejection, which is exculpatory evidence. In other words, if Druecker's account is correct, then the investigators took what should have been considered exculpatory evidence and turned it into incriminatory evidence.

Also very significant is the phone call that Druecker testified one of the detectives made while Druecker was still in the room. During this phone call, the detective told someone on the other end that they had a positive identification, a statement that Druecker overheard. In effect, making that phone call in Druecker's presence served to commit Druecker to the idea that he identified number three from the photo lineup and served to further convince Druecker that he identified the right person.

If Druecker's account of the events at the January 9, 1984 is correct, then it makes good sense from a psychological perspective that Druecker, even while having some awareness that he did not have a good memory of the gunman, would go on to give relatively confident testimony at a later preliminary hearing and again at trial. After all, Druecker was at that point convinced that the detectives knew who committed the murder. In addition, Druecker did not object at the time when the detective reported aloud over the phone to someone else that Druecker had made a positive identification, even though Druecker felt that he had not done so. Moreover, according to his habeas testimony, Druecker felt intimidated by the detectives and the prosecutor.

In summary, Druecker experienced witnessing conditions that were quite unfavorable for having a good, detailed memory of the face of the gunman. The factors that work against a good memory for the gunman's face, such as fear, surprise, short exposure duration, weapon focus, and side-view only, are consistent with the fact that Druecker's description of the gunman is sparse, with no facial details at all. The fact that Druecker was nearsighted and was not wearing corrective lenses is also significant. (I understand that there is a separate report addressing the

**Ex. 700-13**

scientific limitations of his vision in light of known evidence of the extent of his myopia.) But even for a person with perfectly good vision, there is no reason to believe that the person could witness a shooting under these conditions and reliably identify the shooter. The DNA exoneration cases that were referenced earlier in this report, for example, are cases that involved sexual assault in which the witnesses had much closer, longer, and better views of their assailants than Druecker had of this gunman, and yet they all mistakenly identified the culprit.

Druecker had sensed that his memory was weak. He mentioned several times that he had seen the shooter only from the side, he knew that his view lasted only seconds, and according to his own account he asked about the possibility of being hypnotized to help his memory. Generally, eyewitnesses will not make an identification at all under such circumstances unless they are prodded to do so. In fact, if Druecker's habeas testimony is correct, Druecker did not make an identification when shown the photo-lineup. Instead, he said that he did not recognize anyone. But, research experiments show that even small, simple nudges can lead eyewitnesses to make at least a tentative pick[23], which, when followed by some seemingly-confirmatory responses from a lineup administrator, leads witnesses to develop an inflated sense of confidence that they identified the right person (see studies cited in footnote 13). Druecker's habeas testimony is consistent with the scientific account of how an eyewitness with a weak and unreliable memory can be manipulated. If Druecker's habeas account is correct, then the procedures that the detectives used were totally inappropriate in their level of suggestiveness. Moreover, if Druecker's habeas account is correct, then the report that was written by the detectives is a gross misrepresentation of the actual facts. Foremost among these facts would be that Druecker said that he did not recognize anyone from the photos, which is an exculpatory statement, not an incriminatory statement.

Any reasonably trained police investigator would have known in 1984 that a statement by an eyewitness that he could not identify anyone from a photo lineup is something that should clearly be prominently stated in the written report of that photo-identification attempt. Also, any reasonably trained police investigator would have known in 1984 that if an eyewitness asks a question about a photo ("Is this the guy?"), then that should be a part of the report as it places any later statements about that photo into an appropriate context of uncertainty on the part of the eyewitness.

**Arturo Villareal**
Arturo Villareal was delivering flowers at the building where the shooting took place. Villareal is a potentially very important eyewitness because he observed the shooter running down the driveway carrying a handgun and jump into yellow Pinto station wagon with faded wood sides. Villareal described the man as a white male, approximately five feet ten inches to six feet tall, medium build, shoulder length, blond hair, wearing a long sleeve dark blue short with the sleeves

---

[23] E.g., see Clark, S. E., Marshall, T.E., & Rosenthal, R. (2009). Lineup administrator influences on eyewitness identification decisions. Journal of Experimental Psychology: Applied, 15, 63-75; Greathouse, S. M., & Kovera, M. B.  (2009).  Instruction bias and lineup presentation moderate the effects of administrator knowledge on eyewitness identification.  *Law and Human Behavior, 33,* 70-82.

rolled up, and blue jeans. Like Druecker, there is nothing in Villareal's description to indicate that he saw any facial features other than the idea that the person was white (which could have been discerned from the bared arms of the person running instead of discerned from the face). Consistent with Villareal's failure to describe any facial features, at the preliminary hearing and at trial Villareal testified that he was unable to see features. On cross examination Villareal indicated that he believed that he saw the shooter from approximately 175 feet, the distance for which was provided to him by a police officer. (I have been informed that Kate Germond recently was deposed and stated that she measured the distance from where Mr. Villareal said his car was parked to the driveway he saw the shooter exit and get into a car. She testified that she measured it with a surveyor's tape, in the company of the lawyer representing Mr. O'Connell in the habeas proceeding, Peter Camiel, and the distance was 250 feet.)

The January 10, 1984 supplementary narrative report written by Sgt. Gilbert Parra and Investigator J. D. Smith indicates that on January 9, 1984 investigators visited Villareal at the flower shop where he worked and showed the black and white photo lineup to Villareal. According to the report, Villareal looked at the folder for several moments and then pointed to photo number 3 (O'Connell) and said "He is the strongest contender and I'm sure that's him."

At trial, Detective Smith himself testified that, when Villareal looked at the photo lineup, he went back and forth between photos number one, two, and three and that Villareal then said that number three most likely looked like the person he had seen. That is very different from the police report, written by Smith, which did not mention anything about Villareal going back and forth between photos and the police report said that Villareal said "I'm sure that's him." In fact, at trial Villareal disputed the idea that he had ever made a positive identification, and indicated that he identified two people of the six who "resembled" the person he saw.

**Analysis of Villareal's Identification**
The inability of Villareal to be able to describe any facial features of the shooter is a strong indicator that Villareal did not have a good enough memory to make a reliable identification. But, in this case one need not rely on the weak description to know that Villareal's identification was not reliable because we know that facial recognition from a distance of 175 feet is beyond the capabilities of the human eye. To illustrate this, I have reproduced a figure from a research article by Loftus and Harley (2014) as shown on the following page (labeled both in this document and in the original article as Figure 1). This figure, when viewed at a distance of 22 inches, shows what the face of actress Julia Roberts would look like at a distance of 5 feet four inches, 43 feet, and 172 feet. In Villareal's case, he said that he believed he was about 175 feet away. But other evidence indicates that he was farther away, as much as 250 feet. Moreover, Villareal would have been looking through a windshield.

# Figure 1

5.4 ft



43 ft



172 ft

Figure 1. Representation of distance by reduction of visual angle. The visual angles implied by the three viewing distances are correct if this page is viewed from a distance of 22".

Given these facts about the viewing conditions for Villareal on the day of the shooting, there is no way for Villareal to reliably identify the shooter.[24] The extremely poor witnessing conditions for Villareal are not consistent with the idea that Villareal would have picked out someone from the photo-lineup and said "I'm sure that's him." But the January 10, 1984 police report written by Sgt. Gilbert Parra and Investigator J. D. Smith actually used quotes around the statement "I'm sure that's him" and attributed the statement to Villareal. And, if Villareal did not say that, as he contends in his trial testimony, then the report was incorrect and misleading. Any reasonably trained police investigator would have known in 1984 to not write an identification report that portrays an eyewitness as having made a confident identification if the witness did not do so.

**Maurice Soucy**

Maurice Soucy was a neighbor of the ex-spouse of the deceased (Jeanne Lyon). According to Villareal, the shooter was driving a yellow Pinto station wagon with faded wood sides. Investigators were looking for someone who could associate O'Connell with what looked like the getaway car. It appears that no such car was ever recovered. However, investigators took a nighttime photo of a yellow Pinto station wagon with wood sides, which they showed to Maurice Soucy (which has been marked as Ex. 16 in this case). It should be noted that there is no claim here that the Pinto that the investigators took a photo of was the car used by the shooter. Investigators showed the photo of the car to Soucy and, according to the police report, Soucy indicated he had seen a vehicle matching that description and that it was usually driven by a white male, approximately 30 years old, about six feet two inches tall, 180 pounds, slender build, with sandy hair. The police report then says that the investigators showed Soucy the photo lineup (the same six black and white photos shown to Druecker and Villareal) and the report says that Soucy "immediately pointed out photograph # 3 and stated that that was the person who asked him to jump start the yellow Pinto" and that he was able to recognize the person because "he was always having car trouble."

The police report on the alleged identification by Soucy (written two days after meeting with Soucy) is significantly at odds with handwritten notes that were taken contemporaneously by the two detectives. One detective's notes refer to Soucy identifying #3 and possibly #1 and the other detective's notes say "pointed out # 3 as poss. suspect – because of face – but hair was curlier." These handwritten notes, which I am advised were never known to the prosecutor or defense, are quite troublesome. The police report reads as though Soucy's identification was quite firm in the sense of characterizing Soucy as having "immediately pointed out #3." But that depiction in the report does not appropriately characterize the contemporaneous record, which states that Soucy "pointed out #3 as poss. suspect" and notes that Soucy thought that # 1 was also possible.

**Analysis of Soucy's Identification Associating O'Connell with a Pinto Wagon**

The investigators used the photos of the side of a Pinto Wagon shown to Soucy to establish a relation between O'Connell and the shooter's car. But the photos were not of the shooter's car. In addition, the photos were very poor, nighttime photos showing only a small portion of a car with wood panel sides. It is known that O'Connell in fact had owned and driven a 1973 Ford Country Squire LTD wagon with wood panel sides during the time period that Soucy would likely have

---

[24] I note that, if Mr. Druecker's vision in January 1984 was the same as it was when he had refractive surgery in 2007, then these comparative Julia Roberts photos would apply (or more so) to him as well.

seen him in the neighborhood. Other than Soucy's claim, no evidence links O'Connell to a Ford Pinto. However, under the right conditions, a person could easily confuse a Ford Pinto Wagon with wood panel sides with a Ford Country Squire LTD wagon with wood panel sides. And the conditions under which this confusion could happen align quite well with the conditions that the investigators presented to Soucy. Consider Figure 2 in this report.

## Figure 2

A 1973 Ford Country Squire Wagon LTD. Country Squire wagons had four doors.

Photos of Ford Pinto Wagon shown to Soucy.

A 1972 Ford Pinto Wagon had two doors. A Ford Country Squire had four doors.

The front ends of the Pinto (top) and the Country Squire (bottom).










On the far left panel of Figure 2 are a front side and a rear side view of a 1973 Ford Country Squire LTD wagon with wood panel sides, which is the model and color owned by O'Connell. Consider next the second panel from the left, which is a copy of the photos of a Ford Pinto with wood panel sides that investigators showed to Soucy.  Given the very low-light photos of the Pinto and only angled views of the sides, there is little to distinguish between the Ford Squire wagon that O'Connell drove and the Pinto wagon. What stands out is that they both had wood panel sides. If Soucy had been given better photos of a Ford Pinto wagon, he would have had a chance to see that there are some huge differences between the vehicles. As shown in the third panel of Figure 2, Ford made the Pinto Wagon a two-door vehicle whereas the Ford Squire wagon was made as a four-door vehicle. Even more striking are the differences in the front ends of the Ford Pinto wagon and the 1973 Ford County Squire LTD wagon, as shown in the far-right panel of Figure 2.

Soucy was never shown a photo of a Pinto wagon with proper lighting, never shown a side profile that made clear that Pinto wagons have only two doors, and never shown the front end of a Pinto wagon to show that the front end of the car he is being asked to identify looks strikingly different from the car that O'Connell drove. O'Connell told police he drove a 1973 Ford County Squire LTD wagon, neighbors of Jeanne Lyon confirmed that he drove such a car, and a simple check of Department of Motor Vehicle records (which any reasonably-trained investigators would have checked) would have confirmed that fact as well. Also, any reasonably-trained investigator would have compared the 1973 Country Squire wagon to the Pinto wagon so as to understand the differences and similarities before creating a "test" for Soucy. Hence, the showing of these dark images that focused only on similarities between the Pinto and the LTD (wood panel sides) without showing Soucy properly-lighted photos that captured the front ends and showed the number of doors renders the "identification" of the car totally unreliable. Compounding the problem is the fact that the investigators showed only one vehicle to Soucy. That is a highly suggestive procedure, akin to a "showup" in eyewitness identifications of persons. The investigators should have shown photos of multiple vehicles (numerous makes and models were using wood panel siding in those years) and, importantly, one of the vehicles the investigators should have shown Soucy was a 1973 Ford County Squire LTD wagon.

The claimed identification of O'Connell's facial photo from the photo lineup is of little evidentiary value in and of itself. After all, there is no question that O'Connell had a previous relationship with Jeanne Lyon and had spent time in that neighborhood. However, the police report on Soucy's identification of O'Connell's photo is significant for another reason. Specifically, as was evident with the police reports on the identifications allegedly made by Druecker and by Villareal, there are serious discrepancies between the police report and the other evidence about what actually occurred during those identification attempts. In the case of Soucy, the report makes it appear that there had been a solid identification of O'Connell's photo. Contemporaneous handwritten notes of the officers, however, show uncertainty on the part of Soucy. Any reasonably trained police investigator would have known in 1984 to make sure that the report of an identification attempt took full note of any uncertainty on the part of the witness.

I attach as Exhibit A to this deposition my CV, which includes my publications.

My compensation rate is $350 for each hour of review of materials, writing of this report, preparation, etc. When traveling for testimony at trial or deposition, my fees are charged on a flat rate of $1400 for each half day or $2800 (plus expenses) for time away from my home/office.

I declare, under penalty of perjury, that the foregoing is true and correct. Executed at Polk County, Iowa, on January 5, 2017.

*Gary L. Wells*

Gary L. Wells, Ph.D.

# Exhibit A

# CURRICULUM VITAE
## Gary L. Wells
December 2016

**ADDRESS:**

Department of Psychology        Phone: (515)294-6033
Iowa State University            FAX: (515)294-6424
476 Science                       E-mail: glwells@iastate.edu
Ames, Iowa 50011
Web site: http://www.psychology.iastate.edu/~glwells/

## EDUCATION:

B.Sc. Honors (1973) Psychology , Kansas State University
Ph. D. (1977) Experimental Social Psychology, Ohio State University
      (Major Professor: Anthony Greenwald)

## PROFESSIONAL  HISTORY:

| | |
|---|---|
| 2010 – Present | **The Wendy and Mark Stavish Chair in Social Sciences**, Endowed Chair at Iowa State University, Ames, IA |
| 1998 - Present | **Distinguished Professor of Liberal Arts and Sciences,**  Department of Psychology, Iowa State University, Ames, IA |
| 1989 - Present | **Professor**, Department of Psychology, Iowa State University, Ames, IA (Psychology Department Chair from 1989-1993) |
| 2006 – 2013 | **Director** of Social Sciences, American Judicature Society's  Center for Forensic Science and Public Policy, Des Moines, IA |
| 2001 | **Norman L. Munn Distinguished Scholar**, Flinders University, Adelaide, Australia |
| 1984 - 1989 | **Professor**, University of Alberta, Edmonton, Alberta |
| 1985 | **Visiting Professor**, Osgoode Hall Law School, York University, Toronto, Ontario |
| 1981 - 1984 | **Associate Professor**, University of Alberta, Edmonton, Alberta |
| 1977 - 1980 | **Assistant Professor**, University of Alberta, Edmonton, Alberta |
| 1979 - Present | **Consultant** to judges, law enforcement,  defense counsel and prosecution counsel in state and federal criminal cases involving eyewitness memory, crime investigation procedures, and evidence evaluation. |
| 1986 - 1988 | **Consultant** to Weiden and Associates on development of police recruitment exams |
| 1984 - 1985 | **Special Consultant** to the Law Reform Commission of Canada |
| 1985 | **Visiting Professor**, Osgoode Hall Law School, Toronto |
| 1983 - 1984 | **Visiting Scholar**, University of Kansas, Lawrence, KS |
| 1976: | **Investigative Officer** into patient abuse at Lima State Hospital for the Criminally Insane, Lima, Ohio |

## PROFESSIONAL MEMBERSHIPS and FELLOW STATUS:

Association for Psychological Science (Charter Fellow)
American Psychological Association (Fellow)
Personality and Social Psychology (APA Division 8)
Society for Personality and Social Psychology (Fellow)
American Psychology-Law Society (APA Division 41, Fellow, past President)
Society of Experimental Social Psychology (Fellow)
Judgment and Decision Making Society

Psychonomic Society (Senior Fellow)
Society for Applied Research in Memory and Cognition
American Judicature Society
Midwestern Psychological Association (Charter Fellow)

## EDITORIAL OFFICES AND DUTIES:
### Consulting Editor:

*Psychological Bulletin,* Consulting Editor, 2015 - present
*Journal of Experimental Psychology: Applied,* Consulting Editor, 2003-2006; 2013- present
*Law and Human Behavior*, Consulting Editor, 1984-present
*Journal of Applied Research in Memory and Cognition*, Consulting Editor, 2012-present
*Applied Cognitive Psychology,* Consulting Editor, 1998-present
*Psychology, Public Policy, and Law,* consulting Editor, 1995-present
*Journal of Experimental Psychology: Learning, Memory, and Cognition,* Consulting Editor, 2000-2003
*Contemporary Psychology,* Advisory Editor, 1991-1997
*Forensic Reports,* Consulting Editor, 1987-1992
*Journal of Personality and Social Psychology,* Consulting Editor, 1979-1980, 1989-1990, 1992-1994
*Journal of Applied Psychology,* Consulting Editor, 1983-1994
*Law and Human Behavior,* Guest Editor, 1980
*Personality and Social Psychology Bulletin,* 1992-1994
*Psychology, Public Policy, and Law*, Guest Editor, 1995

### Journal Reviewer for:
*American Psychologist; Applied Cognitive Psychology; Basic and Applied Social Psychology; Behavioral Sciences and the Law; British Journal of Social Psychology; Canadian Psychology; Cognitive Psychology; Journal of Applied Psychology; Journal of Applied Social Psychology; Journal of Consumer Research; Journal of Experimental Psychology: Applied; Journal of Experimental Psychology: General; Journal of Experimental Psychology: Learning, Memory and Cognition; Journal of Experimental Social Psychology; Journal of Personality; Journal of Personality and Social Psychology; Journal of Research in Personality; Journal of Social and Clinical Psychology; Law and Human Behavior; Law and Society Review; Memory and Cognition; Osgoode Hall Law Journal; Perception and Psychophysics; Perceptual and Motor Skills; Personality and Social Psychology Bulletin; Psychological Bulletin; Psychological Science; Current Directions in Psychological Science; Psychological Review; Psychology, Public Policy, and Law; Social Cognition; Social Psychology Quarterly; Perspectives on Psychological Science*

### Manuscript Reviewer for:
Academic Press, Allyn & Bacon, Brooks-Cole, Cambridge University Press, Harper & Row, John Wiley & Sons, McGraw-Hill, Random House, Wadsworth

### Program and Grant Review Activities:
NSF Grant Panel, 2011-2013
National Institute of Justice Grant Panel, 2009 & 2010
APA Program Committee - Psychology and Law Division, 1986,1987,1992, 1997, 1999, 2001, 2002, 2003, 2004, 2005
APA Program Committee Reviewer - Division of Personality and Social

**Ex. 700-23**

Psychology, 2001, 1988, 1990
American Psychology - Law Society Program Committee,1986,1992,1994, 1996; 1998; 2000
APA Fellows Committee, Division 41, 1989-1996
National Science Foundation grant applications
MPA - Membership Committee, 1992, 1993, 1994, 1995, 1996
Social Sciences and Humanities Research Council grant applications
Social Sciences and Humanities Research Council of Canada, Adjudication Committee Member, 1987, Ottawa
National Institute of Justice -  Science and Law Program, 2002

## National Committees and Task Forces:

Research Advisory Board, Innocence Project, Manhattan, NY, 2009-present
U.S. Department of Justice,   Eyewitness Evidence Panel, July 1997- July 2001
American Psychology/Law Society, Chair of Committee on Scientific Evidence Concerning Eyewitness Identification, March,1996-December 1998
National Guidelines for Eyewitness Evidence Panel, U. S. Department of Justice, March 1998-October 1999
National Institute of Justice, Co-Chair, Eyewitness Identification PoliceTraining Manual Writing Committee, 1999-2001
Boston Police Department Task Force on Eyewitness Evidence, 2004
*Journal of Experimental Psychology: Applied*, Editor Search Committee, 2012
*Journal of Experimental Psychology: Applied*, Editor Search Committee, 2016

## GRANTS since 1990:

2015-2019    Australian Research Council research grant, (AU$558,700), Partner Investigator with Neil Brewer and Nathan Weber

2014-2017    National Science Foundation research grant, ($263,000), Principal Investigator

2012-2015    National Science Foundation research grant, ($241,000), Co-PI with Madon & Guyll

2009-2014    National Science Foundation research grant, ($410,000), Principal Investigator

2007-2011    National Science Foundation research grant, ($250,000), Principal Investigator

2005-2008    National Science Foundation research grant, ($545,238), Co-PI

2005-2010    Australian Research Council research grant, (AU$371,000), Partner Investigator with Neil Brewer

2002-2006    National Science Foundation research grant ($329,998), Principal Investigator

2000-2002    Australian Research Council research grant, ($112,400), Partner Investigator with Neil Brewer

1998-2002    National Science Foundation research grant ($285,703), Principal Investigator

1993 -1997    National Science Foundation research grant ($272,970), Principal Investigator

1991 -1993    National Science Foundation research grant ($177,000), Principal Investigator

**Ex. 700-24**

## SCHOLARLY AWARDS:

| | |
|---|---|
| 2016 | James Cattell Award for Lifetime Achievement in Research from the Association for Psychological Science (2017 award). |
| 2014 | Distinguished Alumnus Award, The Ohio State University, Department of Psychology |
| 2011 | Distinguished Alumnus Award, Kansas State University, Department of Psychology |
| 2010 | Endowed Chair: The Stavish Chair in the Social Sciences, Iowa State University |
| 2009 | Certificate of Commendation for Innovative Research and Applications in Psychology and Public Policy, American Psychological Foundation |
| 2008 | Honorary Doctorate of Humane Letters, John Jay College of Criminal Justice, City University of New York |
| 2007 | American Psychological Association Presidential Citation for significant contributions to the field of psychology |
| 2001 | Distinguished Contributions to Forensic Psychology Award, American Psychology-Law Society |
| 1999 | Honor of Recognition for "Outstanding Service and Dedication to Improving the Use of Eyewitness Evidence," U.S. Department of Justice, October 26, 1999 |
| 1998 | Awarded title of Distinguished Professor of Liberal Arts and Sciences, Iowa State Univ |
| 1996 | Career Research Excellence Award, Iowa State University |

## COURSES AND WORKSHOPS TAUGHT:

Introductory Psychology
Social Psychology (Graduate and Undergraduate level)
Individual and Social Behavior (undergraduate level)
Judgment and Decision Making Processes (Graduate level)
Research Methods in Social Psychology (Graduate level)
Social Cognition (Graduate level)
Psychology and Law (undergraduate and graduate level)
Workshops and presentations on eyewitness identification to police departments, defense
    attorneys, prosecutors, criminal justice researchers, crime investigators, victims
    groups, trial judges, and appellate judges in:
    Alaska, Alberta, Arkansas, Arizona, Australia, British Columbia, California, Colorado,
    Connecticut, District of Columbia, Florida, Georgia, Hawaii, Idaho, Illinois, Iowa,
    Kansas, Kentucky, Louisiana, Maine, Manitoba, Maryland, Massachusetts, Michigan,
    Minnesota, Mississippi, Missouri, Nebraska, Nevada, New Hampshire; New Jersey,
    New York, New Mexico, North Carolina, Pennsylvania, Puerto Rico, South Carolina,
    Ohio, Oklahoma, Oregon, Ontario, Pennsylvania, South Carolina, Tennessee, Texas,
    Virginia, Washington, and Wisconsin, Washington DC, Puerto Rico

## Offices and Chairs in National Societies:

Chair, Fellows Committee, American Psychology-Law Society, 2001-2004

President-elect, American Psychology-Law Society (and Division 41 of APA), 2004-2005

President, American Psychology-Law Society (and Division 41 of APA), 2005-2006

Chair, Scientific Review Paper Committee, American Psychology-Law Society, 2009-2011

# Refereed Journal Articles

Wixted, J. T. & Wells, G. L. (2017). The relationship between eyewitness confidence and identification accuracy: A new synthesis. *Psychological Science in the Public Interest,* accepted for publication.

Quinlivan D. S., Wells, G. L., Neuschatz, J. S., Katie Luecht, K., Cash, D., & Key, K. (in press). The effects of pre-admonition suggestions on eyewitnesses' choosing rates and retrospective identification judgments. *Journal of Police and Criminal Psychology.*

Smith, A. M., Wells, G. L., Lindsay, R. C. L., & Penrod, S. D. (in press). Fair lineups are better than biased lineups and showups, but not because they increase underlying discriminability. *Law and Human Behavior.*

Wells, G. L. & Quigley-McBride, A. (2016). Applying eyewitness identification research to the legal system: A glance at where we have been and where we could go. *Journal of Applied Research in Memory and Cognition, 5,* 290-295.

Wells, G. L., Yang, Y., & Smalarz, L. (2015).  Eyewitness identification: Bayesian information gain, base-rate effect equivalency curves, and reasonable suspicion. *Law and Human Behavior, 39,* 99-122.

Smith, A., Lindsay, R. C. L., & Wells, G. L. (in press). A Bayesian analysis on the (dis)utility of iterative showup  procedures: The moderating impact of prior probabilities. *Law and Human Behavior.*

Wells, G. L., Smalarz, L, and Smith, A. M. (2015). ROC analysis of lineups does not measure underlying discriminability and has limited value. *Journal of Applied Research in Memory and Cognition, 4,* 313-317.

Smalarz, L., & Wells, G. L. (2015). Contamination of eyewitness self-reports and the mistaken identification problem. *Current Directions in Psychological Science, 24*, 120-124.

Wells, G. L., Smith, A. M., and Smalarz, L., (2015). ROC analysis of lineups obscures information that is critical for both theoretical understanding and applied purposes. *Journal of Applied Research in Memory and Cognition, 4,* 324-328.

Wells, G. L., Steblay, N. K., & Dysart, J. E. (2015). Double-bind photo-lineups using actual eyewitnesses: An experimental test of a sequential versus simultaneous lineup procedure. *Law and Human Behavior*, *39*, 1-14.

Wells, G. L., Steblay, N. K., & Dysart, J. (2015). The flaw in Amendola & Wixted's conclusion on simultaneous and sequential lineups. *Journal of Experimental Criminology*.

Steblay, N. K., Dysart, J. Wells, & G. L., (2015).  An unrepresentative sample is unrepresentative regardless of the reason: A rejoinder to Amendola and Wixted. *Journal of Experimental Criminology*.

Smalarz, L., & Wells, G. L. (2014). Post-identification feedback to eyewitnesses impairs evaluators' abilities to discriminate between accurate and mistaken testimony. *Law and Human Behavior, 38*, 194-202.

Steblay, N. M., Wells, G. L. & Douglass, A. L. (2014). The eyewitness post-identification feedback effect 15 years later: Theoretical and policy implications. *Psychology, Public Policy, and L*aw, *20*, 1-18.

Smalarz, L. & Wells, G. L. (2014). Confirming feedback following a mistaken identification impairs memory for the culprit. *Law and Human Behavior*, *38*, 283-292.

Wells, G. L. (2014). Eyewitness identification: Probative value, criterion shifts, and policy. *Current Directions in Psychological Science, 23,* 11-16.

Wells, G. L., Wilford, M. M., & Smalarz, L. (2013). Forensic science testing: The forensic filler-control method for controlling contextual bias, estimating error rates, and calibrating analysts' reports. *Journal of Applied Research in Memory and Cognition, 2*, 53-56.

Wells, G. L., Steblay, N. K., & Dysart, J. (2012). Eyewitness identification Reforms: Are suggestiveness-induced hits and guesses true hits? *Perspectives on Psychological Science, 7*, 264-271.

Quinlivan D. S., Neuschatz, J. S., Douglass, A., Wells, G.L, & Wetmore, S. (2012). Disambiguating the accessibility hypothesis: The effect of post-identification feedback, delay, and suspicion using accurate witnesses. *Law and Human Behavior, 36*, 206-214.

Charman, S. D., & Wells, G. L. (2012). The moderating effect of ecphoric experience on post-identification feedback: A critical test of the cues-based inference conceptualization. *Applied Cognitive Psychology*, *26*, 243-250.

Quinlivan, D. S., Neuschatz, D.S., Wells, G. L., Cutler, B. L., McClung, J. E., & Harker, D. (2012). Do pre-admonition suggestions moderate the effect of the unbiased-lineup instructions? *Legal and Criminological Psychology, 17,* 165-176.

Olson, E. A., & Wells, G. L. (2012). The alibi-generation effect: Alibi generation experience influences alibi evaluation. *Legal and Criminological Psychology*, *17*, 151-164.

Madon, S., Guyll, M., Scherr, K.C., & Wells, G.L. (2012). Temporal discounting: The differential effect of distal and proximal consequences on confession decisions. *Law and Human Behavior, 36,* 13-20.

Smalarz, L. and Wells, G. L. (2012). Eyewitness identification evidence: Scientific advances and the new burden on trial judges. *Court Review, 48,* 14-21.

Brewer, N., & Wells, G. L. (2011). Eyewitness identification. *Current Directions in Psychological Science, 20*, 24-27.

Steblay, N.K., Dysart, J. & Wells, G. L. (2011). Seventy-two tests of the sequential lineup superiority effect: A meta-analysis and policy discussion. *Psychology, Public Policy, and Law, 17*, 99-139.

Charman, S. D. & Wells, G. L. (2011). The dud effect: Highly dissimilar fillers increase confidence in lineup identifications. *Law and Human Behavior*, *35*, 479-500.

Quinlivan, D. S., Wells, G. L., & Neuschatz, J. (2010). Is manipulative intent necessary to mitigate the eyewitness  post-identification feedback effect?  *Law and Human Behavior*, *34*, 186–197.

Wilford, M. M., & Wells, G. L. (2010). Does facial processing prioritize change detection? Change blindness illustrates costs & benefits of holistic processing. *Psychological Science, 21*, 1611-1615.

Wells, G. L., & Quinlivan, D. S. (2009). The eyewitness post-identification feedback effect: What is the function of flexible confidence estimates for autobiographical events? *Applied Cognitive Psychology, 23*, 751-762.

Wells, G. L., & Quinlivan, D. S. (2009). Suggestive eyewitness identification procedures and the  Supreme Court's reliability test in light of eyewitness science: 30 years later. *Law and Human Behavior, 33*, 1-24.

Clark, S. E., & Wells, G. L. (2008). On the diagnosticity of multiple-witness identifications. *Law and Human Behavior, 32,* 406–422.

Wells, G. L. (2008). Field experiments on eyewitness identification: Towards a better understanding of pitfalls and prospects. *Law and Human Behavior, 32,* 6-10.

Charman, S. D. & Wells, G. L. (2008). Can eyewitnesses correct for external influences on their lineup identifications? *Journal of Experimental Psychology: Applied, 14,* 5-20.

Sauer, J. D., Brewer, N., & Wells, G. L. (2008). Is there a magical time boundary for diagnosing eyewitness identification accuracy in sequential lineups? *Legal and Criminological Psychology, 13,* 123-135.

Wells, G. L. (2008). Theory, logic, and data: Paths to a more coherent eyewitness science. *Applied Cognitive Psychology, 22,* 853-859.

Brewer, N., Weber, N., Clark, A., & Wells, G. L. (2008).  Distinguishing accurate from inaccurate eyewitness identifications with an optional deadline procedure.  *Psychology, Crime and Law, 14,* 397-414.

Wells, G. L. & Hasel, L. E. (2007). Facial composite production by eyewitnesses. *Current Directions in Psychological Science, 16,* 6-16.

Keast, A., Brewer, N., & Wells, G. L. (2007). Children's metacognitive judgments in an eyewitness identification task. *Journal of Experimental Child Psychology, 97,* 286-314.

Charman, S. D., & Wells, G. L. (2007 ). Eyewitness lineups: Is the appearance-change instruction a good idea? *Law and Human Behavior, 31,* 3-22.

Hasel, L. E., & Wells, G. L. (2007). Catching the bad guy: Morphing composite faces helps. *Law and Human Behavior, 31,* 193-208.

Wells, G. L., Memon, A, & Penrod, S. (2006). Eyewitness evidence: Improving its probative value. *Psychological Science in the Public Interest*, 7, 45-75.

Brewer, N., & Wells, G. L. (2006). The confidence-accuracy relation in eyewitness identification: Effects of lineup instructions, foil similarity, and target-absent base rates. *Journal of Experimental Psychology: Applied, 12,* 11-30.

Wells, G. L., Charman, S. D., & Olson, E. A. (2005). Building face composites can harm lineup identification performance. *Journal of Experimental Psychology: Applied*, 11, 147-157.

Bradfield, A. L. & Wells, G. L. (2005). Not the same old hindsight bias: Outcome information distorts a broad range of retrospective judgments. *Memory and Cognition*, 33, 120-130.

Semmler, C., Brewer, N., & Wells, G. L. (2004). Effects of postidentification feedback on eyewitness identification and nonidentification. *Journal of Applied Psychology, 89,* 334-346.

Weber, N., Brewer, N., Wells, G. L., Semmler, C, & Keast, A. (2004). Eyewitness identification accuracy and response latency: The unruly 10-12 second rule. *Journal of Experimental Psychology: Applied, 10,* 139-147.

Olson, E. A., & Wells, G. L. (2004). What makes a good alibi? A proposed taxonomy. *Law and Human Behavior, 28*, 157-176.

Wells, G. L. & Olson, E. (2003). Eyewitness identification. *Annual Review of Psychology, 54*, 277-295.

Wells, G. L. (2003). Murder, extra-marital affairs, and the issue of probative value. *Law and Human Behavior, 27*, 623-628.

Wells, G. L., Olson, E., & Charman, S. (2003). Distorted retrospective eyewitness reports as functions of feedback and delay. *Journal of Experimental Psychology: Applied, 9*, 42-52.

Turtle, J.W., Lindsay, R.C.L. & Wells, G.L. (2003). Best practice recommendations for eyewitness evidence procedures: New ideas for the oldest way to solve a case. *The Canadian Journal of Police and Security Services, 1*, 5-18.

Wells, G. L., Olson, E., & Charman, S. (2002). Eyewitness identification confidence. *Current Directions in Psychological Science, 11*, 151-154. [Reprinted in *Current directions in social psychology* (2004), Upper Sadle River, NJ: Pearson/Prentice Hall.]

Wells, G. L. & Olson, E. (2002). Eyewitness identification: Information gain from incriminating and exonerating behaviors. *Journal of Experimental Psychology: Applied, 8*, 155-167.

Bradfield, A. L., Wells, G.L, & Olson, E.A. (2002). The damaging effect of confirming feedback on the relation between eyewitness certainty and identification accuracy. *Journal of Applied Psychology, 87*, 112-120.

Bushman, B. J., & Wells, G. L. (2001). Narrative impressions of the literature: The availability bias and the corrective properties of meta-analytic approaches. *Personality and Social Psychology Bulletin, 27,* 1123-1130.

Wells, G. L. (2001). Eyewitness lineups: Data, theory, and policy. *Psychology, Public Policy, and Law, 7*, 791-801.

Wells, G. L. & Olson, E. A. (2001). The other-race effect in eyewitness identification: What do we do about it? *Psychology, Public Policy, and Law, 7*, 230-246.

Wells, G. L., Malpass, R. S., Lindsay, R.C.L., Fisher, R.P., Turtle, J. W., & Fulero, S. (2000). From the lab to the police station: A successful application of eyewitness research. *American Psychologist, 55*, 581-598.

Bradfield, A. L. & Wells, G. L. (2000). The perceived validity of eyewitness identification testimony: A test of the five Biggers criteria. *Law and Human Behavior, 24*, 581-594.

Wells, G. L. & Bradfield, A. L. (1999). Distortions in eyewitnesses' recollections: Can the postidentification feedback effect be moderated? *Psychological Science, 10*, 138-144.

Wells, G. L., & Windschitl, P. D. (1999). Stimulus sampling in social psychological experimentation. *Personality and Social Psychology Bulletin, 25*, 1115-1125.

Wells, G. L. (1999). Improving eyewitness identification evidence. *Psychological Science Agenda, 12*, 8-10.

Wells, G. L., & Bradfield, A. L. (1999). Measuring the goodness of lineups: Parameter estimation, question effects, and limits to the mock witness paradigm. *Applied Cognitive Psychology, 13*, 27-40.

Bushman, B. J. & Wells, G. L. (1998). Trait aggressiveness and hockey penalties: Predicting hot tempers on the ice. *Journal of Applied Psychology, 83*, 969-974.

Wells, G. L. & Bradfield, A. L. (1998). "Good, you identified the suspect:" Feedback to eyewitnesses distorts their reports of the witnessing experience. *Journal of Applied Psychology, 83*, 360-376.

Windschitl, P. D., & Wells, G. L. (1998). The alternative outcomes effect. *Journal of Personality and Social Psychology, 75*, 1411-1423.

Wells, G. L., Small, M., Penrod, S. J., Malpass, R. S., Fulero, S. M., & Brimacombe, C. A. E. (1998). Eyewitness identification procedures: Recommendations for lineups and photospreads. *Law and Human Behavior, 22*, 603-647.

Windschitl, P. D. & Wells, G. L. (1997). Behavioral consensus information affects people's inferences about population traits. *Personality and Social Psychology Bulletin, 23*, 148-153.

Windschitl, P. D. & Wells, G. L. (1996). Measuring psychological uncertainty: Verbal vs numeric methods. *Journal of Experimental Psychology: Applied, 2*, 343-364.

Windschitl, P. D. & Wells, G. L. (1996). Base rates do not constrain non-probability judgments. *Behavoral and Brain Sciences, 19*, 40-41.

Luus, C. A. E., Wells, G. L., & Turtle, J. W. (1995). Child eyewitnesses: Seeing is believing. *Journal of Applied Psychology, 80*, 317-326.

Wells, G. L. & Leippe, M. R. (1995). Prospects and problems with partial identification. *Criminal Justice and Behavior, 22*, 373-385.

Wells, G. L. & Seelau, E. P. (1995). Eyewitness identification: Psychological research and legal policy on lineups. *Psychology, Public Policy, and Law , 1*, 765-791

Wells, G. L. (1995) Scientific study of witness memory: Implications for public and legal policy. *Psychology, Public Policy, and Law , 1*, 726-731.

Seelau, S. M. & Wells, G. L. (1995). Applied eyewitness research: The other mission. *Law and Human Behavior, 19*, 317-322.

Luus, C. A. E., & Wells, G. L. (1994). The malleability of eyewitness confidence: Co-witness and perseverance effects. *Journal of Applied Psychology, 79*, 714-723.

Wells, G. L., Luus, C. A. E., & Windschitl, P. D. (1994). Maximizing the utility of eyewitness identification evidence. *Current Directions in Psychological Science 3*, 194-197. [Reprinted in *Annual Editions: Social Psychology* (1996). Guilford, CT: Dushkin Pub.]

Wells, G. L. (1993). What do we know about eyewitness identification? *American Psychologist, 48*, 553-571.

Wells, G. L., Rydell, S. M., & Seelau, E. P. (1993). On the selection of distractors for eyewitness lineups. *Journal of Applied Psychology, 78*, 835-844.

Wright, E. F., Rule, B. G., Ferguson, T. J., & McGuire, G. R., & Wells, G. L. (1992). Misattribution of dissonance and behavior-consistent attitude change. *Canadian Journal of Behavioral Sciences, 24*, 456-464.

Wells, G. L. (1992). Naked statistical evidence of liability: Is subjective probability enough? *Journal of Personality and Social Psychology, 62*, 739-752.

Johnson, R., Rennie, R., & Wells, G. L. (1991). Outcome trees and baseball: A study of omission effects. *Organizational Behavior and Human Decision Processes, 50*, 324-340.

Luus, C. A. E., & Wells, G. L. (1991). Eyewitness identification and the selection of distracters for lineups. *Law and Human Behavior, 15*, 43-57.

Wells, G. L. (1990). Identifying Ivan: A case study in legal psychology. *Social Behavior, 13*, 110-121.

Wells, G. L., & Luus, C. A. E. (1990). The diagnosticity of a lineup should not be confused with the diagnostic value of non-lineup evidence. *Journal of Applied Psychology, 75*, 511-516.

Wells, G. L., & Luus, E. (1990). Police lineups as experiments: Social methodology as a framework for properly-conducted lineups. *Personality and Social Psychology Bulletin, 16*, 106-117.

Lindsay, R. C. L., Wells, G. L., & O'Connor, F. (1989). Mock juror belief of accurate and inaccurate eyewitnesses: A replication. *Law and Human Behavior, 13*, 333-340.

Gavanski, I., & Wells, G. L. (1989). Counterfactual processing of normal and exceptional events. *Journal of Experimental Social Psychology, 25*, 314-325.

Wells, G. L., & Gavanski, I. (1989). Mental simulation of causality. *Journal of Personality and Social Psychology, 56*, 161-169.

Wright, E. F., & Wells, G. L. (1988). Is the attitude-attribution paradigm suitable for testing the dispositional bias? *Personality and Social Psychology Bulletin, 14*, 183-190.

**Ex. 700-32**

Wells, G. L., & Turtle, J. W.  (1987).  Eyewitness testimony:  Current knowledge and emergent controversies.  *Canadian Journal of Behavioral Sciences, 19*, 363-388.

Wells, G. L.  (1987).  Behavioral scientists in courts and corrections.  *Canadian Journal of Behavioral Sciences, 19*, 391-392.

Wells, G. L., Taylor, B. R., & Turtle, J. W.   (1987).  The undoing of scenarios.  *Journal of Personality and Social Psychology, 53*, 421-430.

Wells, G. L., & Turtle, J. W.  (1986).  Eyewitness identification:  The importance of lineup models.  *Psychological Bulletin, 99*, 320-329.

Wells, G. L.  (1986).  Expert psychological testimony:  Empirical and conceptual analyses of effects.  *Law and Human Behavior, 10*, 83-96.

Wells, G. L.  (1985).  Verbal descriptions of faces from memory:  Are they diagnostic of identification accuracy?  *Journal of Applied Psychology, 70*, 619-626.

Wells, G. L., Wrightsman, L. S., & Meine, P.  (1985).  The timing of the defense opening statement:  Don't wait until the evidence is in.  *Journal of Applied Social Psychology, 15*, 758-772.

Wells, G. L.  (1985).  The conjunction error and the representativeness heuristic.  *Social Cognition, 3*, 266-279.

Wright, E. F., & Wells, G. L.  (1985).  Does group discussion attenuate the dispositional bias?  *Journal of Applied Social Psychology, 15*, 531-546.

Lindsay, R. C. L., & Wells, G. L.  (1985).  Improving eyewitness identification from lineups:  Simultaneous versus sequential lineup presentations.  *Journal of Applied Psychology, 70*, 556-564.

Wells, G. L., & Lindsay, R. C. L.  (1985).  Methodological notes on the accuracy-confidence relationship in eyewitness identifications.  *Journal of Applied Psychology, 70*, 413-419.

Wells, G. L.  (1985).  Experimental psychology and the courtroom.  *Behavioral Sciences and the Law, 4*, 363-374.

Wells, G. L., & Hryciw, B.  (1984).  Memory for faces:  Encoding and retrieval operations.  *Memory and Cognition, 12*, 338-344.

Wells, G. L., Enzle, M. E., & Hoffman, C.  (1984).  Self versus other-referent processing at encoding and retrieval.  *Personality and Social Psychology Bulletin, 10*, 574-584.

Wells, G. L.  (1984).  The psychology of lineup identifications.  *Journal of Applied Social Psychology, 14*, 89-103.

Wells, G. L.  (1984).  Do the eyes have it?  More on expert eyewitness testimony.  *American Psychologist*, (comment), *39*, 1064-1065.

Wells, G. L., & Murray, D. M.  (1983).  What can psychology say about the Neil vs. Biggers criteria for judging eyewitness identification accuracy?  *Journal of Applied Psychology, 68*, 347-362.

Petty, R. E., Wells, G. L., Heesacker, M., Cacioppo, J. T., & Brock, T. C.  (1983).  The effects of recipient posture on persuasion:  A cognitive response analysis.  *Personality and Social Psychology Bulletin, 9*, 209-222.

Wells, G. L., & Ronis, D.  (1982).  Discounting and augmentation:  Is there anything special about the number of causes?  *Personality and Social Psychology Bulletin, 8*, 566-572.

Wells, G. L.  (1982).  Attribution and reconstructive memory.  *Journal of Experimental Social Psychology, 18*, 447-463.

Murray, D., & Wells, G. L.  (1982).  Does knowledge that a crime was staged affect eyewitness performance?  *Journal of Applied Social Psychology, 12*, 42-53.

Wells, G. L., & Leippe, M. R.  (1981).  How do triers of fact infer the accuracy of eyewitness identifications?  Memory for peripheral detail can be misleading.  *Journal of Applied Psychology, 66*, 682-687.

Wells, G. L., Ferguson, T. J., & Lindsay, R. C. L.  (1981).  The tractability of eyewitness confidence and its implication for triers of fact.  *Journal of Applied Psychology, 66*, 688-696.

Lindsay, R. C. L., Wells, G. L., & Rumpel, C.  (1981).  Can people detect eyewitness identification accuracy within and between situations?  *Journal of Applied Psychology, 66,* 79-89.

Rule, B. G., & Wells, G. L.  (1981).  Experimental social psychology in Canada:  A look at the seventies.  *Canadian Psychology, 22*, 69-84.

Wells, G. L. (1980). Eyewitness behavior:  The Alberta Conference.  *Law and Human Behavior, 4*, 237-242.

Lindsay, R. C. L., & Wells, G. L.  (1980).  What price justice?  Exploring the relationship between lineup fairness and identification accuracy.  *Law and Human Behavior, 4*, 303-314.

Wells, G. L., Lindsay, R. C. L., & Tousignant, J. P.  (1980).  Effects of expert psychological advice on human performance in judging the validity of eyewitness testimony.  *Law and Human Behavior, 4*, 275-286.  Reprinted in *Controversies in the courtroom* by Wrightsman, Kassin & Willis, Sage Pub., 1987.

Wells, G. L., & Petty, R. E.  (1980).  The effects of head movement on persuasion:  Compatibility and incompatibility of responses.  *Basic and Applied Social Psychology, 1*, 219-230.

Wells, G. L.  (1980).  Asymmetric attributions for compliance:  Reward vs. punishment.  *Journal of Experimental Social Psychology, 16*, 47-60.

Wells, G. L., & Lindsay, R. C. L.  (1980).  On estimating the diagnosticity of eyewitness nonidentifications.  *Psychological Bulletin, 88*, 776-784.

Ferguson, T. J., & Wells, G. L.  (1980).  The priming of mediators in causal attribution.  *Journal of Personality and Social Psychology, 38*, 461-470.

Wells, G. L.  (1980).  [Review of *The psychology of evewitness testimony*].  *Canadian Psychology, 21*, 40-41.

Wells, G. L., Leippe, M. R., & Ostrom, T. M.  (1979).  Guidelines for empirically assessing the fairness of a lineup.  *Law and Human Behavior, 3*, 285-293.

Wells, G. L., Lindsay, R. C. L., & Ferguson, T. J.  (1979).  Accuracy, confidence, and juror perceptions in eyewitness identification.  *Journal of Applied Psychology 64*, 440-448.

Wells, G. L.  (1978).  Applied eyewitness testimony research:  System variables and estimator variables.  *Journal of Personality and Social Psychology, 36*, 1546-1557.

Leippe, M. R., Wells, G. L., & Ostrom, T. M.  (1978).  Crime seriousness as a determinant of accuracy in eyewitness identification*. Journal of Applied Psychology, 63*, 345-351.

Wells, G. L., & Harvey, J. H.  (1978).  Naive attributors' attributions and predictions:  What is informative and when is an effect an effect?  *Journal of Personality and Social Psychology, 36*, 483-490.

Wells, G. L., Petty, R. E., Harkins, S. G., Kagehiro, D., & Harvey, J. H.  (1977).  Anticipated discussion of interpretation eliminates actor-observer differences in the attribution of causality. *Sociometry, 40*, 247-253.

Wells, G. L., & Harvey, J. H.  (1977).  Do people use consensus information in making causal attributions?  *Journal of Personality and Social Psychology, 35*, 279-293.

Wells, G. L.  (1976).  Attitude change validity:  Reply to Hendrick and Bukoff.  *Journal of Personality and Social Psychology, 34*, 1076-1077.

Wells, G. L.  (1976).  Reassessing the validity of laboratory-produced attitude change.  *Journal of Personality and Social Psychology, 34*, 1062-1067.

Petty, R. E., Wells, G. L., & Brock, T. C.  (1976).  Distraction can enhance or reduce yielding to propaganda:  Thought disruption versus effort justification.  *Journal of Personality and Social Psychology, 34*, 874-884.

# Books and Book Chapters

Wells, G. L. (2016). Eyewitness identification.  In D. Faigman, D. Kaye, M. Saks, & J. Sanders (Eds.) , *Modern scientific evidence: The law and science of expert testimony* (pp. 451-479). St. Paul: West Publishing Co.

Smalarz, L, Greathouse, S. M., Wells, G. L., & Newirth, K. A. (2016). Psychological science on eyewitness identificaitons and the U.S. Supreme Court: Reconsiderations in light of DNA exornations and the science of eyewitness identification. In C. Willis-Esqueda & B. H. Bornstein (Eds.), *The witness stand and Lawrence S. Wrightsman, Jr.* New York: Springer.

Wells, G. L. (2016). Some functions and dysfunctions of collaboration. In In R. Zweigenhaft & E. Borgida (eds.) *Collaboration in psychological science: Lifting the veil*. Worth Publishers: New York.

Smalarz, L., & Wells, G. L. (2015), ".Eyewitness Lineups. In A. Jamieson and A.A. Moenssens (Eds.) *Wiley Encyclopedia of Forensic Science*, John Wiley: Chichester. DOI: 10.1002/9780470061589.fsa469.pub2.

Wells, G. L., & Loftus, E. F. (2013). Eyewitness memory for people and events. In R. K. Otto & I. B. Weiner (Eds.), *Handbook of psychology* (2nd. Ed., *Vol. 11) Forensic psychology (pp.617-629)*. Hoboken, NJ: John Wiley & Sons, Inc.

Wilford, M. M , & Wells, G. L. (2013). Eyewitness system variables: Revisiting the system-variable concept and the transfer of system variables to the legal system. In B. L. Cutler (Ed) *Reform of eyewitness identification procedures*. Washington, DC: American Psychological Association.

Smalarz, L. & Wells, G. L. (2013). Eyewitness certainty as a system variable. In B. L. Cutler (Ed) *Reform of eyewitness identification procedures*. Washington, DC: American Psychological Association.

Wells, G. L., & Smalarz, L. (2014). Eyewitness memory. *Oxford online bibliographies*, in press.

Wells, G. L., & Penrod, S. D. (2011). Eyewitness identification research: Strengths and weaknesses of alternative methods. In B. Rosenfeld, & S. D. Penrod (Eds.), *Research methods in forensic psychology.* John Wiley and Sons, Hoboken, NJ.

Wells, G. L. , & Olson, E. E. (2011). Eyewitness memory. In H. Pashler (Ed), *Encyclopedia of the mind.* London: Sage Publications.

Wells, G. L., Greathouse, S. M., & Smalarz, L. (2011). Why do motions to suppress suggestive eyewitness identifications fail? In B. L. Cutler (Ed.), *Conviction of the innocent: Lessons from psychological research.* Washington DC: American Psychological Association Press.

Brewer, N. & Wells, G. L. (2009). Obtaining and interpreting eyewitness identification test evidence: The influence of police-witness interactions. In T. Williamson, R. Bull, & T. Valentine (Eds.) *Handbook of psychology of investigative interviewing: Current developments and future directions.* Chichester, U.K.: Wiley & Sons.

Wells, G. L., Cutler, B. L., & Hasel, L. E. (2009). The Duke-lacrosse rape Investigation: How not to do eyewitness identification procedures. In M. L. Siegel (Ed.), *Race to injustice: Lessons learned from the Duke University lacrosse rape case (pp. 307-321).* Carolina Academic Press.

Cutler, B. L., & Wells, G. L. (2009). Expert testimony regarding eyewitness identification. J. Skeem, K. Douglas, & S. Lilenfeld (Eds.), *Psychological science in the courtroom: Consensus and controversies* (pp. 100-123). New York: Guilford Press.

Wells, G. L., & Charman, S. D. (2009). Eyewitness identification. In David S. Clark (Ed.) *Encyclopedia of law and society.* London: Sage Publications.

Wells, G. L. & Hasel, L. E. (2008). Eyewitness identification: Issues in common knowledge and generalization. In E. Borgida and S. T. Fiske (Eds.) *Beyond common sense: Psychological science in the courtroom (pp. 159-176*). Malden, MA: Blackwell.

Wells, G. L. & Hasel, L. E. (2008). The American Psychology-Law Society. In David S. Clark (Ed.) *Encyclopedia of law and society.* London: Sage Publications.

Charman, S. D. and Wells, G. L. (2007). Applied lineup theory. In R. C. L. Lindsay, D. F. Ross, J. D. Read, & M. P. Toglia (Eds.) *Handbook of eyewitness psychology: Memory for people* (pp. 219-254). Mahwah, NJ: Lawrence Erlbaum Associates.

Wells, G. L. (2005). Helping experimental psychology affect legal policy. In N. Brewer & K. Williams (Eds) *Psychology and law: An empirical perspective (pp. 483-500).* New York: Guilford Publications, Inc.

Ex. 700-37

Weber, N., Brewer, N., & Wells, G. L. (2004). Is there a "magical" decision latency that discriminates correct from incorrect eyewitness identifications? In A. Czerederecka, T. Jaskiewicz-Obydzinska, R. Roesch, and J. Wojciliewicz (Eds), *Forensic psychology and law* (pp.115-124). Krakow: Institute of Forensic Research Publishers.

Lindsay, R.C.L., Brigham, J.C., Brimacombe, C.A.E., & Wells, G.L. (2003). Eyewitness research. In J.R. Ogloff (Ed.) *Taking psychology and law into the twenty-first century* (pp. 200-224). New York: Kluwer Academic/Plenum.

Wells, G. L. & Loftus, E. F. (2003).  Eyewitness memory for people and events.  In A. Goldstein, (Ed.) *Comprehensive handbook of psychology*, Volume 11, *Forensic psychology*.  New York: John Wiley and Sons.

Wells, G. L.  (2002).  Eyewitness testimony.  *Encyclopedia of psychology*.  Washington, DC: American Psychological Association.

Wells, G. L. (2002). Eyewitness testimony.  *The encyclopedia of crime and punishment.* Great Barrington, MA: Berkshire Publishing.

Wells, G. L. (2002). Eyewitness identification: Psychological aspects.  *The encyclopedia of crime and justice.* New York: Macmillan.

Wells, G. L., Wright, E. F., & Bradfield, A. L. (1999). Witnesses to crime: Social and  cognitive factors governing the validity of people's reports. In R. Roesch & S. Hart (Eds.) *Psychology and law: State of the discipline* (pp. 53-87). New York: Plenum Press.

Wells, G. L. (1998). Eyewitness testimony. *Encyclopedia of psychology*. Washington, DC: American Psychological Association, in press.

Kasimatis, M. & Wells, G.L. (1995). Individual differences in counterfactual thinking. In N.J Roese & J.M. Olson (Eds.)  *What might have been: The social psychology of counterfactual thinking* (pp. 103-132). Mahwah, NJ: Lawrence Erlbaum Assoc.

Seelau, E. P., Seelau, S. M., Wells, G. L. (1995). Counterfactual constraints. In N.J Roese & J.M. Olson (Eds.) *What might have been: The social psychology of counterfactual thinking* (pp. 81-102). Mahwah, NJ: Lawrence Erlbaum Assoc.

Luus, C. A. E., & Wells, G. L. (1994). Determinants of eyewitness confidence. In D. F. Ross, J. D. Read, & M. P. Toglia (Eds.), *Adult eyewitness testimony: Current trends and developments,* pp. 348-362. New York: Cambridge University Press.

Wells, G. L., Seelau, E., Rydell, S., & Luus, C. A. E. (1994). Recommendations for conducting lineups. In D. F. Ross, J. D. Read, & M. P. Toglia (Eds.), *Adult eyewitness testimony: Current trends and developments,* pp. 223-244. New York: Cambridge University Press.

Wells, G. L. (1994). The perceived credibility of eyewitness. In M. D. MacLeod & M. Macrae (Eds.), *Stereotypes in the criminal justice system.* London: The Falmer Press.

Luus, C. A. E., & Wells, G. L. (1992). The perceived credibility of child eyewitnesses. In H. Dent & R. Flin (Eds.), *Children as witnesses* (pp. 73-92). New York: John Wiley & Sons.

Yuille, J. C., & Wells, G. L. (1991). Concerns about the application of research findings: The issue of ecological validity. In J. L. Doris (Ed.), *The suggestibility of children's recollections* (pp. 118-128). Washington, DC: American Psychological Association.

Wells, G. L., & Loftus, E. F. (1991). Is this child fabricating? Reactions to a new assessment technique. In J. L. Doris (Ed.), *The suggestibility of children's recollections* (pp. 168-171). Washington, DC: American Psychological Association.

Wells, G. L., Turtle, J. W., & Luus, C. A. (1989). The perceived credibility of child eyewitnesses: What happens when they use their own words? In Ceci et al. (Eds.), *Children take the stand: Adult perceptions of children's testimony* (pp. 23-39). New York: Springer-Verlag.

Wells, G. L., & Turtle, J. W. (1988). What is the best way to encode faces? In M. W. Gruneberg et al. (Eds.), *Practical aspects of memory* (pp. 163-168). New York: Wiley.

Turtle, J. W., & Wells, G. L. (1988). Children versus adults as eyewitnesses: Whose testimony holds up under cross examination? In M. W. Gruneberg et al. (Eds.), *Practical aspects of memory* (pp. 27-33). New York: Wiley.

Wells, G. L. (1988). *Eyewitness identification: A system handbook.* Toronto: Carswell Legal Publications.

Wells, G. L., & Loftus, E. F. (1987). Eyewitness testimony. *International encyclopedia of communications*. Philadelphia, PA: Annenberg School of Communications and Oxford Univ. Press.

Turtle, J. W., & Wells, G. L. (1987). Setting the stage for psychological research on the child eyewitness. In S. J. Ceci, M. P. Toglia, & D. F. Ross (Eds.), *Children's eyewitness memory,* New York: Springer-Verlag Publishers.

Wells, G. L., & Wright, E. F. (1986). Practical issues in eyewitness research. In J. Kaplan (Ed.), *The impact of social psychology on procedural justice.* Springfield, IL: Chas. C. Thomas.

Wells, G. L. (1985). The eyewitness. In S. Kassin & L. Wrightsman (Eds.), *The psychology of evidence and courtroom procedure.* Beverly Hills, CA: Sage.

Wells, G. L. (1984). A re-evaluation of the expert testimony issue. In G. L. Wells & E. F. Loftus (Eds.), *Eyewitness testimony: Psychological perspectives*. New York: Cambridge University Press.

Wells, G. L. (1984). How adequate is human intuition for judging eyewitness testimony? In G. L. Wells & E. F. Loftus (Eds.), *Eyewitness testimony: Psychological perspectives.* New York: Cambridge University Press.

Wells, G. L., & Murray, D. (1984). Eyewitness confidence. In G. L. Wells & E. F. Loftus (Eds.), *Eyewitness testimony: Psychological perspectives.* New York: Cambridge University Press.

Wells, G. L., & Loftus, E. F. (1984). Eyewitness research: Then and now. In G. L. Wells & E. F. Loftus (Eds.), *Eyewitness testimony: Psychological perspectives.* New York: Cambridge University Press.

Wells, G. L., & Loftus, E. F. (Eds.). (1984). *Eyewitness testimony: Psychological perspectives.* New York: Cambridge University Press.

Wells, G. L., & Lindsay, R. C. L. (1983). How do people infer the accuracy of memory? Studies of performance and a metamemory analysis. In S. Lloyd-Bostock & B. R. Clifford (Eds.), *Witness evidence: Critical and empirical papers.* New York: Wiley.

Lindsay, R. C. L., & Wells, G. L.  (1983).  What do we really know about cross-race identifications?  In S. Lloyd-Bostock & B. R. Clifford (Eds.), *Witness evidence:  Critical and empirical papers*.  New York:  Wiley.

Wells, G. L.  (1981).  Lay analyses of causal forces on behavior.  In J. Harvey (Ed.), *Cognition, behavior, and the environment*.  Hillsdale, NJ:  Erlbaum Assoc.

Harvey, J. H., Wells, G. L., & Alvarez, M. D.  (1978).  Attribution in the context of conflict and separation in close relationships.  In J. H. Harvey, W. Ickes, & R. Kidd (Eds.), *New directions in attribution research* (Vol. 2).  Hillsdale, NJ:  Lawrence Erlbaum Assoc.

# Other Publications

Wells, G. L. (2006). Eyewitness identification: Systemic reforms. *Wisconsin Law Review, 2006*, 615-643.

Wells, G. L. (2005). Eyewitness identification evidence: Science and reform. *The Champion*, April Issue (Cover Story) pages 12-21.

Wells, G. L. (2000).  Eyewitness testimony.  *Reader's Guide to the Social Sciences*,  London: Fitzroy/Dearborn, 645-646.

Wells, G. L. (1997). Do the eyes have it? *Contemporary Psychology*, 413-414.

Turtle, J. W. & Wells, G. L. (1997). Partners in crime: Giving away psychology to police. *Contemporary Psychology, 42*, 219-220.

Nettles, W., Nettles, Z. & Wells, G.L. (1996). "I noticed you paused on number three:" Biased testing in eyewitness identification. *The Champion*, November, 38-45.

Wells, G. L., & Windschitl, P. D.  (1993).  What's in a question?  *Contemporary Psychology, 38*, 383-385.

Wells, G. L.  (1993).  Perceived legitimacy and legal compliance.  *Contemporary Psychology, 38*, 294.

Wells, G. L.  (1992).  The acoustics of crime.  *Contemporary Psychology, 37*, 263

Wells, G. L.  (1990).  Who is Ivan?  A lesson in system variable eyewitness violations. *Contemporary Psychology, 35*, 876-877.

Wells, G. L.  (1985).  Thinking about people.  *Contemporary Psychology, 30*, 376-377.

Wells, G. L.  (1985).  Another attribution book:  Trivial pursuit or nascent directions? *Contemporary Psychology, 30*, 65-67.

Wells, G. L.  (1982).  Gaps and canyons in psycho-legal research.  *Contemporary Psychology, 27*, 55-56.

Wells, G. L.  (1982).  The psychology of eyewitness testimony.  *The High School Psychology Teacher, 13*, 2-3.

## INVITED ADDRESSES, COLLOQUIA, WORKSHOPS

State University of New York at Buffalo, NY, 1977.

George Mason University, 1977.

University of Western Ontario, London, ON, 1977.

Vanderbilt University, Nashville, TN, 1979.

Ohio State University, Columbus, OH, 1981.

Oxford University, 1981.

Johns Hopkins University, Baltimore, MD, 1981.

Midwestern Psychological Association, Detroit, MI, 1981.

Interdisciplinary Conference.  Jackson Hole, WY, January, 1981.

University of Calgary, October, 1982.

University of Lethbridge, October, 1982.

Johns  Hopkins University, Baltimore, MD, June, 1983.

American Psychological Association, Anaheim, CA, August, 1983.

University of Kansas, Lawrence, KS, November, 1983.

University of Missouri, Columbia, MO, March, 1984.

Texas Tech University, Lubbock, TX, March, 1984.

University of Texas at El Paso, El Paso, TX, March, 1984.

University of Toronto, Toronto, ON, April, 1984.

Scarborough College, Toronto, ON, April, 1984.

University of Iowa, Iowa City, IA, May, 1984.

Missouri Trial Lawyers Association, Columbia, MO, June, 1984.

University of California, Los Angeles, CA, March, 1985.

American Psychological Association, Los Angeles, CA, August, 1985.

Queen's University, Kingston, ON, October, 1985.

Queen's University Law School, Queen's University, Kingston, ON, October, 1985.

Canadian Institute for the Administration of Justice, Edmonton, AB, August, 1986.

California Continuing Judicial Studies Program.  Lake Tahoe, CA, August, 1986.

University of Missouri, Columbia, MO, January, 1987.

Manitoba Queen's Bench Judges, Hecla Island, MB, May, 1987.

Canadian Psychological Association Meeting, Vancouver, BC, June, 1987.

International Conference on   Applied Aspects of Memory, Swansea, Wales, August, 1987.

Purdue University, Lafayette, IN, December, 1987.

Senior police detectives across Canada (workshop).  Calgary, AB, September, 1988.

Trial Judges of Manitoba.  Winnipeg, MB, December, 1988.

Edmonton Police.  Edmonton, AB,    February, 1989.

University of British Columbia, Vancouver, BC, February, 1989.

Cornell University, Ithaca, NY, June, 1989.

Winnipeg Police. Winnipeg, MB, September, 1989.

Toronto Metro Police Detectives. Toronto, ON, October, 1989.

Midwestern Psychological Association, Chicago, IL, May, 1990.

Ontario Police College, London, ON, June, 1990 (series of talks).

Morningside College, Sioux City, IA, February, 1991.

University of Iowa, Iowa City, IA, April, 1991.

Drake University, Des Moines, IA, April, 1991.

Minnesota Trial Judges Association, September, 1992.

Florida International University, Miami, November, 1992.

International Conference on Forensic Statistics, Tempe, AZ, March, 1993.

University of Kansas, Lawrence, KS, April, 1993.

False Memory Syndrome Foundation, Des Moines, IA, 1994.

American Psychological Association, Los Angeles, 1994.

Ohio State University, Columbus, O., November, 1994.

Michigan State University, East Lansing, MI, December, 1994.

International Association of Forensic Phonetics, Orlando, July, 1995.

Pennsylvania Association of Criminal Defense Attorneys, Harrisburg, PA, October, 1995.

Hope College, Holland, MI, October, 1995.

University of Iowa, November, 1995.

University of Northern Iowa, Cedar Falls, April, 1996.

Midwestern Psychological Association, May, 1996.

Muskingum College, New Concord, Ohio, October, 1996.

Kansas Association of Criminal Defense Lawyers, November, 1996.

Northwestern University Law School, Chicago, March 1997.

National Defense Investigators Association meeting, San Antonio, TX, March, 1997.

Public Defenders and Defense Investigators Workshop, Neenah, WI, May, 1997.

County Prosecutors of Iowa, Okoboji, IA, June 1997 .

Society of Applied Research in Memory and Cognition, Toronto, July, 1997.

American Psychological Association, Chicago, August, 1997.

Federal Bar Association, San Juan, Puerto Rico, September, 1997.

Federal Defenders Meeting, Des Moines, IA, October 1997.

Northwestern University Law School, Chicago, March 1998.

Saint Louis University, March, 1998.

Iowa State University Commencement Address, May 1998.

Criminal Justice Research and Evaluation Meeting, Washington, DC, July 1998.

American Medical Association Meeting on Patient Safety, Rancho Mirage, CA, Nov. 1998.

Federal Bar Council Meeting, Kona, Hawaii, February 1999.

Northwestern University Law School, Chicago, March 1999.

Western Illinois University, April 1999.

Conference of New Jersey Trial Judges, New Jersey, April 1999.

Oklahoma Criminal and Death Defenders Association, Oklahoma City, May 1999.

American Psychology/Law Society Presidential Initiative, Vancouver, B.C., July 1999.

Society for Applied Research in Memory and Cognition, Keynote Address,
Boulder, CO, July, 1999

Federal Judicial Center, Washington, DC, July 1999.

American Psychological Assiciation, Boston, August, 1999.

American Bar Association/American Psychological Association joint conference, invited
address, Washington, DC, October, 1999.

University of North Carolina Psychology Department, invited colloquium, Greensboro, NC,
October, 1999.

Suffolk University Law School, invited talks, Boston, MA, November 1999.

Nothwestern University Law School, February, 2000.

Miscarriages of Justice Conference, Distinguished Speaker, Newport Beach, CA, March 2000.

Kansas State University, invited colloquium, March 2000 .

University of Arkansas, invited colloquium, March 2000.

American Psychology-Law Society, Keynote Speaker, New Orleans, March 2000.

National Consortium of State Courts, invited address, Newark, NJ, May 2000.

University of Georgia, Georgia Medical College, invited colloquium, May 2000.

Capitol Hill Science Seminar, Address to congressional and executive branch staffers in U.S.
Government, Library of Congress, Washington, D.C., July, 2000.

New York State Public Defenders' Association, invited address, Catskills, July, 2000.

National Academy of Sciences, invited talk, Washington, DC, September, 2000.

New Jersey County Prosecutors, invited address, Atlantic City, September, 2000.

Indiana Public Defenders' Council, invited address, Indianapolis, October, 2000.

St. Francis Xavier University, colloquium and invited address, Antigonish, Nova Scotia, October,
2000.

McKenna-Claremont College, invited address, Claremont, California, October, 2000.

California Attorneys for Criminal Justice, invited workshop presentation, Berkeley, California,
October, 2000.

Florida International University, Psychology Department invited colloquium, Miami, October,
2000.

Palm Beach Criminal Lawyers Association, invited address, West Palm Beach, FL, October,
2000.

National Seminar on Forensic Evidence and Criminal Law, invited address, Philadelphia,
November, 2000.

New Jersey Division of Criminal Justice, invited presentation, Absecon, NJ, November, 2000.

Federal Bar Association - Inn of Court, invited address, Manhattan, NY, November, 2000.

Innocence Network, web-based lecture broadcast to law schools across the U.S., Houston, TX,
January, 2001.

The Innocence Network - Digitized lecture broadcast over the internet to law classes in
numerous law schools, filmed in Houston, TX,  with live audience, January, 2001.

Australian Psychological Society Forensic Psychology Conference, Sydney, Australia,
February, 2001.

University of Melbourne, Psychology Department invited colloquium, Melbourne, Australia,
February, 2001.

Flinders University, Psychology Department invited colloquium, Adelaide, Australia, March,
2001.

Univeristy of Adeliade, Psychology Department invited colloquium, Adelaide, Australia, March,
2001.

University of South Australia, Psychology Department invited colloquium, Adelaide, Australia,
March, 2001.

Northwestern University Law School, invited talks (two), Chicago, April, 2001.

Daemon College, invited address, Buffalo, NY, April 2001.

Missouri Association of Criminal Defense Lawyers, invited address, St. Louis, April, 2001.

New Jersey Police and Prosecutors, seminar on eyewitness evidence, Princeton, NJ, May,
2001.

New Jersey State Public Defenders' Association, invited address, Somerset, NJ, May, 2001.

Philadelphia Public Defenders' Association, invited talk, Philadelphia, May, 2001.

Philadelphia Municipial Judges Asscociation Meeting, invited address, Philadelphia, May 2001.

Society for the Application of Research in Memory and Cognition, keynote address, Kingston,
Ontario, Canada, June 2001.

American Psychological Society, invited plenary address, Presidential Symposium, Toronto,
Ontario, Canada, June 2001.

New Jersey Chiefs of Police, invited address, Atlantic City, June, 2001.

Massachusetts Public Defenders, invited address, Boston, June 2001.

National Conference on Criminal Justice Research and Evaluation, invited talk, Washington,
DC, July, 2001.

National Association of Criminal Defense Lawyers, invited address, Minneapolis, August 2001.

Judicial Institute, Invited Address, Des Moines, August 2001.

American Psychological Association, Distinguished Contributions to Forensic Psychology
Award address, San Francisco, August 2001.

National Conference on Science and the Law, invited address, Miami, October, 2001

University of Michigan, Ann Arbor, MI, Psychology Department Colloquium, October, 2001.

Middlebury College, Middlebury, VT, Colloquium, October, 2001.

Brooklyn District Attorney's Office, invited presentation, Brooklyn, NY, November, 2001.

Baker University, Keynote Address, Conference, Baldwin City, KS, November, 2001.

Brooklyn District Attorney's Office, invited presentation, Brooklyn, NY, November, 2001.

New York City Police Department, invited presentation to Police Commissioner and others, February, 2002.

California Attorneys for Criminal Justice, Keynote Address, Monterey, CA,  February, 2002.

University of Nevada - Reno, invited colloquium (2 talks), Reno, NV, March, 2002.

Williams College, invited colloquium, Williamstown, MA, March, 2002.

National Seminar on Forensic Evidence, invited address, New Orleans, April, 2002.

National Association of Defense Investigators, invited address, Portland, OR, April, 2002.

Harvard University, Innocence and the Law, invited panel member, Cambridge, MA, April, 2002.

University of Illinois-Springfield, invited address, Springfield, IL, May, 2002.

South Carolina Public Defenders, invited presentations/workshop, Columbia, SC, May, 2002.

California Attorneys for Criminal Justice, invited lecture, Las Vegas, NV, June, 2002.

Illinois General Assembly, Judiciary Committee, invited oral statement, Chicago, June, 2002.

San Diego Public Defenders, invited lecture, San Diego, CA, June 2002.

Capital Defense Attorneys Conference, invited lecture, Airlie House, Maryland, July, 2002.

California Attorneys for Criminal Justice, invited lecture, Las Vegas, NV, June, 2002.

Regional Criminal Defense Seminar, invited lecture, St. Charles, IL, August, 2002.

Illinois Appellate Judges Association, invited lecture, Galena, IL, October, 2002.

Criminal Defense Advocacy Seminar, invited lecture, November, 2002, Drake University Law School, November, 2002.

District of Columbia Criminal Practice Institute, Keynote Speaker, Georgetown Law Center, Washington, DC, November, 2002.

Carnegie Melon University, Department of Social and Decision Sciences, invited colloquium, Pittsburgh, PA, November, 2002.

Minnesota Judges Association, invited address, Minneapolis, December 2002.

Arizona Attorneys for Criminal Justice, invited lecture, Prescott, AZ, January, 2003.

National Conference on Preventing the Conviction of Innocent Persons, invited speaker, Alexandria, VA, January, 2003.

Chase College of Law, invited speaker, Cincinatti, Ohio, February, 2003.

Innocence Network Conference, invited speaker (2 talks), New Orleans, March 2003.

Southeastern Psychological Association, Keynote, New Orleans, March 2003.

Suffolk County Criminal Bar Assoication, Invited Lecture, Suffolk County, NY, March, 2003.

Illinois State Bar Association CLE program, Invited Lecture, Oakbrook, IL, April 2003.

California Public Defenders Association, Invited Lecure, Sacramento, CA, April, 2003.

Wisconsin Police Training Seminar, all day workshop, Madison, WI, April 2003.

Los Angeles Police Department, Invited Presentation, Los Angeles, May 2003.

Alaska Bar Association, Invited Presentation, Fairbanks, Alaska, May 2003.

University of Washington Law School Conference, Invited Lecture, Seattle, May 2003.

North Carolina Innocence Commission, Invited Presentation, Durham, NC, May 2003.

Illinois Supreme Court Conference on Capital Cases, Invited Presentation, Chicago, May 2003.

Illinois Advanced Judicial Academy, Invited Talks (2), Champaign, IL, June, 2003.

State Bar of Wisconsin, Invited Talk, Madison, WI, June, 2003.

American Psychological Association, Master Lecture, Toronto, August 2003

Minnesota Criminal Justice Institute, Invited Presentation, Bloomington, MN, August 2003.

Illinois Judicial Academy, Invited Lecture, Springfield, IL, September 2003.

Colorado District Attorneys Association, Breckenridge, CO, Invited Presentation, September
    2003.

Washington Univeristy Psychology Department, St Louis, MO, invited colloquium, October,
    2003.

New York State Judicial Institute, New York, NY, invited presentation, October 2003.

Northwestern University Law School, Chicago, IL, invited talk, October 2003.

Wisconsin Avery Commission, Capitol Building, Madison, WI, testimony to Commission,
    February, 2004.

Great Plains Student Psychology Conference, keynote address, Rockhurst College, Kansas
    City, March 2004.

National Legal Aid Defenders' Association, keynote address, Memphis, TN, March 2004.

Texas Tech University, featured speaker, 2nd Annual Llano Estacado Undergraduate
    Psychology Research Conference, Lubbock, TX, March 2004.

Bates College, Psychology Department Colloquium, Lewiston, Maine, April 2004.

Midwestern Psychological Association, Invited Address, Chicago, May 2004.

Illinois Judges Capital Cases Seminar, Chicago, invited talk, May 2004.

Wisconsin Attorney General's Law Enforcement Conference, La Crosse, WI, invited address,
    May 2004.

Intuition in Law Enforcment Conference, (sponsored by Department of Justice, FBI, and APA),
    invited speaker, June 2004.

Wrongful Convictions Seminar, invited address, Durham, North Carolina, June 2004.

Illinois Judges Capital Cases Seminar, Springfield, IL, invited talk, September 2004.

Cardozo Conference on Convicting the Guilty & Exonerating the Innocent, Manhattan, NY,
    invited talks, September, 2004.

National Association of Criminal Defense Lawyers, Atlanta, invited talks, October 2004.

National Academy of Psychiatry and the Law, Scottsdale, AZ, keynote address, October 2004.

Stanford University Law School, Palo Alto, CA, invited talk, October 2004.

Minnesota Prosecutors and Police, Minneapolis, invited presentation, October, 2004.

Tristate Undergraduate Psychology Confrerence, Plattville, WI, keynote address, November
    2004.

Yale University Law School, New Haven, CT, invited talk, November 2004.

Connecticut Innocence Commission, Hartford, CT, invited talk, November, 2004.

Washington University Psychology Department Colloquium, November, 2004.

Metro Police Department and Federal Prosecutors, workshop/lecture, Washington, DC,
    December 2004.

Drake University Law School and American Judicature Society, invited talk, Des Moines, IA,
    January, 2005.

Hennepin County (Minnesota) Prosecutors and Minneapolis Police Department, invited lecture,
    Minneapolis, February 2005.

Louisiana State University Law School, invited lecture to Louisiana police, prosecutors, and
    judges, Baton Rouge, Louisiana, March 2005.

Wisconsin Department of Justice, lectures and workshops for Wisconsin law enforcement:

- April 28, 2005 in Appleton, Wisconsin;
- April 29, 2005 in Pewaukee, Wisconsin;
- May 5, 2005 in Madison, Wisconsin;
- May 6, 2005 in Sparta, Wisconsin;
- June 16, 2005 in Wausau, Wisconsin.

Massachusetts Bar Association, invited lectures, Boston, MA, May 2005.

Wisconsin Department of Justice, invited lecture to Wisconsin prosecutors, Green Lake,
    Wisconsin, June 15, 2005.

Baltimore Police Department and Maryland Police, invited presentations,  Baltimore, MD,
    November, 2005.

Wisconsin Law School, invited lecture, Madison, WI, November 2005.

San Antonio, National Conference on Forensic Science, Invited Address, January 2006.

University of North Carolina -  Greensboro, Psychology Department colloquium, February 2006.

University of Miami Law School, Keynote talk,  February 2006.

California Commission for the Fair Administration of Justice,  San Francisco, CA, Keynote
    presentation, March 2006.

The Innocence Network, Seattle, WA, keynote talk, March 2006.

Faces of Wrongful Conviction Conference, UCLA, Los Angeles, invited address, March, 2006.

University of Iowa Law School, Iowa City, IA, invited (3 hour) talk, March 2006.

American Judicature Society Commission on Forensic Science and Public Policy, invited
    address, Greensboro, NC, March 2006.

Loyola University Eyewitness Conference, invited talk, Chicago, April 2006.

University of Northern Iowa, Student Research Conference, keynote address, Cedar Rapids,
    IA, April 2006.

California Public Defenders Association, invited plenary talk, Palm Springs, CA, April 2006.

Kentucky Bar Convention, invited talk, Covington, Kentucky, June  2006

American Psychological Association, Psychology and Law Division Presidential Address, New
    Orleans, August, 2006

Fort Lauderdale Police Department, all day workshop on lineups, Fort Lauderdale, FL., October
    2006.

Atlanta Bar Association, invited presentation, Atlanta, GA, November, 2006.

Washington University Law School, invited presentation, Saint Louis, MO, November 2006.

Ohio Common Pleas Judges' Association, invited plenary address, Columbus, Ohio, December 2006

Ohio State University College of Law and Psychology Department, colloquium, Columbus, Ohio, December 2006.

John Jay College of Criminal Justice "Off the Witness Stand" conference, plenary address, March 2007.

Second Annual Midwestern Conference on Professional Psychology, keynote address, Minneapolis, MN, March 2007.

Morningside College Palmer Student Research Symposium, keynote address, Sioux, City, IA, April 2007.

Belmont Undergraduate Research Symposium, keynote address, Nashville, TN, April 2007.

Carleton College, invited talk, Northfield, Minnesota, May, 2007.

Wisconsin Judiciary Criminal Law and Sentencing Institute, invited address, Waukesha, Wisconsin, May, 2007.

American Psychological Association Annual Convention, invited talk for Presidential Citation award, San Francisco, CA, August 2007.

Criminal Law Seminar for trial judges, invited talk, Des Moines, IA, October 2007.

Georgia House of Representatives, Committee on Justice Reforms, invited testimony, Atlanta, October 2007.

Brandeis Law School, Advancing Justice Conference, invited address, Louisville, KY, November 2007.

Missouri Public Defenders Conference, invited address, Saint Louis, MO, December, 2007.

American Psychology-Law Society Annual Conference, invited talk, Jacksonville, FL, March 2008.

Columbia University Law School, Litigating Eyewitness Cases Conference, invited talks, Manhattan, NY, March 2008.

Iowa Association of Administrative Law Judges, invited address, Des Moines, IA, April 2008.

Washington University Law School, invited address, Saint Louis, MO, April 2008.

Kentucky Public Defenders Association, invited talk, Lexington, KY, June 2008.

American Judicature Society Annual Meeting, invited talk, New York, New York, August, 2008.

Michigan State University, Cognitive Science Program, invited colloquium, Lansing, MI, September, 2008.

Society of Experimental Social Psychology Annual Conference, research talk, Sacramento, CA, October 2008.

Texas Criminal Justice Integrity Unit, Invited Presentation, Texas Supreme Court,  Austin, TX, October, 2008.

California Public Defenders' Association, invited plenary address, Yosemite, CA, November, 2008.

Pennsylvania Advisory Committee on Wrongful Convictions, invited address, Harrisburg, PA, January, 2009.

American Psychology-Law Society, invited talk, Austin, TX, March 2009.

Cornell University, invited presentation, Law School, Ithaca, NY, March 2009.

Cornell University, invited colloquium to the Law, Psychology, and Human Development Program, Itahca, NY, March, 2009.

Clark County Public Defenders' Office, invited address, Las Vegas, NV, May, 2009.

University of Calgary, invited colloquium, Psychology Department, Calgary, Alberta, Canada, May, 2009.

American Psychological Association, William Bevan Address on Psychology and Public Policy, Toronto, August 2009.

Iowa Death Investigators Association, invited address, Iowa City, IA, September 2009.

Illinois Public Defenders Association, invited address, Springfield, IL, October 2009.

Face Recognition Workshop, invited address, Booz-Allen, McLean, VA, October 2009.

Smokey Mountain Criminal Justice Conference, invited address, Gatlinburg, TN, November 2009.

New York Justice Commission, invited presentation, Manhattan, NY, June 2010.

Police Leadership Meeting, invited talk, Manhattan, NY, July 2010.

Law Enforcement Intelligence Network, invited address, Des Moines, Iowa, October 2010.

University of Nebraska, Psychology Colloquium, Lincoln, NE, November 2010.

Saint Louis University, Annual Richey Lecture in Psychology, Saint Louis, MO, November 2010.

Oklahoma Bar Association Annual Meeting, Plenary Address, Tulsa, OK, November 2010.

Florida Innocence Commission, invited presentation, Tampa, FL, November 2010.

Trucking Industry Defense Association, invited lecture, Miami, February 2011.

Federal Bar Association, invited lecture, Los Cabos, Mexico, February 2011.

Florida International University, psychology colloquium, Miami, February, 2011.

University of Mississippi, invited colloquium, Law School and Psychology Department, Oxford, MS, March 2011.

Southwest Psychological Association, invited address, San Antonio, April 2011.

Society of Applied Research in Memory and Cognition, invited address, Manhattan, NY, 2011.

Kansas State University, invited address, September 2011.

Connecticut Task Force on Eyewitness evidence, invited address, Hartford, CT, October 2011.

Center for American and International Law, invited address, Plano, TX, February 2012

National Association of Criminal Defense Lawyers, Invited Address, Las Vegas, NV, March 2012.

Rocky Mountain Psychological Association, Distinguished Plenary Lecture, Reno, NV, April 2012.

University of California at Irvine, invited address, Irvine, CA, April 2012.

Florida Appellate Judges Association, plenary address, Amelia Island, FL, September 2012.

Oregon Judicial Conference, plenary address, Salem, Oregon, October 2012.

Duke University Law School, Durham, NC,  Invited talk, November 2012

Yale University Law School, New Haven, CT, Invited talk, February, 2013

Northern Illinois University, invited address, DeKalb, IL., April 2013

Sungaard Sytems, invited address, Greensboro, NC, April 2013

New York University Law School, workshop on memory in human rights investigations,
Manhattan, NY, May, 2013.

National Academy of Sciences, invited presentation on system and estimator variables in
eyewitness identification, Washington, D.C., December 2013.

Nebraska Judges Association, keynote address, Omaha, NE, April 2014.

Robbery Investigators of Texas, invited address, Austin, TX, August 2014.

Illinois State Bar Association, invited talk, Chicago, IL, December 2014.

The Ohio State University, Distinguished Alumnus Award talk, April 2015.

Iowa Judges Association, invited talk, Iowa City, September, 2015.

Society of Experimental Social Psychology, invited talk, Denver, October, 2015.

National Research Council, invited presentation, Washington, D.C., October 2015.

Illinois Judges Association, invited talk, Chicago, November 2016.

American Judges Association, invited talk, Seattle, WA, October 2015.

Simon Fraser University School of Criminology, invited talk, Vancouver, British Columbia, April
2016.

Minnesota Undergraduate Psychology Conference, keynote speaker, Minneapolis, MN, April
2016.

Kansas District Judges Association, keynote speaker, Wichita, KS, June 2016.

National Symposium on Eyewitness Identification Reforms, keynote speaker, Yale University,
New Haven CT, June 2016.

Missouri Judicial College, keynote speaker, Lake of the Ozarks, MO, July 2016.

Idao Task Force on Eyewitness Reforms, Boise, ID, October 2016.

Missouri Judicial College, keynote speaker, Saint Louis, MO, October 2016.