# DR. PAUL MICHEL
*Forensic Specialist, Human Vision*
*Fellow, American Academy of Optometry*

O | D

6247 W. Prentice Avenue                                                                 (303) 723-0638
Littleton, CO 80123

January 12, 2017

Kaye, McLane, Bednarski & Litt
Attorneys at Law
234 East Colorado Boulevard, Suite 230
Pasadena, California
626-844-7660

RE: *O' Connell v. County of Los Angeles*

Greetings Mr. Litt:

I have reviewed the following materials in the case of *O' Connell v. County of Los Angeles*:
Ex. 001.02-1-11-84 LASD Report Attaching 1-5-84 S. Pasadena Report;
Ex. 001.030 -S. Pasadena. 1-5-84 APB
Ex. 001.4-1-10-1984 Smith-Parra Report
Ex. 001.5- Sketch
Ex. 001.08 LASD Supplementary Reports- Multiple photographs reports- Evidence submission;
Ex. 001.10 Police Report- South Pasadena PD;
Ex. 001.12 Arrest Report for Frank O'Connell;
Ex. 100.3 Daniel Druecker Criminal Trial Testimony;
Ex. 100.5 Alex Sanchez; Criminal Trial Testimony
Ex. 100.7 Arturo Villareal Criminal Trial Testimony;
Ex. 100.9 J. D. Smith Criminal Trial Testimony;
Ex. 101 Preliminary Hearing Transcript;
Ex. 201.02 Habeas Testimony Paul Michel:
Ex. 203 Habeas Declaration of Daniel Druecker;
Ex. 204 Habeas Declaration of Kate Germond;
Ex. 206 Habeas Declaration of Paul Michel;
And Germond's Scene Measurements.

I am a licensed optometrist and have testified and been qualified on numerous occasions by both state and federal courts. I have testified both on behalf of and against police officers. My education, qualifications, prior testimony and billing rates are contained in my accompanying CV and other documents accompanying this report, and are incorporated herein.

My opinion is based upon a review of the above and a prior visit to the crime scene.

1

**Ex. 702-1**

I.   ARTURO VILLAREAL
    A.   VILLAREAL FACTS

Mr. Arturo Villareal was called as a witness by the state. He was making a flower delivery in the area, at the time of the crime.  He reported seeing a man running out the driveway adjacent to the crime scene. He reported the distance as 175 feet but later said that was what he told an officer and he himself did not know exactly how far it was. ("When the policeman was talking to me, he said it was about 175. I wouldn't know exactly how far it was it was parked" Ex.100.07-15/11-13.) I have been informed that Kate Germond recently was deposed and she stated that she measured the distance from where Mr. Villareal said his car was parked to the driveway he saw the shooter exit and get into a car. She testified that she measured it with a surveyor's tape, in the company of the lawyer representing Mr. O'Connell in the habeas proceeding, Peter Camiel, and the distance was 250 feet.

Mr. Villareal could not tell if the suspect was male or female. He did state the suspect had blonde hair. His statement of race/ethnicity was not definitive as he stated: "He was white, I'm pretty sure. He had blond hair."

Later in testimony, Mr. Villareal described the suspect has having hair that: "went to the back of his shoulders...A blond, light brown, though." Mr. Villarreal's visual exposure to the suspect was only momentary, stating: "and then, when I spotted the gun in his hands, I ducked away." Mr. Villareal described the suspect as running.  In essence, Mr. Villareal described a momentary, visual encounter from a distance of 175 feet, with a running suspect. However, given the precise measurement testified to by Ms. Germond, and given that Mr. Villareal was reporting someone else's measurement, the more reliable distance is 250 feet.

Mr. Villareal did not notice a license plate. He stated action was to: "get out of sight", which would preclude him from further observing the suspect.

The police report stated that Mr. Villareal identified Mr. O'Connell, saying: "he is the strongest contender, and I'm sure that's him."  Det. Smith testified at the trial, that was what Mr. Villareal said at the identification. However, Mr. Villareal, himself, said at both the preliminary hearing and trial that he did not and could not identify anyone. Specifically, Mr. Villareal testified at the Preliminary hearing, in response to whether he was able to see the "features" of the person he saw running down the driveway. "No, not really. I could just tell just-just describe him just a little bit." Ex.101-46/23-25. He said he was shown photographs, picked out the person as best he could and told the detective that "one of them looked like almost like the person that had jumped in the car. I couldn't say yeah or no." Ex. 101-49/4-11.

At the trial, Mr. Villareal testified he picked out Photo # 3(Mr. O'Connell) from the photo spread although he could not recognize him now. Ex. 100.07: 8/3-8, 8/14-23. However, Mr. Villareal explained at both the preliminary hearing and trial that he did not and could not identify anyone. Specifically, Mr. Villareal testified at the Preliminary hearing, in response to whether he

**Ex. 702-2**

was able to see the "features" of the person he saw running down the driveway. "No, not really. I could just tell just-just describe him just a little bit." Ex. 101-46/23-25. He said he was shown photographs, picked out the person as best he could and told the detective that one of them "looked like almost like the person that had jumped in the car. I couldn't say yeah or no". Ex. 101-49/4-11. Similarly, at the trial, Mr. Villareal said that the photo he (Mr. O'Connell), "looked like the man I saw. I couldn't be positive." He agreed it was "fair to say that what [he was]really saying when [he] picked #3 was #3 looked like the shooter, but he's not sure that that's the same person." (Ex. 100.07: 11/12-12/2).

When Mr. Villareal testified as summarized above, Det. Smith testified, reading from the police report, that Mr. Villareal identified Mr. O'Connell, saying:"he is the strongest contender, and I'm sure that's him."

Mr. Villareal said he was reaching for a door handle, saw a guy running with a gun and ducked. When asked if he was able to see the "features" of the person he saw running down the driveway: "NO, not really. I could just –just describe him just a little bit." Ex.101-46/23-25. 100.07: 20/5-23. He saw the running man's right side. Ex. 100.07: 21/9-12. He saw the shooter for a couple of seconds. *Id.* at 14/6-9. He did not "really" get a "good look at the face"; he "could tell just basic features." *Id.* at 23/2-3. At that point, he "would have been looking through two windshields and then 175 feet down." *Id.* at 23/12-16. From where he saw man exiting driveway to where he got into the car was a couple of feet. *Id.* 21/7-10.

It is assumed Mr. Villareal had healthy eyes with good vision. The standard distance for vision testing is 20 feet. Increased viewing distance decreases the resolution ability of the eye.

At a distance of 250 feet, resolution is about 8% of what it would be at the standard vision testing distance. 175 feet is 58% of a football field, and the more reliable distance of 250 feet is 83.5% of a football field.

At a distance of 175 feet, resolution is about 11.5% of what it would be at the standard testing distance. A person with 20/20 visual acuity at 20 feet would have visual functioning near the legal blindness level at the 175 feet distance Mr. Villareal estimated he was from the suspect, and additional decreased vision at the 250 feet Ms. Germond measured. (See also the Julia Roberts photographs in the Gary Wells report, showing the contrast of a close-up view at 5.4', a 43' view and a 172' view. The 172' view is indecipherable). (See footnote #1)[1]

---

[1] The American Foundation for the Blind defines Legal Blindness as "a level of vision loss that has been legally defined to determine eligibility for benefits. The clinical diagnosis refer t a central visual acuity of 20/200 or less in the better eye with the best possible correction and /or a visual field of 20 degree or less. Often, people who are diagnosed with legal blindness still have some usable vision." Thus, the use of the term" legal blindness" here refers to 20/200 vision. Although Mr. Druecker was not legally blind, his uncorrected vision was sufficiently poor that, could it not have been corrected, he would be considered legally blind. During the incident at hand that was his vision because he was not wearing corrective lenses.

**Ex. 702-3**

In consideration of the distance alone, Mr. Villareal's observation and subsequent testimony cannot provide reliable suspect information. Moreover, this was someone he did not previously know, and he viewed in profile, running for a couple of seconds, it is impossible for him to have made a reliable identification considering the distance involved. He was simply too far away to make any facial identification reliable. His visual resolution would have been limited to gross features and not the level of detail to distinguish one person from another with the same basic physical characteristics (height, hair color and length), combined with other features. His testimony, which provided very little detail of his observations, is consistent with a witness making observations under adverse visual conditions.

I.   ALEX SANCHEZ
    A.   SANCHEZ FACTS

Mr. Alex Sanchez testified that he was working as a flagman at a road construction site shortly after the murder had occurred. His position was to direct traffic at the intersection of State Street and Fair Oaks Avenue, in South Pasadena. It is assumed Mr. Sanchez had healthy eyes with good vision.

Mr. Sanchez indicated that traffic was diverted to the east side of Fair Oaks Avenue because: "we were tearing apart the west side of the street." "We had Fair Oaks limited to two lanes of traffic going both ways..."

When Mr. Sanchez held his sign for a Ford Pinto to stop, the female driver: "hesitated for a second and drove right onto Fair Oaks Avenue and almost hit a car and took off." The vehicle direction of travel was westbound on State Street and turned right onto northbound Fair Oaks Avenue. When questioned at trial Mr. Sanchez described the Pinto traveling west on State Street as: "It was coming pretty fast." He described the car after turning right on Fair Oaks Avenue as: "...turned right onto the street real fast and took off."

Mr. Sanchez had one of a variety of possible vantage points, dependent upon his relative position, north to south, on Fair Oaks Avenue. Mr. Sanchez's line of sight, at best, could have been in a direct line to the Pinto at one point at the north end of the intersection; however, if he were further south, his line of sight would have been either partially or fully obscured.

Mr. Sanchez testified that he thought he "picked out two people I thought might have been the guy" referring to the passenger. He believes he picked #s 1 and 3 as the people who "resembled" the passenger. (Ex.100:141/25-142/11). The police report says he only pointed to Photo # 1 (not Frank O'Connell) "and stated he was not sure and there was possibly a resemblance to the person he had seen riding in the passenger seat of the yellow Pinto on 01/05/84." Ex. 1.04-13.

    B.   SANCHEZ OPINION

**Ex. 702-4**

Even under optimum line of sight, there are variables that impaired Mr. Sanchez's visual ability
to make facial identification of persons inside the Pinto. The variables of: 1) time constraint,
2) the vehicle's movement, and 3) the change of travel direction are all limitations on his ability
to make identification. Specifically, the vehicle's movement makes any facial identification
problematic.

1) Time constraint: the events at the intersection most probably occurred during a short period
of time. There was a lot for Mr. Sanchez to observe during this period. These events included a
reported near miss collision between the Pinto and another vehicle. Sergeant Brown's report
of 1-5-1984 reported Mr. Sanchez indicated: "the vehicle was not speeding, but it did appear to
be in a hurry as it left the area traveling north …" Mr. Sanchez's trial testimony "… (gestured)
for her to stop, and she hesitated for a second and drove right onto Fair Oaks and almost hit a
car and took off."

2) The vehicle's movement: moving objects are difficult to visually track. They require
complicated eye tracking movements called saccades. Saccades require a latency period in the
nervous system before the eye muscles start moving. Meanwhile the Pinto would continue to
move during the time the eye is not tracking because of the latency period. Within the eye, we
use a very small area, the size of a pinhead, to align the point of interest. This area is
anatomically termed: the fovea.  The fovea must be aligned with the target of interest for the
eye to resolve fine detail.   Peripheral vision is not capable of resolving fine detail; it can only
visually resolve large shapes and movement without detail or color perception.

3) Change of travel direction:  when the Pinto turned at the intersection, it rotated the line of
sight of Mr. Sanchez by 90 degrees. As the Pinto commenced the turn, the driver would have
come between Mr. Sanchez's line of sight and the passenger, thus blocking further view of the
passenger. The execution of the turn quickly took the passenger out of Mr. Sanchez's line of
sight.

Mr. Sanchez's observation and subsequent testimony provide no reliable suspect information.
His testimony is consistent with a witness making observation under adverse visual conditions.
He provided very little detail of what occurred.

In consideration of the police report which specifies Mr. Sanchez as having picked a person
other than Mr. O'Connell, he was not sure, and he testified that he thought he picked two
possibilities as people who "resembled" the passenger, and the many limitations of his ability to
discern detail, his testimony is of no value as it relates to identifying Mr. O'Connell.

III.   DANIEL DRUECKER
    A.   DRUECKER FACTS

Mr. Daniel Druecker was called as a witness by the state.  Mr. Druecker was a permanent
resident at the complex where the crime occurred. Just prior to the crime, Mr. Druecker was in
the subterranean parking area at his assigned parking space.  He was doing light cleaning of his

5

**Ex. 702-5**

vehicle's interior. He was halfway inside his Honda's driver's side, cleaning the mats when he heard a gunshot and a voice saying: "Oh my God, I have been shot."

During this time, he had already cleaned his mat and was returning it to inside his car.  He was leaning inside his car and he heard the shot. He was facing the back wall of the garage at this time.  He did not see the shooter or the victim at this moment.

In subsequent seconds, Mr. Druecker saw the building maintaince man run by in the common drive area, holding his sides and a second man running after him. He saw the second man stop, raise a handgun and fire.

Mr. Druecker estimated the distance between himself and the shooter to be 20 feet. He related he was not a good judge of distance but did not think the distance was a much as 40 feet.  He later said the distance could have been over 20 feet.

Both the South Pasadena and LA Sheriff's Department Police Reports state the distance was 40 feet.

Mr. Druecker was interviewed that day. He "accompanied investigators to the parking lot where the incident occurred, and a walk-through was conducted." Ex. 1.04: 4-7. The detectives had ordered staff artists who "took measurements and drew to-scale diagram depicting the crime scene and items of evidence in place." Ex. 1.04:4-5. Although the LASD report (Ex.1.04) did not describe the shooter in relation to Mr. Druecker, it placed him at 40 feet away. This distance is supported by the description in the South Pasadena report from the day of the murder that "W "(referring to Mr. Druecker) distance from "S" ( referring to suspect)  was approximately 40'.

After the gun went off, Mr. Druecker ducked to protect himself.  He reported fear, and shaking and perspiration.  He later gave a suspect description to a detective of: a white male five - ten to six foot, dirty long hair, and dirty appearance.

Mr. Druecker cooperated with a composite picture of the suspect.  The composite depicted left lateral view with no mustache, which he stated on numerous occasions, was the only view he got. He was questioned during testimony about the suspect's mustache and. Druecker replied: "I cannot remember."

I visited the crime scene with Attorney Verna Wefald in April 2010. Photographs were taken.  I assumed the position where Mr. Druecker reported having been during his brief observation of the suspect.  Attorney Wefald stood where the suspect was momentarily observed by Mr. Druecker. Mr. Druecker's observations were only momentarily and made during acute fear. Immediately upon recognizing the gravity of the situation and the imminent danger to himself, he took evasive action to duck for cover/ concealment behind his vehicle.

**Ex. 702-6**

Mr. Druecker approximated his distance to the suspect at a minimum of 20 feet or somewhat greater; the police department's determination was described above. My measurement of the distance was approximately 36 feet. (It could not have been much less than that because the overhang area where cars park was approximately 30 feet, and the description of the gunman was that he ran through the middle of the open carport area, not through the area where cars parked. See Ex. 1.02-4 ("W/Druecker stated the S stopped in the middle of the carport"). The lighting conditions at the time of my scene visit and those of the crime were essentially identical: mean daylight conditions and clear sky. There was nothing obstructing the field of view. The witness estimated his observation time to be approximately two seconds.

After thorough consideration, it is my opinion that reliable witness observation would have not been physically possible under the conditions during Mr. Druecker's brief observation due to the limitations of Mr. Druecker's eyesight and his limited observation.

### B.   DRUECKER OPINION

Firstly, I have learned that Mr. Druecker had a significant visual disability during his observation of this crime. By his own admission, he had an uncorrected refractive error during his witnessing of the suspect.

During trial, Mr. Druecker testified that his ophthalmic lenses were prescribed by Optometrist Dr. Sheldon Linden of Pasadena in 1984. When I was first retained in this matter, I contacted Dr. Linden's office and ascertained that the doctor was deceased over a decade and his patient files were no longer available.

The records obtained by Stephen Slade MD, FACS and Richard Baker OD, FAAO indicated that in early 2007, Mr. Druecker had successful refractive surgery. At the time of his surgery, Mr. Druecker was approximately 49 years of age. Mr. Druecker's pre surgical refractive status was moderate to high myopia (nearsightedness) and mild "with the rule" astigmatism. OD -4.00-0.75X 10 and OS -3.75-.75X 175 (spherical equivalents of -4.375 and – 4.125 respectively). With such a refractive error, vision further than ten inches from the eye becomes increasingly blurred.

The body of epidemiological study of myopia indicates myopia typically onsets in early adolescence and progresses into early adulthood and subsides. A small proportion of individuals may have later onset myopia but it is not the norm. At age 25 years, an individual would be expected to have developed the end point of his myopia and refractive status would remain stable until the sixth decade of life. That is, Mr. Druecker's eyesight at age 49 years, when he had surgery was very likely the same as it was at age 25 years, when he observed the shooting of Mr. French.

I am aware that ophthalmologist, Michael Gorin, MD of UCLA Stein Eye Institute has submitted a report in this case. Dr. Gorin opines, inter alia, that, we have good confidence that Mr. Druecker's refractive error (spherical equivalents) at age 25, was between -3.50 and -4.00

**Ex. 702-7**

diopters for both eyes; based on a conservative estimate of Mr. Druecker's likely degree of myopia at age 25, it is extremely likely that (his) visual acuities (in either or both eyes) was at best 20/200 at the time of the witnessed event and it is more likely than not that it was 20/300 or worse.

As an optometrist, I would and have reasonably relied upon the assessment and opinions of ophthalmologists. I have review Dr Gorin's report, agree with his opinions and fully incorporate his analysis into my report.  Attached hereto as Exhibit A is a copy of Gorin's report in this matter.

Mr. Druecker came to the preliminary hearing, March 7, 1984, wearing eyeglasses. He made the statement that he only wore the glasses for distance vision and during hours of darkness.

During the trial, Mr. Druecker came to court wearing soft contact lenses. The courtroom was a confined space during daylight conditions.  He was questioned: "if you wear your glasses or your contacts solely for driving or reading, why is it you have your contacts on now?"
He responded: "for clarity."
He was questioned: "Clarity of what?'"
He responded: "To read things clearer."
He was questioned: "to read things clearer?"
He responded: "Yeah, to see things clearer."
He was questioned: "to see things clearer and to read things clearer are two different things, are they not?"
He responded: "Yes they are."
He was questioned: "To see things clearer means that, if you look at something without your contacts or without your glasses, they could be fuzzy or hazy not sharp; isn't that right?"
He responded: "Correct; not sharp."

Mr. Druecker's statements indicated the need for ophthalmic correction for distant vision and a person whose vision at distance would be significantly impaired without correction.  Correction could be achieved via eyeglasses, contact lenses or refractive surgery. At the preliminary hearing, he was wearing corrective eyeglasses. At trial, Mr. Druecker was wearing contact lenses. Because of the application and care of contact lenses, they are typically worn full time. Later, he would obtain refractive surgery.

From his own testimony, Mr. Druecker indicated a significant impairment in distance vision. From his pre surgery records, documentation exist indicating moderate to severe myopia existed compounded with mild "with the rule" astigmatism. This condition probably developed commencing in adolescence and continued into early third decade of life.

It is probable that Mr. Druecker was unaware of his refractive impairment during the January 1984 momentary viewing of the suspect.  We, as human beings, are not aware of changes in our perception that occur gradually. By January 1984, Mr. Druecker had sought and received correction for his distance vision anomaly for several years. The severity and duration of

**Ex. 702-8**

refractive conditions are frequently unappreciated by the patient until they are noticed or documented by a second party.

While Mr. Druecker stated in his testimony that he was not required to wear glasses for driving, he specified at his deposition that he was told prior to college or his first year of college that he did not need glasses, but that, when he entered college, he began to need them to see the chalkboard, and when he graduated college, he regularly wore contact lenses. (Druecker D. Tr., pg. 164.) At the time of the murder, he wore contacts 90% of the time; if they were bothering him, he would normally wear glasses (*Id*. At 160-161.)

 Mr. Druecker was, at a minimum, 30 feet away from the suspect (see above description of measurements) and his uncorrected visual acuity was $1/20^{th}$ of that of a person with standard (20/20) vision. Mr. Druecker's uncorrected vision would have been equivalent to a person with standard (20/20) vision viewing the suspect at a distance of 600 feet (two football fields). Even assuming Mr. Druecker's refractive error was at the lowest probable magnitude, it would have been 20/200 or more, placing him at the equivalent of a football field away for a person with standard vision.

Secondly, Mr. Druecker reported seeing only the left profile of the suspect. The observational period was for two to three seconds. The witness was not exposed to the frontal view of the face. The skin contours of the planar face surfaces could not have been seen.  The distance between the two eyes could not have been seen from the side nor could the relative heights of the cheek bones. In essence, the witness made an identification of a suspect from a full frontal view photograph when the witness never observed the suspect from a full frontal view point. Over half of the suspect's frontal face was not seen by the witness, yet the identification was considered reliable by the police.

Thirdly, the reliability of Mr. Druecker's suspect identification is further questioned by his inability to specify whether the suspect did or did not have a facial mustache.  The presence or absence of a male facial mustache is a major identifiable feature. The presence of mustache facial hair is easier to discern than are most other facial features.  A male mustache is a relatively large, high color contrast and contour changing feature on the face. The fact that he did not say whether the person had a mustache is a major indication that his observation was not of facial detail sufficient to differentiate one person to the exclusion of all others.

Fourthly, some emotions can be elicited immediately; this is particularly true for fear. Fear changes the thought patterns of the brain, releases adrenaline from the adrenal cortex glands and makes skeletal muscles tremble. Neurological functioning is altered during acute fear. Observations and passage of time can be psychologically altered in acute fear. When startled by the sound of gunfire in an otherwise quiet residential setting, Mr. Druecker would be expected to be initially startled and then enter a state of acute fear. Unlike police personnel, Mr. Druecker had no history of training in the response to fear, nor did he have any means of defending himself from an armed criminal.

**Ex. 702-9**

The elements of movement and time constraints also limit the ability to make reliable observation. The suspect stopped only momentarily and then moved out of Mr. Druecker's field of view. This scenario allowed only for a quick glimpse of the suspect. It has been well documented that during such encounters with an armed suspect, witnesses tend to visually fixate at the weapon as opposed to facial identity of the person deploying the weapon. Even witnesses with very good vision, often describe the weapon at the crime scene in more detail than they can the suspect's facial features.

It is my considered opinion that it would be impossible for any person at Mr. Druecker's vantage point, having his uncorrected myopia (nearsightedness), having only a momentary, lateral side only view of the suspect would not be unable to make a reliable facial identification of the suspect. I consider any facial identification that Mr. Druecker would have made, under these circumstances, to be completely invalid and not worthy of consideration by the court.

Both Mr. Druecker and Mr. Villareal, for essentially the same reasons, simply could not have seen sufficient detail to make a reliable identification; Mr. Villareal because he was nearly a football field away and Mr. Druecker because he was the visual equivalent of a football field away or more due to myopia.

In reaching this conclusion, I have not considered Mr. Druecker's subsequent recantation of his previous identification. However, I do note that his later testimony to that effect supports my conclusion.

Thank you for your interest in the study of human visual science. If I can be of further assistance, please do not hesitate to contact me.

If called to testify to these opinions as an expert witness in this case, I would so testify. Should additional, relevant information become available to me in this case, I am open to incorporating it into my opinions.

I attach as Exhibit B to this deposition my CV, which includes my publications and qualifications, and as Exhibit C the cases in which I have testified in deposition or at trial as an expert over the last four years. My compensation rate is $ 375 for each hour of review / preparation; for testimony at trial or deposition, my minimum daily billing is eight hours ($3,000) plus expenses.

I declare, under penalty of perjury, that the foregoing is true and correct. Executed at Jefferson County, Colorado, on January 12, 2017

Regards

Paul Michel, OD
Fellow, American Academy of Optometry

**Ex. 702-10**

# EXHIBIT A

Ex. 702-11

**UCLA** Stein Eye Institute | **DOHENY** EYE INSTITUTE

Ophthalmology Department
Doris Stein Building – 3-310B
200 Stein Plaza
Los Angeles, CA 90095

RETINAL DISORDERS &
OPHTHALMIC GENETICS
DIVISION

December 5, 2016

CONTACT INFORMATION:
General:                (310) 794-5400
Fax:                    (310) 206-7826
Genetic Counseling:     (310) 794-5608
Research subjects:      (310) 794-5598
    Toll-free           (800) 286-8581
Research e-mail: oculargenetics@jsei.ucla.edu

CLINICAL FACULTY

**Michael B. Gorin, M.D., Ph.D.**
Harold and Pauline Price
    Professor of Ophthalmology
Retinal Disorders & Ophthalmic Genetics
Division Chief
Co-Director, Visual Physiology Laboratory
gorin@jsei.ucla.edu

Appointments:          (310) 794-5400

**Colin A. McCannel, M.D., F.A.C.S.**
Professor of Clinical Ophthalmology
Surgical and Medical Retina
Chief of Retina – Harbor-UCLA Medical Center
cmccannelpatients@jsei.ucla.edu

Appointments:          (310) 794-9922

**David Sarraf, M.D.**
Clinical Professor of Ophthalmology
Medical Retina and Uveitis
sarrafpatients@jsei.ucla.edu

Appointments:          (310) 794-9921

GENETIC COUNSELING
SERVICES

**Michael B. Gorin, M.D. Ph.D.**
**Lindsey Pyers**
Genetics Research and Clinical Coordinator
pyers@jsei.ucla.edu

VISUAL PHYSIOLOGY
LABORATORY

**Steven Nusinowitz, Ph.D.**
Associate Professor of Ophthalmology
Retinal Electrophysiology and Psychophysics
Co-Director, Visual Physiology Laboratory
nusinowitz@jsei.ucla.edu
Office: (310) 825-5798

Appointments:          (310) 794-5400

CLINICAL RESEARCH CENTER

**Sara Harmon, COT**
Clinical Research Coordinator
harmon@jsei.ucla.edu
Office: 310-825-7836      310-794-9921

**Lindsey Pyers**
Clinical Research Coordinator
pyers@jsei.ucla.edu
Office: (310) 794-5598  (800) 286-8581

LABORATORY OF OCULAR
MOLECULAR AND CELLULAR
BIOLOGY AND GENETICS

**Anna Matynia, Ph.D.**
Associate Research Ophthalmologist
Director of Basic Research
matynia@mednet.ucla.edu
Office: (310) 825-7519

Dear Mr. Barry Litt:

At the request of counsel, I have been requested to address the probable visual acuity of an eyewitness with a history of myopia who witnessed an event at age 25 without refractive correction. If called to testify to these opinion as an expert witness in this case, I would so testify.

The only available ocular data is a pre-refractive surgery lens correction in 2009 at a time when the individual was 51 years old. The refraction provided by Slade & Baker Vision Center was OD -4.00-0.75x10 and OS -3.75-.75x175 (spheric equivalents of -4.38 and -4.50 respectively). The issues that need to be considered are:

• Based on this refraction, what is the likely refractive error for this individual at age 25?
• Secondly what would be the equivalent distance visual acuity for that individual if they were not wearing their glasses?

There are several studies that have looked at the stability of refractive error of low to moderate myopes (near-sighted individuals) over a period of time. For the general population, the progression of juvenile myopia (which this individual reportedly has) for most males will level off with their refractive error by age 22 (Goss and Winkler, Am J Optom Physiol Opt. 1983 Aug;60(8):651-8.) and then remain stable. Work by Goldblum et al (Graefes Arch Clin Exp Ophthalmol 2013: 251: pp 1431-6) looked at refraction changes over at least 5 years in 15,000 patients and showed that, for individuals aged 20-24, 49% experienced a myopic shift; individuals age 25-29 had a 40% probability of a refractive change, and that for individuals ages 40-69, refractions remained stable for 40-45% of those individuals. Eighty-five percent of all individuals in the study had bilateral symmetric shifts. However, for all of these age groups, the myopic shifts tended to be less than 1 diopter of increased myopia. Thus, unless the witness was engaged in a profession that involved a great deal of close work[1] (which would increase the refractive error more rapidly bur for which there is no indication), we have good confidence that Mr. Druecker's refractive error (spheric equivalents) at age 25 was between -3.5 and -4.0 D for both eyes.

If we assume that his refractive error at age 25 was the lower (minimal) end of the spectrum (--3.5 D), then the question is "what would have been his distance visual acuity without correction at that time. There is only a single study that has addressed this issue (Peters. Am J of Optom 1961: p194-8.) The data from this paper also appears in several places on the internet in tables that summarize the paper's findings. Essentially, uncorrected visual acuities for myopes tend to remain stable, in contrast to that for hyperopes (far-sighted individuals who require positive corrective lenses) who gradually lose accommodative function as they age. The Peters' graphs show (see figure 2), that for myopes age 25-35, with refractive errors of -2.0 diopters or greater, the uncorrected visual acuities are 20/200 or worse.

Accordingly, based on a conservative estimate of the patient's likely level of myopia at age 25, extrapolated from his refractive error at age 51 and the studies done for visual acuities for individuals in the 25-35 age group with refractive errors of -2.0 or greater, it is extremely likely that Mr. Druecker's visual acuities (in either or both eyes) was at best 20/200 at the time of the witnessed event and it is more likely than not that it was 20/300 or worse. If the individual who was initially identified was a distance of 30 feet from the witness (which I am told is the likely minimum distance), then a person with normal,

ACADEMIC MAILING ADDRESS:    Jules Stein Eye Institute, 100 Stein Plaza, UCLA, Box 957000, Los Angeles, CA 90095-7000, U.S.A.
Consultation Suite:    Doris Stein Eye Research Center, 200 Stein Plaza, UCLA, Los Angeles, CA.

**Ex. 702-12**

corrected visual acuity would have an equivalent level of discrimination of an individual at a distance of 300 feet (the equivalent of a football field's length). To the extent his vision was worse or the distance was greater than 30 feet, it would be proportionately longer. (For example, if the distance was 36 feet, and his vision was 20/300, then it would be the equivalent of a normal sighted person trying to identify an individual at a distance of 540 feet, nearly two football fields. Under the most conservative estimate of 20 feet and 20/200 vision, it would still be the equivalent of trying to recognize a person from 200 feet (2/3 of a football field). It is highly unlikely that any individual can make a certain identification of another person from any of those distances.

Should additional, relevant information become available to me in this case, I am open to incorporating it into my opinions. I declare the foregoing to be true under penalty of perjury.

Respectfully submitted,

Michael B. Gorin, MD PhD
Harold and Pauline Price Chair of Ophthalmology
Chief of the Division of Retinal Disorders and Ophthalmic Genetics
Medical Director of the Visual Physiology Laboratory
Department of Ophthalmology
David Geffen School of Medicine – UCLA
Stein Eye Institute

[1] One study that looked at clinical microscopists (an occupation with intensive and prolonged near vision activities) (McBrien and Adams IOVS 1997: 38:2 p 321-33) found that 48% of individuals with pre-existing myopia did experience an increase in their myopia over a 2-year period of an average of 0.77 Diopters. However, there was a substantial number of individuals who showed no evidence of progression. Thus, for those involved in close near vision work, there is significant deterioration of myopia over time, but, that is not so for the general population, for which such deterioration is quite limited.

Figure taken from Peters paper:



# EXHIBIT B

Ex. 702-14

EXHIBIT A C.V.

**Dr. Paul Michel**

**Fellow; American Academy of Optometry**

**Board Certified Therapeutic Optometrist**

**Education:**

**1977-1981:** Southern California College of Optometry; Fullerton, California.

Degrees: Doctor of Optometry.

Bachelor of Science: Visual Science.

**1976-1977:** California State University; Long Beach, California

Graduate Studies; Perceptual Psychology.

**1972-1976:** California State University; Long Beach, California

Degree: Bachelor of Arts.

Honors: Cum Laude; Phi Kappa Phi Honor Society

Major: Psychology

**Specialty Experience:**

**Year 2016:**

- Stewart vs. Boone County, Kentucky (Federal Court, plaintiff's witness/officer involved shooting).

- Texas vs. Ansiso (Vision issues in brandishing weapon case).

- Texas vs. Lugo (Vision issues in brandishing weapon case).

- Minnesota vs. Stavish (Vision issues fatal DUI case).

- O'Connell vs. Los Angeles County (Federal Court, Plaintiff's witness / police misconduct).

- Hempstead v. City of Cincinnati (Federal Court, plaintiff's witness / officer involved shooting).

- Guest lecturer: University of Colorado, Criminal Justice Administration. Topic: Visual Science for Law Enforcement Personnel.

**Ex. 702-15**

- Kimble v. John Hancock Insurance (Plaintiff's witness / security guard shooting).

**Year 2015:**

- Ohio vs. Brelo (criminal defense / officer involved shooting).

- Testimony: Georgia State Grand Jury, College Park Police Officer Wesley White.

- Colorado vs.Rios (Eyewitness identification issues of felony suspect).

- California vs. Harrington (Vision issues in brandishing weapon case).

- Colorado vs. Ackerman (Vision issues in vehicular homicide case).

- Colorado vs. Johnson (Vision issues in brandishing of weapon case).

- California vs. Lockman (Eyewitness identification of suspect issues).

- Davies vs. Lakewood (Federal Court, civil litigation, police officer involved shooting).

**Year 2014:**

- DeKalb County, Georgia, District Attorney's investigation, Police shooting of Antoine Cantrell.

- Dealth Penalty, Writ of Habeas Corpus Hearing, California vs. Kenneth Gay.

- Lecturer, Annual Seminar, Ohio Criminal Defense Attorneys Association, Cleveland, Ohio.

- Writ of Habeas Corpus, California vs. Jermaine Smothers; California Innocence Project/ California Western School of Law.

**Year 2013:**

- Texas vs. Morino (appeal criminal conviction) first degree homicide.

- Minnesota vs. Boeshe (criminal defense) eyewitness identification, leaving scene.

- California vs. Espinosa (appeal criminal conviction).

- Florida vs. Medlin (criminal defense). Eyewitness identification, felony assault.

**Ex. 702-16**

- Georgia, Habeas Corpus Hearing, The Savannah Three (wrongful conviction, Homicide).

**Year 2012:**

- Participated in CBS: 60 Minutes on scene investigation pertaining to conditions of visibility from witness's vantage point during a homicide.

- Recognized at annual meeting/ Centurion Ministries, Princeton, New Jersey, for work resulting in release of innocent man after 28 years of wrong incarceration.

**Year 2011:**

- California vs. Thulleys (Third Strike, 25 year minimum enhancement).

- Colorado vs. Hernandez (Appeals, attempted homicide).

- California vs. Darn (Appeals cases) invalid eyewitness identification in homicide case.

**Year 2010:**

- Arizona vs. Williamson (attempted homicide trial).

- Alabama vs. Danner (homicide trial).

**Year 2009:**

- Arizona vs. Aronica (vehicle homicide defense case).

- California vs. O'Connell (appeal of murder conviction based on impaired eyewitness identification).

- California vs. Donovan (conditions of visibility at homicide scene).

- Arizona vs. Van Brakel (vehicular homicide defense case).

**Year 2008:**

- Colorado vs. Rimpson (State Court, criminal defense, established that prosecution witness could not have seen what was alleged).

**Year 2007:**

**Ex. 702-17**

- Lobata vs. City of Denver (Federal Court, Police Officer involved shooting, Defense in Civil rights case, Officer perceived soda can as weapon during search of crime scene).

- Texas vs. Spencer (vacating of 20 year old wrongful conviction, eyewitnesses could not have seen what they reported).

**Year 2005:**

- Colorado vs. Robertson (State criminal defense eye witness identification issue).

- Colorado Dental Board vs. Dori Papir, DDS (State Dental regulatory agency discipline hearing).

**Year 2004:**

- Arizona vs. Lovelace (Criminal defense of police officer charged with homicide in on duty shooting).

**Year 2003:**

- New Jersey vs. Moore (Criminal defense, appeal of 1986 rape case, confirmed that victim's original statements were valid. The statements given subsequent to later hypnosis were not consistent with conditions of visibility).

- Parker vs. Swansea (Federal Court, defense Police Officers in Civil Rights case).

- Colorado vs. Thomas. (Criminal Defense, private citizen acquitted after shooting suspect, threat identification an issue).

- Carr vs. Oklahoma City (Federal Civil Rights case), police officer involved shooting.

**Year 2002**:

- Colorado vs. Miller (Criminal Defense, suspect identification issues).

**Year 2001:**

- Ohio vs. Roach (criminal defense, Police Officer acquitted in shooting of unarmed suspect after furtive gesture).

- Taylor vs. Penick (vehicle collision, determination of the effect of plaintiff's speed on defendant's ability to see oncoming traffic).

**Year 2000:**

**Ex. 702-18**

- Lecturer: Smith & Wesson Academy Series: Officer Survival 2000. This was a lecture tour for police on surviving violent encounters with criminals. It included techniques for investigating officer involved shootings and determining the lighting conditions during night time criminal investigations.

- Colorado vs. Avellani (criminal defense, eyewitness identification issues).

- California vs. Gay (death penalty re trial of penalty phase, evaluation of multiple eyewitnesses and which ones could have seen suspect at crime scene).

- Tafayo vs. Denver (Federal court, Police officer involved shooting, Defense in Civil Rights case).

- Washington vs. Delgado (criminal defense, homicide case).

- Colorado vs. Canister (criminal defense, death penalty case).

**Year 1999:**

- Michigan vs. Nixon (State Supreme Court review, written arguments pertaining to lighting levels and ability of witness to see suspect in dark).

- Colorado vs. Bittner (defense of home owner charged in shooting of intruder, threat identification an issue).

- Texas vs. Cook (Innocent man vindicated after 21 years on death row. Case detailed in book:"Chasing Justice" by Kerry Max Cook.

- Colorado vs. Bills (homicide, threat identification an issue).

- New York vs. Carroll (Police Officer charged in shooting of unarmed suspect, threat identification an issue).

**Year 1998:**

- Provided analysis for the defense in Idaho v. FBI Special Agent Lon Horiuchi. (This case involved the incident commonly known at Ruby Ridge and the shooting of Vicky Weaver).

**Spring 1997-1998:**

- Instructor: Physiological Psychology, Colorado Christian University, Lakewood, Colorado.

**Year 1996:**

Ex. 702-19

- Flores vs. Los Angeles (Federal Court, Police Officer involved shootings, Defense in civil rights case).

**Year 1995:**

- Munoz vs. Los Angeles (State court, Police Officer involved shooting, Civil liability)

**Years 1995-Present:**

- Private practice, Therapeutic optometrist, Colorado.

**Years 1982-1995:**

- Staff Optometrist: Mullikin Medical Centers/ Pioneer Hospital, Artesia California.

**Years 1993- 1999:**

- Appointed Specialist Reserve Police Officer: Los Angeles Police Department, Robbery Homicide Division. As requested, assisted the officer involved shooting investigations unit. My specialty was documenting the levels of illumination and visibility at shooting scenes.

**Years 1976- 1983:**

- Line Reserve Police Officer, Huntington Beach California. Graduated Goldenwest Police Academy.  Extensive patrol experience. Also worked full time in Special Investigations Unit and the Jail bureau.

**Foreign Language:**

- Fluent Spanish

**Honors:**

**May 1998:**

- Published, Identification of lethal versus non lethal items in low lighting. "The Law Enforcement Bulletin of the FBI."

**January 1997:**

- Published, Vision Problems in Low Light. "Law and Order Magazine.

**November, 1996:**

**Ex. 702-20**

- Published, Did the Witness Really See What They think They Saw? "The Champion" (National Association of Criminal defense Lawyers).

**November 1995:**

- Published, Consideration of Illuminations As a factor In Investigations of Officer Related Shootings: "Law and Order" Magazine.

**December 1994:**

- Inducted, Fellow: American Academy of Optometry.

**July 1991:**

- National Certification of Competency: National Board of Examiners in Optometry.

**April 1982:**

- Published: The Effects of Tropicamide on Ocular Blood Flow, "American Journal of Physiological Optics and Optometry".

**Ex. 702-21**

# EXHIBIT C

Ex. 702-22

**EXHIBIT B / CASES IN WHICH I HAVE TESTIFIED IN DEPOSITION OR AT TRIAL AS AN EXPERT OVER THE LAST FOUR YEARS.**

**Year 2016:**

- Stewart vs. Boone County, Kentucky (Federal Court, plaintiff's witness/officer involved shooting).

**Year 2015:**

- Ohio vs. Brelo (criminal defense / officer involved shooting).

- Testimony: Georgia State Grand Jury, College Park Police Officer Wesley White.

**Year 2014:**

- Death Penalty, Writ of Habeas Corpus Hearing, California vs. Kenneth Gay.

**Year 2013:**

- Florida vs. Medlin (criminal defense). Eyewitness identification, felony assault.

- Georgia, Habeas Corpus Hearing, The Savannah Three (wrongful conviction, Homicide).

**Ex. 702-23**