# HEIDI L. RUMMEL
Attorney at Law

January 19, 2017

Ronald Owen Kaye
Kaye McLane, Bednarski & Litt LLP
234 E Colorado Blvd Ste 230
Pasadena, CA 91101

    *Re:*    **O'Connell v. J.D. Smith, et al.**

Dear Mr. Kaye:

    I have been asked to provide an expert opinion in this matter. My opinions, as detailed below, are based upon my years of criminal law experience, including as a federal prosecutor, a law professor representing California life-term inmates on parole and post-conviction matters, and a law clerk for federal district judge. My curriculum vitae is attached hereto at Exhibit A.

    I have reviewed the following documents provided by counsel:

- Ex. 1 (Murder Book)
- Exs. 4.1, 4.2, 4.3 (handwritten detective)
- Exs. 5.1, 5.2, 5.3 (handwritten detective notes)
- Ex. 6.1, 6.2 (handwritten detective notes)
- Ex. 7.1 (handwritten detective notes)
- Ex. 9 (anonymous tip and attached handwritten notes)
- Ex. 10, Ex. 11 (homicide materials related to Oregon investigation of Randy Smith)
- Ex. 12.1 (phone message re call from Gina French)
- Ex. 15 (booking and property record for Vicky Bedwell)
- Ex. 100 (1985 trial transcript)
- Ex. 101 (1984 preliminary hearing transcript)
- Exs. 201.1, 201.2, 201.3, 201.4 (habeas testimony of Daniel Druecker, Paul Michel, JD Smith and Tamia Hope)
- Exs. 201.7 (P001570)
- Ex. 201.8 (P001176)
- Exs. 203, 208 (habeas declarations of Daniel Druecker and Michael Flick)
- Ex. 223 (PD016, order dismissing charges)
- Ex. 225 (habeas decision)
- Ex. 227 (criminal court records for Randy Smith)

699 EXPOSITION BOULEVARD ♦ LOS ANGELES, CALIFORNIA ♦ 90089
office (213) 740-2865 ♦ mobile (818) 720-2620 ♦ hrummel@law.usc.edu

**Ex. 704-1**

Ronald Owen Kaye, Esq.
January 19, 2017
Page 2

- Ex. 607 (deposition of Thomas Butler)
- Ex. 608 (deposition of Adolfo Lara)
- 11/11/2016 deposition of Daniel Druecker

I am being compensated for my time spent preparing the report/declaration in this matter at a rate of $300 per hour, and for any time spent testifying in this matter at a rate of $1200 per half day or $2400 per full day.

Based upon my review of the materials related to the above-captioned case, you have asked me to render opinions on the following questions:

1. What would have been the impact on Frank O'Connell's legal representation in his criminal case if counsel for the defense had been provided with evidence that (1) the victim's ex-wife, Jeanne Lyon, and Randy Smith had made a previous attempt on the victim's life; (2) the Los Angeles Sheriff's Department had received an anonymous tip detailing how Jeanne Lyon had arranged through a man in Oregon to hire Richard Stephens to kill the victim; and (3) subsequent investigation partially corroborated the anonymous tip?

2. What would have been the impact on Frank O'Connell's legal representation in his criminal case if counsel for the defense had been provided with evidence that (1) Daniel Druecker's initial photo identification of Mr. O'Connell was uncertain and the investigating detectives pressured him to make a positive identification; and (2) investigating officers improperly confirmed Mr. Druecker's photo identification of Mr. O'Connell prior to his two in-court identifications of Mr. O'Connell?

3. What would have been the impact on Frank O'Connell's legal representation in his criminal case if counsel for the defense had been provided with the detectives' notes indicating that Maurice Soucy identified two possible suspects as associated with a yellow Pinto, contradicting the police report and Mr. Soucy's trial testimony?

4. What would have been the impact on Frank O'Connell's legal representation in his criminal case if counsel for the defense had been provided with evidence that Thomas Butler, a witness who lived in Jeanne Lyon's neighborhood and reported observing a yellow Pinto station wagon, told investigating detectives that he was not able to identify the individual associated with the car from the photospread, contradicting the statement in the police report that he had positively identified Mr. O'Connell?

5. What role does eyewitness identification play in wrongful convictions?

Ronald Owen Kaye, Esq.
January 19, 2017
Page 3

Summary of Trial Evidence

    The prosecution presented evidence that Jay French was shot and killed at his apartment complex on January 5, 1984 shortly after 1:00 in the afternoon. Witnesses testified that the victim made two dying declarations – that the shooter was in a yellow Pinto and that the shooter looked like someone his ex-wife hung around with.[1] The prosecution's theory of the case was that the victim's ex-wife, Jeanne Lyon, enlisted Frank O'Connell, with whom she had had an affair, to kill the victim so that she could regain custody of the child from her marriage to the victim. (Trial Tr. 328-29.)

    The prosecution did not present any physical evidence connecting Mr. O'Connell to the murder. The prosecution relied on an identification of Mr. O'Connell as the shooter by the only eyewitness to the shooting, Daniel Druecker; testimony by Alec Sanchez, a flagman directing traffic in the neighborhood, that Mr. O'Connell was one of two suspects in a photospread who may have been the passenger in the getaway car; and the testimony of Maurice Soucy, a neighbor of the victim's ex-wife, who testified that he observed a car similar to the yellow Pinto parked on the street outside her home and tentatively identified Mr. O'Connell as the driver of the car. The prosecution also presented evidence that witness Arturo Villareal observed the shooter enter the passenger side of a yellow Ford Pinto station wagon with woodgrain side panels. Mr. Villareal testified at trial that he was not able to identify the passenger, although a police report indicated that he had identified Mr. O'Connell.

    Gina French, the victim's wife at the time of the murder, testified about the ongoing custody battle between her husband and Jeanne Lyon. She also testified that Frank O'Connell had previously been to the apartment complex where the victim lived. The only evidence of motive was Mr. O'Connell's prior romantic involvement with the victim's ex-wife.

    The defense presented three alibi witnesses who were present with Frank O'Connell at the residence where Mr. O'Connell lived at the time of the murder.

---

[1] This testimony somewhat varied from earlier statements to the police in which she said that Jay French said that the shooting "had to be somebody or something to do with Jeanne."

[2] I am advised by Plaintiffs' counsel, although I have not reviewed the records, that expert optometry/ophthalmology testimony will establish that Mr. Druecker's vision was at least 20/200 and possibly significantly worse.

[3] Because I am confining myself to suppressed (or arguably suppressed) evidence, I do not address how I would have discredited the association of a yellow Pinto with Mr. O'Connell by Mr. Soucy.

[4] The same is true had I been aware of misstatements regarding Mr. Druecker, that

**Ex. 704-3**

Ronald Owen Kaye, Esq.
January 19, 2017
Page 4

James Hamilton, who also lived at the residence, and Scott Egerer both testified that Mr. O'Connell was with them at the home in La Verne the morning of the murder. Karen Baxter testified that she arrived at the residence around 1:30 and Mr. O'Connell was there.

The defense also presented three witnesses who lived near Jeanne Lyon in 1983 when she and Frank O'Connell were romantically involved. Each of them testified that they had met Frank O'Connell and that he did not drive a yellow Pinto, nor had they seen a yellow Pinto parked near Jeanne Lyon's house.

The Superior Court found Mr. O'Connell guilty of first-degree murder (Cal. Penal Code § 187) and personal use of a firearm (Cal. Penal Code §§ 12022.5 and 12022.06). The Court's verdict relied heavily on what it characterized as "unusually strong" eyewitness identifications: (1) Mr. Druecker's positive, "without a doubt" photo and in court identifications; (2) Mr. Villareal's description and photo identification; and (3) Mr. Sanchez's consistent description and inclusion of Mr. O'Connell as a possible suspect. (Trial Tr. at 349-351.) The Court characterized Maurice Soucy's testimony as "convincing" evidence that Mr. O'Connell was connected to the getaway car. (Trial Tr. at 351.) The Court also concluded that Mr. O'Connell's motive was his relationship with Jeanne Lyon and that the victim recognized the defendant and connected him with Jeanne Lyon. (Trial Tr. at 351.) Although the Court found the alibi witnesses to be credible, in light of the identification and other evidence, the Court discounted the alibi testimony as inaccurate, after-the-fact deductions. (Trial Tr. at 354.)

Suggestive Identification Procedures and Inaccurate Police Reports

*Daniel Druecker*

Daniel Druecker was the prosecution's key witness at the trial. He was the only eyewitness to the shooting, and he testified that he positively identified Frank O'Connell as the shooter from a photospread. (Trial Tr. at 48.) He also identified Frank O'Connell as the shooter in court at the preliminary hearing and at trial. (Trial Tr. at 49.)

Mr. Druecker testified at the 2011 habeas corpus hearing, as he did at the trial, that he was not wearing glasses or contacts to correct his nearsightedness on the day of the murder and that he briefly observed the shooter in profile chase the victim and fire the second shot. (Habeas Tr. at 28-29, 33-34.)

In contrast to his definitive identifications at the preliminary hearing and at trial, Mr. Druecker testified at the habeas hearing that he was never certain of his

Ex. 704-4

Ronald Owen Kaye, Esq.
January 19, 2017
Page 5

identification of Mr. O'Connell and that he felt pressured by the police into making an identification. Specifically, he testified that he told police at the scene that he was not certain that he could identify the shooter. (Habeas Tr. at 38-39.) He further testified that when police officers returned that evening, he told them that he could not remember the shooter and asked to be hypnotized, but the officers refused, explaining that an identification under hypnosis could not be used in court. (Habeas Tr. at 39-40.) He further testified that he told police officers that he did not think meeting with a sketch artist would help him identify the shooter, but agreed to do so. (Habeas Tr. at 40-41.)

Mr. Druecker testified that some time after the shooting, in response to the police showing him a photospread with six color photos, he told them that he "didn't recognize anybody; that they needed to be side-view profiles; that [he] didn't see the guy's face." (Habeas Tr. at 45.) He testified that the police responded by pressuring him to choose a photo, and that they led him to believe they had found the shooter and that he "had to make a pick. The way they said it, I had to make a pick. They weren't going to leave that apartment. They weren't going to leave me alone." (Habeas Tr. at 46-47.) Mr. Druecker described a very tentative and uncertain identification of Mr. O'Connell. "I pointed to picture number 3. And I asked them, 'Is that the guy?'" When the detectives asked whether that was the shooter, Mr. Druecker replied, "I think that's the guy." The detectives told him that he "had to be certain" and he then identified Mr. O'Connell unequivocally. (Habeas Tr. at 47.)

Mr. Druecker also testified at the habeas hearing that the police led him to believe he had correctly identified the shooter. He testified, and Detective J.D. Smith admitted in testimony, that one of the detectives made a phone call in Mr. Drucker's presence indicating that Mr. Druecker had made a positive identification. Mr. Druecker understood the detectives to mean that he had correctly identified the individual they knew to be the shooter. He asked the detectives what the shooting was about, and they told him that it was a love triangle.

The police report does not reflect any of the above information, but rather states that after looking at the photospread for approximately one minute, Daniel Druecker pointed to the photo of Frank O'Connell and stated that he was positive that Mr. O'Connell was the man he saw fire the weapon.

In support of the state habeas proceeding, Mr. Druecker executed a sworn declaration admitting his trial testimony -- that he had no doubt about his photospread or in-court identifications of Frank O'Connell as the individual he saw shoot the victim -- was not accurate. (Ex. 203 at 3.)

Ronald Owen Kaye, Esq.
January 19, 2017
Page 6

    Based on my review of the materials, neither the prosecuting attorneys nor the defense was provided with any of the above information related to Mr. Druecker's uncertainty about his identification, the detectives' pressure and intimidation to choose a photo, or the detectives' affirmation of Mr. Druecker's identification of Frank O'Connell.

    If the detectives' affirmation of Mr. Drucker's photo identification discussed above had been known prior to the preliminary hearing and trial, I would have made a motion (based on Fourteenth Amendment due process grounds) to exclude any subsequent identification as tainted by the detectives' affirmation of the out-of-court identification. After detectives pressured Mr. Druecker to make an identification that he told them he could not make, they led him to believe that he had correctly identified the shooter by making a phone call in his presence indicating that he had positively identified their suspect and by telling him that the shooting stemmed from a love triangle, suggesting that the individual he chose was connected to the victim.

    If the trial court refused to exclude Mr. Druecker's subsequent identifications at the preliminary hearing and trial, I would have used the detective's improper affirmation of his identification to cross-examine and impeach him in order to challenge the validity of his identification of Mr. O'Connell. I would also have used this information to cross-examine the investigating detectives to undermine the integrity of the investigation and suggest their bias against Mr. O'Connell.

    I am not in a position to determine the veracity of Mr. Druecker's habeas testimony, but assuming the truth of that testimony, I also would have used Mr. Druecker's expressed uncertainty about his ability to correctly identify the shooter and the detectives' intimidating behavior to impeach Mr. Druecker and challenge the validity of his identification of Mr. O'Connell. In addition, I would have used this information to cross-examine the detectives to demonstrate the inaccuracies in their report and to suggest their bias against Mr. O'Connell.

    Finally, I would have argued in closing that Mr. Druecker's uncorrected nearsightedness[2] when he witnessed the shooting bolsters the truth of his statement to the detectives that he could not identify the shooter.

---

[2] I am advised by Plaintiffs' counsel, although I have not reviewed the records, that expert optometry/ophthalmology testimony will establish that Mr. Druecker's vision was at least 20/200 and possibly significantly worse.

**Ex. 704-6**

*Maurice Soucy*

Maurice Soucy was the only witness to connect Frank O'Connell to a yellow Pinto. Mr. Soucy testified that he lived across the street from Jeanne Lyon during the summer of 1983 and that he observed a faded and rusty yellow Pinto station wagon with woodgrain panels parked in front of his house many times. He testified that he had spoken to driver of the Pinto once about possible plumbing work, helped him jump start his car, and that he had seen Jeanne Lyon kissing him. He subsequently made an in-court identification of Frank O'Connell at trial.

The police report of Maurice Soucy's photospread identification states that Mr. Soucy viewed the photospread and "immediately" identified Mr. O'Connell's photo as depicting the person associated with the yellow Pinto. The police report also states that Mr. Soucy's wife identified the photo of Mr. O'Connell but indicated that his hair was a little curlier. In fact, according to the detectives' handwritten interview notes, Mr. Soucy did not make a positive identification; he identified two possible photos, including Mr. O'Connell's photo, and indicated that the hair was curlier.

Based on my review of the materials, and the findings of the court on the habeas petition, neither the prosecution nor the defense was provided with the detectives' handwritten notes contradicting the police report.

I would have used the information in the detectives' handwritten notes to cross-examine and impeach Mr. Soucy to challenge the validity of his identification of Mr. O'Connell as the driver of the yellow Pinto and to undermine his subsequent in-court identification. I would also have used this information to cross-examine the detectives to demonstrate the inaccuracies in their report and to suggest their bias against Mr. O'Connell, again calling into question the integrity of the investigation.[3]

*Arturo Villareal*

Arturo Villareal was delivering flowers at the apartment building on the day of the murder. He reported that he observed an individual run to a faded yellow Ford Pinto station wagon with woodgrain sides and enter the passenger side of the car. He indicated that the driver of the getaway car had shoulder-length blond hair, but he did not know whether the driver was a man or a woman.

---

[3] Because I am confining myself to suppressed (or arguably suppressed) evidence, I do not address how I would have discredited the association of a yellow Pinto with Mr. O'Connell by Mr. Soucy.

**Ex. 704-7**

Ronald Owen Kaye, Esq.
January 19, 2017
Page 8

      Detectives showed Mr. Villareal the photospread with Mr. O'Connell's photo four days after the murder. The police report states that Villareal made a definitive, positive identification of O'Connell from the photospread, saying "he is the strongest contender, and I'm sure that's him." At the preliminary hearing, Mr. Villareal testified that he did not make a positive identification, that one of the photos "almost" looked like the person who had jumped in the station wagon, but "[he] couldn't say yeah or no…" (Prelim. Tr. at 49.) At trial, Mr. Villareal testified that he could not make a positive identification and that he had not made a positive identification from the photospread. (Trial Tr. 160, 163.) He acknowledged that photo number three resembled the shooter but that he was not sure it was the same person. The prosecution called J.D. Smith to testify to the statements in his police report in an attempt to impeach Mr. Villareal. (Trial Tr. 203-205.)

      I would have used the inaccuracies and omissions in the police reports related to the Druecker and Soucy identifications to impeach Detective Smith's testimony impeaching Mr. Villareal's inability to identify Frank O'Connell. I would also have argued in closing that Mr. Villareal's trial testimony contradicting the detectives' description of his photospread identification in the police report corroborates the detectives' pattern of inaccuracies and omissions in the police reports, which pattern should lead to the conclusion that Mr. Villareal's testimony should be credited over Detective Smith's.

*Thomas Butler*

      I have reviewed the police report identifying Thomas Butler as a neighbor of Jeanne Lyon who reported seeing a yellow Pinto station wagon parked in front of her home between January and April, 1983. The police report states that the investigating detectives showed him the photospread and "he immediately picked photograph #3, that of Suspect O'Connell" as the driver of the yellow Pinto. Mr. Butler was not called to testify at the trial. Subsequently, Mr. Butler testified at a deposition that he had only seen the driver of the station wagon from the back. He also testified that detectives showed him a photospread and that he "certainly was not able to make a positive identification" although he pointed to one photo that most resembled the person; that he "could not make any – any positive identification of anybody because [he couldn't] determine a face from across the street"; and that he "absolutely" told the detectives that he could not make a positive identification. (Butler Dep. at 18-19.)

      My review of the materials did not provide any information on why Mr. Butler was not called to testify at trial. However, had I been aware of the evidence that the police reports mischaracterized Soucy's identification, and the other suppressed evidence (see below), interviewing Mr. Butler would have been of

**Ex. 704-8**

paramount importance to explore whether there were other misstatements in the police reports. If Mr. Butler had provided the same information that he did in his deposition, I would have known (even excluding Mr. Druecker) that two witnesses were available – Mr. Villareal and Mr. Butler – to testify that Detective Smith misrepresented their identifications (in addition to the undisputed fact he did so with Mr. Soucy). I very likely would have called Mr. Butler as a witness to demonstrate this additional misrepresentation, particularly once it became clear Detective Smith's testimony would be used to impeach Mr. Villareal.[4]

Failure to Disclose Exculpatory Information

*Prior Attempt on Victim's Life by Jeanne Lyon and Randy Smith*

LASD detectives Smith and Gleason interviewed the victim's wife, Gina French, on the day of the murder. Both detectives' handwritten notes reflect that Ms. French reported that Jeanne Lyon and her friend from Oregon, Randy Smith, had tried to "run down" or "run over" the victim while he was riding his motorcycle around May, 1980. Ms. French provided a physical description of Randy Smith as tall with sandy blonde hair. She also described the vehicle involved and the location of the incident. She indicated that the attempt on the victim's life had been reported to the Pasadena Police Department and the victim's family law attorney.

Based on my review of the materials, none of the information about the prior attempt on the victim's life (or whether any follow-up investigation was conducted) was memorialized in police reports or disclosed to the prosecution or defense.

*Anonymous Tip*

On February 8, 1984, LASD received an anonymous tip from a male caller that Jay French's ex-wife paid to have him killed when she learned that he had been awarded custody of the children; that the ex-wife had paid a male in Oregon $7,000, and that the male in turn paid Richard Stephens to do the job; that Richard Stephens was supposed to live in a rear house at either 727 or 757 N. Catalina in Pasadena; that Stephens had a Mexican female or a white or Mexican male named James as an accomplice.[5] It is my understanding that none of the information

---

[4] The same is true had I been aware of misstatements regarding Mr. Druecker, that is, it would have led to particular efforts to interview Mr. Butler and likely calling him as a defense witness.

[5] I have reviewed Randy Smith's Oregon court record from late 1983 and January, 1984 which indicates that he was in custody on January 4, 1984 on drug possession charges; that the court set bail that day in the amount of $10,000; and that Mr.

Ronald Owen Kaye, Esq.
January 19, 2017
Page 10

provided in the anonymous tip (or any follow-up investigation) was memorialized in police reports or disclosed to the prosecution or defense.

I have reviewed materials suggesting that the detectives conducted follow-up investigation related to the anonymous tip:

(1) a handwritten note indicating that detectives observed a 1972 yellow Ford with woodgrain side panels, license plate number 1ADV272, enter the rear side of 757 N. Catalina on February 22, 1984. The note also contains the names Rick? and Richard Stevens (girlfriend) Rosa;

(2) a handwritten note dated February 28, 1984 listing the license plate number 1ADV272, the words '72 Ford, several addresses on N. Catalina, the names Kathy and Richard Stevens, and the words 'moved to Texas over a year ago according to Mgr at apts';

(3) a business card for an apartment manager attached to a handwritten note that reads, 'NO PINTO WGN';

(4) a handwritten note dated February 28, 1984 with the names and identifying information (address, phone number) for Mark Fred Stevens and Cathy Stevens and a description of Mark Fred Stevens as '5-12-57 6-2 190 BRN BLU'; and

(5) a handwritten note dated November 7, 1984 listing three other names -- Edward Richard Stephens (described as a white male age 45 with a DOB 10-25-1939) at the 757 N. Catalina address with a phone number, Alex Stephens with an Altadena address (described as a STURGES FRIEND OF ALEX) and Ken Parker and Linda Hope Stephens (described as sister and brother-in-law) with an Altadena address.

---

Smith posted bail and was released sometime between January 4, 1984 and January 25, 1984. Based on my review of the available records, it is unclear when Mr. Smith posted bail and was released and whether he was in custody on the day of the murder. However, in light of the anonymous tip's reference to a middleman in Oregon, Randy Smith's possible incarceration on the day of the murder does not preclude his involvement in the crime. Especially considered together with the fact that Randy Smith knew Jeanne Lyon, lived in Oregon, and had been involved in a prior attempt on the victim's life, he would likely have been able to provide the defense with invaluable investigative information.

**Ex. 704-10**

Ronald Owen Kaye, Esq.
January 19, 2017
Page 11

Based on my review of the materials, none of the information about the anonymous tip or any follow-up investigation was memorialized in police reports or disclosed to the prosecution or defense.

If the prior attempt on the victim's life and the partially corroborated anonymous tip had been disclosed, I would have explored any and all evidence that Jeanne Lyon hired someone, possibly using Randy Smith in Oregon as an intermediary, to kill the victim. I would have thoroughly investigated (1) the registered owner of the yellow Ford seen at the Catalina address and anyone who had access to the car; (2) Richard and Kathy Stevens and their friends, family, and acquaintances; (3) residents of the 700 block of Catalina Avenue; (4) Jeanne Lyon's friends, co-workers, and acquaintances; (5) Jeanne Lyon's bank accounts and other financial information; and (6) any leads developed from the investigation.

In my opinion, there is a strong likelihood that a thorough investigation at the time of the murder would have produced more evidence that Jeanne Lyon had hired someone to kill the victim. Defense investigation is a critical part of the representation of a criminal defendant, and the suppression of this information prevented the defense from knowing to engage in a gold mine of investigation exploring the issues identified in the previous paragraph and potentially developing admissible evidence that Jeanne Lyon had hired someone to kill her ex-husband.[6] At the very least, the finder of fact would have been presented with an alternative possible suspect who had a much stronger motive than Frank O'Connell (which was highlighted by Deputy Public Defender Lara in his deposition) and an alternate explanation of the victim's dying declaration that the shooter was someone his ex-wife hung around with.

I also would have cross-examined the investigating detectives about their failure to thoroughly investigate the partially corroborated anonymous tip to further challenge the integrity of the investigation and the detectives' bias against Mr. O'Connell.

---

[6] The anonymous tip would not itself have been admissible in state court (unless the foregoing investigation led to the identification of the anonymous caller since it was likely someone somewhat close to Jeanne Lyon given the caller's knowledge of the custody dispute) because "California, unlike federal courts and some state jurisdictions, does not have a 'residual hearsay' exception that permits any hearsay statement into evidence as long as it bears sufficient indicia of reliability." (*In re Cindy L.* (1997) 17 Cal.4th 15, 27–28; accord, *People v. Gonzales* (2012) 54 Cal.4th 1234, 1289 & fn. 24.)

Ronald Owen Kaye, Esq.
January 19, 2017
Page 12

<u>Cumulative Effect of Tainted Identification, Inaccurate Police Reports, and Failure to Disclose Exculpatory Material</u>

      As described above, undisclosed exculpatory evidence seriously calls into question the validity of the two most important identifications in the prosecution's case. In the case of Daniel Druecker, detectives did not memorialize or disclose their improper affirmation of Mr. Druecker's identification of Frank O'Connell and disclosure of Mr. O'Connell's connection to the victim (assuming his testimony is credited). In the case of Maurice Soucy, detectives did not disclose handwritten notes that directly contradicted the certainty of his identification connecting Frank O'Connell to a yellow Pinto. In combination with Arturo Villareal's preliminary hearing and trial testimony denying that he identified the shooter and contradicting the police report, this evidence would have made it highly unlikely for the finder of fact to conclude that these identifications were "unusually strong" and seriously undermines the prosecution's burden to establish guilt beyond a reasonable doubt.

      In my experience, it can be very detrimental to the prosecution when the defense is able to call the integrity of the investigation into question. The above evidence, coupled with the evidence established through the habeas testimony of Mr. Druecker (that he was uncertain about his identification) and Thomas Butler (that he did not make a positive identification), both directly contradicting the police reports, seriously calls the integrity of the investigation into question. Armed with this information, the defense could have established a pattern of inaccurate statements by the investigating detectives and argued that the inaccuracies were intentional and/or established the detectives' bias against Frank O'Connell.

      Moreover, evidence of a viable alternative theory that Jeanne Lyon conspired with Randy Smith to hire someone to kill her ex-husband, would have made it much more difficult to disregard the alibi evidence and would have further undermined the prosecution's theory of the case. Armed with all of this evidence, it is quite reasonable that the defense could have raised a reasonable doubt as to Mr. O'Connell's guilt.

      Finally, if the undisclosed information had been known to the prosecutor (the uncertainty of the key identifications, the misstatements in the police reports, the prior attempt on the victim's life by Jeanne Lyon and Randy Smith, and the partially corroborated anonymous tip), I believe that it is quite possible that the prosecutors may have decided not to pursue charges against Mr. O'Connell. I state this as a former prosecutor; the standard used by most prosecutors in exercising their discretion to bring charges is whether they believe the evidence is sufficient to establish guilt beyond a reasonable doubt.

**Ex. 704-12**

Ronald Owen Kaye, Esq.
January 19, 2017
Page 13

    I also want to briefly connect this to the issue of the potential unreliability of much of the eyewitness identification evidence. In eyewitness identifications cases like this – where the eyewitnesses did not know the suspect, fleetingly saw him from a distance (and in Dan Druecker's case without his corrective lenses), and under stress (at least in Mr. Druecker's case) due to gunfire – prosecutors are (or should be) aware of the fallibility of eyewitness identification, especially when not corroborated by physical or other evidence, and the risk of a miscarriage of justice.

    This risk had been acknowledged by both the United States and California Supreme Courts at the time of Mr. O'Connell's prosecution. *See United States v. Wade*, 388 U.S. 218, 228, 87 S.Ct. 1926, 1933 (1967) ("the vagaries of eyewitness identification are well-known; the annals of criminal law are rife with instances of mistaken identification"; noting "the high incidence of miscarriage of justice" caused by such mistaken identifications, and warning that "the dangers for the suspect are particularly grave when the witness' opportunity for observation was insubstantial, and thus his susceptibility to suggestion the greatest."); *accord, People v. McDonald*, 37 Cal. 3d 351, 363, 690 P.2d 709, 717 (1984) *overruled on other grounds by People v. Mendoza*, 23 Cal. 4th 896, 4 P.3d 265 (2000).

    The role of faulty eyewitness identification in wrongful convictions is well-established. Samuel R. Gross, a law professor at the University of Michigan, is the editor of the National Registry of Exonerations. He co-published an article in 2014 on the rate of death penalty wrongful convictions in the US and estimated that if all death-sentenced defendants remained under sentence of death indefinitely at least 4.1% would be exonerated, and that this is a conservative estimate of the proportion of false conviction among death sentences in the United States. http://www.pnas.org/content/111/20/7230. [PNAS is the National Academy of Sciences.]

    According to the Innocence Project's analysis of the causes of wrongful convictions, eyewitness misidentification is the greatest contributing factor to wrongful convictions, playing a role in more than 70% of convictions overturned

**Ex. 704-13**

Ronald Owen Kaye, Esq.
January 19, 2017
Page 14

through DNA testing nationwide.
http://www.innocenceproject.org/causes/eyewitness-misidentification/. While Mr. O'Connell's is not a DNA case, nothing suggests that eyewitness misidentification plays any lesser role in non-DNA cases.

    I declare under penalty of perjury that the foregoing is true and correct. Executed at Los Angeles, California, on 19 January, 2017.

                                               HEIDI L. RUMMEL

# EXHIBIT A

**Ex. 704-15**

# HEIDI L. RUMMEL

Clinical Professor of Law
USC Gould School of Law
Los Angeles, CA  90089
O: (213) 740-2865 / C: (818) 720-2620
hrummel@law.usc.edu

## EDUCATION

### University of Chicago Law School

J.D., with Honors, 1993

- Mandel Legal Aid Clinic, Employment Discrimination Project
- Comparative Legal Studies Abroad Program to Japan (1992)
- Comparative Legal Studies Abroad Program to Eastern Europe (1993)
- Jill Harris Merit Scholar

### University of North Carolina at Chapel Hill

B.A., English Literature, with Highest Honors, 1989

- Attorney General's Staff
- Teaching Assistant, Legal Argumentation
- Teaching Assistant, Philosophy and Ethics of Legal Communication

## TEACHING EXPERIENCE

### University of Southern California Gould School of Law

Clinical Professor of Law, 2014-present
- Post-Conviction Justice Project   (Director)

Courses Taught: Legislative Policy Practicum; Criminal Law; Post-Conviction Justice Project Seminar; Trial Advocacy; Legal Analysis of Evidence

Clinical Associate Professor of Law, 2010-2013
- Clinical Programs Director, 2011-2013
- Student Bar Association Faculty Appreciation Award

Clinical Assistant Professor of Law, 2008-2010

Visiting Clinical Assistant Professor of Law, 2006-2008
- Children's Legal Issues Clinic (2007-2008)
- Post-Conviction Justice Project (2006)

Adjunct Professor, Legal Writing Program, 2004-2005

## LEGAL EXPERIENCE

### United States Attorney's Office for the Central District of California

Assistant United States Attorney

- Criminal Civil Rights Section, 2002-2005

Investigated and prosecuted human trafficking, involuntary servitude, police misconduct and hate crime offenses.

Established Los Angeles Metropolitan Task Force on Human Trafficking. Oversaw coordination between state and federal law enforcement and non-governmental service providers, administration of federal grant monies, design and implementation of media and public outreach efforts, and development of law enforcement curriculum.

**Ex. 704-16**

Conducted numerous trainings for law enforcement and non-governmental agencies on human trafficking investigations and prosecutions.

Testified at state legislative hearing on AB 22 (California Trafficking Victims Protection Act).

- Deputy Chief, General Crimes Section, 2000-2002

Trained and supervised new trial attorneys in all aspects of their practice, including prosecutorial decisionmaking and plea-bargaining, legal memoranda and motions, motions hearings, bench and jury trials, sentencing proceedings, probation and supervised release hearings, and post-conviction relief. Reviewed all written pleadings, authorized plea agreements, and supervised court trials and hearings.

Developed training curriculum for new attorneys.

- Major Crimes Section, 1998-2000

Investigated and prosecuted child-victim and other violent crimes. Served as liaison to FBI task force targeting crimes against children and prosecuted cases involving internet child pornography and enticement to engage in sexual acts with children. Successfully investigated and prosecuted child prostitution trafficking, gang, federal firearms, and arson offenses.

- General Crimes/Complaints Rotation, 1996-1998

Investigated and prosecuted various federal cases involving immigration, bank robbery, narcotics, and fraud offenses. Litigated post-conviction and Ninth Circuit appellate matters.

**United States Attorney's Office for the District of Columbia**
Assistant United States Attorney, 1994-1996

- Prosecuted misdemeanor and felony cases in state trial court, conducted numerous bench and jury trials, investigated and indicted felony cases before state grand juries, and litigated appellate matters.

**Judge Thomas Penfield Jackson**, U.S. District Court for the District of Columbia
Law Clerk, 1993-1994

## SIGNIFICANT PROSECUTIONS

United States v. Gonzalez (color of law sexual abuse)
United States v. Cheung (child prostitution trafficking conspiracy)
United States v. Trisanti (involuntary servitude)
United States v. Valle-Maldonado (child prostitution trafficking conspiracy)
United States v. Nikrasch (counterfeit currency conspiracy)
United States v. Rose (armed bank robbery conspiracy)
United States v. Naeem (arson)
United States v. Delgado (arson)
United States v. Recinos (Mara Salvatrucha Gang federal firearms offenses)

**SELECTED CONFERENCES, TRAININGS AND SPEAKING ENGAGEMENTS**

    Law Enforcement Trainings
- Los Angeles Sheriff's Department Human Trafficking Training
- FBI Conference on Human Trafficking
- ICE Training, Investigation and Prosecution of Human Trafficking Offenses

    UC Berkeley, Human Rights Center, Working Group on Human Trafficking
- Published Report, "Safety After Slavery: Protecting Victims of Human Trafficking"

    Loyola Law School, Conference on Human Trafficking (Panelist)

    Lifetime Television-sponsored Presentation – "Slavery in the 21st Century: An Evening of Awareness on Human Trafficking" (Speaker)

    Western University College of Law (Speaker)

    Human Rights Watch – "Hopes Betrayed: Trafficking of Women and Children at Home and Abroad" (Featured Speaker)

    Testimony before California Legislative Committee, California Trafficking Victims Protection Act

    U.S. State Department Presentations on Human Trafficking Laws and Prosecutions
- Presentations to visiting foreign dignitaries from countries including Japan, Armenia, Mexico, Chile, and Poland

    Jiangxi Research Institute of Criminology Delegation – "Juvenile Offenders in the Adult Criminal System" (Speaker)

    Testimony before California Assembly Public Safety Committee, Fair Sentencing for Youth Act (SB399)

    U.S. District Court for the Central District of California Re-entry Summit, "Systemic Challenges in Facilitating Reentry" (Panelist)

    Testimony before California Senate Public Safety Committee, Fair Sentencing for Youth Act (SB9)

    US Human Rights Fund Conference, "California's Efforts to Pass Juvenile Life Without Parole Legislation" (Panelist)

    Introductory Remarks, *Crime After Crime*, USC School of Cinematic Arts (2011)

    Gender Responsive Strategies Commission Conference (2011)

    California Lifer Parole MCLE Training (Organizer, Panelist, Moderator) (2011)

    Consultant, Sin By Silence Legislation (AB 593 and AB 1593) (2012)

    Speaker and Organizer, Post-Conviction Justice Project 30th Reunion (2012)

**Ex. 704-18**

Southwestern Law School, "Battering as a Defense to Murder: Legal and Moral Implications" (Presenter)

Board of Parole Hearings Training, "Sin by Silence Legislation and the Parole Process" (Commentator)

Southwestern Law Review Symposium, "Women in the Criminal Justice System: Incarceration, Sentencing, and Collateral Consequences" (Panelist)

Skirball Cultural Center for the USC Emeriti College's Great Decisions Course, "Human Trafficking in the 21st Century" (Presenter)

Survivor Series at the UC-Irvine Initiative to End Family Violence, Inaugural Speaker Event (Presenter with former PCJP client)

California Women's Law Center, "Incarcerated Women and Girls" (Moderator)

National Fair Sentencing For Youth Annual Convening, "Legislative Implementation and Litigation"

## AFFILIATIONS

Bar Admissions
- Illinois, 1993
- District of Columbia, 1994
- California and Ninth Circuit Court of Appeals, 1996

Advisory Committee, California Habeas Project
- Peace Over Violence Humanitarian Advocacy Award (2011)

Campaign for the Fair Sentencing of Youth (SB9 Working Group)

SB9/*Miller*/*Caballero* Litigation Strategies Working Group (Member)

SB9/*Miller*/*Caballero* Representation Committee (Member)

Juvenile Justice Next Steps Committee (Member)

SB 260 Implementation Working Group (Co-chair)

## COMMUNITY ACTIVITIES

Human Rights Watch (Women's Rights Committee Board Member)

Public Counsel Adoptions Program (Office Coordinator, U.S. Attorney's Office)

Project LEAD, Legal Enrichment and Decisionmaking for 5th grade students (Instructor)

The Sherman Oaks Nursery School (Board Member and Committee Chairperson)

San Jose Highly Gifted Magnet (Executive Board Vice-President, Treasurer)

The Center for Restorative Justice Works (Board Member)

**Ex. 704-19**