Russell Fischer
mesrfish@aol.com
(786)367-5000

January 3, 2017

Barry Litt, Esq.
Kaye, McLane, Bednarski & Litt
234 East Colorado Boulevard, Suite 230
Pasadena, California 91101

Re:  *Frank O'Connell, Nicholas O'Connell v.  J.D. Smith, Estate of Gilbert Parra, et al.,*  Case  No. 13-CV-01905-MWF

Dear Mr. Litt:

Enclosed are my preliminary findings and opinions concerning this case based upon the materials I have reviewed. As you requested, I have reviewed the following materials related to the above-titled case.

1.    Petition of Writ of Habeas Corpus
2.    Details of Events Document
3.    DA Murder Book Exhibit 1:
      A.    1.01 Index
      B.    1.02 LASD Report w/attached S. Pasadena Report
      C.    1.03 South Pasadena 1/15/84
      D.    1.04 Smith/Parra Supplemental Report
      E.    1.05 Sketch
      F.    1.06 LASD Firearms ID Report
      G.    1.07 LASD Firearms ID Report on Muzzle Distance
      H.    1.08 LASD Supplementary Reports: Photographs
      I.    1.09 List of Victim's Property in Evidence
      J.    1.10 Police Report: South Pasadena PD
      K.    1.11 Criminalistics Lab Receipts of Evidence
      L.    1.12 2/8/84 Smith/Parra Supplemental Report (FO Arrest)
      M.    1.13 Admonition and Waiver of Rights
      N.    1.14 LA County Jail Booking and Property Record
      O.    1.16 Autopsy Report
      P.    1.17 Coroner's Medical Report
      Q.    1.18 Coroner's Death Report
      R.    1.19 LASD Supp. Report re: Polygraph
      S.    1.20 Polygraph Statement of Frank O'Connell.
4.    Exhibit 2    Sodium Pentothal Session Transcript

**Ex. 707-1**

5.      Exhibit 3.01  1/5/1984 Notes Parra interview w/ Gina French
6.      Exhibit 4.1   Smith Notes 1/5/1984 Re Interview w/ Gina French
7.      Exhibit 4.2   Smith notes re Peter Wisner and previous attempt
8.      Exhibit 4.3   Smith Notes 1/9/1984 Photo Array for Druecker and Sanchez
9.      Exhibit 5.01  Smith Notes 2/5/1984 Photo Array for Soucy
10.     Exhibit 5.02  11/7/1984 Notes re: Richard Stephens Investigation
11.     Exhibit 6.01  Excerpt re: Richard Stephens Investigation
12.     Exhibit 7.1   Notes re 2/5/1884 Soucy
13.     Exhibit 8     Interview Notes #6
14.     Exhibit 9     Anonymous Tip and Notes re: Follow-up
15.     Exhibit 10    Oregon File
16.     Exhibit 11    Notes re: Randy Smith
17.     Exhibit 12    Gina French Message 2/8/1984
18.     Exhibit 100   Trial Transcript:
        A.      100.01  Gina French
        B.      100.02  Carol Gwenn
        C.      100.03  Daniel Druecker
        D.      100.04  Maurice Soucy
        E.      100.05  Alex Sanchez
        F.      100.06  Michael Lewis
        G.      100.07  Arturo Lewis
        H.      100.08  Kent Stoddard
        I.      100.09  J.D. Smith
        J.      100.10  Jean Wilson
        K.      100.11  Pamela Wilson
        L.      100.12  Benda Lee Rogers
        M.      100.13  Karen Baxter
        N.      100.14  James Hamilton
        O.      100.15  Scott Egerer
        P.      100.16  Louis Hatfield
        Q.      100.17  Closing Arguments
        R.      100.18  Court's Verdict
        S.      100.19  Sentencing Hearing
        T.      100.20  Sentencing Letters
19.     Stipulation and Protective Order Re: Production of DA's Office, LASD and Centurion Ministries Materials
20.     D6592-D6924 Investigation of Third Parties
21.     D6925-7476   Training
22.     D7477-D7837 Training
23.     D7838-D8097 Policies and Training
24.     D8271-D8328 Policies and Training
25.     D8090-D8270 Policies and Training

**Ex. 707-2**

26.    D6555-D6591 LASD Training and Policy Documents
27.    Detective Operations Manual  1986  LAPD
28.    Smith-Parra Personnel Records D8329-D8376
29.    Smith-Parra Personnel Records D9541-D9757
30.    Superior Court in re Frank O'Connell on Habeas Corpus, Vol. I and
       II, excerpts
31.    Deposition testimony of Thomas Butler
32.    Deposition excerpts of Deborah Zitella
33.    Deposition excerpts of Danny Maynard
34.    Deposition excerpts of Rebecca Morse
35.    Deposition Gilbert Leslie
36.    Deposition of Mike Bumcrot
37.    Exhibits 16 and 353
38.    September 25, 2014 Statement of Ed Lyon

I have utilized the following materials in the preparation of this report:

Findley, Keith and Michael Scott, *The Multiple Dimensions of Tunnel
     Vision in Criminal Cases*, Wisconsin Law Review, 291 (2006).

Geberth, Vernon J.  (2001). *Practical Homicide Investigation.* New York:
     CRC Press.

Iannone, N.F.. (1980), Supervision of Police Personnel. Englewood Cliffs,
     N.J., Prentice-Hall, Inc. International Association of Chiefs of Police.
     (1989). *Criminal Investigation.*  Arlington, Virginia.

International Association of Chiefs of Police. (1971). *Criminal Investigation.*
     Gaithersburg, Maryland.

International Association of Chiefs of Police. (1983).   *Training Key,
     Volume 14, #332.  The Follow-up Investigation.*  Gaithersburg,
     Maryland

International Association of Chiefs of Police. (1992). *Training Key #414.
     Showups, Lineups, and Photo Identification.*  Alexandria, Maryland.

International Association of Chiefs of Police.  (1993-2010).*Concept and
     Issues Paper.*  Eyewitness Identification. Alexandria, Virginia.

International Association of Chiefs of Police. (2010). *Model Policy.*
     Eyewitness Identification. Alexandria, Virginia.

International Association of Chiefs of Police. (2009). *Model Policy.* Brady
     Disclosure Requirements. Alexandria, Virginia.

3

**Ex. 707-3**

O'Hara, Charles. <u>Fundamentals of Criminal Investigation</u>. Springfield, Charles Thomas Publisher, 1971.

Soderman, Harry, O'Connell, John and O'Hara, Charles. <u>Modern Criminal Investigation.</u> New York, Funk and Wagnalls, 1962.

Weston, Paul and Wells, Kenneth. <u>Criminal Investigation: Basic Perspectives</u>. New Jersey, Prentice-Hall, 1974.

## <u>Experience and Qualifications</u>

I retired from the Miami-Dade Police Department after 33 years of employment. I retired as the Chief of the Criminal Investigations Division specifically in charge of all investigative matters relating to homicide, robbery, sex crimes, domestic crimes and related functions. I also served as the Chief of Uniform Services Division. Prior to my promotion to Chief, I held command level assignments in the Robbery Bureau, Northwest District, and Professional Compliance, Economic Crimes and Narcotics Bureaus. In addition, I also served as a uniform officer and a detective, and held investigative supervisory positions in the Robbery and Homicide Bureaus. In this capacity I have trained supervised, and participated in conducting internal affairs investigations, and have conducted and supervised homicide investigations.

I have instructed police personnel in specialized topical areas since 1986, been an instructor for the International Association of Chiefs of Police (IACP) as to Internal Affairs Legal and Operational Issues and continue to provide instruction to investigators and police managers for homicide training.com. In addition, the United States Department of Justice (DOJ) has retained my services as a consultant/instructor and as a peer reviewer. Specifically, in an attempt to improve upon the solvability and successful prosecution of murders in the country of Colombia, the DOJ requested that I make recommendations to improve upon the training of homicide investigators and their interactions with the various elements of the criminal justice system (Prosecutors, Judges, Police, Medical Examiner, Crime Scene/Laboratory). As a peer reviewer, I have been responsible for reviewing, evaluating and assessing grant applications submitted to the Federal Government by various police agencies throughout the United States in order to obtain funds for solving cold cases (violent crimes, specifically homicides) through the use of DNA.

I have a Master of Public Administration degree from the University of Miami and a Master of Science degree from St. Thomas University in Miami, Florida. I am also a graduate of the Federal Bureau of Investigation National Academy.

**Ex. 707-4**

I have authored articles regarding supervision and managerial accountability which were published in The Police Chief magazine and the FBI Law Enforcement Bulletin.

My resume, which is submitted with this report, provides further information about my professional background.

My findings and observations are divided into six categories which include **Introduction, Details of Murder and Investigation, Analysis and Opinions, LASD Policies and Training, Supervision of Detective J.D. Smith and Summary of Opinions.**

## I.    <u>INTRODUCTION:</u>

On January 5, 1984 Jay French was murdered in the driveway of his apartment complex at 1800 State Street in South Pasadena, California. Frank O'Connell was implicated in the crime by eyewitness testimony of Daniel Druecker who identified him from a photo lineup and thereafter in court as the shooter, by Arturo Villareal, who identified him as the shooter, and by Maurice Soucy who linked him to a photograph of a "look alike" Pinto station wagon. Frank O'Connell was arrested on January 12, 1984. No physical evidence linked him to the crime.

He was convicted of the murder of Jay French on January 14, 1985 and was sentenced to serve 25 years to life. After serving 27 years in prison, on March 29, 2012, the Petition for Writ of Habeas Corpus was granted by Judge Suzette Clover, Judge of the Superior Court, Los Angeles County, California.

Judge Clover, in her decision, stated that the failure to disclose handwritten notes concerning Randy Smith's and Jeanne Lyon's previous attempt on the victim's life constitute a *Brady* violation and deprived Mr. O'Connell of a fair trial. Additionally, she noted that new information presented at the habeas hearing casts legitimate doubt on the accuracy of the eyewitness identifications of Mr. Druecker, Mr. Villareal, Mr. Soucy, and Mr. French (through his dying declaration).

After a review of the aforementioned exhibits, testimony, and reference materials, I would conclude that Detective J.D. Smith and others failed to properly, thoroughly and completely investigate the homicide of Jay French according to minimally established acceptable standards.  The opportunity for this to occur was exacerbated by the lack of close supervision, training, policy formulation, investigative oversight, and attention to detail by Los Angeles County Sheriff's Department (LASD) investigative supervisors.

**Ex. 707-5**

The acts and omissions by detectives of the LASD include the failure to properly conduct and document identification procedures, the failure to act upon information known by them, the failure to properly investigate, false attribution in official LASD reports, the absence of accurate and complete documentation in investigative reports and the failure to document their investigative action and work product that should have been provided to the prosecutor for consideration regarding their disclosure obligations pursuant to *Brady*.

LASD did not conduct a sound, complete, unbiased investigation and their investigation did not meet or exceed generally accepted police practices for the investigation of crimes of this nature during this time period.

This opinion is based upon the following:

## II.    Details of the Murder & Investigation

### A.    South Pasadena Police Department Preliminary Investigation

On January 5, 1984, at 1:16 PM, South Pasadena Police Department (SPPD) received a report of a shooting at 1800 State Street. Officer William Gitmed responded to the scene and verified that a shooting had occurred in the parking garage. The victim, Jay French, told Officer Gitmed that he had been shot by a man who was driving a yellow Ford Pinto. French stated that he did <u>not</u> know the identity of the shooter (Exhibit 001.02 Murder Book, p.4, South Pasadena P.D. Continuation Report (Kent Stoddard) (hereafter 'S.P.P.D. 1/5/1984 Report").[1] French died at Huntington Memorial hospital later that afternoon.

Stoddard interviewed Daniel Druecker, the only witness to the shooting. Druecker provided the following information:

- Prior to the shooting, Mr. French was loading or unloading refrigerators and mattresses from his pick-up truck in the parking garage.
- Druecker heard a loud bang (gunshot) and then someone yell "Oh my God, that guy shot me!" Druecker then observed Mr. French running south through the carport toward the apartment complex being chased by the offender who was carrying a large blue, steel revolver with a barrel

---

[1] As defined by former LASD Homicide Detective J.D. Smith, the term "Murder Book" refers to a compilation of the reports of all the law enforcement personnel involved in a homicide investigation. It includes witness statements and reports from officers and detectives.  Exhibit 201.03, p.3, Habeas Tr. p.208:5–208:22 (Testimony of J.D. Smith). The Murder Book corresponding to the Jay French homicide investigation was compiled by J.D. Smith and Gilbert Parra.  Exhibit 201.03, p.4, 1429, Habeas Tr. pp. 209:23–210:4 (Testimony of J.D. Smith).

**Ex. 707-6**

approximately 6 inches long  (Exhibit 001.02, Murder Book, p.4, S.P.P.D. 1/5/1984 Report).

- From a distance of approximately 40 feet, Druecker observed the offender stop in the middle of the carport and fire one shot. Druecker stated that the suspect never looked at him and he only saw the left side of the offender's face (profile view only).
- Mr. Druecker described the suspect as a white male in his 30's, slim, 6'0 or taller, with shoulder-length, dirty, dark-brown hair and no facial hair. He was wearing blue jeans and a blue t-shirt.
- After the shooting, Mr. French was yelling, "The guy in the yellow Pinto wagon shot me."

Stoddard interviewed Arturo Villareal,[2] who had come to the location to deliver flowers.  Mr. Villareal provided the following information:

- He observed the shooter running to a yellow Ford Pinto station wagon with woodgrain sides, which was parked adjacent to the driveway southbound on State Street.
- Villareal described the shooter as a white male in his late 20's, 5'10," 160-170 pounds, shoulder-length blonde hair, wearing a dark blue shirt (possibly long sleeve) and faded blue jeans. He was carrying a large-frame, blue steel revolver with a long barrel in his right hand. Villareal observed the offender get into the passenger side of the Pinto.
- Villareal could not identify the sex of the getaway driver, but described the driver as having shoulder-length blonde hair. Villareal observed the Pinto leave the location at a high rate of speed northbound. Villareal was not able to identify the shooter. (Exhibit 001.02, Murder Book, p.6, S.P.P.D. 1/5/1984 Report).

Sergeant Douglas Brown of the South Pasadena Police Department interviewed Alex Sanchez who was working as a flagman at a construction site located at the corner of State Street and Fair Oaks Avenue. Sanchez informed Sergeant Brown that he had seen a faded yellow 1970-74 Ford Pinto with faded wood paneling on the sides.  Sanchez stated that the vehicle was driven by a white female, approximately 25 years old, thin build with long light brown or blondish hair.  Sanchez also stated that there was a male passenger in the right front seat of the vehicle, who Sanchez described as white, 25-30 years old with dark brown hair (Exhibit 001.10, Murder Book, pp.1, 2, S.P.P.D.).

In examining the crime scene, Stoddard discovered a boot or shoe heel mark and slight foot impression on the grass parkway adjacent to where the pinto

---

[2] This witness's surname is also spelled Villareal's elsewhere in the official documents, but they are the same person.

had been parked. Plaster casts were taken of the heel impression (Exhibit 001.02, Murder Book, p.6, S.P.P.D. 1/5/1984 Report).[3]

### B. LASD Preliminary Investigation

LASD Homicide Bureau detectives Smith and Gleason responded to the crime scene to assist SPPD. (Exhibit 001.02, p.7. S.P.P.D.) Lt. Wacherman told detectives Smith and Gleason that Jay French said he did **not** know the suspect and had never seen him (Exhibit 004, p.4,, p.6).

### 1. Detectives' Interview of Gina French Re Jeanne Lyon's and Randy Smith's Prior Attempt on the Victim's Life

At 9:30 p.m., LASD detectives interviewed Gina French, the victim's wife. Ms. French informed detectives that, at approximately 1:15 p.m., she ran outside and observed her husband lying on the ground bleeding. As he lay dying, Mr. French said to her, "This had to be somebody or something to do with Jeanne" (Exhibit 001.04, Murder Book, pp.5-6, LASD Supp. Report). She did not indicate that Jay French recognized the shooter. Gina French's report of Jay French's dying statement is corroborated by witness Kenneth Dooley, who also heard Jay French say that the shooting had something to do with Jeanne; Dooley did not indicate that the victim recognized the shooter.[4]

Ms. French also informed detectives that Jay French and his former wife Jeanne Lyon had been embroiled in an on-going child custody dispute concerning their eight year old son Jay Dean French, Jr. (hereafter "Jay French, Jr.").[5] According to Gina French, in 1980, Ms. Lyon kidnapped Jay French, Jr.

---

[3] Forensic officers attempted to compare Mr. O'Connell's leather boots to the plastic cast of a heel impression found at the crime scene. A comparison was not possible. The plastic cast of the heel impression did not have enough detail to determine the size and class characteristics for comparison to the brown leather boot heels. Exhibit 001.08, Murder Book, p.4 (Supp. Forensic Report).

[4] At 6:30 PM on January 5, 1984, during a canvass of the apartment complex, LASD detectives spoke to a resident named Kenneth Dooley. Dooley informed Investigators that after he heard gunshots, he ran down stairs and observed the victim lying on the floor bleeding and the victim's wife bending over the victim (Exhibit ***, Murder Investigation-additional materials, p.17). Dooley stated that he heard the victim say to his wife, "This had something to do with Jeanne" (Exhibit 001.04, Murder Book, p.5, LASD Supplementary Report, hereafter "LASD Supp. Report"); (Exhibit 003, Inv. Notebook 1, pp. 21– 22; Exhibit 003, Inv. Notebook 2, p.10).

[5] According to Gina French, on the morning of the murder at 7:30 am she and her husband received a telephone call from Jeannie who stated their child was sick and wanted to keep him out of school. The victim refused to permit her to do so however this was the first time ever that Jeanne called the house (LASD Report Ex. 1.17).She

and fled with him to Oregon, where she was eventually arrested for child-stealing. Ms. French described several persons whom she knew to associate with Jeanne Lyon, including Jeanne's husband, Edward Lyons, Jeanne's sisters, Debora Huntoon Lopez (Deborah Zitella) and Vicki Bedwell, Jeanne's brother, Dale Huntoon, and Frank O'Connell. As far as can be determined, Ms. French was the first witness to bring up Mr. O'Connell's name.

Gina French also reported an alleged prior attempt on the victim's life. Ms. French told investigators that, around May 1980, Jeanne Lyon and her friend from Oregon, Randy Smith, tried to "run down" Mr. French while he was riding his motorcycle. This incident is reflected in the notes of two different detectives. According to one detective's[6] notes, Ms. French said that Randy Smith tried to "run…down" Mr. French while he rode home from work.  (Exhibit 003.01, Inv. Notebook 1, pp.3–5).   According to Detective Smith's notes, Ms. Lyon and Randy Smith tried to "run over" Jay French while he was on his motorcycle on the way to work. (Exhibit 004.1, Inv. Notebook 2, pp.1-3).  Ms. French's report of a prior attempt appears in detectives' handwritten notes, but does not appear in the police report.

Ms. French provided a physical description of Randy Smith, stating that he was tall with sandy blonde hair (Exhibit 003.01, Inv. Notebook 1, pp.2–5; Exhibit 004.1, Inv. Notebook 2, pp. 1 – 2). Ms. French also described the vehicle involved (Ms. Lyon's green Capri), the location where the incident occurred (near Sacred Heart Girls School), and advised detectives that the incident had been reported to the Pasadena Police Department. She also indicated that the incident had been reported to Jay French's family law attorney, Peter Wisner. Detectives' notes contained contact information for Peter Wisner (Exhibit 003.01, Inv. Notebook 1, p.1; Exhibit 004.2, Inv. Notebook 2, p.1). Detectives were also in contact with Mr. French's prior family law attorney, David Peale, who would have had information relevant to the custody dispute (Exhibit. 004.2, Inv. Notebook 2, p.1).

The prior attempt on Jay French's life was not memorialized in police reports, nor did the police reports indicate whether any follow-up investigation occurred. Police reports do not indicate whether David Peale or Peter Wisner were able to supply useful information.

---

also spoke of a continuing family feud between her husband and Jeanne Lyon (Ex. 1-17).

[6] The author of the notebook is likely Sgt. Gleason, the only LASD detective who responded to the crime scene with Detective J.D. Smith.

**Ex. 707-9**

## 2.  LASD's Preliminary Eyewitness Interviews

On January 5, 1984, at 8:50 PM, LASD detectives contacted Daniel Druecker, the sole witness to the shooting. Druecker described the assailant as 6'0 – 6'3, slim build, mid-30's, with long, brown, shoulder length hair. He had a dirty appearance and was wearing a blue, long sleeve shirt and blue jeans. Mr. Druecker heard Mr. French exclaim "That fucker in the yellow Pinto shot me and I don't know why he shot me" (Exhibit 1.04, Murder Book, p. 6, LASD Supp. Report).

The police report varies somewhat from the detectives' handwritten notes of the January 5, 1984 interview. One detective's notes indicate that Mr. Druecker saw the assailant from the left-side profile; he could not remember if the assailant had facial hair; he described the victim's hair as greasy and wind-blown; shirt was wrinkled and jeans were dirty (this is somewhat contrary to Mr. Druecker's interview with Sgt. Stoddard, in which he related that the assailant did *not* have facial hair) (Exhibit 003, Inv. Notebook 1, pp.23–27). This information was not reflected in the Supp. Report. According to Detective Smith's handwritten notes, Druecker described the assailant as mid to *late* 30's (Exhibit 004, Inv. Notebook 2, p.12). The Supp. Report did not indicate that Druecker described the assailant as mid to late 30's. On January 6, 1984 detectives ordered a composite drawing of the suspect, which was completed and given to officers on January 7, 1984 (Exhibit 1.04, LASD Supp. Report, p. 7). The sketch does not depict the assailant as having a moustache.(Exhibit 1.05).

On January 6, 1984 at 12:45 p.m., LASD detectives interviewed Alex Sanchez, a flagman who observed the getaway vehicle as it fled from the crime scene. He described the driver as an approx. 25 year old woman with shoulder-length, blonde or light brown hair and a thin face. He described the passenger (the shooter) as a 25-30 year old white male, 165 – 175 lbs., with long, shoulder-length brown, curly hair that hung over his ears (Exhibit 1.04, Murder Book, pp.6 -7, LASD Supp. Report,; Exhibit 004, Inv. Notes 2, pp.19–21). Aside from hair color, Sanchez's description of the offender's weight and age was consistent with the description provided by Arturo Villareal, to S.P.P.D. on the day of the murder.

On January 7, 1984 at 5:50 PM, Investigators met with eyewitness Arturo Villareal at the Flower Box Flower Shop, where Villareal is employed delivering flowers.  Mr. Villareal provided a description of the suspect substantially similar to the description he provided to S.P.P.D. on the day of the murder: white male, 5'10– 6'0, medium-build, shoulder length blonde hair; wearing a dark blue shirt with long sleeves and faded jeans (Exhibit 1.04, Murder Book, p.12, LASD Supp. Report; Exhibit 004, Inv. Notes 2, p.35).  Whereas Mr. Villareal's first description indicated the assailant was 5'10, the second description indicated that he may

**Ex. 707-10**

have been as tall as 6'0. Mr. Villareal's description varied from Mr. Druecker's description with respect to the assailant's age, height, weight *and* hair color.

Below is a chart comparing the witness identifications:

| | **Druecker** | **Villareal** | **Sanchez** |
|---|---|---|---|
| SPPD Police Report (South Pasadena's Initial Investigation) | MW<br>30's<br>6'0+<br>Slim<br>Shoulder-length<br>Dirty dark brown hair<br>Blue jeans<br>Blue t-shirt<br>No facial hair<br><br>[only saw the left side of suspect's face] | MW<br>Late 20's<br>5'10<br>160-170 lbs (fairly slim)<br>Shoulder-length<br>Blonde hair<br>Possibly blue jeans<br>Dark blue sweater-shirt (possibly long sleeve); faded blue jeans<br>[No mention of facial hair] | MW<br>25-30<br>Dark brown hair<br><br>[No mention of facial hair] |
| LASD Preliminary Investigation | 1/5/1984<br><br>MW<br>Mid [to *late*] 30's<br>6'0 – 6'3<br>Slim build<br>Long, shoulder-length hair<br>Brown hair<br>Greasy, windblown hair<br>Dirty appearance<br>Blue, long-sleeve shirt<br>Blue jeans (dirty)<br><br>Not sure about facial hair | [1/7/84]<br><br>MW<br>5'10 – 6'0<br>Medium Build<br>Shoulder length<br>Blonde<br>Dark blue, long sleeve shirt with sleeves rolled up<br>Faded blue jeans | [1/6/84]<br><br>MW<br>25-30<br>165-175 lbs<br>Long, shoulder-length (hung over his ears)<br>Curly hair<br>Brown |

11

**Ex. 707-11**

### 3. LASD's Preliminary Investigation of Jeanne Lyon

On January 6, 1984, Detectives interviewed Jeanne Lyon at the law office where she worked. Her employer, Mary Hilyard, informed detectives that she had also represented Jeanne Lyon in the custody dispute with Jay French since 1979. Detectives first spoke to Ms. Hilyard, then interviewed Ms. Lyon in Ms. Hilyard's presence.

During the interview, Detectives questioned Ms. Lyon about Frank O'Connell. Ms. Lyon described him as a cousin that had been staying with her and her husband "for the past several months" (Murder Book, pp.18–19, LASD Supp. Report). She stated that O'Connell had moved out of her house and she had last seen him on the night of January 1, 1984 (Exhibit 001.04, Murder Book, pp.9–10, LASD Supp. Report).

The police report is inconsistent with handwritten notes taken by one of the detectives.  According to the notes, Ms. Lyon told detectives that, prior to New Year's Day, she had not seen Mr. O'Connell for 30 – 45 days (i.e., she did *not* say he had been living with her for the past several months) (Exhibit 004, Inv. Notes 2, p.25). When asked about the offender's vehicle, Mrs. Lyons stated that she did not know anyone that drove a yellow Ford Pinto station wagon (Exhibit 001.04, Murder Book, pp.9–10, LASD Supp. Report).

The police report states that, later that day, Jeanne Lyons advised investigators that Frank O'Connell was not a cousin, but rather was someone she had been romantically involved with during a temporary separation from her husband. She explained that he was only referred to as a cousin for the benefit of her children.  Ms. Lyons informed Investigators that O'Connell was staying somewhere in La Verne, California and gave Investigators O'Connell's phone number, which they matched to his roommate's address in LaVerne, California (Exhibit 001.04, Murder Book, p.10, LASD Supp. Report). Although not reflected in the police report, Detective Smith also obtained bank account information from Ms. Lyon (Exhibit 004, Inv. Notes 2, p.31). There is no indication that detectives investigated the bank account records or sought a warrant or subpoena to review them.

On January 6, 1984, at 9:10 PM, Investigators interviewed Jeanne Lyons' husband, Ed Lyons, at the Temple City Sheriff's Station.  Mr. Lyons stated that he had been at work on January 5, 1984 from approximately 7:00 AM to 3:30 PM, breaking for lunch at approximately 12:30 PM with his boss.  When asked by Investigators whether he wanted the victim dead due to the child custody matter, he stated that he didn't know the victim well enough to wish him dead.  He also stated that he did not know anything about a yellow Pinto station wagon, which was mentioned as the offenders' vehicle (Exhibit 001.04, Murder Book, p.10, LASD Supp. Report).

On January 7, 1984, detectives interviewed Jay French, Jr. Jay Jr. was aware that his mother had been romantically involved with Frank O'Connell.

## C. Photo Identification Evidence

On January 8 and 9, 1984, detectives showed Villareal, Druecker and Sanchez a 6-pack photo array consisting of six black and white photographs of potential offenders (including an August 1983 photo of Frank O'Connell). (Exhibit. 221.01.) All of the photos in the 6-pack were of persons with moustaches (Druecker, Villareal and Sanchez did not describe the suspect as having facial hair). In addition, all of the photos were full face views (not profile views). According to police reports, Frank O'Connell was identified by two witnesses (Druecker and Villareal).

### 1. Alec Sanchez – No Identification

Police reports indicate that Mr. Sanchez failed to identify Frank O'Connell. According to police reports, after looking at the photos, Sanchez pointed to picture #1 (not Frank O'Connell) and stated that he wasn't sure and there was possibly a resemblance to the person he had seen riding in the passenger seat of the yellow Pinto on January 5, 1984 (Exhibit 1.04 Murder Book, p.13, LASD Supp. Report).

At trial, however, Mr. Sanchez testified that he actually picked out two photos, **#1** and **#3** because he was uncertain (Exhibit 100.05, pp.5-6, Trial Tr., pp.137:27–138:19). He could not identify Mr. O'Connell (in the courtroom) as the passenger of the vehicle. He remembered telling the detectives that the female driver had blond hair and that both the driver and passenger had the same color hair (blonde or light brown) (Exhibit 100.05, pp.6-7, Trial Tr., pp.138:25–139:19).

### 2. Arturo Villareal – Positive ID Disputed

The police report indicates that Villareal positively identified Frank O'Connell. The report states that, after looking at the photos, Villareal pointed to Frank O'Connell's photograph (#3) and stated, "He is the strongest contender, and I'm sure that's him" (Exhibit 001.04, Murder Book, p.12, LASD Supp. Report).

Mr. Villareal later disputed having made a positive ID. At the preliminary hearing, Mr. Villareal acknowledged that police officers showed him a 6-pack photo lineup. He maintained, however, that he could not "really" remember if he picked anyone out and when asked about the photos said that one of the photos "almost" looked like the assailant but "[he] couldn't say yeah or no…"(Exhibit. 101, Preliminary Hearing Transcript, p.49:1-16).

At Mr. O'Connell's 1985 trial, Mr. Villareal *again* testified that he could not positively identify Frank O'Connell as the person he saw on the day of the murder and that he had *never* made a positive identification. Mr. Villareal testified that, when shown the photos, he told detectives that number three looked like the gunman but he couldn't be positive; while there was a resemblance, he was not sure it was the same person (Exhibit 100.07, Trial Tr., pp.12–13). Detective J.D. Smith was called in an effort to impeach Mr. Villareal's denial that he had made a positive identification. Smith testified to the contents of the police report above.

### 3. Daniel Druecker – Positive ID Disputed

The police report states that Druecker identified Mr. O'Connell from the 6-pack, pointing to Frank O'Connell's picture (#3) and stated that he was positive that he was the man he saw fire the weapon (Exhibit 001.04, Murder Book, p.12, LASD Supp. Report). At the preliminary hearing and trial, Daniel Druecker affirmed that he had made a positive identification.

During the habeas investigation, Daniel Druecker indicated that he had never been sure of the identification. At the habeas evidentiary hearing, he testified that:

1. He wore glasses and contacts in 1984 because he was nearsighted and could not see clearly without them. He did not usually wear them on his days off and was not wearing them when he observed the assailant.
2. After the murder, detectives came to his apartment and asked for a description of the shooter. He told them he couldn't remember and asked if they could put him under hypnosis. They said they couldn't hypnotize him because it couldn't be used in court.
3. Detectives asked if he would meet with a sketch artist. He agreed but told them he didn't think it would help.
4. When detectives returned with a photo array, Mr. Druecker took that as an indication they must have found the shooter. After being shown the photos and looking at them for a "good while," Mr. Druecker told the detectives he had only seen the shooter's profile. He asked why the photos weren't in profile and/or if they had profile photos. He told the detectives that he did not recognize anyone in the photos. All of the men in the 6-pack had mustaches. He did not recall the shooter having a mustache.
5. Mr. Druecker eventually pointed to picture number three and asked "Is this the guy"?  They responded by asking if it was the person he was identifying as the shooter. Druecker said "I think that's the guy." The detectives told him he had to be certain.

6. After he chose the photo, one of the detectives made a phone call in his presence saying that a positive ID was made. He interpreted that to mean that they caught the shooter and that he had chosen the correct photo.

During the habeas proceedings, J.D. Smith denied that he or his partner pressured Mr. Druecker into making an identification and similarly denied that Mr. Druecker indicated he was unable to make an identification (or could only guess). J.D. Smith acknowledged, however, that he or his partner could have called someone in Mr. Druecker's presence to advise that Mr. Druecker had made an identification (Exhibit 201.03, pp.86–87, Habeas Tr., pp.291:17–292:23, Testimony of J.D. Smith).

Taken in totality the many deficiencies related to the mug show-up folder presentations employed in this murder investigation is a gross violation of generally accepted police procedures.

### D. LASD's Investigation and Arrest of Frank O'Connell

On January 9, 1984, detectives re-interviewed Jeanne Lyon regarding her relationship with Frank O'Connell. Ms. Lyon advised the detectives that she first met Mr. O'Connell over Memorial Weekend of 1983. Mr. O'Connell moved into her house while she and her husband were separated for approximately six weeks during the summer of 1983. When her husband returned, Mr. O'Connell moved out.

On January 12, 1984 at 5:55 p.m., detectives questioned Frank O'Connell at the San Dimas Sheriff's station. Mr. O'Connell explained that he met Jeanne and Ed Lyon over Memorial Day 1983 and that he lived had moved in with Ms. Lyon sometime after June 15, 1984 while she and Ed Lyon were separated. He lived with Jeanne Lyon for six weeks, during which time they became romantically involved. After six weeks, Edward Lyon returned home and Mr. O'Connell left. Jeanne Lyon and Frank O'Connell parted on friendly terms. Regarding his whereabouts on the day of the murder, Mr. O'Connell explained that he had been with his roommates in LaVerne California, until they invited him to lunch around 12:30 p.m. He declined the lunch invitation and instead drove to Covina to visit his son and ex-girlfriend, Leslie Davis. After terminating the interview with Mr. O'Connell, detectives contacted Leslie Davis to investigate his alibi. She reported that Mr. O'Connell arrived at her house between 1:00 and 2:00 on the day of the murder. The police report does not indicate that detectives attempted to contact Mr. O'Connell's roommates in an effort to confirm when he was home on the day of the   ----murder (Exhibit 001.12, Murder Book, pp.1–6, LASD 2/8/1984 Supp. Report).

Detectives arrested Mr. O'Connell later the evening of January 12, 1984 at Ms. Lyon's residence. According to the police report, Mr. O'Connell stated "Hey, J.D., it didn't work." Jeanne Lyon stated "I think you've got the wrong man" (Exhibit 001.12, Murder Book, pp.6–7,LASD 2/8/1984 Supp. Report).

It should be noted that detectives investigated Ed Lyon's brother, Timothy Lyon, as reflected by materials contained in the police file (Exhibit 13). The police report does not document why he was investigated or the reasons why he was cleared.

The police report also omits that detectives arrested Jeanne Lyon's sister, Vicky Bedwell, on murder charges in association with the case (Exhibit 14). Though she was presumably questioned, there is no record of the interrogation in the police file, nor is there any indication of the facts supporting probable cause for her arrest on murder charges. Without this information, it is impossible to determine whether detectives adequately investigated the lead and why she was ultimately cleared.

### E. Shepherd Street Investigation

#### 1. Look-A-Like Yellow Pinto

The yellow Pinto station wagon was never recovered. Police reports indicate that LASD detectives notified the police in Azusa, California where Jeanne Lyon lived and canvassed her neighborhood.

Detective J.D. Smith eventually took a photograph of a Pinto he found parked on a street somewhere in South El Monte. Detective Smith later used this photo of a "look alike" car during interviews of Jeanne Lyon's neighbors, asking witnesses whether the recognized a similar vehicle near Jeanne Lyon's home and whether they recognized the driver of the vehicle.

Exhibit16 as provided to this writer for review and contained within the exhibit folder,  may be a photo of the "look alike" Pinto shown to witnesses.. Detectives failed to record the date and time it was taken, location, license plate and registered owner. During  trial Smith admitted that did not remember which street and could not remember whether the vehicle had a license plate. He took the photo at night.  The photo is of poor quality, in part due to bad lighting.  The photo is very dark.  A viewer of the photo is unable to discern the color of the vehicle other than to note that it is light colored nor is it a full profile of the side, front and/or rear of the vehicle.  It does appear to have wood-like side panels. However, the photo does not capture the distinct features of an early 1970's yellow  Ford Pinto station wagon,

If a vehicle photograph of such poor quality is shown to witnesses in an attempt to determine the make, model and color of the vehicle used by the

perpetrators of a murder, an investigator runs the risk of a misidentification and can confuse a witness who is attempting to assist in the investigation. Because of the poor quality photograph, a witness who is unfamiliar with automobiles and their individual characteristics may be even more challenged to accurately say whether the vehicle in the photo is the same or similar to the suspect vehicle or make an erroneous identification.   What makes the use of a poor quality vehicle photo even more noteworthy and problematic is the fact that Frank O'Connell drove a station wagon at some point in his relationship with J. Lyon.  Detectives should have known the use of an unclear photo of this type, could have caused an unreliable identification particularly because of the vehicle driven by O'Connell.

Further, there is no indication that detectives showed the photograph of the "look alike" to Villareal or Sanchez, the only witnesses who observed the actual getaway vehicle, to determine whether the look-alike resembled the car they saw. Accordingly, there is no way to determine whether it approximated the appearance of the actual getaway vehicle.

## 2.  Michael Lewis and Thomas Butler

Detectives began canvassing Jeanne Lyon's neighborhood on January 27, 1984.

According to the police report, on January 31, 1984, Tom Butler, a former neighbor of Jeanne Lyon's, called detectives to report that he had observed a car matching the description of the getaway vehicle between January 1983 and April 1983. The vehicle was driven by a white male, 6'0 tall, 180 lbs. in his mid-twenties with brown, curly, wavy hair. The vehicle was always parked at the curb in front of 1609, and the driver would go inside for approximately 25 minutes to an hour and then would leave. Mr. Butler moved away from Shepherd Street in April 1983 and could not say whether the vehicle was present afterwards (Exhibit 001.12, Murder Book, pp.8–9, LASD 2/8/1984 Supp. Report).

On February 6, 1984, Detectives administered a photo array to Mr. Butler, also showing him a photo of the look-alike Pinto.  According to the police report, Mr. Butler identified Mr. O'Connell's photo as the person he had seen driving the yellow Pinto station-wagon (Murder Book, p. 45, LASD 2/8/1984 Supp. Report). According to the detectives' notes, Mr. Butler said he had "no doubt" that Mr. O'Connell's photo (#3) was the driver of the Pinto he saw. Exhibit 5.03, p.3. Detectives' notes indicate that they obtained contact information for Butler's brother, Robbie Butler, who would be able to contact Mr. Butler.

Mr. Butler was not called to testify at trial. Mr. Butler has since testified in this case. During his deposition, he stated the following:

17

**Ex. 707-17**

- Between January and April 1983, Mr. Butler was staying with his brother-in-law at 1602 Shepherd Street. He spent several days a week digging a hole in the backyard for a basement project. Approximately every 5 minutes, he would bring a wheelbarrow of dirt from the back yard and dump it on the driveway in front of the house. He had a clear view of the street each time he returned with the wheelbarrow.

- Mr. Butler returned to 1602 Shepherd in January 1984. He saw a sign with a photo of a car in which the LASD was interested. He spoke to the LASD about the sign, advising them that he had seen a Pinto or Gremlin parked on Shepherd Street between January and April 1983. It was yellow to green with wood grain sides.

- When police investigators showed him a 6-pack photo lineup, he told them he could not make an identification (Exhibit 607, pp.18–19, 22 - 24. ("…I have a very hard time with facial recognition. I never would have identified someone from a photo lineup who I had never seen closer than 200 feet away, even if I had seen their face. I have no recollection of ever having seen the person's face or front. I only recall them ever walking toward the house. I don't believe I ever saw the person exit the residence.") ("…I'm quite sure that I was as clear with those detectives as I have been with everybody else that I could not possibly have made any kind of visual I.D. of somebody's face who I had never seen at closer than 2-300 feet.").

- Thomas Butler further confirmed that he gave detectives contact information for himself and his brother. This contact information was not memorialized in the police report.

On February 5, 1984, Detectives contacted Michael Lewis, a resident of 1602 Shepherd Street. Mr. Lewis reported that he had observed a yellow Ford Pinto station wagon with wood sides parked across the street from 1609, Shepherd was unsure as to the last date he saw it (Exhibit 001.12, Murder Book, p. 9,LASD 2/8/1984 Supp. Report). Mr. Lewis testified at trial that he observed the car during the Spring of 1983. The last time that he remembers seeing it, with certainty, was May or early June of 1983.

### 3. Maurice Soucy

On February 6, 1984, detectives showed photos of the "look alike" car photo to Ms. Lyon's neighbor, Maurice Soucy, and his wife, Ina Soucy. Maurice Soucy reported that he had seen a vehicle similar to photos of a "look alike" vehicle. It was driven by a white male, approximately 30 years old, 6/2, 180 lbs, with sandy hair. Mr. Soucy had seen the individual with Jeanne Lyon, kissing her in the front yard, and observed that the car had remained at her house overnight on several occasions. The driver had car trouble, and on at least two occasions, he asked Mr. Soucy to jump start his car. He told investigators that he knew this

suspect was the same person who lived with Jeanne Lyon for a month during the summer until Jeanne's husband came back home.

According to the police report, Mr. Soucy viewed the 6-pack, photo array and "immediately" pointed out Mr. O'Connell's photo as the person who had asked him to jump start the yellow pinto (Exhibit 001.12, Murder Book, pp.10 – 11, LASD 2/8/1984 Supp. Report). The police report also states that Ina Soucy identified Mr. O'Connell's photo but noted that she thought his hair was a little bit curlier (Exhibit 001.12, Murder Book, p.11, LASD 2/8/1984 Supp. Report).

It is undisputed that the police report is incorrect.  According to one detective's handwritten notes, Maurice Soucy actually identified two photos, number 3 (Frank O'Connell) and "poss. #1", as the driver of the Pinto station wagon (Exhibit 005.1, Inv. Notes 3, p.1). Another detective's notes indicate that Mr. Soucy "picked out #3 as poss. [possible] suspect because of face *but hair was curlie*r."  The second note indicates that the identification was not positive (Exhibit 007.1). Moreover, in the police report, detectives incorrectly indicated that Ina Soucy not Maurice Soucy, had indicated that the hair was curlier. At trial, Mr. Soucy identified Mr. O'Connell in court, and testified that he had seen him driving a Pinto like that depicted in the photograph of the "look alike" Pinto.

The handwritten notes were never incorporated into the police report (Exhibit 201.03, p.64, Habeas Tr., p. 269:15-22, Testimony of J.D. Smith). During the habeas proceedings, Judge Clover determined that the handwritten notes were not disclosed to the prosecution or the defense.

### 4.  Jean Wilson, Pamela Wilson, & Brenda Rogers

Mr. Soucy's trial testimony was heavily contested at trial by neighborhood witnesses who denied having seen a yellow Pinto wagon and denied that Mr. O'Connell had ever been observed in connection with a yellow Pinto wagon. Witnesses Jean Wilson and Brenda Rogers lived next door to Ms. Lyon. Pamela Wilson lived across the street. All three were called by the defense and testified that they had not seen a yellow pinto station wagon parked on the street in 1983, that they knew Frank from when he had been staying with Ms. Lyon, and that they had never seen him driving a yellow Pinto in the neighborhood. Ms. Wilson testified that Frank drove a brown station wagon with "woody" sides.

Police reports and handwritten notes indicate that detectives contacted Brenda Rogers on February 6, 1984. Ms. Rogers described herself to the detectives as a neighbor-friend of Jeanne Lyon's, but not a close friend. Ms. Rogers was aware that Mr. O'Connell had moved in with Jeanne Lyon's during the summer of 1983 (Exhibit 001.12, Murder Book, pp.9–10 LASD 2/8/1984 Supp. Report).

**Ex. 707-19**

There is no indication in the police report or handwritten notes that detectives asked Ms. Rogers whether she had observed a yellow Pinto station wagon, much less whether she observed Mr. O'Connell driving a yellow Pinto station wagon ((Exhibit 001.12, Murder Book, pp.9–10, LASD 2/8/1984 Supp. Report; Inv. 3 Notes D2944 – D2945). Ms. Rogers testified that detectives asked her whether she had seen a yellow Pinto in the neighborhood; she told them she had not. This information was not included in the from police reports.

There is no indication in the police report that the detectives contacted Jean Wilson or Pamela Wilson. Pamela Wilson testified that she had, in fact, been interviewed by detectives. When asked about the yellow Pinto she told them that she had never seen such a car in the neighborhood and had not seen Frank O'Connell driving such a car.

### F. Anonymous Tip Regarding Contract Killer

On February 8, 1984, an anonymous, male caller contacted the Los Angeles Sheriff's Department in Altadena. The caller relayed the following information: Jay French's ex-wife (Jeanne Lyon) paid to have Jay French killed when she learned that Jay French received custody of the children; she paid a male in Oregon $7,000.00, who in turn paid someone named Richard Stephens $5,000.00 to do the job; Stephens supposedly lived at either 727 or 757 N. Catalina, Pasadena, in a rear house; Stephens had a female, Mexican accomplice and a male white or Mexican accomplice by the name of James (Exhibit 9, p.1). The detectives' police reports did not incorporate information supplied by the anonymous caller, nor did those reports mention the obvious connection between the caller's reference to a "male in Oregon." Any reasonable detective would have recognized the potential connection to Randy Smith (Jeanne Lyon's friend from Oregon). Considered alongside the Gina French interview, the tip supported the inference that Randy Smith was involved, though not necessarily as the actual shooter, meaning that his alibi for the day of the murder did not exclude the possibility that he was involved in the murder.

Detectives conducted follow-up investigation on February 22, 1984. A handwritten note indicates that, on the morning of February 22, 1984, detectives observed a 1972 Ford with yellow wood grain enter the rear side of 757 N. Catalina. The car bore a license plate number 1ADV272. The note also references "Richard Stevens," "Rick?" and "Rosa" "(girlfriend)" (Exhibit 9, p.2). This information, like the tip itself, was not incorporated into detectives' police reports, and was apparently never disclosed to the prosecutor.

Detectives not only omitted any reference to the tip and car from the police report, they also failed to photograph the vehicle, precluding the defense from investigating whether any eyewitnesses recognized it as the getaway vehicle. There is no indication that the police conducted interviews or otherwise

20

attempted to determine who actually used the yellow Ford, who may have had access to it, and whether such individuals matched the description of the shooter. There is also no indication that police probed into work or personal associates of Jeanne Lyons, even though the nature of the tip strongly suggested that it came from someone well acquainted with Jeanne Lyons.[7]

Handwritten notes reveal that detectives sought to link the license plate to a name and address. A handwritten note dated February 28, 1984 lists the license plate number on the '72 Ford vehicle to three addresses on N. Catalina Street in Pasadena, with the names Kathy Stevens and Richard Stevens (Exhibit 6, p.4). The note also lists an address in Norwalk, California: 19201 Nordhoff #212, with the names Italia and Edward Markweics. Later on February 28, 1984, detectives noted "moved to Texas over a year ago according to Mgr at apts…" (Exhibit 6, p.4). The next page of handwritten notes contains contact information for the apartment managers at 19201 Nordhoff, with the note "no pinto wgn" (Exhibit 6, p. 5).

A subsequent entry lists information concerning persons with the last name "Stevens." The entry lists Mark Fred Stevens in connection with 717 Catalina St. in Pasadena, with a physical description and birth date for Fred Stevens (5/12/1957) (Exhibit 6, p.7). The birth date and physical description roughly align with descriptions of the assailant. Fred Stevens was 6-2 and 190 lbs. He would have been 26 in January 1984. The note also lists Cathy Stevens (Pierce) in connection with a different address (Exhibit 6, p.7). A note dated November 7, 1984 lists other persons with the last name "Stephens" (Exhibit 5.2, p.1). The note references a "Stephens, Edward Richard," described as a white male, 45 years in age, residing at 757 N. Catalina (Exhibit 5.2, p.1). It also lists Alex Stephens at an Altadena address, a friend of Alex Stephens referred to as "Sturges," sister, Linda Hope Stephens, and brother-in-law, Ken Parker, with addresses for Linda and Linda Stephens and Ken Parker (Exhibit 5.2, p.1).

The detectives' police reports contain no reference to their investigation of the anonymous tip, a possible contract killer, Richard Stevens/Stephens, the yellow Pinto observed at the Catalina St. address, or any persons connected to Richard Stephens/Stevens. Detectives failed to obtain photographs of the

---

[7] Information that only came to light in the investigation leading to the habeas petition lends credence to the tip. Witnesses with relationships with Jeanne Lyons have testified that, in the years following the murder, she communicated that she hired a hit man through a third party; she paid several thousand dollars for it; and that an innocent man was in prison for it. This conforms to the tip's statement that a third party was hired to do the shooting, and is inconsistent with the prosecution theory that Mr. O'Connell committed the murder because of his intimate relationship with Jeanne Lyon. Whether, armed with this information, such evidence could have been developed at the time is now impossible to determine

yellow, wood grain vehicle observed at the Catalina street residence. Detectives similarly failed to obtain and memorialize physical descriptions and/or photos of Mark Fred Stevens or Richard Edward Stephens to confirm whether these individuals matched descriptions of the suspect. Not only was this information not disclosed pretrial, but it was not disclosed for the habeas proceeding. It was only turned over in response to discovery requests in this case.

Detectives' police reports also fail to mention a potential further lead. Based on a phone call, Detective Smith evidently spoke with Monsignor Clement J. Connolly at the archdiocese of Los Angeles (Exhibit 6, p.6) regarding an anonymous tip about the case (Exhibit 6, p.9). The notes and police reports do not indicate what information, if any, detectives learned regarding the tip.

## G. Oregon Investigation of Randy Smith.

The official police reports also omit detectives' investigation of Randy Smith. Documents in the police file show that detectives planned a trip to Oregon in December 1984 (Exhibit 10, pp.1-3) (folder entitled "Oregon DEC 1984, containing photos of Randy Smith, post card for hotel in Lebanon, Oregon, message to JD Smith from parole and probation officer in Oregon regarding type of weapon involved in previous weapons charge, map of Lebanon Oregon).

Handwritten notes in the LASD file indicate that at least one detective spoke with Randy Smith's probation/parole officer (Exhibit 11, p.1). The probation officer disclosed that Randy Smith called him on January 4, 1983 (one day before the murder). He was directed to report to the probation office of January 5, 1983 (the day of the murder). Mr. Smith did not report as instructed, and in fact, did not report to the probation office until January 9, 1984. (Exhibit 11, p.1).

Subsequent handwritten notes indicate that at least one detective interviewed an acquaintance of Jeanne Lyon and Randy Smith (the interview subject is unclear and could have been Randy Smith). The witness advised the detective that Randy Smith was last in California in 1980. The notes read as follows: "Randy Smith in LA. June July Aug 1980. Went to Work at Standard hotel 524 34 St. Albany. Sept. 3rd to 4/3/1983 & Injured. Lived at [address in Albany, Oregon] from 3/81 to 12/83. Then moved to studio apt in Albany on 4th St. Wife Babs Lynn Smith Nuttman. F/22 Oct. 25. She lived at Gary St. & 18 St. in Albany. Girlfriend Sandy Vandervoirt (illegible). Had full beard on Dec. 28 thru Jan 9. Last in Cal. 1980. Last [illegible] with Jeanne family 1981 when she was in town with Ed & his girlfriend. [illegible] Jay & Jeanne 1975 While [?] to Oregon. Had Pick Nick at [?] park. Lived with Jeanne 4/80 to 8/80 at [address in Van Nuys, California]. [Phone numbers and address]." (Exhibit 11, p.5.)

The LASD file contains no indications that Mr. Smith was interviewed regarding his whereabouts in early-January 1984, contacts with Jeanne Lyon, or

Mr. Smith's 1980 attempt to run down Mr. French while he was riding his motorcycle (Exhibit 11, pp.1–5). Subsequent notes and phone messages indicate that detectives contacted or attempted to contact various persons in Oregon associated with Jeanne Lyon, including Debbie Bryant (friend) and Fred Huntoon (brother) (Exhibit 12, pp.3, 4.)

Notes reflecting that detectives conducted an investigation in Oregon directly contradict the habeas testimony of Detective J.D. Smith, who maintained that he did not recall doing anything to follow up on Randy Smith.

## H. Alibi Evidence.

Three witnesses testified during the 1985 trial that they were present with Mr. O'Connell at his residence in LaVerne, California when the murder occurred. Mr. O'Connell's roommates, James Hamilton and Scott Egerer, both testified that he was at the house all morning. Karen Baxter arrived at the house between 1:35 – 2:00, approximately twenty minutes after she got off work. According to all three, Mr. O'Connell was there when Baxter arrived, and was still there twenty minutes later when the other three went to lunch.

The extent to which detectives investigated Mr. O'Connell's alibi is unclear. Mr. Egerer testified at trial that he was interviewed by South Pasadena Sergeant Lee Hatfield on 1/7/1984 or 1/8/1984. According to his trial testimony, Mr. Egerer told Mr. Hatfield that he had been home with Frank O'Connell and Jim Hamilton the entire morning of January 5, 1984. Around lunchtime, Jim Hamilton's girlfriend, Karen Baxter, came to the house after she got off work. Mr. Egerer, Mr. Hamilton and Ms. Baxter went out to lunch. Frank did not accompany them. Mr. Egerer insisted that he did not specify to Sgt. Hatfield the time that Karen Baxter arrived or the time they left for lunch because he was not sure. He was only sure that Frank O'Connell had been home with them until they left for lunch.

After speaking to Sgt. Hatfield, Mr. Egerer discussed the timeline of January 5, 1984, with Karen Baxter and Jim Hamilton. Ms. Baxter was positive that she finished work at 1:15 p.m. (the same time she left work each day), stopped at 7-Eleven, and then drove 15-20 minutes to Jim Hamilton's apartment. She arrived between 1:30 – 1:35. The three discussed where to eat lunch and left for lunch shortly before 2:00. Frank O'Connell was at the house when they left for lunch.

Police reports indicate that, on January 10, 1984, investigators contacted Mr. O'Connell's roommate, Scott Egerer, who advised them that Mr. O'Connell was in Santa Barbara. Detectives' handwritten notes indicate that investigators did not ask Mr. Egerer about Mr. O'Connell's whereabouts on the day of the murder (Exhibit 1.04, Murder Book, p.14, LASD Supp. Report); (Exhibit 004, Inv. Notes 2,(p. 39)  There are no police notes indicating that the police interviewed

Jim Hamilton or Karen Baxter.  Mr. Hamilton testified that he did not remember talking to the police and was not present when the police interviewed Scott Egerer.

## I.  Summary of the Prosecution's Case During the 1985 Trial

At trial, prosecution's case focused almost entirely on the testimony of Daniel Druecker and Maurice Soucy. There was no physical evidence linking Mr. O'Connell to the crime, credible alibi testimony and only weak evidence of motive.

Mr. Villareal and Mr. Sanchez testified that they saw the offender flee in a yellow, Pinto station-wagon but were unable to make positive identifications. Daniel Druecker testified that he had identified Mr. O'Connell as the shooter. The prosecution did not bring to light that detectives had affirmed his selection during the photo lineup procedure.

Mr. Lewis testified that he had seen a yellow, Pinto outside Ms. Lyon's home between February and May 1983. He did not testify to having seen it afterwards; he did not link Mr. O'Connell to the vehicle. Maurice Soucy testified that he recognized Mr. O'Connell as the driver of a yellow, Pinto wagon parked outside Jeanne Lyon's home. He was not impeached with the fact that he had failed to make a positive identification when shown the photo array. Jean Wilson, Pamela Wilson, and Brenda Lewis testified that they had never seen Mr. O'Connell associated with a yellow Pinto.

The prosecution established that Gina French once met an acquaintance of Jeanne Lyon's who she believed was Frank O'Connell, but remembered that person as having longer, frizzier hair. She was not impeached with her phone call to police indicating that the defendant she observed was not the person she knew as Frank O'Connell. Detective J.D. Smith was present during the 1985 trial but did not advise the court or prosecutor that Ms. French had previously indicated that, in February 1984, she did not recognize Frank O'Connell as the person she believed to be Frank O'Connell.  Detective Smith testified as to Mr. O'Connell's statements (i.e. he met her on Memorial Day weekend of 1983, lived with her approximately six weeks during the summer of 1983, was romantically involved with her during that time, and moved out because they were not getting along). The prosecution established no further evidence linking Mr. O'Connell to Ms. Lyon, no evidence that they were romantically involved at the time of the murder, and no evidence of motive. Karen Baxter, James Hamilton and Scott Egerer testified that Mr. O'Connell was at his apartment at the time of the murder. The judge ultimately discounted the alibi evidence in favor of the eyewitness identification evidence.

## III.  **Analysis & Opinions**

24

### A. The Police Reports Contained Misrepresentations and Omissions that Violate Generally Accepted Police Customs and Practices

Proper documentation in any type of criminal investigation is important; however, in a homicide investigation, it is crucial. Reports are the foundation upon which the prosecution its case, and serve as prosecutors' primary source of information concerning understand what evidence is available, the names of witnesses, likely defenses, and other details by which to plan their strategy (IACP p.22). Reports are also the principal source used by the courts, prosecutor, defense, and police managers to evaluate the thoroughness of a murder investigation (Geberth, p.808). They serve as a departmental historical record; as a management tool; an aid to officers testifying in court; and can guard against civil or related actions that may be brought against the officer or agency (IACP TK 434, 1993). Additionally, the investigative reports are typically the sole basis upon which a review of a murder investigation or a cold case investigation of an unsolved murder can be based years after a murder.

Retired New York Police Department Lieutenant Vernon Geberth, noted author and law enforcement instructor, indicates that the police report is the tool utilized by the criminal investigator to document the findings of his investigative action. It must be a complete and accurate record of what transpired, whether favorable or unfavorable, to the suspect, victim or witness; to record all results of investigative steps taken, both positive and negative (Geberth p.808).

The International Association of Chiefs of Police (IACP),[8] provides that official police reports should document all investigatory work performed, including statements, confessions, findings made by other agencies, medical examiners, laboratory, etc (IACP p. 23). The report must be accurate and complete in that it must contain all that has been uncovered and is relevant to the proof or disproof of the crime (IACP p. 22). The IACP further recommends that the report be started as soon as possible; any delay between the end of field work and the preparation of the report tends to affect its accuracy and completeness (IACP p. 26).

Failure to ensure thorough, comprehensive, contemporaneous documentation invites the potential for later false and/or inaccurate testimony.

---

[8] The IACP is the largest and oldest professional organization representing police chiefs and law enforcement administrators throughout the United States and has published and continues to publish training materials aimed at professionalizing and educating law enforcement. These materials are intended to provide the foundations for professional police work, refine established skills and apprise officers of new developments in law enforcement. They include publishing and disseminating a law enforcement text, training keys, and model policies that provide and have provided guidance for police practitioners and administrators in a multitude of areas.

Proper documentation is a control against such mistakes, misinterpretations, inaccuracies and false testimony. If so inclined, it would also permit an investigator to include in his/her final report only that information he/she believed was necessary to connect the target of their investigation to the exclusion of all other evidence.

In this case, a number of affirmative investigative steps and significant investigative information and evidence were known to investigators that remained undocumented in an official LASD police report.

This information includes:

| | Omitted Information | Significance |
|---|---|---|
| 1. | Detectives affirmed that Daniel Druecker made a positive identification in his presence. | This information undermines the reliability of Druecker's purported identification. |
| 2. | Arturo Villareal told detectives he was unable to make a positive identification. | This information establishes that Mr. Villareal did not make a positive identification. |
| 3. | Detectives failed to record the significant identifying information concerning the look-alike Pinto, including the location at which the photo was taken, license plate and registered owners. Detectives similarly failed to obtain a daylight photo of the vehicle. | This information relates to significant investigative steps taken by detectives to locate a car similar to the getaway vehicle. |
| 4. | Per an anonymous tip, Jeanne Lyon hired a contact killer to murder Jay French after learning that he had received custody of their children; she paid a male acquaintance from Oregon $7,000, who in turn paid a contract killer by the name of $5,000 to murder French. Stephens lived at 757 N. Catalina St. in Pasadena and may have had a female, Mexican accomplice and male accomplice. | This information was exculpatory in that it suggested an alternate suspect. It also presented a significant investigative lead, given the detail and connection to information disclosed by Gina French regarding Jeanne Lyon's previous attempt to kill Jay French with a male accomplice from Oregon. Even if the tip did not lead to solving the murder, this information would provide an important avenue of |

| | | investigation for the defense. |
|---|---|---|
| 5. | Police observed a 72 Ford with yellow woodgrain sides at 757 N. Catalina; identified "Rosa" as a girlfriend of Richard Stevens. Investigation of the vehicle led them to Edward and Italia Markewicz; according to police notes, they had moved to Texas. (Ex. 6.01) | The presence of a yellow, woodgrain Ford vehicle at an address associated with the anonymous tip was exculpatory and presented a significant investigative lead; any steps taken to follow up on this lead (and their outcome) should have been documented. |
| 6. | Detectives failed to memorialize the appearance of the vehicle observed on Catalina by photographing the car. | The appearance of the vehicle, and whether it matched suspect descriptions of the getaway vehicle, was material to the investigation. |
| 7. | Detectives' follow-up investigation concerning the tip identified, among others, a man by the name of Mark Fred Stevens, associated with Cathy Stevens. Mark Stevens was 6'2, 190 w/brn and blue, contact information is listed for both (Ex. 6.01-4). | This comprised a significant aspect of the investigation that should have been documented. |
| 8. | Per Gina French, Jeanne Lyon and Randy Smith (friend from Oregon) previously tried to run down Jay French, in connection with custody dispute. Notations in a detective notebook include Attorney Peter Wisner, who handled a child custody case involving French and J. Lyon, has information on the date of occurrence of the attempted murder of French (Ex 3.01-5, 004.2-1). | This information suggested the possibility of an alternate suspect. In addition, this information presented a significant investigative lead in that it revealed the identity of a male accomplice from Oregon who had previously been involved with Jeanne Lyon in an attempt on the victim's life. |
| 9. | Gina French described Randy Smith's physical appearance as consistent with witness descriptions of the shooter (tall with blond hair). (Ex. 3.01-4-5, 04.1-2) | This information suggested the possibility of an alternate suspect. |
| 10. | Detectives' investigation of Randy Smith's whereabouts on the date of the | This information could be considered exculpatory in |

|  | murder. Information received Randy Smith's probation officer indicating that Randy Smith, did not appear as required at the probation office on 1-5-84, the day of the murder, and in fact, did not report until 1/9/1984. | that it raised substantial questions regarding Randy Smith's whereabouts on the day of the murder. |
|---|---|---|
| 11. | Police interviewed Randy Smith in December 1983. | Interview of an out-of-state witness or suspect is a significant investigative step that must be documented (as well as the reasons why the witness or suspect is important). |
| 12. | Per Gina French, Jeanne Lyon's step-sister, Vickie Bedwell, matched descriptions of the getaway driver. | This information provided a significant investigative lead, warranting follow-up. |
| 13. | LASD arrested Vickie Bedwell in connection with the murder. Probable cause for the arrest was not documented. LASD also failed to document information learned in her interrogation and, to the extent she was cleared of suspicion, the reasons for clearing her. | The arrest of a potential murder conspirator is a significant investigative step that must be documented (including the reasons for the arrest); interrogation of a suspect is likewise significant. Any information gleaned from the interrogation should be recorded in the police report. |
| 14. | Per Gina French, Jeanne Lyon's sister, Deborah Lopez, also had blond hair and worked at the same law office as Ms. Lyon. (Deborah Lopez was not interviewed). | This information provided a significant investigative lead, warranting follow-up. |
| 15. | Maurice Soucy did not make a positive identification as indicated in the police report, but instead, identified two photos as possible matches. Maurice Soucy said that the hair in photo #3 was curlier (Ina Soucy did not make this statement as indicated in police reports). | This information establishes that Maurice Soucy did not make a positive identification. |
| 16. | Thomas Butler did not make a positive identification as indicated in the police report, and had told detectives that he | Administering a 6-pack to a witness is a significant investigative step; the |

Ex. 707-28

|  | was unable to make a positive identification. Detectives had contact information for Thomas Butler not memorialized in the police report. | results of the 6-pack procedure must be accurately recorded, including when the witness fails to make a positive identification. |
|---|---|---|
| 17. | Brenda Rogers told officers that she knew Frank O'Connell, had not seen him in connection with a yellow Pinto station wagon, and had not seen such a car in the neighborhood. | This information would be considered exculpatory in that it tended to undermine the reliability of Maurice Soucy's purported identification. |
| 18. | Pamela Wilson told detectives that she knew Frank O'Connell, had not seen him in connection with a yellow Pinto station wagon, and had not seen such a car in the neighborhood. | This information was exculpatory in that it tended to undermine the reliability of Maurice Soucy's purported identification. |
| 19. | Gina French left a telephone message for Det. J.D.Smith on 2-8-84 stating that the O'Connell at the preliminary hearing was not the person she knows as O'Connell, that person has large blond bushy mustache and hair. | This message called into question Gina French's knowledge of Frank O'Connell and left unresolved the other acquaintance that Jeanne Lyon observed. |
| 20. | Detectives' investigation of a lead provided by Monsignor Clement Connolly of the Archdiocese of Los Angeles, as evidenced by a business card with his contact information and notes (Ex. 6.01-3). | Leads significant enough to warrant follow-up investigation warrant inclusion in the police report (including what investigative steps were taken and the outcome of that investigation). |

The omission of the above-listed information from the official police reports represents a significant departure from minimally-accepted police practices.

     **B. Generally Accepted Police Standards and Practices Requires Police Reports that Are Truthful, Accurate and Include all Exculpatory Information**

**Ex. 707-29**

The Constitution prohibits police officers from knowingly submitting false evidence for use in a criminal prosecution or trial. False evidence includes any evidence that creates a *materially misleading impression of the facts*. Under this precept, police officers are responsible for the integrity of their investigation results. They are prohibited not only from outright falsification – e.g., lying, framing suspects, or manufacturing physical evidence - but also from advancing evidence they know or should know is false or unreliable due to the technique by which it was obtained. This includes evidence obtained with coercive interrogation methods, suggestive eyewitness identification procedures and manipulation of witnesses' testimony.

At the most basic level, this constitutional protection requires police officers to submit complete, truthful and accurate police reports, which is the primary means by which police relay information to the prosecutor. Beyond reporting, police officers are required to notify the prosecutor should false or unreliable evidence come to light at any time during a prosecution or trial. For example, if a witness gives false testimony in the presence of a police officer, the officer has an obligation to bring the testimony to the attention of the prosecutor.

In the era of this murder investigation, it was common knowledge in law enforcement that the constitution also requires police officers to document and relay potentially exculpatory information. The 1963 landmark decision of the *Supreme Court of Brady v. Maryland* requires prosecuting authorities to provide all material, exculpatory evidence to the defense, including evidence favorable to the defendant as well as impeachment evidence (*Giglio v United States*, 1972). It was generally understood that the prosecutor's pre-trail obligation was to review such material and decide that which falls into this category for disclosure to a defendant. A prosecutor however cannot disclose or consider for disclosure that information/evidence which he/she has not been made aware of by law enforcement.

As recognized by the International Chiefs of Police (IACP):

"Law enforcement has… an 'affirmative duty' to report information that may impact the determination of a court or a jury as to a defendant's guilt or sentencing. This means simply that a department must take positive steps or demonstrable reassure to uncover and reveal *Brady* material. Failure to take such steps, or in the worst-case scenario, suppression of evidence or information that is favorable to the accused, is a violation of due process." (IACP, Concepts and Issues Paper re Brady Disclosure Requirements).

Because a prosecutor can only disclose exculpatory information of which they are aware, *Brady* necessarily requires police officers to notify the prosecutor of any potentially exculpatory evidence, so that the prosecutor can make

**Ex. 707-30**

appropriate disclosures. Thus, police officers' obligations under *Brady* include: (1) recognizing evidence with exculpatory value; (2) memorializing and preserving evidence with exculpatory value; (3) relaying to the prosecutor evidence that potentially implicates *Brady*. In other words law enforcement's duty and obligation is to disclose to the prosecutor anything that is arguably favorable to the defense so that the prosecutor can make an informed determination of what should be disclosed to the defense.

The duty to disclose exculpatory evidence extends into the courtroom. As with false evidence, police officers obligations extend through trial: if police become aware of exculpatory or impeachment information during trial, they are constitutionally required to bring it to the attention of the prosecutor (e.g., if a police officer recognizes that a witness commits perjury and could be impeached with information known to the police, the officer is constitutionally bound to bring the situation to the attention of the prosecutor).

This includes evidence that may impact the credibility of a witness, including police witnesses. Obvious examples of exculpatory evidence include statements or physical evidence that conflicts with the prosecution's theory of guilt, statements or evidence that contradict a prosecution witness, evidence regarding alternate suspects, evidence that undercuts motive, evidence that tends to establish or corroborate an alibi and evidence that undercuts an eyewitness identification.

Though prosecutors decide what evidence warrants disclosure, an affirmative duty extends to all members of the prosecutorial team, including investigators.

As outlined below, the official reports in this case both omitted exculpatory information documented in police notes and contained misrepresentations of fact.

### 1. Maurice Soucy's Failure to Make a Positive Identification

Detectives acted contrary to generally accepted police standards and practices constitutional requirements by presenting a materially misleading description of Soucy's 2/6/1984 photo identification. According to their official police report, "When [Maurice Soucy] viewed the folder he immediately pointed out photograph #3 and stated that that was the person who asked him to jump start the yellow Pinto, and was also the same person he had seen hugging and kissing Jeanne Lyons and driving her red Volkswagen" (Murder Investigation-additional materials Bates P001802) (emphasis supplied).

Detectives' handwritten notes, however, indicate that Mr. Soucy was unable to positively identify Frank O'Connell and that he in fact selected two photos from the photo spread (one of which was not Frank O'Connell). In

addition, whereas the handwritten notes reference Mr. Soucy's observation that person he associated with a yellow Pinto had curlier hair than the Mr. O'Connell, the police report attributes this statement to Ina Soucy. Acceptable police standards dictate that an official police report and later court testimony should be consistent with the truth and, consistent with any notes taken.

Substantial evidence establishes the handwritten notes were not in fact disclosed. During the habeas litigation, District Attorney Juan Mejia stipulated that the handwritten notes concerning Maurice Soucy's identification were **not** disclosed during the original murder trial.(Exhibits. 201.07, 201.08.) Prosecutor Tamia Hope, testified during habeas proceedings that she had no independent recollection of receiving police officers' handwritten notes, nor is there any record showing that she received the notes. Ms. Hope, further stated that, based on her custom and practice, she would not go over all of the handwritten notes because she took the detectives at their word that they had incorporated all investigatory information from their notes into their typewritten report (P001544).

This writer agrees with the sentiments of Prosecutor Hope as it speaks to the necessity to include comprehensive investigative information in an official police report. By omitting this information from their police report, and failing to otherwise apprise the prosecutor, detectives ensured that it would remain indefinitely obscured in their police notes. If detectives follow acceptable police practices by documenting in a report investigative steps taken and information that comes to their attention during the course and progress of a murder investigation, there can be no questions regarding disclosure of investigative information. That was not done in the French murder investigation.

Any reasonable detective would have known that the police report presented a materially misleading representation of the facts. During the habeas proceedings, Detective Smith acknowledged that the police report failed to describe what actually happened during Mr. Soucy's interview. (Exhibit 201.03, p.63,, Habeas Tr., p.268:8-25, Testimony of J.D. Smith). Detective J.D. Smith admitted that, contrary to the police report, Mr. Soucy did not immediately pick out number three, but instead, pointed to two photos, number three and possibly number one (Exhibit 201.03, p.63, Habeas Tr., p. 268:8-25, Testimony of J.D. Smith). In this decisively important area of criminal investigation, identification procedures, the notes of detectives should accurately reflect exactly what was stated by a witness. There should be no differences in terms of what photo or how many photos were selected or the tentative or positive nature of the identification made by a witness. Likewise, if two detectives took notes about a mug show-up folder identification, their notes should be similar and consistent, unless there is an undisclosed reason by one who falsely reports the accuracy of events.

Any reasonable officer would know that Mr. Soucy's selection of two photos was favorable to the defense in that it negated the reliability of his purported identification, and therefore qualified as exculpatory information for the purpose of *Brady*. Information that undermines the reliability of a photo-identification is, by definition, exculpatory evidence that must be memorialized and relayed to the prosecutor.

The exculpatory value is underscored by the fact that the two photos chosen by Mr. Soucy were the same two photos identified by Alec Sanchez and Arturo Villareal. Given the obvious exculpatory value, any reasonable officer would have known that the information should have been included in the police report to ensure that it reached the prosecutor. Detectives did not record it in the police report, precluding the prosecutor from disclosing it to defense counsel prior to trial. Failure to disclose such information in a police report constitutes an extreme departure from accepted police practice.

Detectives could potentially have remedied the situation at trial, yet failed to do so. At trial, Mr. Soucy told the jury that he had positively identified Frank O'Connell. Detective Smith was present for the testimony, yet did not disclose the omitted information even at that time, and did not correct the impression that Mr. Soucy was and always had been certain of his identification, to which Mr. Soucy testified. There is no indication that Detective Smith notified the prosecutor that he had provided false testimony.

It would have been foreseeable to a reasonable police officer that failure to disclose the dual-identification/admission of materially misleading testimony would be   inconsistent with generally accepted police practices and be violative of Mr. O'Connell's due process rights. Here, the detectives were aware that Mr. Soucy provided an essential element to the prosecution's case: he was the only witness who purported to link Mr. O'Connell to descriptions of the getaway vehicle. Without Mr. Soucy's testimony, the prosecution's case would have rested on Daniel Druecker, the only witness to identify Mr. O'Connell as the offender. A reasonable detective could have foreseen that failure to accurately represent Mr. Soucy's identification could contribute to the result of a wrongful conviction. If detectives did not fully appreciate this before trial, they would have appreciated it after the testimony of Sanchez and Villareal: the fact that Mr. Soucy and Alec Sanchez were both unable to make a positive ID, and both saw a resemblance in two different photos, would have strongly corroborated Mr. Villareal's preliminary hearing and trial testimony that he was unable to make a positive identification.

Detective Smith's false attributions not only violate accepted police standards, but also raise serious concerns regarding the veracity and credibility

Ex. 707-33

of all identification procedures conducted in this case, which in turn, raises serious concerns regarding the integrity of other investigative actions.

## 2. Thomas Butler's Failure to Make a Positive Identification

According to official reports, Thomas Butler, not a witness to the murder however a resident of 1602 Shepherd Street, was shown the mug show-up folder and he immediately picked photograph #3 (Frank O'Connell) and said that he was the person he observed driving the yellow Pinto, who on several occasions entered and exited the residence of 1609 Shepherd Street (Exhibit 1-47). The record reflects that this witness never testified at trial.

Mr. Butler has testified in this case that he was unable to make an identification, advised detectives that he could not make a positive identification, and ultimately did not identify any photo from the 6-pack. If Mr. Butler's testimony is credited, then the police report's indication that he made a positive identification represents a material misrepresentation of fact.

Based on the foregoing, not only were acceptable police standards violated but importantly, the veracity and credibility about any and all identification procedures conducted by Detective Smith is questioned based principally on the false attributions in his investigative report. Any mischaracterization of an identification procedure, importantly while contrary to acceptable police standards and practices, undermines the credibility of the very investigators charged with presenting this case to a prosecutor and testimony thereafter.

## 3. Anonymous Tip

Within a month of Frank O'Connell's arrest, the Detectives received an anonymous phone tip that Jeanne Lyon had arranged with a "male from Oregon" to hire a hit man to kill Mr. French The caller identified the hit man as Richard Stephens, who lived at either 727 or 757 N. Catalina, Pasadena. This information was of critical exculpatory value importance because it suggested an alternative suspect while tending to exclude Frank O'Connell as the perpetrator.

The reference to Jeanne Lyon's "male" acquaintance "from Oregon" was particularly significant considered alongside information provided by Gina French. A reasonable detective would have recognized the potential connection to Randy Smith (Jeanne Lyon's friend from Oregon), which supported the inference that Randy Smith was potentially involved, though not as the actual shooter, meaning that his alibi for the day of the murder was not proof of his innocence. Because the official police report omitted both Randy Smith's prior attempt to run down Jay French – and the anonymous tip – the defense lacked the information necessary to effectively investigate Smith's involvement.

**Ex. 707-34**

The tip became even more significant when officers observed a car resembling descriptions of the getaway vehicle at the address of the alleged hit man. According to a note in the LASD files, the Detectives conducted a follow up investigation and observed a 1972 Ford with yellow, wood grain on the rear side of 757 N. Catalina. Because this information carried obvious exculpatory value, detectives were responsible for preserving it and relaying it to the prosecutor for evaluation. Detectives not only omitted any reference to the car from the police report, they also failed to photograph the vehicle, precluding the defense from investigating whether any eyewitnesses recognized it as the getaway vehicle.

There is no indication that the police conducted interviews or otherwise attempted to determine who actually used the yellow Ford, who may have had access to it, and whether such individuals matched the description of the shooter. There is also no indication that police probed into work or personal associates of Jeanne Lyon, even though the nature of the tip suggested that it came from someone with knowledge of her personal circumstances.

I have learned from plaintiff's attorney that defendants may argue that detectives had no obligation to disclose the tip because their follow up investigation led to a dead end. This argument does not comport with police officers' duties to disclose investigative information that could be considered to be exculpatory in nature. Regardless of whether follow-up investigation conclusively exonerated Mr. O'Connell, the tip itself (indicating that Jeanne Lyon had hired a contract killer) – and presence of a car resembling the getaway vehicle – remained vitally important to the defense and presented an avenue of investigation the defense would almost certainly have explored. Because the follow-up investigation did not negate the exculpatory value of the tip, it cannot nullify detectives' obligation to disclose the information to the prosecutor. It makes no difference if the detectives considered the tip less significant after completion of their follow up investigation. It is not the function of law enforcement officers to decide whether exculpatory information is sufficiently material to warrant disclosure; it their function to memorialize and relay all exculpatory information for evaluation by the prosecutor. Whether the tip led to definitive evidence exculpating Mr. O'Connell, it was potentially useful to the defense in addressing the existence of reasonable doubt.

D.D.A. Juan Mejia has submitted a declaration in this case confirming that the anonymous tip was not part of the D.A. file at the time of the habeas litigation, indicating that it had not previously been disclosed to the D.A's office during the original prosecution. D.D.A. was not made aware of the anonymous tip at any time during the habeas litigation.

35

**Ex. 707-35**

### 4. Jeanne Lyon's and Randy Smith's Previous Attempt on Jay French's Life & Randy Smith's Failure to Report for Probation on the Day of the Murder

On the day of the murder, detectives learned from Gina French that, in approximately June 1980, Randy Smith and Jeanne Lyon attempted to run over Jay French with his car. Gina French also provided a physical description of Randy Smith, that was similar to Arturo Villareal's description of the offender. Detectives also failed to disclose that, while in Oregon, they learned from Randy Smith's probation officer that he failed to report on the day of the murder, and in fact, did not report until 1/9/1984.[9]

A reasonable detective would have known that the existence of an alternative suspect is of significant, possibly critical, value to a defendant. During the habeas proceedings, Detective J.D. Smith acknowledged, under oath, that he remembered Gina French disclosing a prior attempt on Jay French's life (Exhibit 201.03, p. 29, Habeas Tr. p. 234:18 – 234:26 ,Testimony of J.D. Smith). J.D. Smith further acknowledged that a prior attempt on the victim's life would be significant to a murder investigation (Exhibit 201.03, pp.31–32, Habeas Tr. p. 236:23 – 237:9 (Testimony of J.D. Smith). The exculpatory value of a plausible, alternate version of events would have been especially valuable to Frank O'Connell considering the state of the prosecution's evidence. While significant evidence pointed to Jeanne Lyon, there was no physical evidence and very little circumstantial evidence to suggest Frank O'Connell's involvement. Evidence suggesting that Jeanne coordinated with a different friend, whom she had known much longer, had previously lived and with whom she had previously involved in an effort to kill her ex-husband, could have been more than sufficient to establish reasonable doubt regarding Mr. O'Connell's involvement.

I am aware that there is a dispute of fact as to whether Detectives believed that Randy Smith was in custody at the time of the murder. (*See* Ex. 227, records related to Randy Smith's criminal matters in January 1984). No records conclusively establish whether Mr. Smith was in custody on January 5, 1984. Regardless, the possibility that detectives believed that Mr. Smith may have been in custody does not change the analysis. Even if detectives had confirmed that Mr. Smith was in custody, which they did not, the prior attempt on Jay French's

---

[9] It is my understanding that Mr. O'Connell's criminal defense counsel was aware of Randy Smith's existence from independent sources, but was not aware of the prior attempt on the victim's life. This scenario underscores the importance of documenting all exculpatory information in police reports. Had defense counsel known of the prior attempt, he could have conducted an independent investigation of Mr. Smith, his whereabouts on the day of the murder, and his potential role even if he was not the shooter.

**Ex. 707-36**

life retained significant exculpatory value given the possibility that Smith was involved in orchestrating the murder, but not as the actual shooter (the anonymous tip, described above, indicated that Jeanne Smith's friend from Oregon helped her locate and hire a hit man; the reference to her friend from Oregon was a plausible reference to Randy Smith, suggesting that he was involved, but not physically present).  The possibility that Smith was in jail did not negate detectives' obligation to advise the prosecutor of Randy Smith's alleged prior attempt to kill Jay French with Jeanne Lyon.

During the habeas litigation, District Attorney Juan Mejia stipulated that the handwritten notes concerning the prior attempt on Jay French's life were **not** disclosed during the original murder trial. Exs. 201.07, 201.08.

### 5. Daniel Druecker's Failure to Make a Positive Identification

If Daniel Druecker's habeas testimony is credible, detectives omitted from their reports information that could have been used to significantly impeach his testimony. According to eyewitness Daniel Druecker: 1) he told the Detectives he was not certain of his identification; 2) he told the Detectives he could not remember and asked to be placed under hypnosis; 3) he told the Detectives he did not think speaking with a sketch artist would help; 4) he initially told the Detectives he did not recognize any of the photos in the photo array; 5) he pointed to photo #3 (Mr. O'Connell) and asked if that was the guy, to which the Detectives responded that he needed to look really hard; 6) after Mr. Druecker identified Mr. O'Connell, one of the Detectives made a phone call in Mr. Druecker's presence saying a positive ID was made, which implied to  Mr. Druecker that he had chosen the "right" person. Defendants deny this account except with regard to the affirmation made in Mr. Druecker's presence.

While I cannot opine on the credibility of Druecker and others who have testified or are part of this investigation, if Mr. Druecker's account is truthful, there can be no question that detectives violated accepted police standards. Any reasonable police officer would have known that this information, taken together, demonstrated that Mr. Druecker was very uncertain; it could have been used to cast doubt on the reliability of the identification. Any reasonable police officer similarly would have known that failure to include these facts amounted to a material misrepresentation of the reliability of Mr. Druecker's identification.

Reasonably trained officers understand that eyewitness testimony is very compelling to juries and often makes the difference in whether a conviction is obtained. Given the importance of eyewitness testimony in general, it would have been reasonably foreseeable that misrepresentation of the circumstances surrounding Mr. Druecker's identification would be contrary to generally accepted police practices and violate Mr. O'Connell's due process rights. In the context of

this case, the potential for a due process violation was even more apparent. Mr. Druecker was the sole witness who purported to identify Mr. O'Connell as the shooter. Any officer would have understood  the weight of this evidence and that eliminating Mr. Druecker's testimony, would almost certainly change the outcome of the trial, particularly considering the lack of physical evidence and weak evidence of motive.

### C.  The failure to properly conduct and document identification procedures including false attribution of information in official LASD investigative reports violated generally-accepted police customs and practices.

While eyewitness testimony is of great assistance in solving crimes and has been historically utilized by criminal investigators, criminal investigators realize that testimony can be mistaken for a number of reasons, including stress which occurred during the crime, civilians are not trained in identification procedures, and the eyewitness and/or a victim can be anxious to identify the perpetrator.  Erroneous eyewitness identifications have been cited as the most frequent cause of wrongful conviction (IACP Model Policy, p. 1). The landmark decision by the United States Supreme Court in 1967, United *States v. Wade* stated in part "the influence of improper suggestions upon identifying witnesses probably accounts for more miscarriages of justice than any other single factor. Perhaps it is responsible for more such errors than all other factors combined" (388 US 218, 229).

Judge Kosinski of the Ninth Judicial Circuit who authored a recent article in the Georgetown Law Journal, spoke to a number of the frailties and misconceptions about the criminal justice system including eyewitness identification.  He addresses how investigations and prosecutions can go wrong specifically noting that eye witness identifications are unreliable and compromised when the identification occurs under the stress of a violent crime (44 Geo. L.J. Ann. Rev. Crim. Proc. 2015).

As criminal investigators are aware, due process prohibits the admission of unreliable identifications obtained by suggestive identification procedures, which are known to lead to misidentification. *Neil v. Biggers,* 409 US 188, 198 (1972). *U.S. v. Field,* 625 F.2d 862 (9th Cir. 1980). *See also*, Steblay, Dysart, Fulero & Lindsay, 2003. In determining whether identification evidence violates due process, courts weigh the corrupting tendencies of the suggestive procedure against indicia of reliability. Reliability is assessed using five criteria: 1) the opportunity of the witness to view the criminal at the time of the crime; 2) the witness' degree of attention; 3) the accuracy of the witness' prior description of the criminal; 4) the level of certainty demonstrated by the witness at the confrontation; and 5) the length of time between the crime and the confrontation.

Ex. 707-38

*Neil v. Biggers*, 409 U.S. at 199-200. This assessment includes an analysis of conditions at the crime scene at the time the witness viewed the offender, including lighting, distance, alertness, physical condition or limitations and distractions. According to the International Association of Chiefs of Police, human perceptions tend to be inaccurate especially under stress (IACP Training Key #414).

Police are trained to prepare, exhibit and display photo arrays in a manner that enhances reliability and avoids suggestiveness. The photographs selected for the array should depict individuals of the same race and sex and have physical features that are reasonably similar. These features should match those of the alleged offender *based on the description provided by witnesses*. Police officers must take care to avoid significant differences in age, height, weight, facial hair, extreme haircuts, eyeglasses, scars, marks, tattoos, piercings, deformities, closed eyes or any other similar characteristics. .

Before the photos are administered, the witness must be admonished, among other things, that s/he does not have to make an identification and that the offender may not be included in the photos at all. Under no circumstances should officers comment on the selections or outcomes of the procedure in any way. If the witness makes an identification, they must be asked to describe, in their own words, how certain they are. Their response must be documented. If there is an equivocal identification, or if a witness expresses uncertainty, reliability is not established and the identification should not be relied upon by the police or prosecution. As the courts recognize, comments endorsing the correctness of a selection may render a lineup impermissibly suggestive. Such comments may tend to reinforce an otherwise weak or tentative identification and therefore lend a later in-court identification greater weight than is actually the case.

As a matter of accountability, there must be a permanent record of the photo array used. In addition, a long-standing and accepted practice for photographic identifications is for the police to instruct the witness to immediately sign and date the photograph they select.  This is a matter of investigative integrity; preparing a complete and accurate record of the outcome of an identification procedure (i.e., positive or negative) is crucial since the record is a critical document in the investigation as well as any subsequent court proceedings.  A signed and dated photograph can be definitively identified in court and supports a claim by the police that the witness actually selected a specific photograph.

Aside from documenting the procedure, the police report should carefully document the witness's opportunity to see and degree of attention, any physical limitations including vision problems, discrepancies in the witness's prior

39

**Ex. 707-39**

description, any reservations expressed by the witness, and any information that could have corrupted the witness's identification.

Because eyewitness identifications are often flawed, if a positive identification has been made, it should be considered the beginning of the investigation of the suspect as opposed to the end. Once a suspect is identified, it is essential to pursue all investigative avenues to determine if the identification is valid and can be corroborated. This is typically accomplished by discovering any connecting forensic evidence to the identified suspect. It is also critically important to thoroughly investigate the suspect's alibi, to prove or disprove his/her whereabouts at the time the crime occurred. Locating witnesses in an area canvass and determining motive is also a factor.

Below, I address the eyewitness identification procedures utilized in this case.

### 1. Maurice Soucy

Mr. Soucy identified Mr. O'Connell from a photo array as the driver of a vehicle that purportedly resembled the getaway vehicle. Detectives' handwritten notes indicate that, instead of choosing a single photograph, Maurice Soucy said that the person he observed could be either of two photos. No reasonable police officer would have relied on this identification given the fact that he identified two photographs, indicating that he was far from certain. His selection of two photos fully negated the reliability of his identification and was more than sufficient basis to disregard it.

When an eyewitness states that the person they observed could be one of two photos (A or B), this indicates they are uncertain as to the identification, may indicate that the witness believes that they are supposed to choose someone and that they do not understand that the offender may not be represented in the photo array at all. When this occurs, it is important to re-emphasize that the right person may not be among the six at all. Here, there is no record that detectives properly admonished Maurice Soucy before administering the photo identification, and no indication that they re-emphasized proper instructions when he made statements indicating his belief that he was supposed to choose someone.

Lack of certainty was not the only reliability issue. Because Mr. Soucy was not a witness to the crime, he obviously did not personally observe the getaway vehicle, nor were detectives able to provide him with photos of the getaway vehicle. Instead they provided him with photos of a *different* yellow Pinto, photographed at night, at an unknown location. Thus, even if Mr. Soucy were able to connect Mr. O'Connell to a vehicle resembling the look-a-like vehicle, there is no evidence to establish that the look-a-like vehicle in fact resembled the

actual getaway vehicle. The police report provides no indication that police showed photos of the look-a-like vehicle to eyewitnesses of the crime (Arturo Villareal and Alec Sanchez) to confirm whether the look-a-like vehicle indeed resembled the vehicle they observed fleeing the crime scene. There is no way to know whether the look-a-like was the same model, year, color or condition.   A reasonable detective would certainly question the reliability of this information.

A reasonable detective would also have recognized that the photo array did not provide a reliable means of determining whether Mr. Soucy actually recognized Mr. O'Connell as the driver of the vehicle he observed near Ms. Lyon's home. Unlike eyewitnesses to the crime, Mr. Soucy had previously seen Mr. O'Connell on various occasions and was therefore predisposed to recognizing his photo. Detectives did not attempt to address this problem by requiring him to describe the person he had seen before showing him a photo array, as is standard practice in the administration of any photo array. As such, there is no way to assess whether his description would have been consistent with his identification. Significantly, Mr. Soucy indicated that the person he observed appeared to be a plumber who worked with Ed Lyon. Because Mr. O'Connell was *not* a plumber, detectives should have considered this statement a red flag that Mr. Soucy had seen someone other than Mr. O'Connell.

Under the circumstances, the fact that Mr. O'Connell's photo stood out to Mr. Soucy is entirely unsurprising. No reasonable officer would have relied upon the identification as evidence without substantial corroboration and strong assurances that Mr. Soucy positively recognized Mr. O'Connell in connection with the (actual) getaway vehicle. That was not the case. As discussed above, Detectives made no effort to ensure that the look-a-like resembled the actual getaway vehicle. They also disregarded the statements of several neighbors who had an even better opportunity than Mr. Soucy  the comings and goings at Jeanne Lyon's house and never observed Mr.O'Connell with a yellow Pinto. Their contradictory testimony would have been more than sufficient to  question and outweigh Mr. Soucy's identification.

Detectives' handling of Mr. Soucy's identification constitutes a sharp departure from accepted practice in every regard. Any detective could have foreseen that submitting false and unreliable identification testimony could result in a departure from standard police procedures and a due process violation, particularly in a case with no physical evidence and weak circumstantial evidence to establish motive and opportunity.

## 2. Arturo Villareal

According to official reports, witness Arturo Villareal observed the gunman fleeing the scene. At the time of the crime, Mr. Villareal told Sgt. Stoddard that he could not identify anyone, which indicates that he did not pay specific attention to

the offender's physical or facial features sufficient to make a positive identification (Exhibit 221, Stoddard report, p. 9). Detectives administered a 6-pack photo array despite this indication that he could not identify the offender. Villareal looked at a mug show-up folder consisting of six black and white photos and after looking at the folder for several moments, pointed to photo #3 (Frank O'Connell), stating "he is the strongest contender, and I'm sure that's him." (Exhibit 1-23). The detectives had an obligation to clarify what exactly Mr. Villareal meant by "strongest contender" yet proceeded as if the identification was positive.  At best, "strongest contender" could indicate an equivocal identification, and possibly indicated he could identify no one at all.

Mr. Villareal testified at the preliminary hearing that he could not identify the features of the offender or the offender's accomplice, but could only describe him "just a little bit" (Preliminary Hearing Transcript, Bates P001655). At trial, Mr. Villareal was unable to recognize O'Connell in court (Exhibit 100-166). He clarified that when he picked number three he was only saying it looked like the man and was not positive (Exhibit 100-169, P000049), contrary to the police report's indication that he made a positive identification. Detective Smith testified, in part, at trial that he kept going back to photo 1 and 3 and made the statement that number 3 looked like the person that most likely looked like the person he'd seen (Exhibit100-209, 210).  Mr. Villareal's vacillation between two photos indicates he was uncertain as to an identification and may indicate that he did not understand that he was not required to choose a photo and that the assailant may not be in the photo spread at all.

Detective Smith testified that he verbally admonished Villareal as follows:

"A.    We told him that we were going to show him six pictures that would be close — that would depict close — facial references of people, and that any one of the people pictured may or may not have been at the scene, and that it was important to pick out the person if he thought the person was possibly the person that he had seen, and it was just as important to not pick out anyone if he wasn't sure." (Exhibit 100.09 -3:15 – 3:19.)

This admonishment is inconsistent with accepted police practices because it instructs the witness to pick out the photo of someone who was "possibly the person they had seen." This language is unclear and confusing to a witness. Witnesses must be admonished to make a selection only if they recognize the person they actually saw.

There is a distinct similarity in the results of the identification procedures in the French murder investigation in favor of strengthening the statements of witnesses and the positive nature of identifying the target of their criminal investigation, O'Connell.  Providing false information in any police report is never

acceptable under any circumstances, yet that is exactly what occurred in this case.

### 3. Alex Sanchez

According to official reports, witness Alex Sanchez, a flagman who was directing traffic at a construction site, looked at the mug show-up folder for approximately two minutes, pointed to photograph #1, stated he was not sure, but there was possibly a resemblance to the person he had seen riding in the passenger seat of the yellow Pinto on 1-5-84 (Exhibit 1-24).

Mr. Sanchez did not identify O'Connell at trial (Exhibit 100-143), when shown photographs by the police, he picked two different photos, photo #1 and #3 as resembling the vehicle passenger (Exhibit 100-141-143,P000048). Detective Smith testified at the criminal trial that Sanchez did indicate that perhaps it was either one or three photo (Exhibit.100-242). The police report documents that he selected photograph #1, and does not indicate that a second photo was also selected. Smith did not recall that his report did not indicate that Sanchez also picked numbers 1 and 3 (Exhibit.100-241). Information from the notes, important in properly framing the identification procedure was not written in the LASD police report.

As with Mr. Soucy and Mr. Villareal, Mr. Sanchez's apparent indecision between two photos indicated that he did not understand that the assailant may not have been in the photo spread at all.

### 4. Daniel Druecker

Part of proper identification procedure is determining whether the witness can make a reliable identification based on their opportunity to view the offender, degree of attention, eyesight and the presence of any conditions that might impair their vision, hearing or judgment. Here, police reports establish that Druecker caught just only a momentary glimpse of the offender's profile before ducking behind his car and had only one opportunity to view him.[10] The event lasted less than 10 seconds from the time Druecker heard shots until the offender fled. (Preliminary Hearing Transcript, Bates P001717). Mr. Druecker has estimated that he only saw the person for two or three seconds.. As documented

---

[10] At the time of the shooting, Daniel Druecker, was inside the carport of his apartment building, standing approximately 30-40' from Jay French.  The observation took place during the daylight (1:00 pm), with bright light in the garage area; however, Druecker never saw a full frontal view of the offender, he only saw the left side of the offender's face, the offender never looked directly at Druecker (Exhibit 1.04 Stoddard incident report, p. 5).

in Sgt. Stoddard's report, Mr. Druecker in fact expressed uncertainty as to whether he could identify the shooter (Exhibit 1, Stoddard incident report, p. 8, "can possibly" identify the offender).

In addition, there is no dispute that detectives made no inquiry regarding Mr. Druecker's vision and evidently did not learn that Druecker was nearsighted and not wearing his corrective eyewear at the time of the shooting. The information regarding Mr. Druecker's myopia did not come out until the habeas proceeding. Mr. Druecker testified at the habeas hearing that his vision was "blurry… fuzzy...hazy…or not sharp…" without his corrective eyewear (Bates P000788, see also Bates P001637, lines 3-5 and Bates P000780; Druecker admits his vision is "blurry" without his glasses). Failure to inquire into an eyewitness's ability to see and observe is an extreme departure from accepted police protocol, particularly in a case where eyewitness testimony of two witnesses served as the basis for prosecution.

According to police reports, Druecker looked at a mug show-up for approximately one minute, pointed to photograph # 3 (Frank O'Connell) and stated that he was positive that he was the man he had seen fire the weapon (Exhibit 1-23).

Detectives failed to properly document the procedure, underscoring concerns regarding its reliability. Based on documents produced so far, Daniel Druecker's photo array was not signed and dated (nor were the photo arrays administered to other eyewitnesses).

During the trial, Druecker confirmed the identification. He also testified that he was shaking (Exhibit 100-81) and that he was not wearing eye glasses on January 5, the day of the murder (Exhibit100-106). It is undisputed that Mr. Druecker testified that he got about a two second glimpse of a side profile of the shooter, never a full face view (P000103,000104). Detective Smith testified at trial that Druecker didn't hesitate when shown a mug show-up folder at all and was certain as to the person in Number 3 (Exhibit 100-249).

Many years after the conviction, Druecker disavowed his earlier identification testimony, on the basis that he felt pressured to make an identification. Mr. Druecker explained that he looked at the photo spread shown him by the police, requested profile photos (which they did not have), told them he did not recognize anyone, and was told to "really look".

According to Druecker, after studying the photos for a long time, selected one photo telling detectives he guessed that that was the guy and after being told he needed to be positive, told the detectives he was positive. (P000105). Druecker explained that as soon as he had chosen the photo, the detective telephoned someone else to say he made an identification. This confirmed to

44

Druecker that he had picked the person who they considered was the suspect (P000104).

If witness Druecker's assertions, albeit many years after the conviction of O'Connell, are accurate and truthful it reflects a seriously flawed photo identification process as conducted by Detective Smith. Reasonably trained detectives understand that a photo identification procedure should be terminated where the witness expresses that they are unable to identify the offender and asks detectives for input in selecting the right photo. Proceeding with an identification under these circumstances violates minimal accepted police practices. Reasonably trained detectives further understand the importance of avoiding statements, clues, casual comments or providing unnecessary or irrelevant information that in any manner may influence the witness's decision making process or perception.  The statements made to Druecker by Det. Smith and telephone call that immediately followed the identification would and did prove to have an overreaching influence on witness Druecker.

Based on the forgoing, even if Mr. Druecker's habeas testimony is not credible, any reasonably trained officer should have had serious doubts about the validity and reliability of Daniel Druecker's identifications and that should have been documented and communicated to the prosecutor.

If Daniel Druecker's habeas testimony is to be believed, his eyewitness testimony should be disregarded altogether (alongside Villareal's and Soucy's). It is my professional opinion that, once eyewitness testimony is removed altogether, a homicide detective and competent police supervisor, apprised of all the facts, would have found the evidence insufficient to establish probable cause and insufficient to present to a prosecutor.

### ~~D.~~  Detectives' Failure to Investigate Critical Leads & Singular Focus on Frank O'Connell demonstrate a gross departure from generally accepted police practices.

In each section above, I have addressed aspects of the investigation that undermined Mr. O'Connell's due process right to a fair trial. Here, I address how detectives' actions and inaction demonstrate a gross departure from generally accepted police practices.

### ~~1.~~  Detectives Follow Up Investigation demonstrates a gross departure from generally accepted police standards and practices.

Every detective is trained that a murder investigation must identify evidence to establish the means (ability to commit crime), motive (reason for committing the crime) and opportunity (chance to commit the crime). Each of

these are necessary to a convincing theory of guilt; the absence of any one is more than sufficient to create reasonable doubt, if not establish the suspect's innocence. Establishing these elements is not, however, sufficient to convict beyond a reasonable doubt: the evidence must also support the conclusion that the accused in fact committed the crime. Here, there were a number of leads and or information that were not followed to a logical conclusion or alternatively, a written record of those investigative efforts were not documented and reviewed by this writer.

There was no convincing evidence of motive despite evidence that Frank and Jeanne were romantically involved during the summer of 1983. In 1981, Jeanne Lyon married Ed Lyon, who provided significant financial support for the custody dispute. At the time of the murder, Jeanne and Ed Lyon were married. This information established motive for Jeanne Lyon, and possibly Ed Lyon, but did not establish motive for Frank O'Connell. Frank and Jeanne Lyon only became romantically involved while she was separated from Ed between June and August 1983; by all accounts, their affair ended after she reconciled with Ed in August 1983. No one states that there was an ongoing amorous relationship. There was no evidence that Frank had ever involved himself in Jeanne's custody dispute and no explanation as to why he would assist Jeanne in murdering Jay five months after his affair with Jeanne ended. These facts should have raised red flags in the minds of detectives, indicating that there was a serious problem with their theory of guilt and that further investigation was warranted.

Given the absence of a compelling motive, the detectives had an even stronger obligation to exhaust leads pointing to alternate suspects and to disclose this information to prosecutors for their consideration as part of their Brady obligations.

### a)    Failure to Investigate Jeanne Lyon

At the time of the French murder investigation the wife of the victim was an important witness particularly in the context of background and pedigree information as is the case in any murder investigation where a spouse is murdered. Knowing that Jeanne Lyon has the most to gain from the death of the victim and therefore a motive, a reasonable detective would have focused investigative efforts on her and her circle of friends, relatives, associates and co-workers.

Though detectives conducted two limited interviews of Jeanne Lyon, the record does not reflect that there were concrete investigative steps taken to exclude her as a conspirator in the murder. A reasonable detective at a minimum would have:

- Conducted a more thorough interview of Jeanne Lyon to develop background information including her relationships personal and professional during the years of her marriage to French and the time frame up to and after the murder of French
- Verified the alibi of her husband, Ed Lyon, conduct a criminal check and research his circle of friends and relatives
- Interviewed Jeanne Lyon's sister, Deborah Zitella, who worked in the same office building as Jeanne
- Obtained and investigated telephone and bank records from Ms. J. Lyon from her residence and business

There is evidence that detectives arrested Jeanne Lyon's sister, Vickie Bedwell, on murder charges, but did not memorialize what information they learned during her interrogation. Failure to memorialize the interrogation of any person for whom there was probable cause to arrest constitutes an extreme departure from accepted police practices.

Simply stated, detectives assigned to the French murder failed to fully and completely focus their investigation on the sole known individual who had a motive to benefit from the death of the victim, Jeanne Lyon. Her prior actions towards the victim including kidnapping their mutual son and attempting to murder the victim demonstrate to any reasonable criminal investigator that the nature of her extreme prior actions are more than sufficient reason to pursue her as a credible suspect in the French murder. A reasonable, experienced detective, consistent with acceptable police practices, would not have failed to fully and completely explore this investigative line of inquiry.

### b)   Failure to Investigate Prior Attempt Involving Randy Smith

In approximately 1980, Jeanne Lyon and Randy Smith (who was similar in appearance to O'Connell) attempted to run down Jay French. The fact that there was a prior murder attempt on the victim, would cause a reasonable detective to take the following actions:

- Interview family law attorneys David Peale and Peter Wisner
- Obtain a copy of any and all police, including investigative, reports pertaining to that criminal incident
- Obtain arrest affidavits and any court related file
- Talk to the assigned investigator of that crime to obtain any background information that may not have been reflected in a report
- Identify witnesses, vehicle involved and conduct background investigation of them to include their alibi's

47

- Conduct a full background check on Randy Smith, including records, obtain photographs, research associates and vehicles and alibi should be verified
- Prepare a mug show-up folder including Smith's photograph to show to the murder eyewitnesses
- Interview Randy Smith regarding his knowledge and participation in this crime; memorialize interview in police report
- Interview Jeanne Lyon regarding this past attempt on the life of her ex-husband

There is no record or reference to an investigation of a prior attempt on the life of the victim in an investigative supplementary report. In fact many years later, Detective Smith agreed that there was nothing in the report about the prior attempt on the life of Jay French also agreeing "absolutely" that that would be important, something he would put in notes, follow-up on and investigate (P001455, 1456).  He had no recollection of doing any follow-up on Randy Smith (P001465).

The failure to investigate this prior attempt is contrary to acceptable police practices.  An intentional failure to investigate thoroughly and document and disclose this information is an egregious violation of generally-accepted police standards and practices. If a determination was made by the LASD that Gina French's information was less than credible or manifested other signs that her observations were not believable, a reasonable officer at the time would have documented those observations and conclusions.

### c)    Anonymous Tip & Failure to Thoroughly Investigate Jeanne Lyon

Detectives had an obligation to investigate the anonymous tip stating that Jeanne Lyon had hired a hit man – not Frank O'Connell – to carry out the murder, as the tip supplied an equally plausible, if not more plausible, explanation for what happened and also dovetailed with information concerning Randy Smith's potential involvement.

While the detectives' notes show that they conducted at least some follow-up concerning the alleged hit man, Richard Stevens, neither the notes or report memorialize what information the detectives uncovered. There is no evidence that they interviewed any of the persons named Richard Stevens, conducted surveillance on Catalina Street, obtained a physical description or photos of Richard Stevens/Mark Fred Stevens, photographed the car observed on Catalina Street, or conducted interviews or investigation to determine who drove or had access to the yellow, wood grained Ford seen on Catalina St.. Given the absence of a compelling motive, detectives' failure to exhaust these leads,

suggests a lack of objectivity and unwillingness to follow investigative information to a logical conclusion that resulted in a reckless disregard for the truth.

Detectives determined that the yellow, 1972 Ford vehicle observed on Catalina street was licensed to a couple that had apparently moved to Texas. A reasonable detective would not have ceased investigation of the car based on information that the registered owner moved out of state. Since the car was obviously left behind, and was being used by someone living in Pasadena, detectives should have sought to determine who was using the car (by surveilling the car and canvassing the neighborhood).

A reasonable investigator would *not* have limited their efforts to the name supplied by the anonymous caller (because the caller may have been mistaken about the name of the contract killer) and the car observed on Catalina street. In addition to the name and car, the anonymous tip necessitated further investigation of Jeanne and Ed Lyon, including their finances. By the time the tip was received, detectives were already in possession of information corroborating key elements of the lead (i.e. Jeanne Lyon and Jay French divorced in 1978, resulting in a bitter custody concerning their son, Jay Jr.), and were in fact aware that the custody dispute had resulted in kidnapping by both parties, [11] protracted family court litigation, and a possible prior attempt on the victim's life.

At a minimum, a reasonable detective would have done the following:

- Investigate Jeanne and Ed Lyon's financial records to determine whether they had the means to $7,000 for a contract killer and whether any withdrawals had been made near the time of the murder.
- Investigate the amount of money they had paid in attorneys' fees over the course of the custody dispute
- Interview Jeanne Lyon's employers and co-workers to determine whether any were aware of relevant information, such as a request for an advance or loan. This investigation should have included all attorneys in the office in which she worked, including James Mack.
- Determine whether Jeanne Lyon knew someone named James (the contract killer's associate, according to the tip)
- Investigate potential connections to Oregon
- Conduct a complete canvas of Jeanne Lyon's neighborhood (While there is documented contact with some of the neighbors of Jeanne Lyon, a full and complete neighborhood canvass should have been

---

[11] In 1979 after Mr. French was granted custody of their child, she absconded with their child and was arrested for that action in 1980.

49

undertaken to include determining information about any and all males and females observed at the residence as well as vehicles).

### d)    Gina French's Indication of an Unidentified Male Associated with Jeanne Lyon

In February 1984, Gina French advised detectives that Frank O'Connell, who she had observed in court, was not the man she knew to be Frank O'Connell. A reasonable detective would realize that this clearly indicates that there was another unidentified male of a similar description associated with Jeanne Lyon.  An interview with Ms. French should have been conducted and an effort made to identify who the person was that she knew to be O'Connell.

### e)    Failure to Investigate Frank O'Connell's Alibis

Detectives similarly failed to reasonably investigate Frank O'Connell's alibi to determine whether he had an opportunity to commit the murder. Detectives received information that Frank O'Connell was home with his roommates on the morning of the murder until "lunchtime." Detectives interviewed Scott Egerer but evidently did not interview his other roommate, Jim Hamilton, or Jim Hamilton's girlfriend, Karen Baxter, who would have established that Frank O'Connell was at the house when she arrived at approximately 1:30 p.m. and remained at the house until shortly before 2:00 p.m.

A reasonably trained detective would have taken separate sworn statements from each of Frank O'Connell's alibi witnesses to lock them into their story, and then determined whether any evidence corroborated or dispelled their account. For example, detectives could have corroborated this information by obtaining copies of Ms. Baxter's time cards from work, where she had been until approximately 1:15 p.m., and/or canvassing the neighborhood for witnesses that could support their sworn statements. A reasonably trained detective similarly would have explored whether the alibi witnesses were biased (i.e. whether they were good friends of Frank O'Connell's) and whether they had any incentive to lie to protect him. It is my understanding that, had detectives investigated their credibility, they would have learned that all three witnesses were regarded as very credible people and that Hamilton and Baxter were not, in fact, good friends of Frank O'Connell.  Despite the importance of alibi evidence in confirming or negating opportunity, detectives did not give this aspect of the investigation sufficient weight, suggesting a lack of objectivity and singular focus on Frank O'Connell and reckless disregard for the truth.

### f)    Failure to Thoroughly Investigate Oregon and California DMV Records

Finally, as witnesses described the vehicle utilized by the murderer, a motor vehicle registration check of yellow Ford Pinto station wagons should have

been undertaken both in the state of California *and Oregon*. Names of record should be cross checked with those names that have any and all relation to this investigation.

### 2.  Detectives' Singular Focus on Frank O'Connell

While no criminal investigation is perfect and without unintentional errors and omissions, significant basic investigative failures occurred in this case. The number and scope of the investigative deficiencies in the French murder investigation lead this writer to conclude that the investigation was inconsistent with minimally accepted police standards and practices.

Given the absence of credible motive, strong alibi evidence, and leads pointing to alternate suspects, the question that arises is this: what explains the Detectives' focus on Frank O'Connell?  The failure to consider alternate theories and suspects indicates that the officers focused in on Mr. O'Connell to the exclusion of other information that they were in possession of and had an obligation to pursue.  Instead of probing obvious weaknesses in the investigation, they rested on a small part of the information available to them. Whenever a criminal investigator or supervisor adopts a myopic view of uncorroborated circumstances of a crime, the results of that investigation tend to be tainted with nonobjective conclusions.  Their efforts were clouded by the notion that under no uncertain terms, Frank O'Connell was the involved subject, thus not yielding to the possibility of an outcome other than that which was preconceived.

Failure to question and consider alternate theories of a crime, particularly in light of a prior attempt on the life of the victim and an anonymous tip with specific information relative to a contract murder of the victim by a former spouse with whom a continuing multi-year child custody dispute is inconsistent with minimally-accepted police practices.

## IV.   LASD POLICIES & TRAINING

It is my understanding that Plaintiffs' counsel requested all policies and training in effect between 1984 – 1985 regarding the disclosure of exculpatory evidence, report writing, eyewitness identification and compliance with constitutional requirements. See Exhibits 411, 412, 413, 414. In response, LASD has produced California POST standards for this time period and various other general policies concerning homicide investigations. [12]  LASD 30(b)(6) witness, Mike Bumcrot, has confirmed that LASD had no policies beyond those listed in Exhibit 425. See Bumcrot, pp.1038-1040.

---

[12] LASD also produced a Field Officer Training Manual, but produced no materials addressing advanced investigatory training for detectives.

**Ex. 707-51**

POST standards reflect basic training requirements for all California police officers. The 1984 – 1985 standards include a Code of Professional conduct, which provides in part**,** that all law enforcement officers have a responsibility to stay abreast of current case law as it applies to their duties. Exhibit. 404, pp. 25 - 34. The standards also reflect that all officers were trained to prepare complete, accurate and objective police reports, including all contradictory information. *See* Exhibit. 401(POST 5.3.2, p. 8(D7025), pp. 27-29 (D7044 – 7046) (characteristics of a good report include completeness and accuracy; p. 85 (D7102) ("show objectivity by recording positive as well as negative facts…") p. 87 (D7104) ("hide nothing" "all information…must be accurate").

Significantly, none of the training materials mandate what materials must be included in a murder book (e.g. chronology of all investigatory activity, all leads, etc.) and none specifically address mandatory reporting and testimonial requirements under *Brady*. As far as I can determine from the materials provided, there were no policies or directives in place during the 1984 – 1985 that described the *Brady* rule, defined "exculpatory evidence" and other key concepts, or explained the affirmative duty of law enforcement to recognize, memorialize and relay exculpatory information. The LASD similarly lacked training regarding the necessity for investigative objectivity and the pitfalls for not exploring all investigative leads.  Lastly, while officers appeared to have been trained on "show up" procedures, I found no procedures for the administration of photo arrays except a copy of an admonition administered with photo arrays, which is undated. See Exhibits 415, 416.

Sheriff's Department representative Mike Bumcrot, a former LASD homicide detective and 30(b)(6) deponent,  testified that in the early 1980's, most homicide detectives attended some type of detective training but the majority of the training was on-the-job (dep. pp.1015,1016).   A formal DOJ one week homicide school in the 1980's was attended by some detectives, not all, and Mr. Bumcrot indicated that someone could serve in homicide at that time and not attend the homicide school  or attend years after their initial assignment to the Bureau (dep. pp.1029- 1034). He noted that the district attorney provided training in the form of memos sent to the LASD and had classes (dep. pp.1017-1022).

He further recalled that there existed no formal LASD policies or formal documents regarding  an officer's constitutional obligations  including Brady obligations, (dep. pp.1036-1042), notebook or case file procedures regarding discovery , photo lineup identification procedures, report writing (dep. pp. 1088 – 1091)  as well as the responsibilities of a Homicide Lieutenant (dep. p.1105). On-the-job training was the primary source of training and was dependent upon the individual (s) tasked with training a new detective regarding these subject matters. Mr. Bumcrot noted that the murder book did not include notebooks (dep.

p.1087) and  there was no established procedure or policy to turn over notebooks to the DA (dep. pp.1088,1089).

In the absence of such policies, the DA had to rely on detectives interpreting what information not contained in the police report and  remained secreted in a detectives notebook qualified as discovery information.  The detective after making that determination would or should advise the DA of that particular information.  The obvious issue with this process, in the absence of policies, was the reliance of detectives to not only make that determination but after having done so, advise the DA.  The inclusion of that information in police reports would  have ensured delivery of the information to the DA for  their consideration or in the alternative, a police/procedure  ensuring that a DA had all of the detective notebooks for each  homicide prosecution.

Also. had there been a policy or procedure to ensure that supervisors reviewed all materials generated  in the homicide investigation and were trained to look for and identify *Brady* type information and transmitted that information to the DA, that could have served as a buffer to ensure there was compliance with this legal mandate.

The lack of policy, therefore directly contributed to violations of the requirement for discovery of information required by *Brady* and considered to be exculpatory in nature.

Based on available and limited materials provided, I conclude that, in 1980- 1985, the LASD failed to implement adequate policies and consistent training regarding the disclosure of exculpatory information and eyewitness identification procedures. (And based on discovery produced in this case, there appear to be no *Brady* policies in place to this day). The absence of such policies and training does not comport with national standards and reflects the agencies' gross departure from meeting.aw enforcement agencies' responsibility for ensuring their officers are aware of and comply with constitutional rules. The Commission on Accreditation for Law Enforcement Agencies (CALEA), specifically provides that police agencies are responsible for implementing constitutional requirements through department policy and training. CALEA (1.2.3, 2006, pp.1-4). Failure to implement written policies is "… is to simply leave employees 'in the dark' in the expectation that they will intuitively divine the proper and expected course of action in the performance of their duties…" (Auten, 1988, pp.1-2???). A violation of constitutional rights is a highly predictable consequence of failure to equip officers with guidelines to handle recurring situations, as exemplified by the LASD in the period 1980-85.

Police agencies inform agency employees and implement *Brady* requirements through policies, training and supervision.  In the early 1980's U.S. police agencies were fully aware of and compliant with the 1963 Supreme Court

53

decision of Brady v Maryland. At a basic level, law enforcement was aware that it was their duty to preserve and forward all information of an exculpatory nature and that that information must be presented to a prosecutor for his/her consideration.  There was an expectation that a law enforcement agency would ensure personnel were aware of their obligations and through their supervisors, ensure that officers were complying with these mandated requirements.  While not all agencies had detailed formalized policies, as espoused and codified by the International Association of Chiefs of Police (IACP) years later, law enforcement agencies trained to make certain employees were aware of what was required, necessary and ensured compliance through agency supervision. This obligation was obvious in light of Supreme Court rulings, certainly by the time of *Harlow v. Fitzgerald* in 1982,  that individual law enforcement officers were responsible to know "clearly established law"  or face liability. During the 1980's, based on clearly established law in the 9th Circuit and in other jurisdictions throughout the United States, it was generally understood that information favorable to the defense including such things as alternate suspect information, contradictory statements and interviews as well as impeachment evidence, had to be disclosed by law enforcement.

Police personnel, particularly investigators and investigative supervisors were aware of the dictates of the *Brady* decision, its implications on law enforcement and the obligations required of criminal investigators.  The absence of such policies, training and supervision to ensure that this occurred is inconsistent  with generally accepted police standards and practices.

Additionally, under *Brady* and P.O.S.T standards in effect in 1984, detectives are required to follow the basic tenets of police work to ensure that they find out the truth, and find out what really happened in a crime where such information is potentially exculpatory.  One type of exculpatory evidence is evidence pointing to another killer or suspect, especially where the killer or a suspect is also a witness for the police in a case.

The problem is especially acute where the detectives, as was the case here, ignored critical exculpatory evidence that should have been available to the defense. In their zeal to identify Mr. O'Connell as the correct suspect, they unquestionably withheld important favorable information regarding at least the Soucy identification and information regarding alternative suspects (and, if their testimony is credited by the trier of fact, Mr. Druecker and Mr. Villareal).  In a 2006 study by the Wisconsin Law Review entitled, "The Multiple Dimensions of

**Ex. 707-54**

Tunnel Vision in Criminal Cases," the causes of hundreds of cases of wrongful conviction in the last fifteen years were studied.[13]

The Wisconsin Law Review study stated, "A theme running through almost every case… is the problem of tunnel vision.  Tunnel vision is a natural human tendency that has particularly pernicious effects in the criminal justice system.  By tunnel vision, we mean that "compendium of common heuristics and logical fallacies," to which we are all susceptible, lead actors in the criminal justice system to "focus on a suspect, select and filter the evidence that will build a case for conviction, while ignoring or suppressing evidence that points away from guilt.[14]  This process leads investigators, prosecutors, judges and defense lawyers alike to focus on a particular conclusion and then filter all evidence in a case through the lens provided by that conclusion."[15] Further illustrations of the dangers of "tunnel vision," have been described by the Ryan Commission in Illinois that found evidence of tunnel vision in a number of the Illinois death row exonerations.[16] Just as reported in the 2006 study by the Wisconsin Law Review, the Ryan Commission's Report illustrated that in any given investigation, especially high-pressure investigations, the danger exists that rather than keeping   an open and objective mind during the investigatory phase, the police may prematurely conclude that a suspect is guilty.  Once the police have reached this conclusion, instead of fully investigating other possibilities, their investigation focuses exclusively on assembling facts that will convict the suspect.[17]

Experienced and credible homicide detectives are fully aware that they need to keep an open mind to ensure that the truth is determined and justice is done.

An effective *Brady* policy summarizes the constitutional rule, explains the agency's affirmative duty to report material of possible *Brady* significance,

---

[13] Keith Findley and Michael Scott, *The Multiple Dimensions of Tunnel Vision in Criminal Cases*, Wisconsin Law Review, 291 (2006).

[14] Dianne Martin, *Lessons About Justice from the Laboratory of Wrongful Convictions: Tunnel Vision, The Construction of Guilt and Informer Evidence*, 70 UMKC Law Rev. 847, 848 (2002).

[15] 3Myrna Raeder, *What Does Innocence Have to Do With It?: A Commentary on Wrongful Convictions and Rationality*, Michigan State Law Review, 1315, 1327-28, 2003

[16] Ryan Commission Report on Capital Punishment, page 20, April, 2002.

[17] Ibid.

**Ex. 707-55**

defines key terms according to the law.[18] The IACP Model *Brady* policy defines exculpatory as "evidence that is favorable to the accused; is material to guilt, innocence or punishment of the accused; and that may impact the credibility of a government witness, including a police officer. Impeachment material is included in the *Brady* disclosure requirement." The IACP model policy also provides examples of exculpatory evidence, including "information that casts doubt on the credibility or accuracy of a witness or evidence" and statements in whatever form that contradict any statement of a proposed government witness.

Effective *Brady* policies must emphasize that it is police officer's duty to preserve and relay *all potentially* exculpatory information so that it can be assessed by the prosecutor for potential *Brady* implications. The IACP recommends this language: "This department shall exercise due diligence to ensure that material of **possible** *Brady* relevance is made available to the office of the prosecutor." IACP Model Policy, Disclosure of Exculpatory Evidence, IV, A., 1, (emphasis supplied); IACP Model Policy IV, A. 3. ("It is the prosecutor's responsibility to establish whether material disclosed by this department must be provided to the defense); *see* also Concepts and Issues Paper re Brady Disclosure Requirements ("…law enforcement agencies are required to inform the prosecution of any evidence known to them that **could** meet the rule.") (emphasis supplied).

Effective *Brady* policies also emphasize that police must relay exculpatory information in a manner that guarantees it is actually brought to the attention of the prosecutor in time for effective use at trial. It is not sufficient to assume that a prosecutor will happen across exculpatory information buried in handwritten field notes. Because police reports are the primary means by which police communicate information to prosecutors, in virtually all cases, relaying exculpatory information means addressing it in police reports. *See* IACP, Model Policy re Disclosure of Exculpatory Evidence (IV, C., 1, 3, [supervisors are responsible for ensuring that *Brady* material is timely brought to the attention of the prosecutor] "through established reporting procedures."). An intentional failure to document and disclose potentially exculpatory information is an egregious violation of generally-accepted police standards and practices.

---

[18] As the IACP observes, mid to large size agencies may need centralized systems to ensure *Brady* material is accessible to officers. In larger agencies, *Brady* material may be dispersed across various locations including both obvious repositories (police reports, investigators' notes and personnel files), and less traditional locations (such aa dispatch center tapes, mobile data terminals and transmissions, video camera recordings, etc.). The IACP specifically recommends that mid-size and larger agencies consider a central linking system to ensure that information in diverse locations can be easily accessed.

**Ex. 707-56**

As the IACP acknowledges, successful implementation requires department wide training. IACP, *Brady* Disclosure Requirements, Concepts and Issues Paper, August 2008 (unless everyone in the department is aware of the *Brady* rules and understands fully their significance and the necessity and manner of reporting such matters, the policy cannot be effective.") (emphasis supplied). Critically, such training must address not only address the procedure for compliance, but also the factors that tend to undermine compliance, including officers tendency to discount evidence that does not fit their theory of guilt. As the IACP explains:

> This training should be designed to ensure not only a full understanding of the *Brady* rules, but also an awareness of the so-called "tunnel vision" phenomenon. This phenomenon tends to cause some investigators to ignore information that does not support their theory of a case. This type of information is often likely to be exculpatory as defined under the *Brady* rules. Unfortunately, it is also the type of evidence that, being considered "irrelevant" by investigators, is often discarded or even destroyed. *Id.*

Lastly, the IACP emphasizes supervisory oversight and accountability. The IACP model policy provides that "Supervisory officers are equally responsible for ensuring that they act with due diligence in identifying any potential *Brady* material connected with any criminal proceeding for which they have oversight and for bringing such material to the attention of the prosecutor in a timely manner through established reporting procedures."

Applying the standards and expectations of police officers in the 1980's, the LASD and in particular the criminal investigators and supervisors in the French murder investigation were seriously deficient in their obligation to comport with the mandates of *Brady*.   Using contemporary standards as espoused by the IACP, the LASD is markedly below generally accepted standards as they have had no policies, training and no apparent supervisory actions to ensure compliance with *Brady* requirements.

## V.  <u>SUPERVISION</u>

The testimony of former LASD Homicide Bureau Lieutenant Gilbert Leslie regarding supervision, training and policies, report writing and investigative actions serves to elucidate issues regarding these important police subject matters and their relationship to the French murder investigation.

Lt. Gilbert Leslie, was a Lieutenant and field supervisor in the LASD Homicide Bureau for approximately 10 years and in particular a homicide supervisor during the time of this murder investigation (Exhibit 609, pp.16-17).

He described his duties as ensuring investigators had all logistical support, were not overloaded with cases, had everything they needed at a murder scene, and made sure the press did not bother them ( Exhibit 609, p.17).  Additionally he described his role as going to a scene, had a person liaison with the press, made sure the hierarchy of the police department was kept aware of what they (investigators) were doing, ensured the paperwork flow, getting reports in a timely manner and that they put the murder book together and was briefed on investigative activities (Exhibit 609, pp.29, 30).

Lt. Leslie agreed that as a homicide supervisor, he had minimal involvement in how detectives handled specific leads (Exhibit 609, p.176).

Speaking to the task of report and file review, when asked if there was anything beside reading the report whether if there was anything else that he would do to familiarize himself with the evidence, Lt. Leslie responded, "No" (Exhibit 609, p.34).  Lt. Leslie affirmed that aside from reviewing reports, he did not review anything else, any other documents in the case (Exhibit 609, p.36).

## A. TRAINING

Lt. Leslie affirmed that he never helped train homicide detectives within the Bureau and did not provide any on the job training (Exhibit 609, p.51).

As to training, Lt. Leslie indicates he did not recall that there were any reference materials for homicide investigators concerning their job responsibilities (Exhibit 609, p.51).

Lt. Leslie did not recall ever speaking to anyone in the Homicide Bureau about the rule for prosecutors to turn over material exculpatory information (Exhibit 609, p.72). He also did not know whether homicide detectives were trained regarding their obligation to disclose exculpatory material (Exhibit 609, p. 74).  Lt. Leslie did not recall ever receiving any training on the Brady rule nor does he remember receiving training on what qualifies as exculpatory information, what had to be disclosed to the District Attorney or discovery obligations of homicide detectives (Exhibit 609, pp.249-250).

This writer concurs with the response of Lt. Leslie when questioned about that section of and interpretation of POST Training record  (Exhibit 401.3) that states good report writing includes  " of all information positive and negative and free from bias and unsubstantiated opinion"  that that would include information that contradicts the detective's theory of guilt and all information positive and negative as well as inconsistent statements by the same witness (Exhibit 609, pp.64-65). As noted in the prior pages of this report, the French murder investigation is replete with examples of how this mandate was not followed.

## B. REPORT WRITING and DISCLOSURE OBLIGATIONS

Leslie opined that he did not think that a police report should account for all of an officer's investigative activities explaining that many leads have no foundation and would basically be a waste of time to put it in the report agreeing that leads that are "dead" and need not be included in a police report (Exhibit 609, pp.39-40). He did respond however that he "thought so" in response to a question that if a lead is sufficiently viable to warrant a follow up investigation that is something that should be put in a police report (Exhibit 609, p.41).

Lt. Leslie stated that LASD detectives used notebooks to report their investigative activities and did not know if they received training regarding that, indicating that they would keep detailed notes in order to complete a detailed and correct report (Exhibit 609, pp.54-56). He did not know if it was standard practice to hold onto notes for the life of the case and beyond or if they were required to keep their notes; but was of the belief that notebooks were supposed to be maintained as part of the murder file (Exhibit 609, pp.56-57). Lt Leslie states he did not know but believed the notebooks were supposed to be maintained as part of the homicide file also noted that he did not think it was standard practice among homicide detectives to maintain their notebooks as part of the homicide file (Exhibit 609, pp.57-58). He affirmed that it was not the detectives practice to take all the information from their notebooks and put it into police reports and did not know how the rest of the information that remained in their notebooks that did not make it into the police report got transferred to the District attorney (Exhibit 609, pp.59-60).

Additionally, he did not remember if there were any policies that dictate whether information from notes had to be transferred into police reports or what information had to be transferred (Exhibit 609, p.61).

He did not know how, in practice, homicide detectives determined what facts go into the permanent record of police reports and did not remember ever talking to detectives about what was included versus what information was omitted (Exhibit 609, pp.61-62).

Regarding an area canvass, he opined that he did not think that it is important or necessary that all persons contacted on an area canvass and their comments be documented (Exhibit 609, p. 102).

In sum, Lt Leslie acknowledged that detectives were solely responsible on their own for determining what information, what negative information is valuable enough to include and what negative information they can leave out (Exhibit 609, pp.70-71). Further, he agreed that detectives exercised a good deal of discretion in determining what to include in police reports and agreed that they can chose the evidence that they find to be most persuasive and compelling to them and put

Ex. 707-59

that evidence in the police report, less persuasive, less compelling evidence would not necessarily need to be included (Exhibit 609, p.124).

Speaking to the issue of information disclosure and related topics, Lt. Leslie indicated that he was not familiar with the United States Supreme Court case Brady v Maryland or what's referred to as the Brady rule further indicating unfamiliarity with the rule that it is a violation of due process for prosecutors to suppress evidence that is favorable to the accused  Exhibit 609, pp. 71-72).

As to the documentation procedures regarding the eyewitness identification process, this writer concurs with Lt Leslie who noted that he would expect to see documented in a police report if a witness pointed to more than one photo or if the witness stated they were not sure about their identification that would be included in the report (Exhibit 609, p.86).  LASD investigative and supervisory personnel failed however, to ensure that the witness in this case who pointed to two photographs, was not articulated or characterized accurately in the French murder investigative reports.

This writer also agrees with the opinion of Lt. Leslie that information documented in a police report versus that which is document in a detective's notes that is contradictory about a photo identification is information that a defense attorney would like to have and is exculpatory  (Exhibit 609, pp.108-109).  Similarly he agreed that a police officer who advances evidence to a prosecutor and knows the evidence is false violates ethical responsibilities of a police officer (Exhibit 609, p.115).  These basic principles are readily understood by U.S. law enforcement supervisors and investigators, yet, information in the French murder investigative reports conflict with information recorded in notes.

Lt. Leslie did acknowledge that some of the specific leads available to French murder investigators should have been investigated and documented. They include the information contained in the anonymous tip (Exhibit 609, p. 150); the Randy Smith lead,  (Exhibit 609, pp.202-204) and if detectives had information that named Randy Smith who tried to kill the victim previously and that he did not show up at for his probation officer on the day of the murder, that should be included in the police report (Exhibit 609, p.206) as well as if the investigative team arrested somebody for murder, it should have been included in the report (Exhibit 609, p.215).  While there is evidence in the documents produced that some investigation did occur, there is a total absence of documentation in an official police report regarding those efforts.

## C.  EYEWITNESS  IDENTIFICATION

Lt. Leslie stated that as far as he could remember, the Homicide Bureau did not have any policies about eyewitness identification procedures during the 1980's (Exhibit 609,  p.82).  He stated he did not know if a detective would

admonish the witness on the photo identification procedure before giving them the photo lineup or if they gave them any instruction, nor if detectives were trained on how to administer a 6 pack photo lineup (Exhibit 609, pp. 82-83).

He also indicated that it was fair to say that as a homicide lieutenant, it wasn't his job to be familiar with the technique for administering any sort of eyewitness identification procedure (Exhibit 609, pp.234-234). When questioned about whether as a supervisor he was responsible for making sure the eyewitness identification process was done correctly, Lt. Leslie stated he was not (Exhibit 609, p.53)

## D. DETECIVE J.D.SMITH

Documents reviewed indicate that Det. Smith had basic law enforcement training as well as training in the field of homicide investigation (9617). M. Bumcrot in reviewing the training file of Det. Smith affirmed that as of January 1985, there appeared to be no indication that he received any formal detective training (dep. p.1136).

A performance evaluation in the period of time 6-1-85 to 6-1-86 reflects that his work was generally completed on schedule, had to be prodded to complete assigned work and missed pertinent points in reports (9605), Shortly after this evaluation period, he was transferred from homicide to a missing persons unit (9602-3). No performance appraisal was provided for this writers review for the period after he was transferred from homicide for 6/87 to 6/89.

In 1989 a memorandum to Captain Grimm indicated that J.D. Smith was told to "find a job within two weeks per your directive" (D8330).

Years later in a performance evaluation (1991) it noted Detective Smith's reports require a great deal of correction, he was not performing to capabilities and the appraiser wrote that he " did not understand why an individual with years of experience has not developed into an outstanding homicide investigator" (9589).

Information reviewed relative to the training and performance of Detective Smith is limited. The records however, reflect and document a number of deficiencies as noted above. In light of these deficiencies, they take on more significance in view of the serious shortcomings noted in the French murder investigation. An employee, specifically a homicide detective that has performance issues or is in need of improvement in areas of performance that include timeliness and content of reports as indicated in the documents provided, it is incumbent on investigative supervisors to work with and address such issues. Oftentimes it may be necessary to ensure that additional training or

**Ex. 707-61**

some form of remediation is provided.  There is no evidence that this occurred in this instance.  This is contrary to minimally accepted police standards and practices.

## E. ANALYSIS AND OPINIONS

Summarizing, Lt. Leslie stated that investigative reports need not include all investigative activities, did not know if the practice was to maintain notebooks as part of the file nor did he know if there was training provided regarding notebooks and did not know how information that remained in notebooks and was not contained in police reports was transferred to the District Attorney.

Importantly, he did not know how detectives determined what facts were recorded in police reports and stated that he did not think it was necessary to include all information obtained during an area canvass in police reports. He acknowledged that detectives were solely responsible for determining what information of an incriminating and exculpatory nature was included in their reports.

Lt. Leslie indicated that he was not familiar with *Brady v Maryland*, never talked to detectives regarding exculpatory information and never received training regarding *Brady*.

He also indicated that the LASD had no policies regarding eyewitness identification procedures, that it was not his job to be familiar with identification procedures and was not responsible for making sure eyewitness procedures were done correctly.

Lt. Leslies' asserts that he had minimal involvement in investigations, only reviewed the investigative supplemental reports in the murder book and no other information the file, did not contribute to the training of detectives, and  had no recollection of reference materials or policies regarding the homicide function of the LASD including eyewitness identification procedures. Speaking to the lack of awareness of some homicide lieutenants of *Brady* obligations and other knowledge that an experienced homicide detective had or is expected to have, Mike Bumcrot noted that lieutenants in homicide are managers, not detectives and had never been homicide detectives (dep. pp.1114-1116).  He agreed that in his experience, normally the only documents that a lieutenant saw were the police reports (dep. p. 1107),

Consistent with generally accepted police standards and practices, investigative supervisors should be familiar with report writing and note retention practices, should be familiar with eyewitness identification procedures and making sure investigators comply with legal and proper investigative procedures. Lt. Leslie should also have reviewed all materials in the murder book and case

Ex. 707-62

file, should be involved in the training of subordinate personnel, and should have had a familiarity and a working knowledge of *Brady v Maryland*. These deficiencies serve to explain how and why numerous and significant failures existed in the French murder investigation.

Further, the fact that Lt. Leslie declares that he never helped train detectives and never looked beyond the supplemental reports within the homicide file, does not contribute to formulating an acceptable, standardized methodology for investigating and documenting homicide investigations particularly in the absence of written policies.  Supervisory behavior of this type does not ensure that deficiencies and inappropriate behavior is detected and corrected.  It is wholly inconsistent with generally accepted police practices that investigative supervisors do not contribute to the training, education and on the job training of subordinate personnel.  Investigative supervisors particularly those who investigate and supervise homicide investigations, consistent with minimally-accepted police practices, are tasked with critically reviewing those reports for timeliness, content, accuracy, compliance with the law and clarity.

While no homicide investigation is perfect absent errors or honest mistakes, the volume and nature of deficiencies present in this homicide investigation far exceed an acceptable level of performance based on generally accepted police standards and practices.

Standards promoted by the IACP dictate specific protocols for "Follow-up Investigation, including Managerial Responsibility and Reports."  IACP Training Key #332, copyright 1983, states in part:

Investigative Supervision

-coordinating and directing the unit's investigative efforts

-supervising personnel on a continuous basis

-training and developing investigators

A text regarding the supervision of police personnel clearly notes that one of the principal duties of the supervisor is the training of his subordinates and states this vital function is an integral part of a supervisors job which cannot afford to be omitted or performed carelessly (Iannone, pp. 329, 332).

Further as to case review, the IACP indicates that the review of the progress of ongoing investigations is one of the most important responsibilities of the supervisor (IACP TK 332, 1982).

Lt. Leslie and investigators violated generally accepted police practices and standards of documenting investigative activities contemporaneous to

Ex. 707-63

actions taken and subsequent critical review of those reports by supervisors. Supervisory personnel failed to adhere to four generally-accepted reasons for an officer to write a report which include: as an historical record, as a management tool, as an aid in testifying in court, and as a guard against civil or related actions that may be brought against the officer or agency (IACP TK 434, 1993).

.   The record is clear that homicide detectives were afforded independence on how they conducted their investigations and how they documented that investigative information.  It is clear that there were no written policies regarding the LASD Homicide Bureau function.

As  evidenced by the testimony of Mike Bumcrot and Lt. Leslie, LASD Homicide Bureau supervisors at the level of lieutenant, those tasked with reviewing and approving investigative reports, did not have the requisite experience and training to adequately supervise those under their charge.  Not surprisingly then when Lt. Leslie testified about his lack of experience and knowledge in homicide investigative practices and protocols, the LASD created a situation where supervisory staff literally knew  less about homicide investigative matters than those they were charged with supervising.

The collective lack of strong supervisory oversight, to correct, question, direct and reinforce department policies and standards or in their absence (as is the case with the LASD) advance contemporary and generally accepted police practices can and does allow officers to act in any fashion they so desire. If there are no guidelines, no or limited supervisory intervention of any type or if detectives are unfamiliar with existing guidelines or lack sufficient training in critical areas of investigation including, report writing, note taking, eyewitness interviews and identification procedures, investigators are left to conduct investigations as they pleased and report investigative results in a similar manner. This, however, can also foster an environment to cut corners, take shortcuts or follow methods inconsistent with generally-accepted police customs and practices. That is exactly what appears to have occurred in this case. Given the scope of the deviations from acceptable practices by the investigative detectives in this murder investigation and analysis of supervisory actions, I would conclude that there was an absence of active supervision.

Taken in totality and based upon my education, training and experience, it is my opinion that the supervision of this investigation, did not meet minimally-acceptable police practices in place during the period of time this crime was committed and investigated by officers from the LASD.

## VI.   SUMMARY OF OPINIONS

### Opinions Restated

Specific deficiencies in this investigation as iterated in the prior pages of this report pertain to the category of report writing, note taking, information disclosure, and eyewitness identification procedures as well as training, policy, and supervision.

I would conclude that the Los Angeles Sheriff's Department failed to properly investigate and document the murder investigation of Jay French according to established professional standards. As a result, the documentation that occurred did not meet minimum police standards and practices, and resulted in information disclosure violations. Additionally, the lack of agency policies as well as supervisory action and inaction were the causative factors that led to and/or exacerbated those serious deficiencies.

In the French murder investigation, a number of affirmative investigative steps, and significant investigative information and evidence known to investigators, remained undocumented in an official LASD police report. The official reports in this case both omitted exculpatory information documented in police notes, and contained misrepresentations of fact as documented and explained in this report. Even if leads were exhausted or discounted as relevant to the French murder investigation, at a minimum the lead and any qualifying factors should have been provided and included in an investigative supplementary report or a minimum made certain that investigative notes and their significance were provided and given to the prosecutors for their consideration as part of their obligation to disclose information to the defense.

This opinion is based upon:

-Failure to follow critical investigative leads and initiate the appropriate follow up investigation.

- Failure to investigate the prior attempt to murder the victim is contrary to acceptable police practices. If a determination was made by the LASD that Gina French's information was less than credible or manifested other signs that her observations were not believable, a reasonable officer at the time would have documented those observations and conclusions.

- Failure to pursue information in February 1984, when Gina French advised detectives that Frank O'Connell, who she had observed in court, was not the man she knew to be Frank O'Connell. A reasonable detective would realize that this clearly indicates that there was another unidentified male of a similar description associated with Jeanne Lyon. An interview with Ms. French should have been conducted and an effort made to identify who the person was that she knew to be O'Connell.

65

- Failure to reasonably investigate Frank O'Connell's alibi to determine whether he had an opportunity to commit the murder. Detectives received information that Frank O'Connell was home with his roommates on the morning of the murder until "lunchtime." The extent to which detectives investigated Mr. O'Connell's alibi is unclear.  Mr. Egerer testified at trial that he was interviewed by South Pasadena.

- Investigators failed to question and consider alternate theories of the crime, particularly in light of a prior attempt on the life of the victim and an anonymous tip with specific information relative to a contract murder of the victim by a former spouse with whom a continuing multi-year child custody dispute.

- Failure to challenge and recognize that Jeanne Lyon had a compelling motivation to kill or have killed the victim.

- Failed to document completely and accurately what transpired during the investigation.

- The failure to document a potential further lead based on a phone call, Detective Smith evidently spoke with Monsignor Clement J. Connolly at the Archdiocese of Los Angeles regarding an anonymous tip about the case. The notes and police reports do not indicate what information, if any, detectives learned regarding the tip.

- The failure to document consistently with information in handwritten notes taken by one of the detectives.  According to the notes, Ms. Lyon told detectives that, prior to New Year's Day, she had not seen Mr. O'Connell for 30 – 45 days (i.e., she did not say he had been living with her for the past several months).

- Failure to fully and completely  investigate the anonymous tip stating that Jeanne Lyon had hired a hit man – not Frank O'Connell – to carry out the murder, as the tip supplied an equally plausible, if not more plausible, explanation for what happened and also intersected with information concerning Randy Smith's potential involvement.

- Failure to investigate the totality and implications of information supplied by an anonymous caller (because the caller may have been mistaken about the name of the contract killer) and the car observed on Catalina Street.

- Failure to recognize that in addition to the name and car, the anonymous tip necessitated further investigation of Jeanne and Ed Lyon, including but not limited to their finances.

- The failure to document their investigation of the anonymous tip, if any, of a possible contract killer, Richard Stevens/Stephens, the yellow Pinto observed

66

**Ex. 707-66**

at the Catalina St. address, or any persons connected to Richard
Stephens/Stevens.

- Failure to obtain photographs of the yellow, wood grain vehicle observed
at the Catalina Street residence.

- Failure to obtain and memorialize physical descriptions and/or photos of
Mark Fred Stevens or Richard Edward Stephens to confirm whether these
individuals matched descriptions of the suspect.

- Failure to document their investigation of Richard Stevens. While the
detectives' notes show that they conducted at least some follow-up concerning
the alleged hit man, Richard Stevens, neither the notes or report memorialize
what information the detectives uncovered.

- Failure to document any reference to the tip and car in the police report,
they also failed to photograph the vehicle, precluding the defense from
investigating whether any eyewitnesses recognized it as the getaway vehicle.
There is no indication that the police conducted interviews or otherwise
attempted to determine who actually used the yellow Ford, who may have had
access to it, and whether such individuals matched the description of the shooter.
There is also no indication that police probed into work or personal associates of
Jeanne Lyons, even though the nature of the tip strongly suggested that it came
from someone well acquainted with Jeanne Lyons.

- Failure to document in official police reports detectives' efforts to
investigate Randy Smith. Documents in the police file show that detectives
planned a trip to Oregon in December 1984 (folder entitled "Oregon DEC 1984,
containing photos of Randy Smith, post card for hotel in Lebanon, Oregon,
message to JD Smith from parole and probation officer in Oregon regarding type
of weapon involved in previous weapons charge, map of Lebanon Oregon).

- Failure to document as indicated in the handwritten notes in the LASD
file, that at least one detective spoke with Randy Smith's probation/parole officer.

- Failure to document that which was in handwritten notes which indicates
that at least one detective interviewed an acquaintance of Jeanne Lyon and
Randy Smith (the interview subject is unclear and could have been Randy
Smith). The witness advised the detective that Randy Smith was last in California
in 1980.

- Failure to document or investigate information that R. Smith did not
appear for a probation office appointment on 1-5-84, the day of the French
murder.

- Failure to document or accomplish an interview of Randy Smith.

67

- Failure to document that Gina French provided a description of Randy Smith that was consistent with the shooter.

- Failure to document or investigate or follow up of Peter Weisner who handled the child custody case involving French and Lyon.

- Failure to document that Gina French indicated Vickie Bedwell matched the description of the getaway driver.

- Failure to document the arrest of Vickie Bedwell and what if any connection it was to the French murder investigation.

- Failure to document and interview D. Lopez, the sister of J. Lyon who had blond hair matching the getaway driver.

- Failure to document that A. Villareal told detectives that he was unable to make a positive identification.

- LASD Detective Smith demonstrated a pattern and practice of only documenting incriminating information in this case and failed to document exculpatory information.

- Notes reflecting that detectives conducted an investigation in Oregon directly contradict the habeas testimony of Detective J.D. Smith, who maintained that he did not recall doing anything to follow up on Randy Smith.

- Failure of Detective J.D. Smith who was present during the 1985 trial to advise the court or prosecutor that Ms. French had previously indicated that, in February 1984, she did not recognize Frank O'Connell as the person she believed to be Frank O'Connell.

- An improper handling of eyewitness documentation procedures.

-The failure to properly document the results of eyewitness procedure. Witness Soucy did not make a positive identification as indicated in the police report, rather he selected two photographs as indicated in the detective's notes.

- Did not recognize pursuant to his obligations to do so, that Mr. Soucy's selection of two photos was favorable to the defense in that it negated the reliability of his purported identification, and therefore qualified as exculpatory information for the purpose of *Brady*.

- Failure to accurately document that witness Thomas Butler did not identify O'Connell as indicated in the police report.

**Ex. 707-68**

- Failure to document the Druecker eyewitness identification procedure and document the circumstances  as to the limitations of the ability of Druecker to identify a suspect.

-Failed to accurately and completely document the result of area canvasses.

- Failed to document Brenda Rogers' statement that she never saw O'Connell connected to a yellow Pinto vehicle.

- Failed to document Pamela Wilson's information who advised the LASD that she had not seen O'Connell in a yellow Pinto.

- A collective failure to document multiple investigative activities, information and leads that had not been resolved (or had been resolved and not documented), led to a failure of the District Attorney to be aware of such information, and therefore resulted in information disclosure violations as required by Brady.

-Failed to have policies that assist, inform and consistently educate LASD homicide investigators about acceptable police standards and practices in the arena of homicide investigation.

- Supervisory deficiencies including the absence of training for subordinate personnel.

- Supervisory deficiencies in terms of a critical review of all the contents in a homicide investigative file and its interrelationship to that which is investigated and documented in a supplemental report.

When I consider the sum total of all of these failures together, I can only opine that this investigation and the supervision of this investigation was a significant departure from minimally accepted police practices.

This concludes my findings and opinions in this case based upon my examination of the documents. I respectfully reserve the right to modify my opinion based upon the receipt and examination of additional information. Additionally, I reserve the right to supplement my opinions should J.D. Smith become available for testimony.

For my work on this report, my understanding is that I will be compensated at a rate of three hundred dollars per hour and three thousand dollars per day for sworn testimony and out of town travel plus expenses.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true, to the best of my knowledge and belief.

**Ex. 707-69**

I declare under penalty of perjury that the foregoing is true and correct. Executed on January 18, 2017.

Sincerely,

Russell Fischer

ADDENDUM

This Addendum is provided only in the unlikely event that the Court determines that the fact of a polygraph exam is admitted into evidence

On February 15, 1984 Frank O'Connell submitted to a polygraph examination. The polygraph examination lasted approximately three hours. The length of the exam and scope of questions indicates that the purpose of the exam was not to test Mr. O'Connell's veracity on discrete issues, but instead, was conducted to obtain information. According to a report authored by Detectives Parra and Smith, the polygraph examiner concluded that Frank O'Connell had been deceptive in his answers. The polygraph transcript indicated that the examiner thought he was deceptive on questions regarding a yellow pinto (Exhibit 1.19, D3586). Significantly, **none** of the actual exam questions addressed a yellow pinto. The report and transcript provide no indication that Mr. O'Connell was dishonest when asked if he was present during the murder. He was subsequently interrogated under sodium pentothal (Exhibit 002, pp. 1 – 16).

**Ex. 707-70**

# EXHIBIT A

**Russell Fischer**
**2290 W. Marion Avenue**
**Punta Gorda, FL  33950**
**Cell Phone:  (786) 367-5000**
**Email:  fish1820@aol.com**

**PROFILE**

Thirty-three years police, managerial and investigative background including the planning, implementation and management of a variety of organizational programs and activities. Responsible for multi-million dollar annual budgets and specialized major crimes initiatives.  Consultant and instructor for the U.S. Department of Justice in Colombia regarding violent crime (homicide) and for homicidetraining.com as to Officer-Involved shootings and In-Custody deaths. Six years as an instructor for the International Association of Chiefs of Police for Internal Affairs: Legal and Operational Issues. Serves as a Department of Justice peer-reviewer.

**ACCOMPLISHMENTS**

- Managed, executed and shared in the development of the Department's first-ever venture to provide comprehensive police service for a contracted municipality. Ensured contract compliance, staffing selection, implementation and regular oversight with elected town officials and a professional manager while simultaneously managing a police district.

- Free Trade Area of the Americas and Miami-Dade General Elections principal in support of operational personnel.  Management role for the International Association of Chiefs of Police and Major Cities Chiefs September 2005 conferences.

- Super Bowl XLI Incident Commander.  Responsible for planning, designing, and implementing a federal, state, and local security model involving over 50 agencies.

- Shared Homicide managerial responsibility for the recovery and investigative operations as it related to the ValuJet Flight 592 crash in the Florida Everglades.

- Management of and funding procurement for various federal, state, and local task force projects concerning organized violent crime and narcotics groups and community-based programs.

- Part-time lecturer and instructor at the Metropolitan Police Institute, Miami-Dade College, International Association of Chiefs of Police (IACP), and for newly assigned detective/supervisory personnel, police recruits, and in-service training

**Ex. 707-72**

Russell Fischer                                                                                    Page 2

sessions.  Author of published articles for the Police Chief (IACP) magazine and Federal Bureau of Investigation Law Enforcement Bulletin.

- Served as the Department Hurricane and Emergency Operations Coordinator. Multiple committee participation and leadership roles, including the Electronic Control Device Committee, Use of Force Committee, and Post-Police Shooting Committee, committee chairperson and author of the Department's multi-million dollar Robbery Intervention Detail Program, which specializes in addressing violent crimes in the greater Miami area.

**EDUCATION**

University of Miami, Coral Gables, Florida
Graduated 1998          Master of Public Administration

St. Thomas University, Miami, Florida
Graduated 1984          Master of Science Degree

John Jay College of Criminal Justice, New York, New York
1973 – 1975                   All M.A. graduate course work completed, Criminal Justice

F.B.I. National Academy, Quantico, Virginia
December 1995 Graduate

**PROFESSIONAL EXPERIENCE**

**DIVISION CHIEF**
**2004-2008**                        **Miami-Dade Police Department**
Criminal Investigations Division, Uniform Services and Special Services Division Chief responsible for the management of major departmental elements, including Homicide, Robbery, Sexual Crimes, Domestic Crimes, Community Affairs, Central Records, Court Services and Warrants Bureaus, as well as the Miami International Airport, Port of Miami and the Special Patrol Bureau.

**POLICE MAJOR/CAPTAIN**
**1996-2004**                        **Miami-Dade Police Department**
Command-level assignments within investigative and operational areas, including Robbery, Professional Compliance (Internal Affairs), Economic Crimes, and Narcotics Bureaus, as well as the Northwest District/Miami Lakes Commander.

**POLICE OFFICER, SERGEANT AND LIEUTENANT**
**1975-2004**                          **Miami-Dade Police Department**
Various investigative and operational assignments.

Ex. 707-73

## Russell L. Fischer, Chief
## (Retired)

## Summary of expert witness / Consultant  cases:

**1.** Expert Witness, Deposition November,  2013
Hill v. City of Hammond, Indiana  2:10-CV-393
United States District Court, Northern District of Indiana
Expert Witness, Deposition November 2013

**2.** Stoney Bowles and Ellen Starlene Dodd v  Captain Mark Mayton et al.,
Case 4:14-cv-289-HLM    Georgia
Expert  Witness, Deposition

**Ex. 707-74**