1
PAUL B. BEACH, State Bar No. 166265
pbeach@lbaclaw.com
2
MICHAEL D. ALLEN, State Bar No. 198126
mallen@lbaclaw.com
3
LAUREN T. KRAPF, State Bar No. 292115
lkrapf@lbaclaw.com
4
LAWRENCE BEACH ALLEN & CHOI, PC
100 West Broadway, Suite 1200
5
Glendale, California 91210-1219
Telephone No. (818) 545-1925
6
Facsimile No. (818) 545-1937

7
Attorneys for Defendants
COUNTY OF LOS ANGELES, J.D. SMITH and ERIC PARRA
8

9
                **UNITED STATES DISTRICT COURT**
10
                **CENTRAL DISTRICT OF CALIFORNIA**
11

12
FRANK O'CONNELL, NICHOLAS    ) Case No. CV 13-01905  MWF (PJWx)
13
O'CONNELL,                   )
                             )
14
        Plaintiffs,          ) Honorable Michael W. Fitzgerald
                             )
15
    vs.                      )
                             )
16
J.D. SMITH; ESTATE OF GILBERT ) **DEFENDANTS' MEMORANDUM**
PARRA, COUNTY OF LOS         ) **OF POINTS AND AUTHORITIES IN**
17
ANGELES AND DOES 1-10,       ) **REPLY TO PLAINTIFFS'**
                             ) **OPPOSITION TO MOTION FOR**
18
        Defendants.          ) **SUMMARY ADJUDICATION AS**
                             ) **TO PLAINTIFFS' CLAIMS FOR**
19
                             ) **RELIEF UNDER SECTIONS IX**
                             ) **AND XI OF THE FIRST AMENDED**
20
                             ) **COMPLAINT TO THE EXTENT**
                             ) **THEY ARE BASED ON THE**
21
                             ) **ALLEGED FAILURE TO**
                             ) **DISCLOSE "ALTERNATE**
22
                             ) **SUSPECT" INFORMATION RE**
                             ) **RANDY SMITH**
                             )
23
                             ) [*Evidentiary Objections; Reply and*
                             ) *Objections to Plaintiffs' Statement of*
24
                             *Genuine Disputes; Response to*
                             *Plaintiffs's Additional Material Facts;*
25
                             *and Supplemental Declarations and*
                             *Exhibits filed concurrently herewith*]
26

27
                             Date:  March 6, 2017
                             Time: 10:00 a.m.
28
                             Courtroom: 5A

                             1

1    TO THE HONORABLE COURT, ALL INTERESTED PARTIES, AND TO

2    THEIR COUNSEL OF RECORD:

3    Defendants COUNTY OF LOS ANGELES, J.D. SMITH and ERIC PARRA

4    hereby submit the following Memorandum of Points and Authorities in reply to

5    Plaintiffs' opposition to their Motion for Summary Adjudication as to Plaintiffs'

6    Claims For Relief under Sections IX and XI of the First Amended Complaint to the

7    extent they are based on the alleged failure to disclose "alternate suspect"

8    information re Randy Smith ("R. Smith").

9

10   Dated:   February 14, 2017        LAWRENCE BEACH ALLEN & CHOI, PC

11

12

13                                     By /s/ Michael D. Allen
14                                        Michael D. Allen
                                          Attorneys for Defendants
15                                        COUNTY OF LOS ANGELES, J.D.
                                          SMITH and ERIC PARRA
16

17

18

19

20

21

22

23

24

25

26

27

28

# TABLE OF CONTENTS

**Page(s)**

MEMORANDUM OF POINTS AND AUTHORITIES.........................................1

I.   PLAINTIFFS FAIL TO CREATE A *GENUINE* ISSUE OF
     MATERIAL FACT THAT THE ALLEGEDLY "EXCULPATORY"
     INFORMATION REGARDING RANDY SMITH WAS
     SUPPRESSED BY THE LOS ANGELES COUNTY SHERIFF'S
     DEPARTMENT. .......................................................................................1

II.  PLAINTIFFS MISCHARACTERIZE THE UNITED STATES
     SUPREME COURT *KYLES* DECISION WHICH INDICATED
     THAT THE *TENDENCY AND FORCE* OF ALLEGEDLY
     UNDISCLOSED EVIDENCE IS TO BE CONSIDERED *ITEM BY
     ITEM*. ....................................................................................................5

III. WHILE THE TENDENCY OF THE ALLEGEDLY
     UNDISCLOSED NOTES ABOUT THE PRIOR ATTEMPT
     WOULD BE TO SUGGEST THAT THE "SOMEBODY" TO DO
     WITH JEANNE THAT FRENCH REFERRED TO WAS R. SMITH
     (AND NOT PLAINTIFF), IN LIGHT OF OTHER EVIDENCE,
     THE PURPORTEDLY UNDISCLOSED NOTES WOULD NOT
     HAVE RESULTED IN A  "SUBSTANTIAL" LIKELIHOOD OF A
     DIFFERENT VERDICT. ..........................................................................7

IV.  IN ADDITION TO THE FACT THAT THERE IS NO EVIDENCE
     THAT THE LASD SUPPRESSED THE ANONYMOUS TIP, AT
     MOST, IT WOULD SUGGEST THAT RANDY SMITH PLAYED
     A ROLE AS A "MIDDLE" OR "STRAW" MAN WHICH WOULD
     STILL NOT BE EXCULPATORY WITH RESPECT TO
     PLAINTIFF *BEING THE SHOOTER.* ...................................................10

V.   SINCE, AT MOST, THE EVIDENCE WITH RESPECT TO THE
     PURPORTEDLY UNDISCLOSED MATERIALS IS THAT THE
     PUBLIC DEFENDER *MIGHT* HAVE CONDUCTED SOME
     ADDITIONAL INVESTIGATION WHICH *MIGHT* HAVE LED
     TO SOME ADMISSIBLE EVIDENCE WHICH *MIGHT* HAVE
     BEEN SUFFICIENTLY FAVORABLE TO MEET THE *BAGLEY*
     STANDARD, THERE IS NO GENUINE ISSUE OF MATERIAL
     FACT AS TO A VIOLATION OF CLEARLY ESTABLISHED
     LAW. ....................................................................................................12

VI.  CONCLUSION ......................................................................................16

i

1

2

# TABLE OF AUTHORITES

3

4

**Cases**                                                                                    **Page(s)**

5

6

*Anderson v. Creighton*,
  483 U.S. 635 (1987) ...........................................................................13

7

*Ashcroft v. al-Kidd*,
  563 U.S. 731 (2011) ...........................................................................13

8

9

*Beaman v. Souk*,
  7 F. Supp. 3d 805 (C.D. Ill. 2014) ............................................9, 14, 15

10

*Brady v. Maryland*,
  373 U.S. 83 (1963) ..........................................................................1, 3

11

12

*Canales v. Stephens*,
  765 F.3d 551 (5th Cir. 2014) ...........................................................9, 15

13

14

*Carrillo v. Cnty of Los Angeles*,
  798 F.3d 1210 (9th Cir. 2015) .............................................................15

15

*Downs v. Hoyt*,
  232 F.3d 1031 (9th Cir. 2000) ..........................................................6, 10

16

17

*Harrington v. Richter*,
  562 U.S. 86 (2011) ..............................................................................7

18

*Kyles v. Whitley*,
  514 U.S. 419 (1995) .............................................................................6

19

20

*Malley v. Briggs*,
  475 U.S. 335 (1986) ...........................................................................12

21

*Mitchell v. Forsyth*,
  472 U.S. 511 (1995) ...........................................................................12

22

23

*Moore v. Illinois*,
  (408 U.S. 786 (1972) .......................................................................8, 14

24

*Pearson v. Callahan*,
  555 U.S. 223 (2009) ...........................................................................12

25

26

*Romero v. Kitsap County*,
  931 F.2d 624 (9th Cir. 1991) ..............................................................12

27

*Serrano v. Francis*,
  345 F.3d 1071 (9th Cir. 2003) .............................................................13

28

ii

*City and County of San Francisco v. Sheehan,*
135 S.Ct. 1765, 1775–76 (2015) ............................................................. 13

*Smith v. Almada,*
640 F.3d 931 (9th Cir. 2011) .................................................................... 7

*State Farm Mutual Automobile Insurance Company v. Warren Chiropractic*
*Rehab Clinic, P.C.,*
315 F.R.D. 220 (E.D. Mich. 2016) .......................................................... 10

*Strickler v. Greene,*
527 U.S. 263 (1999) .................................................................................. 1

*U.S. v. Cacace,*
796 F.3d 176 (2d Cir. 2015) ................................................................. 9, 15

*United States v. Agurs,*
427 U.S. 97 (1976) .................................................................................... 6

*United States v. Bagley,*
473 U.S. 667, (1985) .............................................................................. 5, 6

*Wilson v. Layne,*
526 U.S. 603 (1999) ................................................................................ 13

## <u>MEMORANDUM OF POINTS AND AUTHORITIES</u>

I.     <u>PLAINTIFFS FAIL TO CREATE A *GENUINE* ISSUE OF
MATERIAL FACT THAT THE ALLEGEDLY "EXCULPATORY"
INFORMATION REGARDING RANDY SMITH WAS SUPPRESSED
BY THE LOS ANGELES COUNTY SHERIFF'S DEPARTMENT.</u>

In *Strickler v. Greene,* 527 U.S. 263 (1999), the United States Supreme
Court emphasized that "[t]here are three components of a true *Brady* violation: The
evidence at issue must be favorable to the accused, either because it is exculpatory,
or because it is impeaching; that evidence must have been suppressed by the State,
either willfully or inadvertently; and **prejudice must have ensued**." *Id.* at 281-82.
Before even reaching the issues as to whether the information regarding alternate
suspect R. Smith was even "material" within the meaning of *Brady v. Maryland*,
373 U.S. 83 (1963) and, if so, the alleged non-disclosure was "predjudicial",
Plaintiffs are required to establish a genuine issue of material fact as to the alleged
suppression of such evidence.  Plaintiffs have not and cannot do so.

As an initial matter, there is no dispute that the alleged exculpatory
information regarding R. Smith was documented in notes by the Los Angeles
County Sheriff's Department ("LASD") detectives handling the murder
investigation. (Defendants' Uncontrovered Facts ("UF") 50-51.)  If the detectives
were really trying to "suppress" or hide this information, it begs the following
questions: (1) Why did they even document the information in their notes? or,
alternatively, (2) Why didn't they simply destroy the notes before presenting the
case for prosecution?  The answer is simple – the mere existence of the notes
undermines any notion that the LASD detectives were trying to suppress anything.

Furthermore, the evidence is undisputed that, as early as May, 1984, the
prosecutor specifically forwarded a discovery order to the LASD requiring the
production of their notes. (UF 128-129.)  Det. J.D. Smith specifically testified
during the habeas proceedings that it was his practice to turn over his notes, or any

other part of his file, especially if there was a discovery request from the defense for the investigation notes and Plaintiffs have offered nothing to create a genuine dispute that was his practice.  (UF 131.)  Nor is there any dispute that there is nothing in the LASD file indicating any follow-up from the prosecutor suggesting that she didn't receive the notes and other materials requested in the May, 1984 order. (UF 130.)  In an attempt to create a genuine issue, Plaintiffs rely on a Declaration by D.D.A. Juan Mejia indicating that the subject materials were not in the District Attorney's Office ("DA's Office") file when he was given the assignment to handle the habeas petition in September of 2009.  For multiple reasons, Plaintiffs' reliance on this "evidence" is misplaced.

There is nothing in DDA Mejia's declaration indicating that he had any knowledge as to what materials were in the DA's Office file **at the time of the underlying 1984/1985 prosecution**. Therefore, it is inadmissible because it lacks foundation. Tamia Hope, the prosecutor who handled the prosecution below, testified during the *habeas* proceedings that she had "a memory of receiving handwritten notes from every detective in every case when [she] was asked by the defense attorney to provide them."  (*See,* Defendants' Supplemental Ex. AB at D2567:21-25.)  Moreover, assuming the detectives did, in fact, disclose the notes in response to the May, 1984 letter she sent to them, Ms. Hope would "not necessarily" have maintained a copy in the DA's Office file after producing them to the defense counsel. (*See,* Defendants' Supplemental Ex. AB at D2570:2-5.) Notably, Ms. Hope testified that she did not have a system to keep track of what she turned over to the defense and she could not state with any certainty that she would have kept a separate copy in the DA's file of any notes she received from the detectives and turned over. (*See,* Defendants' Supplemental Ex. AB at D2569:20-D2570:5; D2579:9-19.)   Knowing this, Plaintiffs argue, based on Lara's speculation about things he "might have" or "would have" done if he had received the allegedly non-disclosed materials, that he must have not received the

notes at issue.[1]  For the following additional reasons discussed below, this speculation is insufficient to create a **genuine** issue of material fact.

While the record from the trial below indicates that Adolfo Lara, Plaintiff's public defender, did receive various notes (*see,* Defendants' Supplemental Ex. AB at D2649:11-D2650:3; Supplemental Ex. AF at D3937:9-17; D3938:8-22), he testified during the habeas proceedings that he could not recall whether he received the allegedly suppressed materials or not. (*See,* Defendants' Supplemental Ex. AB at D2650:4-16.)  That included the materials regarding R. Smith (as well as the other purportedly undisclosed notes). (Id.)  Notably, while there is evidence that Lara did, in fact, do follow-up investigation based on his belief that R. Smith was a suspect (UF 83-97), Mr. Lara admitted that he could not recall whether he made a strategic decision to not do certain additional follow-up on the R. Smith lead. (*See,* Defendants' Supplemental Ex. AB at D2661:23-D2662:2.)   In light of Ms. Hope's habeas testimony as well as Mr. Lara's habeas and deposition testimony, Plaintiffs' cannot create a genuine issue of material fact that the notes were not disclosed back in 1984-1985.

Therefore, the various responses by Lara in the cited portions of Plaintiffs' Ex. 608 in response to various hypotheticals regarding things he "would have done" had he received certain materials (*see,* Plaintiffs' Ex. 608 at 608-2:10-608-3:3; 608-3:15-608-4:1; 608-9:7-18; 608-10:11-608-13:18; 608-17:23-608-18:4; 608-19:3-608-21:25; 608-22:4-608-28:1; 608-30:3-608-31:3; 608-32:3-608-33:2; 608-34:2-608-36:25) is pure speculation that (1) he did not receive certain materials and (2) that he did not conduct the purported follow-up investigation that he "would have" done.  In fact, Lara admitted that, if he had received the notes about the prior attempt, he would have investigated R. Smith and looked into where he was on the

---

[1] As discussed in greater detail below in Section, II, *infra*, merely because a piece of evidence might have led to additional investigation that might have led to the discovery of admissible evidence, automatically make it "*Brady"* material.

1  date of the murder.  (UF 94-95.)  Yet, the undisputed evidence is that Lara did

2  precisely that.  (UF 87-93.)  As such, each of the statements about what he "would

3  have" done had he received the documents (which he testified that he did not recall

4  one way or another he received or not) lacks foundation and is insufficient to create

5  a genuine issue of material fact.

6      Moreover, with respect to the South Pasadena Police Department ("SPPD")

7  memo regarding the anonymous tip, there is no evidence that the LASD suppressed

8  this.  The evidence is that the SPPD memo was forwarded directly to the DA's

9  Office and then made its way back to the LASD file when the DA's Office sent it,

10  along with various other materials to the LASD sometime in February, 1993.  (UF

11  98-99.)  While it is true that the initial call regarding the anonymous tip was made

12  to a Sgt. Hunnicut from the LASD's Altadena Station, the fact that Sgt. Hunnicut

13  relayed this information directly to the SPPD is evidence that (1) Sgt. Hunnicut was

14  under the impression that the SPPD was handling the murder investigation[2] and (2)

15  that he was not trying to suppress the evidence, but rather forward it on to the

16  personnel he thought was handling the murder investigation so that it could be

17  properly investigated.

18      Furthermore, there is evidence that the SPPD had a practice of forwarding

19  information it gathered directly to the DA's Office.  In fact, during the underlying

20  criminal trial, it forwarded notes by the same Lt. Hatfield (who prepared the subject

21  memo) to the DA's Office, that were in turn produced immediately to Plaintiff's

22

23  [2] Consistent with this, there is nothing in the LASD file indicating that Sgt. Hunnicut relayed the
24  information he received to LASD's Homicide Bureau.  (*See,* Supplemental Declaration of Steve
   Lankford at ¶ 8.)  Given the sheer size of the LASD, which directly services an area in excess of
25  3,000 square miles (as far north as Antelope Valley, as far south as Lomita, as far east as San
   Dimas and as far west as Catalina Island) and has over 17,000 employees, combined with the fact
26  that, at the time the anonymous tip was called in (February, 1984), the LASD did not have the
   benefit of the internet, emails or otherwise the wider availability of centralized databases that
27  improvements in technology have allowed, the fact that Sgt. Hunnicut appears to have assumed
28  that the SPPD was handling the investigation is certainly, at a minimum, objectively reasonable.

public defender. (*See,* Defendants' Supplemental Ex. AF at D3937:10-24.)  Lt. Hatfield testified about some notes he took regarding an interview he conducted of one of Plaintiffs' purported "alibi" witnesses, Scott Egerer in January, 1984.[3] (See, Plaintiffs' Ex. 100.16.)  The fact that the SPPD memo was found in an envelope addressed **from the DA's Office to the LASD** is consistent with the fact that the SPPD forwarded the memo directly to the DA's Office.[4]

As such, there is no genuine issue of material fact that the LASD suppressed any of the "alternate suspect" material.

## II.   PLAINTIFFS MISCHARACTERIZE THE UNITED STATES SUPREME COURT *KYLES* DECISION WHICH INDICATED THAT THE *TENDENCY AND FORCE* OF ALLEGEDLY UNDISCLOSED EVIDENCE IS TO BE CONSIDERED *ITEM BY ITEM*.

Even assuming, *arguendo,* there was a genuine issue as to the alleged suppression, there is no genuine issue as to either the second and third prongs of the *Brady* analysis required by *Strickland*, i.e. "materiality" and "prejudice".  On July 2, 1985, approximately six months after the underlying criminal trial in the instant case, the United States Supreme Court, in *United States v. Bagley*, 473 U.S. 667, (1985) clarified the rule regarding what evidence is "material" within the meaning of *Brady*.  Specifically, *Bagely* held that "evidence is material only if

---

[3] Because Plaintiffs' Ex. 100.16 appears to have deliberately left out the portion of Lt. Hatfield's testimony where he impeaches Mr. Egerer, that portion of Lt. Hatfield's testimony is being attached with the instant reply papers as part of Defendants' Supplemental Ex. AF (at D4227:2-11).

[4] Plaintiffs' attempt to argue that the SPPD memo was not found in an old manila envelope post-marked from the DA's Office to the LASD when Det. Lankford took over the file lacks foundation.  Det. Lankford has been careful not to transfer the contents of any folder or envelope in his file to other folders or envelopes (*see*, Supplemental Lankford Decl. at ¶ 8) and the evidence is that the SPPD memo has been in that same old envelope each time Det. Lankford has brought the file to defense counsel's office. (*See*, Declaration of George Morris filed concurrently herewith at ¶¶ 5-6 and Declaration of Julia Valino filed concurrently herewith at ¶¶ 2-5.)

1    there is a reasonable probability that, had the evidence been disclosed to the

2    defense, the result of the proceeding would have been different." *Id.* at 682.   In

3    footnote 7 of the *Bagley* decision, the Supreme Court held that "a rule that the

4    prosecutor commits error by any failure to disclose evidence favorable to the

5    accused, no matter how insignificant, would impose an impossible burden on the

6    prosecutor and would undermine the interest in the finality of judgments."

7    *Bagley*, *supra,* 473 U.S. at 675; *Kyles v. Whitley,* 514 U.S. 419, 436-437 (1995).

8         In discussing *Kyles* , Plaintiffs mis-cite the correct standard by claiming

9    that *Kyles* held that '[m]ateriality is not assessed 'item by item,' but rather

10   requires cumulative assessment of **all** *Brady-violations* in view of the entire

11   record." (Plaintiffs' Opposition at 17:1-3 (bold emphasis in original; italicized

12   emphasis added).)  First, *Kyles* re-emphasized what *Bagley* stated ten years

13   earlier, i.e., that "the Constitution is not violated every time the government fails

14   or chooses not to disclose evidence **that might prove helpful to the defense**."

15   *Kyles, supra* (emphasis added).  In other words, contrary to Plaintiffs'

16   characterization of *Kyles,* just because a piece of evidence "might" prove helpful

17   does not automatically make it a "Brady-violation" if it is not disclosed.  Second,

18   Plaintiffs ignore the language in *Kyles* which emphasized that, in analyzing

19   whether the alleged non-disclosure of a particular item of evidence could

20   **potentially** be a Brady-violation, "[w]e evaluate the **tendency and force** of the

21   undisclosed evidence **item by item**; there is no other way." *Kyles, supra*, 514

22   U.S. at 436, fn 10 (emphasis added).

23         "The mere possibility that an item of undisclosed information might have

24   helped the defense, or might have affected the outcome of the trial, does not

25   establish 'materiality' in the constitutional sense."  *United States v. Agurs*, 427

26   U.S. 97, 109–110 (1976); *Downs v. Hoyt*, 232 F.3d 1031, 1036 (9th Cir. 2000)

27   (Court held no *Brady* violation where "[t]he most that can be said of these

28   materials is that they might have provided investigatory leads.") As discussed in

6

the moving papers, and further elaborated below, in analyzing the tendency and force of the alleged non-disclosed evidence pertaining to R. Smith, at most, it would have the tendency to suggest that R. Smith acted as a "straw" or "middle" man thus having minimal exculpatory force.  While Plaintiffs argue that these materials may have provided investigatory leads, that is not the standard for materiality.  Moreover, as discussed in greater detail below, Plaintiffs have not and cannot establish a genuine issue as to the third prong of *Brady*: prejudice.

## III.   WHILE THE TENDENCY OF THE ALLEGEDLY UNDISCLOSED NOTES ABOUT THE PRIOR ATTEMPT WOULD BE TO SUGGEST THAT THE "SOMEBODY" TO DO WITH JEANNE THAT FRENCH REFERRED TO WAS R. SMITH (AND NOT PLAINTIFF), IN LIGHT OF OTHER EVIDENCE, THE PURPORTEDLY UNDISCLOSED NOTES WOULD NOT HAVE RESULTED IN A  "SUBSTANTIAL" LIKELIHOOD OF A DIFFERENT VERDICT.

To prove a reasonable probability of a different result, the United States Supreme Court has emphasized that "likelihood of a different result must be **substantial**, not just conceivable." *Harrington v. Richter,* 562 U.S. 86, 112 (2011) (emphasis added).  In determining whether "prejudice" ensued, there is no *Brady* violation "unless the nondisclosure was so serious that the suppressed evidence would have produced a different verdict." *Smith v. Almada,* 640 F.3d 931, 939 (9th Cir. 2011).  As discussed in the moving papers, and as Plaintiffs alleged in ¶¶ 42-43 and 63 of the FAC, the tendency of the purportedly undisclosed notes regarding the purported prior attempt by French's life by R. Smith was to suggest that French's dying declaration that the shooter was "somebody or something to do with Jeanne" referred to R. Smith (and not Plaintiff).   In light of other evidence, however, the notes would have had minimal force and would not have risen to the "substantial" likelihood of a different result

1    required by the Supreme Court to prove the requisite prejudice of the alleged non-

2    disclosure.

3         First, all of the witnesses described the shooter as "tall" (and as tall as 6'3")

4    and none described the shooter as having a "full beard" while R. Smith had a full

5    beard at the time of the murder and was nowhere near 6'3". (UF 53-54, 58-59.)

6    Indeed, Jeanne Lyon, who knew both R. Smith and Plaintiff, testified that she did

7    not see a resemblance between R. Smith and Plaintiff "at all" (UF 63) and that R.

8    Smith was "much shorter" than Plaintiff. (UF 64.)  Second, based on the Linn

9    County, Oregon jail records, the evidence is that R. Smith had an alibi and could

10   not have been in South Pasadena on the day of the murder. (UF69-78.) Third, it

11   appears that R. Smith's alibi was confirmed by Lara, who not only admitted that

12   his notes confirm that he conducted his investigation as if he not only considered

13   R. Smith a suspect, but that he was aware that R. Smith was in Oregon during the

14   week of the murder[5]. (UF 86-96.)

15        The facts of the instant case are right in line with the United States Supreme

16   Court *Moore v. Illinois* (408 U.S. 786 (1972)) decision cited in the moving papers

17   which Plaintiffs completely ignore in their opposition papers.  Just like in *Moore*,

18   the alleged *Brady* violation was based on the purported non-disclosure of

19   information law enforcement had gathered about an "alternate suspect".  The

20   Supreme Court determined that the suppressed evidence did not violate petitioner's

21   due process rights, especially when compared to the identifications inculpating

22   petitioner. *Id*. at 797–98.   "Here, the elusive 'Slick' was an early lead the police

23   abandoned when eyewitnesses to the killing and witnesses to [the petitioner's]

24   presence" at the bar were found. *Id*. The Supreme Court concluded, "in light of all

25   of the evidence," the "Slick evidence" was "not material to the issue of guilt." *Id*.

26   at 797.

27   _____

28   [5] The fact that Lara did this follow-up investigation further confirms that the allegedly non-disclosed information regarding R. Smith was, in fact, disclosed.

1    "Evidence of potential leads that were not pursued or evidence showing

2    some investigators had doubts about Plaintiff's guilt is also not *Brady* material."

3    *Beaman v. Souk*, 7 F. Supp. 3d 805, 822 (C.D. Ill. 2014), *aff'd sub nom. Beaman*

4    *v. Freesmeyer*, 776 F.3d 500 (7th Cir. 2015).  *see also*, *U.S. v. Cacace*, 796 F.3d

5    176, 184 (2d Cir. 2015) (no prejudice by alleged failure to disclose statements

6    from confidential source suggesting that two additional individuals were part of

7    the conspiracy to murder, and thus no *Brady* violation from nondisclosure.  "The

8    participation of additional people in the murder was not inconsistent with

9    government's account of the ... murder ... [and] does not bear upon whether

10    [defendant] did what the government argued he did."); *Canales v. Stephens*, 765

11    F.3d 551, 576 (5th Cir. 2014) ("there is not a *Brady* violation every time the

12    government does not disclose an alternative suspect, especially when the other

13    suspect was not a particularly plausible one."); *Beaman v. Souk*, *supra,* 7

14    F.Supp.3d at 823 (C.D. Ill. 2014) (Evidence alternative suspect lied on polygraph

15    regarding involvement in the murder was exculpatory, but not material, because

16    alternative suspect had a "solid alibi and no other evidence to indicate his

17    guilt."  Even if technically possible the alternative suspect was involved, "he

18    would still have been only a speculative alternative suspect.").

19         As noted above, there is no dispute that Lara, Plaintiff's public defender,

20    did, in fact, have "other" notes in his file at the time of trial other than the SPPD

21    notes he received from the prosecutor during the trial and he could not recall

22    whether they included the notes regarding R. Smith.  (*See,* Defendants'

23    Supplemental Ex. AB at D2649:11-D2650:16; Supplemental Ex. AF at D3937:9-

24    17; D3938:8-22).  Moreover, Lara admitted that he could not recall whether he

25    made a strategic decision to not do certain follow-up on the R. Smith lead. (*See,*

26    Defendants' Supplemental Ex. AB at D2661:23-D2662:2.)   Lara's current

27    speculation that he "might" have done certain additional investigation does not

28    arise to "prejudice" under the *Brady* standard.  *Downs v. Hoyt*, *supra*.  For this

additional reason, there is no genuine issue of material fact as to Plaintiffs' claims under Section IX and XI of the FAC based on the alleged non-disclosure of the notes regarding "alternate suspect" R. Smith.

**IV. IN ADDITION TO THE FACT THAT THERE IS NO EVIDENCE THAT THE LASD SUPPRESSED THE ANONYMOUS TIP, AT MOST, IT WOULD SUGGEST THAT RANDY SMITH PLAYED A ROLE AS A "MIDDLE" OR "STRAW" MAN WHICH WOULD STILL NOT BE EXCULPATORY WITH RESPECT TO PLAINTIFF *BEING THE SHOOTER.***

Plaintiffs' attempt to suggest that the purportedly undisclosed SPPD memo may have been useful in suggesting that R. Smith played a role in the murder as a "straw" or "middle" man does not change the analysis. The tendency of the anonymous tip is to suggest that a "straw" or "middle" man was involved, but even if that could be proven, it would not rule out Plaintiff **as the shooter**. Plaintiffs' argument that, if Plaintiff were the shooter, Jeanne would not have "needed" a middle man (Plaintiffs' Opposition at 1:23-25) is not only naive, but also ignores the obvious fact that, if Jeanne wanted Plaintiff to do the job, but wanted to make it more difficult to trace the crime back to her, her paying a "straw" or "middle" man to funnel the money back to Plaintiff would be perfectly consistent with the SPPD memo.[6] Plaintiffs' argument that Jeanne did not "need" a middle man to hire Frank implies that a complete stranger to Jeanne was ultimately hired to be the trigger man. This argument only holds water if the evidence was that French did not recognize the shooter. Gina French's testimony, however, was that she heard French say that the shooter "looked like somebody

---

[6] "The alleged use of intermediaries is designed to conceal identity of those paying...") *State Farm Mutual Automobile Insurance Company v. Warren Chiropractic Rehab Clinic, P.C.*, 315 F.R.D. 220, 223 (E.D. Mich. 2016).

Jeanne hangs around with" (Plaintiffs' Additional Material Fact ("AMF") 39, which is evidence that victim French **recognized** the shooter.

Fully aware of this, Plaintiffs' opposition papers blatantly misconstrue facts pertaining to the SPPD memo and French's dying declaration.  First, Plaintiffs misconstrue various reported statements by several witnesses who heard French say he did not "know" the shooter by claiming that these same witnesses heard French say he did not **recognize** the shooter. (*See,* Response by Defendants to Plaintiffs' AMF 1-4)  There is a big difference in "knowing" somebody as opposed to merely recognizing them.  The undisputed evidence here is that French had an opportunity to see Plaintiff on at least one or more occasions. (UF 46-49.)  Also, based on the fact that French's own son was sleeping under the same roof as Plaintiff for an approximate six week period during the summer of 1983 is completely consistent with French potentially **recognizing** the shooter as the same person he knew was "hanging" with his ex-wife over the course of the prior year.

Thus, the fact that the evidence supports that French recognized the shooter (even though he did not know the shooter) undermines Plaintiffs' argument that the shooter could not have been Plaintiff because Jeanne may have used a "straw" or "middle" man.  More importantly, it further limits the force of the purportedly suppressed memo with respect to Plaintiffs' culpability.  Nor does the Plaintiffs' speculation about what the additional investigation that Lara "might have" done change anything.

For these additional reasons, Plaintiffs fail to create a genuine issue of material fact as to whether the anonymous tip would have had a substantial likelihood of a different result at the underlying trial.

///

///

///

11

**V.   SINCE, AT MOST, THE EVIDENCE WITH RESPECT TO THE PURPORTEDLY UNDISCLOSED MATERIALS IS THAT THE PUBLIC DEFENDER *MIGHT* HAVE CONDUCTED SOME ADDITIONAL INVESTIGATION WHICH *MIGHT* HAVE LED TO SOME ADMISSIBLE EVIDENCE WHICH *MIGHT* HAVE BEEN SUFFICIENTLY FAVORABLE TO MEET THE *BAGLEY* STANDARD, THERE IS NO GENUINE ISSUE OF MATERIAL FACT AS TO A VIOLATION OF CLEARLY ESTABLISHED LAW.**

Qualified immunity "is an **immunity from suit** rather than a mere defense to liability; and like an absolute immunity, it is effectively lost if a case is erroneously permitted to go to trial." *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1995) (emphasis in original).   Qualified immunity is designed to shield from liability "all but the plainly incompetent or those who knowingly violate the law." *Malley v. Briggs*, 475 U.S. 335, 341 (1986).

A public employee is entitled to qualified immunity if the defendant did not violate the plaintiff's constitutional rights. *Pearson v. Callahan*, 555 U.S. 223, 232 (2009).  Thus, for the reasons set forth in Sections I-IV, *infra,* because there is no genuine issue of material fact as to a constitutional violation with respect to the alleged non-disclosure of materials pertaining to "alternate suspect" R. Smith, Even assuming there could be a genuine issue as to a constitutional violation, the individual Defendants are still entitled to qualified immunity because the law was not "clearly established" at the time of the underlying investigation that "dead lead" evidence was "*Brady*" material.  *Id.*

Plaintiffs bear the burden of showing that the right allegedly violated was clearly established at the time of the alleged misconduct.  *Romero v. Kitsap County*, 931 F.2d 624, 627 (9th Cir. 1991).  Moreover, "[t]he contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Anderson v. Creighton*, 483 U.S. 635, 640 (1987).

12

1    "A government official's conduct violate[s] clearly established law when, at the

2    time of the challenged conduct, '[t]he contours of [a] right [are] sufficiently clear'

3    that every 'reasonable official would have understood that what he is doing

4    violates that right.'" *Ashcroft v. al-Kidd*, 563 U.S. 731, 739 (2011)

5    (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)); *Wilson v. Layne*, 526

6    U.S. 603, 617–18 (1999) ("If judges thus disagree on a constitutional question, it is

7    unfair to subject police to money damages for picking the losing side of the

8    controversy."); *Serrano v. Francis*, 345 F.3d 1071, 1077 (9th Cir. 2003).

9          Relevant to the instant Motion, the Supreme Court has "repeatedly told

10   courts – and the Ninth Circuit in particular – not to define clearly established law at

11   a high level of generality." *City and County of San Francisco v. Sheehan*, 135 S.Ct.

12   1765, 1775–76 (2015). The law and its application to the specific situation must be

13   so clearly established that the unconstitutionality of the alleged action would be

14   "beyond debate." *Id*. at 1774.  Here, the qualified immunity question at issue is not

15   the broader inquiry as to whether the law was clearly established that material and

16   exculpatory evidence needed to be disclosed, but rather whether the law was

17   clearly established at the time of the underlying 1984 investigation that "dead" lead

18   evidence was considered material and exculpatory. The law was not clearly

19   established **at the time of the underlying 1984 investigation** that the alleged non-

20   disclosure of evidence pertaining another possible suspect, who, at most, may have

21   had a part in the crime as a co-conspirator, but which did not exclude the person

22   being prosecuted of his/her involvement in the crime would constitute a *Brady*

23   violation.  To the contrary, cases preceeding the 1984 investigation indicated that

24   "dead lead" evidence was simply not "material" for purposes of *Brady*.

25          Once again, the evidence is that the notes regarding the prior attempt were

26   disclosed and Plaintiffs have failed to create a genuine issue of material fact that

27   they were not.  Either way, there is no dispute that the LASD detectives

28   documented the prior attempt in their notes. (UF 50-51.)  Nor is there any evidence

13

1   that they destroyed the notes.[7]   Moreover, the trial transcript makes it clear that

2   Lara had various notes in his possession at the time of the trial. (*See,* Defendants'

3   Supplemental Ex. AB at D2649:11-D2650:3; Supplemental Ex. AF at D3937:9-17;

4   D3938:8-22.)   So, for Plaintiffs to prove their case, they need to prove that the

5   LASD Detectives apparently chose not to disclose certain notes, including the

6   notes regarding R. Smith.   Assuming they could prove that, however, Plaintiffs fail

7   to cite to any legal authority preceeding the underlying investigation that would

8   have put LASD Detectives on notice that "dead lead" evidence was required to be

9   disclosed pursuant to *Brady.*

10   In fact, given the case law that existed at the time of the underlying

11   investigation suggested that the non-disclosure of such materials would not

12   violate the constitution.   Based on the United States Supreme Court's 1972

13   decision in *Moore v. Illinois*, *supra,* it was made abundantly clear that there is

14   "no constitutional requirement that the prosecution make a complete and detailed

15   accounting to the defense of all police investigatory work on a case." *Id*. at 795.

16   The fact that *Moore* found no constitutional violation where the alleged non-

17   disclosure involved police investigatory work involving an early lead on a

18   possible alternate suspect, the precise same issue in the instant case indicates that

19   the law was not clearly established regarding any requirement to disclose "dead

20   lead" evidence.   The fact that courts are still undecided as to whether such

21   materials need to be disclosed only indicates that the law is still not clearly

22   established as of today.   *See, e.g. Beaman v. Souk*, *supra,* 7 F. Supp. 3d at 822

23   ("Evidence of potential leads that were not pursued or evidence showing some

24   investigators had doubts about Plaintiff's guilt is also not *Brady* material."); *see*

25   *also*, *Canales v. Stephens*, 765 F.3d 551, 576 (5th Cir. 2014) ("there is not a

26   *Brady* violation every time the government does not disclose an alternative

27   _____

28   [7] Obviously they were preserved and still in the LASD file at the time Plaintiffs subpoenaed it at the time of the *habeas* proceedings.

14

suspect, especially when the other suspect was not a particularly plausible one."); *Beaman v. Souk*, *supra,* 7 F.Supp.3d at 823 (evidence alternative suspect lied on polygraph regarding involvement in the murder was exculpatory, but not material, because alternative suspect had a "solid alibi and no other evidence to indicate his guilt." Even if technically possible the alternative suspect was involved, "he would still have been only a speculative alternative suspect.").

Nor does the anonymous tip change the analysis because, at most, it would suggest that R. Smith played a role as a "middle" or "straw" man in the murder, but it would not have been exculpatory to Plaintiff being the shooter…especially given the evidence that the victim French recognized the shooter as somebody who Jeanne "hangs" out with. (Plaintiffs' AMF 39.)  The law was not clearly established that non-disclosure of participation of additional persons in a crime is a *Brady* violation. *See*, *U.S. v. Cacace*, *supra,* 796 F.3d at 184 (no *Brady* violation where the "participation of additional people in the murder was not inconsistent with government's account of the ... murder ... [and] does not bear upon whether [defendant] did what the government argued he did.")

Plaintiffs' reliance on *Carrillo v. Cnty of Los Angeles*, 798 F.3d 1210 (9th Cir. 2015) to oppose qualified immunity **at the instant juncture** is misplaced. The issue that was before the Court in *Carrillo was* Defendants' argument that the law was not "clearly established" at the time of the underlying 1984 investigation that the *Brady* decision (which imposed an obligation on **prosecutors** to disclose "exculpatory" evidence) applied equally to police officers.  Since that decision involved a different issue and and took place **at the pleadings stage** of the instant litigation, the Court was bound to accept all allegations pled as true could not have considered any of the evidence submitted in support of the instant Motion in its ruling.  Indeed, when this Court denied qualified immunity, it expressly stated that it was "without prejudice" to raising it on summary judgment based on what "evidence turns out." (*See,* Reporter's Transcript on September 23, 2013 Motion

15

for Judgment on the Pleadings, Defendants' Supplemental Exhibit AA at 11:10-21.)

For these additional reasons, Defendants Smith and Parra are entitled to qualified immunity to Plaintiffs' claims under Section IX and XI of the FAC to the extent they are based on the alleged failure to disclose "alternate" suspect information re R. Smith.

## VI.    CONCLUSION

For each and all of the foregoing reasons, as well as the reasons set forth in the moving papers, Defendants COUNTY OF LOS ANGELES, J.D. SMITH and ERIC PARRA respectfully request that their Motion for Summary Adjudication be granted in its entirety.

Dated:  February 14, 2017         LAWRENCE BEACH ALLEN & CHOI, PC


                              By /s/ *Michael D. Allen*
                                  Michael D. Allen
                                  Attorneys for Defendants
                                  COUNTY OF LOS ANGELES, J.D.
                                  SMITH and ERIC PARRA