Barrett S. Litt, SBN 45527
Email: blitt@kmbllaw.com
Ronald O. Kaye, SBN 145051
Lindsay Battles, SBN 262862
KAYE, McLANE, BEDNARSKI & LITT
234 East Colorado Boulevard, Suite 230
Pasadena, California 91101
Telephone: (626) 844-7660
Facsimile: (626) 844-7670

Attorneys for Plaintiffs
Frank and Nicholas O'Connell

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| FRANK O'CONNELL, NICHOLAS O'CONNELL, <br><br> Plaintiffs, <br><br> vs. <br><br> J.D. SMITH; ESTATE OF GILBERT PARRA; ERIC PARRA; COUNTY OF LOS ANGELES AND DOES 1-10 <br><br> Defendants. | CASE NO. 13-01905-MWF (PJWX) <br><br> [HONORABLE MICHAEL W. FITZGERALD] <br><br> **Notice of Motion And Plaintiffs' Motion for Summary Adjudication or Partial Adjudication Re Liability Issues** <br><br> Date:  April 24, 2017 <br> Time:  10:00 A.M. <br> Courtroom: 5A |

TO DEFENDANTS AND TO THEIR ATTORNEYS OF RECORD:

PLEASE TAKE NOTICE that, on April 24, 2017, at 10:00 a.m., in Courtroom 5A of the United States District Court for the Central District of California, 350 West First Street, Los Angeles, California 90012, Plaintiffs Frank O'Connell and Nick O'Connell will, and hereby do, move the Court to find that Plaintiffs are entitled to partial summary judgment on the following issues:

1.      Frank O'Connell's due process right to a fair trial was violated by the suppression of material, exculpatory information including any of the items listed in number 2, below.

2.      Each of the following constitutes exculpatory, exculpatory evidence for the purpose of *Brady v. Maryland*:

a. Making a call in the presence of eyewitness Daniel Druecker affirming his identification of Frank O'Connell from a six-pack photo lineup;

b. Notes reflecting the fact that Maurice Soucy (who identified Frank O'Connell as having been driving a yellow Pinto while associating with Jeanne Lyon) initially made an equivocal identification of Plaintiff Frank O'Connell, including that he initially picked two photos;

c. False statements in the detectives' police reports indicating that a neighbor, Thomas Butler, positively identified Frank O'Connell from a six-pack lineup despite the fact that Mr. Butler made no such positive identification;

d. Notes reflecting the fact that Jay French had reported that his ex-wife, Jeanne Lyon, and an associate of hers, Randy Smith, whom she had known from Oregon, attempted to run him off the road while he was driving his motorcycle.

i

e. Information regarding an anonymous tip stating that Jeanne Lyon had hired a hitman to kill Jay French (which provided other details, including a vehicle closely matching the description of the getaway car).

3.    None of the above listed items were disclosed to the Los Angeles District Attorney's Office or Mr. O'Connell's defense attorney.

4.    Defendant Detective J.D. Smith failed to memorialize in official police reports or otherwise relay to the prosecutor each of the above-listed pieces of exculpatory information, thereby causing the violation of Frank O'Connell's right to a fair trial.

5.    Defendant Detective J.D. Smith acted with "deliberate indifference to or in reckless disregard for the accused's rights (Plaintiff Frank O'Connell) or for the truth.

6.    The County of Los Angeles and the Los Angeles Sheriff's Department failed to adequately train and supervise it deputy sheriffs in the handling and disclosure of Brady material, which was a moving force in the violation of Frank O'Connell's right to a fair trial and was cone with deliberate indifference.

Plaintiff's motion is based on this Notice of Motion, the complete files and records of this action, the Memorandum of Points and Authorities, and supporting declarations and exhibits filed and served concurrently herewith, and on any oral argument to be made at any hearing on the motion.

The parties met and conferred on this motion and were unable to reach substantive agreement.

1

DATED: February 24, 2017          Respectfully Submitted,

2

3                                 KAYE, MCLANE, BEDNARSKI & LITT, LLP

4                                 By: / s / Lindsay Battles
                                  Barrett S. Litt
5                                 Lindsay Battles
                                  Attorneys for Plaintiff
6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

iii

## Table of Contents

I.    INTRODUCTION ..................................................................................... 1

II.   SUMMARY OF FACTS ........................................................................ 3

    A.    LASD's Homicide Investigation .............................................. 3

    B.    Frank O'Connell's 1985 Trial & Conviction ......................... 5

    C.    Suppressed Exculpatory Evidence ......................................... 8

        1.    Suppressed Eyewitness Evidence .......................... 8

            a)  Daniel Druecker ............................................. 8
            b)  Maurice Soucy ................................................ 9
            c)  Thomas Butler ................................................ 9

        2.    Suppressed Alternative Suspect Evidence ............. 9

            a)  Prior Attempt Involving Randy Smith .......... 9
            b)  Anonymous Tip re Murder for Hire ............. 10
            c)  Investigation of the Murder-for-Hire Angle Would Have Yielded Evidence ............... 11

III.  ARGUMENT .......................................................................................... 12

    A.    Uncontroverted Evidence Establishes that Detectives Suppressed Material, Exculpatory Evidence ...................... 13

        1.    Suppressed Eyewitness Impeachment Evidence Was Material ...................................................... 14

            a)  Detectives' Affirmation of Druecker's Identification Was Material, Exculpatory Impeachment Evidence ................... 14
            b)  Notes Showing Soucy Failed to Make a Positive Identification from the Six-Pack Were Material and Exculpatory ................... 15

        2.    Misrepresentations in the Police Report Concerning Thomas Butler Were Material and Exculpatory ................ 16

        3.    Suppressed Alternative Suspect Evidence Was Exculpatory and Material .......................................... 17

iv

a) Jeanne and Randy's Prior Attempt ...................................... 17

b) Anonymous Tip ................................................................... 18

c) The Alternative Suspect Evidence was Favorable to the Defense Regardless of Whether the Tip was Independently Admissible ........................................................................ 20

4.    Collectively Assessed, the Suppressed Exculpatory Evidence Establishes a Strong Probability of a Different Result ....... 22

B.    J.D. Smith Is Liable Under §1983 For The Violation Of Mr. O'Connell's Rights ................................................................ 23

1.    JD Smith Caused The Suppression Of Exculpatory Evidence ........................................................................... 23

2.    Detective Smith Acted With Deliberate Indifference and Reckless Disregard .......................................................... 25

C.    The LASD is Liable for Failure to Train Detectives on the Disclosure Requirements Imposed by Brady v. Maryland .......... 27

IV. CONCLUSION .................................................................... 30

# <u>Table of Authorities</u>

## Cases

*Allen v. Scribner,*
  812 F.2d 426 (9th Cir.)........................................................................... 14

*Amado v. Gonzalez,*
  758 F.3d 1119 (9th Cir. 2014).............................................................. 14

*Banks v. Dretke,*
  540 U.S. 668 (2004) .............................................................................. 15

*Barker v. Fleming,*
  423 F.3d 1085 (9th Cir. 2005).............................................................. 22

*Benn v. Lambert,*
  283 F.3d ....................................................................................... 15, 19

*Brady v. Maryland,*
  373 U.S. 83 (1963) ............................................................................... 12

*Burge v. Parish of St. Tammany,*
  187 F.3d 452 (5th Cir. 1999)................................................................ 16

*Carriger v. Steward,*
  132 F.3d 463 (9th Cir. 1997)................................................................ 15

*Carrillo v. Cty. of Los Angeles,*
  798 F.3d 1210 (9th Cir. 2015)............................................... 18, 20, 23

*Carroll v. State,*
  568 P.2d 324 (Okla. Crim. 1977) ....................................................... 14

*Castro v. County of Los Angeles,*
  833 F.3d 1060 (9th Cir. 2016).............................................................. 25

*Celotex Corp. v. Catrett,*
  477 U.S. 317 (1986) ............................................................................. 27

*City of Canton v. Harris,*
  489 U.S. 378 (1989) ............................................................................. 28

*Connick v. Thompson,*
  563 U.S. 51 (2011) ........................................................................ 27, 28

*Crews v. County of Nassau,*
  996 F.Supp.2d 186 (E.D.N.Y. 2014)................................................... 28

*Cristini v. City of Warren,*
  2012 WL 5508369 (E.D.Mich. 2012) ........................................... 28, 29

*Davis v. Clark Cnty., Wash.,*
  966 F.Supp.2d 1106 (W.D.Wash. 2013) ............................................ 28

*D'Ambrosio v. Bagley,*
  2006 WL 1169926 (N.D. Ohio 2006) ................................................. 19

*Ellsworth v. Warden,*
  333 F.3d 1 (1st Cir.2003) ..................................................................... 21

*Emmett v. Ricketts,*
  397 F. Supp. 1025 (N.D. Ga. 1975) ........................................................... 24
*Ferguson v. Short,*
  2014 WL 3925512 (W.D. Mo. Aug. 12, 2014) .......................................... 28
*Galbraith v. County of Santa Clara,*
  307 F.3d 1119 (9th Cir. 2002) .................................................................... 26
*Gantt v. City of Los Angeles,*
  717 F.3d 702 (9th Cir. 2013) ...................................................................... 13
*Gantt v. Rose,*
  389 F.3d 908 (9th Cir. 2004) ...................................................................... 18
*Giglio v. United States,*
  405 U.S. 150, (1972) ......................................................................... 13, 15
*Gregory v. City of Louisville,*
  444 F.3d 725 (6th Cir. 2006) ...................................................................... 28
*Gumm v. Mitchell,*
  775 F.3d 345 (6th Cir. 2014) ............................................................... 18, 20
*Hayes v. Brown,*
  399 F.3d 972 (9th Cir. 2005) ...................................................................... 15
*Hernandez v. City of El Paso,*
  2009 WL 2096272, at p. ........................................................................ 16, 20
*Horton v. Mayle,*
  408 F.3d 570 (9th Cir. 2005) ...................................................................... 15
*Jackson v. Fogg,*
  589 F.2d 108 (2nd Cir. 1978) ...................................................................... 15
*Kingsley v. Hendrickson,*
  135 S. Ct. 2466 (2015) ................................................................................ 25
*Kirkpatrick v. County of Washoe,*
  843 F.3d 784 (9th Cir. 2016) ...................................................................... 28
*Kyles v. Whitney,*
  514 U.S. ............................................................................................... passim
*Lies v. Farrell Lines, Inc.,*
  641 F2d 765 (9th Cir. 1981) ....................................................................... 27
*Lindsey v. King,*
  769 F.2d 1034 (5th Cir. 1985) .................................................................... 16
*Manning v. Miller,*
  355 F.3d 1028 (7th Cir. 2004) .................................................................... 17
Mark Fred Stevens would have been,
  26 in 1984 ................................................................................................... 11
*Newsome v. McCabe,*
  256 F.3d 747 (7th Cir. 2001) ...................................................................... 17
*Paradis v. Arave,*
  130 F.3d 385 (9th Cir. 1997) ...................................................................... 19

vii

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

*Paradis v. Arave*,
  240 F.3d 1169 (9th Cir. 2001)..................................................................... 20, 21
*Reedy v. Evanson*,
  615 F.3d 197 (3d Cir. 2010) .............................................................................. 26
*Robinson v. Cain*,
  501 F.Supp.2d ..................................................................................................... 16
*Robinson v. Cain*,
  510 F.Supp.2d 399 (E.D. La. 2007) ........................................................... 19, 20
*Rodman v. Safeway Inc.*,
  125 F. Supp. 3d 922 (N.D. Cal. 2015) ............................................................... 14
*Rosales-Martinez v. Palmer*,
  753 F.3d 890 (9th Cir. 2014).............................................................................. 25
*Silva v. Woodford*,
  279 F.3d 825 (9th Cir. 2002).............................................................................. 15
*Singh v. Prunty*,
  142 F.3d ............................................................................................................ 15
Stephens supposedly lived at either,
  727 or 757 .......................................................................................................... 10
*Tennison v. City and Cnty of San Francisco*,
  570 F.3d 1078 (9th Cir. 2008)...................................................................... 20, 25
*U.S. v. Jarvis*,
  560 F.2d 494 (2nd Cir. 1977) ............................................................................ 14
*U.S. v. Jernigan*,
  492 F.3d 1050 (9th Cir. 2007)............................................................... 15, 17, 18
*U.S. v. Leonardi*,
  623 F.2d 746 (2nd Cir. 1980) ............................................................................ 14
*U.S. v. Olson*,
  704 F.3d 1172 (9th Cir. 2013)............................................................................ 21
*U.S. v. Price*,
  566 F.3d 900 (9th Cir. 2009).............................................................................. 21
*United States v. Agurs*,
  427 U.S. 97 (1976) ...................................................................................... 14, 22
*United States v. Bagley*,
  473 U.S. 667 (1985) .................................................................................... 21, 22
*United States v. Coppa*,
  267 F.3d 132 (2nd Cir. 2001) ............................................................................ 13
*United States v. Hayes*,
  376 F.Supp.2d 736 (E.D.Mich.2005) ................................................................ 13
*United States v. Oruche*,
  484 F.3d 590 (D.C.Cir.2007) ............................................................................. 13
*United States v. Sedaghaty*,
  728 F.3d 885 (9th Cir. 2013).............................................................................. 13

*United States v. Skilling*,
   554 F.3d 529 (5th Cir. 2009) ........................................................................ 24

*US v. Blanco*,
   392 F.3d 382 (9th Cir. 2004) ........................................................................ 15

*Walker v. City of New York*,
   974 F2d 293 (2nd Cir. 1992) ........................................................................ 28

*Wearry v. Cain*,
   136 S.Ct. 1002 (2016) .................................................................................. 13

*Williams v. Ryan*,
   623 F.3d 1258 (9th Cir. 2010) ............................................................... 17, 21

## Rules

FRCP 56(b) ....................................................................................................... 27
FRCP 56(d) ....................................................................................................... 27
Rule 56 ............................................................................................................. 27

## Other Authorities

Model Civ. Jury Instr. 9th Cir. 9.7 ................................................................. 35

# MEMORANDUM OF POINTS & AUTHORITIES

## I. INTRODUCTION

This §1983 lawsuit arises from Plaintiff Frank O'Connell's (also "Frank") wrongful conviction and (more than) 27-year incarceration. On January 12, 1984, Frank O'Connell was arrested for the murder of Jay French, a crime for which he consistently and unwaveringly maintained his innocence. He was convicted and sentenced to 25 years to life. On March 29, 2012, the Los Angeles Superior Court granted his habeas petition because LASD detectives failed to disclose material, exculpatory evidence including eyewitness impeachment evidence and alternative suspect evidence. Following the reversal, the District Attorney's Office declined to re-prosecute. By this motion, Plaintiffs seek summary adjudication (or partial summary adjudication) on whether Detective JD Smith and the LASD are liable under §1983 for the suppression of material, exculpatory evidence, in violation of his due process right to a fair trial. (Should the Court determine that summary adjudication is inappropriate as to some element of liability, Plaintiffs seek summary adjudication as to remaining elements, including, at a minimum, whether the evidenced was exculpatory and material).

Frank's conviction hinged on two witnesses' testimony: Daniel Druecker, the sole witness to the shooting, who identified Frank from a six-pack as the gunman, and Maurice Soucy, who linked Frank to the getaway vehicle. There was no physical evidence and only thin evidence of motive. The prosecution argued that Frank had been enlisted in the murder by the victim's ex-wife, Jeanne Lyon, with whom he had been romantically involved for less than two months the summer before the murder. The state's theory was that Jeanne arranged the murder to obtain custody of her son, Jay French Jr.

At the habeas hearing, Daniel Druecker recanted his prior testimony, stating that he was pressured into making an identification, was never sure of his selection

1

from a 6-pack photo lineup, and told that to the detectives. Because that testimony is contested, it is not the basis of this motion. However, because it is undisputed that detectives made, and did not disclose, a phone call in Druecker's presence affirming that he identified the suspect, that is part of this motion

The habeas discovery also revealed exculpatory evidence in detectives' handwritten notebooks not disclosed to the prosecution or defense at Frank's criminal trial. These notes reveal that Maurice Soucy, who alone connected Frank to the getaway vehicle, chose two photos from the six-pack, and did not "immediately" identify Frank as falsely represented in the police report. These undisclosed notes, first discovered during the habeas proceedings, also memorialize an interview with the victim's wife, in which she disclosed that the victim's ex-wife, Jeanne Lyon, had previously conspired with an Oregon-based friend, Randy Smith, to kill Jay French. This information was not reflected in police reports.

The alternative suspect evidence was material standing alone, but became even more significant in light of an anonymous tip received several weeks later (February 1984), indicating that Jeanne conspired with a male in Oregon to hire a contract killer. The tip provided an address for the alleged hitman, where detectives observed a yellow Ford vehicle with woodgrain sides, similar to witness descriptions of the getaway vehicle. The undisclosed anonymous tip and follow-up investigation were entirely omitted from police reports, and were not revealed until discovery in this case, even though all LASD files were subpoenaed for the habeas. This undisclosed tip would have supplied the defense with a plausible alternative to the prosecution's narrative, a basis to further discredit the police investigation, and a gold mine of investigative possibilities. And there is no question that investigation of the murder-for-hire theory would have yielded results. During the habeas investigation, several witnesses came forward with information that Jeanne

2

confessed to having hired a hitman (not Frank). Two of these witnesses were known to police in 1984 and were aware of the murder-for-hire plot at that time.

Discovery has also revealed that official police reports misrepresented the statements of a neighbor of Jeanne Lyon, Thomas Butler, who contacted police regarding a sighting of a yellow Pinto. Butler did not positively identify Frank as falsely represented in police reports. Though Butler did not testify in the underlying trial, evidence that detectives falsely reported his statements would have strengthened doubts regarding the integrity of the police investigation.

Undisputed evidence demonstrates that Detective Smith caused the *Brady* violations by failing to forward exculpatory evidence to the prosecutor, and that he acted with the requisite state of mind to support liability under §1983. Undisputed evidence likewise demonstrates that the LASD failed to provide any administrative guidance or training on detectives' obligation to disclose exculpatory evidence under *Brady*, supporting *Monell* liability under §1983.

## II.    SUMMARY OF FACTS

### A.    LASD's Homicide Investigation

On January 5, 1984, shortly before 1:16 p.m., Jay French was murdered in the parking structure of his apartment complex. While waiting for the ambulance, French told his wife, Gina, "This had to be somebody or something to do with Jeanne." UMF 4.[1] From approximately 250 feet away, delivery man Arturo Villareal, saw the assailant escape in a yellow, Pinto station-wagon with woodgrain sides. UMF 5, 6. He provided responding officers with a physical description: white male, late-20's, approximately 5'10, 160-170 lbs. with shoulder-length, blond hair. UMF 7. Another witness, Alex Sanchez, saw a yellow Pinto fleeing the

---

[1] Jay French told the first officer to arrive, William Gitmed, that he did not recognize the person who shot him. UMF 1. According to police notes, two other residents, Kimberly Wallach and Carol Gwenn, heard Mr. French say that he did not recognize the shooter. UMF 2. Another neighbor, Kenneth Dooley, heard Jay exclaim "the fucker in the yellow Pinto shot me"; he did not indicate that French recognized the shooter. UMF 3. No one said Jay indicated he recognized the shooter. UMF 2, 3, 4.

3

scene and described the passenger as 25-30 years old with *dark* brown hair. UMF 8. Only Daniel Druecker, who was nearsighted and not wearing corrective lenses, observed the shooting. UMF 9. He described the shooter as a white man in his 30's, approx. 6'0 or taller, with shoulder length dark *brown* hair. UMF 10.

That evening, Gina French told homicide detectives that Jay French and his ex-wife, Jeanne Lyon, had been embroiled in an on-going child custody dispute concerning their eight-year-old son (Jay French, Jr.). UMF 11. Ms. French provided names of various people connected to Jeanne Lyon, including her sister, Debbie (then Debbie Lopez), Mary Hilyard (one of the attorneys for whom Jeanne worked), and Frank, who she described as a "boyfriend." UMF 12.

Detectives subsequently learned that Frank met Jeanne and her husband, Ed Lyon, during a camping trip on Memorial Day 1983. UMF 13. In June 1983, Frank moved in with Jeanne in mid-June for approximately six weeks when she and Ed separated. . UMF 14. Although they had sex, they were not seriously, romantically involved. UMF 14-15. In early-August, Jeanne reconciled with Ed and Frank moved out. UMF 16. Frank did not often see Jeanne and Ed, but they remained in touch. UMF 17. On January 1, 1984, he accepted their invitation to join them cruising Colorado Blvd. UMF 18.

Detectives identified Frank as a suspect and included his photo in a 6-pack photo lineup. UMF 19. According to police reports, Daniel Druecker and Arturo Villareal positively identified Frank as the assailant. UMF 20. Alex Sanchez identified a photo, not Frank's, as resembling the passenger of the getaway car. UMF 21. Frank was arrested on January 11, 1983.

On January 27, 1984, detectives canvassed Jeanne Lyon's neighborhood to determine whether neighbors had observed a yellow-Pinto station-wagon. UMF 23. Thomas Butler told police he observed a yellow-Pinto between January and April 1983. UMF 24. According to the police report, Mr. Butler said the vehicle was driven by a white in his mid-20's who was always alone and would go inside for

25 minutes to an hour before leaving. UMF 25. Mr. Butler could not say if the car was there over the summer because he moved on 4/1/1983. UMF 26. The police report says that, on February 6, 1984, Butler chose Frank's photo from a 6-pack, "immediately" identifying him as the driver of the vehicle. UMF 27, 28.

Police reports indicated that detectives showed Maurice Soucy and his wife, Ina, nighttime photos of a "look alike" Pinto. They reported having seen a similar car during the summer of 1983. (These photo are dark and don't capture distinctive features of a Pinto, seriously undermining the identification's reliability). According to police reports, they positively identified Frank from the six-pack as the driver of the car. UMFs 29-33. A third neighbor, Michael Lewis, reported having observed a yellow Pinto, but did not identify anyone as the driver. UMF 34.

### B.    Frank O'Connell's 1985 Trial & Conviction

No physical evidence connected Mr. Frank to the murder. The prosecution's theory was that Jeanne Lyon enlisted Frank, with whom she had had a brief affair, to kill her ex-husband so to regain custody of Jay Jr. UMF 36. Gina French testified about the custody dispute and that Frank had once accompanied Jeanne to her apartment complex. UMF 37. The motive was Frank and Jeanne's brief "romance." UMF 38. Gina testified Jay told her that the shooter "looked like somebody Jeanne hangs around with," which the prosecution strongly argued necessarily and solely referred to Frank (despite Gina's originally reporting only that Jay said the murderer had to be "somebody or something to do with Jeanne"). UMF 39. Officer Gitmed's testimony that he heard Jay say he did **not** recognize the shooter was stipulated. UMF 40.

The centerpiece of the prosecution was, the only eyewitness Daniel Druecker, who claimed to have identified Frank as the gunman from a 6-pack photo lineup (and subsequently identified him in court). UMF 41, 43. The prosecution characterized this as the "strongest piece of evidence." UMF 42.

Arturo Villareal testified he saw the shooter escape in a yellow Pinto station wagon with woodgrain side panels. Contrary to the police report, at the preliminary hearing and trial, Villareal testified that he could *not* positively identify Frank as the shooter. UMF 44, 45. He testified that he told the detective that the photo he selected "looked like the man [he] saw, but [he] couldn't be positive.," UMF 46, and that he chose a person who resembled the assailant but was "not sure" it was the same person. UMF 47. Despite that testimony, JD Smith then testified that Villareal made a positive identification, UMF 48, 49, but also contradictorily testified that Mr. Villareal said "they all looked a lot a like, … but number 3 looked like the person that most likely looked like the person he'd seen." UMF 50. The selection of a photo accompanied by a statement that the photo "looks like the person that most likely looked like the person" is not a positive identification. [2]

Maurice Soucy's testimony was crucial as it supplied the sole connection between Frank and a yellow Pinto. Soucy testified that Frank drove a yellow Pinto station-wagon when he visited Jeanne during the summer of 1983. UMFs 52, 53. In contrast to Soucy, Mike Lewis testified that he saw a yellow Pinto between January and April 1983, but not during the summer of 1983 when Frank lived with Jeanne. UMF 54-56. Butler was not called to testify.

The defense presented three witnesses, other neighbors, who testified that no yellow Pinto had been parked near Jeanne's house during 1983. Jean Wilson and Brenda Rogers lived next door to Jeanne Lyon; Pamela Wilson lived across the street. UMFs 57, 66, 73. All testified that they were familiar with the appearance of yellow Pintos and did not observe a yellow Pinto on Shepherd Street from January 1983 through August 1983. UMFs 60, 61, 67, 76, 77, 78. Brenda Rogers and Pamela Wilson both testified that they had small children and kept an eye on the street. UMFs 68, 77. They were familiar with Frank, first observed him after Memorial Day 1983, and never saw him driving (or riding in) a yellow Pinto.

---

[2] Mr. Sanchez testified that he chose two photos; not a positive identification. UMF 51.

6

UMFs 58, 59, 61, 62, 67, 69, 70, 74, 75, 76. Jean Wilson testified that, for some period of time, Frank drove a large brown station wagon (distinguishable from a Pinto and which Frank also told Detectives when interviewed). UMF 63. Significantly, each testified that they had been interviewed by JD Smith and advised him they had seen no yellow Pinto on Shepherd Street. Their statements were omitted from LASD's police report. UMF 35, 64, 65, 71, 72, 79, 80. In closing, the defense argued that Soucy was mistaken regarding the presence of a yellow Pinto, and may have confused it with a large, brown station wagon Mr. O'Connell owned. UMF 81.

The defense also presented three alibi witnesses who were present with Frank in LaVerne, California, at the time of the murder. Frank's roommates, James Hamilton and Scott Egerer, testified that Frank was home with them the whole morning of the murder. Karen Baxter (Jim's girlfriend) testified she arrived at the house to meet for lunch around 1:30 and Frank was there. UMFs 82-87.

Relying heavily on what it characterized as "unusually strong" eyewitness identifications, the Superior Court found Mr. O'Connell guilty of first degree murder. It characterized Soucy's testimony as convincing evidence that Frank was connected to a yellow Pinto, and found that Frank's motive was his relationship with Jeanne Lyon. The Court characterized the alibi witnesses as credible, but believed their testimony was outweighed by eyewitnesses. UMFs 88-91. Mr. O'Connell was sentenced to 25 years to life.

Since the original trial, substantial exculpatory evidence has come to light, neutralizing or negating virtually all the prosecution's prior evidence, while raising serious questions regarding the competence and integrity of the investigation. On March 29, 2012, more than 27 years after the conviction, the Los Angeles Superior Court granted Mr. O'Connell's petition for a writ of habeas on the basis that police failed to disclose material, exculpatory evidence buried in handwritten notebooks that were suppressed from both the prosecution and defense. Although entitled to a

retrial, the District Attorney declined to re-prosecute. On June 1, 2012, all charges were dismissed.

### C.    Suppressed Exculpatory Evidence

Below we summarize exculpatory evidence that surfaced since the original trial. None of this evidence was disclosed to Mr. O'Connell's defense, as we address in §III, B (1), below.

### 1.    *Suppressed Eyewitness Evidence*

#### a) *Daniel Druecker*

According to Druecker, when detectives contacted him on the evening of the murder, he asked to be hypnotized. UMF 102. In response to being shown the six-pack, he told detectives "he didn't recognize anybody;" he needed to see side-view profiles and that he didn't see the shooter's face. UMF 103. The police responded by telling him to "really look at the photos," causing Druecker to believe that he was required to make a selection. UMF 104. Druecker then made a tentative and uncertain identification, asking the detectives "Is that the guy?" The detectives told him he had to be certain. UMF 105. None of this information was reflected in police reports or otherwise relayed to the defense.[3] Because it is disputed, this motion does not seek summary adjudication as to Daniel Druecker's testimony recanting his identification. UMF 101.

What is <u>not</u> contested is that Daniel Druecker's identification was not immediate and, after selecting a photo, one of the detectives made phone call in his presence indicating he identified the suspect. UMF 106. At the habeas hearing, Detective Smith testified he could not recall making a phone call affirming the identification, but agreed it was something he or his partner could have done. UMF 108. As the habeas decision recognized, JD Smith did not contest whether such a call could have occurred, UMF 246; it is therefore undisputed.

---

[3] Druecker's current testimony is significantly bolstered by the fact that scientific evidence has shown that his uncorrected eyesight was such that he could not make an identification. UMF 9, 107.

### b)    Maurice Soucy

During the habeas, the LASD produced previously undisclosed handwritten notes revealing that Soucy did not make a positive identification when first shown a six-pack. According to J.D. Smith's notes, Soucy identified <u>two</u> photos from the six-pack as possibly resembling the person he observed driving the Pinto. UMF 92. Another detective's notes indicate that Soucy identified Frank's photo as the "poss." driver of the Pinto. UMF 93. This information directly contradicts the police report's statement that Soucy "immediately" identified Frank's photo. Also, contrary to the police report, Maurice, not Ina, Soucy, said the driver of the car had "curlier" hair than Frank's photo. UMF 94.

### c) Thomas Butler

According to Butler's testimony in this case, contrary to the police report, he did not identify anyone from the six-pack as the driver of a Pinto he observed on Jeanne Lyon's street. UMF 98. Though he pointed to a photo resembling the driver, he "could not make any positive identification of anybody because [he couldn't] determine a face from across the street," and he "absolutely" told detectives he could not make a positive identification. UMF 99.

### 2.    Suppressed Alternative Suspect Evidence

### a)    Prior Attempt Involving Randy Smith

Suppressed handwritten notes indicate that, on the evening of the murder, Gina French disclosed that Jeanne Lyon and a white male, Randy Smith, tried to run over Jay French on his motor cycle several years earlier. UMF 111. Ms. French described Randy as "tall with sandy blonde hair."[4] UMF 113. The prior attempt was not memorialized in police reports, nor is there any document indicating that the police investigated further. UMF 114. Detectives did not promptly investigate

---

[4] Ms. French provided detailed information concerning the prior attempt, including a description of the vehicle involved (Ms. Lyon's green Capri), the location of the incident (near Sacred Heart Girls School). She also advised that Jay French had reported it to the Pasadena Police Department, and Jay's family law attorney, Peter Wisner. UMF 112.

Randy's whereabouts on the day of the murder, nor did they investigate whether he and Jeanne had recently been in contact. UMF 115.

### b) *Anonymous Tip re Murder for Hire*

On February 8, 1984, the LASD received a call from anonymous, male caller who relayed that Jeanne Lyon paid to have Jay French killed when she learned he received custody of the children; she **paid a male in Oregon $7,000.00, who in turn paid someone named Richard Stephens $5,000.00 to do the job**; Stephens supposedly lived at either 727 or 757 N. Catalina, Pasadena, in a rear house; Stephens had a female, Mexican accomplice and a male white or Mexican accomplice by the name of James.[5] UMF 125, 126. The caller's knowledge of the custody dispute and ability to provide detailed information provided inherent indicia of reliability. Moreover, detectives were already aware (from their interview of Gina French) that Jeanne had previously conspired with Randy Smith, a male friend from Oregon, to murder her ex-husband. Any reasonable police officer would have appreciated the possibility that Randy Smith had conspired in the subsequent, successful attempt.

The tip was first relayed to SSPD Lt. Hatfield, who was assigned to assist the LASD in the French murder investigation. UMF 127-128. A handwritten note, attached to the tip, indicates that, on February 22, 1984, detectives observed a 1972 yellow Ford, license plate 1ADV272, with "wood grain" enter the rear side of 757 N. Catalina. Detectives did not photograph the car (precluding having eyewitnesses determine if it matched the getaway car), and there are no notes indicating neighbors were questioned regarding how used or had access to the car or whether they matched descriptions of the shooter. UMF 129. The note references "Richard Stevens," "Rick?" and "Rosa" "(girlfriend)." UMF 130. None of this was incorporated into police reports. UMF 134.

---

[5] This information was relayed directly to detectives assigned to the French murder investigation. The Altadena substation relayed this information to Lt. Hatfield of the

The tip was contemporaneously relayed to Detective Smith. His notes show that some follow-up investigation occurred in February 1984 to determine the registered owners of the car (and reflect additional investigation in November 1984). Those notes also list persons with the last name "Stevens," including Mark Fred Stevens in connection with 717 Catalina St. in Pasadena, with a physical description and birth date for Mark Fred Stevens. [6] Mark Fred Stevens would have been 26 in 1984; he was 6-2 and 190 lbs. Detectives obtained no photos of Mark Fred Stevens to confirm whether he matched descriptions of the suspect. Detectives' formal police reports contained no reference to the anonymous tip, the caller's reference to a "male in Oregon," Richard Stevens/Stephens, the Ford observed on Catalina St., or other leads. UMFs 131-134.

### c)    Investigation of the Murder-for-Hire Angle Would Have Yielded Evidence

Although detectives investigated the reference to Randy Smith[7] they did not adequately investigate the murder-for-hire theory. According to notes first produced in *this case* (not produced in the habeas), at least one detective traveled to Oregon in **December 1984** and learned from Randy's probation officer that he failed to report to a mandatory appointment on 1/5/1984. Randy was interviewed did not provide an alibi for 1/5/84. UMFs 116-118. Detectives did not investigate Jeanne's finances, Randy's finances, or communications between them.

Investigation of the murder-for-hire theory would have yielded significant evidence. Habeas investigators identified several witnesses to whom Jeanne confessed that she hired a hitman (UMFS 180, 181, 185, 186, 189, 197) –

---

South Pasadena Police Department, who was assigned to assist Detectives Smith and Parra on the French homicide investigation.
[6] Detectives determined that the car was registered to a Norwalk, California address, though the registered owners had moved to Texas. Handwritten notes contain the names of various other persons potentially associated with Richard Stevens.
[7] A reasonable investigator would not have limited their efforts to the name supplied by the anonymous caller (because the caller may have been mistaken) and the car observed on Catalina Street. A reasonable investigation would have included all aspects of the murder-for-hire theory. UMF 175.

significantly, information regarding Jeanne's confessions came to light years *before* the anonymous tip was produced in the instant litigation. Two of these witnesses were available to investigators at the time of the murder. Deborah Zitella, Jeanne's sister, worked as a legal secretary in the same office as Jeanne.[8] Before the murder, Jeanne Lyon told Deborah she was going to have an attorney for whom she worked, James Mack, arrange a loan from which she would pay a contract killer. After the murder, Jeanne told Deborah that an innocent man had been arrested for the murder. UMFS 176-183. During the habeas, James Mack testified that, prior to the murder, he overheard conversations between Jeanne and Ed Lyon about hiring a hitman for $5,000. At some point, Jeanne told Mack she had hired a hitman and later pointed out the contract killer to Mack. The contract killer was not Frank O'Connell. UMFs 184-187. Because Detectives knew where Jeanne worked, Mack was readily available.

The habeas investigation also revealed several persons to whom Jeanne confessed after Frank's conviction. During the late-1980's, Jeanne confessed to her then-fiancé, Michael Flick, that she paid a hitman to kill her ex-husband. The murder was arranged by Ed Lyon, who met the hitman at a bar, and James Mack, arranged a payment of $10,000. The money came from Jeanne and Ed's joint savings account. Jeanne feared the withdrawal would be traceable if police examined her financial records. UMF 188-194. Detectives obtained Jeanne and Ed's account number during the 1984 investigation, UMF 165, but did not investigate them. Jeanne told Flick that the person arrested and convicted was not the person who killed Jay French, and later confessed to a boyfriend that she "had somebody take care of" Jay Sr.and an innocent man was in jail. UMFS 195-197.

## III. <u>ARGUMENT</u>

*Brady v. Maryland*, 373 U.S. 83 (1963) establishes that the suppression of material, exculpatory evidence violates the due process right to a fair trial. *Id.* at

---

[8] LASD detectives learned of Deborah from Gina French on 1/5/1984 UMF 177.

87. A *Brady*-claim exists where the prosecution suppresses evidence that is (1) favorable to the accused because it is either exculpatory *or* could be used to impeach; and (2) material to guilt or punishment. *Wearry v. Cain*, 136 S.Ct. 1002, 1006 (2016); *Gantt v. City of Los Angeles*, 717 F.3d 702, 709 (9th Cir. 2013). "Evidence qualifies as material when there is 'any reasonable likelihood' it could have 'affected the judgment of the jury.'" *Wearry v. Cain*, 136 S.Ct. at 1006 (2016) (citing *Giglio v. United States*, 405 U.S. 150, (1972)). It is not necessary to demonstrate that the defendant would "more likely than not" have been acquitted had the evidence been admitted. The materiality standard only requires that the suppressed evidence would have been sufficient to "undermine confidence" in the verdict. *Wearry*, 136 S.Ct. at 1006.

### A.    Uncontroverted Evidence Establishes that Detectives Suppressed Material, Exculpatory Evidence

The value of the suppressed evidence to Mr. O'Connell's defense does not hinge on disputed or assumed facts. Materiality is a retrospective analysis of the suppressed evidence's significance to the verdict, with reference to the other evidence and arguments presented in the underlying criminal trial. *United States v. Coppa*, 267 F.3d 132, 140 (2nd Cir. 2001); *United States v. Hayes*, 376 F.Supp.2d 736, 739 (E.D.Mich.2005) ("The typical *Brady* issue is retrospective…the court examines the materiality of the non-disclosed evidence in the context of a completed criminal trial…to assess the probable effect of the evidence on the verdict."). Since the trial transcript establishes what other evidence and arguments were presented, the facts necessary to determine materiality are uncontroverted and the issue of whether specific suppressed evidence was material becomes a question of pure law. *See United States v. Sedaghaty*, 728 F.3d 885, 899–900 (9th Cir. 2013) ("'the question of 'materiality[ ]' is a legal matter that we review de novo.' *United States v. Price,* 566 F.3d 900, 907 n. 6 (9th Cir.2009); *see also United States v. Oruche,* 484 F.3d 590, 595–96 (D.C.Cir.2007) ('[O]nce the existence and

content of undisclosed evidence has been established, the assessment of the materiality of this evidence under *Brady* is a question of law.'").

### 1. Suppressed Eyewitness Impeachment Evidence Was Material

#### a) Detectives' Affirmation of Druecker's Identification Was Material, Exculpatory Impeachment Evidence

Though Druecker's recantation is contested, J.D. Smith does not dispute that detectives affirmed Druecker's identification in his presence (conceding they may have said that).[9] This affirmation was exculpatory and material, independent of Druecker's recantation. Comments endorsing the correctness of a selection tend to reinforce an otherwise weak or tentative identification and lend an in-court identification greater weight than is actually warranted. *U.S. v. Leonardi*, 623 F.2d 746, 755 (2nd Cir. 1980), *cert. denied*, 447 U.S. 928 (1980); *U.S. v. Jarvis*, 560 F.2d 494, 500 (2nd Cir. 1977) (an otherwise fair pretrial identification procedure may be rendered impermissibly suggestive through remarks by government agents), *cert. denied*. 435 U.S. 934 (1978); *Carroll v. State*, 568 P.2d 324 (Okla. Crim. 1977) (identification procedure impermissibly suggestive where officer conveyed opinion subject was guilty). Had this been disclosed, Lara would have used it to cross-examine both Druecker and Smith regarding the reliability of the identification and the integrity of the police investigation. UMF 240. Even if Druecker stood strong in his identification, the affirmation reinforced the possibility he was mistaken.

Generally, the weaker the prosecution's case is, the less is needed to establish materiality. *See Amado v. Gonzalez*, 758 F.3d 1119, 1140 (9th Cir. 2014) (impeaching evidence that cast a "cloud of doubt" on key witness was material where "the remaining evidence against Amado was weak"); *United States v. Agurs*,

---

[9] An assertion that a fact may not have occurred does not create a disputed fact. *See Rodman v. Safeway Inc.*, 125 F. Supp. 3d 922, 934 (N.D. Cal. 2015) (Safeway's argument that some "online store may not have in fact charged a markup" was "speculation," that did not create a disputed fact, citing *Allen v. Scribner*, 812 F.2d 426, 441 (9th Cir.) *amended,* 828 F.2d 1445 (9th Cir.1987) ( "Guesswork and speculation [ ] cannot defeat a motion for summary judgment.").

14

427 U.S. 97, 113 (1976) (if verdict is "of questionable validity, additional evidence of relatively minor importance might be sufficient to create a reasonable doubt.").

In the context of this case, the affirmation was material. Eyewitness impeachment evidence is material where it could undermine the credibility of a key witness on an essential issue in the case. *Banks v. Dretke*, 540 U.S. 668, 699-703 (2004); *Giglio* at 154-155 (1972); *Kyles v. Whitney*, 514 U.S. at 444. [10] Druecker was the centerpiece of the prosecution's case and supplied the only evidence linking Frank to the crime. Without Druecker, there was insufficient evidence to convict, especially given the alibi evidence, the absence of physical evidence and the degree to which Soucy was contradicted by other neighbors of Jeanne Lyon. *Singh v. Prunty*, 142 F.3d at 1161 (suppressed deal for testimony evidence material where witness provided sole evidence supporting prosecution's murder for hire theory); *Carriger v. Steward*, 132 F.3d 463, 479 (9th Cir. 1997); *US v. Blanco*, 392 F.3d 382, 393 (9th Cir. 2004); *Silva v. Woodford*, 279 F.3d 825, 854-55 (9th Cir. 2002) (witness' "credibility was a critical issue, given that he was the only witness who could identify [defendant] as the triggerman"); *Benn v. Lambert*, 283 F.3d at 1054 (holding impeachment evidence material where witness's reliability may well be determinative of guilt or innocence).[11]

### b) *Notes Showing Soucy Failed to Make a Positive Identification from the Six-Pack Were Material and Exculpatory*

---

[10] Eyewitness identification testimony greatly influences juries. As the Ninth Circuit observed in *U.S. v. Jernigan*, "suppression" of exculpatory evidence concerning eyewitnesses only "…erodes the already questionable value of eyewitness identifications. 'Centuries of experience in the administration of criminal justice have shown that convictions based solely on testimony that identifies a defendant previously unknown to the witness is highly suspect. Of all the various kinds of evidence it is the least reliable, especially where unsupported by corroborating evidence.'" *U.S. v. Jernigan*, 492 F.3d 1050, 1052 (9th Cir. 2007) (quoting *Jackson v. Fogg*, 589 F.2d 108, 112 (2nd Cir. 1978)).
[11] *See, also, Horton v. Mayle*, 408 F.3d 570 (9th Cir. 2005) (promise of immunity to the state's star witness was material because witness was the "glue that held the prosecution's case together,"); *Hayes v. Brown*, 399 F.3d 972, 985 (9th Cir. 2005) (undisclosed deal was material where witness's testimony was undoubtedly the centerpiece of the prosecution's case and almost all other evidence was circumstantial).

15

According to suppressed handwritten notes, Soucy selected two photos from the photo spread (one of which was not Frank). This information was favorable and material because it negated the reliability of his identification sufficient to warrant disregarding it. The notes impeached Soucy's identification, and would have provided a potential basis to exclude his in-court identification. UMF 96. Undermining Soucy would have supported the contrary neighbor testimony. Without Soucy's linkage to the getaway car, the prosecution's case rested entirely on Druecker, whose testimony was controverted by three credible, alibi witnesses. *See Kyles v. Whitney*, 514 U.S. at 419; *Lindsey v. King*, 769 F.2d 1034, 1042 (5th Cir. 1985) ( "the destruction by cross-examination of the credibility of one of two crucial witnesses-even if the other remains untouched-may have consequences for the case extending far beyond the discrediting of his own testimony"); *Hernandez v. City of El Paso*, 2009 WL 2096272, at p. 18 (undisclosed witness statement undermining eyewitness account was material because the case hinged on eyewitness testimony).

Additionally, evidence of false attributions in the police report would have raised serious concerns regarding the reliability and integrity of all identification procedures. *See Robinson v. Cain*, 501 F.Supp.2d 399 (investigating officers' false attribution of an identification tends to impeach the credibility of the officers and their investigation); *Burge v. Parish of St. Tammany*, 187 F.3d 452 (5th Cir. 1999) (eyewitness' initial statement to police that she would be unable to identify the murderer was favorable evidence under *Brady*). Defense counsel could have also used detectives' misrepresentation of Soucy's statements to reinforce Villareal's testimony that he had never been able to make an identification and had so advised J.D. Smith, despite Smith's testimony to the contrary. UMF 97.

### 2.    *Misrepresentations in the Police Report Concerning Thomas Butler Were Material and Exculpatory*

*Brady* requires officers to disclose when they have presented false or perjured testimony, have fabricated evidence or have undermined the integrity of

16

evidence through investigatory misconduct. *Manning v. Miller*, 355 F.3d 1028, 1032 (7th Cir. 2004) (FBI agents failed to tell prosecutors they induced false witness statements and submitted false written reports); *Newsome v. McCabe*, 256 F.3d 747 (7th Cir. 2001) (withholding from information about officers' coaching of witnesses violated *Brady*). Butler's uncontroverted testimony establishes that the police report contains a material misrepresentation. Though Butler did not testify at trial, this misrepresentation undermines the veracity and credibility of all the identifications, and of the investigating officers. Had the defense known that Butler did not make an identification, it would likely have called him to show the gross unreliability of the police reports, reinforcing the conclusion that detectives misrepresented Soucy's and Villareal's statements. UMF 100.

### 3.    Suppressed Alternative Suspect Evidence Was Exculpatory and Material

#### a)    Jeanne and Randy's Prior Attempt

Detectives failed to disclose a witness interview revealing Jeanne and Randy Smith's previous attempt to kill Jay French, which standing alone, is exculpatory and material. [12] Alternative suspect evidence is "classic" Brady material. *Williams v. Ryan*, 623 F.3d 1258, 1265 (9th Cir. 2010); *United States v. Jernigan*, 492 F.3d 1050, 1056-1057 (9th Cir. 2007) (en banc). "Withholding knowledge of a second suspect conflicts with the Supreme Court's directive" that it is "the criminal trial" and not "the prosecutor's private deliberations" that ascertain[s] the truth about criminal accusations.'" *Id.* at 1056-1057 (quoting *Kyles*, 514 U.S. at 440, 115 S.Ct. 1555).The Ninth Circuit found that the complaints' alternative suspect allegations,

---

[12] Randy's physical appearance did not exclude him as the shooter. Randy was **5'11** and over 160 lbs., similar to Villareal's initial description of an assailant approximately 5'10 and 160 – 170 lbs. His height is confirmed by a jail booking photo obtained by the Detectives in 1984, which shows Randy standing in front of a height chart. UMF 119-122. Randy had brown hair, which varied from Villareal's description (blond) yet was consistent with Druecker's and Sanchez's descriptions (brown). UMF 123. He was 28 years old (consistent with Villareal and Sanchez).UMF 122. Randy's statement that he had a full beard at the time of the murder was never independently verified. UMF 124.

which Plaintiffs have now established as fact, were exculpatory and material. *Carrillo v. Cty. of Los Angeles*, 798 F.3d 1210, 1226 (9th Cir. 2015).

Even tenuous evidence pointing to a different suspect would have been valuable given the lack of physical evidence and no compelling motive theory. While significant evidence pointed to Jeanne, no physical evidence and little circumstantial evidence suggested Frank's involvement. At the time of the murder, Ed Lyon provided his wife Jeanne significant financial support for the hard fought custody dispute. This was a motive for Jeanne, and possibly Ed, but not for Frank, who had only a brief, casual sexual relationship with Jeanne between June and August 1983 when she and Ed were separated. No evidence suggests an ongoing affair or involvement by Frank in the custody dispute.

Under the circumstances, evidence indicating Jeanne coordinated with a longtime associate, with whom she previously lived and had previously conspired in an effort to kill her ex-husband, could have established reasonable doubt regarding Mr. O'Connell's involvement. *See Williams*, 623 F.3d at 1256-1257 (9th Cir. 2010 (alternative suspect evidence more valuable where no physical evidence or otherwise weak evidence).[13] Lara would have cross-examined investigating officers on the prior attempt's omission from police reports and the adequacy of any follow-up investigation. He would have interviewed persons close to Jay about the incident and would likely have subpoenaed phone records to determine whether Jeanne and Randy had been in touch. In trial, he would have examined Gina about the attempt to show that Randy, whom Jeanne knew far longer than Frank, was at least a plausible alternative, creating reasonable doubt. UMFs 143-147.

### b)    *Anonymous Tip*

---

[13] *See also Jernigan*, 492 F. 3d at 1054 - 1056 (assessing the strength of the prosecutor's case in weighing the materiality of suppressed alternative suspect evidence that bolstered probability that *five* eyewitnesses were mistaken); *Gantt v. Rose*, 389 F.3d 908, 913 (9th Cir. 2004) (newly discovered information material where it undermines conviction based on little physical evidence); *Gumm v. Mitchell*, 775 F.3d 345, 370 (6th Cir. 2014) (alternative suspect evidence material given the prosecution's relatively weak case).

18

The anonymous tip was even more valuable to Frank's defense. The tip not only pointed to an alternative suspect unfamiliar to Jeanne but also contradicted the theory that Jeanne enlisted Frank based on their previous involvement). It pointed to an alternative narrative since Jeanne did not need an out-of-state middle man to hire Frank (or, under the prosecution's theory, need to pay him at all).[14]

The anonymous tip also reinforced Randy Smith's significance to the investigation (and the significance of the prior attempt), enhancing the likelihood of his participation, though not necessarily as the shooter. Any reasonable detective aware of the prior attempt would have appreciated the significance of the tip's reference to a "male in Oregon." Coupled with the earlier information concerning Jeanne's longtime connection to Randy (from Oregon) and their prior attempt on Jay (for the same purpose), the tip was indispensable information. This tip made Randy, a known, longtime associate of Jeanne living in Oregon and involved in a prior attempt on Jay's life, the leading candidate as the tip's "middle man" all completely unknown to the defense. Moreover, the anonymous tip made Randy a central suspect even if he could not have committed the actual murder.[15]

---

[14] *See Williams*, 623 F.3d at 1256 (9th Cir. 2010) (withheld information not only was "inconsistent with the State's theory at trial…but [it] also point[ed] to an alternative suspect."); *Paradis v. Arave*, 130 F.3d 385, 392 (9th Cir. 1997) (undisclosed detectives' notes containing medical examiner's conclusion rebutting prosecution's theory were material impeachment evidence where the medical examiner later offered contradictory testimony); *Benn v. Lambert*, 283 F.3d 1040, 1055 (9th Cir. 2002) (undisclosed expert conclusion that a fire was accidental was could have served to rebut state's primary theory of motive, and the aggravating circumstances of common scheme or plan); *Robinson v. Cain*, 510 F.Supp.2d 399, 410 (E.D. La. 2007) (failure to disclose **anonymous** witness statements violated *Brady*, as they suggested a motive not easily imputable to the defendant, could have led to finding witnesses with firsthand knowledge of the crime and fundamentally contradicted the key witness' testimony); *D'Ambrosio v. Bagley*, 2006 WL 1169926 (N.D. Ohio 2006) (suppressed evidence could have undercut the state's theory and assisted in establishing an alternative theory).
[15] Court records do not conclusively establish Randy's alibi the day of the murder. Court records, obtained for the habeas indicate that Randy was arraigned on 1/4/1984. Bail was set for $10,000. He was ordered to appear on 1/12 (which he did, Ex. 2/27, p. 4). When he posted bail is unclear. UMF 160-163. Court records indicate that, on 1/25/84, Smith assigned his $2,000 interest in bail to the clerk of the court to be applied towards his attorney's fees, indicating that bail was posted at some point.

19

1  The tip's value became more apparent when officers observed a car

2  resembling descriptions of the getaway car at the alleged hit man's address.

3  Handwritten notes attached to the tip show that detectives observed a yellow 1972

4  Ford with wood grain sides. This information obviously exculpatory information

5  was never relayed it to the prosecutor for evaluation. Detectives not only omitted

6  any reference to the car from the police report, they also failed to photograph the

7  vehicle, precluding the defense from investigating whether any eyewitnesses

8  recognized it as similar to the getaway vehicle.[16]

9                    c)    *The Alternative Suspect Evidence was Favorable to*

10                         *the Defense Regardless of Whether the Tip was*
                          *Independently Admissible*

11  It is of no consequence whether the tip would have been independently

12  admissible. Had the tip and prior attempt ben disclosed, Frank's defense attorney

13  could have cross-examined the investigating detectives about significant omissions

14  from the police report, their failure to thoroughly investigate the murder-for-hire

15  theory, Randy Smith's potential involvement (including his finances), and the

16  yellow Ford observed on Catalina, demonstrating their bias against Frank and

17  casting doubt on the integrity of the investigation, especially in conjunction with

18  the suppressed eyewitness evidence.[17] UMFs 167-174. *See Gumm v. Mitchell*, 775,

19  F.3d 345, 370 (6th Cir. 2014) (had they been disclosed, potentially favorable leads

20  "would have provided compelling counter-narrative to the state's theory and would

21  have called into question thoroughness of the police investigation.").[18]

22

23  ---

    [16] Whether detectives believed the tip was a "dead lead" has no bearing on the *Brady*

24  analysis. It is not the function of law enforcement officers to decide whether exculpatory
    information insufficiently material to warrant disclosure. *Carrillo v. Cnty of Los Angeles*,
    798 F.3d 1210, 1226 – 1227 (9th Cir. 2015) (citing *Tennison v. City and Cnty of San*

25  *Francisco*, 570 F.3d 1078, 1094 (9th Cir. 2008).The Ninth Circuit held in this case that
    police have an obligation to disclose exculpatory leads, regardless of whether they deem

26  the information to be a "dead lead." *Id.*
    [17] Impeachment and bias evidence are unquestionably admissible. *See Paradis v. Arave*,

27  240 F.3d 1169, 1179 (9th Cir. 2001).
    [18] *See also, e.g., Robinson*, 510 F.Supp.2d 399 (defense counsel could have used

28  suppressed exculpatory witness statements to elicit information from police regarding the
    integrity of the investigation); *Hernandez v. City of El Paso*, 2009 WL 2096272 (W.D.

20

Suppression of the anonymous tip and prior attempt also deprived Frank's counsel of the opportunity to pursue their own investigation to explore and possibly confirm the alternative theory. Favorable evidence not independently admissible is material where it can impeach a witness or could have led to the discovery of admissible evidence. *U.S. v. Olson*, 704 F.3d 1172, 1183 (9th Cir. 2013); *Williams*, 623 F.3d at 1265; *U.S. v. Price*, 566 F.3d 900, 912 (9th Cir. 2009); *Paradis* 240 F.3d at 1178-1179 (9th Cir. 2001); s*ee also, Ellsworth v. Warden,* 333 F.3d 1, 5 (1st Cir.2003) (inadmissible evidence "could be so promising a lead to strong exculpatory evidence that there could be no justification for withholding it."). Here, the anonymous tip and prior attempt were useful for <u>both</u> purposes.

A *Brady* violation exists where suppression causes the defendant to "abandon lines of independent investigation, defenses, or trial strategies that [he] otherwise would have pursued." *Bagley,* 473 U.S. at 683, 105 S.Ct. 3375, *see also, e.g. Gumm*, 775, F.3d at 370 (6th Cir. 2014) (inadmissible, leads and witness statements were material since they could have led to admissible evidence). Armed with all the suppressed evidence, Plaintiff's defense attorney would have explored all evidence related to the murder-for-hire theory, including: (1) Jeanne and Ed Lyon's bank accounts and other financial information; (2) Randy Smith's bank accounts and communications with Jeanne; (3) Jeanne Lyon's friends, co-workers, and acquaintances; (4) Richard, Stevens, Kathy Stevens, Mark Fred Stevens and their friends and family; (5) the owner of the Ford seen at the Catalina address; (6) any person who had access to the car seen on Catalina/residents of the 700 block of Catalina. UMFs 164, 166.

The likelihood of this investigation yielding admissible evidence is far from speculation because the tip has since been corroborated in significant part. Jeanne has admitted to several people that she hired a hitman (see §II, C, 3 *infra* and

---

Tex. 2009) (disclosure of a witness interview contradicting the state's theory would have nullified an eyewitness account, undermined the veracity of other prosecution witnesses, and significantly, discredited the police investigation generally).

UMFs 175-197), and told one witness that she used funds from a joint account with Ed Lyon (the number for which was known to detectives). Jeanne specifically told her sister, Deborah, that she was going to hire a hitman through James Mack, and after the murder said an innocent man had been arrested for it; James Mack, now dead, heard Jeanne and Ed Lyon discuss hiring a hitman and Jeanne pointed out the hitman to him; it was not Frank). UMF 176-187. Both were known to police and available in 1984. *See* UMF 12, 178,

### 4. Collectively Assessed, the Suppressed Exculpatory Evidence Establishes a Strong Probability of a Different Result.

Materiality is determined "in terms of suppressed evidence *considered collectively, not item by item.*" Through a cumulative assessment of **all** Brady-violations, and in view of the entire record. *Kyles*, 514 U.S. at 436 (emphasis supplied); *U.S. v. Agurs*, 427 U.S. 97, 112 (1976) (courts analyze the totality of the undisclosed evidence "in the context of the entire record."); *Bagley*, 473 U.S. at 682; *Barker v. Fleming*, 423 F.3d 1085 (9th Cir. 2005).

Here, a cumulative assessment clearly undermines confidence in the verdict. Undisputed facts demonstrate that, at a minimum: 1) detectives improperly reinforced Daniel Druecker's identification, which raises serious concerns about its reliability and is particularly significant because he is the sole eyewitness and in light of the alibi evidence; 2) Soucy was unable to positively identify Frank from a six-pack as the driver of a yellow Pinto, particularly significant considering the degree to which Soucy was contradicted by other neighbors; 3) disclosure of detectives' mischaracterization of Soucy's statement would have reinforced Villareal's sworn denial of having made an identification (and insistence that he had so advised detectives), despite Smith's efforts to discredit him; 4) evidence of misrepresentations concerning <u>four</u> witnesses – Druecker, Soucy, Villareal, and Butler – could have established a pattern of inaccurate statements, suggesting intentional misconduct or bias against O'Connell; 5) the alternative suspect/ anonymous tip evidence would have discredited Smith, supplied a plausible

alternative narrative, and no doubt would have "put the whole case in such a different light as to undermine confidence in the verdict." *Kyles*, 514 U.S. at 435. Any one of these could have created a reasonable doubt in this weak prosecution case; collectively they unquestionably undermine confidence in the verdict.

## B.    J.D. Smith Is Liable For The Violation Of Mr. O'Connell's Rights

To prevail on his §1983 claims, Plaintiff must establish that Smith *caused* the violation of Mr. O'Connell's rights and acted with the requisite state of mind.

### 1.    *JD Smith Failed to Relay Exculpatory Evidence to the Prosecutor, Causing the Violation of Mr. O'Connell's Due Process Rights*

Though prosecutors bear responsibility for deciding what exculpatory information warrants disclosure, prosecutors can only disclose exculpatory information of which they are aware. Police officers therefore have an affirmative, constitutional obligation to notify the prosecutor of any potentially exculpatory evidence and may be held liable for causing the suppression of material, exculpatory evidence. *Carrillo v. Cnty. of Los Angeles*, (9th Cir. 2015). The undisputed evidence demonstrates that J.D. Smith's failure to disclose exculpatory evidence (which he could have done by forwarding copies of handwritten notes and advising the district attorney of additional exculpatory evidence buried in the notes) caused the violation of Mr. O'Connell's rights. Among numerous other material omissions,[19] detectives' reports contain no reference to confirming Druecker's identification in his presence, Maurice Soucy's dual identification, Butler's nonidentification, the anonymous tip, or Randy Smith's prior attempt. Except for the Druecker confirmation, this was secreted in handwritten notebooks (consisting of hundreds of pages), but *not* incorporated into police reports. Even if the notebooks had been forwarded to the district attorney, failure to translate critical information from cryptic notes into a more comprehensible format would

---

[19] *See* Declaration of Russell Fischer, detailing approx. twenty significant omissions from police report, pp. 26-29, UMF 239..

not satisfy detectives' obligations under *Brady*. *See, e.g. United States v. Skilling*, 554 F.3d 529, 577 (5th Cir. 2009), *aff'd in part, vacated in part, remanded,* 561 U.S. 358, 130 S. Ct. 2896, 177 L. Ed. 2d 619 (2010) ("it should go without saying that the government may not hide *Brady* material of which it is actually aware in a huge open file in the hope that the defendant will never find it"); *Emmett v. Ricketts,* 397 F. Supp. 1025, 1043 (N.D. Ga. 1975) (" the prosecutorial duty to produce exculpatory evidence imposed by *Brady* may not be discharged by 'dumping' …. a voluminous mass of files").

In any event, undisputed facts demonstrate that detectives failed to forward their handwritten notes to the district attorney. Deputy District Attorney Juan Mejia, who represented the prosecution at the habeas, "reviewed all of the District Attorney files [he] was able to assemble from the 1985 prosecution and subsequent appeal." Prior to the 2011 habeas hearing, Mr. Mejia confirmed that the handwritten notes produced by the LASD to Plaintiff's habeas counsel were **not** part of the district attorney's file for the 1985 prosecution and subsequent appeal. UMFs 136-138. Mr. Mejia stipulated to this at the evidentiary hearing. The only reasonable inference is that the prosecutor never received the notes. UMF 139. [20]

According to the trial D.A.,Tamia Hope, had she received the notes, would have forwarded them to defense counsel. UMF 241. Lara testified that, had the notes been disclosed, he would have used them to impeach Soucy, point to an alternative suspect, and cast doubt on the integrity of the police investigation. UMF 95, 145, 146, 147, 153, 170, 172, 173, 242. Lara did not use the handwritten notes to impeach Soucy, point to an alternative suspect or to cast doubt on the integrity of the investigation. Lara acknowledges that, insofar as he did not cross-examine

---

[20] Records from the public defender file indicate that Lara learned of Randy when Gina French indicated that Randy may look like Frank. Whatever general knowledge the defense had that Randy lived in Oregon and was a person to investigate, it did not know of Randy's prior involvement in an attempt on Randy's life or of an Oregon male hiring the killer. UMFs 140-147. Contrary to defendants' contention, Lara's investigation of whether Randy flew from Portland to Los Angeles on January 4, 1984, indicates that Lara did *not* believe Randy was incarcerated and had *not* excluded him as the shooter.

Soucy or JD Smith regarding information in the handwritten notes, it is fair to infer that he did not have them. UMFs 243.

The anonymous tip was **not** part of the District Attorney's file habeas D.A. reviewed for the habeas litigation, nor was it produced by LASD during the habeas litigation. UMFs 148, 149. It can only be inferred that LASD never forwarded it to the District Attorney. Hon. Patrick Walsh reviewed the public defender file for direct or indirect references to Richard Stevens, the anonymous tip or a contract killer. See Dkt. 116. Lara testified that, had the tip been disclosed, he would have examined Lt. Hatfield and J.D. Smith about the tip and their follow-up investigation. Lara did not cross-examine Hatfield or Smith regarding the tip, and agreed that, if he did not examine detectives about the tip, it is fair to infer he did not have the information. UMF 152-154. [21]

### 2.    *Detective Smith Acted With Deliberate Indifference and Reckless Disregard*

Uncontroverted facts establish that Detective Smith acted with "deliberate indifference to or in reckless disregard for the accused's rights or for the truth in withholding evidence for prosecutors." *Rosales-Martinez v. Palmer*, 753 F.3d 890, 897 (9th Cir. 2014) (*quoting*, *Tennison v. City & County of San Francisco*, 570 F.3d 1078, 1089 (9th Cir. 2009).Any confusion on whether this requires a subjective as well as an objective inquiry has been recently resolved in  *Castro v. County of Los Angeles*, 833 F.3d 1060, 1070 (9th Cir. 2016) (en banc), where the Ninth Circuit explained that, in light of *Kingsley v. Hendrickson*, 135 S. Ct. 2466, 2472 (2015) (pretrial inmate excessive force claims brought under the Fourteenth Amendment

---

[21] It is of no consequence that the tip was purportedly discovered in an envelope from the District Attorney's office. The envelope is post-marked February 1, **1993** (nine years after the anonymous tip), and is not evidence that the District Attorney forwarded the tip to the LASD, particularly given notes of a follow-up investigation, by J.D. Smith, in February 1984 and November 1984. AMF 131, 155-159. Moreover, during a March 2014 physical inspection, Detective, Steve Lankford, advised Plaintiffs' counsel that the original file had deteriorated, requiring homicide personnel to replace some folders, indicating that the original organization had been changed. Lankford said he first noticed the tip during that inspection. AMF 158.

require only objective unreasonableness, and no subjective standard is required; "a pretrial detainee must show only that the force purposely or knowingly used against him was objectively unreasonable"), deliberate indifference in a pretrial inmate's failure to protect claim required only showing a "substantial risk of serious harm to the plaintiff that could have been eliminated through reasonable and available measures that the officer did not take." The Second Circuit, citing both *Kingsley* and *Castro*, recently concluded that this objective deliberate indifference standard applied to the conditions of confinement for pretrial inmates. *See Moore v. Pineiro* (2nd Cir. 2/21/2017) ("the pretrial detainee must prove that the defendant-official acted intentionally to impose the alleged condition, or recklessly failed to act with reasonable care to mitigate the risk that the condition posed to the pretrial detainee even though the defendant-official knew, or should have known, that the condition posed an excessive risk to health or safety").

While the Ninth Circuit has not had occasion to discuss this distinction in the *Brady* context, the logic of the *Kingsley* analysis and its application above to due process claims for pretrial inmates necessarily means that the objective standard is what is required here, i.e., (adapting *Castro* to the *Brady* context), did the failure to disclose exculpatory evidence pose a substantial risk that Plaintiff would be deprived of a fair trial that could have been eliminated through reasonable and available measures that the officer did not take," This may be proven through both direct or circumstantial evidence.[22]

Here, reckless disregard is demonstrated by the materially misleading representations of *at least* two witnesses' statements (Soucy and Butler), and of important alternative suspect information (including the anonymous tip and related

---

[22] *See also, e.g., Reedy v. Evanson*, 615 F.3d 197, 213 (3d Cir. 2010) (reckless disregard exists where an officer recklessly omits facts any reasonable person would know a judge would want to know). Reckless disregard is measured by willingness to affirmatively distort facts, and therefore may exist where officers distort even minor details. *Galbraith v. County of Santa Clara*, 307 F.3d 1119, 1127 (9th Cir. 2002) (medical examiner's reckless disregard by reporting decedent was strangled, while ignoring abundant evidence pointing to suicide instead of strangulation).

investigation), and numerous, significant omissions from police reports. Detectives omitted Soucy's selection of two photos, the anonymous tip, sighting of a yellow Pinto near the alleged gunman's residence, the prior attempt on the victim's life, and exculpatory information supplied by Brenda Rogers, Pamela Wilson and Jean Wilson (i.e. that they recognized Frank and had never seen him in connection with a yellow Pinto). Undisputed evidence demonstrates that the detectives' conduct fell below the level of minimally acceptable police standards. UMFs 239, 244, 245 (expert testimony of Russell Fischer).[23]

Should the Court decide that state of mind (or any other element of liability) is inappropriate for summary adjudication, Plaintiff requests partial summary adjudication on any issues the Court deems appropriate.[24]

## C.    The LASD is Liable for Failure to Train Detectives on the Disclosure Requirements Imposed by Brady v. Maryland

A municipality's failure to train gives rise to §1983 liability if the deficient training is closely related to the ultimate injury and reflects deliberate indifference to an individual's civil rights. Deliberate indifference requires disregard for a "known or obvious consequence of [its] action." *Connick v. Thompson*, 563 U.S. 51, 61 (2011). It exists where the "need for more or different training is so obvious,

---

[23] Because Defendants' police expert report did not address the Defendants' misrepresentations or failures to disclose exculpatory evidence, they do not create a disputed issue of fact.

[24] The Court has authority to grant summary judgment on an element of a claim, even where it does not dispose of the entire claim. FRCP 56(b) provides that "[a] party against whom relief is sought may move at any time…for a summary on all *or part of the claim*." Fed.R.Civ.P. 56(b) (emphasis supplied). Moreover, FRCP 56(d) provides that a court may determine "what material facts are not genuinely at issue," even "if summary judgment is not rendered on the whole action." Under these rules, the court is not limited to disposing of entire claims on a summary judgment motion. Indeed, the Supreme Court has explicitly noted that "one of the principal purposes of the summary judgment rule is to isolate and dispose of factually unsupported claims or defenses". *Celotex Corp. v. Catrett*, 477 U.S. 317 at 323-24 (1986). *See e.g., Lies v. Farrell Lines, Inc.,* 641 F2d 765, 768-69 & n.3 (9th Cir. 1981) (recognizing that "[i]t is appropriate to decide a few limited issues by summary judgment, even if those issues are not entirely dispositive of any one claim…[as] summary judgment can thus serve to set the issues for trial"; citing *Moore's Federal Practice* for the proposition that "[i]t is clear that Rule 56 authorizes a summary adjudication that will often fall short of a final determination, even of a single claim").

27

and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers…can reasonably be said to have been deliberately indifferent." *Id*. (quoting *City of Canton v. Harris*, 489 U.S. 378, 390 (1989)). Though deliberate indifference "ordinarily" requires a pattern of similar constitutional violations, *Connick*, 563 U.S. at 52, it also exists where a violation of rights is "a highly predictable consequence" of a failure to equip law enforcement officers with specific skills or training to handle *recurrent* situations. *Id.* at 52; [25] *Canton*, 489 U.S. at 390; *Kirkpatrick v. County of Washoe*, 843 F.3d 784, 794, 796-797 (9th Cir. 2016) (pattern of prior violations unnecessary where County permitted social workers to regularly remove children from parental custody, outside exigent circumstances, without training on warrant requirements); Model Civ. Jury Instr. 9th Cir. 9.7 (2007) (no requirement of recurrent pattern included).

The failure to train police officers on *Brady* disclosure requirements may support *Monell* liability, even absent a pattern of prior violations. *Gregory v. City of Louisville*, 444 F.3d 725, 753 (6th Cir. 2006); *Walker v. City of New York*, 974 F2d 293, 297-298 (2nd Cir. 1992); *Ferguson v. Short*, 2014 WL 3925512 (W.D. Mo. Aug. 12, 2014); *Crews v. County of Nassau*, 996 F.Supp.2d 186, 210 (E.D.N.Y. 2014); *Davis v. Clark Cnty., Wash.*, 966 F.Supp.2d 1106, 1137 (W.D.Wash. 2013); *Cristini v. City of Warren*, 2012 WL 5508369 at *12-13 (E.D.Mich. 2012). Because there is no reason to assume officers are familiar with *Brady* when they join the police force, and because investigating officers will routinely encounter exculpatory information, failure to train on this significant "constitutional component" of their job, carries the highly "predictable consequence" of due process violations. *Gregory*, 444 F.3d 725, 753 (6th Cir. 2006) ("Widespread officer ignorance on the proper handling of exculpatory materials would have the 'highly predictable consequence' of due process violations.");

---

[25] *Connick* holds that the failure to train prosecutors in *Brady* disclosure requirements does not amount to deliberate indifference since it is assumed that prosecutors learn how to interpret and apply constitutional requirements in law school.

*Cristini*, 2012 WL 5508369 (need for training is "obvious" because: (1) investigators will assuredly encounter evidence contradicting their working theory and/or exonerating a suspect, (2) officers are "not generally familiar with *Brady's* principles or equipped to do the necessary legal research to become familiar with those principles," and (3) failure to disclose carries potentially "serious consequences, such as the conviction of an innocent person.").

Undisputed facts establish that LASD had no formal policies or directives describing the *Brady* rule, "exculpatory evidence" or law enforcement's duty to recognize, memorialize and relay exculpatory information. See testimony of LASD's 30(b)(6) witness, a homicide detective since the 1980's (no formal *Brady* policy from the 1980's to to present). UMFs 203, 204, *see also*, UMF 213 (no *Brady* policy to this day). LASD likewise had no mandatory *Brady* training. During the early-1980's, academy training did not address *Brady*. According to LASD's 30(b)(6) witness, during the early-1980's, detectives were primarily trained through on-the-job training. Whether a detective received informal training would depend on the individual initiative of their training officer, not on policy. During this time, some detectives attended a non-mandatory, one-week homicide school, and some (including JD Smith, who only attended after the events here, in 1986) served in homicide for years before attending it. That school contained no *Brady* training. UMFs 205-212.

The LASD also lacked formal policies and training regarding the content of police reports (i.e. what information is sufficiently significant to be included in a police report, what information from handwritten notes should be incorporated into police reports, and the contents of murder books). UMF 215. In the absence of any formal policies and training, detectives decided for themselves what information to memorialize, and had discretion to omit exculpatory information where they believed it was not sufficiently significant or outweighed by other evidence. Detectives were not required to incorporate information they deemed to be a "dead

1  lead," even where such information held exculpatory value. UMFs 216 - 221. The

2  LASD similarly had no policy addressing how investigators should flag potentially

3  exculpatory information when presenting a case for prosecution and no policy

4  requiring detectives to turn over their complete homicide file, including notebooks.

5  District attorneys had to rely on detectives to advise them of information not

6  contained in their police reports (i.e. information secreted in in notebooks). UMFs

7  222 – 227. LASD had no supervisory mechanism to ensure detectives

8  memorialized and relayed all exculpatory information to the district attorney.

9  Homicide detectives were supervised by lieutenants who reviewed only the formal

10 police reports. Because they did not review notebooks or other contents of the

11 "poor boy," they would have no way of knowing whether detectives had relayed

12 exculpatory information not memorialized in a police report, unless detectives

13 specifically advised them such information existed. UMFs 228-236.

14      LASD's contention that detectives normally made available to the district

15 attorney their handwritten notebooks is of no consequence. No training alerted

16 detectives to the *necessity* of disclosure. As a matter of practice, detectives did not

17 leave their complete set of notebooks with the district attorney, but rather brought

18 them to meetings with the D.A., who would have no way to know whether they

19 contained exculpatory information not memorialized in the police report unless the

20 detective so advised. UMF 224 – 227. The LASD's *Brady* training policies were

21 completely inadequate. The absence of policies does not comport with national

22 standards and reflects a gross departure from minimal law enforcement standards

23 to ensure officers comply with the Constitution. UMF 237 - 238.

24 **IV. CONCLUSION**

25      For the forgoing reasons, Plaintiffs' motion should be granted.

26

27

28

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

DATED:  February 24, 2017        Respectfully Submitted,
                                 Kaye, McLane, Bednarski & Litt, LLP

                                 By: / s / Lindsay Battles
                                 Barrett S. Litt
                                 Lindsay Battles
                                 Attorneys for Plaintiffs