Barrett S. Litt, SBN 45527
Email: blitt@kmbllaw.com
Ronald O. Kaye, SBN 145051
Lindsay Battles, SBN 262862
KAYE, McLANE, BEDNARSKI & LITT
234 East Colorado Boulevard, Suite 230
Pasadena, California 91101
Telephone: (626) 844-7660
Facsimile: (626) 844-7670

Attorneys for Plaintiffs
FRANK AND NICHOLAS O'CONNELL

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| FRANK O'CONNELL, NICHOLAS O'CONNELL, <br><br> Plaintiffs, <br><br> vs. <br><br> J.D. SMITH; ESTATE OF GILBERT PARRA; ERIC PARRA; COUNTY OF LOS ANGELES AND DOES 1-10, <br><br> Defendants. | CASE NO. 13-01905-MWF (PJWx) <br><br> [HONORABLE MICHAEL W. FITZGERALD] <br><br> NOTICE OF MOTION AND MOTION FOR PARTIAL SUMMARY JUDGMENT ON THE ISSUE OF FRANK O'CONNELL'S GUILT FOR THE MURDER OF JAY FRENCH, INCLUDING THE LEGAL STANDARD UNDER WHICH THE ISSUE IS TO BE DETERMINED; DECLARATION; EXHIBITS, PROPOSED ORDER [STATEMENT OF UNCONTROVERTED FACTS AND CONCLUSIONS OF LAW; (FILED SEPARATELY)]. <br><br> Date: April 24, 2017 <br> Time: 10:00 A.M. <br> Courtroom: 5A |

TO DEFENDANTS AND TO THEIR ATTORNEYS OF RECORD:

PLEASE TAKE NOTICE that, on April 24, 2017, at 10:00 a.m., in Courtroom 5A of the United States District Court for the Central District of California, 350 West First Street, Los Angeles, California 90012, Plaintiffs Frank O'Connell (also "Mr. O'Connell") and Nick O'Connell will, and hereby do, move for summary judgment to preclude what is properly framed as Defendants' affirmative defense that Frank O'Connell is guilty of the murder of Jay French because there is insufficient evidence of Mr. O'Connell's guilt. Plaintiffs seek the following relief, which requires a determination of the applicable legal standard and the application of summary judgment principles to it. Plaintiffs seek the following determinations:

1. Because Mr. O'Connell has never been validly convicted of the murder of Jay French, and guilt or innocence is determined in the criminal process, Defendants may not argue his guilt in this case.

2. The applicable legal standard for the issue of guilt or innocence in a due process violation of liberty case is as follows: A Plaintiff's guilt for of a crime on which he was charged, convicted and subsequently released on a petition for a writ of habeas corpus for a violation of due process is, in the context of a civil rights due process claim, and to the extent to which it is allowed at all, relevant and permissible only as an affirmative defense on which Defendants bear the burden of proof (i.e., Defendants must prove by a preponderance of the evidence that Mr. O'Connell would be criminally convicted of the murder of Jay French, i.e., convicted by a unanimous jury based on a reasonable doubt standard).

3. The evidence of guilt is insufficient as a matter of law to permit any claim of guilt to be determined by a jury because no reasonable jury

1   could find Mr. O'Connell guilty on the available evidence, and

2   summary judgment should be granted Plaintiffs on the issue.

3   Defendants should be precluded from arguing in any manner that Mr.

4   O'Connell murdered Jay French.

5       This motion is based on this Notice of Motion, the complete files and

6   records of this action, the Memorandum of Points and Authorities, and supporting

7   declarations and exhibits filed and served concurrently herewith, and on any oral

8   argument to be made at any hearing on the motion.

9       The parties met and conferred on this motion and were unable to reach a

10  substantive agreement.

11

12   DATED: February 24, 2017        Respectfully Submitted,

13                                   KAYE, MCLANE, BEDNARSKI & LITT, LLP

14

15                                   By:____/s/ Barrett S. Litt_____
                                         Barrett S. Litt
16                                       Attorneys for Plaintiff

17

18

19

20

21

22

23

24

25

26

27

28

1

**TABLE OF CONTENTS**

I.    INTRODUCTION ...................................................................................1

II.   STATEMENT OF FACTS. .....................................................................3

    A.    *PROCEDURAL FACTS* .......................................................................3
    B.    *INVESTIGATION BACKGROUND FACTS.* .........................................4
    C.    *EVIDENCE OF GUILT AND SUBSEQUENT EVIDENCE DISCREDITING IT.* ..........4
        1.    Dan Druecker ...............................................................4
        2.    Arturo Villareal ..........................................................6
        3.    Alex Sanchez ...............................................................8
        4.    Maurice Soucy ............................................................8
    D.    *AFFIRMATIVE EVIDENCE OF INNOCENCE* .....................................11
        1.    Alibi Evidence and Neighbor Evidence That Mr. O'Connell Never Drove a Yellow Pinto ...............................................................11
        2.    Jeanne Lyon Has Confessed Multiple Times To Third Parties That She Hired a Hit Man To Kill Jay French And An Innocent Man Was In Prison For It. ............................................................12
        3.    Mr. O'Connell's Hair Did Not Match The Shooter Descriptions. .......13
        4.    The Suppressed Anonymous Tip Corroborates That Frank O'Connell Was Not The Person Who Killed Jay French. ............................14

III.  MR. O'CONNELL WAS DETERMINED NOT GUILTY IN THE CRIMINAL JUSTICE PROCESS, AND THE JURY SHOULD BE INSTRUCTED THAT HE IS INNOCENT AS A MATTER OF LAW. 15

    A.    *GUILT IS ONLY DETERMINED IN CRIMINAL PROCEEDINGS.* ...........................15
    B.    *A RETROSPECTIVE ANALYSIS OF WHETHER THE SAME RESULT WOULD HAVE OCCURRED ANYWAY IS NOT APPROPRIATE WHERE THE CRIMINAL CASE WAS ULTIMATELY DISMISSED.* .........................................16

IV.   IF THE DEFENSE OF GUILT IS ALLOWED, THE DEFENSE MUST PROVE THAT MR. O'CONNELL WOULD HAVE BEEN CONVICTED ANYWAY. ...........................................................19

    A.    *THE BURDEN OF PROOF IS ON THE DEFENDANTS* .....................................19
    B.    *THE JURY SHOULD BE INSTRUCTED THAT MR. O'CONNELL IS PRESUMED INNOCENT.* ........................................................20
    C.    *EVIDENCE THAT THE PROSECUTION DECLINED TO RE-PROSECUTE SHOULD BE ADMITTED.* ............................................21
    D.    *DEFENDANTS MUST PROVE THAT MR. O'CONNELL WOULD HAVE BEEN CRIMINALLY CONVICTED.* ..............................21

V.    UNDER THE FOREGOING STANDARD, THERE IS INSUFFICIENT EVIDENCE TO PERMIT DEFENDANTS TO ARGUE GUILT. .........23

i

2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

1

**VI.   CONCLUSION.............................................................................25**

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

## <u>TABLE OF AUTHORITIES</u>

2

3

4

**Cases**

5

*Alexander v. Polk,*
6        750 F.2d 250 (3rd Cir.1984) ....................................................................... 20

*Baker v. McCollan,*
7        443 U.S. 137 (1979) ................................................................................... 15

8   *Belsea v. Tindall,*
         190 F. 440 (9th Cir. 1911) .......................................................................... 22
9
*Brewer v. Chauvin,*
10       938 F.2d 860 (8th Cir. 1991) ...................................................................... 20

11  *Burge v. Parish of St. Tammany,*
         1995 WL 317125 (E.D.La.) ........................................................................ 15
12
*Carey v. Piphus,*
13       435 U.S. 247 (1978) ............................................................................. passim

14  *Carriger v. Stewart,*
         132 F.3d 463 (9th Cir. 1997) ...................................................................... 21
15
*Carter v. City of Philadelphia,*
16       No. 97-CV-4499, 2000 WL 1016653 (E.D.Pa.) ......................................... 22

17  *Coffin v. United States,*
         156 U.S. 432 (1895) ................................................................................... 20
18
*Commonwealth v. Bazemore,*
19       614 A.2d 684 (Penn. 1992) ......................................................................... 24

20  *Crawford v. Washington,*
         541 U.S. 36 (2004) ...................................................................................... 24
21
*Dayton Bd. of Ed. v. Brinkman,*
22       433 U.S. 406 (1977) ................................................................................... 16

23  *Delo v. Lashley,*
         507 U.S. 272 (1993) ................................................................................... 20
24
*D'Ambrosio v. Bagley,*
25       2010 WL 711938, (N.D.Ohio 2010) ........................................................... 24

26  *Estelle v. Williams,*
         425 U.S. 501 (1976) ................................................................................... 20

27  *Franklin v. Aycock,*
         795 F.2d 1253 (6th Cir. 1986) .................................................................... 20
28
*Heck v. Humphrey,*
         512 U.S. 477 (1994) ................................................................................... 15

iii

1
2   *Herrera v. Collins,*
3       506 U.S. 390 (1993)........................................................................20
    *In re Winship,*
4       397 U.S. 358 (1970)........................................................................20
5   *Jackson v. Virginia,*
        443 U.S. 307, 99 S. Ct. 2781 (1979) ..........................................23
6   *Kramer v. Latah County, Idaho,*
7       2007 WL 988894 (D. Idaho Mar. 30, 2007)...............................20
    *Kyles v. Whitley,*
8       514 U.S. 419 (1995)........................................................................19
9   *Lam v. Univ. of Hawai'i,*
        40 F.3d 1551 (9th Cir. 1994) ........................................................22
10  *McCann v Coughlin,*
11      698 F2d 112 (2d Cir 1993) ...........................................................20
    *McClure v. Indep. School Dist. No. 16,*
12      228 F.3d 1205 (10th Cir.2000) .....................................................20
13  *Mooney v. Holohan,*
        294 U.S. 103 (1935)........................................................................19
14  *Mt. Healthy City Sch. Dist. Bd. Of Educ. v. Doyle,*
15      429 U.S. 274 (1977)...............................................................16, 17
    *People v. Barnes,*
16      42 Cal.3d 284 (1986) .....................................................................24
17  *People v. Johnson,*
        26 Cal. 3d 557 (1980) ....................................................................23
18  *People v. Smith)* 185 I11.2d 532,
19      708 N.E.2d 365 ..............................................................................24
    *People v. Young,*
20      34 Cal. 4th 1149, (2005) ...............................................................23
21  *Price Waterhouse v. Hopkins,*
        490 U.S. 228 (1989)........................................................................16
22  *Schlup v. Delo,*
23      513 U.S. 298 (1995)........................................................................15
    *State v. Moore,*
24      109 Ariz. 111 (Ariz. 1973) ...........................................................24
25  *Taylor v. Kentucky,*
        436 U.S. 478 (1978)........................................................................20
26  *Texas v. Lesage,*
27      52 U.S. 18 (1999)...........................................................................16
    *Thompson v. Connick,*
28      553 F.3d 836 (5th Cir. 2008) .................................................18, 21

*U.S. v. Doyle,*
   130 F.3d 523 (2nd Cir. 1997) ................................................................. 20

*U.S. v. Fitzgerald,*
   615 F.Supp.2d 1156 (S.D. Cal. 2009) ..................................................... 24

*U.S. v. Koubriti,*
   336 F.Supp.2d 676 (E.D. Mich. 2004) .................................................... 24

*U.S. v. McFarland,*
   311 F.3d 376 (5th Cir. 2002) ........................................................... 21, 22

*United States v. Agurs,*
   427 U.S. 97 (1976) .................................................................................. 19

*United States v. Chancey,*
   715 F.2d 543 (11th Cir. 1983) ............................................................... 23

*United States v. Danzey,*
   594 F.2d 905 (2d Cir. 1979) .................................................................. 23

*United States v. Ginn,*
   87 F.3d 367 (9th Cir. 1996) ................................................................... 23

*United States v. Smith,*
   563 F.2d 1361 (9th Cir. 1977) ............................................................... 23

*US v. Bagley,*
   473 U.S. 667 (1985) ................................................................................ 19

*Wandick v. Chrans,*
   869 F.2d 1084 (7th Cir. 1989) ............................................................... 23

*White v. McKinley,*
   605 F.3d 525 (8th Cir. 2010) .......................................................... 15, 17

*Zinermon v. Burch,*
   494 U.S. 113 (1990) ................................................................................ 16

**Statutes**

Cal. Const., art. I, §16 ............................................................................. 22

**Rules**

F.R.Crim.P. Rule 23(b)(1), 31(a) ............................................................. 22

Fed. R. Evid. 404(b) and 403 ................................................................... 25

Fed. R. Evid. 801(d)(2)(B) ......................................................................... 4

## I.    INTRODUCTION

As the Court is aware from prior motions in this case, Defendants contend that Mr. O'Connell is guilty of Jay French's murder. The instant motion explains why that argument is impermissible here, and if permissible is an affirmative defense on which Defendants bear the burden to prove Mr. O'Connell would be criminally convicted, and why there is insufficient evidence to support the defense.

Mr. O'Connell claims that the Defendant detectives violated his due process right to a fair trial by failing to disclose material exculpatory information regarding alternate suspects and the reliability of, and suggestibility during, eyewitness identifications; by presenting false and misleading statements in their reports; and thereby setting in motion a chain of events resulting in his wrongful conviction and decades of incarceration. A *Monell* claim is brought against LASD for failure to have adequate policies, oversight and training.

This motion addresses why, in light of the prior habeas determination that Mr. O'Connell's constitutional rights were violated by, *inter alia*, the suppression of exculpatory evidence, and the fact that, in the course of that habeas proceeding, substantial evidence emerged undermining the reliability of and directly contradicting the evidence relied on at the original criminal trial, there is insufficient reliable evidence of guilt from which a jury could find that Mr. O'Connell murdered Jay French.

Because this motion is directed at the sufficiency of the evidence to convict Mr. O'Connell, the evidence of the violations of Mr. O'Connell's rights is only addressed to the extent it is relevant to that issue. (A separate summary judgment motion on liability is also being filed.)

In a nutshell, Plaintiffs maintain that the only arguably admissible evidence of Mr. O'Connell's guilt now available is the following:

1. **Dan Druecker.** Mr. Druecker was the sole eyewitness to the actual murder. He originally identified Mr. O'Connell as the person he saw shoot Jay French, and so testified. He has since totally recanted his identification, testified

that he could not make an identification, was manipulated and pressured into doing so, and made numerous unreported statements to the Detectives that he could not make an identification. Significantly, irrefutable scientific evidence has now determined that his uncorrected eyesight (he was not wearing his corrective lenses at the time he saw the murder) was too poor to make a valid or at all reliable identification, independently of Mr. Druecker's recantation.

2. **Arturo Villareal.** Mr. Villareal saw the shooter at the scene run and jump into a yellow Pinto from a distance he said he thought was 175 feet (based on hearsay told to him by an officer). Measurements show it was actually 250 feet. Mr. Villareal testified that he never made a positive identification, but Defendant Smith testified at the criminal trial that he did. Assuming Mr. Villareal had perfect vision, newly available irrefutable scientific evidence has established that he was too far away to make a reliable eyewitness identification.

3. **Alex Sanchez.** Alex Sanchez testified that he thought he picked out two possible people he thought might have been the shooter, and the police report indicated he identified a different person than Mr. O'Connell from the photo array and did not pick Mr. O'Connell. This is not remotely evidence of guilt.

4. **Maurice Soucy..** The detectives showed Mr. Soucy (a neighbor of Jeanne Lyon, Jay French's ex-wife) a photo array from which he purportedly identified Mr. O'Connell (suppressed detective notes indicated his identification was equivocal). Detectives also showed him a darkened photo of a "look-alike" yellow Pinto station wagon taken at night, which showed only parts of the car indistinguishable from a similar Ford station wagon (a Country Squire, not a Pinto) driven by Mr. O'Connell. The manipulated darkened photo was so flawed that it cannot reliably connect Mr. O'Connell to a yellow Pinto, especially since other neighbors testified he drove a different model brown Ford station wagon.[1]

---

[1] This summary and the Statement of Facts do not include statements made by Ed Lyon while in LASD custody in 2014 after being arrested for Jay French's murder (and released after he made them). Any statements contained in those interviews

Substantial new affirmative evidence of innocence has come to light in addition to the alibi evidence presented at the criminal trial, including confessions by Ms. Lyon that she hired a hit man for the murder, and Mr. O'Connell was innocent. In summary, there is irrefutable scientific evidence that the only two people to arguably identify Mr. O'Connell as the shooter could not have seen his facial features sufficiently to make a reliable identification. Maurice Soucy's testimony, even if not considered discredited in light of the highly suggestive identification procedure to link with a yellow Pinto and his unavailability for cross-examination, is insufficient to establish that Mr. O'Connell was the shooter. And there is compelling affirmative evidence of innocence.

## II.    STATEMENT OF FACTS.

### A.    PROCEDURAL FACTS

Frank O'Connell was tried and convicted of first degree murder on January 15, 1985. He was sentenced to 25 years to life. SUF #2. Throughout the criminal proceedings and his more than 27 years in prison, Mr. O'Connell steadfastly maintained his innocence. SUF #3. His petition for a writ of habeas corpus was granted on March 29, 2012. SUF#4. The underlying murder charges were dismissed on June 11, 2012, after the District Attorney's Office indicated it was unable to proceed. SUF #5.

---

are hearsay, made in a coercive interview environment, and not under oath. To the extent they contain statements purportedly made by third parties Jeanne Lyon or her sister Debbie Zitella, neither Ms. Lyon nor her sister were ever confronted with the statement, making them not even admissible for impeachment as a prior inconsistent statement, and both have testified that they believed Mr. O'Connell was innocent. These statements were immediately disavowed by Mr. Lyon, who submitted a declaration upon his release explaining that he made them because he thought it was the only way to secure his release on the charge of the murder of Jay French. To the extent Defendants attempt to rely on this evidence, we will address it further in the Reply, and reserve the right to supplement the record if Defendants present misleading or incomplete information.

### B.   INVESTIGATION BACKGROUND FACTS.

Jay French was murdered on January 5, 1984. SUF #6. Mr. French had been engaged in a longstanding dispute with his ex-wife, Jeanne Lyon, over the custody of their child, Jay, Jr. SUF #7. Mr. French had custody of his son, but litigation over future custody continued and was hotly contested. SUF #8. Mr. O'Connell was a friend/acquaintance of Ms. Lyon, and had stayed with her for a few weeks in 1983. SUF # 9. Mr. French told Officer Gitmed of the South Pasadena Police Dept. before he died that he had been shot by a man who was driving a yellow Ford Pinto, and that that he did <u>not</u> know the identity of the shooter. SUF 21[2]; Other Jay French neighbors who were present told officers either nothing indicating French recognized the shooter or he said he did not recognize the shooter. SUF 340-41

### C.   EVIDENCE OF GUILT AND SUBSEQUENT EVIDENCE DISCREDITING IT.

As mentioned in the Introduction, there were three eyewitnesses to some aspect of the murder, plus Mr. Soucy linking Mr. O'Connell to a yellow Ford Pinto, and Ed Lyon's statements. We address each.

#### 1.   Dan Druecker

Mr. Druecker, the only true eyewitness to the murder (SUF # 26), testified at the murder trial that he could identify Mr. O'Connell as the murderer. He testified at the preliminary hearing, the trial, the evidentiary hearing on Mr. O'Connell's habeas Petition and in deposition in this case. He also has submitted declarations in the habeas case and this case. Expert vision evidence now establishes that he could never make a reliable identification.

Mr. Druecker's pre-filing statements to the Defendant Detectives were contained in reports prepared by them (although much was omitted). Mr. Druecker

---

[2] For ease of presentation, the documents in the Murder Book are relied on by Plaintiffs in this motion. Some of the facts relied on were not presented at the criminal trial, although most were. The police reports in the Murder Book were either authored by the Defendants Smith, Parra and LASD, or were adopted by them in the course of their investigation by their inclusion in the Murder Book presented to the Distract Attorney and thus constitute adoptive admissions, admissible against them. See Fed. R. Evid. 801(d)(2)(B) (statement a opposing "party manifested that it adopted or believed to be true" is not hearsay).

testified at the habeas hearing that he testified falsely at the trial and that his criminal trial testimony that he could identify Mr. O'Connell as the shooter of Jay French was not true SUFs 83-86; that he did so under pressure and influence from the Detectives SUFs 73-80; and that he told the Defendants that he could not make a reliable identification (which was not revealed in the police reports). SUFs 69-72. More specifically, he testified at the habeas hearing that: a) he wore glasses for myopia (nearsightedness), which he was not wearing when he saw the shooting SUF 31, 55, 58, 59; b) that when he heard shooting, he ducked, and got only a brief glimpse of the shooter SUF #32, 61-68, 112; c) that he only saw the shooter's left profile SUFs 63-64,113; d) that he had never before seen a gun fired, felt scared and confused during the shooting, and focused on the gun SUF #62, 66, 67; e) that he told the Detectives he could not remember what the shooter looked like and asked to be hypnotized SUF #69; f) that the Detectives kept calling and then showed up with a set of photos, which he took as an indication that they had found the shooter SUFs 72-80; g) that he told the Detectives that he did not recognize anyone in the photos, after which they told him to look really hard, which he again took as an indication that the shooter was among the photos SUF #74, 75; h) that he pointed to photo #3 and asked if that was the shooter, after which the Detectives asked if that was his identification, which led him to say he thought that was shooter SUF #76, 77; i) that the Detectives then told him he had to be certain, and only then did he say that was the guy SUF #59; j) that he felt intimidated and scared by the Detectives SUF #78; k) that, after he made the identification, one of the Detectives made a call in his presence stating they had a positive identification, which he interpreted to mean he had picked out the shooter SUF #80; l) that, although a sketch was done, it did not look like the guy he saw SUF #71;and  m) that, although he testified at the preliminary hearing and trial that he was certain of his identification, he was not, and could not in fact identify Mr. O'Connell as the shooter. SUF #83-85. He has since confirmed his testimony in a filed declaration. SUF #95.

Further, scientific evidence establishes Mr. Druecker's uncorrected eyesight was at least 20/200 and likely was 20/300 or more. It would not have been possible for him to make a reliable identification from that distance, which is the equivalent of at least a football field away. SUF 41-42, 90-104. The viewing conditions significantly increase the difficulty in making an identification (short time, profile view, presence of a gun, fear). SUF 31, 55-59, 62-64, 66-67, 104-105, 109-114.

### 2.    Arturo Villareal

Witness Arturo Villareal was delivering flowers at the building where Jay French was shot. SUF #115. He saw the shooter drive away with a woman in a 1970-75 yellow Pinto wagon with faded wood sides. SUF #116. The Detectives' police report stated that Mr. Villareal chose Mr. O'Connell, and said he was "the strongest contender, and I'm sure that's him." SUF #118.

Mr. Villareal testified at the Preliminary Hearing and the trial. At the Preliminary Hearing, he said, in response to whether he was able to see the "features" of the person he saw running down the driveway, "No, not really. I could just tell just - just describe him just a little bit." SUF #119. He said he was shown photographs, picked out the person as best he could, and told the Detectives that "one of them looked like almost like the person that had jumped in the car. I couldn't say yeah or no." SUF#120.

Mr. Villareal testified at trial that he was unable to identify Mr. O'Connell and that, at the lineup, he identified two photographs and told the Detectives he "couldn't be positive." He further testified he told the Detectives that Mr. O'Connell's photograph "looked like the person who was there, but I'm not positive." SUF #119-24. On cross examination, Mr. Villareal indicated he believed he was 175 feet away, based on what an officer told him, but it wasn't further. SUF #125 [In fact, it was 250 feet away based on precise measurements made by Kate Germond during the habeas. SUF #130.] Mr. Villarreal was reaching for a door handle, saw a guy running with a gun and ducked. SUF #126. He saw the running man's right side. SUF# 127. He did not "really" get a "good look at the face"; he

"could tell just basic features." SUF #128. At that point, he "would have been looking through two windshields and then about 175 feet down." SUF # 129.

Mr. Villareal denied having made a positive ID. At the preliminary hearing, he maintained he never made a positive ID from the photospread, and, when asked about the photos said that one of the photos "almost" looked like the assailant but "[he] couldn't say yeah or no…" SUF #119-124, 131. At the 1985 criminal trial, Mr. Villareal *again* testified that he could not positively identify Frank O'Connell as the person he saw on the day of the murder and that he had *never* made a positive identification. Mr. Villareal testified that, when shown the photos, he told detectives that number three looked like the gunman but he couldn't be positive; while there was a resemblance, he was not sure it was the same person. SUF #132.

Detective Smith testified in rebuttal at the murder trial that Villareal "looked at the folder for a couple of minutes and studied each picture. He kept going back to picture one and picture 3." SUF #135. Regarding how sure Mr. Villareal was, Det. Smith testified that he said "they all looked alike, but number 3 looked like the person that most likely looked like the person he's seen." SUF #136. That information was not in the report. After testifying to the foregoing, and being prompted by the District Attorney, Det. Smith quoted from his report, that Mr. Villareal chose Mr. O'Connell, and said he was "the strongest contender, and I'm sure that's him" and claimed that was a quote. SUF #137.

By Det. Smith's own admission, the police report falsely represented what occurred during Mr. Villareal's identification. He testified that 1) Mr. Villareal went back and forth between Nos. 1 and 3, and 2) Mr. Villareal said the person he identified only "most likely looked like the person he's seen." Not only was this information not in the police reports, but it is directly contrary to the description in the report that Mr. Villareal pointed to photograph 3 (Mr. O'Connell) and stated, "he is the strongest contender, and I'm sure that's him." SUF #135-137.

Whether Mr. Villareal was 250 feet away (the measured distance), or even 175 feet, he was too far to make a reliable identification of a running man seen

from one side for a couple of seconds. Expert optometrist Paul Michel explains that, at that distance, even a person with perfect 20/20 vision could not make an identification because the details of facial features cannot be made from that far. The human eye is simply incapable of seeing more than very general features at that distance. SUF #138-142. Expert Gary Wells' report shows photos of what a person looks like at distances of 5.4, 43 and 172 feet, demonstrating that the person is indecipherable at 172 feet. SUF #143.

### 3.    *Alex Sanchez*

Witness Alex Sanchez saw the shooter drive away from the scene of the shooting in what he described as a yellow Pinto station wagon with wooden sides, driven by a woman. SUF #144. According to the police report, Mr. Sanchez picked photo #1 (who was not Mr. O'Connell) from the photographic lineup "and stated he was not sure and there was possibly a resemblance to the person he had seen riding in the passenger seat of the yellow Pinto on 01/05/84." SUF #146.

At Mr. O'Connell's criminal trial, Mr. Sanchez testified that he thought he "picked out two people I thought might have been the guy" referring to the passenger. He believes he picked #s 1 and 3 as the people who "resembled" the passenger. SUF # 147. The police report says he only pointed to Photo # 1 (not Frank O'Connell). SUF #148.

### 4.    *Maurice Soucy*

Detectives were looking to see if neighbors could associate Frank O'Connell with a yellow Pinto station wagon. The police showed Maurice Soucy, a neighbor of Jeanne Lyon a "look alike" nighttime yellow Pinto station wagon with wood sides, similar to the description of the getaway car. That photo is dark. SUF #150-151, 172, 176. They also showed him the photo array. SUF #152.

The police report states that Mr. Soucy "took one look and indicated he had seen a vehicle matching this description, and it was driven usually by a male White, approximately 30 years old, 6'2", 180 pounds, slender build, with sandy hair" and further indicated that he had seen a man staying with Jeanne Lyon who

asked him to jump start a similar looking car. SUF # 153. The police report further states that the person asked Mr. Soucy "if he knew anyone in the neighborhood that needed carpentry or plumbing done because he was a handyman." SUF#154.

The police report states Mr. Soucy was shown the six-pack of photos and "immediately pointed out photograph #3 and stated that that was the person who asked him to jump start the yellow Pinto" and that he "was able to recognize the individual right away because he was always having car trouble." SUF #155. The police report also states that Ina Soucy "concurred" with Mr. Soucy's identification of # 3 but "she indicated she thought his hair was a little bit curlier." SUF #156.

According to one of the Detectives' undisclosed, contemporaneous, handwritten notes, during the interview with Maurice Soucy and his wife, Ina, Mr. Soucy "I.D. #'s 3 & poss #1 & photos of pinto & put frank as positive with Pinto." SUF #157. The second Detectives' notebook of the interview said, "pointed out # 3 as poss. suspect – because of face – but hair was curlier Maurice." SUF # 158 (emphasis supplied).

Mr. Soucy testified to his identification of the yellow Pinto and Mr. O'Connell at trial, consistently with the version described in the police report (but without reference to curly hair). SUF #159.

The notebooks and their contents, including the Soucy information, were not known to the prosecutor or defense, and were only discovered during the habeas proceedings. SUF # 160. The police report description is false, given that the notes point to a second suspect and indicate a possible identification; the statement regarding curlier hair is attributed to Ina, not Maurice, in the notes.

The investigators showed the nighttime photos of the side of a "look-alike" Pinto Wagon to Soucy to establish a relationship between Mr. O'Connell and the shooter's car. SUF #164. No records establish that Druecker, Villareal, or Sanchez ever testified or stated that the nighttime photo matched what they saw. The photos were poor, nighttime photos showing only a small portion of a car with wood panel sides. SUF 164. It was known to the detectives that Mr. O'Connell in fact had

owned and driven a brown 1973 Ford Squire LTD wagon with wood panel sides during the time Soucy could have seen him in the neighborhood. SUF#162-63. (Other neighbors knew, it was readily discoverable from DMV records, and Mr. O'Connell told them.) SUF #162-163, 204-210. Other than Soucy's claim, no evidence links Mr. O'Connell to a Ford Pinto. Under the conditions that the investigators presented to Soucy, a person could easily confuse a Ford Pinto Wagon with wood panel sides with a Ford Squire LTD wagon with wood panel sides. SUF #165-168. The photos below were taken from the Wells report. SUF #165.

A 1973 Ford Country Squire Wagon LTD. Country Squire wagons had four doors.

Photos of Ford Pinto Wagon shown to Soucy.

A 1972 Ford Pinto Wagon had two doors. A Ford Country Squire had four doors.

The front ends of the Pinto (top) and the Country Squire (bottom).










These photos (Figure 2 from the Wells Report) compares them. SUF #165. On the far left are a front side and a rear side view of a 1973 Ford Squire LTD wagon with wood panel sides, which is the model and color owned by Mr. O'Connell; the second panel from the left is a copy of the nighttime photos of a Ford Pinto with wood panel sides that investigators showed to Soucy. While the rear and sides (which is what the nighttime photo showed) are very similar, the key

differences (two door versus four door and front end) were obscured (see right side panels of Figure 2). SUF #165-166. The Soucy identification was very flawed, by the suggestiveness of showing only one photo when Mr. O'Connell drove a similar looking wagon that was not a Pinto. SUF #167-173.

Given the very low light photos of the Pinto and only angled views of the sides, there is little to distinguish between the Ford Squire wagon that Mr. O'Connell drove and the Pinto wagon. What stands out is that they both had wood panel sides. If Soucy had been given better photos of a Ford Pinto wagon, he would have had a chance to see that there are some huge differences between the vehicles. The showing of dark images that focused only on similarities between the Pinto and the Country Squire (wood panel sides) without showing Soucy properly-lighted photos that captured the front ends and showed the number of doors renders the "identification" of the car totally unreliable. Given all the circumstances, any identification of the yellow Pinto was unreliable. SUF #164-176.

### D.    AFFIRMATIVE EVIDENCE OF INNOCENCE

#### 1.    *Alibi Evidence and Neighbor Evidence That Mr. O'Connell Never Drove a Yellow Pinto*

Scott Eggerer testified at the O'Connell criminal trial that he was living with Frank O'Connell in LaVerne at the time of the murder; that he was with Frank O'Connell the whole morning of January 5, 1984, until at least 1:30-2:00 p.m.; that Karen Baxter arrived at the LaVerne house around 1:30 on January 5, 1984, and Frank O'Connell was there when she arrived; when he first talked to the police, he only recalled that Frank was with him through lunch time, but after subsequently talking with Karen Baxter about when she gets off work and when she arrived did he determine that it was through 1:30-2:00 p.m.; and he never saw Frank O'Connell with a yellow Pinto during the time Frank between Sept. 1983-January 1984. SUF #213-216.

Jim Hamilton testified at the O'Connell criminal trial that he was living with Frank O'Connell in LaVerne at the time of the murder, and was with Frank

1    O'Connell the whole morning of January 5, 1984, until approximately 1:30 p.m. or

2    later; SUF #217; that he recalled the events of January 5, 1984 because the next

3    day he went to a basketball game at the Forum with Frank O'Connell; and that he

4    never saw Frank O'Connell with a yellow Pinto during the time Frank lived with

5    him SUF #218-219.

6        Karen Baxter testified at the O'Connell criminal trial that she was Jim

7    Hamilton's girlfriend on January 5, 1984, and arrived at the house Jim was living

8    at with Frank O'Connell and Scott Egerer at approximately 1:30-1:35 p.m., after

9    getting off work at 1:15, which she did every day. Karen Baxter told the South

10   Pasadena Police when they interviewed her that she arrived at the house at 1:35

11   p.m. SUF #220-224

12           ***2.      Jeanne Lyon Has Confessed Multiple Times To Third Parties***
13           ***That She Hired a Hit Man To Kill Jay French And An***
             ***Innocent Man Was In Prison For It.***

14       Depositions of Boone Maynard, Becky Morse, Michael Flick and Debbie

15   Zitella have been conducted in this case. Mr. Maynard, a paraplegic for whom Ms.

16   Lyon was a caregiver and then in a romantic relationship, testified that Ms. Lyon

17   told him that she had someone "take care" of Jay French, and that Ms. Lyon "felt

18   bad" because "there was an innocent man in jail for it." SUF #241-242.

19       Becky Morse, a co-worker/friend, testified that Ms. Lyon said a lawyer

20   friend who worked in her office helped make sure her former husband was taken

21   care of. SUF #244. Ms. Morse told LASD investigator Lankford that Ms. Lyon did

22   tell her that. SUF #245 (Ms. Morse testified that Ms. Lyon did not say an innocent

23   man was in prison.  Because her contrary statement, which could have been used to

24   refresh recollection, was disclosed after her deposition, Plaintiffs move it into

25   evidence under Fed. R. Evid. § 807.)

26       Michael Flick, who had been married to Jeanne Lyon, testified that she told

27   him before they were married that her then husband, Ed Lyon, met someone at a

28   bar who said he murder Jay French for her; that Ed arranged for a lawyer Jeanne

1    worked with, Jim Mack, to pay the guy; that the person arrested for the murder

2    wasn't the person who murdered Jay French; and that the total was $10,000 for the

3    murder. SUF #247-253. Mr. Flick first executed a signed declaration to the

4    foregoing effect on 02/9/1999, the day after he first met with Centurion Ministries

5    and long before his call to Centurion Ministries in 2014 indicating that he thought

6    he was going to receive 20% of Mr. O'Connell's recovery. SUF# 254-256.[3]

7        Debbie Zitella, Jeanne Lyon's sister, testified that Ms. Zitella told her before

8    it happened that she wanted Jay Sr. dead, and she was going to get James Mack, a

9    disbarred attorney, to help her with a loan and a hit man; and told her afterwards

10   that the killer was a hit man and family man who did this on the side, and that an

11   innocent man was in jail for the murder. SUF #229-236.[4]

12           **3.      *Mr. O'Connell's Hair Did Not Match The Shooter***

13                    ***Descriptions.***

14       All three of the witnesses on the scene – Daniel Druecker, Arturo Villareal

15   and Alex Sanchez –described the shooter as having long shoulder length hair.

16   (Druecker said "long, brown shoulder-length hair"); Ex. 001.04-12 Villareal said

17   ("shoulder length, blond hair; later said "long blond hair, shoulder length and

18   bangs"); Ex. 001.04-8 (Sanchez said "long shoulder length brown, curly hair which

19

---

20   [3] Defendants will attempt to impeach this testimony by referring to the recording of a call Mr.
     Flick made to Centurion when he said that he was told recently of his commission recently at a
21   meeting with Paul Henderson. Independent witnesses to that meeting verify that no such
     conversation occurred. SUF #257-259. That impeachment is of little probative value because
22   undisputed and unimpeached testimony establishes that Mr. Flick described Ms. Lyon's
     statement before ever coming into contact with Centurion Ministries. Imogene Paige was Mr.
23   Flick's girlfriend around 1987 or 1988, and again in 1998-99 after he married and divorced
     Jeanne Lyon. They are not together now, she is married to someone else, but they are friends.
24   She was present when Mike Flick met with Centurion investigators. Before that meeting, Mike
     Flick told her on a couple of occasions that Jeanne Lyon had had her husband killed and an
25   innocent man was in jail. She also testified that she was present during the interview when Mr.
     Flick related Ms. Lyon's confession; no compensation was offered, and they did not tell Mr.
26   Flick what to say. SUF#260-265.
27   [4] Zitella has made some contradictory statements, not at her deposition, but at interviews with the
     Sheriff's Department, regarding whether she heard that Mr. O'Connell was innocent from Jeanne
28   Lyon or a representative of Centurion Ministries. When viewed in the context of statements of

1  hung over his ears"). SUF#271 The O'Connell photo array has people with a
2  mustache and long hair. SUF #272-273.

3        However, Mr. O'Connell's hair at the time was short. There is a photo taken
4  the day before Christmas 1983 (12 days before the murder) of Frank with his
5  approximately seven month old nephew. Given the nephew's age in the photos and
6  when he was born, it has to be from 1983. SUF #274-279. Frank's hair is short and
7  could not possibly have grown out to fit the shooter's hair description 12 days
8  later. His hair in the booking photo, taken 1/12/84, shows hair ungroomed and
9  grown out somewhat, but not close to fitting the description of shoulder length
10 hair. SUF# 281. These Christmas 1983 photos demonstrate that Mr. O'Connell
11 could not have had shoulder length hair on Jan. 5 1984.

12             **4.    *The Suppressed Anonymous Tip Corroborates That Frank
13                     O'Connell Was Not The Person Who Killed Jay French.***

14       On February 8, 1984, an anonymous male caller contacted the Los Angeles
15 Sheriff's Department in Altadena, and relayed that, when Jeanne Lyon learned that
16 Jay French received custody of the children, she paid a male in Oregon $7,000.00,
17 who in turn paid someone named Richard Stephens $5,000.00 to murder Jay
18 French. SUFs #305-306. This tip was only disclosed in this case (not the habeas or
19 the criminal trial). SUFs#314-325. This information must be considered in the
20 context of the also suppressed Gina French interview, where she relayed that Ms.
21 Lyon and a male companion, Randy Smith, had previously tried to kill Jay French
22 by running him off the road. SUF #283-284. The tip supported the inference that
23 Randy Smith was potentially involved, though not necessarily as the actual
24 shooter; and any alibi for the day of the murder did not exclude his involvement in
25 the murder as the male in Oregon, where Smith was living in 1984, who hired the
26 shooter. SUF #328.[5]

27 _____
   others to whom Ms. Lyon confessed, her testimony is nonetheless highly corroborative of that
28 other testimony.
   [5] While Defendants contend that their own follow-up investigation excluded Randy Smith, and
   have even filed a summary judgment motion that it is not *Brady* information on that basis, it is

                                        14

1
2

### III.    MR. O'CONNELL WAS DETERMINED NOT GUILTY IN THE CRIMINAL JUSTICE PROCESS, AND THE JURY SHOULD BE INSTRUCTED THAT HE IS INNOCENT AS A MATTER OF LAW.

3

#### A.    *GUILT IS ONLY DETERMINED IN CRIMINAL PROCEEDINGS.*

4
5

Since guilt is not relevant to liability[6], the question becomes whether, and

6
under what standards, it can be asserted as a damages defense. *See Carey v.*

7
*Piphus*, 435 U.S. 247 (1978) (allowing damages defense that students would have

8
been suspended anyway absent violation of procedural due process, discussed

9
*infra*). But a foundational question is whether guilt may be asserted here at all.

10
A defendant may not sue for wrongful conviction unless s/he has overturned

11
his/her conviction and not been re-tried and re-convicted. *See Heck v. Humphrey*,

12
512 U.S. 477, 486-87 (1994) (to bring §1983 claim, conviction or sentence must be

13
reversed by appeal, habeas, court ruling or expunged by executive order). Under

14
*Heck*, guilt or innocence is determined in the criminal process, where the plaintiff

15
is either convicted, or freed without being convicted, not in a civil rights case. That

16
rule avoids parallel litigation and potentially conflicting outcomes. *Id*.

17
In *Schlup v. Delo*, 513 U.S. 298 (1995), the Supreme Court explained that,

18
"in our legal system, … *the line between innocence and guilt is drawn with*

19
*reference to a reasonable doubt*…[because] proof beyond a reasonable doubt

20
marks the  legal boundary between guilt and innocence" *Id.* at 328 (emphasis

21

---

22
questionable that their investigation even excluded him as the shooter and it certainly did not
23
exclude him as being involved in the manner described in the anonymous tip. No investigation
was conducted to determine if Smith played the Oregon role described in the anonymous tip.
24
SUF #329. The determination that the Stevens located at the Catalina address identified in the
anonymous tip was not the registered owner of a Pinto seen in the area did not even establish that
25
Pinto that was not the car used in the shooting since there are various ways the car could have
been used by Stevens even if not registered to him. SUF #330.
26
[6] *See, e.g., White v. McKinley*, 605 F.3d 525, 537 -538 (8th Cir. 2010) (evidence of guilt properly
excluded from§1983 trial on *Brady* violation; plaintiff had been acquitted in criminal re-trial;
27
"the question for the jury was whether White received a fair trial"); *Baker v. McCollan*, 443 U.S.
137, 145 (1979) (an arrestee's "innocence of the charge..., while relevant to a tort claim of false
28
imprisonment in most...jurisdictions, is largely irrelevant to his claim of deprivation of liberty
without due process of law"); *Burge v. Parish of St. Tammany*, 1995 WL 317125, 3 (E.D.La.)

1  supplied). Thus, a person is "actually innocent" if s/he would not be convicted

2  based on proof beyond a reasonable doubt.

3    **B.    A RETROSPECTIVE ANALYSIS OF WHETHER THE SAME RESULT**
    **WOULD HAVE OCCURRED ANYWAY IS NOT APPROPRIATE WHERE THE**
4    **CRIMINAL CASE WAS ULTIMATELY DISMISSED.**

5         In *Carey v. Piphus*, 435 U.S. 247, (1978), students sued challenging a school

6  suspension without due process. All parties agreed that, "if petitioners can prove

7  on remand that '[respondents] ***would have been suspended even if a proper***

8  ***hearing had been held***,'" then "the failure to accord procedural due process could

9  not properly be viewed as the cause of the suspensions." *Id*. 435 U.S. at 260

10  (emphasis supplied). Where the parties differed was whether the students would

11  nonetheless be entitled to damages for injuries inherent in the deprivation, which

12  the Court ruled they would not, thus limiting damages if they would have been

13  suspended to nominal damages. The "principle that damages are designed to

14  compensate persons for injuries caused by the deprivation of rights" governs both

15  §1983 actions and the common law, but, in the §1983 context, the "*rules governing*

16  *compensation* for.. the deprivation of constitutional rights should be *tailored to the*

17  *interests protected by the particular right in question*." *Id*. 435 U.S. at 255-59.

18  (Emphasis supplied.). As the Court later explained, *Carey* held that "*where the*

19  *deprivation would have occurred anyway*, and the lack of due process did not itself

20  cause any injury (such as emotional distress), the plaintiff may recover only

21  nominal damages".*Zinermon v. Burch*, 494 U.S. 113, 126 (1990).[7]

22         The essence of the *Carey* rule, which applies equally to the due process

23  claim here, is that, if a person would have suffered the same injury absent the

24  _____

25  ("Mr. Burge's guilt or innocence is irrelevant to the issue of whether exculpatory evidence was
    wrongly withheld, an essential element of his civil rights cause of action").

26  [7] Other constitutional cases pose such hypothetical "would have" inquiries, in some cases as the
    basis for defeating liability as well as damages. *See, e.g., Texas v. Lesage*, 52 U.S. 18, 21 (1999)

27  (§1983 race discrimination case); *Dayton Bd. of Ed. v. Brinkman*, 433 U.S. 406, 420 (1977)
    (desegregation case); *Price Waterhouse v. Hopkins,* 490 U.S. 228 (1989) (mixed motive

28  employment cases); *Mt. Healthy City Sch. Dist. Bd. Of Educ. v. Doyle*, 429 U.S. 274, 285-287
    (1977) (damages defense from when plaintiff would have been discharged anyway).

constitutional violation, then there is either no constitutional violation (see framing of issue in *Mt. Healthy* (fn.6) or no causation of the resulting damage (see framing of issue for due process violations in *Carey*). In *Carey*, it was not possible to hold a new suspension hearing for people who were no longer students and not in a position to continue as students, so a hypothetical inquiry was necessary. [8]

Under *Carey*, the question in a wrongful conviction case is whether the deprivation (i.e., conviction) would have occurred anyway, absent a constitutional violation. Unlike the school expulsion hearing in *Carey*, where it was too late to hold a new proceeding, the government has the opportunity to re-prosecute after the original conviction is vacated based on proper evidence. Whether conviction would have occurred anyway is thus not a hypothetical issue. He either was or wasn't convicted.

If the person was not re-tried because, as here, the prosecution declined to do so for lack of evidence (what was meant by the inability to proceed), that should end the inquiry. A hypothetical inquiry about whether he would be convicted is inappropriate because we know he was not even retried, much less convicted. *Carey*, in combination with *Heck* and *Schlub*, inexorably lead to the conclusion that, since Mr. O'Connell could have been but was not retried, he **was never legally convicted and sent to prison; he is thus innocent as a matter of law; and therefore he is entitled to damages for wrongly spending 27 plus years in prison as an innocent person.**

In the only two reported cases of which Plaintiffs are aware where a wrongfully convicted person was tried and acquitted, the Court of Appeal affirmed rulings that the defendants could not introduce evidence of guilt. *See White v. McKinley*, 605 F.3d 525 (8th Cir. 2010) (not an abuse of discretion to exclude evidence of guilt and preclude the defense from arguing guilt where person fled

---

[8] The "would have" inquiry appears in tort law where appropriate *See e.g.*, REST 3d TORTS-PH §26 ("Factual Cause"), comment e ("The requirement that the actor's tortious conduct be

after first trial and conviction, case was reversed on *Brady* grounds, and Plaintiff was retried and acquitted); *Thompson v. Connick*, 553 F.3d 836, 864 (5ᵗʰ Cir. 2008), *aff'd by equally divided en banc court*, 78 F.3d 293 (2009), *certiorari granted on other grounds*, 130 S.Ct. 1880 (2010 (guilt not a defense where the plaintiff was released on a writ of habeas corpus, retried and acquitted).

Although the current situation is not an exact parallel to *White* or *Thompson*, Mr. O'Connell's situation is more compelling because the prosecution obviously did not believe it could obtain a conviction. It makes no sense that a guilt defense is available where the prosecution did not believe it had sufficient evidence to proceed, but is unavailable where the prosecution did believe it had sufficient evidence to go to trial albeit it was ultimately unsuccessful.

Defendants would not be deprived the opportunity to argue guilt because legal guilt or innocence is a determination between the sovereign and the individual. Since Mr. O'Connell was never lawfully convicted, he never lawfully spent time in prison. *See Thompson,* 553 F.3d at 864. Without a conviction, it is an undisputed fact that Mr. O'Connell was wrongly imprisoned, and Plaintiffs should be granted summary judgment on the issue of guilt on that basis.[9]

This ruling would not preclude admission of evidence of guilt to the extent it is relevant on other issues (e.g., *Brady* violation and evidence from the criminal trial relevant to it) with an appropriate limiting instruction indicating that it may not be considered for purposes of guilt. The Court should instruct the jury, both initially and in the final jury instructions, that Mr. O'Connell has never been lawfully convicted of the crime for which he was imprisoned, is "actually innocent" under the law, if the jury finds liability, it must award him damages as an

---

necessary for the harm to occur requires a counterfactual inquiry. One must ask what would have occurred if the actor had not engaged in the tortious conduct.")

[9] Defendants can contest whether they engaged in unconstitutional conduct, whether their conduct deprived Mr. O'Connell of a fair trial, whether they had the requisite state of mind and whether Mr. O'Connell was damaged. But, because Mr. O'Connell has not been convicted, they cannot argue he is really guilty, and deserved to be in jail anyway.

innocent man wrongly convicted and imprisoned. The Court should preclude Defendants from referring, implying or suggesting in argument or questioning that Mr. O'Connell murdered Jay French.[10] Evidence regarding materiality would come in with a limiting instruction.[11]

Mr. O'Connell would be free to emphasize his innocence because he is innocent in the eyes of the law and his innocence is important in the damages determination. He would specifically be permitted to show his efforts to establish his innocence and clear his name, including but not limited to his protestations of innocence to the parole board and others. He would be permitted to show evidence of his actual innocence adduced during the habeas investigation, including the testimony of Maynard, Morse, Flick and Zitella.

## IV.   IF THE DEFENSE OF GUILT IS ALLOWED, THE DEFENSE MUST PROVE THAT MR. O'CONNELL WOULD HAVE BEEN CONVICTED ANYWAY.

If the Court nonetheless permits guilt evidence, several questions arise: 1) Who has the burden of proof; 2) what is the standard of proof; 3) does the presumption of innocence apply; and 4) what type of evidence can be used? Few cases address these issues in the wrongful conviction context.

### A.   *THE BURDEN OF PROOF IS ON THE DEFENDANTS*

*Carey v. Piphus* put the burden of proof on defendants ("*if petitioners* [defendants below] *can prove…*," 435 U.S. at 260 (emphasis supplied)). Most Courts of Appeals to address the issue have held that the burden is on the

---

[10] This is exactly how the process works in reverse. If a convicted person brings a §1983 action for excessive force, he cannot contest his conviction, but the defendant can rely on it and use it, if it is otherwise relevant, in the civil action.

[11] For *Brady*, the standard is essentially whether defendant "received a fair trial, understood as a trial resulting in a verdict worthy of confidence." *US v. Bagley*, 473 U.S. 667, 682 (1985); *Kyles v. Whitley*, 514 U.S. 419, 434 (1995) (quoting *Bagley*). For false evidence, it is whether the false evidence "could have affected" the verdict. *See Mooney v. Holohan*, 294 U.S. 103, 112 (1935); *United States v. Agurs*, 427 U.S. 97, 103 (1976).

defendants.[12] *See McClure v. Indep. School Dist. No. 16,* 228 F.3d 1205, 1213 (10th Cir.2000) (defendant's burden to prove would terminate anyway); *Brewer v. Chauvin,* 938 F.2d 860, 864-65 (8th Cir. 1991) (same; must show "plaintiff would have been fired" absent due process violation); *Alexander v. Polk,* 750 F.2d 250, 264 (3rd Cir.1984) (both *Carey* and *Mount Healthy* require the public employer to show that "it would have reached the same decision"); *Franklin v. Aycock*, 795 F.2d 1253, 1263 (6th Cir. 1986) (district court improperly allocated "burden of proving causation" to the plaintiff).

## B.    THE JURY SHOULD BE INSTRUCTED THAT MR. O'CONNELL IS PRESUMED INNOCENT.

The "presumption of innocence …[is] axiomatic and elementary", and "lies at the foundation of our criminal law." *Coffin v. United States,* 156 U.S. 432, 453 (1895). This presumption "is a basic component of a fair trial," *Estelle v. Williams*, 425 U.S. 501, 503 (1976), and derives from the Due Process Clauses. *Taylor v. Kentucky*, 436 U.S. 478, 485-86 n.13 (1978). "The standard [of proof beyond a reasonable doubt] provides concrete substance for the presumption of innocence" *In re Winship,* 397 U.S. 358, 363 (1970) (internal quotation marks omitted). The "presumption of innocence and the beyond-a-reasonable-doubt standard apply to all criminal defendants without regard to their actual guilt or innocence." *U.S. v. Doyle*, 130 F.3d 523, 538 (2nd Cir. 1997). The presumption of innocence attaches until one has been *fairly* or *validly* convicted, which Mr. O'Connell has not.[13]

---

[12] The lone exception is the Second Circuit. *See McCann v Coughlin*, 698 F2d 112, 126 (2d Cir 1993). The Ninth Circuit has apparently not addressed burden issue so far as Plaintiff can determine, but district courts facing comparable issues have similarly ruled that the burden of proof is on the defendants. *See, e.g., Kramer v. Latah County, Idaho*, 2007 WL 988894 (D. Idaho Mar. 30, 2007) (Defendants have burden to show "that they would have made the same decision even in the absence of the due process violation").

[13] *See Herrera v. Collins,* 506 U.S. 390, 399 (1993) (after being "*afforded a fair trial and convicted*…, the presumption of innocence disappears") (emphasis supplied); *id*, 506 U.S. at 443 (Blackmun, J. dissenting) ("*conviction after a constitutionally adequate trial* strips the defendant of the presumption of innocence") (emphasis supplied); *Delo v. Lashley*, 507 U.S. 272, 278-279 (1993) ("Once the defendant has been convicted *fairly* …, the presumption of innocence disappears", citing *Herrera* majority and Blackmun *Herrera* dissent, *supra*) (emphasis supplied);

1    Thus, Mr. O'Connell is entitled to the presumption of innocence, a conclusion

2    reinforced by *Heck* and *Schlup's* requirements of conviction.

3    **C.    EVIDENCE THAT THE PROSECUTION DECLINED TO RE-PROSECUTE**
          **SHOULD BE ADMITTED.**

4

5    Where the defense is being allowed to argue guilt, the facts, as here, are that

6    the prosecution declined to re-prosecute. (If Mr. O'Connell had been re-tried and

7    acquitted, then the defense should not be allowed; if he was re-tired and convicted,

8    then the suit would be barred under *Heck* or, alternatively, there would be no

9    damages.) The prosecution's delineation to re-prosecute is relevant under the

10   *Carey* framework, and Plaintiff should be permitted to argue that the fact that the

11   declination supports the conclusion that he would not have been convicted.

12   **D.    DEFENDANTS MUST PROVE THAT MR. O'CONNELL WOULD HAVE**
          **BEEN CRIMINALLY CONVICTED.**

13

14   The only reported case we have found addressing the standard to be

15   employed where guilt is asserted as a defense to a wrongful conviction is

16   *Thompson v. Connick*, 553 F.3d 836, 864 (5th Cir. 2008), *aff'd by equally divided*

     *en banc court*, 78 F.3d 293 (2009), *certiorari granted*, 130 S.Ct. 1880 (2010).[14]

17   *Thompson* was retried and acquitted. Defendants argued they should have been

18   permitted to nonetheless argue Plaintiff's gilt in the §1983 case. In rejecting this

19   argument, the Court of Appeal explained that the acquittal determined the key

20   inquiry because, "*to establish that Defendants' Brady violation did not cause the*

21

22   _____

23   *Carriger v. Stewart*, 132 F.3d 463, 477 (9th Cir. 1997) (presumption of guilt applies "*after a constitutionally valid conviction*") (emphasis supplied); *cf. Stepney v. Lopes*, 597 F.Supp.1 (D.Conn. 1984) (grant of habeas petition means petitioner "will have been found to have been

24   wrongfully in custody from its inception").

25   [14] Because neither the en banc Fifth Circuit nor the issue addressed by the Supreme Court (whether imposing liability on a district attorney's office for failing to train a prosecutor, where

26   there was a single *Brady* violation, contravenes §1983's culpability and causation standards) disputed the original panel decision on whether the guilt issue could be re-litigated, the decision

27   is citable on this point, and in any event, this unanimous decision is of great persuasive value. (The panel opinion may be cited under Fifth Circuit rules. *See U.S. v. McFarland*, 311 F.3d 376,

28   377 (5th Cir. 2002) (en banc) (panel bound by a prior panel decision affirmed by an equally divided en banc court).)

1      *guilty verdict, Defendants would have had to demonstrate that they could still*

2      *prove Thompson was guilty beyond a reasonable doubt in the absence of the*

3      *violation." Id.* (emphasis supplied).

4           Thus, the affirmative defense of guilt requires proof beyond a reasonable

5      doubt that the plaintiff was guilty, based on constitutionally permissible evidence.

6      Defendants bear the burden of proof in a civil affirmative defense. *See, e.g., Belsea*

7      *v. Tindall*, 190 F. 440, 445 (9th Cir. 1911); *Lam v. Univ. of Hawai'i*, 40 F.3d 1551,

8      1564 (9th Cir. 1994) (preponderance standard for employer affirmative defense

9      that would have taken same action anyway). In the wrongful conviction context, a

10     slight reworking of the Carey standard establishes defendant's burden, which here

11     is to prove it is more likely than not that Mr. O'Connell would be convicted absent

12     the constitutional violation. See *Carey* language, modified so that the issue is

13     whether Plaintiff "would have been ~~suspended~~ **convicted** even if a proper ~~hearing~~

14     **trial** had been held." 435 U.S. at 260.

15          Because a conviction constitutionally requires proof beyond a reasonable

16     doubt, and both California and federal law require a unanimous verdict by a twelve

17     person jury (Cal. Const., art. I, §16; F.R.Crim.P. Rule 23(b)(1), 31(a)), the jury

18     should be instructed that, to succeed on their affirmative defense, Defendants must

19     prove it is more likely than not that Frank O'Connell would be found guilty

20     beyond a reasonable doubt of the murder of Jay French by a unanimous jury

21     composed of twelve people. See unpublished orders of Judge Howard Matz in

22     *Goldstein v. City of Long Beach*, CV 04-9692 AHM (Ex) (attached as Ex. A),

23     8/11/11 order in *Lisker v. City of Los Angeles*, CV09-09374 AHM (AJWx)

24     (attached as Ex. B), and 2/15/12 *Lisker* order (attached as Ex. C). (Mr. Litt was

25     counsel in both cases. There is not space to explain the evolution of Judge Matz's

26     analysis, but it can be gleaned from reviewing his decisions.)[15]

27

28     ‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾
     [15] The only other case directly addressing this issue, other than the Judge Matz decisions
     discussed above, is *Carter v. City of Philadelphia,* No. 97-CV-4499, 2000 WL 1016653, at 2-3
     (E.D.Pa.), which Judge Matz cites in both *Goldstein* and *Lisker*. There, the court held, in a §1983

**V.    UNDER THE FOREGOING STANDARD, THERE IS INSUFFICIENT EVIDENCE TO PERMIT DEFENDANTS TO ARGUE GUILT.**

While even a single witness can support the identification of a suspect, that evidence must be such it can be "*solidly believed*." *United States v. Ginn*, 87 F.3d 367, 369 (9th Cir. 1996) (quoting *United States v. Smith*, 563 F.2d 1361, 1363 (9th Cir. 1977).[16] *See also Jackson v. Virginia*, 443 U.S. 307, 318, 99 S. Ct. 2781, 2788-89 (1979) ("the critical inquiry on review of the sufficiency of the evidence to support a criminal conviction must be …. to determine whether the record evidence could reasonably support a finding of guilt beyond a reasonable doubt"); *Wandick v. Chrans*, 869 F.2d 1084, 1089 (7th Cir. 1989) ("*[c]redible* testimony of one identification witness is sufficient to support a conviction"); *United States v. Danzey*, 594 F.2d 905, 916 (2d Cir. 1979) (given the dangers of eyewitness identification, "we *must scrutinize such evidence with care*); *United States v. Chancey*, 715 F.2d 543 (11th Cir. 1983) (testimony so inherently incredible that no reasonable person could credit it beyond a reasonable doubt); *People v. Young*, 34 Cal. 4th 1149, 1181, (2005) ("[r]esolution of conflicts and inconsistencies in the testimony is the exclusive province of the trier of fact…., *unless the testimony is physically impossible or inherently improbable*); *People v. Johnson*, 26 Cal. 3d 557, 578 (1980) (to constitute evidence on which a reasonable trier of fact may rely, it must be "*reasonable, credible, and of solid value*" in the light of the totality

---

action alleging damages for malicious prosecution and wrongful imprisonment, "the issue of whether or not a civil plaintiff committed the underlying criminal act is central to the measure of damages," because it "bears on the emotional damage he may have suffered during his imprisonment." The Court also noted that the "wrongfully imprisoned person suffers a form of emotional anguish unlike any other" while "a factually guilty individual's distress at his own confinement may be attributable to the 'justified deprivation and not the deficient procedures that caused the justified deprivation.'" [quoting *Carey v. Piphus*]). Accordingly, defendants were permitted to add the affirmative defense of guilt, and certain discovery on the issue was permitted. As an affirmative defense, the burden of proof is on the defendant. The *Carter* Court did not define Defendants' burden of proof, or the other issues involved in allowing the defense.

[16] *See also Smith*, 563 F.2d at 1364-65 (Judge Hufstedler, concurring specially in *Smith*, noted that the majority opinion said the law "still cling[s] to the notion that that eyewitness identifications are generally reliable," a proposition she found "highly dubious").

23

1   of the evidence); *People v. Barnes*, 42 Cal.3d 284, 306 (1986) (testimony

2   inherently incredible where physically impossible or falsity otherwise apparent

3   without resort to inference or deduction); *People v. Smith*) 185 I11.2d 532, 708

4   N.E.2d 365, 370-71 (Ill. 1999 (Illinois Supreme Court unanimously reversed a

5   murder conviction where the testimony of the most crucial prosecution witness

6   contained "serious inconsistencies" and was repeatedly impeached). (emphasis

7   added to all cites I this paragraph).

8          Under these standards, and in the light of the whole record, the inculpatory

9   testimony is so compromised and inherently unreliable as to require summary

10  judgment. That whole record includes: three alibi witnesses establishing Mr.

11  O'Connell could not have been the shooter; Jeanne Lyon's multiple confessions

12  that she hired a hit man and an innocent man was in prison; the fact that the only

13  crime eyewitness who ever testified he could identify Frank O'Connell as the

14  shooter (Dan Druecker) has totally recanted and scientific evidence establishes that

15  he could not have seen well enough to make a reliable or credible identification

16  (Mr. Villareal denied ever making an identification, and was 250 feet away, and

17  Mr Sanchez never made an identification and pointed to a different person in the

18  photospread); the Soucy identification of Mr. O'Connell with a Pinto was fatally

19  flawed given the nighttime photo of the car, the limited view, the similarity

20  between the Ford Country Squire wagon Mr. O'Connell drove at one point and a

21  yellow Pinto wagon[17], the Jeanne Lyon neighbor testimony that Mr. O'Connell

22

23  ───────────────

    [17] Because Mr. Soucy is dead, SUF #344 Mr. O'Connell has been denied his right to adequately
24  cross-examine Mr. Soucy n light of the newly available evidence, which should render his prior
    testimony inadmissible. *See Crawford v. Washington,* 541 U.S. 36 (2004)). Federal and state
25  courts recognize that former testimony is not admissible where *Brady* violations deprived the
    defendant of information necessary to conduct a full and fair cross-examination at the former
26  proceeding. *U.S. v. Fitzgerald*, 615 F.Supp.2d 1156 (S.D. Cal. 2009); *State v. Moore*, 109 Ariz.
    111 (Ariz. 1973); *Commonwealth v. Bazemore*, 614 A.2d 684 (Penn. 1992); *U.S. v. Koubriti*, 336
27  F.Supp.2d 676, 681 (E.D. Mich. 2004); *D'Ambrosio v. Bagley*, 2010 WL 711938, (N.D.Ohio
    2010).
28

drove a brown Ford Country Squire with wood sides, and the evidence that Mr. O'Connell's hair could not have been long enough to match the unanimous descriptions.

We anticipate that Defendants will attempt to raise peripheral issues as evidence of guilt, including specifically the Ed Lyon statement referenced in the Introduction, and numerous "bad acts" inadmissible under Fed. R. Evid. 404(b) and 403, the claim that Centurion Ministries prejudiced various witnesses, and other things. Since we do not know exactly what their contentions are, we will address them in the Reply, and reserve the right to provide additional uncontroverted facts where applicable to the extent they selectively select facts; we have included certain relevant evidence on these issues in the Statement of Uncontroverted Facts.

## VI. CONCLUSION.

For the reasons stated above, this motion should be granted, and Defendants should be precluded from introducing evidence of guilt at all. If the Court concludes otherwise and allows the defense, the Defendants should have to prove by a preponderance of the evidence that a twelve person criminal jury would unanimously find beyond a reasonable doubt that Frank O'Connell murdered Jay French. Evidence of guilt *qua* guilt should not be relevant for any other purpose.


DATED: February 24, 2017          Respectfully Submitted,

                                  KAYE, MCLANE, BEDNARSKI & LITT


                                  By: */ s / Barrett S. Litt*
                                  Barrett S. Litt
                                  Attorneys for Plaintiff