PAUL B. BEACH, State Bar No. 166265
pbeach@lbaclaw.com
MICHAEL D. ALLEN, State Bar No. 198126
mallen@lbaclaw.com
LAUREN T. KRAPF, State Bar No. 292115
lkrapf@lbaclaw.com
LAWRENCE BEACH ALLEN & CHOI, PC
100 West Broadway, Suite 1200
Glendale, California 91210-1219
Telephone No. (818) 545-1925
Facsimile No. (818) 545-1937

Attorneys for Defendants,
COUNTY OF LOS ANGELES, J.D. SMITH and ERIC PARRA

## UNITED STATES DISTRICT OF COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| FRANK O'CONNELL, NICHOLAS O'CONNELL<br><br>        Plaintiffs,<br><br>    v.<br><br>J.D. SMITH; ESTATE OF GILBERT PARRA; ERIC PARRA, COUNTY OF LOS ANGELES AND DOES 1-10.<br><br>        Defendants. | Case No. 13-CV-01905-MWF (PJWx)<br><br>Honorable Michael W. Fitzgerald<br><br>**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT, OR ALTERNATIVELY, SUMMARY ADJUDICATION OF INDIVIDUAL ISSUES**<br><br>[*Separate Statement of Undisputed Material Facts; Declarations and Exhibits; and [Proposed] Judgment filed concurrently herewith*]<br><br>Date:    April 24, 2017<br>Time:    10:00 a.m.<br>Crtm:    5A |

TO THE HONORABLE COURT, ALL INTERESTED PARTIES, AND

TO THEIR ATTORNEYS OF RECORD:

    PLEASE TAKE NOTICE that on April 24, 2017, at 10:00 a.m., or as soon

thereafter as Defendants may be heard, in Courtroom 5A of the above-entitled

Court, located at 350 West First Street, Los Angeles, California 90012, Defendants COUNTY OF LOS ANGELES, J.D. SMITH and ERIC PARRA will, and hereby do move the Court for summary judgment on the grounds that there is no genuine issue of material fact as to any of Plaintiffs' remaining claims[1], and these Defendants are entitled to judgment as a matter of law.

PLEASE TAKE FURTHER NOTICE that if, for any reason summary judgment cannot be had, these Defendants will, and hereby do further move the Court for summary adjudication as to each of the following issues:

1. Plaintiffs' remaining *Brady*-based Claims for Relief under Sections IX and X of the FAC are barred by the absence of a genuine issue a material fact as to suppression of the allegedly non-disclosed materials;

2. Plaintiffs' remaining *Brady*-based Claims for Relief under Sections IX and X of the FAC are also barred by the absence of a genuine issue of material fact as to the "materiality" and "prejudice" as to the allegedly non-disclosed materials;

3. Plaintiffs' "suggestive eyewitness identification" Claims for Relief under Sections IX and X of the FAC are barred by the absence of a genuine issue of material fact that any identification "procedure was so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification";

4. Plaintiffs' "fabrication of evidence" Claims for Relief under Sections IX and X of the FAC are barred because the allegation that the individual Defendants engaged in aggressive investigative tactics, in itself, is

---

[1] Defendants' previously filed a Motion for Summary Adjudication ("MSA") as to Plaintiffs' Claims for Relief under Sections IX and XI of the First Amended Complaint ("FAC") to the extent they are based on the alleged failure to disclose "alternate suspect" information re Randy Smith ("R. Smith"). (Dkt. 240.) As of the time of the filing of the instant Motion, the MSA was still pending.

insufficient to support this claim and there is otherwise insufficient
evidence that any of the individual Defendants knew or should have known
Plaintiff was factually innocent of the murder they were investigating;

5.  Plaintiffs' "reckless investigation" for Relief under Sections IX and X of the
    FAC are barred because "reckless investigation" is not a cognizable claim
    under 42 U.S.C. § 1983;

6.  Plaintiffs' Claims for Relief under Sections IX and X of the FAC are further
    barred against the individual Defendants on the grounds of qualified
    immunity because there is insufficient evidence that they violated "clearly
    established" law;

7.  Even assuming, *arguendo*, there is a genuine issue of material fact as to any
    of Plaintiffs' alleged constitutional violations, there is no genuine issue of
    material fact that a policy, practice or custom of "deliberate indifference"
    by the County of Los Angeles caused any of the alleged violations; and/or

8.  Plaintiffs' Claims for Relief under Sections IX and X of the FAC are further
    barred against Defendant Eric Parra because Plaintiffs did not time bring the
    instant action against Parra or otherwise file a timely creditor's claim with
    the estate of Gilbert Parra.

///
///

    This Motion is based upon this Notice, the accompanying Memorandum of
Points and Authorities, the concurrently filed Declarations of Lauren T. Krapf,
Steve Lankford, Mike Bumcrot and Eric Parra and accompanying Exhibits, the

1  Separate Statement of Undisputed Material Facts and Conclusions of Law, and

2  the Court's file in this matter, and upon such other and further matters as may be

3  presented at or before the hearing of this Motion.  This Motion is made following

4  counsel for Defendants' good faith, but unsuccessful attempt to informally

5  resolve these issues pursuant to Local Rule 7-3.  (Declaration of Lauren T. Krapf

6  at ¶ 3; Ex. A.)

7

8  Dated:  February 24, 2017          LAWRENCE BEACH ALLEN & CHOI PC

9

10                                        By:   /s/ Michael D. Allen

11                                              Michael D. Allen
                                                Lauren T. Krapf
12                                              Attorneys for Defendants,
                                                COUNTY OF LOS ANGELES, J.D.
13                                              SMITH and  ERIC PARRA

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# <u>TABLE OF CONTENTS</u>

**PAGE**

MEMORANDUM OF POINTS AND AUTHORITIES.........................................1

I.    INTRODUCTION AND SUMMARY OF KEY FACTS.............................1

II.   THERE IS NO GENUINE ISSUE OF MATERIAL FACT AS TO THE
ALLEGED SUPPRESSION OF THE VARIOUS NOTES ...................................5

III.  THE PURPORTEDLY NON-DISCLOSED DOCUMENTS WERE NOT
"MATERIAL" NOR COULD ANY PREJUDICE HAVE ENSUED FROM THE
ALLEGED SUPPRESSION...................................................................7

      A.    Eyewitness Maurice Soucy ................................................8

      B.    Eyewitness Arturo Villarreal. .............................................9

IV.   THE IDENTIFICATION PROCEDURE WITH RESPECT TO
EYEWITNESS DRUECKER WAS NOT SO IMPERMISSIBLY SUGGESTIVE
AS TO GIVE RISE TO A VERY SUBSTANTIAL LIKELIHOOD OF
IRREPARABLE MISIDENTIFICATION.............................................10

      A.    No Genuine Issue As To A Substantial Likelihood Of
            Misidentification. ............................................................10

      B.    Druecker's Identification Had Sufficient Indicia of Reliabilty. .......12

V.    NO GENUINE ISSUE OF MATERIAL FACT THAT THE DETECTIVES
CONTINUED THEIR INVESTIGATION INTO PLAINTIFF AFTER THEY
KNEW OR SHOULD HAVE KNOWN HE WAS INNOCENT……………..…..14

VI.   PLAINTIFFS' "RECKLESS INVESTIGATION" CLAIM FAILS
BECAUSE IT IS NOT COGNIZABLE UNDER SECTION 1983. ....................16

VII.  THE INDIVIDUAL DEFENDANTS ARE ENTITLED TO  QUALIFIED
IMMUNITY AS A MATTER OF LAW.............................................16

      A.    Alleged Non-Disclosure Of Notes Re Soucy and Villareal.............17

      B.    Alleged Suggestive Photographic Line-up With Druecker. .............18

i

VIII. THERE IS NO GENUINE ISSUE OF MATERIAL FACT THAT A POLICY, PRACTICE OR CUSTOM OF "DELIBERATE INDIFFERENCE" BY THE LASD CAUSED ANY OF THE ALLEGED CONSTITUTIONAL VIOLATIONS. .........................................................................................19

    A.    The LASD's Practice At All Relevant Times Was To Document All Of The Details (Both Potentially Inculpatory and Exculpatory) And To Disclose *All* Evidence Regardless As To Whether It Qualifies As "*Brady*" Evidence. ..........................22

    B.    Because the LASD Had Numerous Safeguards In Place To Prevent Suggestive Identifications, There Is No Genuine Issue Of Material Fact As To A Practice Of "Deliberate Indifference" With Respect To Any Of The Identifications. ...........23

    C.    Nor Can Plaintiffs Prevail On A Failure To Train Theory. ..............23

IX.    PLAINTIFFS' CLAIMS AGAINST ERIC PARRA (AS THE ADMINISTRATOR OF THE ESTATE OF GILBERT PARRA) ARE TIME BARRED. ......................................................................................26

    A.    Plaintiffs Failed to Pursue Their Claims With Respect to Det. Parra Within One Year of His Death As Required By *California Code of Civil Procedure* § 366.2....................................26

    B.    Plaintiffs' Anticipated Attempt to Rely on *California Probate Code* § 550 Based on the *Indemnification* Provisions of the *California Government Code* Is Misplaced. ....................28

    C.    Plaintiffs Failed To Follow The Strict Requirements Imposed By The California Probate Code....................................29

X.    CONCLUSION..........................................................................30

ii

1

## <u>TABLE OF AUTHORITIES</u>

2

3

**Cases**                                                                 **Pages**

4

5     *Adickes v. S.H. Kress & Co.*,
        398 U.S. 144 (1970) ...............................................................................20

6

7     *Amrine v. Brooks*,
        522 F.3d 823 (8th Cir.2008) ..................................................................16

8

9     *Anderson v. Creighton*,
10      483 U.S. 635 (1987) ...............................................................................17

11

12    *Ashcraft v. Tennessee*,
        322 U.S. 143 (1944) ...............................................................................11

13

14    *Ashcroft v. al-Kidd*,
15      563 U.S. 731 (2011) ...............................................................................17

16

17    *Bastidas v. Los Angeles*,
        2006 WL 4749706 (C.D. CA 2006) ......................................................19

18

19    *Bennett v. City of Slidell*,
20      728 F.2d 762 (5th Cir. 1984) .................................................................20

21

22    *Board of Comm'rs of Bryan Cty. v. Brown*,
        520 U.S. 397 (1997) ...............................................................................24

23

24    *Bradley v. Breen*,
        73 Cal.App.4th 798 (1999)......................................................................27

25

26    *Brady v. Maryland*,
27      373 U.S. 83 (1963) ...................................................................................5

28

*Cameron v. Brown*,
   2016 WL 796011 (C.D. CA 2016)...................................................11

*Canton v. Harris*,
   489 U.S. 378 (1989) ...........................................................23, 24

*Carter v. D.C*,
   795 F.2d 116 (D.C. Cir. 1986) .............................................21

*Chambers v. Florida*,
   309 U.S. 227 (1940) ...........................................................11

*City and County of San Francisco v Sheehan*,
   135 S.Ct. 1765 (2015) …………………..…………………………17, 18

*Connick v. Thompson*,
   131 S. Ct. 1350 (2011) ......................................................24

*Cunningham v. Wenatchee*,
   345 F.3d 802 (9th Cir. 2003)...............................................14

*Dawes v. Rich*,
   60 Cal.App.4th 24 (1997)....................................................26

*Denham v. Deeds*,
   954 F.2d 1501 (9th Cir. 1992)..............................................10

*Devereaux v. Abbey*,
   263 F.3d 1070 (9th Cir. 2001).........................................14, 16

*Downs v. Hoyt*,
   232 F.3d 1031 (9th Cir. 2000).........................................8, 18

*Escobedo v. Estate of Snider*,
   14 Cal.4th 1214 (1997)........................................................28

iv

*Farmer v. Brennan*,
    511 U.S. 825 (1994) ........................................................................... 15

*Gausvik v. Perez*,
    345 F.3d 813 (9th Cir. 2003) ..................................................... 14, 15

*Gov't Employees Ins. Co. v. Gibraltar Casualty Co.*,
    184 Cal.App.3d 163 (1986) ............................................................. 29

*Grant v. Long Beach*,
    315 F.3d 1081 (9th Cir. 2002) ........................................................ 10

*Hall v. Los Angeles*,
    697 F.3d 1059 (9th Cir. 2012) ........................................................ 14

*Hamilton v. Rogers*,
    791 F.2d 439 (5th Cir. 1986) .......................................................... 21

*Hanline v. Ventura*,
    2006 WL 3360672 (C.D. CA 2016) ................................................ 28

*Harrington v. Richter*,
    562 U.S. 86 (2011) ............................................................................. 8

*Hunter v. Bryant*,
    502 U.S. 224 (1991) ........................................................................ 18

*Kyles v. Whitley*,
    514 U.S. 419 (1995) ............................................................... 5, 8, 17

*Malley v. Briggs*,
    475 U.S. 335 (1986) ........................................................................ 16

*Merritt v. Los Angeles*,
    875 F.2d. 765 (9th Cir. 1989) ......................................................... 24

v

*Mitchell v. Forsyth*,
    472 U.S. 511 (1995) ........................................................................16

*Monell v. Dept. of Social Services*,
    436 U.S. 658 (1978) ........................................................................20

*Moore v. Illinois*,
    408 U.S. 786 (1972) .....................................................................7, 22

*Nathanson v. Superior Court*,
    12 Cal.3d. 355 (1974) .....................................................................30

*Neil v. Biggers*,
    409 U.S. 188 (1972) ........................................................................12

*Oklahoma City v Tuttle*,
    471 U.S. 808 (1985) ........................................................................20

*Pearson v. Callahan*,
    555 U.S. 223 (2009) ........................................................................16

*Pelayo v. City of Downey*,
    570 F.Supp.2d 1183 (C.D. CA 2008).........................................28, 29

*Raley v. Ylst*,
    470 F.3d 792 (9th Cir. 2006).............................................................7

*Ramos v. Chicago*,
    707 F.Supp. 345 (N.D. Ill. 1989) .....................................................21

*Reck v. Pate*,
    367 U.S. 433 (1961) ........................................................................11

*Redman v. San Diego*,
    942 F.2d 1435 (9th Cir. 1991)..........................................................15

1

2  *Romero v. Kitsap County*,
3      931 F.2d 624 (9th Cir. 1991)................................................................17

4
5  *Sacramento v. Lewis*,
      523 U.S. 833 (1998) ......................................................................15

6
7  *Serrano v. Francis*,
8      345 F.3d 1071 (9th Cir. 2003)..........................................................17

9  *Simmons v. U.S.*,
10     390 U.S. 377 (1968) .................................................................10, 12

11
12 *Sloman v. Tadlock*,
      21 F.3d 1462 (9th Cir. 1994)............................................................21
13

14 *Souliotes v. City of Modesto*,
15     2016 WL 3549266 (E.D. CA 2016) ..................................................16

16
17 *Tennison v. San Francisco*,
      570 F.3d 1078 (9th Cir. 2009)...........................................................16
18

19 *U.S. v. Agurs*,
20     427 U.S. 97 (1976) .........................................................................8

21
22 *U.S. v. Aichele*,
      941 F.2d 761 (9th Cir. 1991)..............................................................9
23

24 *U.S. v. Bagley*,
      473 U.S. 667 (1985) ....................................................................7, 8
25

26 *U.S. v. Carbajal*,
27     956 F.2d 924 (9th Cir. 1992)...........................................................10

28

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

*U.S. v. Carr*,
    761 F.3d 1068 (9th Cir. 2014)..................................................................10, 11, 18

*U.S. v. Dupuy*,
    760 F.2d 1492 (9th Cir. 1985)..............................................................................5

*U.S. v. Preston*,
    751 F.3d 1008 (9th Cir.2014)..............................................................................11

*Wilson v. Layne*,
    526 U.S. 603 (1999) ............................................................................................17

*Younker v. County of San Diego*,
    233 Cal.App.3d 1324 (1991)...............................................................................29

**Statutes**

*California Code of Civil Procedure § 366.2* ...................................................passim
*California Government Code § 825* .............................................................28, 29
*California Probate Code § 550* ................................................................... 28, 29
*California Government Code § 995* ..................................................................28

1

## MEMORANDUM OF POINTS AND AUTHORITIES

2

## I.  INTRODUCTION AND SUMMARY OF KEY FACTS.[2]

3
4
5
6
7
8
9
10
11
12

Around 1:15 p.m. on January 5, 1984, Jay French ("French") was shot and murdered in the carport area of the South Pasadena apartment building where he worked as a maintenance man. The shooting was witnessed by Daniel Druecker ("Druecker"), who was in the carport area when he suddenly heard a loud bang. (Undisputed Fact ("UF") 3–9.)  The grabbed his attention and he looked up and saw French being chased by another individual with a gun. (UF 10–14.)  Druecker observed the assailant run for several moments before he stopped directly in Drucker's line of sight for several seconds, and fired a second shot before running off. (UF 15–16.)   Moments later, Druecker went over to where he found French bleeding to death near the manager's office of the building. (UF 33–35.)

13
14
15
16
17
18
19
20
21
22
23
24
25

Officers from the South Pasadena Police Department ("SPPD") arrived to the scene first and took statements from various witnesses including Druecker. Detectives from the Los Angeles County Sheriff's Department ("LASD") arrived later and took additional witness statements. (UF 38–40.)  Druecker, who was able to observe the shooter both as he was chasing the maintenance man and was able to also see his profile for several seconds when the second shot was fired, provided a detailed description of the shooter, including both facial features as well as the clothing worn by the shooter. (UF 15–17, 41–45.)  Arturo Villareal ("Villareal"), who saw the assailant flee the scene in a yellow Pinto was also interviewed. (UF 57).  Villareal gave a mostly consistent description of the assailant as Druecker. (UF 58.)  French's then wife, Gina French, was also interviewed.  She informed investigators that French was involved in a long-standing custody battle with his ex-wife, Jeanne Lyon ("Jeanne"). (UF 63–65.) She also indicated that French's

26

———————————————

27
28

[2] A more detailed version of the uncontroverted facts, which demonstrate the absence of a genuine issue of material fact for trial, is set forth in the Separate Statement of Undisputed Material Facts filed concurrently herewith.

1

dying words suggested that he recognized the shooter as somebody that Jeanne "hangs" around with. (UF 67.)

The day after the murder, LASD Detectives J.D. Smith (retired) and Gilbert Parra (deceased), ("the Detectives") interviewed Jeanne at approximately 2:45 p.m. (UF 39, 68.)  During this interview, Jeanne mentioned that she had a "cousin" by the name of Frank O'Connell ("Plaintiff") that had stayed at her place for a period of time. (UF 70.)   Later that evening, however, while Jeanne's then husband (Ed Lyon) was being interviewed, Jeanne corrected herself and indicated that her earlier statement that Plaintiff was her "cousin" was not true. (UF 72-73.)  As the investigation continued, and additional witnesses were interviewed, including French's son Jay Jr. (the subject of the custody battle), the Detectives learned that Plaintiff and Jeanne had an affair earlier during 1983. (UF 75-79, 90-93.)  Given the dying declaration of French that the shooter was somebody who "hangs" with Jeanne combined with Jeanne's lie about the nature of her relationship with Plaintiff, Plaintiff became a possible suspect in the murder.

As the investigation progressed, multiple witnesses, with varying degrees of confidence, all connected Plaintiff to the murder.  This included Druecker, who picked Plaintiff's photo out of a photo array ("six pack") as the shooter, as well as Villareal, who also picked Plaintiff's photo. (UF 82-88, 94-107.)  In addition, at least four of Jeanne's neighbors informed the Detectives that they had seen a yellow Pinto parked in front of or across the street from Jeanne's house at various times during 1983. (UF 171-72.)  Several of the neighbors, a couple named Maurice and Ina Soucy, indicated that they observed an adult male move into or frequently visit Jeanne for an approximate six week period following Memorial Day of 1983 (UF 139-153) and saw this same person driving a yellow Pinto[3] and

---

[3] According to their reports, the Detectives also received information that a yellow Pinto had been noticed in the parking lot of the business Plaintiff had been working at earlier in 1983, but that the vehicle had "recently disappeared."

kissing Jeanne. (UF 142, 162.)  Both of the Soucys also identified Plaintiff in the same six pack shown to Druecker and Villareal. (UF 145, 148.)

During several interviews of Plaintiff, he informed the Detectives that he first met Jeanne while camping at the Colorado River over Memorial Day weekend and that he stayed at Jeanne's place for an approximate six week period shortly after that because he had lost his job and had nowhere to stay.[4] (UF 175, 202.) Plaintiff also admitted that he and Jeanne had an affair while he stayed at her place, but that he had minimal contact with her after he moved out until, "all of a sudden", she contacted him less than a week before French was murdered and they got together to cruise Colorado Boulevard in Pasadena on New Year's Day of 1984. (UF 207–08.)  Plaintiff informed the Detectives that, on New Year's Day, Jeanne tried to hand him a weapon, but that he could not say with 100% certainty as to whether he handled it. (UF 211.)

According to the LASD reports, Plaintiff informed the Detectives that he had previously fired a .38 caliber revolver[5] with some friends at work sometime during the previous year. (UF 2, 177.)   Plaintiff also admitted that he was aware of the custody battle, had likely seen French (and French saw him) on at least one occasion and that Jeanne had made statements to him on multiple occasions suggested that she wanted to kill French. (UF 205, 236–237.)  Plaintiff even

---

[4] Plaintiff also informed the Detectives that, even up to the date of the murder, he did not have his own place to stay and had been crashing at various friends' places throughout the second half of 1983 and into the first week of 1984.  He also repeatedly made statements to the Detectives that he was "broke" and did not have much money.

[5] The evidence at the scene indicated that the shooting may have been a .38 caliber weapon.

admitted to the Detectives that he made a statement to Jeanne suggesting that he knew a guy in San Jose and could have French killed for "200 bucks." (UF 206.)

Plaintiff informed the Detectives that, on the day of the murder, he was at the house of his roommates (Jim Hamilton and Scott Egerer) where he had been crashing and left the house at around 12:30 p.m. to go to his ex-girlfriend's (Leslie Davis) house to do laundry. (UF 182–185.)   Ms. Davis was interviewed on January 12, 1984 and, after she was unable to provide a clear alibi for Plaintiff, a warrant for his arrest was issued and he was arrested that night. (UF 186–189.)

On January 15, 1985, Plaintiff was convicted in a bench trial for French's murder. In support of the decision to convict, the Honorable Sally Disco stated on the record that the evidence presented was "overwhelming," identification evidence was "unusually strong," and evidence connecting Plaintiff to the getaway car was "convincing." (UF 243.)  About 20 to 25 years later, Druecker was contacted by Centurion Ministries ("CM"), who told him that he identified the wrong man. (UF 244–247.) While Druecker initially stood steadfast in his prior testimony in which he testified that he was "absolutely certain" that Plaintiff was the person he saw murder French, after CM continued to pressure Druecker, he eventually recanted. (UF 248–256.) This led to a *habeas* petition, which was granted in March of 2012.  The instant civil suit followed.

Relevant to the instant Motion are Plaintiffs' claims that the Detectives' fabricated evidence, notes regarding the identifications of Plaintiff by witnesses Villareal and Soucy were never disclosed[6] and that Druecker's identification of

---

[6] Specifically, Plaintiffs assert that the notes indicate that neither Soucy or Villareal were able to pick out Plaintiff's photo from the "six pack" with 100% certainty. (FAC at 11:7-14:11.)

4

Plaintiff was based on an overly suggestive line-up.[7]  As discussed below, however, Plaintiffs cannot create a genuine issue of material fact on these claims.

## II.    THERE IS NO GENUINE ISSUE OF MATERIAL FACT AS TO THE ALLEGED SUPPRESSION OF THE VARIOUS NOTES.

To prove their *Brady* claims, Plaintiffs must establish each of the following three elements: (1) the evidence in question was favorable in that it was either exculpatory or impeachment evidence, (2) the government suppressed this evidence and (3) prejudice ensued from the suppression.  *Kyles v. Whitley*, 514 U.S. 419, 433 (1995).   Before even reaching the allegedly non-disclosed information was even material and exculpatory within the meaning of *Brady v. Maryland*, 373 U.S. 83 (1963) and its progeny, Plaintiffs are required to establish a genuine issue of material fact as to the alleged suppression of such evidence. Plaintiffs have not and cannot do so.

There is no meaningful "suppression" within the scope of *Brady* if the alleged evidence was provided to the defense or "if the means of obtaining the exculpatory evidence has been provided to the defense." *U.S. v. Dupuy*, 760 F.2d 1492, 1502 (9th Cir. 1985).  Plaintiffs' argue that the Detectives' reports did not include all of the details of the identifications of Plaintiff.  Here, however, there is no dispute that the Detectives documented in their notes, in detail, the various information they gathered during their investigation. (UF 273 – 275.)   That included the fact that neither Soucy nor Villareal identified Plaintiff with 100% certainty. Thus, it begs the question: if the Detectives were really trying to "suppress" or hide the potential impeachment information from the identifications, then why did they even bother to document that information in their notes to begin with?  Nor is there any evidence that the detectives tried to destroy the notes as

_____

[7] Specifically, Plaintiffs allege that Druecker took several minutes before he pointed to Plaintiff's photo in the "six pack" and that, after Druecker pointed to Plaintiff's photo, the Detectives made statements confirming that Druecker picked the right guy. (FAC at 9:9-10:10.)

they were still in the LASD file when CM subpoenaed the file prior to the *habeas* proceedings.  Thus, unless Plaintiffs can create a genuine issue of material fact that the notes regarding the identifications were not disclosed, their *Brady* claims with respect to these materials fail as a matter of law.

The trial transcripts indicate that Adolfo Lara ("Lara"), Plaintiff's public defender, had various notes at the time of trial. (UF 290–297.)   When he was asked during the *habeas* whether the various notes in issue were in his file at the time of the underlying trial, he testified that he could not recall. (UF 298.)   Also, it was discovered that the original public defender's file was misplaced and, by the time Lara testified at the *habeas* proceedings, it was missing various materials. (UF 287–289.)  Det. Smith testified that it was his practice to turn over his entire file, including all of his notes, especially when requested to do so by the prosecutor. (UF 280.)  Tamia Hope, the prosecutor, testified that it was also her practice to turn over all notes she received to the defense and that there was never a case she handled where she requested notes from detectives that she did not turn over the notes.[8] (UF 282–285.)  As a result, Plaintiffs' suppression argument relies on speculation by Lara about things he "might have" or "would have" done if he had gotten the notes (based on an assumption that he did not receive the notes). Given the evidence above that the notes were, in fact, disclosed combined with the additional undisputed facts that Lara was well aware of Druecker, the Soucys and Villareal, and their identifications of Plaintiff, however, and had more than ample opportunity to interview them (and, in fact, did so) prior to trial, there is insufficient evidence of suppression.

---

[8] Hope testified, however, that she did "not necessarily" maintain a duplicate copy of materials she would turn over to the defense and, at the time of the 1985 trial, did not have a tracking system to document what specific materials she turned over to the defense. (UF 285.)

In *Raley v. Ylst*, the petitioner was convicted of first-degree murder. 470 F.3d 792, 795 (9th Cir. 2006). There, the petitioner argued that the prosecution violated his right to due process under *Brady*, by failing to disclose exculpatory and mitigating evidence contained in the petitioner's medical records from his pretrial confinement. *Id*. at 803–04. *Ylst* held that no *Brady* violation occurred because the petitioner possessed "the salient facts regarding the existence of the records that he claims were withheld," namely that he had visited medical personnel at the jail and was taking the medication they prescribed for him. *Id*. at 804. "Because Petitioner knew of the existence of the evidence, his counsel could have sought the documents through discovery." *Id*. Here, like *Raley*, besides the fact that Lara admitted that he could not recall, one way or another, whether he received the notes or not, the evidence is that Lara (1) was aware of the identifications of Plaintiff both Druecker, Villareal, and Soucy long before the trial, (2) had every opportunity to interview them and ask them details about their identifications of Plaintiff, and, (3) Lara and/or his investigators met with all three to gauge the strength of their identifications of Plaintiff.  (UF 149–160.) Under these circumstances, Plaintiffs have not and cannot create a genuine issue of material fact as to the "suppression" element of their *Brady* claims.

### III.   THE PURPORTEDLY NON-DISCLOSED DOCUMENTS WERE NOT "MATERIAL" NOR COULD ANY PREJUDICE HAVE ENSUED FROM THE ALLEGED SUPPRESSION.

In *Moore v. Illinois*, 408 U.S. 786, 795 (1972), the Supreme Court emphasized that there is "no constitutional requirement that the prosecution make a complete and detailed accounting to the defense of all police investigatory work on a case."  In *U.S. v. Bagley*, 473 U.S. 667 (1985), the Court clarified the rule regarding what evidence is "material" within the meaning of *Brady* holding that "evidence is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different."  *Id.* at 682.  In footnote 7 of *Bagley*, the Court held that "a rule

that the prosecutor commits error by any failure to disclose evidence favorable to the accused, no matter how insignificant, would impose an impossible burden on the prosecutor and would undermine the interest in the finality of judgments." *Bagley*, *supra,* 473 U.S. at 675; *Kyles v. Whitley,* 514 U.S. 419, 436-437 (1995). Ten year later, *Kyles* re-emphasized that, stating that "the Constitution is not violated every time the government fails or chooses not to disclose evidence **that might prove helpful to the defense**." *Kyles, supra* (emphasis added). Also, *Kyles* emphasized that, in analyzing whether the alleged non-disclosure of a particular item of evidence could **potentially** be a Brady-violation, "[w]e evaluate the **tendency and force** of the undisclosed evidence **item by item**; there is no other way." *Kyles, supra*, 514 U.S. at 436, fn 10 (emphasis added).

"The mere possibility that an item of undisclosed information might have helped the defense, or might have affected the outcome of the trial, does not establish 'materiality' in the constitutional sense." *U.S. v. Agurs*, 427 U.S. 97, 109–110 (1976); *Downs v. Hoyt*, 232 F.3d 1031, 1036 (9th Cir. 2000) (Court held no *Brady* violation where "[t]he most that can be said of these materials is that they might have provided investigatory leads.") To prove a reasonable probability of a different result, the Supreme Court has emphasized that "likelihood of a different result must be **substantial**, not just conceivable." *Harrington v. Richter,* 562 U.S. 86, 112 (2011) (emphasis added). While Defendants adamantly dispute that the subject notes were not disclosed, since neither of the purportedly undisclosed sets of notes with respect to Soucy or Villareal would have resulted in a different verdict, there is no genuine issue of material fact as to Plaintiffs' *Brady* claims regarding these materials.

A. **Eyewitness Maurice Soucy.**

The Detectives' notes summarize Soucy's identification of Plaintiff as "I.D. #3 & poss. #1" indicating that Soucy pointed to another photo as the "possible" person he saw staying at Jeanne's and driving a yellow Pinto. Plaintiffs assert that

those notes were not disclosed and, as a result, the defense "did not have an opportunity to question the accuracy of Mr. Soucy's identification." (FAC at ¶¶ 37, 39.) Even assuming the notes were not disclosed prior to trial, however, they would not have resulted in a substantial likelihood of a different result.

In the instant case, long before the underlying January, 1985 trial took place, Lara was aware that Soucy identified Plaintiff and, in fact, interviewed him (than a week after the LASD detectives) to gauge the strength of his identification. Soucy told Lara that the man he saw move into (or begin to frequently visit) Jeanne's place and driving a yellow Pinto started shortly after Memorial Day of 1983 and lasted for approximately six weeks. (UF 150–151.) Since Plaintiff was the **only** person to move in to Jeanne's place for the approximate six week period after Memorial Day of 1983, any attempt to impeach Soucy's identification based on the allegedly non-disclosed notes would have been immediately shot down on re-direct because Plaintiff was the only person to move into Jeanne's place during that six week period shortly after Memorial Day and, therefore, no reasonable juror could have determined that the person in photo #1 was the person that Soucy observed. (UF 168–170.) As such, because there was no "actual prejudice" from any alleged failure to turn over the notes from the Soucy identification, Plaintiffs' *Brady* claims with respect to the Soucy identification notes fail as a matter of law.

### B.    Eyewitness Arturo Villarreal.

Plaintiffs allege that that the Detectives' notes indicating Villarreal was not absolutely positive in his identification of Plaintiff were not disclosed. Once again, even assuming these notes were not disclosed, they would not have resulted in a substantial likelihood of a different result. Villarreal testified at both at the preliminary hearing and trial that, although Plaintiff looked the most like the man he saw, he was not 100% positive. (UF 89.) "When a defendant has the opportunity to present impeaching evidence to the jury . . . there is no prejudice in the preparation of his defense." *U.S. v. Aichele*, 941 F.2d 761, 764 (9th Cir. 1991).

Here, there was no prejudice because Villarreal testified at the preliminary hearing that he was not certain the photograph he chose from the six pack was, in fact, the man he observed and only that it "looked like" Plaintiff.  This was reiterated at trial when Villarreal, once again, said the photograph he picked "looked a lot like" Plaintiff, but that he was not absolutely certain in his identification.

## IV.   THE IDENTIFICATION PROCEDURE WITH RESPECT TO EYEWITNESS DRUECKER WAS NOT SO IMPERMISSIBLY SUGGESTIVE AS TO GIVE RISE TO A VERY SUBSTANTIAL LIKELIHOOD OF IRREPARABLE MISIDENTIFICATION.

The Supreme Court has held that, only if an identification "procedure was so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification," should it be deemed invalid.  *Simmons v. U.S.*, 390 U.S. 377, 384 (1968); *Denham v. Deeds*, 954 F.2d 1501, 1504 (9th Cir. 1992); *U.S. v. Carbajal*, 956 F.2d 924, 929 (9th Cir. 1992). The two questions to be considered in making this determination are: "(1) [d]id the officers employ an identification procedure so impermissibly suggestive as to give rise to a substantial likelihood of misidentification?" and "if so, (2) did the witnesses exhibit sufficient indicia of reliability to protect the integrity of their identifications?" *Grant v. Long Beach*, 315 F.3d 1081, 1086 (9th Cir. 2002).

### A.   No Genuine Issue As To A Substantial Likelihood Of Misidentification.

"An identification procedure is suggestive when it emphasizes the focus upon a single individual thereby increasing the likelihood of misidentification." *U.S. v. Carr*, 761 F.3d 1068, 1074 (9th Cir. 2014); *see also Carbajal*, 956 F.2d at 929 (holding six pack was not impermissibly suggestive when only defendant wore a wig and had bruises on his face).

In *Carr*, the Court rejected a suggestive line-up claim where it was argued that officers were impermissibly suggestive when a witness—who agreed to participate as a driver in a bank robbery with her boyfriend and several men she'd never met—(1) was not properly admonished prior to a photo lineup and (2) was

10

allegedly coerced by an officer who the told her that her cooperation could help her avoid prison time. *Carr*, 761 F.3d at 1074–75.  *Carr* noted that some degree of pressure cannot alone render a photo identification invalid. *Id*. at 1075. The fact that the witness may have felt internal pressure was not impermissibly suggestive when the witness was not claiming to be "deprived of food, friends, and counsel, *cf. Reck v. Pate*, 367 U.S. 433, 441 – 42 [] (1961), or deprived of sleep, *cf. Ashcraft v. Tennessee*, 322 U.S. 143, 153[] (1944), or subjected to extended interrogation, *cf. Chambers v. Florida*, 309 U.S. 227, 238 – 39 [] (1940), or that she was mentally disabled and subjected to misleading questioning, *cf. U.S. v. Preston*, 751 F.3d 1008, 1017–18 (9th Cir.2014) (en banc)." *Id.*; *see also Cameron v. Brown*, 2016 WL 796011, at *7 (C.D. CA 2016) (holding that when a detective repeatedly said, "Do your best," in a photo lineup, he did not exert undue influence and "any sense of obligation [the witness] felt was merely a 'personal feeling' [*sic*] not a feeling compelled by [the detective].").

Here, the evidence is that the six pack shown to Druecker contained six identically-sized photos: Plaintiff and five filler photos with people of the same gender, race, age range, and with similar facial features. (UF 83.)   Druecker admitted that, at no time prior to his pointing to Plaintiff's photo, did the Detectives do anything suggestive. (UF 117–123.)  Also, Druecker has admitted multiple times that the Detectives were "professional at all times." (UF 124.)

Here, Plaintiffs have an even weaker case than *Carr* because, as discussed in greater detail in Section VIII, *infra*, the LASD's procedure was to read off an admonition card prior to showing a six pack to a witness.[9] (UF 85, 95.) Consistent with the above, Det. Smith testified about the admonition he gave

---

[9] The admonishment card used by the LASD specifically stated, "You should not conclude or guess that the [photos] contain the picture of the person who committed the crime," and "[Y]ou are not obligated to identify anyone."[9] (UF 329.)

11

prior to conducting photo lineups. (UF 117.)  Druecker testified that, while he could not recall everything the Detectives told him, he acknowledged that he was told to always tell the truth. (UF 114, 108-116.)  After carefully looking at the photos, Druecker only selected Plaintiff's photo. Any pressure Druecker felt prior to pointing to Plaintiff's photo was purely internal. (UF 125–127.)  Thus, there is no genuine issue that the identification procedure created a substantial likelihood of misidentification.

### B.    Druecker's Identification Had Sufficient Indicia of Reliabilty.

  "[T]he central question, [is] whether under the 'totality of the circumstances' the identification was reliable even though the confrontation procedure was suggestive." *Neil v. Biggers*, 409 U.S. 188, 199 (1972).  In assessing the reliability of a six-pack identification, five factors are to be considered: (1) the witness's opportunity to view the suspect at the time of the crime, (2) the witness's degree of attention to the perpetrator at the time of the crime, (3) the accuracy of any earlier description of the suspect, (4) the level of certainty demonstrated at the confrontation, and, (5) the lapse of time between the time of the crime and the confrontation." *Id.* at 199-200.

  Here, considering the totality of the circumstances under the *Biggers* factors, there can be no genuine issue of material fact as to the reliability of Druecker's identification of Plaintiff. First, it was stipulated at trial that Druecker was only 20 feet from the shooter and the weather did not create any visibility issues. (UF 17.)  *See, e.g., Simmons*, *supra,* 390 U.S. at 385 (holding there was little chance for misidentification when the robbery took place "in the afternoon in a well-lighted [*sic*] bank[,]" and "[t]he robbers wore no masks.").

  Second, the shooting did not take place in a crowded mall or place where there were numerous things happening at once.  It was an empty carport area (except for Druecker, the shooter and French) so there were no other distractions.  Druecker testified that, initially he heard a loud noise (later determined to be the

first shot), drawing his undivided attention to the shooter.  It was after Druecker's attention focused on the shooter that the shooter stopped directly in Druecker's line of sight for several seconds, during which Druecker had an unobstructed view of the shooter's profile.[10]

Third, Druecker gave detailed physical descriptions of the shooter's facial features and clothing, including a profile description of the shooter to a sketch artist. Even the judge in the underlying trial noted that the composite sketch bore a "striking resemblance" to Plaintiff.  Druecker's description of the shooter's clothing as "worn," "wrinkled," and "dirty," was consistent with the fact that Plaintiff had been crashing at other people's homes, for the greater part of  the six or seven months, prior to the shooting (including the day of the shooting) and even claimed to have gone to his ex-girlfriend's house on the day of the murder to do laundry. (UF 20, 42, 185, 200–201.)  In addition to the foregoing, as discussed above, Druecker's identification of Plaintiff as the shooter is bolstered by the fact that at least two other witnesses (Soucy, Villareal) also identified Plaintiff.

Fourth, Druecker testified both at the preliminary hearing and at trial that he had no doubt "at all" regarding his identification. (UF 101, 105–06.)   Even when CM initially approached him in 2006 and made assertions that they were trying to assist a "wrongfully" convicted individual, Druecker stood steadfast in his prior testimony. It was not until after two years of pressure by CM (and almost 25 years after the murder) that Druecker finally recanted.

Fifth, Druecker gave his description to both SPPD and LASD investigators on the date of the murder, spoke to a sketch artist the day after the murder, and identified Plaintiff as the shooter in a six pack just four days after the murder. As

_____

[10] While it is anticipated that Plaintiffs will argue that Druecker was not wearing his glasses at the time of the murder, Druecker testified that the only reason he wore glasses was for night driving. (UF 31.)   Druecker further testified at trial that he was told by his eye doctor that he did not even need glasses. (UF 27–28.)

such, the reliability of Druecker's identification is supported by the fact that there very little time lapse between his witnessing the shooting, giving descriptions of the shooter, and identifying Plaintiff.  Accordingly, taking all of the *Biggers* factors into consideration, there is no genuine issue as to indicia of reliability.

## V.   NO GENUINE ISSUE OF MATERIAL FACT THAT THE DETECTIVES CONTINUED THEIR INVESTIGATION INTO PLAINTIFF AFTER THEY KNEW OR SHOULD HAVE KNOWN HE WAS INNOCENT.

In *Devereaux v. Abbey*, 263 F.3d 1070 (9th Cir. 2001), the Court held that a "fabrication of evidence" claim fails unless "(1) Defendants continued their investigation of [plaintiff] despite the fact they knew or should have known that he was innocent; or (2) Defendants used investigative techniques that were so coercive and abusive that they knew or should have known that those techniques would yield false information."  *Id.* at 1076; *see Hall v. Los Angeles*, 697 F.3d 1059, 1068 (9th Cir. 2012). Plaintiffs' allegation that the Detectives engaged in aggressive investigative tactics, in itself, is insufficient to support of a "fabrication of evidence" claim. *Cunningham v. Wenatchee*, 345 F.3d 802 (9th Cir. 2003).  Here, the evidence is that Plaintiff's own public defender interviewed Druecker, Soucy and Villareal and learned the same thing the Detectives learned.

In *Cunningham,* the plaintiff was prosecuted for sexual abuse of his daughter.  After his conviction was vacated, he filed a § 1983 action based on, *inter alia*, evidence that the officer told the daughter that she could not leave the hospital where she was being treated until she confessed to the abuse. *Id.* at 812. The Court, while describing the interrogation as "inappropriate," held that even such extreme investigative tactics did not rise to the level of a "coercive" investigation. *Id*.  Similarly, in *Gausvik v. Perez*, 345 F.3d 813, 817 (9th Cir. 2003), the plaintiff claimed that an officer in a child molestation investigation used overbearing tactics during various interviews and falsified his affidavit to achieve probable cause. *Id*.  The Court held, "such tactics do not establish a

deliberate-fabrication-of-evidence claim. As *Devereux* notes: 'an allegation that an interviewer disbelieved an initial denial and continued with aggressive questioning of the child cannot, without more, support a deliberate-fabrication-of-evidence claim, even if the allegation is amply supported by the evidence.'" *Id*. at 813. The Court held that an officer carelessly handling an investigation has no bearing on whether he knew a suspect was innocent. *Id*.; *Sacramento v. Lewis*, 523 U.S. 833, 849 (1998) (holding negligence is not actionable under § 1983); *Farmer v. Brennan*, 511 U.S. 825, 835 (1994); *Redman v. San Diego*, 942 F.2d 1435, 1440 (9th Cir. 1991).

Here, as detailed above, Druecker has continually testified that the Detectives were professional at all times during the presentation of the six pack. Druecker also positively identified Plaintiff as the shooter at the prelim and trial. Moreover, the notion that the purportedly undisclosed notes—indicating that Soucy identified Plaintiff's photo (#3), but also pointed to another photo (#1) as a possibility—would yield false information, is incorrect. As stated above, the only person who moved into Jeanne's place during the relevant time period that Soucy testified to was Plaintiff. Finally, any argument regarding the Detectives' identification techniques with Villareal is moot because he testified at the prelim and trial that, though Plaintiff looked the most like the shooter, he could not identify Plaintiff as the shooter for certain.

Thus, there is no genuine issue of material fact that the Detectives knew or should have known that Plaintiff was factually innocent nor, to the extent Plaintiffs allege the techniques were so coercive and abusive that they would yield false information, that any such false information was used at trial. Even if the Deputies should have conducted certain identification procedures differently or included additional information in their reports, the Ninth Circuit has made it clear that mishandling facts in an investigation does not rise to the level of **deliberate** fabrication of evidence. *Gausvik*, 345 F.3d at 817 (9th Cir. 2003).

## VI.   PLAINTIFFS' "RECKLESS INVESTIGATION" CLAIM FAILS BECAUSE IT IS NOT COGNIZABLE UNDER SECTION 1983.

Here, while Plaintiffs allege in two headings that Defendants are liable for a "reckless investigation" (*see*, Ex. B at IX and X), these claims fail "because a 'reckless investigation' is not a cognizable claim under §1983." *Souliotes v. City of Modesto*, 2016 WL 3549266, at *10 (E.D. CA 2016). In *Souliotes*, the Court examined the viability of a "reckless investigation" claim under § 1983, but it "[could not] find any cases where the Ninth Circuit recognized 'reckless investigation' as an independent cause of action." *Id*. (citing *Tennison v. San Francisco*, 570 F.3d 1078, 1089 (9th Cir. 2009); *Amrine v. Brooks*, 522 F.3d 823 (8th Cir.2008).)  The court also looked to *Devereaux*, where the Ninth Circuit held that there is "no constitutional due process right" to have an investigation "carried out in a particular way." 263 F.3d at 1075. Based on these findings, the court held that "a 'reckless investigation,' in and of itself, does not present a cause of action under §1983." *Souliotes*, *supra*. As such, Plaintiffs' "reckless investigation" claims fail as a matter of law.

## VII.   THE INDIVIDUAL DEFENDANTS ARE ENTITLED TO QUALIFIED IMMUNITY AS A MATTER OF LAW.

Qualified immunity "is an **immunity from suit** rather than a mere defense to liability; and like an absolute immunity, it is effectively lost if a case is erroneously permitted to go to trial." *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1995) (emphasis in original).   Qualified immunity is designed to shield from liability "all but the plainly incompetent or those who knowingly violate the law." *Malley v. Briggs*, 475 U.S. 335, 341 (1986).

A public employee is entitled to qualified immunity if the defendant did not violate the plaintiff's constitutional rights. *Pearson v. Callahan*, 555 U.S. 223, 232 (2009)  Thus, for the reasons set forth in Sections II–VI *infra,* because there is no genuine issue of material fact as to a constitutional violation, the individual Defendants are entitled to qualified immunity.  Even assuming, *arguendo,* there

is genuine issue as to a constitutional violation, the individual Defendants are still entitled to qualified immunity because there is no evidence of a violation of a "clearly established" law.

Plaintiffs bear the burden of showing that the right allegedly violated was clearly established at the time of the alleged misconduct. *Romero v. Kitsap County*, 931 F.2d 624, 627 (9th Cir. 1991). Moreover, "[t]he contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Anderson v. Creighton*, 483 U.S. 635, 640 (1987). "A government official's conduct violate[s] clearly established law when, at the time of the challenged conduct, '[t]he contours of [a] right [are] sufficiently clear' that every 'reasonable official would have understood that what he is doing violates that right.'" *Ashcroft v. al-Kidd*, 563 U.S. 731, 739 (2011) (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)); *Wilson v. Layne*, 526 U.S. 603, 617–18 (1999) ("If judges thus disagree on a constitutional question, it is unfair to subject police to money damages for picking the losing side of the controversy."); *Serrano v. Francis*, 345 F.3d 1071, 1077 (9th Cir. 2003).

### A.   Alleged Non-Disclosure Of Notes Re Soucy and Villareal.

Here, with respect to the alleged non-disclosure of the notes pertaining to the Soucy and Villareal identifications, Plaintiffs are essentially alleging that, simply because they were allegedly not disclosed, then it must have necessarily been a "*Brady*" violation. That is not the standard under *Brady*. As the Supreme Court made clear in 1972 in the *Moore v. Illinois* case and reiterated over 20 years later in the *Kyles* case, "the Constitution is not violated every time the government fails or chooses not to disclose evidence **that might prove helpful to the defense**." *Kyles v. Whitley, supra,* 514 U.S. at 436-437. The Supreme Court has "repeatedly told courts – and the Ninth Circuit in particular – not to define clearly established law at a high level of generality." *City and County of San Francisco v. Sheehan*, 135 S.Ct. 1765 (2015) at 1775–76. The law and its

1  application to the specific situation must be so clearly established that the

2  unconstitutionality of the alleged action would be "beyond debate." *Id*. at 1774.

3      As discussed in Section III above, while Plaintiffs argue that the Soucy and

4  Villareal notes might have been helpful in potential cross-examination of those

5  witnesses, the evidence undermines this claim.  Nor was there any clearly

6  established law in 1984 that evidence that might have provided investigatory

7  leads required to be disclosed under *Brady*.  In fact, over 15 years after the

8  underlying investigation, the Ninth Circuit shot down any such notion. *See,*

9  *Downs v. Hoyt*, 232 F.3d 1031, 1036 (9th Cir. 2000) (no *Brady* violation where

10 "[t]he most that can be said of these materials is that they might have provided

11 investigatory leads.")  Since there was no clearly established law in 1984 (or even

12 as of today) that the alleged non-disclosure of information that "might" be useful

13 to the defense is a violation of *Brady,* the individual Defendants are entitled to

14 qualified immunity with respect to the alleged non-disclosure of notes pertaining

15 to the Soucy and Villareal identifications.  At the very minimum, where, as here,

16 a reasonable officer could have believed the Detectives conduct was lawful, any

17 violation was harmless error, at most, and the Detectives are entitled to qualified

18 immunity on this additional basis. *Hunter v. Bryant*, 502 U.S. 224, 227 (1991).

19      **B.    Alleged Suggestive Photographic Line-up With Druecker.**

20      At no time prior to Druecker pointing to Plaintiffs' photograph did the

21 Detectives do anything suggestive.  As discussed in Section IV, *infra,* the

22 standard to prove a suggestive line-up is fairly high and conduct a lot more

23 egregious than that alleged in the instant case has been found to not rise to the

24 level of a constitutional violation.  While Defendants deny any suggestion that

25 Druecker was not admonished prior to the line-up, even assuming that he wasn't,

26 the law was not clearly established in 1984 that a line-up without an

27 admonishment was a violation of clearly established law.  Nor is it clearly

28 established today. *See, e.g. Carr*, *supra,* 761 F.3d at 1074–75 (no constitutional

violation where witness was not admonished that the photographs shown may not include pictures of the suspects.)

While Plaintiffs allege that, **after** Druecker pointed to Plaintiffs' photograph, the Detectives made certain comments to solidify the identification, when Druecker was asked at trial "Would it be fair to say that, when you settled on number 3 [Plaintiff's photo], in your mind was that the person or was that the closest person resembling the gunman?", Druecker definitively responded: "That was the person." Further, while Defendants dispute the various alleged misconduct **after** Druecker pointed to Plaintiffs' photo even occurred, the law was not clearly established that law enforcement would have a "*Brady*" duty to disclose their **own** alleged misconduct.[11] *See, e.g., Bastidas v. Los Angeles*, 2006 WL 4749706 at * 7-9 (C.D. CA 2006). It would also defy credulity to require law enforcement to disclose misconduct that they deny engaging in. In other words, the appropriate analysis with respect to any alleged misconduct with respect to the Druecker identification is the suggestive line-up analysis under *Simmons* and *Biggers* and their progeny, not *Brady*.

With respect to the *Devereaux* claims, as discussed above, the law was not clearly established at the time of the underlying investigation that engaging in aggressive tactics in itself, clearly established at the time of the underlying investigation to rise to the level of a constitutional violation. *See Cunningham v. Wenatchee*, *supra.*

## VIII. THERE IS NO GENUINE ISSUE OF MATERIAL FACT THAT A POLICY, PRACTICE OR CUSTOM OF "DELIBERATE INDIFFERENCE" BY THE LASD CAUSED ANY OF THE ALLEGED CONSTITUTIONAL VIOLATIONS.

Because there is no *respondeat superior* liability under § 1983, to prove their claims against the County, Plaintiffs must not only prove a constitutional

---

19

violation, but also establish that such violation was caused by a policy, practice or custom of "deliberate indifference" of the County. *Monell v. Dept. of Social Services*, 436 U.S. 658, 690 (1978). For reasons discussed in Sections I-VI, *infra,* since there is no genuine issue of material fact as to the various alleged constitutional violations, this Court need not even analyze the second step of the *Monell* analysis and determine whether the alleged violations were caused by a policy, practice or custom of "deliberate indifference."  Even assuming, *arguendo*, there was a genuine issue as to any of the alleged constitutional violations, there is insufficient evidence that any violations was caused by a policy, practice or custom of "deliberate indifference."

Since there is no written policy of LASD that permitted the suppression of evidence, suggestive identification procedures or fabrication of evidence, Plaintiffs must establish their *Monell* claims through either a practice or custom of "deliberate indifference."    To prove that the County had a practice or custom of deliberate indifference which caused any of the alleged constitutional violations, however, Plaintiffs must show that the practices are "persistent and widespread . . . permanent and well-settled [and] deeply imbedded." *Adickes v. S.H. Kress & Co.* 398 U.S. 144, 167-68 (1970).  Courts have proven to be particularly sensitive to claims that a government entity maintains an unspoken, wrongful "custom" of violating civil rights. In *Oklahoma City v. Tuttle*, 471 U.S. 808 (1985) at 823-824, the Supreme Court found that a § 1983 plaintiff cannot recover under a "custom" theory by simply producing evidence of isolated incidents of alleged misconduct directed toward him.  Rather, a plaintiff must produce evidence of misconduct "so common and well-settled as to constitute a custom that fairly represents municipal policy, actual or constructive knowledge of such custom must be attributable to the governing body or to an official to whom the body has delegated policymaking authority." *Bennett v. City of Slidell*, 728 F.2d 762, 767 (5th Cir. 1984) en banc, re-hearing denied, 735 F.2d 861 (5th

1   Cir. 1984), cert. denied, 472 U.S. 1016 (1985).  In the absence of an

2   overwhelming showing of numerous prior similar incidents -- involving

3   numerous other citizens and officers -- a section 1983 plaintiff proceeding on a

4   tacit, wrongful "custom" theory fails to make a prima facie case against a

5   governmental entity.[12]

6         Against this background, to the extent that Plaintiffs attempt to prove a

7   tacit, wrongful custom by the County, their § 1983 claims are hopelessly

8   defective.  Plaintiffs have no evidence of a requisite pattern of wrongful acts --

9   involving numerous officers -- sufficient to raise an inference that such customs

10  existed and indeed no such policies, practices or customs exist.  Indeed, Plaintiffs

11  seek to base their claim solely on the existence of the subject conviction.

12  However, as set forth above, it is well settled that one incident is insufficient to

13  establish *Monell* liability.  Therefore, that leaves the issue as to whether there is

14  sufficient evidence of a practice of deliberate indifference that caused the alleged

15  constitutional violations.  As discussed below, the answer is a definitive no.

16  ///

17  _____

18  [12] Indeed, as many as 12 prior incidents have been held insufficient to constitute

19  evidence of a "pattern" for purposes of § 1983 liability premised on a "custom."

20  *See*, *Hamilton v. Rogers*, 791 F.2d 439, 443 (5th Cir. 1986) (approximately 12
    racial employment incidents in two and-a-half years at fire department

21  insufficient to constitute pattern for purposes of civil rights laws); *Carter v. D.C,*

22  795 F.2d 116, 123-24 (D.C. Cir. 1986) (plaintiff produced evidence of
    approximately 11 prior incidents in an effort to establish municipal custom; court

23  enters directed verdict for city: "This catalog of disquieting events is not

24  sufficient to demonstrate a pervasive pattern of police officer use of force,
    persisting in a district because of (supervisory) tacit approval . . ._"); *Ramos v.*

25  *Chicago*, 707 F.Supp. 345, 347 (N.D. Ill. 1989) (six prior incidents fail to make

26  up prima facie case under § 1983 against municipality); *Sloman v. Tadlock*, 21

27  F.3d 1462 (9th Cir. 1994) (court overturns jury finding of *Monell* liability for lack
    of evidence indicating that misconduct was widespread on police force;

28  "habitual" harassment of plaintiff by one officer insufficient as a matter of law).

1    ///

2    **A.    The LASD's Practice At All Relevant Times Was To Document All Of The Details (Both Potentially Inculpatory and Exculpatory) And To Disclose *All* Evidence Regardless As To Whether It Qualifies As "*Brady*" Evidence.**

5    With respect to Plaintiffs' *Brady* claims, the mere existence of the various

6    notes that Plaintiffs claim was exculpatory and not-disclosed undermines any

7    notion of "deliberate indifference." Indeed, the evidence is undisputed that

8    Homicide Bureau's practice was for its detectives to take detailed notes of all of

9    their observations (regardless as to whether such observations may support or

10    potentially weaken their case). (UF 271-275, 321.) Regardless as to whether a

11    particular detective found a particular fact relevant to a report he/she prepared, [13]

12    Homicide Bureau's practice was not just to disclose its reports, but **everything**,

13    including all of the detectives' notes. (UF 277-280, 321.)

14    While it is anticipated that Plaintiffs will try to argue that LASD personnel

15    were not given detailed training on the contours of *Brady*, this is nothing but a *red*

16    *herring* because the LASD's practice went beyond simply disclosing "*Brady*"

17    evidence and instead erred on the side of caution by requiring detectives to

18    disclose their entire file after presenting a case for prosecution. Nor can such a

19    practice be said to rise to the level of "deliberate indifference" because, if

20    anything, it takes human error out of the equation. If the LASD's practice, on the

21    other hand, was only to disclose what it deemed to be "*Brady*" evidence, it would

22    require detectives to make nuanced decisions about particular items of evidence

23    and would only increase the likelihood that certain evidence might not be

24    disclosed if a particular detective made a mistake in determining that it was

25    _____

26    [13] Therefore, Plaintiffs' argument that every single detail from the detectives'
notes were not incorporated into their reports is irrelevant because the LASD's
27    practice is to disclose detectives' notes. In any event, *Brady* does not even
require "a complete and detailed accounting to the defense of all police
28    investigatory work on a case." *Moore v. Illinois*, *supra,* 408 U.S. at 795.

neither material nor exculpatory.  Here, because the evidence is undisputed that it was the LASD's practice to document everything in detail and to disclose their entire file, Plaintiffs cannot create a genuine dispute that any alleged *Brady* violation was caused by a practice of "deliberate indifference."

**B.    Because the LASD Had Numerous Safeguards In Place To Prevent Suggestive Identifications, There Is No Genuine Issue Of Material Fact As To A Practice Of "Deliberate Indifference" With Respect To Any Of The Identifications.**

A number of safeguards have been in place at Homicide Bureau dating back to the time of the underlying investigation to prevent the possibility of suggestive photo line-ups.  This includes the following practices: (1) selecting photos of individuals of the same race, gender, age and same general facial/hair features as the suspect (UF 326-327), (2) in creating the six-pack, placing the photos, in random order, in a manila envelope that had six equally-sized windows (to prevent some photos from being larger than others) (UF 328), (3) admonishing witnesses prior to presenting the six pack that they are not obligated to pick a photo if they do not recognize the suspect (UF 329-331) and (4) avoiding any conduct during the presentation of the six pack (such as tapping on a photo, mentioning a specific photo, staring at a particular photo, etc.) to suggest one photo over another. (UF 332.)  While additional safeguards have been added since the underlying investigation, such as taping and/or video-recording identification procedures, the safeguards that were in existence at the time of the underlying photo identifications certainly undermines any notion that any suggestive line-up was caused by a practice of "deliberate indifference."

**C.    Nor Can Plaintiffs Prevail On A Failure To Train Theory.**

Here, because Plaintiffs have no evidence that the County had a policy, practice or custom of suppressing exculpatory evidence, fabricating evidence and/or engaging in suggesting identification procedures, Plaintiffs must rely on the single-incident "failure to train" liability hypothesized by the Supreme Court

in *Canton v. Harris*, 489 U.S. 378, 389 (1989)  To the extent that Plaintiffs contend that the County is liable on the basis that there was inadequate training, Plaintiffs' claim also fails.

In *Merritt v. Los Angeles*, 875 F.2d 765, 770 (9th Cir. 1989), the Court specifically articulated the elements necessary to prove a failure to train claim: "[…] (1) an inadequate training program, (2) deliberate indifference on the part of the county in adequately training its law enforcement officers, and (3) whether the inadequate training 'actually caused' a deprivation of [plaintiff]'s constitutional rights."  *Id.*  "It does not follow that, because *Brady* has gray areas and some *Brady* decisions are difficult, prosecutors will so obviously make wrong decisions that failing to train them amounts to 'a decision by the city itself to violate the Constitution.'" *Connick v. Thompson*, 131 S. Ct. 1350, 1365 (2011) (quoting *Canton, supra,* 489 U.S., at 395 (O'Connor, J., concurring in part and dissenting in part)).  "To prove deliberate indifference, [Plaintiffs need] to show that [Defendants were] on notice that, absent additional specified training, it was 'highly predictable' that [Homicide detectives] would be confounded by those gray areas and make incorrect *Brady* decisions as a result." *Connick v. Thompson*, *supra*, 135 S.Ct. at 1365.  "In fact, [Plaintiffs have] to show that it was *so* predictable that failing to train the [Detectives] amounted to *conscious disregard* for [Plaintiff's] *Brady* rights."  *Connick*, *supra*, 135 S.Ct. at 1365 (citing *Board of Comm'rs of Bryan Cty. v. Brown, supra,* 520 U.S. at 409; *Canton, supra,* at 389.)

The LASD is a hierarchical organization that provides multiple levels of training and supervision to ensure that constitutional protections are observed. (UF 304, 307-310.)  All prospective sworn employees of the LASD are required to satisfy certain criteria and complete a 22-week Peace Officer Standards and Training ("POST") certified academy which covers a variety of topics including, but not limited to, ethics, identification procedures and disclosure requirements. (UF 311-313.)  Any sworn member of the LASD seeking to join Homicide

24

Bureau must have prior detective experience and complete additional training on various topics such as witness identifications, accurate report writing, production of exculpatory evidence. (UF 314-317.)  For those individuals that complete the requirements and join Homicide Bureau, they are required to complete a probationary period during which they are directly supervised at multiple levels, including a training partner, regarding various aspects of homicide investigations. (UF 316.)   In addition, detectives receive periodic legal updates from the DA's Office and conduct weekly meetings to discuss relevant legal issues. (UF 318-320.)   Through the aforementioned mechanisms, which include academy training as well as additional formal and on-the-job training, Homicide detectives receive specific training to avoid the types of violations Plaintiffs allege occurred in the instant case. (UF 306, 313-314, 316-336.)

Given the undisputed evidence that it is has been the practice of the LASD's Homicide Bureau to take detailed notes about detectives' observations (regardless as to whether the observations may potentially weaken a case) and for detectives to disclose their entire files (including their notes) after presenting cases for prosecution, this eliminated the possibility of detectives inadvertently making wrong choices about what materials needed to be disclosed pursuant to *Brady* where they fell into the "gray area" of borderline exculpatory materials. As such, the lack of additional training on the nuances of what materials would be required to be disclosed under "Brady" does not rise to the level of "deliberate indifference."   Moreover, the evidence is that Homicide detectives were given specific training on how to prepare six packs and present them to avoid any suggestiveness. (UF 324-332.)   Based on the foregoing, Plaintiffs cannot create a genuine issue with respect to the "failure to train" theory.

## IX. PLAINTIFFS' CLAIMS AGAINST ERIC PARRA (AS THE ADMINISTRATOR OF THE ESTATE OF GILBERT PARRA) ARE TIME BARRED.

### A. Plaintiffs Failed to Pursue Their Claims With Respect to Det. Parra Within One Year of His Death As Required By *California Code of Civil Procedure* § 366.2.

Plaintiffs have asserted claims against deceased Detective Parra's son, Eric Parra, on the basis that he was the personal representative of the estate. Det. Parra passed away in October, 2003 and his estate was closed over 10 years ago. (UF 339–341.) At no time did Plaintiffs ever file a timely creditor's claim with the estate. (UF 342.) As such, Plaintiffs' claims against Parra are time barred based on the limitations period set in *California Code of Civil Procedure* (*"CCP"*) § 366.2. This statute applies to all causes of action which survive the decedent's passing, **whether accrued or not accrued**, arising in contract, tort or otherwise. Under § 366.2, a plaintiff must commence an action against the decedent within one (1) year after the date of death. Plaintiff filed the instant lawsuit approximately 10 years after Parra's date of death and, as such, the claims against Parra a time-barred by § 366.2.

The limitations period imposed by § 366.2 applies to all causes of action and it is irrelevant whether a person representative or distributee of property is an actual named defendant. This is made clear by the Law Revision Committee Comment to § 366.2, which states, "The one-year limitation of Section 366.2 applies in any action on a liability of the decedent, whether against a personal representative under Probate Code Sections 9350-9354 or against another person, such as a distributee under Probate Code Section 9392…" *See also, CCP* § 377.40 ("a cause of action against a decedent that survives may be asserted against the decedent's personal representative"). The limitations period imposed by *CCP* § 366.2 is based on the strong public policy that estate administration should be conducted expeditiously and with finality. *See*, *Dawes v. Rich*, 60 Cal.App.4th 24, 34 (1997).

1    Courts analyzing § 366.2 have applied strict enforcement principles
2  resulting in what some might consider to be harsh results.  For example, in
3  *Bradley v. Breen,* 73 Cal.App.4th 798 (1999), the victim of a convicted child
4  molester sued his former wife, alleging that she aided her former husband in
5  carrying out the attacks.  The defendant's former husband had passed away in jail,
6  and the ex-wife filed a cross-complaint against his estate seeking equitable
7  indemnity.  While it would seem unfair to preclude the cross-complaint against
8  the perpetrator's estate, *Bradley* ruled that the cross-complaint was barred by §
9  366.2. *Bradley, supra,* 73 Cal.App.4th at 804-05.  The ex-wife's argument that
10  she could not have filed the cross-complaint any sooner due to the extended
11  statutes of limitations for molestation actions (which permitted the complaint
12  against her to be filed well after the deadline under *CCP* § 366.2 had expired) was
13  rejected by the Court which emphasized that the "Legislature has determined that
14  the one-year statute of limitations will best effectuate the strong public policy of
15  expeditious and final estate administration, despite the possibility that in a rare
16  case such as the present one, an action for equitable indemnity may be
17  foreclosed." *Id.* at 805–06.
18    It is clear from the plain language of § 366.2 that the claims against Eric
19  Parra in the instant case are barred, just as in *Bradley.*  Det. Gilbert Parra passed
20  away over 13 years ago and any assets he may have had have long been
21  distributed.  The interest of equity simply does not allow for Plaintiffs in the
22  instant case to go after Det. Parra's son for recompense for actions he did not
23  take, and which he could not possibly have had any first-hand personal
24  knowledge or control over, if they were to even have occurred.  The precise
25  reasoning behind the Legislature's passing of § 353 and, later, § 366.2 is stark
26  here.  This law was passed to deal with situations exactly like the one presently
27  before this Court, i.e., to prevent litigants from creating uncertainty in the
28  disposition of the assets of a decedent.

1    Any claim by Plaintiffs that they were unable to file the instant lawsuit

2    until the underlying conviction was dismissed, reversed or otherwise vacated is

3    irrelevant, nor does § 366.2 provide for an exception under these circumstances.

4    In fact, the plain language of § 366.2 states that an action not filed within the one-

5    year limitations period is barred "whether accrued or not accrued."

6        **B.**    <u>**Plaintiffs' Anticipated Attempt to Rely on *California Probate***</u>

7    <u>***Code* § 550 Based on the *Indemnification* Provisions of the**</u>
    <u>***California Government Code* Is Misplaced.**</u>

8    Defendants anticipate that Plaintiffs may attempt to circumvent the lack of

9    compliance with the strict deadline imposed by *CCP* § 366.2 by asserting that

10   *Probate Code* § 550, et seq., applies to this matter. This argument fails because

11   the County is not an insurance provider, and therefore, any purported duty to

12   indemnify pursuant to *California Government Code* § 825 is misplaced. *Probate*

13   *Code* § 550 provides, "an action to establish the decedent's liability for which the

14   decedent was protected by insurance may be commenced or continued against the

15   decedent's estate without the need to join as a party the decedent's personal

16   representative or successor in interest"). The California Supreme Court has made

17   it clear that plaintiffs seeking to rely upon § 550 must establish proof of insurance

18   coverage. *See, Escobedo v. Estate of Snider,* 14 Cal.4th 1214 (1997); *see also,*

19   *Pelayo v. City of Downey,* 570 F.Supp.2d 1183, 1197 (C.D. CA 2008).

20   The County's duty to indemnify employees pursuant to *Government Code*

21   §§ 825 and 995,[14] however, is not the equivalent of insurance, and the County is

22   not an insurance provider. *See, Hanline v. Ventura*, 2006 WL 3360672 at *3

23   (C.D. CA 2016) ("[t]he practice Plaintiff describes is indemnification, not

24

25   _____

26   [14] *Government Code* § 825 provides that "if an employee or former employee of a public entity requests the public entity to defend him or her . . . the public entity

27   shall pay any judgment thereon." Furthermore, § 995 states that a public entity shall indemnify its employee it the employee "requests" indemnification.

28

insurance.  Indemnification is not an exception to section 550"); *see also, Younker v. County of San Diego*, 233 Cal.App.3d 1324, 1331 n.8 (1991) ("the County's obligation under section 825 was **not that of an insurer** . . . .") (emphasis added); *Gov't Employees Ins. Co. v. Gibraltar Casualty Co.*, 184 Cal.App.3d 163, 174 (1986) (holding that a school district's duty to indemnify a teacher under Government Code § 825 was not equivalent to that of an insurer).

Furthermore, it is clear that a public entity's duty to indemnify an employee under *Government Code* § 825 is only triggered upon the employee's **written request** for the public entity to indemnify him.  Here, there has not and will be no requests for indemnification (UF 343–344), and accordingly, the indemnification requirement will not be triggered.  In *Pelayo*, the Court held that the city did not have a duty to indemnify a deceased employee because there was no request for defense.  The court reasoned that "the statute is clear that the duty of a public entity to indemnify an employee is not triggered unless the employee makes an affirmative request for a defense in writing at least ten days before trial."  *Pelayo, supra* at 1196.  Since the County's indemnification requirements are distinguishable from insurance and have not been triggered (nor will they be), Plaintiffs cannot rely on § 550 to revive their claims against Det. Parra or to pursue claims against his son, Defendant Eric Parra.

**C.    Plaintiffs Failed To Follow The Strict Requirements Imposed By The California Probate Code.**

The *Probate Code* imposes strict requirements upon creditors seeking to file a claim against an estate, or against a decedent's successor-in-interest as in the instant case under *Probate Code* § 9000, et seq.  If these requirements are not met, the claim is barred and the creditor is barred from seeking recovery. *See, Probate Code* § 9002(b) ("[a] claim that is not filed as provided in this part is barred").  Plaintiffs are deemed "creditors" under *Penal Code* § 9000(c) as "person[s] who may have a claim against estate property."  The damages which Plaintiffs seek constitute "claims", which is defined in *Probate Code* § 9000(a) as

29

1  "a demand for payment for any of the following, whether due, not due, accrued or

2  not accrued, or contingent, and whether liquidated or unliquidated: (1) Liability of

3  the decedent, whether arising in contract, tort, or otherwise." *Probate Code* §

4  9100(c) expressly states that "Nothing in this section shall be interpreted to

5  extend or toll any other statute of limitations or revive a claim that is barred by

6  any statute of limitations.  The reference in this subdivision to a 'statute of

7  limitations' includes Section 366.2 of the Code of Civil Procedure."

8      The policy reasons behind *Probate Code* § 9000, et seq. are similar to those

9  supporting the creation of CCP § 366.2 – namely, providing for the final

10  administration of an estate in a timely fashion.  *See, e.g., Nathanson v. Superior*

11  *Court,* 12 Cal.3d. 355, 365 (1974).  It is irrelevant that, prior to the reversal of the

12  underlying murder conviction, Plaintiffs' claims may have been previously barred

13  by *Heck* because *Probate Code* § 9000(a), by its express language, applies to both

14  accrued and non-accrued claims.  As such, Plaintiffs claims against Eric Parra are

15  barred as a matter of law on this additional basis.

16  **X.    CONCLUSION.**

17      For each and all of the foregoing reasons, Defendants COUNTY OF LOS

18  ANGELES, J.D. SMITH and ERIC PARRA respectfully request that this Court

19  enter judgment in their favor on Plaintiffs' claims of fabrication of evidence,

20  *Brady* claims (with respect to the allegedly non-disclosed notes) and suggestive

21  line-up and that these claims be dismissed with prejudice.

22  Dated:  February 24, 2017          LAWRENCE BEACH ALLEN & CHOI PC

23

24                              By:   /s/ Michael D. Allen

25                                  Michael D. Allen
                                  Attorneys for Defendants,

26                                  COUNTY OF LOS ANGELES, J.D.
                                  SMITH and ERIC PARRA

27

28