1   PAUL B. BEACH, State Bar No. 166265
    pbeach@lbaclaw.com
2   MICHAEL D. ALLEN, State Bar No. 198126
    mallen@lbaclaw.com
3   LAUREN T. KRAPF, State Bar No. 292115
    lkrapf@lbaclaw.com
4   LAWRENCE BEACH ALLEN & CHOI, PC
    100 West Broadway, Suite 1200
5   Glendale, California 91210-1219
    Telephone No. (818) 545-1925
6   Facsimile No. (818) 545-1937

7   Attorneys for Defendants
    COUNTY OF LOS ANGELES, J.D. SMITH and ERIC PARRA
8

9

10              **UNITED STATES DISTRICT COURT**

11              **CENTRAL DISTRICT OF CALIFORNIA**

12  FRANK O'CONNELL, NICHOLAS                )   Case No. 13-CV-01905 MWF (PJWx)
    O'CONNELL                                 )
13                                            )   Honorable Michael W. Fitzgerald
14                Plaintiffs,                 )
                                              )
15         v.                                 )   **DECLARATIONS OF LAUREN T.**
                                              )   **KRAPF, STEVE LANKFORD,**
16  J.D. SMITH; ESTATE OF GILBERT             )   **MIKE BUMCROT; AND ERIC**
    PARRA; ERIC PARRA, COUNTY OF              )   **PARRA; AND EXHIBITS**
17  LOS ANGELES AND DOES 1-10.                )   **SUBMITTED BY DEFENDANTS**
                                              )   **IN SUPPORT OF THEIR MOTION**
18                Defendants.                 )   **FOR SUMMARY JUDGMENT, OR**
                                              )   **ALTERNATIVELY, SUMMARY**
19                                            )   **ADJUDICATION OF INDIVIDUAL**
                                              )   **ISSUES**
20                                            )
                                              )   [*Memorandum of Points and*
21                                            )   *Authorities; Separate Statement of*
                                              )   *Undisputed Facts; and [Proposed]*
22                                            )   *Judgment filed concurrently herewith*]
                                              )
23                                            )
                                              )   Date:        April 24, 2017
24                                            )   Time:        10:00 a.m.
                                              )   Courtroom:   5A
25                                            )
                                              )
26  ─────────────────────────────────────────)

27  ///

28

                              1

1    Defendants COUNTY OF LOS ANGELES, J.D. SMITH and ERIC PARRA

2  submit the attached Declarations of Lauren T. Krapf, Steve Lankford, Mike

3  Bumcrot, and Eric Parra as well as the following exhibits in support of their Motion

4  for Summary Judgment, or Alternatively, Summary Adjudication of Individual

5  Issues.

6

7

8  Dated: February 24, 2017        LAWRENCE BEACH ALLEN & CHOI, PC

9

10

11                    By /s/ *Michael D. Allen*
                          Michael D. Allen
12                        Attorneys for Defendants
                          COUNTY OF LOS ANGELES, J.D.
13                        SMITH and ERIC PARRA

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

2

## DECLARATION OF LAUREN T. KRAPF

I, Lauren T. Krapf, declare as follows:

1.      I am an attorney at law, duly authorized to practice before this Court and I am an associate in the law firm of Lawrence Beach Allen & Choi, PC, attorneys for Defendants COUNTY OF LOS ANGELES, J.D. SMITH and ERIC PARRA in the within entitled action. I have personal knowledge of the facts stated herein. If called to testify to the matters herein, I could and would competently do so.

2.      This case involves claims against the County of Los Angeles and the Los Angeles County Sheriff's Department ("LASD") Homicide Detectives J.D. Smith and Gilbert Parra (deceased) based on Plaintiff Frank O'Connell's 1985 conviction for the January 5, 1984 murder of Jay French. Although Plaintiff's conviction was reversed in 2012, following the filing of a habeas petition, Plaintiff has never been found to be factually innocent of the murder for which he was previously convicted.

3.      This Motion is made following a good faith, but unsuccessful attempt to informally resolve issues pursuant to Local Rule 7-3. On January 24, 2017, this office sent Plaintiffs' counsel a letter regarding the issues set forth in this instant motion. A true and correct copy of the letter is attached hereto and incorporated herein by reference as Exhibit "A". On January 27, 2017, the Parties met to discuss the aforementioned letter and the potential for an informal resolution regarding issues related to Plaintiffs' claims for relief. Unfortunately, the Parties were unable to resolve any of these issues.

4.      Attached to and incorporated by reference as Exhibit "B" is a true and correct copy of Plaintiffs' First Amended Complaint in this matter.

5.      Attached to and incorporated by reference as Exhibit "C" is a true and correct copy of a January 11, 1984 County of Los Angeles Sheriff's

1  Department Complaint Report from the LASD Investigation into the January 5,

2  1984 murder of Jay French, File No. 084-00004-2610-011.

3       6.     Attached to and incorporated by reference as Exhibit "D" is a true

4  and correct copy of the January 5, 1984 South Pasadena Police Department

5  ("SPPD") Report regarding the initial into the January 5, 1984 murder of Jay

6  French, File No. 084-00004-2610-011.

7       7.     Attached to and incorporated by reference as Exhibit "E" is a true

8  and correct copy of a January 10, 1984 County of Los Angeles Sheriff's

9  Department Supplementary Report from the LASD investigation into the January

10  5, 1984 murder of Jay French, File No. 084-00004-2610-011.

11      8.     Attached to and incorporated by reference as Exhibit "F" is a true

12  and correct copy of a February 8, 1984 County of Los Angeles Sheriff's

13  Department Supplementary Report from the LASD investigation into the January

14  5, 1984 murder of Jay French, File No. 084-00004-2610-011.

15      9.     Attached to and incorporated by reference as Exhibit "G" is a true

16  and correct copy of the Los Angeles County Sheriff's Department ("LASD"),

17  Scientific Services Bureau, Firearms Identification Section Report from the

18  LASD investigation into the January 5, 1984 murder of Jay French, File No. 084-

19  00004-2610-011.

20      10.    Attached to and incorporated by reference as Exhibit "H" is a true

21  and correct copy of the six-pack photograph array, with Plaintiff Frank

22  O'Connell's photograph in spot three, used during identification procedures

23  during the investigation into the 1984 murder of Jay French.

24      11.    Attached to and incorporated by reference as Exhibit "I" is a true and

25  correct copy of an empty six-pack photograph array folder, with slots for

26  suspect/filler photos on the front side of the manila folder and a witness

27  admonition fastened to the back side of the folder, used during identification

28  procedures during LASD investigation in the 1980's.

4

12.     Attached to and incorporated by reference as Exhibit "J" are true and correct copies of hand-written notes taken by the Detectives, generated during the investigation into the January 5, 1984 murder of Jay French, File No. 084-00004-2610-011.

13.     Attached to and incorporated by reference as Exhibit "K" is a true and correct copy of a composite sketch of the shooter based on a description given by eyewitness Daniel Druecker from the LASD investigation into the January 5, 1984 murder of Jay French, File No. 084-00004-2610-011.

14.     Attached to and incorporated by reference as Exhibit "L" is a letter that was sent to Detective Smith on May 24, 1984 by the District Attorney's Office, along with a discovery order from the underlying criminal proceedings, requiring the Detectives to make available for inspection the items in the discovery order, which specifically included their notes.

15.     Attached to and incorporated by reference as Exhibit "M" are true and correct copies of pages from the Reporter's Transcript of the March 7, 1984 Preliminary Hearing in *The People of the State of California v. Frank Thomas O'Connell*, Case No. A565559.

16.     Attached to and incorporated by reference as Exhibit "N" are true and correct copies of pages of testimony from the underlying criminal trial that were part of the Reporter's Transcript in *People of the State of California v. Frank Thomas O'Connell*, Case No. A565559.

17.     Attached to and incorporated by reference as Exhibit "O" are true and correct copies of pages from the Reporter's Transcript of the Proceedings Re: Habeas Corpus Petition for *In Re Frank O'Connell on Habeas Corpus*, Case No. 565559.

18.     Attached to and incorporated by reference as Exhibit "P" are true and correct copies of pages from the Reporter's Transcript of the May 18, 2016

1  Videotaped Deposition of Adolfo Lara in *Frank O'Connell v. J.D. Smith et al.*,

2  Case No. 13-CV-00-MWF (PJWx).

3      19.    Attached to and incorporated by reference as Exhibit "Q" are true

4  and correct copies of pages from the Reporter's Transcript of the November 11,

5  2016 Videotaped Deposition of Daniel Druecker in *Frank O'Connell v. J.D.*

6  *Smith et al.*, Case No. 13-CV-00-MWF (PJWx).

7      20.    Attached to and incorporated by reference as Exhibit "R" are true

8  and correct copies of pages from the Reporter's Transcript of the December 1,

9  2016 Videotaped Deposition of Kate Germond in *Frank O'Connell v. J.D. Smith*

10  *et al.*, Case No. 13-CV-00-MWF (PJWx).

11      21.    Attached to and incorporated by reference as Exhibit "S" are true

12  and correct copies of pages from the Reporter's Transcript of the Videotaped

13  Deposition of Frank O'Connell, Volume One, taken on December 7, 2016, and

14  Volume Two, taken on December 12, 2016, in *Frank O'Connell v. J.D. Smith et*

15  *al.*, Case No. 13-CV-01905-MWF.

16      22.    Attached to and incorporated by reference as Exhibit "T" are true

17  and correct copies of pages from the Reporter's Transcript of the Videotaped

18  Deposition of Jeanne Lahodny, taken on May 12, 2016, in *Frank O'Connell v.*

19  *J.D. Smith et al.*, Case No. 13-CV-01905-MWF.

20      23.    Attached to and incorporated by reference as Exhibit "U" are true

21  and correct copies of pages from Public Defender's Office Investigation Reports,

22  generated prior to Plaintiff's underlying criminal trial.

23      24.    Attached to and incorporated by reference as Exhibit "V" is the

24  transcript from a February 15, 1984 interview Plaintiff gave during the LASD

25  investigation into the January 5, 1984 murder of Jay French, File No. 084-00004-

26  2610-011.

27

28

25.     Attached to and incorporated by reference as Exhibit "W" is a true and correct copy of a Declaration of Adolfo Lara, signed and dated January 14, 2010.

26.     Attached to and incorporated by reference as Exhibit "X" are true and correct copies of pages from the Reporter's Transcript of the Videotaped Deposition of Deborah Zitella, taken on October 31, 2014, in *Frank O'Connell v. J.D. Smith et al.*, Case No. 13-CV-01905-MWF.

27.     Attached to and incorporated by reference as Exhibit "Y" are true and correct copies of pages from the Reporter's Transcript of the August 20, 2014 Videotaped Deposition of Danny Lee "Boone" Maynard in *Frank O'Connell v. J.D. Smith et al.*, Case No. 13-CV-00-MWF (PJWx).

28.     Attached to and incorporated by reference as Exhibit "Z" are true and correct copies of pages from the Reporter's Transcript of the October 14, 2016 Videotaped Deposition of Michael Flick in *Frank O'Connell v. J.D. Smith et al.*, Case No. 13-CV-00-MWF (PJWx).


I declare under penalty of perjury under the laws of the State of California and of the United States that the foregoing is true and correct.


Executed on February 24, 2017 at Glendale, California.

Lauren T. Krapf

## DECLARATION OF STEVE LANKFORD

I, Steve Lankford, declare as follows:

1. I am employed as a Homicide Detective for the Los Angeles County Sheriff's Department ("LASD") and I am currently assigned to the Homicide Bureau. The following facts are within my personal knowledge and, if called as a witness, I could and would competently testify thereto.

2. The Homicide Bureau of the LASD has the responsibility of conducting investigations into criminal and non-criminal deaths in Los Angeles County, along with officer-involved shootings. I have been employed with the LASD for over 32 years and have been assigned to the Homicide Bureau for the past 12 years. The LASD is the largest sheriff's department in the world. It directly services an area in excess of 4,000 square miles and provides police services for a population in excess of 10,000,000. At the present time, the LASD consists of over 17,000 employees; including 9,000 sworn peace officers and more than 8,000 civilians. There are LASD facilities as far north as Antelope Valley, as far south as Lomita, as far east as San Dimas and as far west as Catalina Island.

3. Any individual wanting to become a sworn peace officer of the LASD must be Peace Officer Standards and Training ("POST") certified. This requires a minimum of 664 hours of POST-developed training and testing in 42 separate areas of instruction called Learning Domains. Most POST-certified basic training academies exceed the 664 hour minimum by 200 or more hours. I completed my POST certification in October, 1984 at the LASD Academy in Whittier, California. This included a variety of subjects including, but not limited to, how the criminal justice system works, elements of various crimes, investigative report writing and gathering and preserving evidence.

4. Additional requirements are needed for any sworn LASD personnel interested in becoming a member of the LASD's Homicide Bureau. In addition

1  to a minimum of two to three years of experience as a patrol officer and a

2  minimum of one to two years of investigative background (at any number of

3  LASD divisions including, but not limited to, Fraud & Cyber Crimes Bureau,

4  Commercial Crimes Bureau) and the completion of additional formal training at a

5  POST-certified homicide school.  The POST-certified homicide school involves a

6  minimum of 80 additional hours of training on various subjects including, but not

7  limited to, (1) report writing, (2) handing evidence and chain of command issues,

8  (3) identification procedures, including how to conduct photographic arrays ("six

9  packs"), (4) filing cases with prosecutors as well as (5) the requirement to

10  disclose any and all exculpatory materials to prosecutors.  I completed my POST-

11  certified homicide school requirement in 2002 at the LASD Homicide School in

12  La Mirada, California.

13      5.      Once assigned to Homicide Bureau, every detective must complete

14  at least a one year probationary period during which he/she is assigned to a senior

15  detective who provides additional one-on-one training and evaluation over the

16  course of the year on a variety of topics including, but not limited to report

17  writing, identification procedures and, of course, the requirements to disclose

18  exculpatory evidence.  Ever since I have been assigned to Homicide Bureau, it

19  has been consistently emphasized to me how important it is to disclose the

20  complete homicide file in any case filed with a prosecutor.  This includes not just

21  the murder book, but all additional notes and other materials.

22      6.      Today, all detectives at Homicide Bureau are divided into six groups,

23  who are each supervised by one of six "Team Lieutenants."  Senior detectives

24  who are training newer probationary detectives are required to regularly prepare

25  written evaluations and provide a copy of such evaluations to the Team

26  Lieutenant as well as to the Training Lieutenant (which is a role that is filled by

27  one of the six Team Lieutenants).  The written evaluations cover all aspects of

28  being a homicide detective including, but not limited to, report writing,

9

1    identification procedures (including six packs), evidence gathering and

2    preservation as well as disclosing evidence to the prosecutors.  Detectives who

3    fail to pass their probationary period cannot continue to be assigned to Homicide

4    Bureau.

5           7.    In addition to the aforementioned training, all sworn LASD

6    personnel have minimum continuing education requirements that must be

7    completed in order to maintain sworn status.

8           8.    I am one of the lead detectives at the LASD Homicide Bureau,

9    assigned to the currently pending investigation into the homicide of Jay French.

10    After Frank O'Connell's habeas petition was granted in 2012 and his conviction

11    for the 1984 murder of Jay French was vacated, the investigation into the murder

12    was re-opened.  I became responsible for the investigation and took possession of

13    the 1984 French investigation materials.  I have spent the past four years

14    extensively reviewing evidence relating to the crime that is now over three

15    decades old, as well as successfully locating and interviewing numerous potential

16    witnesses now scattered throughout the country and in other parts of the world.

17           9.    In conducting homicide investigations with the LASD, it is standard

18    for detectives interview all key witnesses, conduct identification procedures with

19    any eye witnesses, and gather extensive evidence about the incident and potential

20    suspects. Detectives often use six-pack photograph arrays ("six packs") to assist

21    with witness identifications of suspects.  Attached hereto, and incorporated by

22    reference as Exhibit "H", is a true and correct copy of the six pack used during

23    identification procedures during the 1984 – 85 investigation into the murder of

24    Jay French, with Frank O'Connell's photograph in spot three.

25          10.    Attached hereto, and incorporated by reference as Exhibit "I", is a

26    true and correct copy of an empty six pack photograph array folder, with slots for

27    suspect/filler photos on the front side of the manila folder and a witness

28

1  admonition fastened to the back side of the folder, used during identification

2  procedures during LASD investigations in the 1980s.

3       11.    During the entire time I have been at the LASD, in conducting an

4  investigation, first, all initial interviews are completed and the relevant leads are

5  investigated. If there is sufficient evidence of a crime committed by a particular

6  suspect, the pertinent information regarding that suspect's involvement in the

7  crime is memorialized in a report, including, but not limited to, information

8  regarding six-pack identifications. Information that is tangential or not pertinent

9  would not usually be included in reports.

10      12.    It is standard for LASD homicide detectives to maintain a case file,

11  which includes documents, notebooks, hand-written notes, and other evidence

12  compiled during an investigation.  It is also standard for LASD homicide

13  detectives to make this entire case file available to the prosecuting attorney

14  assigned to a case.

15      13.    Additionally, it is standard for LASD homicide detectives to take

16  notes in small bound notebooks.  To keep track of these notebooks, homicide

17  detectives often label the first notebook used during an investigation as "Book 1"

18  and, after it is full, start a new notebook label "Book 2" and so on, as the

19  detectives did in this investigation.

20      14.    It is common for prosecutors to request detectives' notes and other

21  materials from homicide investigations, and it is standard practice to turn over

22  any such requested materials, whether detectives deem them pertinent or not.

23  This is especially true if there is a specific discovery order, requesting materials

24  from an investigation file.  Attached to and incorporated by reference as Exhibit

25  "L" is a letter I reviewed, which was sent to Detective Smith on May 24, 1984 by

26  the District Attorney's Office along with a discovery order from the underlying

27  criminal proceedings, requiring the detectives to make available for inspection the

28  items in the discovery order, which specifically included handwritten notes.

1    15.    The May 24, 1984 letter and accompanying discovery order were

2  found in the investigation file. There is nothing else in the file indicating any

3  follow up from the District Attorney's Office regarding the discovery order or

4  otherwise suggesting that the materials identified in the May 24, 1984 letter were

5  not, in fact, turned over.

6

7    I declare under penalty of perjury under the laws of the State of California

8  and of the United States that the foregoing is true and correct.

9    Executed on February 22, 2017 at LANCASTER , California.

10

11                                                    177529

12    Steve Lankford

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

### DECLARATION OF MIKE BUMCROT

I, Mike Bumcrot, declare as follows:

1.    I have personal knowledge of the facts stated herein.  If called as a witness, I could and would competently testify to the following facts as personally known to me.

2.    For nearly the last half century, approximately 49 years, I have been employed by the Los Angeles County Sheriff's Department ("LASD") and for approximately 38 of those years I have been assigned to the LASD's Homicide Bureau, where I am currently assigned.  In 1968, I was hired as a deputy sheriff and graduated the LASD Academy ("Academy").  After the Academy, and prior to becoming a detective, I was assigned to the jails, patrol, and the Special Enforcement Bureau ("SEB," commonly known as "SWAT").  In 1975, I was assigned to the Detectives Division as a narcotics detective.  In 1979, I was transferred on loan to the Homicide Bureau, where, in 1980, I officially transferred. I remained at the Homicide Bureau until I retired in 2002.  Shortly thereafter, however, I was rehired and returned to the Homicide Bureau to train new Homicide detectives.  In 2005, I was assigned to cold DNA cases.  In 2009, I was assigned to cold latent print cases, where I remain today.  Over my career, I have worked on approximately 600 and reviewed in excess of 4,000 homicide investigations.  Also, in this case, I have been designated as the County's "person most knowledgeable" regarding LASD's policies, practices, and customs with respect to various aspects of homicide investigations in the early 1980s including, but not limited to, report writing, note taking, record keeping, disclosure of evidence compiled in homicide investigations, and eyewitness identifications.

3.    Formed in 1850, the LASD is now the largest sheriff's department in the world.  Originally serving areas that are currently part of Kern, Orange, Riverside and San Bernardino Counties, today the LASD directly services an area in excess of 4,000 square miles and provides police services for a population in

excess of 10,000,000.  Currently, the LASD consists of over 17,000 employees, including 9,000 sworn peace officers and more than 8,000 civilians.  There are LASD facilities as far north as Antelope Valley, as far south as Lomita, as far east as San Dimas, and as far west as Catalina Island.

4.    I am informed and believe that Plaintiffs Frank O'Connell and Nicholas O'Connell have filed a lawsuit stemming from Plaintiff Frank O'Connell's ("Plaintiff")[1] 1985 conviction for the 1984 murder of Jay French.

5.    I am further informed and believe that Plaintiffs allege that Plaintiff's conviction was the result of constitutional violations caused by various, lack thereof, or failure to implement LASD policies, practices or customs regarding:

A.    Eyewitness identification:

i.    failing to ensure the eyewitness identification procedures complied with the requirements of due process;

ii.    failing to ensure deputies did not influence eyewitness identifications;

iii.    failing to completely document deputies' interactions with eyewitnesses;

iv.    failing to adequately train deputies not to influence eyewitnesses and provide exculpatory eyewitness identification information to prosecutors; and

v.    failing to adequately supervise deputies to ensure that they did not influence eyewitness identifications and that exculpatory eyewitness information was provided to prosecutors.

B.    Producing exculpatory evidence or fabricating evidence:

---

[1] References to "Plaintiff" hereinafter refer to Frank O'Connell only (unless otherwise specified), while references to "Plaintiffs" refer to both Plaintiffs.

i.    failing to maintain files and information regarding the provision of exculpatory evidence to prosecutors and/or defense counsel;

ii.    failing to ensure exculpatory evidence was provided to prosecutors;

iii.    failing to train deputies in the provision of exculpatory evidence; and

iv.    failing to supervise deputies in the provision of exculpatory evidence.

6.    With respect to the operations of the Homicide Bureau and its detectives, Plaintiffs' allegations are untrue.  To the contrary, over my nearly 50 years with the LASD and 38 years in the Homicide Bureau, the LASD has exercised great care to prevent the type of constitutional violations Plaintiffs allege. As detailed below, the LASD is a hierarchical organization that provides multiple levels of supervision to ensure that constitutional protections are observed.  Further, the LASD provides multiple levels of training for all of its personnel, including Homicide Bureau detectives, in the areas identified by Plaintiffs.  Training and supervision are provided to personnel assigned to the Homicide Bureau on a wide variety of subject matters including, but not limited to, investigating crimes, documenting the investigations, disclosing evidence, and utilizing various identification techniques.

7.    At all times relevant to this case, the LASD has had a management and supervision structure that organizes responsibilities and personnel so that the LASD's policies, procedures, and constitutional protections are successfully implemented.  This structure includes layers of direct supervision, so that every employee is supervised by a higher-ranking member of the LASD, and that those supervisors are overseen by other higher-ranking LASD members, and so on. (Attached hereto and incorporated as Exhibit "AA" are true and correct copies of LASD descriptions of duties of the Undersheriff through sergeants, including

supervising their subordinates.)  Although these are contemporary policies, the multi-layered supervision structure was in place at all times relevant to this case. When a supervisor observes a subordinate that she or he believes has committed misconduct – for example, engaging in the fabrication or suppressing evidence, conducting suggestive identification procedures, or failing to disclose exculpatory evidence – that supervisor is obligated by LASD policy to report these violations. If, after investigation, corrective action needs to be taken, the LASD disciplines its personnel for violating its policies and procedures.  Discipline may include various measures, up to and including termination.  (*Id.*, for example, one of the Captain's duties is to review and evaluate all information that may lead to disciplinary action. (*See,* Exhibit AA at D8105) Further, one of the lieutenant's duties is taking routine disciplinary action. (*See,* Exhibit AA at D8106)).

     8.     During the 1980s, the Homicide Bureau had a captain and five teams, which each consisted of a Team Lieutenant and 10 to 14 detectives.  The Team Lieutenant would partner the detectives and assign them cases.  The Team Lieutenants were supervised by the Homicide Bureau Captain.  In addition to the Team Lieutenants, who directly supervised the detectives' investigations, there were Administrative Lieutenants, who were assigned directly to the Captain.

     Administrative Lieutenants' duties included reviewing and approving reports for form, including insuring correct spelling and grammar and, when relevant, that all criminal elements were addressed.  As with other Bureaus and stations, Administrative Lieutenants were also responsible for assisting the Capitan with day-to-day running of the Homicide Bureau.  Administrative Lieutenants did not supervise Homicide detectives' investigations, which were supervised by the Team Lieutenants.  Retired Lieutenant Gilbert W. Leslie, for example, who reviewed several reports in the underlying investigation, was an Administrative Lieutenant at the Homicide Bureau while I was there in the early 1980s.  At the partner level, all

1  new detectives were assigned to a training partner, who supervised and trained the

2  new detectives.

3        9.    Efforts to ensure compliance with LASD policies and procedures begin

4  before LASD members are hired, through the application and vetting process.  All

5  LASD deputies are and were required to meet the criteria of the recruiting process

6  and then to successfully complete a Commission on Peace Officer Standards and

7  Training ("POST")-certified academy training.  Today, all deputies are required to

8  complete a full-time, 22 week, POST-certified academy, as required by the State of

9  California.  POST was established by the California Legislature in 1959 to set

10  minimum selection and training standards for California law enforcement.  At all

11  times relevant to this case, deputy candidates received similar extensive POST

12  training regarding constitutional policing, LASD's policies and procedures, and

13  well-established law enforcement techniques.  This academy training included such

14  issues as eyewitness identification, documenting investigations and producing

15  exculpatory evidence in criminal prosecutions.

16        10.    For example, as part of their academy training, all persons seeking to

17  become sworn members of the LASD would have been trained as to law

18  enforcement ethics (Unit 2), constitutional rights (Unit 15), legal show-ups (Unit

19  19), report writing and note taking (Unit 23), and investigating crimes against

20  persons (Unit 55).  (Attached hereto and incorporated by reference as Exhibits

21  "AB" –"AF" are true and correct copies of portions of POST Basic Course Unit

22  Guides for various subjects in effect at the time of the underlying incident).  In

23  regards to ethics, additional training is and was provided as to the Law Enforcement

24  Code of Ethics (*see,* Exhibit AB at D7501), the prohibition on providing false

25  testimony (*see,* Exhibit AB at D7492), and the duty to report misconduct of others

26  (*see,* Exhibit AB at D7508).  Additional training is and was provided as the basics

27  in constitutional rights, including the prohibition on conspiring to violate the

28  constitutional rights of a citizen (*see,* Exhibit AC at D7512 – 14; D7519 – 20).

1  Furthermore, training also included the basics of photo lineups (*see,* Exhibit AD at

2  D7536 – 41).  Additionally, training also included the issues of accurate report

3  writing and note taking (*see,* Exhibit AE at D7542 – 47; D7553).  Further, training

4  was also provided as to the basics in Homicide investigations (*see,* Exhibit AF at

5  D7683; D7740 – 66).

6       11.    In the 1980s, like today, LASD personnel seeking to become Homicide

7  Detectives – even before they were assigned to the Homicide Bureau – were also

8  provided in-service or on-duty training after their academy training.  This further

9  training may include, without limitation, such subjects as documenting criminal

10  investigations and field criminal investigation techniques.  Additionally, personnel

11  were provided additional training prior to assignment to patrol.  Such patrol training

12  included further instruction in report writing and note taking, eyewitness

13  identification, and constitutional policing.

14       12.    LASD personnel seeking to apply for a detective assignment to

15  Homicide Bureau must have prior LASD experience, including the training listed

16  above.  Typically, that meant prior experience as a detective in another bureau in

17  the Detective Division was required.  Additionally, most applicants also had patrol

18  experience and training.  For example, I worked as a narcotics detective for five

19  years and had SEB (SWAT) experience prior to my assignment to the Homicide

20  Bureau.  As part of the application process, applicants to the Homicide Bureau

21  would be required to undergo a thorough background investigation and pass an oral

22  interview with one or more of Homicide Bureau's supervisory personnel.  The

23  interview consisted of review of a prior search warrant drafted by the applicant,

24  general questions about the applicant's on-the-job experience, and detailed

25  discussions regarding the applicant's major cases.

26       13.    Once accepted into the Homicide Bureau, detectives are sent to a

27  homicide school for additional, specialized training.  In the early 1980s, the

28  homicide school was the Department of Justice ("DOJ") homicide school in San

Jose.  More recently, this training has been offered at a homicide school in La Mirada.  At all relevant times, new detectives at Homicide Bureau have been assigned to a training partner for their probationary period, which typically lasts one year.  The training partner's responsibilities include supervision and training ("field training") the new detectives regarding various aspects of homicide investigations.  Both the homicide school and the field training cover topics including, but not limited to, constitutional witness identifications, accurate report writing and note taking, and production of exculpatory evidence to criminal prosecutors.

14.    As to field training and supervision, it is my understanding that Detective Gilbert Parra, a ranking sergeant at the time of the 1984 murder of Jay French, was the senior investigator supervising Detective J.D. Smith throughout the Jay French murder investigation (as well as other investigations).  Detective Parra, who helped train me when I was first assigned to Homicide Bureau, is one of the best training detectives I have ever worked with over my 38 years at the Homicide Bureau.  He was extremely thorough in his explanations, provided detailed on-the-job training as to all aspects of homicide investigations and was a stickler for detail.

15.    As an illustration of field training, Detective Parra and I were partnered together for about one year, when I was first assigned to the Homicide Bureau.  For our first couple of cases, Detective Parra had me observe him conducting the investigations, including asking questions when arriving at a crime scene, interviewing witnesses, conducting photo lineups, handling court appearances, and organizing and disclosing notes, reports, and evidence to the criminal prosecution and defense.

16.    After observing Detective Parra, we switched roles.  He observed me as I conducted most of the investigations.  Throughout the investigations, Detective Parra provided feedback regarding my techniques and tips on detail and thoroughness, to enable me to continue to improve my skills.

17.    During the 1980s, Homicide detectives, in addition to prior academy, in-service/on-duty and field training, would periodically receive legal briefs from the District Attorney's Office ("DA Briefs"). These DA Briefs educated and trained the detectives about various issues relevant to homicide prosecutions. They also detailed what adjustments or modifications should be made throughout the investigation and how to re-focus certain aspects of an investigation. The DA Briefs would be placed on a briefing board at the Homicide Bureau and reviewed by the detectives. During the 1980s, the Homicide Bureau improved its practices with respect to receiving and reviewing the DA Briefs by requiring each detective to initial the DA Brief to confirm that they had both reviewed and understood the contents.

18.    Currently, the Homicide Bureau holds weekly meetings to discuss current cases, successful tactics, existing challenges, and other related matters. Along the lines of the DA Briefs, approximately once a quarter, a Deputy District Attorney ("DDA") attends the weekly meeting and presents relevant subjects to the detectives. Typically, the DAA provides training, covering current issues or legal development, and addresses questions regarding the presentation or any other concerns detectives have regarding the prosecutorial process.

19.    Since 1979, when I was assigned to the Homicide Bureau, it has been the Homicide Bureau's practice to require detectives to take accurate, detailed notes of all of their observations (regardless as to whether such observations may support or potentially weaken their case), to save their notebooks, keep all notes in the relevant case file, and, if the case was presented for criminal prosecution, to make all of their notes (along with all other investigation evidence) available to the prosecutor assigned to the case.

20.    At all times relevant to this case, the Homicide Bureau's practice was that the first supplemental report, i.e. scene investigation and witness interviews,

1    should be completed within a couple of weeks of the incident and the murder book

2    should be completed within a month.

3         21.    Rather than require Homicide detectives to make item-by-item

4    determinations as to whether particular items of evidence are "exculpatory" or not,

5    since I was first assigned to the Homicide Bureau in 1979 and up to the present, it

6    has been the practice of the Homicide Bureau to err on the side of caution, and

7    disclose **all** of the evidence gathered to the prosecutor assigned to the case and let

8    the prosecutor assigned to the case make decisions as to what evidence might or

9    might not be exculpatory.

10        22.    In fact, Detective Parra was very adamant that, prior to preliminary

11   hearings, he and/or his partner allow the defense attorney to go through the entire

12   Homicide investigative folder.  Detective Parra also made certain that he and/or his

13   partner made copies of notes for both the prosecution **and** defense.  In his training,

14   Detective Parra emphasized open discovery, meaning that access should be given to

15   the entire investigative file.

16        23.    While there certainly has never been any written policy that would

17   condone falsification of evidence, at no time that I have been at LASD has there

18   ever been any "unwritten practice" of falsifying evidence.  In fact, the LASD does

19   not tolerate deputies suppressing evidence, conducting illegally suggestive

20   identification procedures, and/or engaging in dishonesty to fabricate evidence.  As

21   discussed above, it is the supervisors' obligation to report any such misconduct.  In

22   turn, such claims are duly investigated.  If substantiated, as discussed above,

23   discipline could result in termination and/or potential criminal liability.

24        24.    Since 1979, when I was assigned to the Homicide Bureau, detectives

25   have received on-the-job training regarding various identification procedures,

26   including, but not limited to, conducting photographic lineups with six-pack

27   photograph arrays ("six packs").  Additionally, deputies assigned to the Homicide

28   Bureau would have successfully completed POST-certified academy training,

which included eyewitness identification procedures, discussed above.  Further, most of the detectives received further on-the-job training in their assignments at patrol or other sections of the Detective Division.  Additional on-the-job training would be provided to newly assigned detectives to the Homicide Bureau on specific identification procedures, such as six-pack identification procedures.

25.   In the early 1980s, the LASD did not have the same array of technology as it has today.  There was no internet, emails, or the wider availability of centralized databases that exist today.  Before the internet was available for obtaining photographs, Homicide Bureau maintained a large file cabinet of booking photos for detectives to use when constructing six packs.  To prevent the photo array itself from being suggestive, detectives were trained to go through the photos by hand and pick out the "fillers," which were five photos of people of the same race, gender, age, and had the same general facial/hair features as the suspect.  Once the detective picked out fillers, she or he was trained to place the filler photos and the suspect photo in a manila envelope that had six equally-sized windows (to prevent some photos from being larger than others) cut out for the booking photos ("six-pack folder").  The detective would be trained to place the photos in random order.

26.   In addition to the practice of ensuring the six-pack folders themselves would not be suggestive, the Homicide Bureau maintained the practice of gauging the strength of a witness's identification of a particular suspect.  First, before presenting a six-pack folder to a witness, detectives would be trained to admonish a witness.  To prevent inconsistent admonitions from being given to different witnesses, the Homicide Bureau has had a standard admonition.  This admonition provides, in pertinent part: (1) the witness should not assume that the photographs contain the picture of the person who committed the crime at issue; (2) the witness is not obligated to identify anyone; (3) the witness should not discuss his/her identification with any other witnesses.

27.    In the 1980s, detectives were trained to read this admonition to each witness prior to administering a six-pack photographic lineup identification. At one time, this admonition was in the form of a card that detectives could either carry with them or attach to the back of their six-pack folder. While I was partnered with Detective Parra, it was his practice to secure the admonition wording to the back of his six-pack folder. Attached hereto and incorporated as Exhibit "I" is a true and correct copy of an empty six-pack photograph array folder used during LASD identification procedures in the 1980s, with slots for suspect/filler photos on the front side of the manila folder and a witness admonition fastened to the back.

28.    Consistent with other training provided by Homicide Bureau, while I was working with Detective Parra he trained me to never acknowledge whether an eyewitness selected a lead suspect or not. He was especially adamant about this because he trained me that he did not want witnesses to share information about their identifications as it could taint other witnesses. Detective Parra specifically trained me that if, during a photo lineup, someone says, "Is this the guy?" I should respond by saying, "I don't know, is it?" as to not undermine or reinforce the eyewitness's selection.

29.    Further, training currently provided is similar, except for the introduction of modern technology, to the training at times relevant to this case. For example, Homicide detectives are trained to not do anything during the presentation of the six-pack (such as tapping on a photograph, mentioning a specific photograph prior to a witness selecting it, staring at a particular photograph, etc.) to suggest one photograph over another. Detectives are also encouraged to tape or video-record all suspect interviews, including identification procedures. Finally, detectives are told to request witnesses not share anything about their identification to others, to keep all identifications as untainted as possible. (Attached hereto and incorporated as Exhibit "AG" are true and correct copies of LASD's written policies and procedures on photo identifications.) Absent the references to new technology, the

1  current policies and procedures are essentially a codification of Homicide Bureau's

2  practices at times relevant to this case.

3    30.    On December 21, 2016, I was deposed in the instant civil matter, as the

4  County's "person most knowledgeable" regarding the LASD's policies, practices

5  and customs with respect to various aspects of homicide investigations in the early

6  1980's including, but not limited to, report writing, note taking, record keeping,

7  disclosure of evidence compiled in homicide investigations, and eyewitness

8  identifications.  I was not deposed in the capacity of an expert.

9    31.    During the deposition, I was asked various hypotheticals by Plaintiffs'

10  counsel.  Subject to objections by Defendants' counsel, in answering questions

11  pertaining to these hypotheticals, I only considered the specific facts and

12  circumstances presented by the specific question, even if the question lacked

13  important contextual facts relating to this matter.  If given those facts in addition to

14  the facts in the hypothetical, many of my answers to Plaintiffs' hypothetical

15  questions would have been different.

16    I declare under penalty of perjury under the laws of the State of California

17  and the United States of America that the foregoing is true and correct.

18  Executed on February _22_, 2017, at _Los Angeles_, California.

19

20  _Mike Bumcrot_

21  Mike Bumcrot

22

23

24

25

26

27

28

## DECLARATION OF ERIC G. PARRA

I, Eric G. Parra, declare:

I have personal knowledge of the facts stated herein, and if so called, could competently testify thereto.

1.    I am employed by the Los Angeles County Sheriff's Department ("LASD") and am presently assigned as the Chief of the Custody Services Division, General Population, of the LASD. My father, Gilbert Parra, who is now deceased, was employed by the LASD for over 32 years. He started with the LASD in 1960, was promoted to Sergeant in 1968 and was first assigned to the LASD's Homicide Bureau in 1976. He spent over 16 years at Homicide Bureau until he retired in 1993. He passed away on October 19, 2003.

2.    I am informed and believe that Plaintiff Frank O'Connell has filed a lawsuit seeking monetary damages based on his claim that he was "wrongfully" convicted for the January 5, 1984 murder of Jay French based, in part, by alleged conduct by my father, who was the senior detective assigned to the French murder investigation. I am further informed and believe that Plaintiffs have named me as a defendant based on their understanding that I was the administrator of my father's estate which was closed around 2005, over ten years ago. At no time did any of the Plaintiffs or any of their representatives ever file a creditor's claim with my father's estate asserting the potential for the instant lawsuit.

3.    While I have no first-hand personal knowledge of any of my father's alleged conduct with respect to his involvement in the underlying homicide investigation, I know that my father was a well-respected detective during his time at Homicide Bureau and Plaintiff's assertions run completely contrary from what I knew of my father.

4.    At no time have I made any written requests for defense or

///

///

1   indemnification from the County of Los Angeles, nor do I have any intention of

2   doing so at any time prior to the trial in this matter.

3

4        I declare under penalty of perjury under the laws of the United States of

5   America and the State of California and that the foregoing is true and correct.

6

7        Executed on January __26__, 2017, at Los Angeles, California.

8

9

10        ERIC G. PARRA

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28