1  PAUL B. BEACH, State Bar No. 166265
   pbeach@lbaclaw.com
2  MICHAEL D. ALLEN, State Bar No. 198126
   mallen@lbaclaw.com
3  LAUREN T. KRAPF, State Bar No. 292115
   lkrapf@lbaclaw.com
4  LAWRENCE BEACH ALLEN & CHOI, PC
   100 West Broadway, Suite 1200
5  Glendale, California 91210-1219
   Telephone No. (818) 545-1925
6  Facsimile No. (818) 545-1937

7
   Attorneys for Defendants,
8  COUNTY OF LOS ANGELES, J.D. SMITH and ERIC PARRA

9

10              **UNITED STATES DISTRICT OF COURT**

11              **CENTRAL DISTRICT OF CALIFORNIA**

12

13  FRANK O'CONNELL, NICHOLAS          ) Case No. 13-CV-01905-MWF (PJWx)
    O'CONNELL                          )
14                                     ) Honorable Michael W. Fitzgerald
                                       )
15              Plaintiffs,            ) **DEFENDANTS MEMORANDUM**
                                       ) **OF POINTS AND AUTHORITIES**
16                                     ) **IN OPPOSITION TO**
                                       ) **PLAINTIFFS' MOTION FOR**
17         v.                          ) **PARTIAL SUMMARY**
                                       ) **JUDGMENT ON THE ISSUE OF**
18                                     ) **"GUILT"**
                                       )
19  J.D. SMITH; ESTATE OF GILBERT      ) [Opposition to Plaintiffs' Motion for
    PARRA; ERIC PARRA, COUNTY OF       ) Summary Adjudication re Liability
20  LOS ANGELES AND DOES 1-10.         ) Issues; Responses to Plaintiffs'
                                       ) Separate Statements; Consolidated
21              Defendants.            ) Objections to Plaintiffs' Evidence;
                                       ) Declarations and Additional Exhibits;
22                                     ) and Application to File Under Seal
                                       ) Additional Exhibits D, E, F and I filed
23                                     ) concurrently herewith]
                                       )
24                                     )
                                       ) Date: April 24, 2017
25                                     ) Time: 10:00 a.m.
                                       ) Courtroom: 5A
26                                     )
                                       )
27  _____)

28

                              1

1    TO THE HONORABLE COURT, PLAINTIFFS, ALL INTERESTED

2    PARTIES AND TO THEIR ATTORNEYS OF RECORD:

3        Defendants COUNTY OF LOS ANGELES, J.D. SMITH, and ERIC PARRA

4    hereby submit the following Memorandum of Points and Authorities in opposition

5    to Plaintiffs' Motion for Partial Summary Judgment on the issue of "guilt".

6

7

8    Dated:  March 19, 2017            LAWRENCE BEACH ALLEN & CHOI PC

9

10                                By:  /s/ Michael D. Allen

11                                     Michael D. Allen
                                     Attorneys for Defendants,
12                                     COUNTY OF LOS ANGELES, J.D. SMITH and
                                     ERIC PARRA

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

2

# TABLE OF CONTENTS

**PAGE**

MEMORANDUM OF POINTS AND AUTHORITIES ........................................ 1

I. INTRODUCTION AND SUMMARY OF KEY FACTS. ................................ 1

    A. Facts Regarding January 5, 1984 Murder of Jay French and Subsequent Investigation and Prosecution of Plaintiff ...................... 1

    B. The Events Leading to Plaintiff's Habeas Petition ................................. 4

    C. Claims In the Instant Lawsuit Making Inculpatory Facts Known To Detectives During 1984 Investigation Relevant ............................ 7

II. THERE HAS NEVER BEEN A FINDING THAT PLAINTIFF WAS "FACTUALLY" INNOCENT. .......................................................... 8

III. THE GOVERNMENT'S DECISION NOT TO REPROSECUTE PLAINTIFF TO DATE CANNOT BE USED TO PRECLUDE EVIDENCE OF PLAINTIFF'S INVOLVEMENT IN THE FRENCH MURDER BECAUSE THERE ARE SEVERAL REASONS FOR SUCH A DECISION UNRELATED TO A DETERMINATION ON PLAINTIFF'S GUILT OR INNOCENCE ........ 10

    A. Several Reasons May Exist for a Prosecutor's Decision Not to Re-prosecute That are Unrelated to Plaintiff's Factual Innocence ...................................................................................... 10

    B. Habeas Has No Preclusive Effect ........................................................ 12

    C. No Instruction That Plaintiff Is "Presumed Innocent" Should Be Given ................................................................................... 13

IV. EVIDENCE REGARDING PLAINTIFF'S INVOLVEMENT IN THE FRENCH MURDER IS DIRECTLY RELEVANT TO PLAINTIFFS' CLAIMS DURING THE LIABILITY PHASE OF TRIAL ................................................................................................ 14

    A. Evidence of Plaintiff's Involvement in the Underlying Crime is Relevant to a *Brady* Violation Claim and is Admissible at Trial ...................................................................................... 15

    B. Evidence of Plaintiff's Involvement in the Murder is Relevant to the Claim of Fabrication of Evidence and is Admissible at Trial ...................................................................................... 18

i

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

V.     EVIDENCE REGARDING PLAINTIFF'S INVOLVEMENT IN THE FRENCH MURDER IS ALSO DIRECTLY RELEVANT TO DAMAGES. ...........................................................................20

VI.    PLAINTIFFS MISSTATE THE HOLDING OF *CAREY V. PIPHUS* WHICH, IN FACT, HELD THAT, IF PLAINTIFF WOULD HAVE BEEN CONVICTED ANYWAY, PLAINTIFFS ARE LIMITED TO AN AWARD OF NOMINAL DAMAGES ...................................21

VII.   CONCLUSION. ...............................................................................27

1

## TABLE OF AUTHORITIES

2

3

**Cases**                                                                   **Page(s)**

4

*Anthony v. White,*
    376 F.Supp. 567 (D. DE 1974)............................................................19

5

*Blain v. Doctor's Co.,*
    222 Cal. App. 3d 1048 (1990)............................................................19

6

7

*Borunda v. Richmond,*
    885 F.2d 1384 (9th Cir. 1989).....................................................10, 11

8

*Brady v. Maryland,*
    373 U.S. 83 (1963)............................................................................15

9

10

*Burge v. Parish of St. Tammany,*
    1995 WL 317125 (E.D.LA 1995)..........................................16, 17, 18

11

12

*Carey v. Piphus,*
    435 U.S. 247 (1977).....................................................................passim

13

*Carter v. Philadelphia,*
    2000 WL 1016653 (E.D. PA 2000)....................................................21

14

15

*Costanich v. Dept. of Social and Health Serv.,*
    627 F.3d 1101 (9th Cir. 2010)............................................................18

16

*Delo v. Lashley,*
    507 U.S. 272 (1993)..........................................................................13

17

18

*Deskovic v. Peekskill,*
    637 F.Supp.2d 154, (S.D. NY 2009)...................................................20

19

20

*Devereaux v. Abbey,*
    263 F.3d 1070 (9th Cir. 2001).......................................................8, 18

21

*Downs v. Hoyt,*
    232 F.3d 1031 (9th Cir. 2000)...........................................................16

22

23

*Durosko v. Lewis,*
    882 F.2d 357 (9th Cir. 1989).............................................................10

24

*Feld & Sons v. Pechner, Dorfman, Wolfee, Rounick & Cabot,*
    458 A.2d 545 (1983)..........................................................................19

25

26

*Harrington v. Richter,*
    562 U.S. 86 (2011)............................................................................16

27

*Jimenez v. Sambrano,*
    2010 WL 55307 (S.D. CA 2010)........................................................10

28

iii

*Kirkland v. Mannis,*
    639 P.2d 631 (1982) ............................................................................... 19

*Kyles v. Whitley,*
    514 U.S. 419 (1995) ......................................................................... 15, 16

*Lisker v. City of Los Angeles,*
    2013 WL 1276047 (C.D. CA 2013) ....................................................... 19

*McCloskey v. California,*
    2008 WL 4283817 (S.D. CA 2008) ....................................................... 10

*Moore v. Illinois,*
    408 U.S. 786 (1972) ............................................................................... 15

*One Lot Emerald Cut Stones & One Ring v. U.S.,*
    409 U.S. 232 (1972) ............................................................................... 12

*Richards v. Jefferson County,*
    517 U.S. 793 (1996) ............................................................................... 12

*Santosky v. Kramer,*
    455 U.S. 745 (1982) ............................................................................... 13

*Schlup v. Delo,*
    513 U.S. 298 (1985) ................................................................................. 9

*Standlee v. Rhay,*
    557 F.2d 1303 (9th Cir. 1977) ............................................................... 12

*Strickler v. Greene,*
    527 U.S. 263 (1999) ............................................................................... 15

*Taylor v. Sturgell,*
    553 U.S. 880 (2008) ............................................................................... 12

*Thompson v. Connick,*
    553 F.3d 836 (5th Cir. 2008) ................................................................. 24

*Townes v. New York,*
    176 F.3d 138 (2nd Cir. 1999) .......................................................... 25, 26

*Tuttelman v. San Jose,*
    2011 WL 839137 (9th Cir. 2007) .......................................................... 12

*U.S. v. Agurs,*
    427 U.S. 97 (1976) ................................................................................. 16

*U.S. v. Bagley,*
    473 U.S. 667 (1985) ............................................................................... 15

*Unilogic, Inc. v. Burroughs Corp.,*
    10 Cal. App. 4th 612 (1992) .................................................................. 19

iv

*White v. McKinley*,
    605 F.3d 525 (8th Cir. 2010) ............................................................................16

*Zahrey v. Coffey*,
    221 F.3d 342 (2d Cir.2000) ............................................................................19

*Zinermon v. Burch*,
    494 U.S. 113 (1990) ...........................................................................24, 25, 26

**Statutes**

42 U.S.C. § 1983.........................................................................................passim

**Rules**

Fed.R.Civ.P. 12(b)(6) ....................................................................................24

1    <u>**MEMORANDUM OF POINTS AND AUTHORITIES**</u>

2    **I.**    <u>**INTRODUCTION AND SUMMARY OF KEY FACTS.**</u>[1]

3        **A.**    <u>**Facts Regarding January 5, 1984 Murder of Jay French and**</u>

4            <u>**Subsequent Investigation and Prosecution of Plaintiff**</u>

5          Around 1:15 p.m. on January 5, 1984, Jay French ("French") was shot and

6    murdered in the carport area of the South Pasadena apartment building where he

7    worked as a maintenance man. The shooting was witnessed by Daniel Druecker

8    ("Druecker"), who was in the carport area when he suddenly heard a loud bang.

9    This grabbed his attention and he looked up and saw French being chased by

10   another individual with a gun. Druecker observed the assailant run for several

11   moments before he stopped directly in Drucker's line of sight for several seconds,

12   and fired a second shot before running off. Moments later, Druecker went over to

13   where he found French bleeding to death near the manager's office of the

14   building.

15         Officers from the South Pasadena Police Department ("SPPD") arrived to

16   the scene first and took statements from various witnesses including Druecker.

17   Detectives from the Los Angeles County Sheriff's Department ("LASD") arrived

18   later and took additional witness statements. Druecker, who was able to observe

19   the shooter both as he was chasing the maintenance man and was able to also see

20   his profile for several seconds when the second shot was fired, provided a detailed

21   description of the shooter, including both facial features as well as the clothing

22   worn by the shooter. Arturo Villareal ("Villareal"), who saw the assailant flee the

23   scene in a yellow Pinto was also interviewed. Villareal gave a mostly consistent

24   description of the assailant as Druecker. French's then wife, Gina French, was also

25   interviewed.  She informed investigators that French was involved in a long-

26   —————————————

27   

28   [1] A more detailed version of the uncontroverted facts is set forth in the Separate Statement of Undisputed Facts ("UF") [Docket No. 271.] submitted in support of Defendants' own Motion for Summary Judgment ("Defendants' MSJ"). [Docket No. 268.]

standing custody battle with his ex-wife, Jeanne Lyon ("Jeanne"). She also indicated that French's dying words suggested that he recognized the shooter as somebody that Jeanne "hangs" around with.

The day after the murder, LASD Detectives J.D. Smith (retired) and Gilbert Parra (deceased), ("the Detectives") interviewed Jeanne at approximately 2:45 p.m. During this interview, Jeanne mentioned that she had a "cousin" by the name of Frank O'Connell ("Plaintiff")[2] that had stayed at her place for a period of time. Later that evening, however, while Jeanne's then husband (Ed Lyon) was being interviewed, Jeanne corrected herself and indicated that her earlier statement that Plaintiff was her "cousin" was not true. As the investigation continued, and additional witnesses were interviewed, including French's son Jay Jr. (the subject of the custody battle), the Detectives learned that Plaintiff and Jeanne had an affair earlier during 1983. Given the dying declaration of French that the shooter was somebody who "hangs" with Jeanne combined with Jeanne's lie about the nature of her relationship with Plaintiff, Plaintiff became a possible suspect in the murder.

As the investigation progressed, multiple witnesses, with varying degrees of confidence, all connected Plaintiff to the murder.  This included Druecker, who picked Plaintiff's photo out of a photo array ("six pack") as the shooter, as well as Villareal, who also picked Plaintiff's photo. Druecker also described the profile facial features of the shooter he observed which resulted in a composite sketch of

---

[2] References to "Plaintiff" hereinafter refer to Frank O'Connell only (unless otherwise specified), while references to "Plaintiffs" refer to both Frank and Nicholas O'Connell.

the shooter.[3]  In addition, at least four of Jeanne's neighbors informed the Detectives that they had seen a yellow Pinto parked in front of or across the street from Jeanne's house at various times during 1983.  Several of the neighbors, a couple named Maurice and Ina Soucy, indicated that they observed an adult male move into or frequently visit Jeanne for an approximate six week period following Memorial Day of 1983 and saw this same person driving a yellow Pinto[4] and kissing Jeanne. Both of the Soucys also identified Plaintiff in the same six pack shown to Druecker and Villareal.

During several interviews of Plaintiff, he informed the Detectives that he first met Jeanne while camping at the Colorado River over Memorial Day weekend and that he stayed at Jeanne's place for an approximate six week period shortly after that because he had lost his job and had nowhere to stay.[5]  Plaintiff also admitted that he and Jeanne had an affair while he stayed at her place, but that he had minimal contact with her after he moved out until, "all of a sudden", she contacted him less than a week before French was murdered and they got together

---

[3] Plaintiffs' attempt to introduce purported photographs from Christmas 1983 to suggest that Plaintiff did not match the description of the shooter is undermined by other photographs of Plaintiff taken both several months prior to the murder (*see,* Declarations and Additional Exhibits ("Defendants Addl. Ex.") submitted in opposition to Plaintiffs' two motions for summary adjudication at Defendants' Addl. Ex. K) and a week after the murder. (*See,* Defendants' Addl. Ex. L.)  Both of these photographs not only depict Plaintiff with significantly longer hair, but also more closely resemble the composite sketch of the shooter (Plaintiffs' Ex. 1.05) which the judge below found bore a "striking" resemblance to Plaintiff. (Plaintiffs' Ex. 100 at p. 360:6-11 (D4272:6-11).)

[4] Plaintiffs' attempt to attack the quality of the photographs of the vehicle shown to the Soucys is a red herring because, according to a report prepared by Plaintiff's own defense counsel below, Maurice Soucy **described** the vehicle he saw Plaintiff driving as a yellow Pinto. (*See,* Ex. U submitted in support of Defendants' MSJ" at D4886.)

[5] Plaintiff also informed the Detectives that, even up to the date of the murder, he did not have his own place to stay and had been crashing at various friends' places throughout the second half of 1983 and into the first week of 1984.  He also repeatedly made statements to the Detectives that he was "broke" and did not have much money.

1   to cruise Colorado Boulevard in Pasadena on New Year's Day of 1984.  Plaintiff

2   informed the Detectives that, on New Year's Day, Jeanne tried to hand him a

3   weapon, but that he could not say with 100% certainty as to whether he handled it.

4          According to the LASD reports, Plaintiff informed the Detectives that he

5   had previously fired a .38 caliber revolver[6] with some friends at work sometime

6   during the previous year. Plaintiff also admitted that he was aware of the custody

7   battle, had likely seen French (and French saw him) on at least one occasion and

8   that Jeanne had made statements to him on multiple occasions suggested that she

9   wanted to kill French. Plaintiff even admitted to the Detectives that he made a

10  statement to Jeanne suggesting that he knew a guy in San Jose and could have

11  French killed for "200 bucks."

12         Plaintiff informed the Detectives that, on the day of the murder, he was at

13  the house of his roommates (Jim Hamilton and Scott Egerer) where he had been

14  crashing and left the house at around 12:30 p.m. to go to his ex-girlfriend's (Leslie

15  Davis) house to do laundry. Ms. Davis was interviewed on January 12, 1984 and,

16  after she was unable to provide a clear alibi for Plaintiff, a warrant for his arrest

17  was issued and he was arrested that night.

18         On January 15, 1985, Plaintiff was convicted in a bench trial for French's

19  murder. In support of the decision to convict, the judge below stated on the record

20  that the evidence presented was "overwhelming," identification evidence was

21  "unusually strong," and evidence connecting Plaintiff to the getaway car was

22  "convincing."

23  **B.     The Events Leading to Plaintiff's Habeas Petition**

24         It was not until over 20 years after Plaintiff's 1985 conviction for first

25  degree murder that Centurion Ministries ("CM"), a company of non-attorneys that

26  claims to "investigate" convictions, began to tamper with a number of witnesses

27  _____

28  [6] The evidence at the scene indicated that the shooting may have been a .38 caliber weapon.

4

1   (many of whom had no personal knowledge of the murder) and provide them

2   false and misleading information in an attempt to get them to assist in presenting

3   the case to attorneys for a habeas petition.  This even included an "interview"

4   with Jay French's widow, Gina, whom a CM investigator tried to convince that

5   Randy Smith (and not Plaintiff) was the real killer.[7] (*See,* Defendants' Addl. Ex.

6   D at 232:20-233:4, 233:18-234:16 and 234:21; *see also,* Defendants' Addl. Ex. D

7   at D8566:4-6, D8567:15-18, D8575:22-D8576:7, D8588:1-2).  Even lead CM

8   investigator Kate Germond testified that she found this line of "questioning"

9   improper. (*Id.*)

10      While Ms. Germond denied ever trying to taint witnesses herself, none of

11   her interviews were recorded.  Ms. Germond admitted, however, that approaching

12   witnesses and telling them that CM is trying to free a "wrongly convicted" person

13   would be improper and lead to potential tainting and/or tampering of witnesses.

14   (*See,* Defendants' Addl. Ex. C at 63:3-64:2.) Druecker testified at the *habeas*

15   proceedings that, when Germond first approached him, she introduced herself as

16   someone who works for an organization "that helps the wrongly accused" and

17   that "she believed [Plaintiff] was falsely accused." (*See,* Defendants' MSJ UF

18   243-246.)  According to witness Deborah Zitella, that was the same approach that

19   Germond took with her.[8] (*See,* Defendants' MSJ Ex. X at 12:4-10.)  Likewise,

20

21   _____

22   [7] To Defendants' knowledge, this is the only witness interview that CM recorded.

23   [8] Zitella even told the LASD when she was interviewed by them that the first she ever heard that

24   an "innocent" man was in jail was not from Jeanne, but from CM investigator Germond. (*See,* Defendants' Addl. Ex. F at p. 13:8-14 (D8779:8-14), 17:18-23 (D8783:18-23).  Ed Lyon,

25   Jeanne's husband at the time of the murder, told the LASD that he never heard Jeanne tell others that Plaintiff was "innocent" and, to the contrary, heard her tell others that Plaintiff did, in fact,

26   commit the murder. (Defendants' Addl. Ex. E at D12110:19-D12111:16 and D12114:4-17.)

27   When the LASD mentioned that CM had been getting declarations from individuals indicating that Jeanne told them that Plaintiff was "innocent", Mr. Lyon said there was "no doubt about"

28   him hearing Jeanne indicate that Plaintiff was, in fact, the killer. (*Id.* at D12115:21-D12116:5.)

witness Boone Maynard testified that he was approached in the same manner. (*See*, Defendants' MSJ Ex. Y at 62:6-9, 64:10-20, 69:5-70:22.)

In fact, when Germond was presented with a letter that she wrote to yet another third-party witness named "Mr. Redman" engaging in precisely those same improper tactics, she said she was "gobsmacked" and admitted that the language was "heavy handed." (*See*, Defendants' Addl. Ex. C at 71:10-73:14, 74:6-13 and Deft. Exhibit "1" attached to Defendants' Addl. Ex. C at CM000324.)

Mike Flick, one of the witnesses who Jeanne purportedly confessed to and told that an "innocent" man was in jail, testified that he was previously under the impression that he stood to obtain a significant financial gain for his cooperation. (Defendants' MSJ Ex. Z at 113:10-24.) While Plaintiffs tried to impeach this based on testimony by his brother, James Oviatt, Mr. Oviatt admitted during his deposition that he was not aware as to all of the occasions Flick spoke to CM investigators and, during the one meeting between CM and Flick that Oviatt attended, Oviatt primarily recalled the CM investigator discussing a $21,000,000 settlement he received in another case (which served no other purpose other than to imply how much Flick that stood to gain if he cooperated). (Defendants' Addl. Ex. J at 15:20-16:10, 16:18-19:22.) Moreover, Oviatt also testified that he saw the CM investigator hand Flick some cash as part of a "stipend" for Flick's time. (*Id.* at 19:23-20:11.)

With respect to Mr. Druecker, even though he initially stood firm, CM continued pressured him for several years and finally got him to recant in 2008. While this led to the granting of Plaintiff's petition for habeas corpus on March 29, 2012, significantly, Plaintiff's habeas petition was not granted based on a holding that he was factually innocent. In fact, there has never been any finding that Plaintiff is factually innocent of the murder of Jay French.

6

## C.    Claims In the Instant Lawsuit Making Inculpatory Facts Known To Detectives During 1984 Investigation Relevant.

Plaintiffs have brought various claims under 42 U.S.C. § 1983, against the County of Los Angeles, as well as retired Detective J.D. Smith and Eric Parra (son of deceased Detective Gilbert Parra) arising from the 1984-1985 investigation conducted by the Detectives.  Specifically, Plaintiffs allege that the Detectives (1) failed to disclose allegedly exculpatory information, and (2) deliberately fabricated evidence related to eyewitness identifications and conducted a suggestive, unreliable eyewitness identification examination. Plaintiffs also assert *Monell* claims against the County for an alleged failure to train, supervise, and implement appropriate policies concerning disclosure of exculpatory evidence and eyewitness identification procedures.[9]

Now, Plaintiffs are seeking to limit Defendants' ability to defend the instant case on the grounds that Plaintiff is "legally innocent" of the crime for which he was imprisoned. [10]  Plaintiff, however, has never been able to establish a credible alibi demonstrating that he did not participate in the murder[11] and, as the judge below formerly noted, there was (and still is) substantial evidence

---

[9] The lack of a genuine issue as to Plaintiffs' various claims are discussed, in detail, in Defendants' two pending Motion, the "Randy Smith" MSA [Docket No. 240] and their subsequently filed MSJ on the remaining issues. [Docket No. 268.]

[10] As this Court is well aware, a person is "legally" innocent of a crime for which they are charged unless they are proven "guilty" beyond a reasonable doubt.  There is a key distinction between "legal" innocence and "factual" innocence.

[11] In an improper attempt to relitigate the underlying criminal case, Plaintiffs once again try to argue that Plaintiff had a "solid" alibi. The statement by Plaintiff's albi witness, Scott Egerer, that he was home with Plaintiff until at least 1:30-2:00 p.m. on the day of the murder was impeached at trial by SPPD Lt. Louis Hatfield who testified that he interviewed Mr. Egerer within days after the murder and was told by Mr. Egerer that he (as well as the other alibi witnesses Jim Hamilton and Karen Baxter) had left their house at 12:45 p.m. on the day of the murder. (*See*, Plaintiffs' Ex. 100 at p. 314:26-315:11 (D4226:26-D4227:11).)  As such, the judge below found the alibi witnesses unconvincing. (*Id.* at p. 363:18-364:11 (D4275:18-D4276:11).)

1   indicating that he participated in the murder of Jay French notwithstanding the
2   granting of his habeas petition and the fact that there has not yet been a decision
3   whether to re-prosecute him.

4        Plaintiff has never sought nor obtained a finding of factual innocence.  The
5   Restatement of Tort § 657, Comment B states that the issue of factual guilt or
6   innocence may be litigated in a civil case despite an acquittal of the accused at the
7   criminal trial, and that the proper standard of proof **at the civil trial** is
8   "preponderance of the evidence" (rather than "beyond a reasonable doubt").  As
9   to liability, pursuant to *Devereaux* v. *Abbey,* 263 F.3d 1070 (9th Cir. 2001),
10  evidence as to whether or not Plaintiff is factually innocent including, but not
11  limited to, whether Detectives Smith and/or Parra knew or should have known
12  Plaintiff was factually innocent, is directly relevant.  Moreover, with respect to
13  the *Brady* claims, it would be impossible for either this Court or a jury to analyze
14  the "materiality" or "prejudice" elements of the *Brady* claims by only being told
15  in a vacuum what evidence was purportedly withheld without knowing the
16  various inculpatory evidence known at the time of the underlying prosecution
17  showing that Plaintiff did commit the murder.

18       Furthermore, because public policy rejects awarding money to persons who
19  commit crimes (even if they were subject to a procedural due process violation),
20  courts have repeatedly required a finding of "factual" innocence before a party
21  can obtain anything beyond nominal damages for the due process violation.  In
22  addition, evidence regarding Plaintiff's involvement in the murder of French is
23  relevant to show that the emotional distress damages purportedly suffered was a
24  direct result of the commission of the crime.

25  **II.   THERE HAS NEVER BEEN A FINDING THAT PLAINTIFF WAS**
26       **"FACTUALLY" INNOCENT.**

27       Plaintiffs' instant Motion is nothing more than a motion in limine in
28  disguise and a transparent attempt to improperly limit Defendants' ability to

defend the instant lawsuit.  Plaintiffs provide generalized theories of "guilt" and "innocence" arguing that, because Plaintiff's conviction was overturned and that the District Attorney's Office ("DA's Office") has not decided to re-prosecute him as of the current date, the evidence regarding his role in the murder of French should be resolved by means of summary adjudication.  Notably, however, Plaintiff has **never** been adjudicated "factually innocent."  One might be "innocent" because he was not found guilty beyond a reasonable doubt, but this is not the same as a finding of "factual innocence."

Plaintiffs' reference to *Schlup v. Delo*, 513 U.S. 298 (1985) is wholly misplaced.  The issue in *Schlup* was limited to what burden of proof should be imposed on a habeas petitioner alleging a miscarriage of justice, wherein the petitioner must show that a constitutional violation "has probably resulted in the conviction of one who was actually innocent." *Id.* at 327.  The claim of actual innocence serves as an equitable exception to habeas petitions that are otherwise procedurally-barred.  Under *Schlup*, a petitioner's otherwise procedurally-barred claims may be considered on the merits "if the claim of actual innocence is sufficient to bring his within the 'narrow class of cases…implicating a fundamental miscarriage of justice.'" *Id.* at 315.

"Innocence of the crime," which Plaintiffs address *ad nauseum* in the moving papers, means that the government did not prove its case.  "Factual innocence," on the other hand, means that the person did not commit the crime. In the instant case, there is a big difference between what Plaintiffs are claiming, i.e., "actual" or legal innocence, compared to what the evidence actually indicates, i.e., that Plaintiff was a key participant in the murder of French.

///

///

///

9

III.   **THE GOVERNMENT'S DECISION NOT TO REPROSECUTE PLAINTIFF TO DATE CANNOT BE USED TO PRECLUDE EVIDENCE OF PLAINTIFF'S INVOLVEMENT IN THE FRENCH MURDER BECAUSE THERE ARE SEVERAL REASONS FOR SUCH A DECISION UNRELATED TO A DETERMINATION ON PLAINTIFF'S GUILT OR INNOCENCE**

A prosecutor's decision not to re-prosecute a person after the granting of a habeas petition, but before a civil rights trial, is not necessarily indicative of the **belief** that the individual is innocent, let alone that the person is **actually** factually innocent. Therefore, a lack of re-prosecution cannot be used to exclude evidence regarding Plaintiff's involvement in the underlying crime as to the issues of liability or damages. Plaintiffs' Motion suggests that, because the prosecutor has not decided to re-prosecute Plaintiff to date, this should take the place of a civil jury's determination of the weight the evidence of Plaintiff's involvement in the murder of French holds as to the issues of liability and damages. This suggestion is wholly improper and should be denied by the Court.

A.   **Several Reasons May Exist for a Prosecutor's Decision Not to Re-prosecute That are Unrelated to Plaintiff's Factual Innocence**

While Plaintiffs argue that Plaintiff has yet to be re-prosecuted should preclude any evidence of Plaintiff's involvement in the murder of French, this argument is not supported by the relevant legal authority. First, a plaintiff's acquittal of a past criminal offense is inadmissible at a subsequent **civil** trial to show the plaintiff did not commit the crime. *See e.g., Borunda v. Richmond*, 885 F.2d 1384, 1387 (9th Cir. 1989); *Durosko v. Lewis*, 882 F.2d 357 (9th Cir. 1989); *Jimenez v. Sambrano*, 2010 WL 55307, at *1 (S.D. CA 2010); *McCloskey v. California,* 2008 WL 4283817, at *2 (S.D. CA 2008). An acquittal is irrelevant because it constitutes a "negative sort of conclusion lodged in a finding of failure

1    of the prosecution to sustain the burden of proof beyond a reasonable doubt."

2    *Borunda*, 885 F.2d at 1387.

3        Certainly, if a past acquittal, which invokes double jeopardy such that the

4    person may never be charged with that crime again, is inadmissible to prove that

5    person's factual innocence, then a decision by a single prosecutor not to file

6    charges (a decision which is not binding, can be reversed at any time, and has no

7    legal consequences), is inadmissible to prove Plaintiff's factual innocence of Mr.

8    French's murder.

9        Further, a prosecutor's decision not to re-prosecute a suspect can be made

10   for a multitude of reasons and may be based on numerous factors unrelated to

11   opinions on a suspect's factual guilt or innocence.  Contrary to what Plaintiffs'

12   Motion incorrectly asserts, some key evidence that existed in the initial criminal

13   trial no longer exists.  For example, key witnesses have passed away, including

14   Detective Parra and witness Maurice Soucy and others are simply impossible to

15   locate.  Additionally, the passage of 30 years naturally works to diminish a

16   person's memory on events and observations, making their testimony weaker than

17   it would have been soon after the murder.  Finally, in the present case, it appears

18   that CM has sufficiently pressured Mr. Druecker and other witnesses enough

19   during the course of their "investigation" to tamper with Mr. Druecker's

20   previously unwavering identification of Plaintiff (at both the preliminary hearing

21   and trial).  The criminal investigation into Mr. French's murder remains is still

22   ongoing and whether it results in charges against Plaintiff and or anyone else

23   remains to be seen.

24       Because there are a variety of reasons unrelated to whether Plaintiff

25   actually was involved in the murder of French for why the prosecutor in this case

26   has decided not to re-prosecute yet, including deaths of key witnesses, faded

27   memories, and destruction of evidence, and because the investigation into the

28   murder is active and ongoing (with Plaintiff still potentially a suspect), the

1   Plaintiffs' attempt to use the decision as determinative evidence of Plaintiff's

2   factual innocence is unfounded and should be rejected.[12]

3   **B.    Habeas Has No Preclusive Effect**

4   The granting of a habeas petition has no preclusive or collateral estoppel

5   effect in a subsequently related civil trial. *See, One Lot Emerald Cut Stones &*

6   *One Ring v. U.S.*, 409 U.S. 232 (1972); *Standlee v. Rhay*, 557 F.2d 1303 (9th Cir.

7   1977) ("The difference in the burdens of proof in criminal and civil proceedings

8   usually precludes application of collateral estoppel.").

9   In the instant case, there is insufficient privity between the Defendants and

10  the State, who was the answering party on the habeas petition. Generally, a

11  person who was not a party to a prior proceeding is said not to have had a "full

12  and fair opportunity to litigate" the issues and claims that were resolved in the

13  prior litigation. *Richards v. Jefferson County*, 517 U.S. 793, 798 (1996). In fact,

14  "[t]he application of claim and issue preclusion to non-parties thus runs up

15  against the 'deep-rooted historic tradition that everyone should have his own day

16  in court.'" *Id.*; *see also, Taylor v. Sturgell*, 553 U.S. 880, 884 (2008). The Ninth

17  Circuit n *Tuttelman v. San Jose*, 2011 WL 839137 (9th Cir. 2007) specifically

18  held that it would be improper to apply collateral estoppel of a ruling in a prior

19  criminal proceeding to individual police officers in a subsequent civil action

20  because the officers were not in privity with the DA's Office. *Id.* at *2.

21  As such, relevant to the issues raised in Plaintiffs' Motion, the granting of

22  Plaintiff's habeas petition is also insufficient to show that Plaintiff is factually

23  innocent in the French murder. It is undisputed that Plaintiff was previously

24  convicted of the crime beyond a reasonable doubt and, but for the granting of his

25  habeas petition on procedural grounds, he would still be in prison serving his

26  sentence. Additionally, Plaintiff has never received a finding of factual

27  _____

28  [12] Likewise, due to its irrelevance, if the prosecution does not decide to re-prosecute Plaintiff prior to trial, this likewise should be inadmissible.

12

1   innocence.  Consequently, Plaintiffs have not and cannot show that the requisite
2   privity is present to apply collateral estoppel regarding the granting of the habeas
3   petition and therefore, it cannot be used to exclude evidence of Plaintiff's
4   involvement in the French murder or to show his factual innocence.[13]

5   **C.**   **No Instruction That Plaintiff Is "Presumed Innocent" Should Be**
6        **Given**

7   Plaintiffs continually attempt to conflate criminal standards into the instant
8   civil action.  This action solely requests damages and Plaintiff's liberty interests
9   are not at stake.  "The extent to which procedural due process must be afforded
10  the recipient is influenced by the extent to which he may be condemned to suffer
11  grievous loss [citations omitted].  Whether the loss threatened by a particular type
12  of proceeding is sufficiently grave to warrant more than average certainty on the
13  part of the factfinder turns on both the nature of the private interest threatened and
14  the permanency of the threatened loss."  *Santosky v. Kramer*, 455 U.S. 745, 758
15  (1982).  No serious loss of individual liberty is being threatened here.  Therefore,
16  a damages case should not be afforded the benefit of the elevated burdens of
17  proof found in criminal actions.

18  In fact, the Supreme Court held that "even at the guilt phase [of a criminal
19  action], the defendant is not entitled automatically to an instruction that he is
20  presumed innocent of the charged offense."  *Delo v. Lashley*, 507 U.S. 272, 278
21  (1993).  "**An instruction [that a person is presumed innocent] is**
22  **constitutionally required only when, in light of the totality of the**
23  **circumstances, there is a 'genuine danger' that the jury will convict** based on
24  something other than the state's lawful evidence, proved beyond a reasonable
25  doubt."  *Id.* (Emphasis added.)  There is no "genuine danger" of the jury
26  convicting Plaintiff in the instant case because this is a civil damages action

27  _____

28  [13] Indeed, Detective Parra was not alive at the time habeas petition was filed and, therefore, did not have any opportunity to participate in those proceedings.

13

1  brought by Plaintiff.  Therefore, this Court is not bound by any requirement to

2  instruct the jury that Plaintiff is "presumed innocent," nor does the law support

3  such an instruction.

4  **IV.    EVIDENCE REGARDING PLAINTIFF'S INVOLVEMENT IN THE**

5  **FRENCH MURDER IS DIRECTLY RELEVANT TO PLAINTIFFS'**

6  **CLAIMS AND IS THEREFORE RELEVANT DURING THE**

7  **LIABILITY PHASE OF TRIAL.**

8       Plaintiffs' Complaint contains allegations that Defendants violated

9  Plaintiff's due process rights to a fair trial based on (1) a failure to turn over

10  exculpatory information (a *Brady* violation), and (2) fabrication of evidence.

11  While Defendants agree with Plaintiffs that the ultimate decision on whether

12  Plaintiff is "guilty" (i.e. proof of commission of the offense "beyond a reasonable

13  doubt") of Mr. French's murder is a decision left for the **criminal courtroom** and

14  has absolutely no bearing for a civil lawsuit like the instant case, the **evidence**

15  regarding Plaintiff's involvement in the murder is both relevant and admissible to

16  both issues of liability and damages in the instant civil lawsuit.  Contrary to

17  Plaintiffs' argument that the "Court should preclude Defendants from referring,

18  implying or suggesting in argument or questioning that Mr. O'Connell murdered

19  Jay French"[14] (Plaintiffs' Motion at 19:1-3), the weight of legal authority

20  indicates that, in determining whether evidence of a plaintiff's involvement in the

21  underlying crime is relevant, courts must consider the causes of action alleged

22  and the elements a plaintiff is required to prove.

23       In the present case, evidence of Plaintiff's involvement in the French

24  murder is relevant to both the *Brady* and fabrication of evidence claims and is

25  therefore admissible **even during the liability phase of trial**.

26

27  _____

28  [14] Despite Plaintiffs' labelling of their Motion as a motion for "partial summary judgment", Defendants note that this language reeks of a motion in limine.

14

**A.**   **Evidence of Plaintiff's Involvement in the Underlying Crime is Relevant to a *Brady* Violation Claim and is Admissible at Trial**

To prove their claim that Plaintiff was denied his due process right to a fair trial under *Brady* based on an alleged nondisclosure of evidence, Plaintiffs must prove each of the following elements: (1) the evidence in question was favorable to the accused in that it was exculpatory or impeachment evidence, (2) the government willfully or through deliberate indifference suppressed this evidence, and (3) prejudice ensued from the suppression (*i.e.*, the evidence is "material"). *Brady v. Maryland*, 373 U.S. 83 (1963); *Strickler v. Greene*, 527 U.S. 263, 281-82 (1999).

Contrary to Plaintiffs' assertions that *Brady* is violated if any document is not disclosed, in *Moore v. Illinois*, 408 U.S. 786, 795 (1972), the Supreme Court emphasized that there is "no constitutional requirement that the prosecution make a complete and detailed accounting to the defense of all police investigatory work on a case."  In *U.S. v. Bagley*, 473 U.S. 667 (1985), the Court clarified the rule regarding what evidence is "material" within the meaning of *Brady* holding that "evidence is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different."  *Id.* at 682.   In footnote 7 of *Bagley*, the Court held that "a rule that the prosecutor commits error by any failure to disclose evidence favorable to the accused, no matter how insignificant, would impose an impossible burden on the prosecutor and would undermine the interest in the finality of judgments." *Bagley*, *supra,* 473 U.S. at 675, *Kyles v. Whitley,* 514 U.S. 419, 436-437 (1995). Ten years later, *Kyles* re-emphasized that, stating that "the Constitution is not violated every time the government fails or chooses not to disclose evidence **that might prove helpful to the defense**." *Kyles, supra* (emphasis added).  Also, *Kyles* emphasized that, in analyzing whether the alleged non-disclosure of a particular item of evidence could **potentially** be a Brady-violation, "[w]e

evaluate the **tendency and force** of the undisclosed evidence **item by item**; there is no other way." *Kyles, supra*, 514 U.S. at 436, fn 10 (emphasis added).

"The mere possibility that an item of undisclosed information might have helped the defense, or might have affected the outcome of the trial, does not establish 'materiality' in the constitutional sense." *U.S. v. Agurs*, 427 U.S. 97, 109–110 (1976); *Downs v. Hoyt*, 232 F.3d 1031, 1036 (9th Cir. 2000) (Court held no *Brady* violation where "[t]he most that can be said of these materials is that they might have provided investigatory leads.") To prove a reasonable probability of a different result, the Supreme Court has emphasized that "likelihood of a different result must be **substantial**, not just conceivable." *Harrington v. Richter,* 562 U.S. 86, 112 (2011) (emphasis added).

As such, by only showing both the purported non-disclosed evidence in a vacuum without also showing the additional evidence indicating that Plaintiff did, in fact, kill French, Defendants would be denied **their** due process right to a fair trial in the instant case. A civil jury should not, and cannot, be asked to look at the alleged undisclosed exculpatory evidence in vacuum forcing them to make a hypothetical decision about what a prior trier of fact might have done with the new information, without knowing what other evidence of Plaintiff's involvement in the murder existed **at the time of trial** and was factored into the underlying decision to convict Plaintiff of first degree murder. [15]  As such, evidence of

---

[15] The only two cases cited by Plaintiffs dealing with the admissibility of evidence of the commission of a crime in a lawsuit alleging a *Brady* violation are distinguishable from the facts of this case. Both *White v. McKinley*, 605 F.3d 525 (8th Cir. 2010) and *Burge v. Parish of St. Tammany*, 1995 WL 317125, 3 (E.D.LA 1995) dealt with circumstances in which the plaintiff was subsequently retried after their previous convictions were overturned, and in both cases, the plaintiffs were acquitted of the crimes before bringing the civil rights action. Further, the Defendants in *Burge* were not attempting to simply introduce evidence of the plaintiff's involvement in a crime to combat the plaintiff's *Brady* violation allegation (as Defendants are in the instant litigation), but instead, the defendants argued for the affirmative defense that plaintiff was **actually** guilty of the crime. Given the plaintiff's prior acquittal, *Burge* rejected the defendant's affirmative defense of actual guilt. Finally, both cases cited by Plaintiffs are out of circuit cases and therefore are not controlling on this Court.

Plaintiff's involvement in the murder is relevant to the *Brady* cause of action alleged by Plaintiff, and is therefore admissible as to the issue of liability.

The *Lisker* case,[16] which Plaintiffs' referenced in their moving papers as Plaintiff' Ex. C, supports this position. *Lisker* allowed the introduction of evidence regarding the plaintiff's potential commission of the crime **at the liability phase.** Plaintiffs misconstrue *Lisker* by citing to only a non-opposed motion in limine in that case (Plaintiffs' Ex. C), but deliberately excluding the August 11, 2011 and February 16, 2012 Orders from the same case[17] where the court held that evidence of the plaintiff's involvement in the murder would be relevant at the liability phase. First, the August 11, 2011 Order specifically recognized that, with respect to the *Brady* claims, during the liability phase, the defendants would "be permitted to try to prove and argue that the evidence presented at the 1985 trial was not false, had not been withheld pretrial, and was not material if it was withheld, **all in order to establish confidence in the guilty verdict.**" (See, Defendants' Addl. Ex. M at p. 4 (emphasis added).) In that regard, the Court held, "Of course, certain evidence introduce at Plaintiff's 1985 criminal trial – including evidence relevant to Plaintiff's alleged guilt – will be admissible in the liability phase." (*Id.*)

Subsequently, in the February 16, 2012 Order, *Lisker* reiterated that evidence of the plaintiff's involvement in the underlying murder would be relevant at the liability phase emphasizing that the plaintiff's due process "claims are **inextricably intertwined with the question of his innocence or guilt**." (*See*, Defendants' Addl. Ex. N at p. 1 (emphasis added.)) Later in the same order, the Court states that "[t]o refute Plaintiff's evidence regarding Defendants' state

---

[16] *Bruce Lisker v. City of Los Angeles, et al.*, USDC Case No. CV 09-09374 AHM (AJWx).

[17] As such, these Orders are being submitted concurrently herewith as Defendants' Addl. Ex. M and N, respectively.

1  of mind, Defendants also will be permitted to introduce evidence incriminating

2  Plaintiff that was known to the individual Defendants in 1983-1985" even if it

3  was not necessarily received into evidence at the original trial. *Id.* at pg. 2.)[18]

4  **B.** **Evidence of Plaintiff's Involvement in the Murder is Relevant to**

5  **the Claim of Fabrication of Evidence and is Admissible at Trial**

6  A person has a due process right "not to be subject to criminal charges on

7  the basis of false evidence that was deliberately fabricated by the government."

8  *Devereaux v. Abbey*, 263 F.3d 1070, 1074-75 (9th Cir. 2001).  Intentional

9  fabrication of evidence is required; it is not enough that the police failed "to

10  follow guidelines or carry out an investigation in a manner that will ensure an

11  error-free result." *Id*. at 1076-77.

12  The Ninth Circuit set forth the standard for proving a due-process

13  "fabrication of evidence" violation in *Devereaux*.  There, the court held that to

14  prove such a claim, there must be a "showing that the [investigator] **knew or**

15  **should have known that the alleged perpetrator was innocent**, or that the

16  interview techniques employed were so coercive and abusive that the

17  [investigator] knew or should have known that they would yield false

18  information." *Id.* at 1077 (emphasis added.)  "The *Devereaux* test envisions an

19  investigator whose unlawful motivation **is illustrated by [his/]her state of mind**

20  **regarding the alleged perpetrator's innocence** . . ." *Costanich v. Dept. of Social*

21  *and Health Serv.*, 627 F.3d 1101, 1111 (9th Cir. 2010) (emphasis added.)

22  A successful fabrication of evidence claim is also dependent on proof that

23  the false evidence played a material role in the plaintiff's conviction, as the

24  _____

25  [18] While Plaintiffs also refer to another Order by Judge Matz in *Goldstein v. Long Beach*, Case

26  No. CV-049692, that case is clearly distinguishable because, unlike *Lisker* and the instant case,

     it did not involve "fabrication of evidence" claims.  (*See,* Plaintiffs' Exhibit "A" at pp. 2-3.)  As

27  discussed in Section IV (B), below, the existence of those claims, in addition to the *Brady*

     claims, increases the relevancy of the inculpatory evidence known to the Detectives at the time

28  of the underlying investigation.

plaintiff would fail to state or prove a Section 1983 claim absent this causal link. *See Zahrey v. Coffey,* 221 F.3d 342, 348 (2d Cir.2000) ("The manufacture of false evidence, 'in and of itself,' ... does not impair anyone's liberty, and therefore does not impair anyone's constitutional right."); *Lisker v. City of Los Angeles*, 2013 WL 1276047, at *15 (CA Cal. 2013).

In the present case, Plaintiffs contend that Detectives Smith and Parra fabricated evidence by making false statements in police reports pertaining to the eyewitness identifications by Druecker, Villarreal and Soucy. In order to be successful, Plaintiffs must show that the alleged false evidence played a material role in Plaintiff's conviction. Similar to the *Brady* argument above, evidence of Plaintiff's involvement in the murder is necessary for a civil jury who must determine whether, given the totality of the evidence against Plaintiff, the fabricated evidence played a role in his conviction. Additionally, like in *Lisker*, a fabrication of evidence cause of action requires a consideration of the Defendants' state of mind, which, in turn, requires the admission of evidence **known to Detectives Smith and Parra in the 1984-1985 investigation**, regardless of whether such evidence was presented to the criminal trier of fact. As such, evidence of Plaintiff's involvement in the murder is inextricably intertwined and relevant to the fabrication of evidence claims brought by Plaintiffs, and is therefore admissible at trial.[19]

---

[19] Such evidence would also be relevant to the defense of "unclean hands." Aside from immunity defenses, other defenses, likewise derive from the common law, are also available in suits under 42 U.S.C. § 1983. *Anthony v. White*, 376 F.Supp. 567 (D. DE 1974). In *Blain v. Doctor's Co.*, 222 Cal. App. 3d 1048 (1990), the court held that unclean hands is an appropriate affirmative defense in legal actions. *See, also, Unilogic, Inc. v. Burroughs Corp.*, 10 Cal. App. 4th 612 (1992); *Kirkland v. Mannis*, 639 P.2d 631 (1982); *Feld & Sons v. Pechner, Dorfman, Wolfee, Rounick & Cabot*, 458 A.2d 545 (1983). In other words, Plaintiff should not be allowed to engage in heinous conduct and obtain monetary damages as an indirect result of that conduct.

**V.    EVIDENCE REGARDING PLAINTIFF'S INVOLVEMENT IN THE FRENCH MURDER IS ALSO DIRECTLY RELEVANT TO DAMAGES.**

In the present case, it appears that Plaintiff is attempting to attribute the emotional distress he suffered while incarcerated to his purported wrongful conviction.  However, if he murdered an innocent person, part (if not most) of his emotional distress would likely have been caused by the act of taking another person's life.  Courts, as a matter of public policy, have allowed introduction of evidence regarding the civil rights plaintiff's commission of a crime to preclude damages.

Plaintiff has never been found factually innocent in the present case and there is still substantial incriminating evidence indicating that Plaintiff was involved in the French murder.   Once again, since Plaintiffs are seeking emotional damages, Defendants should be allowed to introduce evidence that the emotional distress purportedly suffered was a direct result of taking the life of an innocent person.

Indeed, Judge Matz recognized this in both the *Goldstein* and *Lisker* cases referenced by Plaintiffs in their moving papers as Plaintiffs' Ex. A, B and C. Specifically, in the August 11, 2011 *Lisker* Order that Plaintiffs deliberately omitted from their moving papers, Judge Matz cited to a prior order in *Goldstein* (Plaintiffs' Ex. B) in which the Court stated:

> Defendants will be permitted to try to prove that to the extent that
> Plaintiff seeks damages for the fact of (an impact of)…incarceration,
> he may not recover such damages because, in fact, he *was* guilty of
> the murder. …The reason such evidence of "actual guilt" is relevant
> and admissible in this phase is that it "bears on the emotional
> damage [Plaintiff] may have suffered during his imprisonment. …"
> *Deskovic v. Peekskill*, [637] F.Supp.2d [154], 2009 WL 3050275

(S.D. NY 2009) (citation deleted).  As stated in *Carter v. Philadelphia*, 2000 WL 1016653 (E.D. PA 2000) at *2, "The touchtone for [emotional] damages …is whether or not the plaintiff was, in fact, wrongfully imprisoned.  Accordingly, the issue of whether or not a civil plaintiff committed the underlying criminal act essential to the measure of damages for a wrongful imprisonment claim. …**[A] reasonable jury could conclude that an innocent person serving a jail term is likely to feel more emotional anguish than a guilty person who knows, that he, in fact, committed the crime** but may have an avenue of relief available to him because of police misconduct [fn. omitted] s*ee, Carey v. Piphus,* [*supra,*] 435 U.S. [at] 260…where the Supreme Court observed that an award of damages for injuries caused by a constitutional violation would be a windfall if the injuries would have occurred absent the violation.  This observation is based on standard principles of causation and compensation.  The Court stated, "[W]here a deprivation is justified but procedures are deficient, whatever distress a person feels may be attributable to the justified deprivation rather than to deficiencies or procedure.  But…[an] injury caused by a justified deprivation, including distress, **is not properly compensable under §1983**." *Id.* at 435 U.S. 263…

(*See,* Defendants' Addl. Ex. M at pp. 6-7 (italics in original; bold emphasis added).)

## VI.   PLAINTIFFS MISSTATE THE HOLDING OF *CAREY V. PIPHUS* WHICH, IN FACT, HELD THAT, IF PLAINTIFF WOULD HAVE BEEN CONVICTED ANYWAY, PLAINTIFFS ARE LIMITED TO AN AWARD OF NOMINAL DAMAGES

In *Carey v. Piphus*, 435 U.S. 247 (1977), two students in separate incidents

21

had been suspended from a public school without being given an opportunity to have their claims adjudicated.  One student had been seen by the principal passing around what appeared to be a marijuana joint.  Upon the becoming aware of the principal's presence, the joint was thrown into a hedge.  The principal took the student and directed that he be suspended for 20 days for violating school rules even though the student denied smoking marijuana.  A suspension notice was sent and the only meeting that took place was to explain the suspension.

The other student was suspended for wearing an earring in violation of a school rule that was created due to a belief that the practice was indicative of involvement of gang activity.  This student claimed that it was a symbol of black pride.  While he was told that he would be suspended if he refused to remove the earring, he refused to do so.  Ultimately, this student was also suspended for 20 days without an opportunity to adjudicate the issue.  Both students sued claiming that they had been suspended without due process of law in violation of the Fourteenth Amendment.

The two student cases were consolidated and a bench trial was conducted via stipulated records.  The lower court held that both students had been suspended without procedural due process, but refused to award damages since the plaintiffs failed to place any evidence in the record to support their damages. *Id.* at 251-252.  The plaintiffs appealed and the appellate court reversed and remanded holding that, among other things, with respect to any damages related to days off from school, the plaintiffs would not be entitled to these if it could be shown that the suspensions were justified. *Id.* at 252.  In contrast, the appellate court found that the plaintiffs would be entitled to recover substantial damages on the basis that their procedural due process rights were violated. *Id.*  On this last issue, Supreme Court granted certiorari to consider the issue. *Id.* at 253.

The Supreme Court did not analyze the district court's belief that any damages related to days off from school, or that the plaintiffs would not be

1   entitled to damages if the defendants showed that their suspensions were justified.

2   *Id.* at 260.  It did not evaluate or analyze this issue because the Court did "not

3   understand the parties to disagree with this conclusion." *Id.*  The Court did not

4   disagree as well.  *Id.*  Moreover, it agreed with the proposition that "the failure to

5   accord procedural due process could not properly be viewed as the cause of the

6   suspensions." *Id.*  The Supreme Court reasoned that, if the suspensions were

7   justified, "an award of damages for injuries caused by the suspensions would

8   constitute a windfall, rather than compensation, to [the Plaintiffs]." *Id.*

9          The only issue that the Supreme Court granted certiorari to consider was

10  regarding the appellate court's finding that the plaintiffs would be entitled to

11  recover substantial damages on the sole basis that their procedural due process

12  rights were violated.  *Id.* at 264-67.  The Court disagreed and held that, with

13  respect to the due process claim, even if a violation is found, that violation is not

14  so "great as to justify awarding compensatory damages without proof that such

15  injury actually was caused." *Id.* at 266-67.  Ultimately, if the suspensions were

16  justified because the students actually engaged in the misconduct, the plaintiffs

17  would only be entitled to recover **nominal damages**.  *Id.*

18         For these reasons, in the event Plaintiffs prove a due process violation in

19  the instant case, Plaintiffs would still need causation and "proof of actual injury"

20  before compensatory damages, other than nominal damages, could be awarded.

21  *Carey v. Piphus, supra,* 435 U.S. at 264.  According to *Carey*, while Plaintiffs can

22  present their case of causation of actual injury (i.e., Plaintiff did not commit the

23  crime), Defendants would be entitled the opportunity to demonstrate that the

24  original conviction was justified.  Plaintiffs' reading into *Carey* that Defendants

25  would somehow have the burden to prove Plaintiff guilty beyond a reasonable

26  doubt **during the liability phase in a civil context** is misplaced and not

27  supported by any binding case law.  *Carey* was merely illustrating that the

28  Defendants in that case would have an opportunity to present a defense against

23

1    whatever the Plaintiffs presented in order to challenge the assertion that they

2    would not have been suspended otherwise.  In the event there was evidence

3    demonstrating that the suspensions would have been justified, the plaintiffs would

4    be limited to nominal damages.

5          While no case, including *Carey*, has held that Defendants would only be

6    able to argue evidence of guilt in response to damages and no case, including

7    *Carey*, has held that Defendants would have the burden to prove Plaintiff guilty

8    (much less beyond a reasonable doubt) **during the liability phase**, Plaintiffs

9    appear to suggest that this is the case and, because Plaintiff has not been retried,

10   that Defendants are now foreclosed from raising this issue.  This is nonsense for

11   multiple reasons and unquestionably lacking in any legal authority or analysis to

12   support such a suggestion.[20]

13         In fact, the Supreme Court has held the exact opposite.  In *Zinermon v.*

14   *Burch*, 494 U.S. 113 (1990), a man alleged that, while wandering around on a

15   Florida highway, he was taken to a private mental health facility that received

16   patients suffering mental illness.  Despite that fact that he was hallucinating,

17   psychotic and confused, he was asked to sign consent forms for his admission.

18   He remained in the facility for three days, wherein he was given psychotropic

19   medication and found to be in need of long-term care.  The man signed transfer

20   documents and was transferred to a state hospital where he signed a voluntary

21   admission request.  The man remained there for five months and then brought suit

22   under Section 1983 for procedural due process violations.

23         While the Supreme Court granted certiorari on limited grounds regarding a

24   dismissal pursuant to Fed.R.Civ.P. 12(b)(6), it referenced *Carey*.  On the issue of

25

26   _____

27   [20] Plaintiffs' citation to *Thompson v. Connick*, 553 F.3d 836, 864 (5th Cir. 2008) to suggest that
     Defendants would be required to prove "guilt" **in the liability phase of a civil case** is

28   misplaced and taken out of context.  First, the issue in *Connick* was what proof of "guilt" would
     be required in the context of the **affirmative defense** of "guilt", not the standard of proof as to

                                          24

1  damages, the Supreme Court emphasized that:

2    Hence, Burch might be entitled to actual damages, beyond the

3    nominal damages awardable for a procedural due process violation

4    unaccompanied by any actual injury, [citation to *Carey* omitted] if he

5    can show either that if the proper procedure had been followed he

6    would have remained at liberty and that he suffered harm by being

7    confined, or that even if he would have been committed anyway under

8    the involuntary placement procedure, the lack of this procedure

9    harmed him in some way.

10  *Zinermon v. Burch, supra*, 494 U.S. at 134 (emphasis added.)

11    More recently, in *Townes v. New York*, 176 F.3d 138 (2nd Cir. 1999), the

12  plaintiff alleged he was unlawfully convicted based on improper investigation

13  tactics and evidence that should not have been admitted at trial was admitted.

14  The plaintiff's criminal conviction was overturned after a state appellate court

15  found that the trial court erred in failing to suppress evidence from the unlawful

16  search.  *Id.* at 142.  The plaintiff subsequently filed a civil action against the

17  police officers and the city under Section 1983.  Like the instant case, there was

18  substantial evidence that plaintiff had committed the crime, but obtained the

19  reversal because of procedural error.

20    *Townes* noted that the basic purpose of Section 1983 damages is "to

21  compensate persons for injuries that are caused by deprivation of constitutional

22  rights" and that the goal of Section 1983 jurisprudence has been to tailor liability

23  to fit the interests protected by the particular constitutional right at issue.  *Id.* at

24  147-48 (citing *Carey*, *supra,* 435 U.S. at 253.)  *Townes* held that there was a

25  "gross disconnect" between the constitutional violations alleged and the harm for

26  which the plaintiffs sought recovery—his related conviction and incarceration.

27

28  liability.  Second, the language Plaintiffs' cited to was merely dictum, and from a non-binding out-of-circuit case at that.

25

*Id.* at 148.  *Townes* further emphasized that no "value would be served if [plaintiff], who illegally possessed firearms and narcotics, reaps the financial benefits that he seeks. [Plaintiff] has already reaped an enormous benefit by reason of the illegal seizure and search to which he was subjected:  **his freedom**… Now [plaintiff] seeks damages to compensate him for his conviction and timed served, **on top of the benefit he enjoys as a result of the suppression**.  That remedy would vastly over deter police officers and would result in a wealth transfer that "is peculiar if not perverse."  [citation omitted.]  *Id.*

Consequently, before Plaintiffs in the instant case may recover compensatory damages (and not just nominal damages) for their due process claims, Plaintiffs must prove (1) that Plaintiff was not involved in the murder of French (causation); and (2) that he was harmed as a result of being confined (actual damages).  *Zinermon v. Burch, supra*.  Until this proven, Plaintiffs are not entitled to actual damages.  Naturally, while it is Plaintiffs' burden to prove causation and harm, Defendants would be able to present a defense that Plaintiff actually killed French and attack his claim of damages.  Ultimately, it would require an examination of Plaintiff's involvement in the murder of French, as Plaintiffs would need to prove that he was not involved in the murder and the defense would seek to present evidence demonstrating his involvement.  This evidence of Plaintiff's involvement is necessary because, in the event that Plaintiff's conviction was justified by the facts, then "an award of damages for injuries caused by the [confinement] would constitute a windfall, rather than compensation, to [Plaintiffs]" and the Supreme Court has held that this is not allowed.  *Carey v. Piphus*, *supra*, 435 U.S. at 260.

There is substantial evidence indicating Plaintiff murdered of French.  There is also substantial evidence of witness tampering **after** the conviction by CM.  It would be perverse to allow Plaintiffs to obtain a windfall by profiting from this heinous act if Plaintiff did, in fact, murder French.  Once again, simply

1  because Plaintiff is "presumed innocent" and the DA's Office has not decided to

2  re-prosecute does not mean that Plaintiff is "factually innocent" and did not

3  commit the crime.[21]

4  **VII.  CONCLUSION.**

5      For each and all of the reasons stated above as well as the reasons set forth

6  in Defendants' separately pending (1) Motion for Summary Adjudication as to

7  Plaintiffs' Claims Under Sections IX and XI to the extent they are based on the

8  alleged failure to disclose "alternate suspect" evidence regarding Randy Smith

9  [Docket No. 240] and (2) Motion for Summary Judgment or, Alternatively,

10  Summary Adjudication of Individual Issues [Docket No. 268], Defendants

11  respectfully request that Plaintiffs' Motion be denied.

12

13

14  Dated:  March 19, 2017          LAWRENCE BEACH ALLEN & CHOI PC

15

16                                  By:  /s/ Michael D. Allen

17                                       Michael D. Allen
                                         Attorneys for Defendants,
18                                       COUNTY OF LOS ANGELES, J.D. SMITH and
                                         ERIC PARRA

19

20

21

22

23
_____

24  [21] It is also important to highlight the fact that Detectives Smith and Parra were not in the same

25  position as the Defendants in either the *Carey* or *Zinermon* cases because neither of them were
    in control of Plaintiff's prosecution.  Instead, the DA's Office and Plaintiff's defense counsel

26  selected (1) what evidence would be used and how, (2) what theory(ies)/strategies would be
    presented and argued to the jury, (3) who, what and how to cross-examine and (4) what

27  witnesses to call.  Moreoever, it is neither of the Detectives' fault that the Public Defender's
    Office lost their original file or that the DA's Office did not "necessarily" maintain a duplicate

28  copy of the notes the Detectives provided it.  For this additional reason, it would be highly
    improper to allow Plaintiffs to recover damages against the County based on purported
    misconduct by Detectives Smith and Parra, especially if Plaintiff did, in fact, kill French.