Barrett S. Litt, SBN 45527
Email: blitt@kmbllaw.com
Ronald O. Kaye, SBN 145051
Lindsay Battles, SBN 262862
KAYE, McLANE, BEDNARSKI & LITT
234 East Colorado Boulevard, Suite 230
Pasadena, California 91101
Telephone: (626) 844-7660
Facsimile: (626) 844-7670

Attorneys for Plaintiffs
Frank and Nicholas O'Connell

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| FRANK O'CONNELL, NICHOLAS O'CONNELL, <br><br> Plaintiffs, <br><br> vs. <br><br> J.D. SMITH; ESTATE OF GILBERT PARRA; ERIC PARRA; COUNTY OF LOS ANGELES AND DOES 1-10 <br><br> Defendants. | CASE NO. 13-01905-MWF (PJWX) <br><br> [HONORABLE MICHAEL W. FITZGERALD] <br><br> **Plaintiffs' Opposition to Defendants' Motion for Summary Adjudication Regarding Individual Liability Issues** <br><br> Date:  April 24, 2017 <br> Time:  10:00 A.M. <br> Courtroom:  5A |

## **Table of Contents**

I.    INTRODUCTION……………………………………………………….....1

II.   ARGUMENT…………………………………………………………....2

      A.    Evidence Impeaching the Reliability of Soucy's Identification
            Was Material and Exculpatory…………………………………….....2

            1.    *Suppressed Handwritten Notes Demonstrate that Maurice Soucy*
                  *Failed to Make a Positive Identification as Falsely Reported by*
                  *Detectives*…………………………………………..2

            2.    *The Notes Demonstrated Detectives' Willingness to*
                  *Falsify Eyewitness Statements, Corroborating Villareal* ……...5

            3.    *Collectively Assessed, the Suppressed Exculpatory*
                  *Evidence Establishes an Exceedingly Strong Probability*
                  *of a Different Result*…………………………………………….6

      B.    Detectives' Handwritten Notebooks Were Undeniably Suppressed….7

      C.    Evidence of Detectives' False Attribution of Witness Statements
            Supports §1983 Claim for Deliberate Fabrication of Evidence……...10

      D.    Druecker's Identification Violated Due Process …………………..13

            1.    *Detectives Used Impermissibly Suggestive Techniques*……...13
            2.    *The Identification Lacked Sufficient Indicia of Reliability*……..15

      E.    Evidence of Detectives Intentional Investigatory Misconduct –
            Including Falsification of Eyewitness Statements – Coupled With Their
            Reckless Failure to Investigate the Murder-for-Hire Theory
            Is Sufficient to Support a §1983 Reckless Investigation Claim……...17

            1.    *§1983 Reckless Investigation Claims Require Evidence*
                  *of Intentional or Reckless Investigatory Conduct*……………..17
            2.    *Detectives Recklessly Disregarded Exculpatory Evidence*
                  *of a Murder-for-Hire*…………………………………….......19

      F.    Substantial Evidence Supports Plaintiffs' §1983 *Monell* Theories…..25

            1.    *The LASD's Failure to Train Homicide Detectives on*
                  *Brady Disclosure Requirements Supports §1983 Liability*…...25

i

1

2.    *The LASD Similarly Lacked Formal Training on
Eyewitness Identification Procedures*…………………….....29

G.    Plaintiffs Assert Viable Claims Against Eric Parra…………………...29

III.    CONCLUSION……………………………………………………...30

1

## <u>Table of Authorities</u>

2

3  **Cases**

4

5  *Akins v. Epperly*,
     588 F.3d 1178 (8th Cir. 2009) ...................................................................... 18

6  *Bagley*,
     473 U.S. ................................................................................................................ 6

7  *Barker v. Fleming*,
     423 F.3d 1085 (9th Cir. 2005) ........................................................................ 6

8  *Belz v. Clarendon America Ins. Co.*,
     69 Cal.Rptr.3d 864 (Cal.App.2 Dist.2007) .............................................. 30

9  *Brady v. Maryland*,
     373 U.S. 84 (1963) ........................................................................................ 17

10 *Brown v. Miller*,
     519 F.3d 231 (5th Cir. 2008) ...................................................................... 11

11 *Burge v. Parish of St. Tammany*,
12   187 F.3d 452 (5th Cir. 1999) ........................................................................ 5

13 *Carrillo v. County of Los Angeles*,
     798 F.3d 1210 (9th Cir. 2015) ............................................................. 1, 4, 12

14 *Castellano v. Fragozo*,
15   352 F.3d 939 (5th Cir. 2003) ...................................................................... 11

16 *Christianson v. Colt Industries Operating Corp.*,
     108 C.Ct. 2166 , 486 U.S. 800 (1988) ........................................................ 4

17 *Costanich v. Department of Social and Health Services*,
18   627 F.3d 1101 (9th Cir. 2010) ............................................................. 12, 13

19 *Crews v. County of Nassau*,
     996 F.Supp.2d 186 (E.D.N.Y. 2014) .......................................................... 25

20 Cristini v. City of Warren,
21   2012 WL 5508369 (E.D.Mich. 2012) .................................................. 25, 27

22 *Davis v. Clark Cnty., Wash.*,
     966 F.Supp.2d 1106 (W.D.Wash. 2013) .................................................. 26

23 *Devereaux*,
24   263 F.3d 1070 (9th Cir. 2001) .................................................................... 13

25 *Dominguez v. Hendley*,
     545 F.3d 585 (7th Cir. 2008) ...................................................................... 11

26 *Emmett v. Ricketts*,
     397 F. Supp. 1025 (N.D. Ga. 1975) .......................................................... 27

27 Ferguson v. Short,
     2014 WL 3925512 (W.D. Mo. Aug. 12, 2014) .......................................... 25

28 *Grant v. City of Long Beach*,
     315 F.3d 1081 (9th Cir. 2002) .................................................................... 13

*Gregory v. City of Louisville*,
 444 F.3d 725 (6th Cir. 2006) ............................................................ 11, 25

*Hernandez v. City of El Paso*,
 2009 WL 2096272, at p. ................................................................... 4

*Jackson v. Brown*,
 513 F.3d 1057 (9th Cir. 2008) .......................................................... 11, 12

*Kyles v. Whitney*,
 514 U.S. .......................................................................................... 4, 6, 7

*Lindsey v. King*,
 769 F.2d 1034 (5th Cir. 1985) .......................................................... 4

*Malley v. Briggs*,
 475 U.S. 335, 106 S. Ct. 1092 (1986) .............................................. 11

*Napue v. Illinois*,
 360 U.S. 264 (1959) ........................................................................ 18

*Neil v. Biggers*,
 (1972) 409 US 188 .......................................................................... 13, 16

*Pineda Oliva v. Hedgpeth*,
 375 Fed.Appx. 697 (9th Cir. 2010) .................................................. 13, 14, 15

*Ricciuti v. N.Y.C. Transit Auth.*,
 124 F.3d 123 (2d Cir. 1997) ............................................................ 11

Robinson v. Cain,
 501 F.Supp.2d. ................................................................................ 5

*Sanders v. English*,
 950 F.2d 1152 (5th Cir.1992) .......................................................... 17

*Souliotes v. City of Modesto*,
 2016 WL 3549266 (E.D. Cal. 2016) ................................................ 19

*State v. Henderson*,
 208 N.J. 208, p.  (N.J. 2009) ........................................................... 14

*Stemler v. City of Florence*,
 126 F.3d 856 (6th Cir.1997) ............................................................ 11

*Tennison v. City and County of San Francisco*,
 570 F.3d 1078 .................................................................................. 8, 19

*U.S. v. Agurs*,
 427 U.S. 97 (1976) .......................................................................... 6, 18

*U.S. v. Field*,
 625 F.2d 862 (9th Cir. 1980) ........................................................... 13, 15

*United States v. Ramirez*,
 608 F.2d 1261 (9th Cir. 1979) ......................................................... 12

*United States v. Skilling*,
 554 F.3d 529 (5th Cir. 2009) ........................................................... 27

*Walker v. City of New York*,
 974 F.2d 293 (2nd Cir. 1992) .......................................................... 25

iv

*Washington v. Wilmore*,
  407 F.3d 274 (4th Cir. 2005) ....................................................................... 11
*Whitley v. Hanna*,
  726 F.3d 631 (5th Cir. 2013) ....................................................................... 17
*Whitley v. Seibel*,
  613 F.2d 682 (7th Cir. 1980) ....................................................................... 17
*Whitlock v. Brueggemann*, __ F. 3d __,
  2012 WL 1939906 (7th Cir. May 30, 2012) .............................................. 11
*Wilson v. Lawrence County*,
  260 F.3d. 946 (8th Cir. 2001) ................................................... 11, 17, 18, 19
*Winslow v. Smith*,
  696 F.3d 716 (8th Cir. 2012) ............................................................ 17, 18, 19
*Youngblood v. Arizona*,
  488 U.S. ....................................................................................................... 18
*Zahrey v. Coffey*,
  221 F.3d 342 (2nd Cir.2000) ....................................................................... 10

**Statutes**

[Cal. Prob. Code] §§553, 554(a) ..................................................................... 36
Probate Code §550 ................................................................................... 35, 36
Probate Code §9100 ........................................................................................ 36

v

## <u>MEMORANDUM OF POINTS & AUTHORITIES</u>

### I.    <span style="font-variant: small-caps">Introduction</span>

Defendants inappropriately seek summary judgment on numerous liability issues for which there is a genuine dispute of fact. Considerable evidence establishes that (all) of the detectives' handwritten notebooks were suppressed. The notes impeached Maurice Soucy, information which the Ninth Circuit has already decided was material and exculpatory. *Carrillo v. County of Los Angeles*, 798 F.3d 1210, 1225-1226 (9th Cir. 2015) (suppressed handwritten notes showing that Maurice Soucy identified two photos from the six pack were material and exculpatory; qualified immunity denied). The notes would have been invaluable to the defense because they (1) undermined the sole witness purporting to connect Frank O'Connell (hereafter "Frank") to a yellow Pinto, and (2) established that detectives falsely reported Soucy's statements, which in turn, would have reinforced the likelihood that detectives falsely reported statements of other witnesses, including Arturo Villareal and Thomas Butler. (Plaintiffs do not assert a *Brady* claim on the basis of handwritten notes concerning Villareal, but rather, assert that detectives failed to advise defense counsel of the false statements in their reports as a *Brady* violation and assert a direct false evidence claim).

Detectives' false attributions in the police report support §1983 liability for deliberate fabrication of evidence. Contrary to Defendants' assertions, deliberate fabrication claims do not require evidence that detectives continued the investigation despite knowledge that the suspect was innocent. Rather, the standard is that the detectives knew or should have known reported information was false. (Here, the detectives' own field notes establish they knew the reports were false.)

Plaintiffs' suggestive identification claim is viable. Plaintiffs have adduced more than sufficient evidence to demonstrate that Druecker's identification was obtained by impermissibly suggestive means and was highly unreliable under the *Biggers* factors. The totality of intentional and reckless investigatory conduct in

this case – falsification of witness statements, suppression of exculpatory information, and use of suggestive eyewitness identification procedures – coupled with the failure to conduct even minimally adequate investigation of the murder-for-hire lead, is more than sufficient to establish a §1983 claim for reckless investigation, which has been repeatedly recognized by federal courts.  Qualified immunity is not available.

Most of the relevant facts have been extensively briefed in connection with Plaintiffs' opposition to: (1) Defendants' first Motion for Summary Adjudication regarding Randy Smith (Dkt. 247); (2) Plaintiffs' Motion for Summary Judgment regarding Liability (Dkt. 263); and (3) Plaintiffs' Motion for Summary Judgment regarding Guilt. Dkt. (Dkt. 265). <u>Because the Court is familiar with the factual background, and because there are few, additional facts material to the resolution of this motion, we do not include a preliminary "summary of facts," but instead, discuss material facts in the body of our arguments.</u> See foregoing Dkt. Nos. for extensive fact summaries.

## II.  ARGUMENT

### A.  Evidence Impeaching the Reliability of Soucy's Identification Was Material and Exculpatory

#### 1.  *Suppressed Handwritten Notes Demonstrate that Maurice Soucy Failed to Make a Positive Identification as Falsely Reported by Detectives*

Detectives identified Mr. Soucy while canvassing Jeanne Lyon's neighborhood to determine whether neighbors had observed a yellow, Pinto station-wagon. AMF 30, 36. Three neighbors, Jean Wilson, Pamela Wilson, and Brenda Rogers, told detectives that they monitored cars parked on the street, had never seen a yellow Pinto (and had never seen Frank driving a yellow Pinto). AMFs 40, 87, 94, 102. This exculpatory information came out during the 1985 trial, but was <u>not</u> memorialized in detectives' police reports. AMFs 40, 88, 95, 103. Those reports referenced two witnesses – Thomas Butler and Maurice Soucy –

who both purportedly reported seeing a yellow Pinto station wagon parked in front of Jeanne Lyon's house and positively identified Frank O'Connell as the driver. AMFs 30-39. Thomas Butler has since flatly denied the police report, stating he was never able to identify anyone from the six-pack and in fact so advised the detectives, who falsely reported otherwise. AMFs 35, 121-123.

The police report says that, on February 8, 1984, Maurice Soucy, and his wife, Ina, were shown nighttime photos of a "look alike" Pinto, with woodgrain similar to the getaway car, and Mr. Soucy "indicated he had seen a vehicle matching this description, and it was driven usually by a male White, about 30 years old, 6'2", 180 pounds, slender build, with sandy hair" and further indicated that he had seen a man staying with Jeanne Lyon who asked him to jump start a similar looking car. AMF 38. The police report states that Soucy positively identified Frank from the six-pack as the driver of the car, and Ina "concurred" but "indicated she thought his hair was a little bit curlier." AMF 38.

Soucy was crucial to the prosecution's case as the only witness who connected Frank to a yellow Pinto station-wagon in 1983. AMFs 75, 76, 112. Though Frank's defense attorney, Adolfo Lara, argued that Soucy must have been mistaken in his identification of Plaintiff with a yellow Pinto (AMF 104), he had no information with which to directly impeach Soucy's purported identification.

During the habeas, LASD produced previously undisclosed contemporaneous handwritten notes revealing that Soucy failed to make a positive identification when shown the six-pack. According to one of these notes, during the interview with Maurice Soucy and his wife, Ina, Mr. Soucy *"I.D. #'s 3 & poss #1* & photos of pinto & put frank as positive with Pinto." AMF 115. The second Detectives' notebook said, *"pointed out # 3 as poss. suspect* – because of face – but hair was curlier Maurice." AMF 116 (emphasis supplied). This information directly contradicts the police report's statement that Soucy "immediately"

identified Frank's photo (and, contrary to the police report, Maurice, not Ina, said the driver of the car had "curlier" hair than Frank's photo. AMF 38, 117.

The Ninth Circuit held that the suppression of handwritten notes showing that Maurice Soucy identified two photos from the six-pack was material and exculpatory, and denied qualified immunity under the facts of this case. *Carrillo*, 798 F.3d at 1225-1226 (holding that the law was clearly established at least by 1978 that the suppression of eyewitness impeachment evidence violates due process; "the disclosure of Soucy's choice of *two* men from the photo lineup would have undermined his identification of O'Connell"). Under the law-of-the-case doctrine, that decision is binding. *Christianson v. Colt Industries Operating Corp.*, 108 C.Ct. 2166 , 486 U.S. 800, 815 (1988).

The handwritten notes negated the reliability of Soucy's identification sufficient to warrant disregarding it. They impeached Soucy's identification, and provided a potential basis to exclude his in-court identification. AMFs 118, 119. Undermining Soucy would have left the testimony of Jean Wilson, Pamela Wilson and Brenda Rogers. Without Soucy's link to a yellow Pinto, the prosecution's case rested entirely on Druecker, whose testimony was controverted by three credible, alibi witnesses. *See Kyles v. Whitney*, 514 U.S. at 419; *Lindsey v. King*, 769 F.2d 1034, 1042 (5th Cir. 1985) ( "the destruction by cross-examination of the credibility of one of two crucial witnesses-even if the other remains untouched-may have consequences for the case extending far beyond the discrediting of his own testimony"); *Hernandez v. City of El Paso*, 2009 WL 2096272, at p. 18 (undisclosed witness statement undermining eyewitness account was material because the case hinged on eyewitness testimony).

Defendants argue that Soucy's dual-identification has no bearing on the weight of his testimony because Frank O'Connell was the only male to move into Jeanne Lyon's home during the summer of 1983. This argument has no merit. Soucy's selection of *two* photos indicated that he made the selection based on a

*resemblance* between the two selected individuals and the driver of a vehicle he saw – not based on his recognition of the driver. The dual-identification carries even greater exculpatory value given the confusing polaroid photos shown to him, and the significant possibility that Soucy was confused about having seen a Pinto vs. a Country Squire station wagon.

### 2. The Notes Demonstrated Detectives' Willingness to Falsify Eyewitness Statements, Corroborating Villareal

Establishing false evidence in the police report would have raised serious concerns regarding the reliability and integrity of all identification procedures. *See Robinson v. Cain*, 501 F.Supp.2d 399 (false attribution of an identification tends to impeach the credibility of the investigation); *Burge v. Parish of St. Tammany*, 187 F.3d 452 (5th Cir. 1999) (eyewitness' initial statement that she was unable to identify the murderer was exculpatory). Defense counsel could have used detectives' misrepresentation of Soucy's statements to reinforce Villareal's trial testimony that, contrary to the police report, he could not make an identification and so advised J.D. Smith, despite Smith's testimony to the contrary. AMF 120.

Witness Arturo Villareal was delivering flowers when he saw the shooter drive away in a 1970-75 yellow Pinto wagon with faded wood sides. AMF 6.[1] The Detectives' police report stated that Mr. Villareal chose Mr. O'Connell from the six-pack, and said he was "the strongest contender, and I'm sure that's him." AMF 22. At the preliminary hearing, Villareal testified that he had been *unable* to make a positive identification from the six pack. AMF 63, 64. At the preliminary

---

[1] Measurements taken during the habeas establish that Villareal was about 250 away (AMF 7), despite his testimony that he was about 175 feet away looking through two windshields (AMF 66, 67). Whether Mr. Villareal was 250 feet away (the measured distance), or even 175 feet, he was too far to make a reliable identification of a running man seen from one side for a couple of seconds. Unrebutted expert optometrist Paul Michel explains that, at that distance, even a person with perfect 20/20 vision could not make an identification. The human eye is incapable of seeing more than very general features at that distance. Expert Gary Wells' shows photos demonstrating that a person is indecipherable at 172 feet (less than the 250 or 175 feet above). AMFs 23-26.

hearing, he said, in response to whether he was able to see the "features" of the person he saw running down the driveway, "No, not really. I could just tell just - just describe him just a little bit." AMF 64. He  picked out the person as best he could from a photospread, and told the Detectives that "one of them looked like almost like the person that had jumped in the car. **I couldn't say yeah or no**." AMF 64. At trial, Mr. Villareal *again* testified that he could not positively identify Frank and that he had *never* made a positive identification, saying he told the detective that the selected photo "looked like the man [he] saw, but [he] couldn't be positive, AMF 65, 68, and he picked a person who resembled the assailant but was "not sure" it was the person. AMFs 69.

Detective Smith testified in rebuttal that Villareal had made a positive identification, directly contrary to Mr. Villareal's testimony, AMF 70, 72, but also contradictorily stated that, in selecting a photo, Mr. Villareal said "that they all looked a lot a like, he said, but number 3 looked like the person that most likely looked like the person he'd seen." AMF 73. The selection of a photo accompanied by a statement that the photo "looks like" the person that most likely looked like the person" is not a positive identification. Evidence that J.D. Smith had falsely attributed a positive identification to Maurice Soucy would have supported the likelihood that he had falsely attributed a positive identification to Villareal.

### 3. Collectively Assessed, the Suppressed Exculpatory Evidence Establishes an Exceedingly Strong Probability of a Different Result.

Materiality is determined "in terms of suppressed evidence *considered collectively*," first "item by item," and then by a cumulative assessment of **all** *Brady*-violations, and in view of the entire record. *Kyles*, 514 U.S. at 436 (emphasis supplied); *U.S. v. Agurs*, 427 U.S. 97, 112 (1976) (courts analyze the totality of suppressed exculpatory evidence "in the context of the entire record."); *Bagley*, 473 U.S. at 682; *Barker v. Fleming*, 423 F.3d 1085 (9th Cir. 2005). Here, Plaintiffs' evidence taken as true shows manifold *Brady* violations, permeating

every aspect of the prosecution's case:  (1) Druecker asked to be hypnotized, said he could not make an identification, made a tentative ID and asked if he picked the right person, was hesitant, was told he had to make a positive identification, and had a call made in his presence indicating he had made an ID – none of which was disclosed – which all raise serious concerns about its reliability, and is particularly significant because he is the sole eyewitness and was controverted by credible alibis; (2) Soucy was unable to identify Frank from the photo lineup (particularly significant considering the degree to other neighbors contradicted him); (3) Detectives falsely reported that Soucy positively identified Frank (significant given Villareal's and Butler's statements contrary to the police report); (4) detectives falsely reported that Villareal made a positive identification from the six pack; (5) detectives falsely reported that Butler made a positive identification from the six pack (evidence of detectives' misrepresentations concerning <u>four</u> witnesses – Druecker, Soucy, Villareal, and Butler – could have established a pattern of inaccurate statements, suggesting intentional misconduct or bias against O'Connell); (6) alternative suspect/ anonymous tip evidence that would have discredited Smith, supplied a plausible alternative narrative, and no doubt would have "put the whole case in such a different light as to undermine confidence in the verdict." *Kyles*, 514 U.S. at 435. AMFs 115 – 141, 178-201. (For a more complete discussion of the alternative suspect evidence, see Dkt. 247, p. 10-16, and Dkt. 263, p. 9-12). Any one of these could have created a reasonable doubt in this weak prosecution case; collectively they unquestionably undermine confidence in the verdict.

**B.    Detectives' Handwritten Notebooks Were Undeniably Suppressed**

Defendants argue there was no meaningful suppression because Adolfo Lara was in possession of "some" handwritten notes. This argument is disingenuous and wholly refuted by evidence demonstrating that LASD failed to disclose **all** of detectives' handwritten notebooks, including those reflecting Maurice Soucy's

7

dual-identification and alternative suspect evidence related to Randy Smith/investigation of the anonymous tip.[2]  There were five (5) notebooks, totaling 212 pages (this does not include loose handwritten notes elsewhere in the file). AMF 335. Three of the notebooks (Exs. 4, 5, 6) were J.D. Smith's. AMF 336. During the entire prosecution, the only handwritten notes disclosed to Lara were SPPD Lt. Hatfield's rough notes of his interview with Scott Egerer, which were disclosed mid-trial. Lara's reaction to Lt. Hatfield's handwritten notes indicates he received no other handwritten notes leading up to trial.

Though J.D. Smith has testified that it was "his practice" to turn over handwritten notes and other materials when requested, the evidence shows that did not occur here. D.D.A Tamia Hope testified that, had she received detectives' handwritten notes, she would have forwarded them to defense counsel. AMF 228. It is inconceivable that Tamia Hope would have turned over 212 pages of notes to her opposing counsel, including various notes damaging to the prosecution's case, without retaining a copy.

The notes are absent from the D.A. file. Deputy District Attorney Juan Mejia, who represented the prosecution at the habeas, "reviewed all of the District Attorney files [he] was able to assemble from the 1985 prosecution and subsequent appeal." Prior to the 2011 habeas hearing, Mr. O'Connell's habeas counsel presented Mr. Mejia with handwritten detectives' notes produced by LASD in response to a subpoena. Mr. Mejia's states that the handwritten notes produced by the LASD were **not** part of the district attorney's file for the 1985 prosecution and

---

[2] Defendants argue that the evidence must not have been suppressed because Defendants memorialized it in their notebooks and would not have done so if they were trying to suppress it ("if the Detectives were really trying to 'suppress' or hide the potential impeachment information…then why did they even bother to document that information in their notes." Dkt. 268, p. 17:21-17:25). This argument has no merit. Liability under §1983 for suppression of exculpatory evidence does not require the intent to suppress or hide evidence. It requires actions that cause exculpatory evidence to be suppressed, undertaken with deliberate indifference or in reckless disregard for the truth or the defendant's right. *Tennison v. City and County of San Francisco*, 570 F.3d 1078, 1089.

subsequent appeal. AMFs 202-205. At the evidentiary hearing, Mr. Mejia stipulated to this. AMF 206. The only reasonable inference is that the District Attorney never received the handwritten notes; it is certainly a disputed issue.

Mr. Mejia specifically declared that he "thoroughly reviewed all of the District Attorney files [he] was able to assemble from the 1985 prosecution and subsequent appeal." The absence of specific documents from those files (detectives' handwritten notes and the anonymous tip – exhibits 3, 4, 5, 6, 7, 8, 9, 10, 11) supports the inference that such materials were never provided to the District Attorney handling the 1985 file. Had those materials been provided to the District Attorney, there would be copies of them in the file. Ms. Hope had three pages of handwritten police notes in her file (AMF 329), supporting the inference additional notes would be there if they had been given to her.

Substantial evidence confirms that Hope never forwarded the notes to Lara, which would have occurred had she received them. Had Soucy's dual-identification been disclosed, Lara would have used it to impeach Soucy, point to an alternative suspect, and cast doubt on the integrity of the police investigation. AMFs 118, 237, 330, 331. Lara did not examine Maurice Soucy or J.D. Smith regarding Soucy's dual identification, nor did he argue that the notes cast doubt on the police investigation. AMF 330, 331. Lara testified that the fact that he did not cross-examine Maurice Soucy on handwritten notes indicates that he did not have access to the information at trial. *Ibid.* Since Lara never received the notes – as evidence by the trial transcript – the only inference is that J.D. Smith failed to provide his notes to Ms. Hope.

Though Lara did receive some notes in the middle of the 1985 trial, the transcript establishes that these notes pertained only to SPPD Lt. Hatfield's interview of Scott Egerer, and more importantly, that these were the only handwritten notes Mr. Lara received during the prosecution. According to the transcript, D.D.A. Tamia Hope provided Lara, "rough" handwritten notes received

9

from a SPPD Officer. Upon receiving the notes, Mr. Lara advised the court that he would consider "request[ing] more time to either investigate the matter *or see what was involved in why these notes were not transcribed and made available much earlier in this case*." AMF 242, 243 (emphasis supplied). Lara's concern with why the handwritten notes had not been transcribed by the time of trial reflects his expectation that all police notes would be transcribed (into the police report) and strongly suggests that all of other materials provided to Mr. Lara from the District Attorney's Office came to him in the format of a typed report. His dismay at receiving "rough" notes also suggests that these were the only rough, handwritten notes he received from the D.A.s office or the police.

Testimony at the criminal trial leaves no doubt that the "rough notes" in question were Lt. Hatfield's handwritten notes of his interview of Scott Egerer; they were not J.D. Smith's handwritten notebooks and had nothing to do with the anonymous tip. After Scott Egerer testified, Lt. Hatfield was called in an effort to impeach Egerer's testimony. Lara's cross-examination of Egerer addresses Hatfield's "rough notes" and the fact that Hatfield failed to include a date for his interview of Egerer. AMF 244[3]

## C. Evidence of Detectives' False Attribution of Witness Statements Supports §1983 Claim for Deliberate Fabrication of Evidence

A due process §1983 claim lies against officers who falsify evidence in reports, thereby setting in motion a chain of events that results in the deprivation of a fair trial and attendant deprivation of liberty. *See, e.g., Zahrey v. Coffey*, 221 F.3d 342, 349, 352 (2nd Cir.2000) (§1983 claim for "fabrication of evidence by a government officer acting in an investigating capacity"; the "chain of causation" is

---

[3] J.D. Smith was subsequently called to testify as to when he directed Hatfield to interview Egerer. During cross, Lara asked J.D. Smith: "…you weren't even aware that Lieutenant Hatfield had any notes until about two days ago, isn't that true?" J.D. Smith answered yes. AMF 245 This exchange makes clear that the SPPD "rough" notes that surfaced *in the middle of trial* were rough notes concerning Hatfield's interview of Scott Egerer and Karen Baxter.

not "broken where the initial wrongdoer can reasonably foresee that his misconduct will contribute to an 'independent' decision that results in a deprivation of liberty'"); *Whitlock v. Brueggemann*, __ F. 3d __, 2012 WL 1939906 (7th Cir. May 30, 2012) ("the act of fabrication [during the investigation] caused a harm to them [plaintiffs].... because it was introduced … at trial, [and] was instrumental in their convictions"); *Gregory v. City of Louisville*, 444 F.3d 725, 737, 760 (6th Cir. 2006) (investigative notes knowingly fabricated with a reasonable likelihood that the falsification would affect the decision of the jury); *Ricciuti v. N.Y.C. Transit Auth.*, 124 F.3d 123, 130 (2d Cir. 1997) ("a police officer's fabrication and forwarding to prosecutors of known false evidence works an unacceptable 'corruption of the truth-seeking function of the trial process.'"). *See also* Ninth Circuit Model Civil Instruction 9.33 (fabricated evidences "used" to charge, prosecute or convict person meets establishes liability)[4]

A §1983 false evidence claim requires proof that detectives' caused the presentation of evidence known to be false that *could* have affected the judgment of the jury. *Jackson v. Brown*, 513 F.3d 1057, 1076 (9th Cir. 2008) (False evidence is material if there is "any reasonable likelihood" it "***could*** have affected the

---

[4] *See also Stemler v. City of Florence,* 126 F.3d 856, 872 (6th Cir.1997) (officer "violated Stemler's right to due process if he knowingly fabricated evidence against her, and if there is a reasonable likelihood that the false evidence could have affected the judgment of the jury"); *Dominguez v. Hendley*, 545 F.3d 585, 589 (7th Cir. 2008) (officers' tampering with evidence used to secure conviction constituted an "independent" claim for violation of due process); *Washington v. Wilmore*, 407 F.3d 274, 282 (4th Cir. 2005) (false statement in police report would constitute due process violation); *Brown v. Miller*, 519 F.3d 231, 237 (5th Cir. 2008) (due process rights violated when the government obtains a conviction with testimony that government agents know is false); *Wilson v. Lawrence County*, 260 F.3d. 946 (8th Cir. 2001) (knowing use of false or unreliable evidence to secure conviction violated defendant's due process right under the Fourteenth Amendment); *Castellano v. Fragozo*, 352 F.3d 939, 945–961 (5th Cir. 2003) (manufacturing of evidence to obtain wrongful conviction indisputably denied plaintiff rights secured by the due process clause of the Fourteenth Amendment). *Cf. Malley v. Briggs*, 475 U.S. 335, 345, 106 S. Ct. 1092, 1098 (1986) (falsified warrant leading to

judgment of the jury.") (additional emphasis supplied). Evidence is "false" if, taken as a whole, it creates a materially misleading impression of the facts. *United States v. Ramirez*, 608 F.2d 1261, 1266 n.9 (9th Cir. 1979).

Here, detectives falsely reported that Soucy had made a positive identification from the six-pack, which set in motion a chain of events leading to the presentation of Soucy's trial testimony (in which he falsely testified that he identified Frank from the six-pack lineup). Because the handwritten notes establish that Soucy did not make a positive identification, but rather, identified two photos, there is no dispute that the police reports were false, nor any doubt as to whether detectives knew they were false. This evidence was material as a matter of law. *Jackson v. Brown*, 513 F.3d 1057, 1076 (9th Cir. 2008) (evidence that satisfies the *Brady* materiality standard necessarily satisfies the *Napue* standard); *Carrillo v. County of Los Angeles*, 798 F.3d 1210, 1225-1226 (9th Cir. 2015) (handwritten notes concerning Soucy were material under *Brady*). Detectives also falsified Villareal's and Butler's statements, which reinforces the conclusion that the false evidence was presented intentionally or recklessly. Though Butler was not called to testify, and Villareal disputed the police report's characterization at trial, these false statements helped to set in motion a chain of events leading to conviction.

Defendants incorrectly argue that Plaintiffs must prove that detectives continued their investigation after they knew or should have known he was innocent. Evidence that officers continued to investigate after they should have known a suspect was innocent constitutes one circumstantial method of proving deliberate fabrication (i.e. the officers knew or should have known the proffered evidence was false). But such circumstantial evidence is not needed where direct

---

arrest; "[s]ince the common law recognized the causal link between the submission of a complaint and an ensuing arrest, we read §1983 as recognizing the same causal link.").

evidence of falsification exists. *See Costanich v. Department of Social and Health Services*, 627 F.3d 1101, 1111 (9th Cir. 2010); Model Instruction 9.33, *supra*.[5]

### D.    Druecker's Identification Violated Due Process

Due process bars admission of identifications obtained by unnecessarily suggestive procedures in the absence of sufficient indicators of reliability to ensure the integrity of the identification. *Neil v. Biggers* (1972) 409 US 188, 198; *U.S. v. Field,* 625 F.2d 862 (9th Cir. 1980), ("In applying that analysis, the reliability of identification evidence is tested by weighing the indicia of reliability against the corrupting tendencies of the suggestive … identification procedure."); *Grant v. City of Long Beach*, 315 F.3d 1081, 1086 (9th Cir. 2002). This standard was in place by 1980 (*Biggers*) if not earlier.

#### 1.    *Detectives Used Impermissibly Suggestive Techniques*

The Ninth Circuit has found photo lineup procedures similar to those employed here to be impermissibly suggestive as a matter of law. In *Pineda Oliva v. Hedgpeth*, 375 Fed.Appx. 697, 698 (9th Cir. 2010), the Ninth Circuit found a phone lineup to be impermissibly suggestive on the basis of three features. First, detectives failed to admonish the witness that the spread may or may not have contained a photo of the suspect, causing the witness to believe that she "had to make a selection." Second, after the witness chose a photo other than the suspect, detectives implicitly suggested that her first choice wasn't the person they had in mind (encouraging her to try again). After she selected another photo (the suspect),

---

[5]    *Devereaux v. Abbey* merely supplied two examples of how to establish "deliberate" fabrication in the context of inducing potentially false witness statements: (1) continuing investigation after officers knew or should have known that plaintiff was innocent; or (2) investigative techniques so coercive and abusive that officers knew or should have known that they would yield false information. *Devereaux*, 263 F.3d 1070, 1075 (9th Cir. 2001). *Costanich*, held that these are not the exclusive methods and direct evidence of fabrication will suffice : "deliberately mischaracterize[ing] witness statements in .. investigative report also….[constitutes] a constitutional violation." 627 F.3d at 1111.

detectives praised her, "signal[ing] that she had made the 'right' choice." *Id*. These features, taken together, rendered the procedure impermissibly suggestive.

The procedures in this case were equally suggestive. Notwithstanding Smith's testimony, Druecker does not remember detectives admonishing him before showing him the photospread, and specifically does not remember being advised that the person he saw may or may not be featured in the photos. AMF 337. Even if Druecker had been admonished, Smith's admonishment did not make clear that she should select a photo only if he actually recognized the shooter.. Smith's testimony at the criminal trial, regarding Mr. Villareal, that he would be shown "six Pictures that …and that it was important to pick out the person if he thought the person was *possibly the person* that he had seen, and it was just as important to not pick out anyone if he wasn't sure" is circumstantial evidence that any admonition was improper. AMF 71. (Emphasis supplied.)

After viewing the photos, Druecker said he had only seen the profile, couldn't make an identification from the front-view photos, and that he did <u>not</u> recognize the shooter in the photos. AMF 126. This was a **lineup rejection**, which is as exculpatory as selection of a filler photo (and requires terminating the procedure). AMF 127, 128. As in *Pineda Oliva*, detectives failed to terminate the procedure, but instead changed their tone and insisted that he return to the photos and "really look" again, *strongly suggesting to him that they expected him to pick someone*. AMF 129. Based on their demeanor, believed he had to make a selection and weren't going away until he did. AMF 130-133. He then made a tentative identification, pointing to one photo and asking "Is this the guy?" AMF 134. The detectives made a call in his presence affirming his identification. AMF 135, 136. This call "served to commit Druecker to the idea that he identified number three from the photo lineup and … to further convince Druecker that he identified the right person."  AMF 137. *See, State v. Henderson*, 208 N.J. 208, p. 253 (N.J. 2009)

(discussing confirmatory feedback). These procedure, if credited, were "inappropriate in their level of suggestiveness." AMF 138 (Gary Wells).

### 2.    *The Identification Lacked Sufficient Indicia of Reliability*

Druecker's identification was not reliable under the *Biggers* factors. [6] Both the LASD and SPPD estimated the distance at 40 feet. AMF 154-156.  An inspection conducted during the habeas estimated 36 feet and determined it could not have been less than 30. AMF 157-159. *See United States v. Field*, 625 F.2d 862, 868 (9th Cir. 1980) (identification unreliable where witness viewed the robber twice "both times for only a few seconds and from a distance of 20 feet."). Druecker's estimate suggests that he viewed the shooter for as little as two seconds. AMF 162. He never saw anything but a left side profile of the shooter. AMF 163, 167. *See Pineda Oliva*, 375 Fed.Appx. at 699 (insufficient indicia of reliability where witness saw shooter's face from a distance and for a fleeting period of time).

Druecker never described details of the suspect's face, consistent with poor viewing conditions, and scientific evidence establishing that his vision was too poor to enable a reliable identification. AMF 10, 142-153. Druecker testified that he was confused and scared (AMF 168-171), which, as Gary Wells explains, impairs the identification's reliability by directing "limited cognitive resources at survival…resources that could have been spent on attending to details and transferring information into long-term memory are crowded out." AMF 160, 161. The presence of a weapon "directs attentional resources toward the weapon, which reduces attentional resources directed at the shooter's face," .AMF 172. "This is corroborated by the detail Druecker provided about the weapon (large, blue steel

---

[6] *Biggers* identified five criteria to assess the reliability of an eyewitness identification: 1) the witness' opportunity to view the criminal at the time of the crime; 2) the witness' degree of attention; 3) the accuracy of the witness' prior description; 4) the level of

15

frame revolver, approximately 6-inch barrel") in contrast to the limited detail he provided regarding facial features (no detail about the nose, eyes, chin or brow)." AMF 173. This lack of detail of facial features is consistent with "[t]he factors that work against a good memory for the gunman's face, such as fear, surprise, short exposure duration, weapon focus, and side-view only…" AMF 175.

Contrary to Defendants' assertions, Druecker's descriptions do not support the reliability of his identification, particularly when compared to the description provided by Arturo Villareal. Shortly after the shooting, Druecker described the shooter to the SPPD as a slim man in his 30's with shoulder-length, dirty, **dark brown** hair and **no** facial hair. AMF 11. Later the same day, Druecker told the LASD that the shooter appeared to be in his mid to *late* 30's, significantly older than Mr. O'Connell, and possibly as tall as 6'3. AMF 12. Villareal described the shooter as slim (160-170 lbs.) and about 5'10 (significantly shorter than 6'3). Villareal mentioned shoulder-length hair, but **blonde** not brown hair. AMF 8. These inconsistencies suggest that neither witness could effectively describe the suspect, beyond his shoulder-length hair. Villareal's descriptions were inconsistent with Frank's physical appearance. (Frank was 6'4 and 195 lbs. at the time of his arrest, AMF 29).

The County falsely contends Druecker's description of the suspect as wearing dirty clothing is "consistent" with the "fact that Plaintiff had been crashing at other people's homes for the greater part of six months and claimed to go to Leslie's house to do laundry." Plaintiff had not been "crashing on people's couches" for the better part of six months. Frank's and his roommates' statemetns and trial testimony establish that he had been living in LaVerne with two roommates for nearly three months before the murder. His roommates, along with

---

certainty demonstrated by the witness at the confrontation; and 5) the length of time between the crime and the confrontation. *Neil v. Biggers*, 409 U.S. at 199-200.

Karen Baxter, testified that he was home at the time of the murder. The fact that Frank brought laundry to his ex-girlfriend's house on the day of the murder is not evidence that his clothes were dirty or wrinkled that day and certainly not evidence that he matched descriptions of the shooter.

Druecker's professed confidence during the original trial is of no consequence. Druecker has now admitted that he was never confident in his identification, that he had mentioned to police several times that he had only seen the shooter from the side. AMF 163. When detectives asked for a description, Druecker told them he couldn't remember and asked to be hypnotized. AMF 124, 125.  Any expression of confidence during the 1985 trial can be attributed to the detectives' phone call affirming his identification in his presence.  As Gary Wells explains, "seemingly-confirmatory responses from a lineup administrator [] leads witnesses to develop an inflated sense of confidence that they identified the right person." AMF 176, 177.

Defendants **falsely** assert that "at least two other witnesses (Soucy, Villareal) also identified Plaintiff. At both the preliminary hearing and trial, Villareal denied having made a positive identification, repudiating both the description of his identification in the police report and J.D. Smith's trial testimony (AMF 63-73). Soucy was not an eyewitness to the murder, never saw the suspect, and therefore is entirely irrelevant to the reliability of Druecker's identification.

  **E.** **Evidence of Detectives Intentional Investigatory Misconduct – Including Falsification of Eyewitness Statements – Coupled With Their Reckless Failure to Investigate the Murder-for-Hire Theory Is Sufficient to Support a §1983 Reckless Investigation Claim**

   *1.* *§1983 Reckless Investigation Claims Require Evidence of Intentional or Reckless Investigatory Conduct*

Federal courts recognize that reckless failure to investigate violates due process and may support §1983 liability. *Winslow v. Smith*, 696 F.3d 716, 732 (8th

Cir. 2012); *Wilson v. Lawrence Cnty.*, 260 F.3d 946, 956 – 957 (8th Cir. 2001) (where coerced confession supplied primary evidence of guilt, failure to investigate alternate suspect information violated due process); *Whitley v. Hanna*, 726 F.3d 631, 654 (5th Cir. 2013)(citing *Wilson*); *Sanders v. English*, 950 F.2d 1152, 1162 (5th Cir.1992) (defendant deliberately ignored exonerating information indicating he had arrested the wrong person); *see also*, *Whitley v. Seibel*, 613 F.2d 682, 686 (7th Cir. 1980) (intentional acts in investigation violate due process).

The right to be free from reckless investigatory tactics implicates the liberty "interest in obtaining fair criminal proceedings before being denied one's liberty…" , *Wilson*, 260 F.3d 946, 956, n. 8, (citing, *Brady v. Maryland*, 373 U.S. 84, 87 (1963), *Napue v. Illinois,* 360 U.S. 264, 269 (1959). Wilson found that, because police officers are servants of the law, "the twofold aim of which is that guilt shall not escape or innocence suffer," they have a responsibility to investigate viable alternative suspect evidence in some circumstances. 260 F.3d at 957 (internal quotations omitted, citing *United States v. Agurs*, 427 U.S. 97, 110-111 (1976) and *Youngblood v. Arizona*, 488 U.S. at 54-55). The *Wilson* officers had such an obligation when faced with involuntary confession and no corroborating evidence. Because the right to a fair criminal trial has been established for decades, qualified immunity is not available. *Wilson*, 260 F.3d at 956 (no qualified immunity for 1986 investigation, based on line of cases from *Brady* ).

To establish §1983 liability, a plaintiff must show that the failure to investigate was intentional or reckless, which can be established with proof of deliberate investigatory misconduct independent from the failure to investigate. *Winslow v. Smith*, 696 F.3d at 732. Actionable intentional or reckless conduct sufficient to support a claim may include, *inter alia*, (1) efforts to coerce or threaten the suspect, (2) purposeful disregard of exculpatory evidence; (3) systematic pressure to implicate the defendant in face of contrary evidence. *Winslow v. Smith*, 696 F.3d at 732 (citing *Akins v. Epperly*, 588 F.3d 1178, 1184

(8th Cir. 2009). Though a reckless investigation claim is distinguishable from a fabrication of evidence (or *Brady*) claim, it may be inextricably intertwined with them. *Winslow*, 696 F.3d at 732.

Federal courts have recognized reckless investigation claims in cases involving failure to investigate exculpatory information, coupled with deliberate or reckless conduct that would constitute independent due process violations. In *Wilson v. Lawrence Cnty.*, the Eight Circuit held that failure to investigate an alternate suspect lead supported a §1983 due process claim where the defendant officers also engaged in reckless investigatory misconduct, including coercion of a confession. 260 F.3d at 956 – 957. The Court reasoned, "[I]f Wilson's allegations about unlawful coercion are proved true, a reasonable factfinder could determine that Defendants recklessly or intentionally chose to force [the confession] instead of attempting to solve the murder through reliable but time consuming investigatory techniques designed to confirm their suspicions." *Id.* (internal quotation and citation omitted). In *Winslow v. Smith*, the Eighth Circuit found that defendant police officers could be held liable for recklessly ignoring exculpatory evidence and/or pressuring vulnerable witnesses to fill gaps in the investigation. *Winslow.* 696 F.3d, at 734.

In view of these decisions, *Souliotes v. City of Modesto*, 2016 WL 3549266 at 10 (E.D. Cal. 2016) is not persuasive and provides no reason to conclude that the Ninth Circuit would decline to recognize a failure to investigate claim. Though *Tennison v. City and County of San Francisco*, 570 F.3d 1078, 1089, cited in *Souliotes*, does not directly address the viability of reckless investigation claims, it approvingly cites the Eighth Circuit's decision in *Wilson* for the proposition that §1983 claims for police investigatory misconduct require proof of reckless disregard. *Tennison* did not differ with any aspect of *Wilson*'s reasoning, and, if anything, it suggests that the Ninth Circuit would agree with the Eighth Circuit.

     2.   ***Detectives Recklessly Disregarded Exculpatory Evidence of a Murder-for-Hire***

19

Here, detectives' reckless failure to investigate the murder-for-hire theory, coupled with deliberate investigatory misconduct (suppression of exculpatory evidence, falsifying at least three witness statements in their reports, and using impermissibly suggestive techniques to secure an identification), is more than sufficient to support a §1983 reckless investigation claim.

On the day of the murder, Detectives learned from Gina French that Jay French had been involved in a bitter and longstanding custody dispute with his ex-wife, Jeanne Lyon, who was married to Ed Lyon. Gina told investigators about Jeanne's "boyfriend" Frank O'Connell. Soon after, detectives learned that, six months before the murder, she allowed Frank to live at her house for six weeks while she was separated from Ed, during which time she and Frank became romantically involved. Frank was immediately identified as a suspect to the exclusion of other viable suspects. AMF 13-21.

Yet according to suppressed handwritten notes, Gina French also disclosed that Jeanne Lyon had a male friend from Oregon, Randy Smith, with whom she conspired in an attempt to run over Jay French on his motorcycle several years earlier (in connection with the custody dispute). Ms. French described Randy as "tall with sandy blonde hair," consistent with general descriptions of the suspect.[7] AMF 178-181. Detectives did not initially investigate Randy Smith's possible involvement, despite his much longer relationship with Jeanne and previous participation with her in an attempt to kill Jay French (for the purpose of ending the custody dispute). They did not immediately establish Smith's whereabouts on the day of the murder, nor did they investigate whether he and Jeanne had recently been in contact. AMF 182. Detectives omitted  this lead from the police report.

_____

[7] Ms. French provided detailed information concerning the prior attempt, including a description of the vehicle involved (Ms. Lyon's green Capri), the location of the incident (near Sacred Heart Girls School). She also advised that Jay French had reported it to the Pasadena Police Department, and Jay's family law attorney, Peter Wisner. AMF 179.

Ignoring this information, Detectives focused exclusively on Frank. Of three eyewitnesses who saw the assailant, two were unable to make an identification (Sanchez and Villareal). J.D. Smith nonetheless misrepresented Villareal's statements in his report, indicating that he had made a positive identification when he had not. Daniel Druecker, the only eyewitness to the murder, initially rejected the lineup, then made a tentative and unreliable identification after detectives made him believe he had to choose someone. Detectives should have assigned his "identification" minimal weight given serious reliability concerns, but instead, affirmed it in Druecker's presence, causing him to believe he chose the "right" person.

With only the flimsy evidence supplied by Druecker, no credible theory of motive and three alibi witnesses, detectives should have broadened the scope of the search. Instead, they reached to link him to the getaway car despite substantial evidence indicating that no such link existed. Their canvass of Jeanne Lyon's neighborhood yielded at least three credible, exculpatory witnesses – Jean Wilson, Pamela Wilson, and Brenda Rogers – who told them they knew Frank by sight, had never seen him driving or riding in a yellow Pinto and had never seen a yellow Pinto at Jeanne Lyon's home. In the face of this strong exculpatory evidence, which was *not memorialized in police reports*, detectives falsely reported that neighbor Thomas Butler identified Frank as the driver of a yellow Pinto parked near Jeanne's home, and that neighbor Maurice Soucy exclusively identified Frank when he identified two people.

And detectives obtained this yellow Pinto evidence using objectively reckless techniques. They did not use photos of the actual getaway vehicle in canvassing the neighborhood, but instead, showed witnesses dark nighttime photos of a "look alike" Pinto they found parked in Azusa. They used photos of a supposed "look alike" car without showing them to Villareal and Sanchez to confirm that the look alike actually resembled the getaway car. These "look alike"

21

1    photos were poor, nighttime photos showing only a small portion of a car with

2    wood panel sides; they do not capture distinctive features of a Pinto and could not

3    be used to distinguish a Pinto station wagon from other types of station wagons.

4    AMF 41-52. Detectives also knew that Mr. O'Connell drove a brown 1973 Ford

5    Squire LTD wagon with wood panel sides during the time he visited the

6    neighborhood. AMF 53, 54. (Other neighbors knew, it was readily discoverable

7    from DMV records, and Mr. O'Connell told them.) Any detective would have

8    realized that, given the poor quality photos, a person could easily confuse a Ford

9    Pinto Wagon with a Ford Squire LTD wagon (both with wood panel sides).

10    By early-February 1984,detectives had no credible evidence of guilt if all the

11    facts were known. What they had – Sanchez (no ID), Villareal (no ID), Druecker

12    (unreliable ID obtained via suggestive procedures), Butler (no ID), Soucy (dual ID;

13    highly unreliable ID of car) – was heavily outweighed by strong alibi evidence

14    (Egerer, Hamilton and Baxter) and three witnesses who undermined any possible

15    link to a yellow Pinto (Rogers, Jean Wilson, Pamela Wilson). It was at this

16    juncture that the LASD received a highly detailed, anonymous tip that Jeanne Lyon

17    paid a male in Oregon $7,000.00, who in turn paid someone named Richard

18    Stephens $5,000.00 to have her ex-husband killed to end the custody dispute.

19    According to the tip, Stephens lived at either 727 or 757 N. Catalina, Pasadena, in

20    a rear house; Stephens had a female, Mexican accomplice and a male white or

21    Mexican accomplice by the name of James.[8]  AMF 192-194.  Any reasonable

22    detective would have taken the detailed tip very seriously, especially considering

23    the caller's knowledge of the custody dispute, which provided inherent indicia of

24

25

26

27

28

---

[8] This information was relayed directly to detectives assigned to the French murder
investigation. The Altadena substation relayed this information to Lt. Hatfield of the
South Pasadena Police Department, who was assigned to assist Detectives Smith and
Parra on the French homicide investigation. See Dkt. 263 (MSA re Liability), p 25, FN
21, for further explanation of why the envelope in which the tip was recently found does
not establish that it went to the DA in 1984.

reliability.[9] The lead became even more significant when detectives observed a 1972 yellow Ford, license plate 1ADV272, with "wood grain" enter the rear side of 757 N. Catalina. AMF 196. J.D. Smith investigated the car's registered owners and whether anyone with a name similar to Richard Stevens lived on Catalina Street.[10] There is no indication that detectives  photographed the car (precluding having eyewitnesses determine if it matched the getaway car) or interviewed neighbors to determine who used it.

Detectives' perfunctory investigation of the hitman's alleged name (Richard Stevens) and registered owners of the car was nowhere near sufficient to confirm or disprove the murder-for-hire lead. No reasonable investigator would have limited their investigation to the name Richard Stevens (because the caller may have been mistaken or because the contract killer may have used an alias). Obvious next steps in investigating the murder-for-hire angle would have included: surveillance of the car observed on Catalina, interviews of Richard and/or Mark Stevens to determine whether they had access to the car, and photos of the car, interviews of Catalina St. neighbors, a thorough investigation of Jeanne and Ed Lyon, their friends, family and co-workers, and their finances, including a review of their bank accounts. AMF 246.[11] Police had their bank account information but never obtained the bank records. AMF 232.

---

[9] Any reasonable detective aware of the prior attempt would have appreciated the significance of the tip's reference to a "male in Oregon," would have recognized that Jeanne's connection to Randy potentially corroborated this aspect of the tip, and would have made him a focus for investigation The prior attempt and tip bolstered the likelihood that Randy participated in the murder, though not necessarily as the actual shooter.

[10] Smith's notes show that some follow-up investigation occurred in February 1984 to determine the registered owners of the car (and reflect additional investigation in November 1984). AMFs 198-200

[11] Although detectives investigated the reference to Randy Smith  they did not adequately investigate the murder-for-hire theory. According to notes first produced in *this case* (not produced in the habeas), at least one detective traveled to Oregon in **December 1984** and learned that he failed to report to a mandatory probation appointment on 1/5/1984. Randy was interviewed did not provide an alibi. AMFs 183-185.

Investigation of the murder-for-hire theory would have yielded significant evidence. Years later, habeas investigators identified several witnesses to whom Jeanne confessed that she hired a hitman (AMF 247-268). Two of these witnesses were available to investigators at the time of the murder. Deborah Zitella, Jeanne's sister, worked as a legal secretary in the same office as Jeanne.[12] Before the murder, Jeanne told Deborah she was going to have an attorney for whom she worked, James Mack, arrange a loan from which she would pay a contract killer. After the murder, Jeanne told Deborah that an innocent man had been arrested for the murder. AMF 252-254. During the habeas, James Mack signed a declaration stating that, prior to the murder, he overheard conversations between Jeanne and Ed Lyon about hiring a hitman for $5,000. At some point, Jeanne told Mack she had hired a hitman and later pointed out the contract killer to Mack. The contract killer was *not* Frank. AMF 255-258. Because Detectives knew where Jeanne worked, Mack was readily available.[13]

The habeas investigation also revealed several persons to whom Jeanne confessed after Frank's conviction (and long before the anonymous tip was produced in discovery in this case). During the late-1980's, Jeanne confessed to her then-fiancé, Michael Flick, that she paid a hitman to kill her ex-husband. The murder was arranged by Ed Lyon, who met the hitman at a bar, and James Mack, who arranged a payment of $10,000. The money came from Jeanne and Ed's joint savings account. Jeanne feared the withdrawal would be traceable if police examined her financial records. Jeanne told Flick that the person arrested and convicted was not the person who killed Jay French, and later confessed to a boyfriend that she "had somebody take care of" Jay Sr. and an innocent man was in jail. AMF 259-268.

---

[12] LASD detectives learned of Deborah from Gina French on 1/5/1984 AMF 248, 249.
[13] Defendants attempt (unsuccessfully) to establish that statements obtained from Centurion Ministries are unreliable. Had defendant officers done their job properly, the information could have emerged before Centurion was ever involved.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**F.    Substantial Evidence Supports Plaintiffs' §1983 Monell Theories**

*1.    The LASD's Failure to Train Homicide Detectives on Brady Disclosure Requirements Supports §1983 Liability*

Failure to train police officers on *Brady* disclosure requirements may establish *Monell* liability, even absent a pattern of prior violations. [14] Because there is no reason to assume police officers understand *Brady* disclosure requirements when they join the police force, and because investigating officers will routinely encounter exculpatory information, failure to train on this significant "constitutional component" of their job, carries the highly "predictable consequence" of due process violations. *Gregory*, 444 F.3d 725, 753 (6th Cir. 2006) ("Widespread officer ignorance on the proper handling of exculpatory materials would have the 'highly predictable consequence' of due process violations."); *Cristini* , 2012 WL 5508369 at *13 (need for training is "obvious" because: (1) investigators will assuredly encounter evidence contradicting their working theory and/or exonerating a suspect, (2) officers are "not generally familiar with *Brady's* principles or equipped to do the necessary legal research to become familiar with those principles," and (3) failure to disclose carries potentially "serious consequences, such as the conviction of an innocent person.").

At a minimum, an effective *Brady* policy summarizes the constitutional rule, explains the agency's affirmative duty to report material of possible *Brady* significance, defines key terms (e.g. "exculpatory") according to the law. Since it is not safe to assume that a prosecutor will happen across exculpatory information buried in handwritten field notes, effective *Brady* policies must emphasize the duty of police officers to preserve and relay all potentially exculpatory information in a manner that guarantees it is actually brought to the attention of the prosecutor.

---

[14] *Gregory v. City of Louisville*, 444 F.3d 725, 753 (6th Cir. 2006); *Walker v. City of New York*, 974 F2d 293, 297-298 (2nd Cir. 1992); *Ferguson v. Short*, 2014 WL 3925512 (W.D. Mo. Aug. 12, 2014); *Crews v. County of Nassau*, 996 F.Supp.2d 186, 210 (E.D.N.Y.

25

Because police reports are the primary means by which police communicate information to prosecutors, in virtually all cases, effectively relaying exculpatory information means addressing it in police reports. AMF 316-325.

During the early-1980's, the LASD entirely lacked training on *Brady*. It had no formal policies or directives describing the *Brady* rule, "exculpatory evidence" or law enforcement's duty to recognize, memorialize and relay exculpatory information. AMFs 274, 275 (testimony of Mike Bumcrot, LASD's 30(b)(6) witness, a homicide detective since the 1980's; LASD concedes that it had no formal *Brady* policy from the 1980's to present), *see also*, AMF 284, 285 (currently no *Brady* policy or formal training).[15] Though Defendants suggest otherwise, during the early-1980's, academy training did not address *Brady*. According to LASD's 30(b)(6) witness, during the early-1980's, detectives were primarily trained through on-the-job training. Whether a detective received informal training would depend on the individual initiative of their training officer, not on policy. During this time, some detectives attended a non-mandatory, one-week homicide school, and some (including JD Smith, who only attended after the events here, in 1986) served in homicide for years before attending it. AMF 276-282.

Detectives insist that the POST training required for all new recruits included training on "disclosure requirements." Dkt. 268, p. 24:22-28. Discovery in this case establishes that POST training did <u>not</u> address Brady disclosure requirements at all. AMF 277, 338. Defendants misleadingly claim that applicants to the homicide department must complete additional training on various topics,

---

2014); *Davis v. Clark Cnty., Wash.*, 966 F.Supp.2d 1106, 1137 (W.D.Wash. 2013); *Cristini v. City of Warren*, 2012 WL 5508369 at *12-13 (E.D.Mich. 2012).

[15] Plaintiffs cite heavily to the deposition testimony Det. Bumcrot, LASD's 30(b)(6) witness, and Lt. Gilbert Leslie, a homicide field lieutenant during the 1980's. Det. Bumcrot submitted a declaration, Dkt. 272, that seeks to undercut both his own testimony and Lt. Leslie's. Plaintiffs's objections to Dkt. 272 address significant discrepancies between the declaration and earlier, harmful deposition testimony.

including exculpatory evidence. Defendants' 30(b)(6) witness admitted in deposition that, during the 1980's, the LASD did not require new members of the homicide department to complete additional training on *Brady*. AMF 276-282. Plaintiffs' police practices expert has opined that LASD's *Brady* training policies were completely inadequate. The absence of policies does not comport with national standards and reflects a gross departure from minimal law enforcement standards to ensure constitutional compliance. AMF 311-325.

The LASD insists that no *Monell* liability exists because homicide detectives had a practice of memorializing all investigatory information in their notebooks and making that information "available" to the district attorney. This contention is of no consequence. First, even assuming this was the general practice (which we do not concede given what occurred in this case,) this practice would be nowhere near sufficient to satisfy *Brady* obligations. *Brady* requires police to disclose exculpatory information in a meaningful way (e.g. memorializing it in official reports). Dumping *hundreds* of pages of barely decipherable scrawl on a prosecutor, without clearly indicating whether exculpatory information is secreted within, does not constitute meaningful disclosure. *See, e.g. United States v. Skilling*, 554 F.3d 529, 577 (5th Cir. 2009), *aff'd in part, vacated in part, remanded,* 561 U.S. 358, 130 S. Ct. 2896, 177 L. Ed. 2d 619 (2010) ("it should go without saying that the government may not hide *Brady* material of which it is actually aware in a huge open file in the hope that the defendant will never find it"); *Emmett v. Ricketts,* 397 F. Supp. 1025, 1043 (N.D. Ga. 1975) (" the prosecutorial duty to produce exculpatory evidence imposed by *Brady* may not be discharged by 'dumping' .... a voluminous mass of files"). Further, a practice of making notebooks available would do nothing to ensure the disclosure of exculpatory information memorialized elsewhere in the poor boy.[16]

---

[16] J.D. Smith's notes <u>do not</u> memorialize the (exculpatory) content of the anonymous tip memo, which was buried elsewhere in the "poor boy" (homicide file).

Besides, whatever some detectives' practice and even if detectives could discharge *Brady* obligations by depositing their notebooks on the D.A., that is not what happened here. Detectives do not routinely *leave* the notebooks with the DA to review (the only way in which the D.A. could hope to excavate exculpatory information). Det. Lankford testified that while homicide detectives "share" their homicide file with the D.A., they do "not hand it over to the D.A.'s office." AMF 295  In essence, this practice relied on detectives to advise the prosecutor of *Brady* information, which in turn, necessitated formal guidance on the contours of *Brady* disclosure requirements. *Ibid.* No such guidance existed. Though district attorneys had to rely on detectives to advise them of exculpatory information not contained in their police reports, LASD had no policy addressing how investigators should flag potentially exculpatory information when presenting a case for prosecution and no policy requiring detectives to turn over their complete homicide file. AMF 293-298. In the absence of *Brady* training, there is no sound reason to assume that detectives would, on their own accord, verbally apprise the D.A. of potentially exculpatory information memorialized anywhere outside of the official report, and, as we have explained above, the evidence shows that the exculpatory evidence was not made available here (given its absence in DA or Public Defender file, Public Defender testimony he never saw it, corroborated by the fact that information that would obviously be used by any defense counsel was not used).

No departmental guidance ensured that *Brady* information was incorporated into reports. LASD lacked policies and training regarding the content of reports (i.e. what information is sufficiently significant to be included). AMFs 286 - 292. Accordingly, detectives decided for themselves what to memorialize, and had discretion to omit exculpatory information they believed was not significant or outweighed by other evidence. Detectives were not required to incorporate information they deemed to be a "dead lead," even where such information held exculpatory value. *Ibid*. LASD had no supervisory mechanism to ensure detectives

memorialized and relayed all exculpatory information to the district attorney. Homicide detectives were supervised by lieutenants who reviewed *only* the formal police reports, and who did not necessarily have any detective or homicide training. Because they did not routinely review notebooks or other contents of the "poor boy," they had no way of knowing whether detectives relayed exculpatory information not memorialized in a report, unless detectives specifically advised them such information existed. AMFs 301-309.

### 2. *The LASD Similarly Lacked Formal Training on Eyewitness Identification Procedures*

The LASD's training on eyewitness identification procedures was similarly deficient, even if detectives were informally taught to admonish witnesses before administering six packs. According to Mike Bumcrot, LASD's 30(b)(6) witness who has been assigned to the Homicide Bureau for 38 years, during the 1980's, LASD had **no formal training** regarding the administration of six packs. Bumcrot testified that the LASD has "never had any formal policy on how to prevent unwitting or subconscious or unconscious influences on eyewitness identifications." AMF 299-300.

### G. Plaintiffs Assert Viable Claims Against Eric Parra

Defendants argue that claims against Eric Parra are time barred. This Court previously held that the one-year statute of limitations specified in §366.2 does not apply in this case, and that a creditor's claim is unnecessary. Dkt. 28, p. 5. Citing Judge Dale Fischer's order in *Shortt v. County of Los Angeles*, CV 11-05484-DSF-JCG, Dkt. 66 ("Shortt Order"), the Court concluded that a party bringing suit under Probate Code §550 does not have a claim against estate property, *see* [Cal. Prob. Code] §§553, 554(a), is therefore not a "creditor" and need not comply with the requirements such as the filing deadline in Probate Code §9100.'" Dkt. 28, pp. 5, citing Shortt Order, at 6, n. 3. Even if Plaintiffs were considered creditors, they

would still be exempt from the requirement to file a creditor's claim as long as their suit can be proved under §550. Dkt. 28, p. 6.

The only issue is whether Eric Parra's refusal to request indemnification bars the claim. Regardless of whether Mr. Parra eventually submits a claim, there are compelling reasons to reject *Pelayo*'s conclusion that no right to indemnification exists prior to a request for legal defense/indemnification. Section 825 requires a request for defense (from which indemnification flows automatically), which is highly analogous to "notice" provisions commonly included in policies for liability insurance, and should be construed under the same principles governing notice provisions in the insurance context. Even where notice of claim constitutes a precondition for coverage, non-willful failure to satisfy a notice provision does not defeat coverage unless the failure results in actual substantial prejudice. *See, e.g., Belz v. Clarendon America Ins. Co.*, 69 Cal.Rptr.3d 864 (Cal.App.2 Dist.2007) (insured's failure to comply with notice provision would relieve insurer of obligation to indemnify only if insurer could demonstrate actual, substantial prejudice from the lack of notice). <u>In *Shortt v. County of Los Angeles*, Judge Fischer determined that the absence of a request may not render §550 unavailable so long as the public entity has notice of the claim, as is the case here.</u> He observed, "[I]t is not clear that the absence of a request under §825(a) should eliminate the possibility of recovery," where the public entity has timely notice of the nature of the claim so that it may investigate and settle those having merit without litigation. Battles Decl.,¶3, Ex. A, p. 4 FN 2 (6/14/12 Order of Dale Fischer, Dkt. 79). This conclusion is reinforced by the fact that Eric Parra declines to seek indemnification for the sole purpose of defeating Plaintiffs' claims. Defendants have presented no evidence that, if a judgment was entered against Parra, it would not pay the judgment.

## III.   CONCLUSION

For the forgoing reasons, Defendants' motion should be denied.

1

2

DATED: 3/24/2017              Respectfully Submitted,
Kaye, McLane, Bednarski & Litt, LLP

3

By: /s /Lindsay Battles

4

Barrett S. Litt

5

Lindsay Battles

6

Attorneys for Plaintiffs

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28