PAUL B. BEACH, State Bar No. 166265
pbeach@lbaclaw.com
MICHAEL D. ALLEN, State Bar No. 198126
mallen@lbaclaw.com
LAUREN T. KRAPF, State Bar No. 292115
lkrapf@lbaclaw.com
LAWRENCE BEACH ALLEN & CHOI, PC
100 West Broadway, Suite 1200
Glendale, California 91210-1219
Telephone No. (818) 545-1925
Facsimile No. (818) 545-1937

Attorneys for Defendants,
COUNTY OF LOS ANGELES, J.D. SMITH and ERIC PARRA

### UNITED STATES DISTRICT COURT

### CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| FRANK O'CONNELL, NICHOLAS O'CONNELL | Case No. 13-CV-01905-MWF (PJWx) |
| Plaintiff, | Honorable Michael W. Fitzgerald |
| vs. | **DEFENDANTS' REPLY AND OBJECTIONS TO PLAINTIFFS' STATEMENT OF GENUINE DISPUTES IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT OR, ALTERNATIVELY, SUMMARY ADJUDICATION OF INDIVIDUAL ISSUES** |
| J.D. SMITH; ESTATE OF GILBERT PARRA; ERIC PARRA, COUNTY OF LOS ANGELES AND DOES 1-10. | |
| Defendants. | |
| | *[Reply To Opposition To Motion For Summary Judgment; Declarations and Supplemental Exhibits and Response To Plaintiffs' Additional Material Facts filed concurrently herewith]* |
| | Date: April 24, 2017<br>Time: 10:00 A.M.<br>Crtm: 5A |

TO THE HONORABLE COURT, ALL PARTIES, AND THEIR

ATTORNEYS OF RECORD:

Defendants COUNTY OF LOS ANGELES, J.D. SMITH and ERIC PARRA,

submit the following in Opposition to Plaintiffs Statement of Genuine Disputes

1

Offered In Opposition To Motion for Summary Judgment Or, Alternatively, Summary Adjudication Of Individual Issues.

For the Court's convenience, Defendants address each and every one of Plaintiffs' purported genuine disputes in the instant document.  The table below is arranged to provide the Court with the uncontroverted facts in the left-hand column, Plaintiffs' responses in the middle column, and Defendants' reply and/or objections in the right-hand column.

| Uncontroverted Material Facts | Plaintiffs' Response: | Defendants' Replay and/or Objections |
|---|---|---|
| **UNDISPUTED MATERIAL FACTS REGARDING THE JANUARY 5, 1984 MURDER OF JAY FRENCH** | | |
| 1.  On January 5, 1984 at approximately 1:00 p.m., Jay French ("French") was shot and killed in the parking area of the South Pasadena apartment building at 1800 State Street, where he lived and worked as a maintenance man. | Undisputed.<br><br>Objection: Insofar as they are offered for truth – rather than a record of the investigation – police report statements are inadmissible hearsay. FRE 801, 802. Plaintiffs' object to the admission of any police report statements for their truth. (Defs. Exs. D, E, F, G, H, I). **We do not repeat this objection throughout the separate statement.** | Plaintiffs' objection to the admission of any police report statements for their truth is irrelevant as they are admissible as the officers present sense impression, record of a regularly conducted activity, and going to the Detectives' state of mind. FRE 803.<br><br>**Defendants' do not repeat this Reply throughout the separate statement.** |
| 2.  According to the Los Angeles County Sheriff's Department ("LASD"), Scientific Services Bureau, Firearms Identification Section report, the evidence found at the scene | Undisputed. | |

| Uncontroverted Material Facts | Plaintiffs' Response: | Defendants' Replay and/or Objections |
|---|---|---|
| was consistent with the bullets having been shot from a .38 caliber gun. | | |
| 3.  In January 1984, Daniel Druecker ("Druecker") was living at the Penthouse Apartments on 1800 State Street in South Pasadena. | Undisputed. | |
| 4.  On January 5, 1984, at around 1 p.m., Druecker—who had a day off from work—decided to go down to the parking area of his apartment building to clean out his car. | Undisputed. | |
| 5.  When Druecker went down to the subterranean parking area, he saw the apartment's maintenance man, later identified as French, piling mattresses onto the back of a pickup truck. | Undisputed. | |

| Uncontroverted Material Facts | Plaintiffs' Response: | Defendants' Replay and/or Objections |
|---|---|---|
| 6. Druecker did not see anyone besides French when he was walking to his car. | Undisputed. | |
| 7. Druecker's roommate's car was parked immediately in front of his car in the subterranean parking area. | Undisputed. | |
| 8. Druecker switched the vacuum from his roommate's car to his own car and then began cleaning out his mats. | Undisputed. | |
| 9. Suddenly, as Druecker was cleaning the mats in his car, he heard a loud bang. | Undisputed. | |
| 10. The loud bang grabbed Druecker's attention. | Undisputed. | |
| 11. After he heard the loud bang, Druecker heard someone say, "Oh my god. I've been shot!" coming from the direction where French was piling mattresses onto the pickup truck. | Undisputed.. | |
| 12. After he heard, "Oh my god, I've been shot," Druecker got out of his car and | Undisputed. | |

| Uncontroverted Material Facts | Plaintiffs' Response: | Defendants' Replay and/or Objections |
|---|---|---|
| stood by the driver's side door. | | |
| 13.  After Druecker heard the initial, loud bang, and got out of his car, and stood by the driver's side door, he saw French run by, clutching his side. | Undisputed. | |
| 14.  Druecker testified that after French ran out of sight, he saw another man chasing French, coming from the direction that he heard the initial loud bang. | Undisputed. | |
| 15.  At the preliminary hearing, and the underlying criminal trial, and again during his November 11, 2016 deposition, Druecker testified that, for several seconds, he had an unobstructed view of the man chasing French, when he stopped directly in Druecker's line of sight. | Undisputed. | |
| 16.  Druecker testified that after the man chasing French stopped directly in his line of sight, he "raised both of his | Undisputed. | |

| Uncontroverted Material Facts | Plaintiffs' Response: | Defendants' Replay and/or Objections |
|---|---|---|
| hands with the gun and shot him again, shot at the guy." | | |
| 17. At trial, Druecker estimated how far the shooter was from him and the parties stipulated that it was 20 feet. | Undisputed that Druecker estimated that the shooter was approximately the same distance as the distance between the witness stand and two chairs, which the parties stipulated was approximately 20 feet. Disputed insofar as Druecker acknowledged at trial that the distance could have been 35 feet. **Dkt. 263, Battles Decl.: Ex. 100**, p. 59:3-10 (Druecker murder trial testimony).<br><br>Disputed that the distance was 20 feet. Based on Druecker's description on the day of the murder, both the LASD and SPPD estimated the distance at **40** feet. **Ex. 1.02**, p. 4 (SPPD Report) ("W's distance from S was approximately 40'"); **Ex. 1.04**, p. 6 (1/10/84 Police Report) (On the day of the murder, Mr. Druecker accompanied LASD homicide detectives to the parking lot where the incident occurred, and a walk-through was conducted. The 1/10/84 Police Report placed the | Plaintiffs fail to create a genuine issue of material fact. Mr. Druecker showed the attorneys and the court how far he was from the shooter and, based on that, the parties stipulated at trial that he was approximately 20 feet away from the shooter. |

| Uncontroverted Material Facts | Plaintiffs' Response: | Defendants' Replay and/or Objections |
|---|---|---|
| | distance between Mr. Druecker and the shooter at 40 feet.).<br><br>The distance between Mr. Druecker and the shooter could not have been much less than 36 feet because the overhang area where cars park was approximately 30 feet, and the description of the gunman was that he ran through the middle of the open carport area, not through the area where cars parked. **Ex. 1.02**, p. 4 (1/10/84 Police Report placing Suspect in the "middle of the carport); **Ex. 702**, p. 6 (Michel Report). | |
| 18.  When asked to describe the shooter at the preliminary hearing, Druecker testified: "he's white," "tall, about six foot three, he's slim built, had long hair" and he was wearing "kind of dirty clothes" and had "long," "messy" hair "down to the shoulder." | Undisputed. | |
| 19.  When asked at the preliminary hearing if Druecker | Undisputed. | |

| Uncontroverted Material Facts | Plaintiffs' Response: | Defendants' Replay and/or Objections |
|---|---|---|
| remembered the clothing the shooter was wearing, he testified the shooter was wearing "blue jeans with a [long sleeve] blue top." | | |
| 20. Also, at the preliminary hearing, Druecker testified that the shooter had a "dirty appearance" and that his clothing was "dirty," "wrinkled" and "worn." | Undisputed. | |
| 21. Centurion Ministries ("CM"), a company that investigates convictions of people that it considers to be wrongly charged, took on Plaintiff Frank O Connell's ("Plaintiff") case around 1997. | Objection. The cited testimony does not support the proposition for which it is cited. Vague as to the term "company." (CM is a non-profit organization). | Plaintiffs fail to create a genuine issue of material fact and they fail to comply with Central District of California Local Rules 56-2 and 56-3 which requires a party attempting to dispute a fact "to list genuine issues [of material fact] with appropriate record citations" necessary to "withstand the motion for summary judgment." *Nilsson v. Louisiana Hydroelec*, 854 F.2d 1538, 1545 (9th Cir. 1988) ("when a local rule such as Rule 7.14.3 [the predecessor to the current Local Rule 56-3] has been promulgated, it serves as |

| Uncontroverted Material Facts | Plaintiffs' Response: | Defendants' Replay and/or Objections |
|---|---|---|
| | | adequate notice to non-moving parties that if a genuine issue exists for trial, they must identify that issue and support it with evidentiary material"). Also, Kate Germond admitted that CM works to free wrongfully convicted people. During Germond's deposition, she reviewed a letter sent to a witness with her signature at the bottom which said, "I am writing to you because our organization works to free wrongly convicted people and we believe that in 1983 in South Pasadena a man was murdered and the police and prosecutors arrested and prosecuted the wrong man." Ex. R at 72: 8–20, CM000324. |
| 22. During the course of their investigation, one of the things CM did was to look into the weather conditions at the time of the murder to determine whether they may have adversely affected visibility conditions. | Undisputed. | |
| 23. CM used a service called | Undisputed. | |

| Uncontroverted Material Facts | Plaintiffs' Response: | Defendants' Replay and/or Objections |
|---|---|---|
| Compuweather experts to look into the weather conditions at the time of the murder. | | |
| 24. According to Compuweather experts, the weather at 1:00 p.m. on January 5, 1985 the sky was "mostly clear", "no precipitation was occurring" and "the visibility was unrestricted to the local horizon." | Undisputed. | |
| 25. Based on the Compuweather experts' findings, CM determined that weather did not adversely affect Druecker's ability to identify the shooter. | Undisputed. | |
| 26. At trial, Druecker was asked whether he was wearing glasses when he saw the shooter. | Undisputed. | |
| 27. Druecker testified, however, that he was given a choice by his doctor whether or not to get glasses because he did not even need them. | Undisputed that Druecker so testified in the 1985 trial.  Disputed that Druecker had no need to wear glasses. Though Druecker testified during the 1985 trial that a doctor had advised against | Plaintiffs fail to create a genuine issue of material fact.  Regardless of Druecker's testimony at his deposition concerning his need for glasses in college, at the |

10

| Uncontroverted Material Facts | Plaintiffs' Response: | Defendants' Replay and/or Objections |
|---|---|---|
| | wearing glasses, he failed to mention that this advice was before college (6 or more years before he testified). **Battles 3/24/17 Decl., Ex. 613**, Druecker Dep. Tr., p. 166:8 – 166:20.<br><br>Mr. Druecker testified at his deposition that, when he entered college, he began to need his glasses to see the chalkboard, and when he graduated college, he regularly wore contact lenses; by the time of the murder, he wore contacts 90% of the time; if they were bothering him, he would normally wear glasses. **Dkt. 265, Litt Decl., Ex. 613**, pp. 160:19-25 – 161:6, 164:13-20 (Druecker D. Tr., 160-164).<br><br>It is probable that Mr. Druecker was unaware of his refractive impairment during the January 1984 momentary viewing of the suspect because, although by January 1984, Mr. Druecker had sought and received correction for his distance vision anomaly for several years, the severity and duration of refractive conditions are frequently | underlying murder trial, Druecker testified that he was told by his eye doctor that he did not even need glasses and that he only wore them for the limited purpose of driving at night to judge distances. (*See*, Plaintiffs' Guilt MSJ Ex. 100 at pp. 109:24–110:11 (D3910:24–D3911:11).) In fact, Mr. Druecker was asked if he was able to see the numbers on the calendar in the courtroom clearly without his glasses on and he responded, "Yes, I am." (*See*, Plaintiffs' Guilt MSJ Ex. 100 at p. 109:24-27 (D3910:24-27).)<br><br>Also, any reference to Druecker's alleged refractive impairment during 1984 should be disregarded as lacking foundation, calling for speculation, and an improper expert opinion because page 7 of the Michel Report/Declaration indicates that he was unable to obtain Druecker's records from 1984. |

| Uncontroverted Material Facts | Plaintiffs' Response: | Defendants' Replay and/or Objections |
|---|---|---|
| | unappreciated by the patient until they are noticed or documented by a second party. **Ex. 702**, pp. 8-9 (Michel Report/Declaration). | |
| 28.  In fact, at first, Druecker's doctor advised against it. | <u>Disputed</u> that Druecker had no need to wear glasses. Though Druecker testified during the 1985 trial that a doctor had advised against wearing glasses, he failed to mention that this advice was before college (6 or more years before he testified). **Battles 3/24/17 Decl." Ex. 613**, Druecker Dep. Tr., p. 166:8 – 166:20.<br><br>Mr. Druecker testified at his deposition that, when he entered college, he began to need his glasses to see the chalkboard, and when he graduated college, he regularly wore contact lenses; by the time of the murder, he wore contacts 90% of the time; if they were bothering him, he would normally wear glasses. **Dkt. 265, Litt Decl., Ex. 613**, pp. 160:19-25 – 161:6, 164:13-20 (Druecker D. Tr., 160-164).<br><br>It is probable that Mr. Druecker was unaware of | Plaintiffs fail to create a genuine issue of material fact.<br><br>Regardless of Druecker's testimony at his deposition concerning his need for glasses in college, at the underlying murder trial, Druecker testified that he was told by his eye doctor that he did not even need glasses and that he only wore them for the limited purpose of driving at night to judge distances. (*See*, Plaintiffs' Guilt MSJ Ex. 100 at pp. 109:24–110:11 (D3910:24–D3911:11).)  In fact, Mr. Druecker was asked if he was able to see the numbers on the calendar in the courtroom clearly without his glasses on and he responded, "Yes, I am." (*See*, Plaintiffs' Guilt MSJ Ex. 100 at p. 109:24–27 (D3910:24–27).)<br><br>Also, any reference to Druecker's alleged refractive impairment |

| Uncontroverted Material Facts | Plaintiffs' Response: | Defendants' Replay and/or Objections |
|---|---|---|
| | his refractive impairment during the January 1984 momentary viewing of the suspect because, although by January 1984, Mr. Druecker had sought and received correction for his distance vision anomaly for several years, the severity and duration of refractive conditions are frequently unappreciated by the patient until they are noticed or documented by a second party. **Ex. 702**, pp. 8-9 (Michel Report/Declaration). | during 1984 should be disregarded as lacking foundation, calling for speculation, and an improper expert opinion because page 7 of the Michel Report/Declaration indicates that he was unable to obtain Druecker's records from 1984. |
| 29. During trial, Druecker was asked to look at the calendar in the courtroom without his glasses on. | Undisputed. | |
| 30. When asked at trial to look at the courtroom calendar and whether he could see the numbers on the courtroom calendar clearly, Druecker testified that he could. | Undisputed. | |
| 31. Druecker testified that his glasses were only for night driving. | Undisputed.<br><br>Disputed that Druecker had no need to wear glasses except for night driving. Though Druecker testified | Plaintiffs fail to create a genuine issue of material fact.<br><br>Regardless of Druecker's testimony at his deposition |

| Uncontroverted Material Facts | Plaintiffs' Response: | Defendants' Replay and/or Objections |
|---|---|---|
| | during the 1985 trial that a doctor had advised against wearing glasses, he failed to mention that this advice was before college (6 or more years before he testified). **Ex. 613**, Druecker Dep. Tr., p. 166:8 – 166:20.<br><br>Mr. Druecker testified at his deposition that, when he entered college, he began to need his glasses to see the chalkboard, and when he graduated college, he regularly wore contact lenses; by the time of the murder, he wore contacts 90% of the time; if they were bothering him, he would normally wear glasses. **Dkt. 265, Litt Decl., Ex. 613**, pp. 160:19-25 – 161:6, 164:13-20 (Druecker D. Tr., 160-164).<br><br>It is probable that Mr. Druecker was unaware of his refractive impairment during the January 1984 momentary viewing of the suspect because, although by January 1984, Mr. Druecker had sought and received correction for his distance vision anomaly for several years, the severity and duration of refractive | concerning his need for glasses in college, at the underlying murder trial, Druecker testified that he was told by his eye doctor that he did not even need glasses and that he only wore them for the limited purpose of driving at night to judge distances. (*See*, Plaintiffs' Guilt MSJ Ex. 100 at pp. 109:24–110:11 (D3910:24–D3911:11).)  In fact, Mr. Druecker was asked if he was able to see the numbers on the calendar in the courtroom clearly without his glasses on and he responded, "Yes, I am." (*See*, Plaintiffs' Guilt MSJ Ex. 100 at p. 109:24–27 (D3910:24–27).)<br><br>Also, any reference to Druecker's alleged refractive impairment during 1984 should be disregarded as lacking foundation, calling for speculation, and an improper expert opinion because page 7 of the Michel Report/Declaration indicates that he was unable to obtain Druecker's records from 1984. |

| Uncontroverted Material Facts | Plaintiffs' Response: | Defendants' Replay and/or Objections |
|---|---|---|
| | conditions are frequently unappreciated by the patient until they are noticed or documented by a second party. **Ex. 702**, pp. 8-9 (Michel Report/Declaration). | |
| 32.  After Druecker saw the shooter fire the gun, Druecker ducked behind his car. | <u>Undisputed</u>. | |
| 33.  After Druecker ducked behind his car, he waited a few moments, then got up and ran toward French. | <u>Undisputed</u>. | |
| 34.  As Druecker ran toward French, he saw pools of blood and followed the blood, which was splattered on the wall and on the walkway, all the way to the apartment manger's door. | <u>Undisputed</u>. | |
| 35.  When Druecker got to French, French was on the ground near the apartment manager's door and holding his side, screaming. | <u>Undisputed</u>. | |
| 36.  While Druecker was near French, while French was on | <u>Undisputed</u>. | |

| Uncontroverted Material Facts | Plaintiffs' Response: | Defendants' Replay and/or Objections |
|---|---|---|
| the ground near the apartment manager's door, Druecker heard French scream, "My god. That fucker in the yellow pinto shot me." | | |
| 37. Druecker testified that after French said, "That fucker in the yellow pinto shot me," people started coming out of the apartments, the manager came by, and somebody called the paramedics. | Undisputed. | |
| 38. Because the shooting occurred in South Pasadena, the South Pasadena Police Department ("SPPD") responded to the scene first and then, LASD Detectives arrived. | Undisputed. | |
| 39. LASD Sergeant Gilbert Parra ("Det. Parra") (deceased) and LASD Detective J.D. Smith ("Det. Smith") (retired) were eventually assigned to handle the investigation. | Undisputed. | |
| 40. Druecker, the eyewitness to the shooting, spoke to | Undisputed. | |

| Uncontroverted Material Facts | Plaintiffs' Response: | Defendants' Replay and/or Objections |
|---|---|---|
| investigators from both the SPPD and LASD on the day of the murder. | | |
| 41.  According to the SPPD January 5, 1984 Report, Druecker described the shooter as: male, white, "30's, 6-0+", with shoulder length, "dirty" hair, wearing blue jeans and a blue shirt. | <u>Undisputed</u> that Druecker provided this information. <u>Disputed</u> insofar as this summary does not reflect Druecker's complete description. Druecker also described the shooter as slim, with **dark brown hair**, wearing a blue t-shirt and with **no facial hair**. *See* **Defs. Ex. D** at D1006. | Plaintiffs fail to create a genuine issue of material fact.<br><br>Also, Plaintiffs' objection regarding the police reports as hearsay contradicts their response regarding Druecker's description. (*See*, UF 1.)<br><br>According to the SPPD January 5, 1984 Report, Druecker's statements were not inconsistent. |
| 42.  According to the January 10, 1984 Supplementary Report, Druecker described the shooter as: male, white, 6' - 6'3", slim, mid-thirties with shoulder length hair and a "dirty appearance," wearing "a blue long sleeve shirt and blue jeans or dirty [L]evis." | <u>Undisputed</u> that the report contains this description. <u>Disputed</u> that the 1/10/1984 report accurately reflects Daniel Druecker's statements. According to Detective Smith's handwritten notes, on 1/5/1984, Daniel Druecker described the assailant as a white male in his *mid to late* 30's. **Ex. 004.5**, p. 2. | Plaintiffs fail to create a genuine issue of material fact. There is nothing inconsistent about the information in the January 10, 1984 Supplementary Report and Detective Smith's handwritten notes. While some of the notes indicate "30+" (Plaintiff's Opp. to Randy Smith MSA Ex. 3.02-4) and other notes indicate "mid to late 30's" (Plaintiff's Opp. to Randy Smith MSA Ex. 004.5) the report (which indicates "30's") is not inconsistent.<br><br>Importantly, neither the |

| Uncontroverted Material Facts | Plaintiffs' Response: | Defendants' Replay and/or Objections |
|---|---|---|
| | | January 10, 1984 LASD Supplemental Report or the notes indicate that the shooter was shorter than 6'0" (and both indicate that the shooter was as tall as 6'3"). |
| | | In addition, both materials provide specific details of the clothing the shooter wore which undermines the notion that the eyewitness did not have a reasonable opportunity to view the shooter. Notably, the fact that both sets of materials describe the clothing worn by the shooter as "dirty" is consistent with fact that at the time of the murder Plaintiff had limited means and was living by crashing at other people's places. *See, e.g.,* Defendants' MSJ Ex. O at D1089:9-18 (shortly before moving into Jeanne's, Plaintiff was fired from his job); D1097:14-26 (when Plaintiff moved out of Jeanne's place, he "had no place to live"); D1116:2-8 (Plaintiff stated that he "didn't have much money" during the first week of January, 1984); D1118:25-D1119:18 (Plaintiff tells detectives in early 1984 that |

| **Uncontroverted Material Facts** | **Plaintiffs' Response:** | **Defendants' Replay and/or Objections** |
|---|---|---|
| | | he didn't have money for gas and also told the detectives that "I am completely broke."). In fact, according to the police reports, Plaintiff told the detectives that, on the day of the murder, he went to his ex-girlfriend's house to do laundry. (*See,* Defendants' MSJ Ex. F at D1042.) |
| 43. On January 6, 1984, the day after the murder, Druecker described the profile of the shooter to a composite sketch artist "to the best" of his ability. | <u>Undisputed</u>. | |
| 44. Based on Druecker's description, the composite sketch artist drew a composite sketch of the profile of the shooter. | <u>Undisputed</u>. | |
| 45. In providing the reasons supporting the decision to convict Plaintiff for the murder of French, the court said, among other things, that the composite sketch | <u>Objection</u>. The Court's opinion is irrelevant to any legal issue presented in this case and constitutes inadmissible hearsay insofar as it is offered for truth. FRE 401, 403, 801, 802. | Plaintiffs fail to create a genuine issue of material fact. The judge, who had opportunities to observe Plaintiff at the preliminary hearing, trial, and any other pre-trial hearings that Plaintiff attended, had more |

| Uncontroverted Material Facts | Plaintiffs' Response: | Defendants' Replay and/or Objections |
|---|---|---|
| "bears a striking resemblance to [Plaintiff]. Even now, I believe it's a striking resemblance to [Plaintiff]." | <u>Undisputed</u> that the Court characterized the sketch as bearing a striking resemblance; <u>Disputed</u> that it is possible to objectively determine whether the sketch in fact bears a resemblance to Frank O'Connell, or that the sketch in fact bears such a resemblance. *See e.g.*, **Dkt. 263, Battles Decl.: Ex. 100.17**, p. 21:26 - 21:28, 1984 Trial Tr. (defense closing argument) ("In my mind, I don't think they're close."); **Ex. 700-11** (Gary Wells Reprot/Declaration) (sketch does not show strong similarities to Plaintiff, and science on composites show they tend to produce extraordinarily poor likenesses"). <br><br> <u>Disputed</u> that the composite sketch resembled Plaintiff. Mr. Druecker testified at the O'Connell habeas hearing that he testified at the O'Connell habeas hearing that the sketch that was prepared did not look like the guy Mr. Druecker saw shooting. **Dkt. 265, Litt Decl., Ex. 201.01**, p. 27:8-19 (Dan Druecker habeas | than an ample opportunity to observe Plaintiff's profile and compare it to the composite sketch. There is no dispute that the judge noted that the composite sketch "bears a striking resemblance to [Plaintiff as he appeared in 1984 and 1985]. Even now, I believe it's a striking resemblance to [Plaintiff as he appeared at the trial in 1985]". (*See,* Defendants' MSJ Ex. N at D2208:9-12.) |

| Uncontroverted Material Facts | Plaintiffs' Response: | Defendants' Replay and/or Objections |
|---|---|---|
| | testimony); **Ex. 001.05** (Police artist sketch of suspect).<br><br>The composite in this case was basically consistent with Druecker's very general description; there is nothing about the nose, chin, eyes, lips or forehead that shows any strong similarities to O'Connell or that would not just as well (or better) fit a large share of the white male with longer brown hair population. The science on eyewitness face composites shows that they tend to produce extraordinarily poor likenesses of the individuals they are meant to depict and this is true even if the witness knows the person quite well. **Dkt. 263, Battles Decl.: Ex. 700**, p. 11 (Wells Report/Declaration). | |
| 46. According to the January 10, 1984 Supplementary Report, on January 5, 1984, at approximately 6:30 p.m., the Detectives spoke to Kenneth Dooley ("Dooley"), who lived in one of | Undisputed. | |

21

| Uncontroverted Material Facts | Plaintiffs' Response: | Defendants' Replay and/or Objections |
|---|---|---|
| the apartments at the murder location. | | |
| 47.  According to the January 10, 1984 Supplementary Report, Dooley told the Detectives that, at approximately 1:15 p.m., he was inside his apartment when he heard a male voice yell, "The fucker is going to shoot me." | Undisputed. | |
| 48.  According to the January 10, 1984 Supplementary Report, Dooley then heard a shot followed by footsteps, and heard the male voice say, "The mother fucker shot me." | Undisputed. | |
| 49.  According to the January 10, 1984 Supplementary Report, after hearing the shots, Dooley went onto his balcony and observed French, who he recognized as the apartment maintenance man, laying in front of the manager's door bleeding, with French's wife bending over him. | Undisputed. | |
| 50.  According to the | Undisputed. | |

| Uncontroverted Material Facts | Plaintiffs' Response: | Defendants' Replay and/or Objections |
|---|---|---|
| January 10, 1984 Supplementary Report, just before French died, Dooley heard him say, "This had something to do with Jeanne." | | |
| **UNDISPUTED MATERIAL FACTS REGARDING WITNESSES OBSERVING THE ASSAILANT FLEEING THE MURDER SCENE.** | | |
| 51. On January 5, 1984, at approximately 1:15 p.m., Arturo Villareal ("Villareal") was making a flower delivery at an apartment building on the 1800 block of State Street in South Pasadena. | Undisputed. | |
| 52. Villareal parked and exited his vehicle, and began walking around the car to grab plants, when he saw a man running from the building. | Undisputed. | |
| 53. Villareal testified that he saw the man running with a gun in his hand. | Undisputed. | |
| 54. Villareal also testified that he saw the man jump into a car, in the passenger's side, and took off. | Undisputed. | |
| 55. Villareal testified that the car he saw the | Undisputed. | |

| Uncontroverted Material Facts | Plaintiffs' Response: | Defendants' Replay and/or Objections |
|---|---|---|
| man with the gun fleeing the scene get into was a "really faded," yellow, Ford Pinto station wagon with wood panels on the side ("yellow Pinto"). | | |
| 56.  Villareal testified that the yellow Pinto was about 175 feet from him when he first saw it. | <u>Undisputed</u> that Villareal testified the Pinto was 175 feet away. <u>Disputed</u> that the distance was actually 175 feet away. Based on measurements taken by habeas investigators, Villareal observed the assailant from approximately **250 feet** away.<br><br>**Dkt. 263, Battles Decl., Ex. 204**, ¶8 (Declaration of Kate Germond); **Ex. 617**, pp. 280:3 – 282:4, Kate Germond Dep. Tr. | Plaintiffs fail to create a genuine issue of material fact. Kate Germond ("Germond") was not present during the 1984 murder and, therefore, her measurements are speculative and lack any foundation . |
| 57.  According to the January 10, 1984 Supplementary Report, on January 5, 1984, at approximately 5:50 p.m., the Detectives spoke to Villareal. | <u>Undisputed.</u> | |
| 58.  When Villareal was asked to describe the man he saw escape in the yellow Pinto, he said that he | <u>Objection.</u> Vague as to time. Villareal provided several descriptions of the shooter.<br><br><u>Disputed</u> insofar as this fact | Plaintiffs fail to create a genuine issue of material fact.<br><br>Villareal did not have an |

24

| Uncontroverted Material Facts | Plaintiffs' Response: | Defendants' Replay and/or Objections |
|---|---|---|
| was a white, male with long, shoulder-length hair, wearing blue jeans and a dark, long-sleeve, blue shirt. | does not accurately capture Villareal's descriptions of the shooter, none of which were consistent with Frank's physical appearance.<br>• On the day of the murder, Villareal described the shooter to SPPD officers as a white male, late-20's, approximately **5'10**, **160-170** lbs. with shoulder-length, blond hair. *This description was not consistent with Frank O'Connell.* **Dkt. 263, Ex. 1.2** (1/5/1984 South Pasadena Police Department Report), p. 6 (summary of interview of Villareal).<br>• Later that day, he described the shooter to LASD as 5'10-6'0, medium build, with **blond** hair. *This description was also inconsistent with Frank O'Connell.* **Defs Ex. E at 1023**.<br>• At the preliminary hearing, Villareal | opportunity to view the shooter at as close a distance as the sole eyewitness (Druecker) gave to the responding officers.<br><br>However, Villareal did give descriptions consistent with Plaintiff; he indicated that the person he saw was wearing a dark blue long sleeved shirt and faded blue jeans (which is consistent with the description of the clothing observed by Druecker). |

| Uncontroverted Material Facts | Plaintiffs' Response: | Defendants' Replay and/or Objections |
|---|---|---|
| | described the shooter as about 5'10, maybe 5'11, approx.. 160 lbs. (but could be a bit more), with blonde hair. *This description is inconsistent with Frank O'Connell.* **Defs Ex. M at D1776:20 - 1777:2** . <br><br> • At the trial, Villareal described the shooter as 5'10 or 5'11, weighing 160-170 lbs., wearing a sweatshirt. *This description is inconsistent with Frank O'Connell.* Defs Ex. N at D2007: 17 – D2008: 14. <br><br> Frank was 6'4 and 195 lbs. at the time of his arrest. **Dkt. 263, Ex. 1.12** (2/8/1984 Arrest Report), p. 1. | |
| 59.  Also, around the same time, i.e. on January 5, 1984, at approximately 1:15 p.m., Alex Sanchez ("Sanchez") was directing traffic on Fair Oaks and State Street in South | Undisputed. | |

| Uncontroverted Material Facts | Plaintiffs' Response: | Defendants' Replay and/or Objections |
|---|---|---|
| Pasadena when he noticed a Pinto coming through the intersection. | | |
| 60.  Sanchez testified that after he signaled for the Pinto to stop, the driver hesitated for a second, but then drove right through Fair Oaks. | Undisputed. | |
| 61.  At trial, Sanchez described the Pinto as a station wagon that was "faded yellow with faded wood paneling on the sides." | Undisputed. | |
| 62.  When asked to describe the occupants, Sanchez described the male passenger as white, "between 25 and 30" and said his hair was not straight and possibly "not combed." | Undisputed. | |
| **ADDITIONAL FACTS REGARDING VARIOUS WITNESS INTERVIEWS.** | | |
| 63.  According to the January 10, 1984 Supplementary Report, on January 5, 1984, at approximately 9:30 p.m., the Detectives spoke to Gina French | Undisputed. | |

| Uncontroverted Material Facts | Plaintiffs' Response: | Defendants' Replay and/or Objections |
|---|---|---|
| ("Gina"), who was French's wife at the time. | | |
| 64. According to the January 10, 1984 Supplementary Report, during Gina's January 5, 1984 interview, she told the Detectives that, at about 1:15 p.m. that same day, she heard a commotion in the building's courtyard when she ran outside and observed her husband laying, bleeding near the manager's apartment door. | Undisputed. | |
| 65. According to the January 10, 1984 Supplementary Report, during Gina's January 5, 1984 interview, she told the Detectives that, at the time of his murder, French had been engaged in—what Plaintiffs characterize in their FAC as—a longstanding dispute with his ex-wife, Jeanne, over the | Undisputed. | |

| <u>Uncontroverted Material Facts</u> | <u>Plaintiffs' Response:</u> | <u>Defendants' Replay and/or Objections</u> |
|---|---|---|
| custody of their child, Jay French Jr. ("Jay Jr."). | | |
| 66. According to the FAC, as of the date of his murder, French had custody of his son, but litigation over future custody continued and was "hotly" contested. | <u>Undisputed</u>. | |
| 67. During the underlying criminal trial, Gina testified that, after coming to French, just before he died, he told her, "[I]t looked like somebody [Jeanne] hangs around with, or somebody she hung around with." | <u>Undisputed</u> that Gina French so testified. <br><br> <u>Disputed</u> that her testimony accurately conveyed Jay French's dying statement. On the day of the murder, Gina French told police that Jay said the murder had to be "somebody or something to do with Jeanne. **Dkt. 263, Battles Decl., Ex. 1.4** (1/10/1984 investigation report), p. 7 (interview of Gina French). <br><br> Police and civilian witnesses reported that Jay French did not recognize the person who shot him. Jay French told the first officer to arrive, William Gitmed, that he did not recognize the person who shot him. **Ex. 1.2** (1/5/1984 South Pasadena Police Department Report), p. 4 | Plaintiffs fail to create a genuine issue of material fact. <br><br> Nothing in the cited notes indicate that either Ms. Wallach or Ms. Gwen indicated that they heard Mr. French say that he did not **recognize** the shooter. A person could recognize an individual who they may have seen once or twice before without necessarily **knowing them**. <br><br> The cited evidence indicates that French told Officer Gitmed that he did not **know** the person who shot him. A person can recognize an individual who they may have seen once or twice before without necessarily **knowing them**. |

| Uncontroverted Material Facts | Plaintiffs' Response: | Defendants' Replay and/or Objections |
|---|---|---|
| | ("V told Off Gitmed that a man in a yellow Pinto wagon had shot him and that he did not know the S."); **Ex. 100.8** pp. 10:7 – 11:17 (1985 Trial Tr., SPPD Off. Kent Stoddard testified that his report included "a statement from the victim indicating that he did not know who shot him"; stipulation between counsel that Jay French stated to Off. Gitmed that he did not recognize the gunman). **Dkt. 265, Litt Decl., Ex. 619** Gitmed D.Tr. p. 20:16-20.<br><br>According to handwritten notes, dated 1/6/1984, two other residents, Kimberly Wallach and Carol Gwenn, heard Mr. French say that he did not recognize the shooter. **Ex. 34**, p. 1, 3 (1/6/1984 notes reflecting interviews with Kimberly Wallach and Carol Gwenn). | The undisputed evidence in this case is that, on at least one occasion, French and Plaintiff had the opportunity to see each other (*see*, Declarations and Exhibits Submitted in Support of Defendants' MSJ Ex. V at (D1104:2-21, D1107:24-D1108:24).)<br><br>Given that French may have been able to recognize Plaintiff from the one or more occasions he had an opportunity to see Plaintiff, it is irrelevant whether he knew Plaintiff or not. Given the dying declaration by French it is indication that he recognized the shooter. |
| 68. According to the January 10, 1984 Supplementary Report, the Detectives interviewed Jeanne Lyon ("Jeanne"), on January 6, 1984 at approximately 2:45 p.m., the day after the | Undisputed. | |

| Uncontroverted Material Facts | Plaintiffs' Response: | Defendants' Replay and/or Objections |
|---|---|---|
| murder. | | |
| 69. During her January 6, 1984 interview, Jeanne denied any involvement in the murder. | Undisputed. | |
| 70. During her January 6, 1984 interview, Jeanne also told the Detectives about a person she referred to as a "cousin," by the name of Frank O'Connell, who had stayed with her and her husband for a period of time over the summer of 1983. | Undisputed. | |
| 71. During the January 6, 1984 interview, Jeanne also told the Detectives that the last time she saw Plaintiff was on the night of January 1, 1984, while she, her family, and Plaintiff were cruising Colorado Boulevard, after the Rose Bowl. | Undisputed. | |
| 72. Later on January 6, 1984, at approximately 9:10 p.m. (after Jeanne had already been interviewed once), the | Undisputed. | |

| Uncontroverted Material Facts | Plaintiffs' Response: | Defendants' Replay and/or Objections |
|---|---|---|
| Detectives interviewed Edward Gerald Lyons, Jr. ("Ed"), Jeanne's then husband, at the Temple City Sheriff's Station. | | |
| 73. Jeanne was present during Ed's January 6, 1984 interview and during this interview Jeanne told the Detectives that Plaintiff was, in fact, not a cousin. | Undisputed. | |
| 74. On January 6, 1984, Jeanne also advised the Detectives that Plaintiff was staying somewhere in La Verne, and provided Plaintiff's phone number. | Undisputed. | |
| 75. On January 7, 1984, the Detectives interviewed Jay Jr. | Undisputed. | |
| 76. Gina was present during the January 7, 1984 interview of Jay Jr. | Undisputed. | |
| 77. According to the January 10, 1984 Supplementary Report, during the January 7, 1984 interview of Jay Jr., Jay Jr. told the | Undisputed. | |

| Uncontroverted Material Facts | Plaintiffs' Response: | Defendants' Replay and/or Objections |
|---|---|---|
| Detectives that he was familiar with Plaintiff, and that Plaintiff was introduced to him as Ed's "cousin." | | |
| 78. According to the January 10, 1984 Supplementary Report, during the January 7, 1984 interview of Jay Jr., Jay Jr. said that, on occasion, Plaintiff stayed overnight with him, his mother (Jeanne) and his younger brother. | Undisputed that the police report indicates that Jay Jr. so informed the LASD; without contemporaneous notes or a recording of the interview it cannot be determined what Jay Jr. said. | |
| 79. According to the January 10, 1984 Supplementary Report, during the January 7, 1984 interview of Jay Jr., Jay Jr. also informed the Detectives that he had seen Jeanne and Plaintiff in bed together, openly embracing, and kissing, while his stepfather (Ed) was away. | Undisputed that the police report indicates that Jay Jr. so informed the LASD; without contemporaneous notes or a recording of the interview it cannot be determined what Jay Jr. said. | |
| 80. According to the January 10, 1984 Supplementary Report, on January 9, 1984, the Detectives went to the Flower | Undisputed. | |

| Uncontroverted Material Facts | Plaintiffs' Response: | Defendants' Replay and/or Objections |
|---|---|---|
| Box Flower Shop where Villareal worked as a delivery boy. | | |
| 81. According to the January 10, 1984 Supplementary Report, on January 9, 1984, the Detectives interviewed Villareal regarding the January 5, 1984 murder of Jay French. | <u>Undisputed</u>. | |
| 82. According to the January 10, 1984 Supplementary Report, during their January 9, 1984 interview with Villareal, the Detectives brought a six pack photograph array ("six pack"), also known as a mug show up folder, with them. | <u>Undisputed</u>. | |
| 83. The six pack, used to assist with witness identifications of suspects, consisted of a photograph/mug shot of a suspect (here, Plaintiff) and five photographs/mug shots, placed in random order, of similar looking people: who are the | <u>Undisputed</u> that a six pack should consist of six similar looking people of the same gender, age range and who have similar facial features.<br><br><u>Disputed</u> insofar as the only remaining copy of the six-pack is black and white and of such poor quality that it is difficult to determine the degree of similarity between | Plaintiffs fail to create a genuine issue of material fact.<br><br>Defendants' MSJ Ex. H (D3587) depicts a clearer copy of the six pack than the one submitted by Plaintiffs in their Opposition to the instant MSJ. Therefore, Plaintiffs exhibit is an inaccurate representation of |

| Uncontroverted Material Facts | Plaintiffs' Response: | Defendants' Replay and/or Objections |
|---|---|---|
| same gender, race, age range, and have similar facial features to the suspect in question. | the photos. *See* **Ex. 221.01** (copy of 6-pack photo lineup). | "the only remaining copy of the six-pack." |
| 84. According to the January 10, 1984 Supplementary Report, during that interview, the Detectives presented Villareal with the six pack to see whether he could identify the man he saw running from 1800 State Street, with a gun in his hand, on January 5, 1984. | Undisputed. | |
| 85. According to the January 10, 1984 Supplementary Report, during that interview, the Detectives admonished Villareal prior to showing him the six pack. | Undisputed that the report so indicates.<br><br>Disputed that Villareal was properly admonished. Detective Smith testified, regarding the admonishment of Mr. Villareal in reviewing the photospread, that he told Mr. Villareal both that "We told him that we were going to show him six Pictures that would be close -- that would depict close – facial references of people, and that any one of the people pictured may or may not have been at the scene, | Plaintiffs fail to create a genuine issue of material fact.<br><br>It is also undisputed, without objection, that Lara asked Villareal about the Detectives' ID procedures and confirmed that the Detectives did not pressure him or make any leading statements. (UF 159–160.)<br><br>While it is Defendants'' contention that Villareal was properly admonished, even, assuming *arguendo*, Villareal was not "properly" admonished, the |

| Uncontroverted Material Facts | Plaintiffs' Response: | Defendants' Replay and/or Objections |
|---|---|---|
| | and that it was important to pick out the person if he thought the person was possibly the person that he had seen, and it was just as important to not pick out anyone if he wasn't sure." **Dkt. 263, Battles Decl.: Ex. 100,** p. 209:5 – 209:15 (1984 Trial Tr., J.D. Smith). | lack of an admonishment prior to an identification procedure will not render it unconstitutional. *U.S. v. Carr*, 761 F.3d 1068, 1074–75 (9th Cir. 2014). |
| 86. During the criminal trial, Villareal testified about being shown a six pack to determine whether he could identify any person in the photos as the assailant he saw running with a gun and jumping into the yellow Pinto, on January 5, 1985. | Undisputed. | |
| 87. According to the January 10, 1984 Supplementary Report, during that interview, Villareal selected photo #3 (Plaintiff) as the "strongest contender," after looking at the six pack for "several moments." | Undisputed that the police report states that Villareal chose #3.<br><br>Disputed that Villareal was able to make a positive identification. At the preliminary hearing and trial, Villareal testified that he had *not* been able to make a positive identification and had only chosen the person who most resembled the | Plaintiffs fail to create a genuine issue of material fact. At the criminal trial Villareal was asked, "And now you remember which one you picked out," referring to the six pack he was shown by the LASD investigators. Villareal replied, "Number 3," which was Plaintiff. (*See*, Defendants' MSJ Ex. N at D2009: 6–17.) |

| Uncontroverted Material Facts | Plaintiffs' Response: | Defendants' Replay and/or Objections |
|---|---|---|
| | assailant. **Dkt. 263, Battles Decl.: Ex. 100**, pp. 168:26 – 170:2, 1985 Tr. Tr. (testimony of Arturo Villareal). Villareal specifically testified that, when the detective administered the photo lineup, he told him that the photo he selected "looked like the man [he] saw, but [he] couldn't be positive." ***Ibid***, p. 169:12 – 169:21. Villareal confirmed that he picked out a person who resembled the assailant but was "not sure" it was the same person. ***Ibid.*** 169:19 – 170:2. | Also, when shown the photos, Villareal remembered pointing to Plaintiff's photo (#3) and saying "he is the strongest contender and I'm sure that's him." (Plaintiffs' Ex. 100.07 at 32:1–3(D3991:1–3.) <br><br> Also Villareal testified at the criminal trial that he was not 100% positive that Plaintiff was the person he saw (precisely what the allegedly non-disclosed notes indicated). (Plaintiffs' Ex. 100.07 at 11:1-28 (D3970:1-28).) |
| 88. At trial, Villareal testified that he was able to identify a person in the six pack, and selected photo #3 (Plaintiff). | <u>Disputed</u> that Villareal testified that he was able to identify the person he saw. At the preliminary hearing <u>and</u> trial, Villareal testified that he had *not* been able to make a positive identification and had only chosen the person who most resembled the assailant. **Dkt. 263, Battles Decl.: Ex. 100**, pp. 168:26 – 170:2, 1985 Tr. Tr. (testimony of Arturo Villareal). Villareal specifically testified that, when the detective administered the photo | Plaintiffs fail to create a genuine issue of material fact. At the criminal trial Villareal was asked, "And now you remember which one you picked out," referring to the six pack he was shown by the LASD investigators. Villareal replied, "Number 3," which was Plaintiff. (*See*, Defendants' MSJ Ex. N at D2009: 6–17.) <br><br> Also, when shown the photos, Villareal remembered pointing to Plaintiff's photo (#3) and |

| Uncontroverted Material Facts | Plaintiffs' Response: | Defendants' Replay and/or Objections |
|---|---|---|
| | lineup, he told him that the photo he selected "looked like the man [he] saw, but [he] couldn't be positive." ***Ibid***, p. 169:12 – 169:21. Villareal confirmed that he picked out a person who resembled the assailant but was "not sure" it was the same person. ***Ibid.*** 169:19 – 170:2. | saying "he is the strongest contender and I'm sure that's him." (Plaintiffs' Ex. 100.07 at 32:1–3 (D3991:1–3.)<br><br>Also Villareal testified at the criminal trial that he was not 100% positive that Plaintiff was the person he saw (precisely what the allegedly non-disclosed notes indicated). (Plaintiffs' Ex. 100.07 at 11:1–28 (D3970:1–28.)) |
| 89. Villareal testified that he told the Detectives that the person he chose (Plaintiff), "looked like the man [he] saw" but he couldn't be positive. | Undisputed. | |
| 90. On January 9, 1984, the Detectives interviewed Jeanne again at the Temple City Sheriff's Station, at which time she advised the Detectives that she and Plaintiff had first met over Memorial Day weekend of 1983. | Undisputed. | |
| 91. During the January 9, 1984 | Undisputed. | |

| Uncontroverted Material Facts | Plaintiffs' Response: | Defendants' Replay and/or Objections |
|---|---|---|
| interview of Jeanne, she also informed the Detectives that Plaintiff lived with her for approximately six weeks during the summer of 1983. | | |
| 92. Jeanne lived at 1609 Shepard Street in Duarte. | Undisputed. | |
| 93. During the approximate six weeks Plaintiff lived with Jeanne at 1609 Shepard Street, they engaged in sexual activity. | Undisputed. | |
| ADDITIONAL UNDISPUTED MATERIAL FACTS REGARDING EYEWITNESS DANIEL DRUECKER'S IDENTIFICATION OF PLAINTIFF. | | |
| 94. According to the January 10, 1984 Supplementary Report, on January 9, 1984, the Detectives interviewed Druecker to determine whether he could identify the shooter he saw on January 5, 1985. | Undisputed. | |
| 95. According to the January 10, 1985 Supplementary Report, Druecker was admonished regarding the six pack "mug show up procedure." | Objection. Hearsay, FRE 801, 802. The police report's statements regarding detectives' communications with Druecker are admissible hearsay.<br><br>Undisputed that the police | Plaintiffs fail to create a genuine issue of material fact. At the *habeas*, Druecker testified the Detectives did advise him prior to showing him the six pack. (Defendants' MSJ Ex. O at D2310: 8–10.) |

| Uncontroverted Material Facts | Plaintiffs' Response: | Defendants' Replay and/or Objections |
|---|---|---|
| | report so states.<br><br>Disputed that Det. Smith admonished Daniel Druecker before showing him the six-pack. Druecker has testified that he does not recall being told that the person he saw may not be in the six-pack or that he did not have to choose a photo.<br><br>**Battles 3/24/17 Decl., Ex. 201.01**, Habeas Tr. (Daniel Druecker), pp. 28:27 – 29:17 (Druecker did not recall detectives reading anything before they opened the folder, advising that the person he saw may or may not be in the photos, or telling him he was not expected to choose someone) **Ex. 613**, Dep. of Daniel Druecker, pp. 217:8 – 224:24 (does not recall being admonished).<br><br>Disputed that Druecker was properly admonished. Detective Smith testified, regarding the admonishment of Mr. Villareal in reviewing the photospread, that he told Mr. Villareal both that "We told him that we were going to show him six Pictures | Druecker further testified that he did not remember everything the officers told him during the ID procedures. (UF 115–116; Defendants' MSJ Ex. O at D2310: 11–17.) Also, it is undisputed, without objection, that no one from the LASD, DA's Office, or SPPD ever asked Druecker to lie, and specifically asked him to tell the truth.  (UF 108–114.)<br><br>While it is Defendants' contention that Druecker was properly admonished, even, assuming *arguendo*, Druecker was not "properly" admonished, the lack of an admonishment prior to an identification procedure will not render it unconstitutional. *U.S. v. Carr*, 761 F.3d 1068, 1074–75 (9th Cir. 2014). |

40

| Uncontroverted Material Facts | Plaintiffs' Response: | Defendants' Replay and/or Objections |
|---|---|---|
| | that would be close -- that would depict close –facial references of people, and that any one of the people pictured may or may not have been at the scene, and that it was important to pick out the person if he thought the person was possibly the person that he had seen, and it was just as important to not pick out anyone if he wasn't sure." This admonishment improperly suggests that a witness may select a photo based on *resemblance* not *recognition*. **Dkt. 263, Battles Decl.: Ex. 100,** p. 209:5 – 209:15 (1984 Trial Tr., J.D. Smith). | |
| 96. According to the January 10, 1985 Supplementary Report, Druecker looked at the six pack and pointed to photo # 3 (Plaintiff). | Objection. Hearsay, FRE 801, 802. The police report's statements regarding detectives' communications with Druecker are admissible hearsay.<br><br>Undisputed.<br><br>Disputed insofar as this suggests that Druecker made a positive identification. Mr. Druecker testified at the O'Connell habeas hearing that, when he was shown the photospread, he told the | Plaintiffs fail to create a genuine issue of material fact.<br><br>Druecker testified he had no doubt in his mind "at all" about his identification of Plaintiff as the gunman (1) in the six pack, (2) at the preliminary hearing, (3) and at trial. (Defendants' MSJ Ex. N at D1897: 5–D1898: 5.)<br><br>Regardless of Druecker's testimony at his deposition concerning his need for |

| Uncontroverted Material Facts | Plaintiffs' Response: | Defendants' Replay and/or Objections |
|---|---|---|
| | Detectives that he only saw the shooter's profile and did not recognize anyone from the photospread. **Dkt. 263, Battles Decl.: Ex. 201.01**, pp. 30:13-32:2 (Druecker testimony at O'Connell habeas). Mr. Druecker testified at the O'Connell habeas hearing that, after he told Detectives he did not recognize anyone, their tone changed, and they told him to really look. **Ibid**, p. 32:8-13 (Druecker testimony at O'Connell habeas). Mr. Druecker testified at the O'Connell habeas hearing that he pointed to #3 in the photospread and asked, "Is this the guy?" to which the Detectives responded by asking if he was identifying that person as the shooter. **Ibid.** p. 33:5-18 (Druecker testimony at O'Connell habeas). Mr. Druecker testified at the O'Connell habeas hearing that he did not identify # three because he recognized him; he never got a good look at the shooter. **Ibid.**, p. 34:1-5 (Druecker testimony at O'Connell habeas). Mr. Druecker testified at the O'Connell habeas hearing that, after he chose Photo # | glasses in college, at the underlying murder trial, Druecker testified that he was told by his eye doctor that he did not even need glasses and that he only wore them for the limited purpose of driving at night to judge distances. (*See*, Plaintiffs' Guilt MSJ Ex. 100 at pp. 109:24–110:11 (D3910:24–D3911:11).)  In fact, Mr. Druecker was asked if he was able to see the numbers on the calendar in the courtroom clearly without his glasses on and he responded, "Yes, I am." (*See*, Plaintiffs' Guilt MSJ Ex. 100 at p. 109:24–27 (D3910:24–27).)<br><br>Also, any reference to Druecker's alleged refractive impairment during 1984 should be disregarded as lacking foundation, calling for speculation, and an improper expert opinion because page 7 of the Michel Report/Declaration indicates that he was unable to obtain Druecker's records from 1984. |

| <u>Uncontroverted Material Facts</u> | <u>Plaintiffs' Response:</u> | <u>Defendants' Replay and/or Objections</u> |
|---|---|---|
| | 3, a detective made a phone call in his presence saying a positive ID was made, which he interpreted to mean they caught the guy and he had picked the person it had to be. ***Ibid.***, p. 34:11-21 (Druecker testimony at O'Connell habeas).<br><br>Disputed that Druecker could see well enough to make a reliable identification. Druecker was not wearing his contacts or glasses at the time of the murder. **Dkt. 263, Battles Decl.:  Ex. 100**, pp. 105:19 – 106:1, 1985 Trial Tr. (testimony of Daniel Druecker).<br><br>It is extremely likely that Mr. Druecker's visual acuities (in either or both eyes) was at best 20/200 at the time of the witnessed event and it is more likely than not that it was 20/300 or worse. At the conservative estimate of 20/200 vision and 30 feet distance, he was the equivalent of a football field away.  Reliable witness observation would have not been possible for Daniel | |

| Uncontroverted Material Facts | Plaintiffs' Response: | Defendants' Replay and/or Objections |
|---|---|---|
| | Druecker due to the limitations of Mr. Druecker's eyesight and his limited observation. **Ex. 702**, pp. 7,9 (Michel Report/ Declaration); **Ex. 701**, p. 2 (Gorin Report/ Declaration). | |
| 97. At the preliminary hearing, Druecker testified that he first identified the shooter as photo #3 (Plaintiff), on January 9, 1984, when the Detectives came to his apartment and showed him a six pack. | <u>Undisputed</u> that Druecker so testified.<br><br><u>Disputed</u> insofar as this suggests that Druecker made a positive identification. Mr. Druecker testified at the O'Connell habeas hearing that, when he was shown the photospread, he told the Detectives that he only saw the shooter's profile and did not recognize anyone from the photospread. **Dkt. 263, Battles Decl.: Ex. 201.01**, pp. 30:13-32:2 (Druecker testimony at O'Connell habeas). Mr. Druecker testified at the O'Connell habeas hearing that, after he told Detectives he did not recognize anyone, their tone changed, and they told him to really look. ***Ibid***, p. 32:8-13 (Druecker testimony at O'Connell habeas). Mr. Druecker testified at the O'Connell habeas hearing that he pointed to #3 in the photospread and asked, "Is | Plaintiffs fail to create a genuine issue of material fact.<br><br>Druecker testified he had no doubt in his mind "at all" about his identification of Plaintiff as the gunman (1) in the six pack, (2) at the preliminary hearing, (3) and at trial. (Defendants' MSJ Ex. N at D1897: 5–D1898: 5.)<br><br>Regardless of Druecker's testimony at his deposition concerning his need for glasses in college, at the underlying murder trial, Druecker testified that he was told by his eye doctor that he did not even need glasses and that he only wore them for the limited purpose of driving at night to judge distances. (*See*, Plaintiffs' Guilt MSJ Ex. 100 at pp. 109:24–110:11 (D3910:24–D3911:11).) In fact, Mr. Druecker was |

| Uncontroverted Material Facts | Plaintiffs' Response: | Defendants' Replay and/or Objections |
|---|---|---|
| | this the guy?" to which the Detectives responded by asking if he was identifying that person as the shooter. *Ibid.* p. 33:5-18 (Druecker testimony at O'Connell habeas). Mr. Druecker testified at the O'Connell habeas hearing that he did not identify # three because he recognized him; he never got a good look at the shooter. *Ibid.*, p. 34:1-5 (Druecker testimony at O'Connell habeas). Mr. Druecker testified at the O'Connell habeas hearing that, after he chose Photo # 3, a detective made a phone call in his presence saying a positive ID was made, which he interpreted to mean they caught the guy and he had picked the person it had to be. *Ibid.*, p. 34:11-21 (Druecker testimony at O'Connell habeas).<br><br>Disputed that Druecker could see well enough to make a reliable identification. Druecker was not wearing his contacts or glasses at the time of the murder. **Dkt. 263, Battles Decl.:  Ex. 100**, pp. 105:19 | asked if he was able to see the numbers on the calendar in the courtroom clearly without his glasses on and he responded, "Yes, I am." (*See*, Plaintiffs' Guilt MSJ Ex. 100 at p. 109:24–27 (D3910:24–27).)<br><br>Also, any reference to Druecker's alleged refractive impairment during 1984 should be disregarded as lacking foundation, calling for speculation, and an improper expert opinion because page 7 of the Michel Report/Declaration indicates that he was unable to obtain Druecker's records from 1984. |

| Uncontroverted Material Facts | Plaintiffs' Response: | Defendants' Replay and/or Objections |
|---|---|---|
| | – 106:1, 1985 Trial Tr. (testimony of Daniel Druecker). It is extremely likely that Mr. Druecker's visual acuities (in either or both eyes) was at best 20/200 at the time of the witnessed event and it is more likely than not that it was 20/300 or worse. At the conservative estimate of 20/200 vision and 30 feet distance, he was the equivalent of a football field away.  Reliable witness observation would have not been possible for Daniel Druecker due to the limitations of Mr. Druecker's eyesight and his limited observation. **Ex. 702**, pp. 7,9 (Michel Report/ Declaration); **Ex. 701**, p. 2 (Gorin Report/ Declaration). | |
| 98. In his November 11, 2016 deposition, Druecker admitted that his memory regarding the incident was better at the preliminary hearing compared to the other two times he testified about the January 5, 1984 murder, because | Undisputed, but immaterial to any legal issue presented by Defendants' motion. Insofar as this is relevant at all, it is relevant to the trier of fact's assessment of the *credibility* of Druecker's habeas testimony. The Court's function is "not to weigh the evidence…but *to determine whether there is a* | |

| **Uncontroverted Material Facts** | **Plaintiffs' Response:** | **Defendants' Replay and/or Objections** |
|---|---|---|
| it was closest in time to the incident and "because [he] was still in his 20's." | *genuine issue* for trial…Credibility determinations the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249-255 (1986) (emphasis added).  For summary judgment purposes, the question is whether Plaintiffs have established a genuine dispute of fact as to whether Detectives caused the introduction an impermissibly suggestive and unreliable identification testimony. The credibility of Druecker's testimony regarding his interactions with police in 1984 has no bearing on this inquiry. | |
| 99. At the preliminary hearing, the court asked Plaintiff to stand so Druecker could "compare his build and weight" before making an identification. | Undisputed. | |
| 100. At the preliminary hearing, Druecker asked that Plaintiff "turn sideways" so he could see a profile of | Undisputed. | |

| **Uncontroverted Material Facts** | **Plaintiffs' Response:** | **Defendants' Replay and/or Objections** |
|---|---|---|
| Plaintiff. | | |
| 101. At the preliminary hearing, after Plaintiff stood up and turned sideways so Druecker could see his profile, Druecker said, "That's him." | Undisputed that Druecker so testified.<br><br>Disputed that Druecker was able to identify Plaintiff. Druecker has recanted his identification during the preliminary hearing. Mr. Druecker testified at the O'Connell habeas hearing that, when he picked O'Connell out at the preliminary hearing, that testimony was not true. He never got a good look at the man and had no idea what he looked like. **Dkt. 263, Battles Decl.: Ex. 201.01**, pp. 35:11-36:3 (Druecker testimony at O'Connell habeas).<br><br>Disputed that Druecker could see well enough to make a reliable identification. Druecker was not wearing his contacts or glasses at the time of the murder. **Ex. 100**, pp. 105:19 – 106:1, 1985 Trial Tr. (testimony of Daniel Druecker).<br><br>It is extremely likely that Mr. Druecker's visual acuities (in either or both eyes) was at best 20/200 at | Plaintiffs fail to create a genuine issue of material fact.<br><br>Druecker testified he had no doubt in his mind "at all" about his identification of Plaintiff as the gunman (1) in the six pack, (2) at the preliminary hearing, (3) and at trial. (Defendants' MSJ Ex. N at D1897: 5–D1898: 5.)<br><br>Druecker was steadfast in his identification for over twenty years. Druecker admitted that, when CM first contacted him, they showed up unannounced at his door, stated that they helped the "wrongly accused" and that they were trying to help Plaintiff get his conviction overturned. (*See*, Defendants' Addl. MSJ Ex. AJ at pp. 67:14-68:1 (P001286–P001287:1).<br><br>Druecker even testified that Germond told him that "she believed [Plaintiff] was falsely accused." (See Defendants' MSJ Ex. Q at 122: 21–25; Defendants' MSJ Ex. O at D2334: 20– |

| **Uncontroverted Material Facts** | **Plaintiffs' Response:** | **Defendants' Replay and/or Objections** |
|---|---|---|
| | the time of the witnessed event and it is more likely than not that it was 20/300 or worse. At the conservative estimate of 20/200 vision and 30 feet distance, he was the equivalent of a football field away.  Reliable witness observation would have not been possible for Daniel Druecker due to the limitations of Mr. Druecker's eyesight and his limited observation. **Ex. 702**, pp. 7,9 (Michel Report/ Declaration); **Ex. 701**, p. 2 (Gorin Report/ Declaration). | D2335: 1.)

Even CM's own investigator admitted that such a tactic would not only be "heavy handed", but also taint witnesses. (*See*, Defendants' Randy Smith MSA Addl. Ex. C (Germond Depo.) at 62:20–74:13 and CM 00324 (October 20019 letter from CM  investigator Germond to "Mr. Redman" asserting that CM was trying to undo Plaintiff's conviction because he was "wrongly convicted".)

Druecker testified that he was told by his eye doctor that he did not even need glasses and that he only wore them for the limited purpose of driving at night to judge distances. (*See*, Plaintiffs' Guilt MSJ Ex. 100 at pp. 109:24–110:11 (D3910:24–D3911:11).)  In fact, Mr. Druecker was asked if he was able to see the numbers on the calendar in the courtroom clearly without his glasses on and he responded, "Yes, I am." (*See*, Plaintiffs' Guilt MSJ Ex. 100 at p. 109:24–27 (D3910:24–27).) |

| Uncontroverted Material Facts | Plaintiffs' Response: | Defendants' Replay and/or Objections |
|---|---|---|
| | | Also, any reference to Druecker's alleged refractive impairment during 1984 should be disregarded as lacking foundation, calling for speculation, and an improper expert opinion because page 7 of the Michel Report/Declaration indicates that he was unable to obtain Druecker's records from 1984. |
| 102. At the preliminary hearing and at the criminal trial, Druecker identified Plaintiff as the person who shot French. | Undisputed that Druecker so testified.<br><br>Disputed that Druecker was able to identify Plaintiff. Druecker has recanted his identification during the preliminary hearing. Mr. Druecker testified at the O'Connell habeas hearing that, when he picked O'Connell out at the preliminary hearing, that testimony was not true. He never got a good look at the man and had no idea what he looked like. **Dkt. 263, Battles Decl.:  Ex. 201.01**, pp. 35:11-36:3 (Druecker testimony at O'Connell habeas).<br><br>Disputed that Druecker could see well enough to | Plaintiffs fail to create a genuine issue of material fact.<br><br>Druecker testified he had no doubt in his mind "at all" about his identification of Plaintiff as the gunman (1) in the six pack, (2) at the preliminary hearing, (3) and at trial. (Defendants' MSJ Ex. N at D1897: 5–D1898: 5.)<br><br>Druecker was steadfast in his identification for over twenty years. Druecker admitted that, when CM first contacted him, they showed up unannounced at his door, stated that they helped the "wrongly accused" and that they were trying to help Plaintiff get |

| Uncontroverted Material Facts | Plaintiffs' Response: | Defendants' Replay and/or Objections |
|---|---|---|
| | make a reliable identification. Druecker was not wearing his contacts or glasses at the time of the murder. **Ex. 100**, pp. 105:19 – 106:1, 1985 Trial Tr. (testimony of Daniel Druecker).

It is extremely likely that Mr. Druecker's visual acuities (in either or both eyes) was at best 20/200 at the time of the witnessed event and it is more likely than not that it was 20/300 or worse. At the conservative estimate of 20/200 vision and 30 feet distance, he was the equivalent of a football field away.  Reliable witness observation would have not been possible for Daniel Druecker due to the limitations of Mr. Druecker's eyesight and his limited observation. **Ex. 702**, pp. 7,9 (Michel Report/ Declaration); **Ex. 701**, p. 2 (Gorin Report/ Declaration). | his conviction overturned. (*See*, Defendants' Addl. MSJ Ex. AJ at pp. 67:14-68:1 (P001286–P001287:1).

Druecker even testified that Germond told him that "she believed [Plaintiff] was falsely accused." (See Defendants' MSJ Ex. Q at 122: 21–25; Defendants' MSJ Ex. O at D2334: 20–D2335: 1.)

Even CM's own investigator admitted that such a tactic would not only be "heavy handed", but also taint witnesses. (*See*, Defendants' Randy Smith MSA Addl. Ex. C (Germond Depo.) at 62:20–74:13 and CM 00324 (October 20019 letter from CM  investigator Germond to "Mr. Redman" asserting that CM was trying to undo Plaintiff's conviction because he was "wrongly convicted".)

Regardless of Druecker's testimony at his deposition concerning his need for glasses in college, at the underlying murder trial, Druecker testified that he |

| Uncontroverted Material Facts | Plaintiffs' Response: | Defendants' Replay and/or Objections |
|---|---|---|
| | | was told by his eye doctor that he did not even need glasses and that he only wore them for the limited purpose of driving at night to judge distances. (*See*, Plaintiffs' Guilt MSJ Ex. 100 at pp. 109:24–110:11 (D3910:24–D3911:11).) In fact, Mr. Druecker was asked if he was able to see the numbers on the calendar in the courtroom clearly without his glasses on and he responded, "Yes, I am." (*See*, Plaintiffs' Guilt MSJ Ex. 100 at p. 109:24–27 (D3910:24–27).) <br><br>Also, any reference to Druecker's alleged refractive impairment during 1984 should be disregarded as lacking foundation, calling for speculation, and an improper expert opinion because page 7 of the Michel Report/Declaration indicates that he was unable to obtain Druecker's records from 1984. |
| 103. At the underlying criminal trial, Druecker identified Plaintiff as the gunman. | Undisputed that Druecker so testified. <br><br> Disputed that Druecker was able to identify Plaintiff. | Plaintiffs fail to create a genuine issue of material fact. <br><br> Druecker testified he had no |

| Uncontroverted Material Facts | Plaintiffs' Response: | Defendants' Replay and/or Objections |
|---|---|---|
| | Druecker has recanted his identification during the preliminary hearing. Mr. Druecker testified at the O'Connell habeas hearing that, when he picked O'Connell out at the preliminary hearing, that testimony was not true. He never got a good look at the man and had no idea what he looked like. **Dkt. 263, Battles Decl.: Ex. 201.01**, pp. 35:11-36:3 (Druecker testimony at O'Connell habeas).

Disputed that Druecker could see well enough to make a reliable identification. Druecker was not wearing his contacts or glasses at the time of the murder. **Ex. 100**, pp. 105:19 – 106:1, 1985 Trial Tr. (testimony of Daniel Druecker).

It is extremely likely that Mr. Druecker's visual acuities (in either or both eyes) was at best 20/200 at the time of the witnessed event and it is more likely than not that it was 20/300 or worse. At the conservative estimate of 20/200 vision and 30 feet | doubt in his mind "at all" about his identification of Plaintiff as the gunman (1) in the six pack, (2) at the preliminary hearing, (3) and at trial. (Defendants' MSJ Ex. N at D1897: 5–D1898: 5.)

Druecker was steadfast in his identification for over twenty years. Druecker admitted that, when CM first contacted him, they showed up unannounced at his door, stated that they helped the "wrongly accused" and that they were trying to help Plaintiff get his conviction overturned. (*See*, Defendants' Addl. MSJ Ex. AJ at pp. 67:14–68:1 (P001286–P001287:1).

Druecker even testified that Germond told him that "she believed [Plaintiff] was falsely accused." (*See* Defendants' MSJ Ex. Q at 122: 21–25; Defendants' MSJ Ex. O at D2334: 20–D2335: 1.)

Even CM's own investigator admitted that such a tactic would not only be "heavy handed", but also |

| Uncontroverted Material Facts | Plaintiffs' Response: | Defendants' Replay and/or Objections |
|---|---|---|
| | distance, he was the equivalent of a football field away.  Reliable witness observation would have not been possible for Daniel Druecker due to the limitations of Mr. Druecker's eyesight and his limited observation. **Ex. 702**, pp. 7,9 (Michel Report/ Declaration); **Ex. 701**, p. 2 (Gorin Report/ Declaration). | taint witnesses. (*See*, Defendants' Randy Smith MSA Addl. Ex. C (Germond Depo.) at 62:20–74:13 and CM 00324 (October 20019 letter from CM  investigator Germond to "Mr. Redman" asserting that CM was trying to undo Plaintiff's conviction because he was "wrongly convicted".)

Regardless of Druecker's testimony at his deposition concerning his need for glasses in college, at the underlying murder trial, Druecker testified that he was told by his eye doctor that he did not even need glasses and that he only wore them for the limited purpose of driving at night to judge distances. (*See*, Plaintiffs' Guilt MSJ Ex. 100 at pp. 109:24–110:11 (D3910:24–D3911:11).)  In fact, Mr. Druecker was asked if he was able to see the numbers on the calendar in the courtroom clearly without his glasses on and he responded, "Yes, I am." (*See*, Plaintiffs' Guilt MSJ Ex. 100 at p. 109:24–27 (D3910:24–27).) |

| Uncontroverted Material Facts | Plaintiffs' Response: | Defendants' Replay and/or Objections |
|---|---|---|
| | | Also, any reference to Druecker's alleged refractive impairment during 1984 should be disregarded as lacking foundation, calling for speculation, and an improper expert opinion because page 7 of the Michel Report/Declaration indicates that he was unable to obtain Druecker's records from 1984. |
| 104. At the underlying criminal trial, Druecker testified that he had also identified Plaintiff as the gunman when picking him out in the six pack and at the preliminary hearing. | <u>Undisputed</u> that Druecker so testified.<br><br><u>Disputed</u> that Druecker recognized Plaintiff from the six-pack. Mr. Druecker testified at the O'Connell habeas hearing that, when he was shown the photospread, he told the Detectives that he only saw the shooter's profile and did not recognize anyone from the photospread. **Dkt. 263, Battles Decl.: Ex. 201.01**, pp. 30:13-32:2 (Druecker testimony at O'Connell habeas). Mr. Druecker testified at the O'Connell habeas hearing that, after he told Detectives he did not recognize anyone, their tone changed, and they told him to really look. **Ibid**, p. 32:8- | Plaintiffs fail to create a genuine issue of material fact.<br><br>Druecker testified he had no doubt in his mind "at all" about his identification of Plaintiff as the gunman (1) in the six pack, (2) at the preliminary hearing, (3) and at trial. (Defendants' MSJ Ex. N at D1897: 5–D1898: 5.)<br><br>Druecker was steadfast in his identification for over twenty years. Druecker admitted that, when CM first contacted him, they showed up unannounced at his door, stated that they helped the "wrongly accused" and that they were trying to help Plaintiff get |

| Uncontroverted Material Facts | Plaintiffs' Response: | Defendants' Replay and/or Objections |
|---|---|---|
| | 13 (Druecker testimony at O'Connell habeas). Mr. Druecker testified at the O'Connell habeas hearing that he pointed to #3 in the photospread and asked, "Is this the guy?" to which the Detectives responded by asking if he was identifying that person as the shooter. *Ibid.* p. 33:5-18 (Druecker testimony at O'Connell habeas). Mr. Druecker testified at the O'Connell habeas hearing that he did not identify # three because he recognized him; he never got a good look at the shooter. *Ibid.*, p. 34:1-5 (Druecker testimony at O'Connell habeas). Mr. Druecker testified at the O'Connell habeas hearing that, after he chose Photo # 3, a detective made a phone call in his presence saying a positive ID was made, which he interpreted to mean they caught the guy and he had picked the person it had to be. *Ibid.*, p. 34:11-21 (Druecker testimony at O'Connell habeas). <br><br> Disputed that Druecker recognized Plaintiff in | his conviction overturned. (*See*, Defendants' MSJ Addl. Ex. AJ at pp. 67:14–68:1 (P001286–P001287:1). <br><br> Druecker even testified that Germond told him that "she believed [Plaintiff] was falsely accused." (See Defendants' MSJ Ex. Q at 122: 21–25; Defendants' MSJ Ex. O at D2334: 20–D2335: 1.) <br><br> Even CM's own investigator admitted that such a tactic would not only be "heavy handed", but also taint witnesses. (*See*, Defendants' Randy Smith MSA Addl. Ex. C (Germond Depo.) at 62:20–74:13 and CM 00324 (October 20019 letter from CM investigator Germond to "Mr. Redman" asserting that CM was trying to undo Plaintiff's conviction because he was "wrongly convicted".) <br><br> Regardless of Druecker's testimony at his deposition concerning his need for glasses in college, at the underlying murder trial, Druecker testified that he |

| Uncontroverted Material Facts | Plaintiffs' Response: | Defendants' Replay and/or Objections |
|---|---|---|
| | Court. Mr. Druecker testified at the O'Connell habeas hearing that, when he picked O'Connell out at the preliminary hearing, that testimony was not true. He never got a good look at the man and had no idea what he looked like. **Ex. 201.01**, pp. 35:11-36:3 (Druecker testimony at O'Connell habeas).<br><br>Disputed that Druecker could see well enough to make a reliable identification. Druecker was not wearing his contacts or glasses at the time of the murder. **Ex. 100**, pp. 105:19 – 106:1, 1985 Trial Tr. (testimony of Daniel Druecker).<br><br>It is extremely likely that Mr. Druecker's visual acuities (in either or both eyes) was at best 20/200 at the time of the witnessed event and it is more likely than not that it was 20/300 or worse. At the conservative estimate of 20/200 vision and 30 feet distance, he was the equivalent of a football field away. Reliable witness observation would | was told by his eye doctor that he did not even need glasses and that he only wore them for the limited purpose of driving at night to judge distances. (*See*, Plaintiffs' Guilt MSJ Ex. 100 at pp. 109:24–110:11 (D3910:24–D3911:11).) In fact, Mr. Druecker was asked if he was able to see the numbers on the calendar in the courtroom clearly without his glasses on and he responded, "Yes, I am." (*See*, Plaintiffs' Guilt MSJ Ex. 100 at p. 109:24–27 (D3910:24–27).)<br><br>Also, any reference to Druecker's alleged refractive impairment during 1984 should be disregarded as lacking foundation, calling for speculation, and an improper expert opinion because page 7 of the Michel Report/Declaration indicates that he was unable to obtain Druecker's records from 1984. |

| Uncontroverted Material Facts | Plaintiffs' Response: | Defendants' Replay and/or Objections |
|---|---|---|
| | have not been possible for Daniel Druecker due to the limitations of Mr. Druecker's eyesight and his limited observation. **Ex. 702**, pp. 7,9 (Michel Report/ Declaration); **Ex. 701**, p. 2 (Gorin Report/ Declaration). | |
| 105. At the underlying criminal trial, Druecker testified that he had **no doubt in his mind "at all"** about his identification of Plaintiff as the gunman. | <u>Undisputed</u> that he so testified. <u>Disputed</u> that his professed confidence has any bearing on the reliability of his identification. Mr. Druecker testified at the O'Connell habeas hearing that, after he chose Photo # 3, a detective made a phone call in his presence saying a positive ID was made, which he interpreted to mean they caught the guy and he had picked the person it had to be. **Dkt. 263, Battles Decl.: Ex. 201.01**, p. 34:11-21 (Druecker testimony at O'Connell habeas).  As explained by Gary Wells, seemingly-confirmatory responses from a lineup administrator may lead witnesses to develop an inflated sense of confidence that they identified the right person. **Ex. 700**, p. 14 (Wells Report/Declaration). | Plaintiffs fail to create a genuine issue of material fact.

Plaintiff's defense team was aware that Druecker identified Plaintiff in a six pack photo line-up and had the opportunity to interview Druecker to gauge the strength and reliability of his identification.

Also, Druecker testified he had no doubt in his mind "at all" about his identification of Plaintiff as the gunman (1) in the six pack, (2) at the preliminary hearing, (3) and at trial. (*See* Defendants' MSJ Ex. N at D1897: 5–D1898: 5; Plaintiffs' Ex. 100 at D3852:6–D3853:5); also, Druecker was interviewed by Plaintiff's defense counsel during the underlying criminal trial and was cross-examined **twice** (at the preliminary |

| Uncontroverted Material Facts | Plaintiffs' Response: | Defendants' Replay and/or Objections |
|---|---|---|
| | | hearing and trial) about his identification and did not express doubt regarding his identification.<br><br>Plaintiffs' assertions regarding Druecker's confidence are immaterial because there is no meaningful "suppression" within the meaning of *Brady* "if the **means** of obtaining the exculpatory evidence has been provided to the defense." *U.S. v. Dupuy*, 760 F.2d 1492, 1502 (9th Cir. 1985) (emphasis added); *U.S. v. Griggs*, 713 F.2d 672, 674 (11th Cir. 1983). |
| 106. At the underlying criminal trial, Druecker was asked the following question about his selection of Plaintiff's photo in the six-pack: "Would it be fair to say that, when you settled on number 3 [Plaintiff's photo], in your mind was that the person or was that the closest person resembling the gunman?" | Undisputed. | |
| 107. At the underlying criminal | Undisputed. | Plaintiffs fail to create a genuine issue of material |

| Uncontroverted Material Facts | Plaintiffs' Response: | Defendants' Replay and/or Objections |
|---|---|---|
| trial, in response to the question: "Would it be fair to say that, when you settled on number 3 [Plaintiff's photo], in your mind was that the person or was that the closest person resembling the gunman?" Druecker responded, "That was the person." | Disputed that Druecker could see well enough to make a reliable identification. Druecker was not wearing his contacts or glasses at the time of the murder. **Dkt. 263, Battles Decl.: Ex. 100**, pp. 105:19 – 106:1, 1985 Trial Tr. (testimony of Daniel Druecker). It is extremely likely that Mr. Druecker's visual acuities (in either or both eyes) was at best 20/200 at the time of the witnessed event and it is more likely than not that it was 20/300 or worse. At the conservative estimate of 20/200 vision and 30 feet distance, he was the equivalent of a football field away. Reliable witness observation would have not been possible for Daniel Druecker due to the limitations of Mr. Druecker's eyesight and his limited observation. **Ex. 702**, pp. 7,9 (Michel Report/Declaration); **Ex. 701**, p. 2 (Gorin Report/Declaration). | fact.<br><br>Druecker testified that he was told by his eye doctor that he did not even need glasses and that he only wore them for the limited purpose of driving at night to judge distances. (*See*, Plaintiffs' Guilt MSJ Ex. 100 at pp. 109:24–110:11 (D3910:24–D3911:11).) In fact, Mr. Druecker was asked if he was able to see the numbers on the calendar in the courtroom clearly without his glasses on and he responded, "Yes, I am." (*See*, Plaintiffs' Guilt MSJ Ex. 100 at p. 109:24–27 (D3910:24–27).)<br><br>Also, any reference to Druecker's alleged refractive impairment during 1984 should be disregarded as lacking foundation, calling for speculation, and an improper expert opinion because page 7 of the Michel Report/Declaration indicates that he was unable to obtain Druecker's records from 1984. |
| 108. During his November 11, 2016 | Undisputed. | |

| Uncontroverted Material Facts | Plaintiffs' Response: | Defendants' Replay and/or Objections |
|---|---|---|
| deposition, Druecker testified that, at no time prior to the preliminary hearing was he instructed to lie. | | |
| 109. During his November 11, 2016 deposition, Druecker testified that, no one from the LASD asked him to lie. | Undisputed. | |
| 110. During his November 11, 2016 deposition, Druecker testified that, J.D. Smith never asked him to lie. | Undisputed. | |
| 111. During his November 11, 2016 deposition, Druecker testified that, Gilbert Parra never asked him to lie. | Undisputed. | |
| 112. During his November 11, 2016 deposition, Druecker testified that, no one from the District Attorney's Office ("DA's Office") asked him to lie. | Undisputed. | |
| 113. During his November 11, 2016 deposition, Druecker testified that, none of the police, including the policemen from | Undisputed. | |

| Uncontroverted Material Facts | Plaintiffs' Response: | Defendants' Replay and/or Objections |
|---|---|---|
| SPPD asked him to lie. | | |
| 114. During his November 11, 2016 deposition, Druecker testified that, law enforcement specifically asked him to tell the truth. | <u>Undisputed</u>. | |
| 115. During his November 11, 2016 deposition, Druecker testified that, he remembered when the Detectives showed him the six pack to determine whether he could identify the shooter in the January 5, 1984 shooting of Jay French. | <u>Undisputed</u>. | |
| 116. During his November 11, 2016 deposition, Druecker testified that he did not remember every specific thing the Detectives told him. | <u>Undisputed</u>. | |
| 117. During the *habeas*, Druecker and Det. Smith testified, and at the criminal trial Det. Smith testified that, before showing him the six pack, the Detectives admonished Druecker. | <u>Objection.</u> The cited testimony **does not support the proposition that Druecker testified at the habeas that detectives admonished him.** To the contrary, he stated that detectives did <u>not</u> admonish him. *Defs* Ex Ex. O at D2310: 8 – 10. | Plaintiffs fail to create a genuine issue of material fact. At the *habeas*, Druecker testified the Detectives did advise him prior to showing him the six pack. (Defendants' MSJ Ex. O at D2310: 8–10.) Druecker further testified that he did not remember |

| Uncontroverted Material Facts | Plaintiffs' Response: | Defendants' Replay and/or Objections |
|---|---|---|
| | Disputed that Det. Smith admonished Daniel Druecker before showing him the six-pack. Druecker has testified that he does not recall being told that the person he saw may not be in the six-pack or that he did not have to choose a photo. **Battles 3/24/17 Decl.: Ex. 201.01**, Habeas Tr. (Daniel Druecker), pp. 28:27 – 29:17 (Druecker did not recall detectives reading anything before they opened the folder, advising that the person he saw may or may not be in the photos, or telling him he was not expected to choose someone) **Ex. 613**, Dep. of Daniel Druecker, pp. 217:8 – 224:24 (does not recall being admonished).<br><br>Disputed that Druecker was properly admonished. Detective Smith testified, regarding the admonishment of Mr. Villareal in reviewing the photospread, that he told Mr. Villareal both that "We told him that we were going to show him six Pictures that would be close -- that would depict close –facial | everything the officers told him during the ID procedures. (UF 115–116; Defendants' MSJ Ex. O at D2310: 11–17.) Importantly, it is undisputed, without objection, that the no one from the LASD, DA's Office, or SPPD ever asked Druecker to lie, and specifically asked him to tell the truth.  (UF 108–114.)<br><br>While it is Defendants' contention that Druecker was properly admonished, even, assuming *arguendo*, Druecker was not "properly" admonished, the lack of an admonishment prior to an identification procedure will not render it unconstitutional. *U.S. v. Carr*, 761 F.3d 1068, 1074–75 (9th Cir. 2014). |

63

| Uncontroverted Material Facts | Plaintiffs' Response: | Defendants' Replay and/or Objections |
|---|---|---|
| | references of people, and that any one of the people pictured may or may not have been at the scene, and that it was important to pick out the person if he thought the person was possibly the person that he had seen, and it was just as important to not pick out anyone if he wasn't sure." This admonishment improperly suggests that a witness may select a photo based on *resemblance* not *recognition*. **Dkt. 263, Battles Decl.: Ex. 100,** p. 209:5 – 209:15 (1984 Trial Tr., J.D. Smith). | |
| 118. During his November 11, 2016 deposition, Druecker testified that, he looked at the photos carefully. | Undisputed. | |
| 119. During his November 11, 2016 deposition, Druecker testified that, he remembered when the Detectives showed him the six pack to determine whether he could identify the shooter in the January 5, 1984 shooting of Jay French. | Undisputed. | |

| Uncontroverted Material Facts | Plaintiffs' Response: | Defendants' Replay and/or Objections |
|---|---|---|
| 120. During his November 11, 2016 deposition, Druecker testified that, at no time during the six-pack identification procedure, did the Detectives tell Druecker that they weren't going to leave until Druecker picked a photo. | Undisputed. | |
| 121. During his November 11, 2016 deposition, Druecker testified that the Detectives did not tap on any photo during the six-pack identification procedure. | Undisputed. | |
| 122. The only photograph Druecker pointed to was the photograph of Plaintiff. | Undisputed. | |
| 123. During his November 11, 2016 deposition, Druecker testified that at no time prior to Druecker pointing to Plaintiff's photo (photo #3) did the Detectives do anything suggestive. | Objection. Vague and ambiguous as to "suggestive." The question specifically asked whether detectives did anything "suggestive" the "the manner" of tapping on the photo. *Defs* Ex. Q at 102: 22 – 103: 1.<br><br>The testimony consists of expert legal opinion that | Plaintiffs fail to create a genuine issue of material fact. |

65

| **Uncontroverted Material Facts** | **Plaintiffs' Response:** | **Defendants' Replay and/or Objections** |
|---|---|---|
| | Druecker is not qualified to offer. FRE 701, 702. <br><br> <u>Undisputed</u> that Druecker so testified. | |
| 124. At the 2011 *Habeas* proceedings and during his 2016 Deposition, when describing his interactions with the Detectives, Druecker admitted that they "were always professional". | <u>Objection</u>. As the deposition testimony reveals, the term "professional" is ambiguous in this context. <br><br> <u>Disputed</u> that Druecker agreed in his deposition that detectives were "professional." When asked whether the detectives were professional, he answered "you can be professional and you can be crook." He went on to say: "A person can be dressed professionally and they can be either honest or dishonest. Not to say that Sheriffs were dishonest, but people can be professional and they can also have another agenda….I would say [describe them as] overbearing, intimidating." Druecker clarified that they were professional in demeanor, yet still intimidating and overbearing. **Battles 3/24/17 Decl.: Ex. 613**, Druecker Deposition, p. 133:2 - 134:4. | Plaintiffs fail to create a genuine issue of material fact. <br><br> The fact that the witness may have felt internal pressure was not impermissibly suggestive when the witness was not claiming to be "deprived of food, friends, and counsel, *Reck v. Pate*, 367 U.S. 433, 441–42 [] (1961), or deprived of sleep, *Ashcraft v. Tennessee*, 322 U.S. 143, 153[] (1944), or subjected to extended interrogation, *Chambers v. Florida*, 309 U.S. 227, 238–39 [] (1940), or that she was mentally disabled and subjected to misleading questioning, *U.S. v. Preston*, 751 F.3d 1008, 1017–18 (9th Cir.2014) (en banc)." *Id.*; *see also Cameron v. Brown*, 2016 WL 796011, at *7 (C.D. CA 2016) (holding that when a detective repeatedly said, "Do your best," in a photo lineup, he did not exert undue influence and "any |

| Uncontroverted Material Facts | Plaintiffs' Response: | Defendants' Replay and/or Objections |
|---|---|---|
| | | sense of obligation [the witness] felt was merely a 'personal feeling' [sic] not a feeling compelled by [the detective]."). |
| 125. At the 2011 *Habeas* proceedings, Druecker said he "gave the [Detectives] and the prosecutor what they wanted" because he "felt they wanted [him] to pick out that man that [he] picked out in the lineup." | Undisputed that he so testified. | |
| 126. At the 2011 *Habeas* proceedings, Druecker admitted that the prosecutor never told him that she "wanted [him] to pick out that man that I picked out in the lineup." | Undisputed. | |
| 127. At the 2011 *Habeas* proceedings, when asked what it was, specifically, that the Detectives wanted him to do, Druecker said that "they wanted [him] to tell the truth." | Undisputed. | |
| 128. During his November 11, 2016 deposition, Druecker testified that he | Undisputed. | |

| Uncontroverted Material Facts | Plaintiffs' Response: | Defendants' Replay and/or Objections |
|---|---|---|
| remembered nothing was obstructing his view of the shooter, when the shooter stood directly in his line of sight. | | |
| 129. During his November 11, 2016 deposition, Druecker testified that he had a personal recollection (on the date of the deposition) of the way the shooter stood when he stopped directly in Druecker's line of sight. | <u>Undisputed</u>. <u>Disputed</u> that Druecker had sufficient vision to see the shooter's facial features and make an identification. | Plaintiffs fail to create a genuine issue of material fact; this fact does not reference facial features. |
| 130. During his November 11, 2016 deposition, Druecker testified that he "vividly" recalled how the shooter was standing when he stopped directly in Druecker's line of sight. | <u>Undisputed</u>. | |
| 131. During his November 11, 2016 deposition, Druecker testified that his personal recollection of the way the shooter stood, when he stopped directly in Druecker's line of sight, was with his legs apart, arms | <u>Undisputed</u>. | |

| Uncontroverted Material Facts | Plaintiffs' Response: | Defendants' Replay and/or Objections |
|---|---|---|
| pointed straight out, and with two hands on a black, long barrel gun. | | |
| 132. At his November 11, 2016 deposition, Druecker testified that he recalled details regarding what the suspect was wearing. | Undisputed. | |
| 133. At his November 11, 2016 deposition, Druecker testified that he recalled details regarding what the suspect was wearing when he stood directly in his line of sight before firing the second shot. | Undisputed. | |
| 134. At his November 11, 2016 deposition, Druecker testified that he had the opportunity to observe the shooter's height and build when the shooter stopped directly in his line of sight before firing the second shot. | Undisputed. | |

| Uncontroverted Material Facts | Plaintiffs' Response: | Defendants' Replay and/or Objections |
|---|---|---|
| 135. At his November 11, 2016 deposition, Druecker testified that he remembered seeing that the shooter was tall, had long, wavy hair, and was wearing a long-sleeve, blue shirt and dark blue, dirty looking jeans. | Undisputed. | |
| **UNDISPUTED MATERIAL FACTS ABOUT JEANNE LYON'S NEIGHBORS SEEING A YELLOW PINTO PARKED AT OR NEAR JEANNE'S HOUSE AND NEIGHBOR MAURICE SOUCY'S CONNECTING PLAINTIFF TO THE YELLOW PINTO.** | | |
| 136. In late January and early February, 1984, the Detectives interviewed several of Jeanne's neighbors. | Undisputed. | |
| 137. On February 6, 1984, the Detectives interviewed Maurice Soucy ("Soucy"), and his wife Ina, who both lived across the street from Jeanne between 1983 and 1984. | Undisputed. | |
| 138. The Detectives interviewed Soucy and his wife, Ina, about whether they had seen a yellow pinto in the | Undisputed. | |

| Uncontroverted Material Facts | Plaintiffs' Response: | Defendants' Replay and/or Objections |
|---|---|---|
| neighborhood and/or the driver of a yellow Pinto. | | |
| 139. According to the February 8, 1984 Supplementary Report, Soucy indicated that he had seen a yellow Pinto at or near Jeanne's house. | Objection. Hearsay, FRE 801, 802. The police report's summaries of witness statements are admissible hearsay.<br><br>Undisputed. | Plaintiffs do not create a genuine issue of material fact.<br><br>Plaintiffs' objection to the admission of any police report statements for their truth is irrelevant as such evidence is admissible as the officers present sense impression, record of a regularly conducted activity, and going to the Detectives' state of mind. FRE 803. |
| 140. According to the February 8, 1984 Supplementary Report, Soucy said he had seen the driver of the yellow Pinto as well. | Undisputed. | |
| 141. According to the February 8, 1984 Supplementary Report, Soucy said he saw the yellow Pinto driven by a "male, white, approximately 30, 6'2", 180 pounds, slender build, with sandy hair." | Undisputed. | |
| 142. According to the February 8, 1984 | Undisputed. | |

| Uncontroverted Material Facts | Plaintiffs' Response: | Defendants' Replay and/or Objections |
|---|---|---|
| Supplementary Report, he had seen the driver of the yellow Pinto, on several occasions, in front of Jeanne's residence, hugging and kissing. | | |
| 143. According to the February 8, 1984 Supplementary Report, Soucy said that when looking into the back window of the yellow Pinto, he saw male clothing and work tools. | Undisputed. | |
| 144. During the February 6, 1984 interview, the Detectives also asked Soucy if he could identify the driver of the yellow Pinto in a six pack. | Undisputed that detectives asked Soucy whether he could identify the driver of the yellow Pinto in a six pack. | |
| 145. Soucy identified photo #3 (Plaintiff) as the same man that he observed at Jeanne's place driving the yellow Pinto. | Objection. Hearsay, FRE 801, 802. The police report is inadmissible as evidence for whether Mr. Soucy made an identification.

Disputed that Mr. Soucy positively identified photo #3. Detective Smith's handwritten notes indicate that Soucy identified two photos from the six-pack as possibly resembling the | Plaintiffs fail to create a genuine issue of material fact.

Soucy identified Plaintiff as a male, white individual attached to a yellow Pinto who stayed with Jeanne or frequently visited her for an approximate six week period following Memorial Day, 1983. While Plaintiffs argue that notes indicating |

| <u>Uncontroverted Material Facts</u> | <u>Plaintiffs' Response:</u> | <u>Defendants' Replay and/or Objections</u> |
|---|---|---|
| | person he observed driving the Pinto. **Dkt. 263, Battles Decl.: Ex. 5.1** (excerpt of handwritten notes produced by LASD); **Ex. 35**, pp. 3 <u>COLA Response to RFA 67</u> (Admission that JD Smith authored notes Bates stamped D2926 - D2955). Another detective's notes indicate that Soucy identified Frank's photo as the "poss." driver of the vehicle he had seen. **Ex. 7.1**, p. 2 (excerpt of handwritten notes produced by the LASD). | that he did not definitively identify Plaintiff (photo #3), but also indicated that it could it could have "possibly" been a different person (photo #1), there is corroborating evidence provided by Soucy to both the LASD detectives and Plaintiff's own defense attorney (i.e. there is no evidence that any other male, whites moved in to Jeanne's place during the approximate six week period following Memorial Day of 1983), so the only person he could have seen staying at Jeanne's and driving a yellow Pinto for an approximate six week period following Memorial Day of 1983 was Plaintiff. (*See,* UF 170; Defendants' MSJ Ex. U at D4886.) |
| 146. According to the February 8, 1984 Supplementary Report, Ina also saw the yellow Pinto on her block. | <u>Objection.</u> Hearsay, FRE 801, 802. The police report is inadmissible as evidence of Ina Soucy's statements. <br><br> <u>Undisputed.</u> | Plaintiffs do not create a genuine issue of material fact. FRE 80 –03. |
| 147. According to the February 8, 1984 Supplementary Report, Ina also saw the driver of the yellow Pinto. | <u>Objection.</u> Hearsay, FRE 801, 802. The police report is inadmissible as evidence of Ina Soucy's statements. <br><br> <u>Undisputed.</u> | Plaintiffs do not create a genuine issue of material fact. FRE 80 –03. |

| Uncontroverted Material Facts | Plaintiffs' Response: | Defendants' Replay and/or Objections |
|---|---|---|
| 148. According to the February 8, 1984 Supplementary Report, Ina also selected photo #3 (Plaintiff) after being shown the six pack. | Objection. Hearsay, FRE 801, 802. The police report is inadmissible as evidence of any purported identification by Ina Soucy.<br><br>Undisputed. | Plaintiffs do not create a genuine issue of material fact. FRE 80 –03. |
| 149. On February 10, 1984, less than a week after being interviewed by the LASD Detectives, Soucy was also interviewed by Plaintiff's Public Defender, Adolfo Lara ("Lara") and/or Lara's investigator. | Undisputed. | |
| 150. According to a Public Defender's Investigation Report generated prior to Plaintiff's criminal trial, Soucy told Lara (and/or his public defender's investigator) about "a man who drove a yellow pinto" who was "either living at, or very frequently vising [Jeanne's] house." | Undisputed. | |
| 151. According to a Public Defender's Investigation Report generated prior to Plaintiff's criminal | Undisputed. | |

| Uncontroverted Material Facts | Plaintiffs' Response: | Defendants' Replay and/or Objections |
|---|---|---|
| trial, Soucy saw the man staying at Jeanne's place, driving a yellow Pinto, shortly after Memorial Day 1983 until the middle of summer 1983. | | |
| 152. According to a Public Defender's Investigation Report generated prior to Plaintiff's criminal trial, Soucy "describe[d] the vehicle" as: "an older model, yellow Pinto station wagon with wood or simulated wood, sides. | Undisputed. | |
| 153. According to a Public Defender's Investigation Report generated prior to Plaintiff's criminal trial, Soucy "describe[d] this man" as: tall, 6'1" to 6'2", 175 – 180 [pounds], good build." | Undisputed. | |
| 154. According to a Public Defender's Investigation Report generated prior to Plaintiff's criminal trial, Druecker was also interviewed by | Undisputed. | |

| Uncontroverted Material Facts | Plaintiffs' Response: | Defendants' Replay and/or Objections |
|---|---|---|
| Lara (and/or his public defender's investigator). | | |
| 155. According to a Public Defender's Investigation Report generated prior to Plaintiff's criminal trial, during the interview, Druecker walked through the parking area where the murder occurred and talked about the man he saw who shot French, on January 5, 1984. | Undisputed. | |
| 156. According to a Public Defender's Investigation Report generated prior to Plaintiff's criminal trial, during the interview, Druecker insisted "he watched the action until after the second shot before ducking behind the car." | Undisputed. | |
| 157. According to a Public Defender's Investigation Report generated prior to Plaintiff's criminal trial, Villareal was also interviewed by Lara (and/or his public defender's | Undisputed. | |

| Uncontroverted Material Facts | Plaintiffs' Response: | Defendants' Replay and/or Objections |
|---|---|---|
| investigator). | | |
| 158. According to a Public Defender's Investigation Report generated prior to Plaintiff's criminal trial, during the interview, Villareal talked about the man he saw on January 5, 1984 running from State Street and jumping into a yellow pinto. | Objection. Relevance, FRE 401. Plaintiffs do not assert that detectives failed to disclose exculpatory information with regard to Villareal, beyond the falsity of the characterizations in their police reports. Villareal's statements to defense counsel are irrelevant to any liability issue in this case.  Undisputed. | Plaintiffs fail to create a genuine issue of material fact.  Additionally, Plaintiffs contradict themselves where in Plaintiffs' Opposition, they claim the LASD "failed to disclose all of detectives' handwritten notes." (Pl. Opp. 7:28 – 8: 2.) |
| 159. According to a Public Defender's Investigation Report generated prior to Plaintiff's criminal trial, during the interview, Villareal also talked about the identification procedures performed by the LASD. | Undisputed. | |
| 160. According to a Public Defender's Investigation Report generated prior to Plaintiff's criminal trial, during the interview, Villareal stated that "Smith and Parra [] did not pressure him or make any leading statements." | Undisputed. | |

| Uncontroverted Material Facts | Plaintiffs' Response: | Defendants' Replay and/or Objections |
|---|---|---|
| 161. Soucy testified that he saw the man who drove the yellow Pinto on multiple occasions. | Undisputed. | |
| 162. Soucy testified that he saw this man and Jeannie kissing each other. | Undisputed. | |
| 163. Soucy testified that during June, July and August of 1983, he "definitely" saw the yellow Pinto parked "directly in front of [his] house." | Undisputed that he so testified.<br><br>Disputed that Soucy could reliably say whether he had seen a yellow Pinto after detectives showed him photos of a "look alike" vehicle. The photos of the "look-alike" Pinto were very poor, nighttime photos showing only a small portion of a car with wood panel sides. **Dkt. 263, Battles Decl.: Ex. 16** (photo of look-alike Pinto); **Ex. 700,** Expert Report of Gary Wells, p. 17. Given the very low-light photos of the Pinto and only angled views of the sides, there is little to distinguish between the Ford Squire wagon that O'Connell drove and the Pinto wagon. What stands out is that they both had wood panel sides. **Ex. 700,** Expert Report of Gary Wells, p. 19. | Plaintiffs fail to create a genuine issue of material fact where less than a week later, Lara, Plaintiff's public defender interviewed Soucy and that Soucy **described** the vehicle he saw the person living at Jeanne's place from around Memorial Day of 1983 to the middle of summer driving as a yellow Pinto. (*See*, Defendants' MSJ Ex. U at D4886.) |

| Uncontroverted Material Facts | Plaintiffs' Response: | Defendants' Replay and/or Objections |
|---|---|---|
| | The fact that the investigators showed only one vehicle to Soucy is a highly suggestive procedure, akin to a "showup" in eyewitness identifications of persons. Under the conditions that the investigators showed the Pinto photo to Soucy, a person could easily confuse a Ford Pinto Wagon with wood panel sides with a Ford Country Squire LTD wagon with wood panel sides. Ex. 700, p.18 (Wells Report). | |
| 164. Soucy testified that he saw the faded Pinto in front of his house "many times." | Undisputed that he so testified.<br><br>Disputed that Soucy could reliably say whether he had seen a yellow Pinto after detectives showed him photos of a "look alike" vehicle. The photos of the "look-alike" Pinto were very poor, nighttime photos showing only a small portion of a car with wood panel sides. **Dkt. 263, Battles Decl.: Ex. 16** (photo of look-alike Pinto); **Ex. 700,** Expert Report of Gary Wells, p. 17. Given the very low-light photos of the Pinto and only angled | Plaintiffs fail to create a genuine issue of material fact where less than a week later, Lara, Plaintiff's public defender interviewed Soucy and that Soucy **described** the vehicle he saw the person living at Jeanne's place from around Memorial Day of 1983 to the middle of summer driving as a yellow Pinto. (*See*, Defendants' MSJ Ex. U at D4886.) |

| Uncontroverted Material Facts | Plaintiffs' Response: | Defendants' Replay and/or Objections |
|---|---|---|
| | views of the sides, there is little to distinguish between the Ford Squire wagon that O'Connell drove and the Pinto wagon. What stands out is that they both had wood panel sides. **Ex. 700,** Expert Report of Gary Wells, p. 19.<br><br>The fact that the investigators showed only one vehicle to Soucy is a highly suggestive procedure, akin to a "showup" in eyewitness identifications of persons. Under the conditions that the investigators showed the Pinto photo to Soucy, a person could easily confuse a Ford Pinto Wagon with wood panel sides with a Ford Country Squire LTD wagon with wood panel sides. Ex. 700, p.18 (Wells Report). | |
| 165. Soucy identified Plaintiff at trial as the same man that he observed at Jeanne's place from around Memorial Day of 1983 to the middle of summer of 1983, driving the yellow Pinto. | Undisputed that he so testified.<br><br>Disputed that Soucy could reliably say whether he had seen a yellow Pinto after detectives showed him photos of a "look alike" vehicle. The photos of the "look-alike" Pinto were very poor, nighttime photos | Plaintiffs fail to create a genuine issue of material fact where regardless of the pinto photographs, Soucy identified Plaintiff.<br><br>Also, Lara, Plaintiff's public defender interviewed Soucy and that Soucy **described** the vehicle he saw the person living at |

| Uncontroverted Material Facts | Plaintiffs' Response: | Defendants' Replay and/or Objections |
|---|---|---|
| | showing only a small portion of a car with wood panel sides. **Dkt. 263, Battles Decl.: Ex. 16** (photo of look-alike Pinto); **Ex. 700,** Expert Report of Gary Wells, p. 17. Given the very low-light photos of the Pinto and only angled views of the sides, there is little to distinguish between the Ford Squire wagon that O'Connell drove and the Pinto wagon. What stands out is that they both had wood panel sides. **Ex. 700,** Expert Report of Gary Wells, p. 19.<br><br>The fact that the investigators showed only one vehicle to Soucy is a highly suggestive procedure, akin to a "showup" in eyewitness identifications of persons. Under the conditions that the investigators showed the Pinto photo to Soucy, a person could easily confuse a Ford Pinto Wagon with wood panel sides with a Ford Country Squire LTD wagon with wood panel sides. Ex. 700, p.18 (Wells Report). | Jeanne's place from around Memorial Day of 1983 to the middle of summer driving as a yellow Pinto. (*See*, Defendants' MSJ Ex. U at D4886.) |
| 166. Soucy testified that he saw Plaintiff | Undisputed that he so testified. | Plaintiffs fail to create a genuine issue of material |

| Uncontroverted Material Facts | Plaintiffs' Response: | Defendants' Replay and/or Objections |
|---|---|---|
| drive the car about 10 – 15 times. | Disputed that Soucy could reliably say whether he had seen a yellow Pinto after detectives showed him photos of a "look alike" vehicle. The photos of the "look-alike" Pinto were very poor, nighttime photos showing only a small portion of a car with wood panel sides. **Dkt. 263, Battles Decl.: Ex. 16** (photo of look-alike Pinto); **Ex. 700,** Expert Report of Gary Wells, p. 17. Given the very low-light photos of the Pinto and only angled views of the sides, there is little to distinguish between the Ford Squire wagon that O'Connell drove and the Pinto wagon. What stands out is that they both had wood panel sides. **Ex. 700,** Expert Report of Gary Wells, p. 19.<br><br>The fact that the investigators showed only one vehicle to Soucy is a highly suggestive procedure, akin to a "showup" in eyewitness identifications of persons. Under the conditions that the investigators showed the Pinto photo to Soucy, a | fact where less than a week later, Lara, Plaintiff's public defender interviewed Soucy and that Soucy **described** the vehicle he saw the person living at Jeanne's place from around Memorial Day of 1983 to the middle of summer driving as a yellow Pinto. (*See*, Defendants' MSJ Ex. U at D4886.)<br><br>Also, multiple other witnesses who lived on the same street, including the Ina Soucy, Lewis and Butler, all informed the investigators and/or testified at trial that they did observe a yellow Pinto on that street at different points during the year 1983 (including during the summer of 1983), and connected Plaintiff to the Pinto.<br><br>(Defendants' MSJ Ex. N at D1964: 13 – D1965: 10, D1993: 8 – 23; Defendants' MSJ Ex. F at D1046–47; Defendants' MSJ Ex. T at 111: 20 – 112: 6.) |

| Uncontroverted Material Facts | Plaintiffs' Response: | Defendants' Replay and/or Objections |
|---|---|---|
| | person could easily confuse a Ford Pinto Wagon with wood panel sides with a Ford Country Squire LTD wagon with wood panel sides. Ex. 700, p.18 (Wells Report). 1967: 7. | |
| 167. According to the February 8, 1984 Supplementary Report, Soucy did not indicate he observed anyone else, other than this driver of the yellow Pinto, move into Jeanne's place during the six week period in the summer of 1983, until Jeanne's husband came back home. | Objection. Hearsay, FRE 801, 802. Soucy's statements in the police report are inadmissible hearsay and cannot be admitted for their truth.<br><br>Undisputed. | Plaintiffs' objection to the admission of any police report statements for their truth is irrelevant as such evidence is admissible as the officers present sense impression, record of a regularly conducted activity, and going to the Detectives' state of mind. FRE 803. |
| 168. Soucy did not indicate that he observed other men move into Jeanne's house during the time period between Memorial Day of 1983 and the middle of summer of 1983. | Objection. Hearsay, FRE 801, 802. Soucy's statements in the police report are inadmissible hearsay and cannot be admitted for their truth.<br><br>Undisputed. | Plaintiffs' objection to the admission of any police report statements for their truth is irrelevant as such evidence is admissible as the officers present sense impression, record of a regularly conducted activity, and going to the Detectives' state of mind. FRE 803. |
| 169. Both Plaintiff and Jeanne testified that Plaintiff moved into Jeanne's place shortly after Memorial Day of | Undisputed. | |

| Uncontroverted Material Facts | Plaintiffs' Response: | Defendants' Replay and/or Objections |
|---|---|---|
| 1983 through about the middle of summer of 1983. | | |
| 170. Both Plaintiff and Jeanne testified at their depositions that Plaintiff was the only adult male who stayed at her place for the approximate six week time frame after Ed moved out shortly after Memorial Day of 1983. | <u>Undisputed</u>. | |
| 171. According to the February 8, 1984 Supplementary Report, Tom Butler, another neighbor of Jeanne's, also saw a yellow Pinto station wagon parked in front of 1609 Shephard Street (Jeanne's address). | <u>Objection.</u> Vague as to time.<br><br><u>Undisputed</u> that Butler told police he had seen a car similar to photos of the look-alike Pinto. <u>Disputed</u> that Butler saw the vehicle during any relevant time period. Butler told police he did not see the vehicle after **April 1, 1983**. *Defs* Ex. F at D1047. | Plaintiffs fail to create a genuine issue of material fact. Further, other witnesses saw the yellow pinto into the summer of 1983. |
| 172. According to the February 8, 1984 Supplementary Report, Michael Lewis, another neighbor of Jeanne's, saw a yellow Pinto station wagon, with wood sides, parked near 1609 Shepard Street several times. | <u>Objection.</u> Vague as to time.<br><br><u>Undisputed</u> that Lewis told police he had seen a car similar to photos of the look-alike Pinto. <u>Disputed</u> that he saw the car parked at 1609 Shepherd during any relevant time period. Michael Lewis testified that he saw a car resembling a | Plaintiffs fail to create a genuine issue of material fact where Lewis testified he remembered seeing the yellow Pinto as late as June 1984. (*See*, Plaintiffs' Ex. 100.06 at p. 9:15-21 (D3957:15-21).) |

| Uncontroverted Material Facts | Plaintiffs' Response: | Defendants' Replay and/or Objections |
|---|---|---|
| | yellow Pinto between January and April 1983. Mr. Lewis could not remember seeing the car after the first week of June 1983. **Dkt. 263, Battles Decl.: Ex. 100**, pp. 153:1-153:7, 156:1-156:23, 1985 Trial Tr. (testimony of Michael Lewis). Michael Lewis's testimony contradicted Mr. Soucy in that Mr. Soucy only observed the yellow Pinto in June, July and August of 1983. **Ex. 100.17**, p. 12:13 – 12:26 (defense closing argument); *compare* **Ex. 100**, pp. 153:1-153:7, 156:1-156:23, 1985 Trial Tr. (testimony of Michael Lewis) *to* **Ex. 100**, pp. 115:17 – 116:12, 1985 Trial Transcript (testimony of Maurice Soucy). | |
| 173. At his deposition, Plaintiff testified that he bought and drove a station wagon with faded-brown wood grain panels during the summer of 1983. | Undisputed that Plaintiff testified he purchased a Country Squire station wagon during the last week that he was at Jeanne and Ed Lyon's home. **Battles 3/24/17 Decl.: Ex. 614**, Deposition of Frank O'Connell, pp. 526:22 - 527:8. | |
| **UNDISPUTED MATERIAL FACTS REGARDING PLAINTIFF'S INTERVIEWS WITH THE LASD.** | | |

| **Uncontroverted Material Facts** | **Plaintiffs' Response:** | **Defendants' Replay and/or Objections** |
|---|---|---|
| 174. On January 12, 1984, the Detectives interviewed Plaintiff at the San Dimas Sheriff's Station. | Undisputed. | |
| 175. According to the February 8, 1984 Supplementary Report, Plaintiff told the Detectives that Plaintiff met Jeanne and her husband on Memorial Day Weekend of 1983, at the Colorado River. | Undisputed. | |
| 176. According to the February 8, 1984 Supplementary Report, Plaintiff told the Detectives that, at the time he met Jeanne, Plaintiff worked at a lumber mill, "Forms and Surfaces" in Carpentaria. | Undisputed. | |
| 177. According to the February 8, 1984 Supplementary Report, when asked whether he had ever fired a .38 caliber revolver, Plaintiff said that he had fired one with some friends at work (at Forms and Surfaces in Carpentaria). | Undisputed. | |

| Uncontroverted Material Facts | Plaintiffs' Response: | Defendants' Replay and/or Objections |
|---|---|---|
| 178. According to the February 8, 1984 Supplementary Report, Plaintiff told the Detectives that Plaintiff and Jeanne "became close friends" that weekend. | Undisputed. | |
| 179. According to the February 8, 1984 Supplementary Report, Plaintiff told the Detectives that around June 10 or 11, 1983, he was laid off from his job at Forms and Surfaces. | Undisputed. | |
| 180. According to the February 8, 1984 Supplementary Report, Plaintiff told the Detectives that sometime around the middle of June 1983, Jeanne invited him to move into her place, because she and Ed were separating. | Undisputed. | |
| 181. According to the February 8, 1984 Supplementary Report, Plaintiff told the Detectives that Plaintiff stayed at Jeanne's place for about six weeks | Undisputed. | |
| 182. According to the | Undisputed. | |

| **Uncontroverted Material Facts** | **Plaintiffs' Response:** | **Defendants' Replay and/or Objections** |
|---|---|---|
| February 8, 1984 Supplementary Report, Plaintiff told the Detectives that on January 5, 1984, he was at Jim Hamilton and Scott Egerer's apartment, where he was staying at the time. | | |
| 183. According to the February 8, 1984 Supplementary Report, Plaintiff told the Detectives that, on January 5, 1984, he was with Jim Hamilton, Scott Egerer, and one of their friends, Karen Baxter. | Undisputed. | |
| 184. According to the February 8, 1984 Supplementary Report, Plaintiff told the Detectives that, on January 5, 1984 at about 12:30 p.m., Hamilton, Egerer and Baxter asked him if he wanted to join them for lunch, but he declined. | Undisputed. | |
| 185. According to the February 8, 1984 Supplementary Report, Plaintiff told the Detectives that, | Undisputed. | |

| Uncontroverted Material Facts | Plaintiffs' Response: | Defendants' Replay and/or Objections |
|---|---|---|
| instead of going to lunch with Hamilton, Egerer and Baxter, he instead went to his ex-girlfriend's (Leslie Davis ("Davis")) house to do laundry. | | |
| 186. According to the February 8, 1984 Supplementary Report, the Detectives also spoke to Davis on January 12, 1984. | Undisputed. | |
| 187. According to the February 8, 1984 Supplementary Report, Davis said that on January 5, 1984, she went to a sewing class from 9 a.m. until 12 p.m., and then picked up her son from a babysitter, to bring him home. | Undisputed. | |
| 188. According to the February 8, 1984 Supplementary Report, Davis told the Detectives that once she got home, she fed her son, put him down, laid on her couch and fell asleep. | Undisputed. | |
| 189. According to the February 8, 1984 Supplementary Report, Davis told the | Undisputed. | |

| Uncontroverted Material Facts | Plaintiffs' Response: | Defendants' Replay and/or Objections |
|---|---|---|
| Detectives that she woke up to a knock on the door around 1 p.m. or 2 p.m., but she was uncertain of the time. | | |
| 190. According to the February 8, 1984 Supplementary Report, Davis told the Detectives that Plaintiff was at her door, wearing Levis, boots, and a t-shirt. | Undisputed. | |
| 191. According to the February 8, 1984 Supplementary Report, Davis told the Detectives that she let Plaintiff in and Days of Our Lives was playing on the television. | Undisputed. | |
| 192. According to the February 8, 1984 Supplementary Report, the Detectives learned, through criminal records, that Plaintiff had been the subject of "field interrogation reports" on "several occasions." | Undisputed. | |
| 193. According to the February 8, 1984 Supplementary Report, the Detectives | Objection. Hearsay, FRE 801, 802. The police report's statements regarding alleged | Plaintiffs' objection to the admission of any police report statements for their truth is irrelevant as such |

| Uncontroverted Material Facts | Plaintiffs' Response: | Defendants' Replay and/or Objections |
|---|---|---|
| learned, through criminal records, that Plaintiff had been counseled by State Police patrol personnel regarding a despondency over a love affair. | interactions between the State Police and Frank are admissible hearsay.<br><br>Undisputed that the police report so states. | evidence is admissible as the officers present sense impression, record of a regularly conducted activity, and going to the Detectives' state of mind. FRE 803. |
| 194. According to the February 8, 1984 Supplementary Report, the Detectives learned, that a yellow Pinto station wagon was seen at the "Forms and Surfaces" parking lot | Objection. Hearsay, FRE 801, 802. The police report's statements regarding purported sightings of a yellow Pinto at Forms and Surfaces are admissible hearsay.<br><br>Undisputed that the police report so states. | Plaintiffs' objection to the admission of any police report statements for their truth is irrelevant as such evidence is admissible as the officers present sense impression, record of a regularly conducted activity, and going to the Detectives' state of mind. FRE 803. |
| 195. According to the February 8, 1984 Supplementary Report, the Detectives learned that the yellow Pinto station wagon at the "Forms and Surfaces" parking lot had recently disappeared. | Objection. Hearsay, FRE 801, 802. The police report's statements regarding purported sightings of a yellow Pinto at Forms and Surfaces are admissible hearsay.<br><br>Undisputed that the police report so states. | Plaintiffs' objection to the admission of any police report statements for their truth is irrelevant as such evidence is admissible as the officers present sense impression, record of a regularly conducted activity, and going to the Detectives' state of mind. FRE 803. |
| 196. According to the February 8, 1984 Supplementary Report, the Detectives learned that "Forms and Surfaces" was a business known to local authorities to | Objection. Hearsay, FRE 801, 802. The police report's statements regarding Forms and Surfaces' alleged hiring practices is admissible hearsay. Relevance, FRE 401, 403. Whether Forms | Plaintiffs' objection to the admission of any police report statements for their truth is irrelevant as such evidence is admissible as the officers present sense impression, record of a regularly conducted |

| Uncontroverted Material Facts | Plaintiffs' Response: | Defendants' Replay and/or Objections |
|---|---|---|
| hire parolees and petitioners. | and Surfaces hired individuals with criminal backgrounds is entirely irrelevant to any issue in this case. Any probative value is substantially outweighed by the potential for prejudice. | activity, and going to the Detectives' state of mind. FRE 803. |
| 197. On January 12, 1984, Plaintiff was arrested and taken into custody for the murder of Jay French | Undisputed. | |
| 198. On February 15, 1984, Plaintiff was again interviewed at the LASD crime lab. | Undisputed | |
| 199. During the February 15, 1984 interview, Plaintiff shared that, even up to the date of the murder, he did not have his own place to stay and had been crashing at various friends' places throughout the second half of 1983 and into the first week of 1984. | Objection. *The cited evidence does not support the proposition for which it is cited.*<br><br>Disputed that, on the date of the murder, Plaintiff did not have his "own place to stay and had been crashing at various friends' places throughout the second half of 1983 . Defendants flagrantly mischaracterize Plaintiff's statements to detectives in 1984. During the February 15, 1984 interrogation, detectives did not specifically discuss with Plaintiff the chronology of where he was living before the murder. They did refer | Plaintiffs fail to create a genuine issue of material fact.<br><br>During the February 15, 1984 interview, Plaintiff said that when he moved out of Jeanne's place he "had no place to live" and he was invited by Ed and Jeanne "to stay on the couch a couple of weeks"(*See*, Defendants' MSJ Ex. V at 23:15-18); in discussing what he did during the first week of January, 1984, Plaintiff stated that he "didn't have much money"; Plaintiff also told the detectives that he didn't have money for |

| **Uncontroverted Material Facts** | **Plaintiffs' Response:** | **Defendants' Replay and/or Objections** |
|---|---|---|
| | to his residence on Third Street in LaVerne as "his house." **Defs Ex. V at D1145.** Plaintiff likewise referred to the LaVerne residence as his house or home. *See e.g.* D1111 ("she either left our house at five minutes after two or 2:35…").

During the January 12, 1984 interview, Mr. O'Connell told detectives that he was living on Third Street in La Verne with two roommates, Jim Hamilton and Scott Egerer. **Defs Ex. F at D1042**. He repeatedly referred to the LaVerne residence as his "house." *See e.g. ibid* at 1042. ("..on 01/05/84, he was at his house on Third Street with his roommate…) (emphasis supplied); D1041("He stated that since he was having a party at *his house* on Third Street…") (emphasis supplied). Detectives referred to his house on LaVerne as his "home." *Ibid*. at 1044.

The fact that he had roommates (common for someone in their 20's) does not mean he did not have his | gas and said, "I am completely broke." (*See*, Defendants' MSJ Ex. V at D1119:17-20). |

93

| Uncontroverted Material Facts | Plaintiffs' Response: | Defendants' Replay and/or Objections |
|---|---|---|
| | own place to stay.<br><br>Detectives did not specifically ask Frank when he moved in with Scott Egerer and Jim Hamilton during the January 12 or February 15 interrogations. The arrest report indicates that, after moving out of Jeanne Lyon's home, Frank lived with Gary Lewis and Tom Reck; "It was at a later time that he met a friend named Scott Egerer , and began to stay with him at the residence on Third Street in La Verne." **Defs Ex. F at D1040**.<br><br>Mr. O'Connell testified in deposition that he stayed with Scott Egerer and Jim Hamilton for approximately three months, ending at the time of his arrest (approximately mid-October 1983 to early January 1984). **Battles 3/24/17 Decl.: Ex. 614**, Frank O'Connell Deposition, p. 295:2-295:7.<br><br>Between August 1983 when he left Jeanne Lyon's house and October 1983, he stayed with two friends: Mike Winkelman (employer) and Tom Reck (who lived at | |

| Uncontroverted Material Facts | Plaintiffs' Response: | Defendants' Replay and/or Objections |
|---|---|---|
|  | home with his parents) **Ex. 614**, Frank O'Connell Deposition, p. 281:16 – 282:21, 286:1 – 286:23, 288:17 – 289:3. |  |
| 200. During the February 15, 1984 interview, he also made statements to the Detectives that he was "broke" and did not have much money. | Objection. Vague as to time. The cited testimony does not support the proposition that Plaintiff was broke during the months leading up to the murder.<br><br>Undisputed that Plaintiff told detectives that he was "completely broke" and did not have gas money *on Wednesday, January 11, 1984*. **Defs Ex. V** at D1118-D1119.<br><br>Disputed that Plaintiff was broke in the months leading up to the murder. Plaintiff testified that he was employed in the months before the murder, always contributed to household expenses where he lived, and in the years before the murder, had always worked to help provide for his family. **Battles 3/24/17 Decl.: Ex. 614,** Frank O'Connell Deposition, pp. 290:20 – 290:22 (Plaintiff contributed to household expenses), 298:15 – 299:13 (Plaintiff had construction | Plaintiffs fail to create a genuine issue of material fact.<br><br>During the February 15, 1984 interview, Plaintiff said that when he moved out of Jeanne's place he "had no place to live" and he was invited by Ed and Jeanne "to stay on the couch a couple of weeks"(*See*, Defendants' MSJ Ex. V at 23:15-18); in discussing what he did during the first week of January, 1984, Plaintiff stated that he "didn't have much money"; Plaintiff also told the detectives that he didn't have money for gas and said, "I am completely broke." (*See*, Defendants' MSJ Ex. V at D1119:17-20). |

| Uncontroverted Material Facts | Plaintiffs' Response: | Defendants' Replay and/or Objections |
|---|---|---|
| | jobs at two locations while living with Scott Egerer); 205:21 – 206:23 (from the time Plaintiff left San Jose [years before the murder.] he always worked and tried to provide for his family; he described himself as "a young guy trying to figure out what…[he]was going to do in life"). | |
| 201. During the February 15, 1984 interview, Plaintiff reconfirmed that he first met Jeanne at the Colorado River over Memorial Day weekend 1983. | Undisputed. | |
| 202. Plaintiff also shared that when Ed moved out of Jeanne's place in July of 1983, Plaintiff moved in for approximately six weeks, and on several occasions, had sex with Jeanne. | Undisputed. | |
| 203. During his February 15, 1984 interview, Plaintiff indicated that he thought Jeanne broke things off after one night when he "shot some coke up," | Undisputed. | |

| Uncontroverted Material Facts | Plaintiffs' Response: | Defendants' Replay and/or Objections |
|---|---|---|
| because Jeanne didn't like that Plaintiff would come to her house, shoot up cocaine, "get weird," and "paranoid off of it." | | |
| 204. During his February 15, 1984 interview, Plaintiff mentioned that he had conversations with Jeanne "quite a few times," where she said, "I'm gonna have to kill - - [*sic*] or I'm gonna kill him," referring to French. | <u>Disputed</u>. Defendants misrepresent Frank O'Connell's statements to detectives. Plaintiff told detectives that he had heard Jeanne say she could "kill" her ex-husband but thought she was "blowing hot air." Plaintiff said: "—right, and she would always say, you know, she hated him – she hated him – in fact there is quite a few number of times she – I'm gonna have to kill – or I'm gonna kill him, but you know, I mean when somebody says that…I usually think all that's just hot air coming out…I never take it serious…Everybody does that.." **Defs. Exh V** at 1094:19 – D1095:5. | Plaintiffs fail to create a genuine issue of material fact and mischaracterize Plaintiff's statements given to the LASD.<br><br>Contrary to Plaintiffs' suggestion, Plaintiff did not tell the Detectives that he thought Jeanne was "blowing hot air" when she told him "quite a few times" that "I'm gonna have to kill" French, but rather that he "**usually** think[s] all that's just hot air coming out" (Defendants' MSJ Ex. V at D1094: 27-28) when someone talks about killing someone. (Emphasis added.) The fact that Plaintiff said that he "usually" thinks that's "just hot air" but did not specifically indicate that he thought it was "just hot air" when Jeanne repeatedly made the statement is evidence that he may have actually taken it seriously |

| Uncontroverted Material Facts | Plaintiffs' Response: | Defendants' Replay and/or Objections |
|---|---|---|
| | | (or at least could have led the LASD detectives to believe that she made the statement seriously). |
| 205. During his February 15, 1984 interview, Plaintiff shared that he once told Jeanne, if she "really want him killed," that Plaintiff "[knew] a guy in San Jose" and that for "200 bucks we can have him killed." | Disputed. Defendants misrepresent Frank O'Connell's statements to detectives. Plaintiff expressly told detectives that he made this statement "sarcastically"; the statement was in no way serious. Plaintiff said: "Well one day, I remember saying to her hey, if you really want him killed, but this was sarcastically, I didn't say it – you know, I would never do that --…I said, well I know a guy in San Jose if you know, 200 bucks we can have him killed…that was more or less one of those…expressions, it wasn't serious. **Defs. Exh. V** at 1096:15 – 1096:25. | Plaintiffs fail to create a genuine issue of material fact.

Whether or not Plaintiff intended the statement to be sarcastic does not preclude the possibility that the Detectives could have determined that Jeanne did not interpret the comment sarcastically. Either way, it is undisputed that Plaintiff made the statement (sarcastically or not). |
| 206. During the February 15, 1984 interview, Plaintiff said that after staying with Jeanne for approximately six weeks during the summer of 1983, he "didn't stay in to [*sic*] much contact with her." | Undisputed. | |

| Uncontroverted Material Facts | Plaintiffs' Response: | Defendants' Replay and/or Objections |
|---|---|---|
| 207. During the February 15, 1984 interview, after stating that he did not have much contact with Jeanne after he moved out of her place, Plaintiff stated that, "[a]ll of a sudden" on "New Year's Eve, I got a telephone call by [Jeanne]." | Undisputed. | |
| 208. During the February 15, 1984 interview, Plaintiff said that, on January 1, 1984, Jeanne invited him to cruise Colorado Boulevard, but asked that Plaintiff drive "because Ed's got 2,000 worth of warrants out for him[.]" | Undisputed. | |
| 209. During the February 15, 1984 interview, Plaintiff said that on January 1, 1984, at approximately 8:00 p.m., he went to Jeanne's house and Jeanne showed him "what looked like a little handgun," and that "she tried handing it to [him]." | Disputed. This statement mischaracterizes Frank O'Connell's statements to detectives. Mr. O'Connell told detectives that Jeanne showed him what appeared to be a small gun, which she told him was a mace gun, that shoots out "something" in "gas form." **Defs. Ex. V at 1100:24 – 1101:13.**<br><br>Immaterial in that there is | Plaintiffs fail to create a genuine of material fact and misstate Plaintiff's statements given to the Detectives.<br><br>Plaintiff did not tell the Detectives that it appeared to him to be a mace gun, but actually told the Detectives that he thought it might be "a [sic] automatic". (Defendants' |

| Uncontroverted Material Facts | Plaintiffs' Response: | Defendants' Replay and/or Objections |
|---|---|---|
| | no physical evidence connecting Plaintiff to the crime or a murder weapon; nor is there any evidence to suggest that the murder weapon was a "little handgun." According to LASD crime lab analysis, the murder weapon was a .38 special or 357 magnum. (Defs UMF #2, above). Eyewitnesses described the murder weapon as a large, blue steel revolver with a "long barrel." **Dkt. 263, Battles Decl.: Ex. 1.02**, 1/5/198 SPPD Report, pp. 4, 5 (interviews of Druecker and Villareal). | MSJ Ex. V at D1101:2-4.) Also, the fact that Plaintiff admitted that Jeanne tried to hand him **a weapon** is additional evidence the LASD had to believe that Jeanne had Plaintiff kill French. |
| 210. During the February 15, 1984 interview, Plaintiff said that, at the time of the January 1 conversation with Jeanne about the gun, Plaintiff knew it could be a real gun; however, in his February 15, 1984 interview, Plaintiff told the LASD that he "couldn't remember" if he ever touched it. | <u>Disputed.</u> This mischaracterizes Frank O'Connell's statements. Frank said that Jeanne told him the gun was a mace gun, though he had no way to know, and worried that it might be real. Defs. Exh. V, p. D1101:5 – D1102:11. When asked if he touched it, Mr. O'Connell said he doesn't think he touched it, and while he couldn't be certain, he "more than likely would say 90 [percent] – I'd put the weight on the side that I didn't touch it." Defs. Exh. V, p. 1107:3 – 1107:23. | Plaintiffs fail to create a genuine of material fact and misstate Plaintiff's statements given to the Detectives.<br><br>Plaintiff did not tell the Detectives that it appeared to him to be a mace gun, but actually told them that he thought it might be "a [*sic*] automatic". (Defendants' MSJ Ex. V at D1101:2-4.)<br><br>Also, the fact that Plaintiff admitted that Jeanne tried to hand him **a weapon** is additional evidence the |

| Uncontroverted Material Facts | Plaintiffs' Response: | Defendants' Replay and/or Objections |
|---|---|---|
| | | Detectives had to believe that Jeanne had Plaintiff kill French. |
| 211. During the February 15, 1984 interview, Plaintiff also said that on January 1, 1984, he went out to dinner with Jeanne, Ed, and Jay Jr., and then drove them down Colorado Boulevard. | Undisputed. | |
| 212. During the February 15, 1984 interview, Plaintiff said that while he, Jeanne, Ed, and Jay Jr. were cruising down Colorado Boulevard on the night of January 1, 1984, he heard Jay Jr. and Jeanne say they wanted to look for French and Gina (who were "usually out [there] in a certain area every year"). | Undisputed. | |
| 213. During the February 15, 1984 interview, Plaintiff also said that, after Jeanne and Jay Jr. had said that they wanted to look for French and Gina, Jay Jr. explained that French | Undisputed. | |

| Uncontroverted Material Facts | Plaintiffs' Response: | Defendants' Replay and/or Objections |
|---|---|---|
| and Gina were "usually out here in a certain area every year." | | |
| 214. During his February 15, 1984 interview, Plaintiff was asked whether, on the night of January 1, 1984, he had seen French or whether he was aware as to whether French had seen him. | Undisputed. | |
| 215. During the February 15, 1984 interview, in response to the inquiry as to whether he saw French or whether he knew French saw him on the night of January 1, 1984, Plaintiff responded that he did not know. | Disputed. This mischaracterizes Plaintiff's statements. Plaintiff said he didn't know whether he saw Jay French on 1/1/1984 *because he [Plaintiff] wouldn't know what he looks like.* Defs. Exh. V, p. 1104:1 – 1104:24. | Plaintiffs fail to create a genuine issue of material fact.<br><br>Plaintiff, who knew he was being investigated for the French murder, would not have admitted to the Detectives that he actually knew what French looked like.<br><br>More importantly, the relevancy of this fact is that Plaintiff admitted that he did not know whether French saw **him.** Given the dying declaration of French that indicated that he recognized the shooter when he said the shooter "looked like somebody Jeanne hangs around with" (UF 67), Plaintiff's |

| Uncontroverted Material Facts | Plaintiffs' Response: | Defendants' Replay and/or Objections |
|---|---|---|
| | | admission to the Detectives that he did not know whether French saw him is relevant. |
| 216. During the February 15, 1984 interview, Plaintiff was asked whether he knew if he had ever seen French or French had seen him. | Undisputed. | |
| 217. During the February 15, 1984 interview, in response to the inquiry as to whether he had ever seen French or whether he was aware as to whether French had seen him, Plaintiff indicated there was at least one occasion when he and French may have seen each other. | Undisputed. | |
| 218. Specifically, during the February 15, 1984 interview, Plaintiff said that there was at least one occasion when Plaintiff took Jeanne to a counseling appointment and he and French may have seen each other. | Undisputed. | |
| 219. During the February 15, 1984 | Undisputed. | |

| Uncontroverted Material Facts | Plaintiffs' Response: | Defendants' Replay and/or Objections |
|---|---|---|
| interview, Plaintiff specifically stated that the person he saw the time he took Jeanne to the counseling appointment (that may have been French) looked at each other. | | |
| **UNDISPUTED MATERIAL FACTS ABOUT PLAINTIFF'S BATTERY/VANDALISM ARREST WHILE HE WAS STAYING AT JEANNE'S HOUSE DURING THE SUMMER OF 1983 AND JEANNE'S CUSTODY BATTLE WITH FRENCH.** | | |
| 220. During the six-week period that Plaintiff was staying with Jeanne, one night the two of them went to a restaurant with Jay Jr. and Benjy ("Jeanne's kids"), Plaintiff Nick O'Connell ("Nick"), Leslie (Plaintiff's ex-girlfriend/Nick's mother), and Mark (Leslie's then-boyfriend). | Undisputed, but immaterial, to any legal issue presented by Defendants' motion. Objection on the basis that this incident is irrelevant to any issue related to liability in this case; any probative value is substantially outweighed by the risk of prejudice and confusion. FRE 401, 403. | Plaintiffs fail to create a genuine issue of material fact. Such information is relevant to substantiating Plaintiff's relationship with Jeanne, which is a source of motive, as well as his relationship with Jay Jr., and connection to French. |
| 221. Shortly after going to dinner with Jeanne's kids, Nick, Leslie, and Mark, Plaintiff and Jeanne were arrested for battery and vandalism (respectively). | Objection. Plaintiff's arrest for battery and vandalism is character evidence, inadmissible under FRE 404(b). This incident is irrelevant to any legal issue in this case; any probative value is substantially outweighed by the risk of prejudice and confusion. | Plaintiffs fail to create a genuine issue of material fact. Such information is relevant to substantiating Plaintiff's relationship with Jeanne, which is a source of motive, as well as his relationship with Jay Jr., and connection to French. |

| Uncontroverted Material Facts | Plaintiffs' Response: | Defendants' Replay and/or Objections |
|---|---|---|
| | FRE 401, 403.<br><br>Undisputed, but immaterial, to any legal issue presented by Defendants' motion. Objection on the basis that this incident is irrelevant to any issue related to liability in this case; any probative value is substantially outweighed by the risk of prejudice and confusion. FRE 401, 403. | |
| 222. Both Plaintiff and Jeanne testified at their depositions that, the night they went to dinner with their kids, Mark, and Leslie, Plaintiff got into an altercation with Mark outside the restaurant. | Undisputed, but immaterial, to any legal issue presented by Defendants' motion.<br><br>Objection. This incident is irrelevant to any legal issue in this case; any probative value is substantially outweighed by the risk of prejudice and confusion. FRE 401, 403. Evidence of the altercation between Frank and Mark, including Frank's subsequent arrest, is inadmissible character evidence under FRE 404(a) and (b). | Plaintiffs fail to create a genuine issue of material fact. Such information is relevant to substantiating Plaintiff's relationship with Jeanne, which is a source of motive, as well as his relationship with Jay Jr., and connection to French. |
| 223. At his deposition, Plaintiff testified that he and Mark got into an altercation the night they went to dinner with Leslie, Jeanne, | Objection. This incident is irrelevant to any legal issue in this case; any probative value is substantially outweighed by the risk of prejudice and confusion. FRE 401, 403. Evidence of | Plaintiffs fail to create a genuine issue of material fact.<br><br>Plaintiff testified that after Mark attempted to leave with Nick, Plaintiff said, |

| Uncontroverted Material Facts | Plaintiffs' Response: | Defendants' Replay and/or Objections |
|---|---|---|
| and their kids because Mark said Plaintiff could not have Nick for the weekend. | the altercation between Frank and Mark, including Frank's subsequent arrest, is inadmissible character evidence under FRE 404(a) and (b).<br><br>Undisputed that Plaintiff and Mark got into an altercation, but immaterial, to any legal issue presented by Defendants' motion.<br><br>Disputed that the altercation occurred because Mark told Plaintiff he could not have Nick for the weekend. The altercation occurred because, after returning from the restroom, Plaintiff discovered that Mark/Leslie were attempting to a leave with Nick. When Plaintiff tried to stop him, Mark approached Frank and hit him; Frank blocked but eventually hit back in self-defense. Defs Ex. S at 315: 9 – 318: 15. | "Wait a minute. Whoa, whoa, whoa. That's my son. That's not your son. And we have an agreement that I can have him for the next couple days." (See Defendants' MSJ Ex. S at 315: 9 – 318: 15.)<br><br>Nowhere in the cited testimony does Plaintiff say he hit back in self-defense.<br><br>Also, such information is relevant to substantiating Plaintiff's relationship with Jeanne, which is a source of motive, as well as his relationship with Jay Jr., and connection to French. |
| 224. At his deposition, Plaintiff testified that when he and Mark got into an altercation the night they went to dinner with Leslie, Jeanne, and their kids, Plaintiff punched | Objection. This incident is irrelevant to any legal issue in this case; any probative value is substantially outweighed by the risk of prejudice and confusion. FRE 401, 403. Evidence of the altercation between Frank and Mark, including | Plaintiffs fail to create a genuine issue of material fact.<br><br>Nowhere in the cited testimony does Plaintiff say he hit back in self-defense.<br><br>Also, such information is |

106

| Uncontroverted Material Facts | Plaintiffs' Response: | Defendants' Replay and/or Objections |
|---|---|---|
| Mark in the stomach several times. | Frank's subsequent arrest, is inadmissible character evidence under FRE 404(a) and (b).<br><br>Undisputed that Plaintiff and Mark got into an altercation, but immaterial, to any legal issue presented by Defendants' motion.<br><br>Disputed insofar as this description mischaracterizes Plaintiff's testimony. Frank testified that Mark approached him and began swinging. Frank initially blocked his swings but eventually hit him in the stomach several times. Defs Ex. S at 315: 9 – 318: 15. | relevant to substantiating Plaintiff's relationship with Jeanne, which is a source of motive, as well as his relationship with Jay Jr., and connection to French. |
| 225. At his deposition, Plaintiff testified that after he punched Mark in the stomach several times, Mark tripped over a curb and began bleeding. | Objection. This incident is irrelevant to any legal issue in this case; any probative value is substantially outweighed by the risk of prejudice and confusion. FRE 401, 403. Evidence of the altercation between Frank and Mark, including Frank's subsequent arrest, is inadmissible character evidence under FRE 404(a) and (b).<br><br>Undisputed that Plaintiff and Mark got into an altercation, but immaterial, | Plaintiffs fail to create a genuine issue of material fact. Such information is relevant to substantiating Plaintiff's relationship with Jeanne, which is a source of motive, as well as his relationship with Jay Jr., and connection to French. |

| Uncontroverted Material Facts | Plaintiffs' Response: | Defendants' Replay and/or Objections |
|---|---|---|
| | to any legal issue presented by Defendants' motion. | |
| 226. At his deposition, Plaintiff testified that Leslie and Nick observed the entire altercation. | Objection. This incident is irrelevant to any legal issue in this case; its probative value is substantially outweighed by the risk of prejudice and confusion. FRE 401, 403. Evidence of the altercation between Frank and Mark, including Frank's subsequent arrest, is inadmissible character evidence under FRE 404(a) and (b).

Undisputed that Leslie/Nick *could* see the observation. Disputed insofar as Plaintiff's testimony does not establish that Nick in fact observed the altercation. This incident is immaterial, to any legal issue presented by Defendants' motion. | Plaintiffs fail to create a genuine issue of material fact. Such information is relevant to substantiating Plaintiff's relationship with Jeanne, which is a source of motive, as well as his relationship Nick. |
| 227. Shortly after the altercation between him and Mark, Plaintiff heard someone screaming, "Call and ambulance. Call the police." | Objection. This incident is irrelevant to any legal issue in this case; any probative value is substantially outweighed by the risk of prejudice and confusion. FRE 401, 403. Evidence of the altercation between Frank and Mark, including Frank's subsequent arrest, is inadmissible character evidence under FRE 404(a) | |

| Uncontroverted Material Facts | Plaintiffs' Response: | Defendants' Replay and/or Objections |
|---|---|---|
| | and (b).<br><br>Undisputed, but immaterial, to any legal issue presented by Defendants' motion. | |
| 228. After the altercation between him and Mark, both the paramedics and the police arrived. | Objection. This incident is irrelevant to any legal issue in this case; any probative value is substantially outweighed by the risk of prejudice and confusion. FRE 401, 403. Evidence of the altercation between Frank and Mark, including Frank's subsequent arrest, is inadmissible character evidence under FRE 404(a) and (b).<br><br>Undisputed, but immaterial, to any legal issue presented by Defendants' motion. | |
| 229. At his deposition, Plaintiff testified that after the police arrived, he told them what happened but they did not arrest him immediately. | Objection. This incident is irrelevant to any legal issue in this case; any probative value is substantially outweighed by the risk of prejudice and confusion. FRE 401, 403. Evidence of the altercation between Frank and Mark, including Frank's subsequent arrest, is inadmissible character evidence under FRE 404(a) and (b).<br><br>Undisputed, but immaterial, | |

| Uncontroverted Material Facts | Plaintiffs' Response: | Defendants' Replay and/or Objections |
|---|---|---|
| | to any legal issue presented by Defendants' motion. | |
| 230. After the altercation between him and Mark, Mark was taken to the hospital. | Objection. This incident is irrelevant to any legal issue in this case; any probative value is substantially outweighed by the risk of prejudice and confusion. FRE 401, 403. Evidence of the altercation between Frank and Mark, including Frank's subsequent arrest, is inadmissible character evidence under FRE 404(a) and (b). <br><br> Undisputed, but immaterial, to any legal issue presented by Defendants' motion. | |
| 231. After Mark was taken to the hospital, Jeanne vandalized Mark's car. | Objection. This incident is irrelevant to any legal issue in this case; any probative value is substantially outweighed by the risk of prejudice and confusion. FRE 401, 403. Evidence of the altercation between Frank and Mark, including Frank's subsequent arrest, is inadmissible character evidence under FRE 404(a) and (b). <br><br> Undisputed, but immaterial, to any legal issue presented by Defendants' motion. | Plaintiffs fail to create a genuine issue of material fact. Such information is relevant to substantiating Plaintiff's relationship with Jeanne, which is a source of motive, as well as his relationship with Jay Jr., and connection to French. |
| 232. While he was living with Jeanne, | Undisputed. | |

| **Uncontroverted Material Facts** | **Plaintiffs' Response:** | **Defendants' Replay and/or Objections** |
|---|---|---|
| Plaintiff knew Jeanne was going through a legal battle with French over her son, Jay Jr. | | |
| 233. At his deposition Plaintiff testified that, while he was living with Jeanne, Plaintiff knew Jeanne and French were going to counseling. | Undisputed. | |
| 234. Both Plaintiff and Jeanne testified at their depositions that they got arrested for battery and vandalism within a week after the altercation/vandalism. | Objection. This incident is irrelevant to any legal issue in this case; any probative value is substantially outweighed by the risk of prejudice and confusion. FRE 401, 403. Evidence of the altercation between Frank and Mark, including Frank's subsequent arrest, is inadmissible character evidence under FRE 404(a) and (b).<br><br>Undisputed, but immaterial, to any legal issue presented by Defendants' motion. | Plaintiffs fail to create a genuine issue of material fact. Such information is relevant to substantiating Plaintiff's relationship with Jeanne, which is a source of motive. |
| 235. At his deposition, Plaintiff testified that when he saw Jeanne on January 1, 1984, she again talked to him about her legal battle with French for visitation and/or | Undisputed. | |

| Uncontroverted Material Facts | Plaintiffs' Response: | Defendants' Replay and/or Objections |
|---|---|---|
| custody of Jay Jr. | | |
| 236. At his deposition, Plaintiff testified that, when he saw Jeanne on January 1, 1984, she "expressed some nerves about what might happen with respect to her ability to visit Jay Jr. or have custody of him." | Undisputed. | |
| 237. At her deposition, Jeanne testified that in November and December of 1983, French was "very upset and didn't want to relinquish any more" visitation rights to Jeanne regarding Jay Jr. | Undisputed. | |
| 238. At her deposition, Jeanne reviewed court documents affirming that a hearing regarding the custody of Jay Jr. that was originally on December 16, 1983 was continued to January 19, 1984. | Undisputed. | |
| 239. At her deposition, Jeanne affirmed that the | Undisputed. | |

| Uncontroverted Material Facts | Plaintiffs' Response: | Defendants' Replay and/or Objections |
|---|---|---|
| hearing regarding the custody of Jay Jr. that was originally on December 16th of 1983 and continued to January 19, 1984 never occurred. | | |
| 240. At her deposition, Jeanne testified that she did not know, one way or another, whether Jay, Jr. said anything to French about "the person that was living with [her] for four to six weeks during the summer of 1983." | Undisputed, but immaterial to any issue presented by Defendants' motion. | Plaintiffs fail to create a genuine issue of material fact. Such information is relevant to substantiating Plaintiff's relationship with Jeanne, which is a source of motive, as well as his relationship with Jay Jr., and connection to French.<br><br>More importantly, the relevancy of this fact is that Jeanne admitted that Jay Jr. could have told French about Plaintiff.  Given the dying declaration of French that indicated that he recognized the shooter when he said the shooter "looked like somebody Jeanne hangs around with" (UF 67), and the fact that Plaintiff admitted to the Detectives that he did not know whether French saw him (More importantly, the relevancy of this fact is that Plaintiff admitted that he did not know whether French saw **him**.  Given the dying declaration of French |

| Uncontroverted Material Facts | Plaintiffs' Response: | Defendants' Replay and/or Objections |
|---|---|---|
| | | that indicated that he recognized the shooter when he said the shooter "looked like somebody Jeanne hangs around with" (UF 67), Plaintiff's admission to the Detectives that he did not know whether French saw him is relevant (UF 215), this admission is relevant. |
| **UNDISPUTED MATERIAL FACTS REGARDING PLAINTIFF'S CONVICTION, HABEAS PROCEEDINGS, AND INSTANT LAWSUIT.** | | |
| 241. On January 15, 1985, following a bench trial, Plaintiff was convicted of first-degree murder for the murder of French. | <u>Undisputed</u>. | |
| 242. In finding Plaintiff guilty, the court noted that the evidence presented by the prosecution was "overwhelming," the I.D. evidence was "unusually strong," the composite sketch bore a "striking resemblance" to Plaintiff, and the evidence connecting Plaintiff to the getaway car was "convincing." | <u>Objection</u>. The Court's opinion is irrelevant to any legal issue presented in this case and constitutes inadmissible hearsay insofar as it is offered for truth. FRE 401, 403, 801, 802.<br><br><u>Undisputed</u> that this was the Court's characterization of the evidence; <u>disputed</u> that this statement accurately characterized the prosecution's evidence or that the characterization would have been made had the court been aware of all the withheld evidence, and the fruits of a timely | Plaintiffs fail to create a genuine issue of material fact and they fail to comply with Central District of California Local Rules 56-2 and 56-3 which requires a party attempting to dispute a fact "to list genuine issues [of material fact] with appropriate record citations" necessary to "withstand the motion for summary judgment." *Nilsson v. Louisiana Hydroelec*, 854 F.2d 1538, 1545 (9th Cir. 1988) ("when a local rule such as Rule 7.14.3 [the |

| Uncontroverted Material Facts | Plaintiffs' Response: | Defendants' Replay and/or Objections |
|---|---|---|
| | investigation from that evidence.<br><br>Disputed that the composite sketch resembled Plaintiff. Mr. Druecker testified at the O'Connell habeas hearing that he testified at the O'Connell habeas hearing that the sketch that was prepared did not look like the guy Mr. Druecker saw shooting. Ex. 201.01, p. 27:8-19 (Dan Druecker habeas testimony); Ex. 001.05 (Police artist sketch of suspect). | predecessor to the current Local Rule 56-3] has been promulgated, it serves as adequate notice to non-moving parties that if a genuine issue exists for trial, they must identify that issue and support it with evidentiary material").<br><br>During the underlying trial, Druecker testified that he was not wearing his glasses or at the time of the murder; however, he also testified that his eye doctor told them that he did not even need glasses and, in any event, he only wore them for night driving to judge distances. (*See,* Defendants' MSJ Ex. N at D1953:24-D1954:11.)<br><br>With respect to Soucy, Jeanne's neighbor who identified Plaintiff as a male, white individual attached to a yellow Pinto who stayed with Jeanne or frequently visited her for an approximate six week period following Memorial Day, 1983, while Plaintiffs allege in this lawsuit that notes indicating that he did not definitively identify Plaintiff (photo #3) but also |

| Uncontroverted Material Facts | Plaintiffs' Response: | Defendants' Replay and/or Objections |
|---|---|---|
| | | indicated that it could it could have "possibly" been a different person (photo #1), the corroborating evidence provided by Soucy to both the LASD detectives and Plaintiff's own defense attorney (i.e. there is no evidence that any other male, whites moved in to Jeanne's place during the approximate six week period following Memorial Day of 1983) so the only person he could have seen staying at Jeanne's and driving a yellow Pinto for an approximate six week period following Memorial Day of 1983 was Plaintiff. (*See*, Defendants' MSJ Ex. U at D4886.)

Finally, with respect to Villareal, the flower delivery person who also identified Plaintiff as escaping in the getaway yellow Pinto, while Plaintiffs assert that detectives notes while indicating that he could not identify with 100% certainty were not disclosed, that information was nevertheless elicited during the underlying trial. (*See,* Defendants' MSJ Ex. |

| Uncontroverted Material Facts | Plaintiffs' Response: | Defendants' Replay and/or Objections |
|---|---|---|
| | | N at D1894:12-21.) |
| 243. On Memorial Day in 2006, 21 years after Plaintiff's conviction, Kate Germond ("Germond"), an investigator for CM, showed up at Druecker's house. | Undisputed. | |
| 244. Druecker testified that, on Memorial Day in 2006, Germond introduced herself to him as someone who works for an organization "that helps the wrongly accused." | Undisputed, but immaterial to any legal issue presented by Defendants' motion. Insofar as this is relevant at all, it is relevant to the trier of fact's assessment of the *credibility* of Druecker's habeas testimony. The Court's function is "not to weigh the evidence…but *to determine whether there is a genuine issue* for trial…Credibility determinations the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249-255 (1986) (emphasis added). For summary judgment purposes, the question is whether Plaintiffs have established a genuine dispute of fact as to whether Detectives caused the introduction an | Plaintiffs fail to create a genuine issue of material fact.<br><br>Kate Germond admitted that CM works to free wrongfully convicted people. During Germond's deposition, she reviewed a letter sent to a witness with her signature at the bottom which said, "I am writing to you because our organization works to free wrongly convicted people and we believe that in 1983 in South Pasadena a man was murdered and the police and prosecutors arrested and prosecuted the wrong man." (Defendants' MSJ Ex. R at 72: 8–20, CM000324.)<br><br>Germond admitted that such a tactic would not only be "heavy handed", but also taint witnesses. (*See*, |

| Uncontroverted Material Facts | Plaintiffs' Response: | Defendants' Replay and/or Objections |
|---|---|---|
| | impermissibly suggestive and unreliable identification testimony. The credibility of Druecker's testimony regarding his interactions with police in 1984 has no bearing on this inquiry.<br><br>Disputed insofar as this fact suggests that CM pressured Druecker into recanting his identification. Neither the Centurion investigator nor Mr. O'Connell's attorney pressured him to recant his testimony, made Druecker feel guilty, or attempted to convince him that Mr. O'Connell was innocent. He agreed to talk to them because he'd done something wrong and he wanted to right it. **Dkt. 265, Litt Decl., Ex. 201.01**, p. 42:1-24 (Druecker testimony at O'Connell habeas). | Defendants' Randy Smith MSA Addl. Ex. C (Germond Depo.) at 62:20–74:13 and CM 00324 (October 20019 letter from CM investigator Germond to "Mr. Redman" asserting that CM was trying to undo Plaintiff's conviction because he was "wrongly convicted".)<br><br>Druecker was steadfast in his identification for over twenty years. Druecker admitted that, when CM first contacted him, they showed up unannounced at his door, stated that they helped the "wrongly accused" and that they were trying to help Plaintiff get his conviction overturned. (*See*, Defendants' Addl. MSJ Ex. AJ at pp. 67:14-68:1 (P001286–P001287:1).<br><br>Druecker even testified that Germond told him that "she believed [Plaintiff] was falsely accused." (See Defendants' MSJ Ex. Q at 122: 21–25; Defendants' MSJ Ex. O at D2334: 20–D2335: 1.) |
| 245. Druecker testified that, on | Undisputed, but immaterial to any legal issue presented | Plaintiffs fail to create a genuine issue of material |

| Uncontroverted Material Facts | Plaintiffs' Response: | Defendants' Replay and/or Objections |
|---|---|---|
| Memorial Day in 2006, Germond told him that she was helping Plaintiff contest his conviction for the January 5, 1984 French murder. | by Defendants' motion. Insofar as this is relevant at all, it is relevant to the trier of fact's assessment of the *credibility* of Druecker's habeas testimony. The Court's function is "not to weigh the evidence…but *to determine whether there is a genuine issue* for trial…Credibility determinations the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249-255 (1986) (emphasis added).  For summary judgment purposes, the question is whether Plaintiffs have established a genuine dispute of fact as to whether Detectives caused the introduction an impermissibly suggestive and unreliable identification testimony. The credibility of Druecker's testimony regarding his interactions with police in 1984 has no bearing on this inquiry.

Disputed insofar as this fact suggests that CM pressured Druecker into recanting his identification. Neither the | fact.

Kate Germond admitted that CM works to free wrongfully convicted people. During Germond's deposition, she reviewed a letter sent to a witness with her signature at the bottom which said, "I am writing to you because our organization works to free wrongly convicted people and we believe that in 1983 in South Pasadena a man was murdered and the police and prosecutors arrested and prosecuted the wrong man." (Defendants' MSJ Ex. R at 72: 8–20, CM000324.)

Germond admitted that such a tactic would not only be "heavy handed", but also taint witnesses. (*See*, Defendants' Randy Smith MSA Addl. Ex. C (Germond Depo.) at 62:20–74:13 and CM 00324 (October 20019 letter from CM  investigator Germond to "Mr. Redman" asserting that CM was trying to undo Plaintiff's conviction because he was "wrongly convicted".) |

119

| Uncontroverted Material Facts | Plaintiffs' Response: | Defendants' Replay and/or Objections |
|---|---|---|
| | Centurion investigator nor Mr. O'Connell's attorney pressured him to recant his testimony, made Druecker feel guilty, or attempted to convince him that Mr. O'Connell was innocent. He agreed to talk to them because he'd done something wrong and he wanted to right it. **Dkt. 265, Litt Decl., Ex. 201.01**, p. 42:1-24 (Druecker testimony at O'Connell habeas). | Druecker was steadfast in his identification for over twenty years. Druecker admitted that, when CM first contacted him, they showed up unannounced at his door, stated that they helped the "wrongly accused" and that they were trying to help Plaintiff get his conviction overturned. (*See*, Defendants' Addl. MSJ Ex. AJ at pp. 67:14-68:1 (P001286–P001287:1).<br><br>Druecker even testified that Germond told him that "she believed [Plaintiff] was falsely accused." (See Defendants' MSJ Ex. Q at 122: 21–25; Defendants' MSJ Ex. O at D2334: 20–D2335: 1.) |
| 246. Druecker testified that, on Memorial Day in 2006, Germond told him that "she believed [Plaintiff] was falsely accused." | Undisputed, but immaterial to any legal issue presented by Defendants' motion. Insofar as this is relevant at all, it is relevant to the trier of fact's assessment of the *credibility* of Druecker's habeas testimony. The Court's function is "not to weigh the evidence…but *to determine whether there is a genuine issue* for trial…Credibility determinations the weighing | Plaintiffs fail to create a genuine issue of material fact.<br><br>Kate Germond admitted that CM works to free wrongly convicted people. During Germond's deposition, she reviewed a letter sent to a witness with her signature at the bottom which said, "I am writing to you because our organization works to free |

| Uncontroverted Material Facts | Plaintiffs' Response: | Defendants' Replay and/or Objections |
|---|---|---|
| | of the evidence, and the drawing of legitimate inferences from the facts are jury functions." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249-255 (1986) (emphasis added).  For summary judgment purposes, the question is whether Plaintiffs have established a genuine dispute of fact as to whether Detectives caused the introduction an impermissibly suggestive and unreliable identification testimony. The credibility of Druecker's testimony regarding his interactions with police in 1984 has no bearing on this inquiry.

Disputed insofar as this fact suggests that CM pressured Druecker into recanting his identification. Neither the Centurion investigator nor Mr. O'Connell's attorney pressured him to recant his testimony, made Druecker feel guilty, or attempted to convince him that Mr. O'Connell was innocent. He agreed to talk to them because he'd done something wrong and he wanted to right it. **Dkt. 265, Litt Decl., Ex. 201.01**, p. | wrongly convicted people and we believe that in 1983 in South Pasadena a man was murdered and the police and prosecutors arrested and prosecuted the wrong man." (Defendants' MSJ Ex. R at 72: 8–20, CM000324.)

Germond admitted that such a tactic would not only be "heavy handed", but also taint witnesses. (*See*, Defendants' Randy Smith MSA Addl. Ex. C (Germond Depo.) at 62:20–74:13 and CM 00324 (October 20019 letter from CM  investigator Germond to "Mr. Redman" asserting that CM was trying to undo Plaintiff's conviction because he was "wrongly convicted".)

Druecker was steadfast in his identification for over twenty years. Druecker admitted that, when CM first contacted him, they showed up unannounced at his door, stated that they helped the "wrongly accused" and that they were trying to help Plaintiff get his conviction overturned. (*See*, Defendants' Addl. |

| Uncontroverted Material Facts | Plaintiffs' Response: | Defendants' Replay and/or Objections |
|---|---|---|
| | 42:1-24 (Druecker testimony at O'Connell habeas). | MSJ Ex. AJ at pp. 67:14-68:1 (P001286–P001287:1).<br><br>Druecker even testified that Germond told him that "she believed [Plaintiff] was falsely accused." (See Defendants' MSJ Ex. Q at 122: 21–25; Defendants' MSJ Ex. O at D2334: 20–D2335: 1.) |
| 247. Druecker testified that he told Germond that he did not want to talk about the incident, so Germond asked him if she could send him some materials (i.e. court documents and transcripts) about the case. | <u>Undisputed</u>, but <u>immaterial</u> to any legal issue presented by Defendants' motion. Insofar as this is relevant at all, it is relevant to the trier of fact's assessment of the *credibility* of Druecker's habeas testimony. The Court's function is "not to weigh the evidence…but *to determine whether there is a genuine issue* for trial…Credibility determinations the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249-255 (1986) (emphasis added). For summary judgment purposes, the question is whether Plaintiffs have established a genuine dispute of fact as to whether | Plaintiffs fail to create a genuine issue of material fact.<br><br>Kate Germond admitted that CM works to free wrongfully convicted people. During Germond's deposition, she reviewed a letter sent to a witness with her signature at the bottom which said, "I am writing to you because our organization works to free wrongly convicted people and we believe that in 1983 in South Pasadena a man was murdered and the police and prosecutors arrested and prosecuted the wrong man." (Defendants' MSJ Ex. R at 72: 8–20, CM000324.)<br><br>Germond admitted that such a tactic would not only be |

| Uncontroverted Material Facts | Plaintiffs' Response: | Defendants' Replay and/or Objections |
|---|---|---|
| | Detectives caused the introduction an impermissibly suggestive and unreliable identification testimony. The credibility of Druecker's testimony regarding his interactions with police in 1984 has no bearing on this inquiry.<br><br>Disputed insofar as this fact suggests that CM pressured Druecker into recanting his identification. Neither the Centurion investigator nor Mr. O'Connell's attorney pressured him to recant his testimony, made Druecker feel guilty, or attempted to convince him that Mr. O'Connell was innocent. He agreed to talk to them because he'd done something wrong and he wanted to right it. **Dkt. 265, Litt Decl., Ex. 201.01**, p. 42:1-24 (Druecker testimony at O'Connell habeas). | "heavy handed", but also taint witnesses. (*See,* Defendants' Randy Smith MSA Addl. Ex. C (Germond Depo.) at 62:20–74:13 and CM 00324 (October 20019 letter from CM investigator Germond to "Mr. Redman" asserting that CM was trying to undo Plaintiff's conviction because he was "wrongly convicted".)<br><br>Druecker was steadfast in his identification for over twenty years. Druecker admitted that, when CM first contacted him, they showed up unannounced at his door, stated that they helped the "wrongly accused" and that they were trying to help Plaintiff get his conviction overturned. (*See,* Defendants' Addl. MSJ Ex. AJ at pp. 67:14-68:1 (P001286–P001287:1).<br><br>Druecker even testified that Germond told him that "she believed [Plaintiff] was falsely accused." (See Defendants' MSJ Ex. Q at 122: 21–25; Defendants' MSJ Ex. O at D2334: 20–D2335: 1.) |

| **Uncontroverted Material Facts** | **Plaintiffs' Response:** | **Defendants' Replay and/or Objections** |
|---|---|---|
| 248. Germond sent Druecker a manila folder with court documents and transcripts relating to Plaintiff's conviction of the January 5, 1984 French murder. | Undisputed that CM sent Druecker *a transcript of his own testimony*, but immaterial to any legal issue presented by Defendants' motion. Insofar as this is relevant at all, it is relevant to the trier of fact's assessment of the *credibility* of Druecker's habeas testimony. The Court's function is "not to weigh the evidence…but *to determine whether there is a genuine issue* for trial…Credibility determinations the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249-255 (1986) (emphasis added).  For summary judgment purposes, the question is whether Plaintiffs have established a genuine dispute of fact as to whether Detectives caused the introduction an impermissibly suggestive and unreliable identification testimony. The credibility of Druecker's testimony regarding his interactions with police in 1984 has no bearing on this inquiry. | Plaintiffs fail to create a genuine issue of material fact.

Kate Germond admitted that CM works to free wrongfully convicted people. During Germond's deposition, she reviewed a letter sent to a witness with her signature at the bottom which said, "I am writing to you because our organization works to free wrongly convicted people and we believe that in 1983 in South Pasadena a man was murdered and the police and prosecutors arrested and prosecuted the wrong man." (Defendants' MSJ Ex. R at 72: 8–20, CM000324.)

Germond admitted that such a tactic would not only be "heavy handed", but also taint witnesses. (*See*, Defendants' Randy Smith MSA Addl. Ex. C (Germond Depo.) at 62:20–74:13 and CM 00324 (October 20019 letter from CM  investigator Germond to "Mr. Redman" asserting that CM was trying to undo Plaintiff's conviction because he was "wrongly |

| Uncontroverted Material Facts | Plaintiffs' Response: | Defendants' Replay and/or Objections |
|---|---|---|
| | Disputed insofar as this fact suggests that CM pressured Druecker into recanting his identification. Neither the Centurion investigator nor Mr. O'Connell's attorney pressured him to recant his testimony, made Druecker feel guilty, or attempted to convince him that Mr. O'Connell was innocent. He agreed to talk to them because he'd done something wrong and he wanted to right it. **Dkt. 265, Litt Decl., Ex. 201.01**, p. 42:1-24 (Druecker testimony at O'Connell habeas). | convicted".) Druecker was steadfast in his identification for over twenty years. Druecker admitted that, when CM first contacted him, they showed up unannounced at his door, stated that they helped the "wrongly accused" and that they were trying to help Plaintiff get his conviction overturned. (*See*, Defendants' Addl. MSJ Ex. AJ at pp. 67:14-68:1 (P001286–P001287:1). Druecker even testified that Germond told him that "she believed [Plaintiff] was falsely accused." (See Defendants' MSJ Ex. Q at 122: 21–25; Defendants' MSJ Ex. O at D2334: 20–D2335: 1.) |
| 249. Over the next two years, Germond continued to call Druecker and leave messages on his answering machine. | Undisputed, but immaterial to any legal issue presented by Defendants' motion. Insofar as this is relevant at all, it is relevant to the trier of fact's assessment of the *credibility* of Druecker's habeas testimony. The Court's function is "not to weigh the evidence…but *to determine whether there is a genuine issue* for | Plaintiffs fail to create a genuine issue of material fact. Kate Germond admitted that CM works to free wrongly convicted people. During Germond's deposition, she reviewed a letter sent to a witness with her signature at the bottom which said, "I am |

| Uncontroverted Material Facts | Plaintiffs' Response: | Defendants' Replay and/or Objections |
|---|---|---|
| | trial…Credibility determinations the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249-255 (1986) (emphasis added).  For summary judgment purposes, the question is whether Plaintiffs have established a genuine dispute of fact as to whether Detectives caused the introduction an impermissibly suggestive and unreliable identification testimony. The credibility of Druecker's testimony regarding his interactions with police in 1984 has no bearing on this inquiry.  Disputed insofar as this fact suggests that CM pressured Druecker into recanting his identification. Neither the Centurion investigator nor Mr. O'Connell's attorney pressured him to recant his testimony, made Druecker feel guilty, or attempted to convince him that Mr. O'Connell was innocent. He agreed to talk to them because he'd done something wrong and he | writing to you because our organization works to free wrongly convicted people and we believe that in 1983 in South Pasadena a man was murdered and the police and prosecutors arrested and prosecuted the wrong man." (Defendants' MSJ Ex. R at 72: 8–20, CM000324.)  Germond admitted that such a tactic would not only be "heavy handed", but also taint witnesses. (*See*, Defendants' Randy Smith MSA Addl. Ex. C (Germond Depo.) at 62:20–74:13 and CM 00324 (October 20019 letter from CM  investigator Germond to "Mr. Redman" asserting that CM was trying to undo Plaintiff's conviction because he was "wrongly convicted".)  Druecker was steadfast in his identification for over twenty years. Druecker admitted that, when CM first contacted him, they showed up unannounced at his door, stated that they helped the "wrongly accused" and that they were trying to help Plaintiff get |

| Uncontroverted Material Facts | Plaintiffs' Response: | Defendants' Replay and/or Objections |
|---|---|---|
| | wanted to right it. **Dkt. 265, Litt Decl., Ex. 201.01**, p. 42:1-24 (Druecker testimony at O'Connell habeas). | his conviction overturned. (*See*, Defendants' Addl. MSJ Ex. AJ at pp. 67:14-68:1 (P001286–P001287:1). Druecker even testified that Germond told him that "she believed [Plaintiff] was falsely accused." (See Defendants' MSJ Ex. Q at 122: 21–25; Defendants' MSJ Ex. O at D2334: 20–D2335: 1.) |
| 250. Druecker never listened to Germond's telephone messages. | Undisputed, but immaterial to any legal issue presented by Defendants' motion. Insofar as this is relevant at all, it is relevant to the trier of fact's assessment of the *credibility* of Druecker's habeas testimony. The Court's function is "not to weigh the evidence…but *to determine whether there is a genuine issue* for trial…Credibility determinations the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249-255 (1986) (emphasis added). For summary judgment purposes, the question is whether Plaintiffs have | Plaintiffs fail to create a genuine issue of material fact. Kate Germond admitted that CM works to free wrongfully convicted people. During Germond's deposition, she reviewed a letter sent to a witness with her signature at the bottom which said, "I am writing to you because our organization works to free wrongly convicted people and we believe that in 1983 in South Pasadena a man was murdered and the police and prosecutors arrested and prosecuted the wrong man." (Defendants' MSJ Ex. R at 72: 8–20, CM000324.) |

| **Uncontroverted Material Facts** | **Plaintiffs' Response:** | **Defendants' Replay and/or Objections** |
|---|---|---|
| | established a genuine dispute of fact as to whether Detectives caused the introduction an impermissibly suggestive and unreliable identification testimony. The credibility of Druecker's testimony regarding his interactions with police in 1984 has no bearing on this inquiry.<br><br>Disputed insofar as this fact suggests that CM pressured Druecker into recanting his identification. Neither the Centurion investigator nor Mr. O'Connell's attorney pressured him to recant his testimony, made Druecker feel guilty, or attempted to convince him that Mr. O'Connell was innocent. He agreed to talk to them because he'd done something wrong and he wanted to right it. **Dkt. 265, Litt Decl., Ex. 201.01**, p. 42:1-24 (Druecker testimony at O'Connell habeas). | Germond admitted that such a tactic would not only be "heavy handed", but also taint witnesses. (*See*, Defendants' Randy Smith MSA Addl. Ex. C (Germond Depo.) at 62:20–74:13 and CM 00324 (October 20019 letter from CM investigator Germond to "Mr. Redman" asserting that CM was trying to undo Plaintiff's conviction because he was "wrongly convicted".)<br><br>Druecker was steadfast in his identification for over twenty years. Druecker admitted that, when CM first contacted him, they showed up unannounced at his door, stated that they helped the "wrongly accused" and that they were trying to help Plaintiff get his conviction overturned. (*See*, Defendants' Addl. MSJ Ex. AJ at pp. 67:14-68:1 (P001286–P001287:1).<br><br>Druecker even testified that Germond told him that "she believed [Plaintiff] was falsely accused." (See Defendants' MSJ Ex. Q at 122: 21–25; Defendants' |

| Uncontroverted Material Facts | Plaintiffs' Response: | Defendants' Replay and/or Objections |
|---|---|---|
| | | MSJ Ex. O at D2334: 20–D2335: 1.) |
| 251. In 2008, two years after Germond first contacted Druecker, Druecker called Germond ("the 2008 phone call") and they discussed Druecker's eyewitness testimony from the court proceedings prior to Plaintiff's conviction of the January 5, 1984 French murder. | Undisputed, but immaterial to any legal issue presented by Defendants' motion. Insofar as this is relevant at all, it is relevant to the trier of fact's assessment of the *credibility* of Druecker's habeas testimony. The Court's function is "not to weigh the evidence…but *to determine whether there is a genuine issue* for trial…Credibility determinations the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249-255 (1986) (emphasis added). For summary judgment purposes, the question is whether Plaintiffs have established a genuine dispute of fact as to whether Detectives caused the introduction an impermissibly suggestive and unreliable identification testimony. The credibility of Druecker's testimony regarding his interactions with police in 1984 has no bearing on this inquiry. | Plaintiffs fail to create a genuine issue of material fact.

Kate Germond admitted that CM works to free wrongfully convicted people. During Germond's deposition, she reviewed a letter sent to a witness with her signature at the bottom which said, "I am writing to you because our organization works to free wrongly convicted people and we believe that in 1983 in South Pasadena a man was murdered and the police and prosecutors arrested and prosecuted the wrong man." (Defendants' MSJ Ex. R at 72: 8–20, CM000324.)

Germond admitted that such a tactic would not only be "heavy handed", but also taint witnesses. (*See*, Defendants' Randy Smith MSA Addl. Ex. C (Germond Depo.) at 62:20–74:13 and CM 00324 (October 20019 letter from CM investigator Germond to "Mr. Redman" asserting that CM was trying to undo |

| Uncontroverted Material Facts | Plaintiffs' Response: | Defendants' Replay and/or Objections |
|---|---|---|
| | Disputed insofar as this fact suggests that CM pressured Druecker into recanting his identification. Neither the Centurion investigator nor Mr. O'Connell's attorney pressured him to recant his testimony, made Druecker feel guilty, or attempted to convince him that Mr. O'Connell was innocent. He agreed to talk to them because he'd done something wrong and he wanted to right it. **Dkt. 265, Litt Decl., Ex. 201.01**, p. 42:1-24 (Druecker testimony at O'Connell habeas). | Plaintiff's conviction because he was "wrongly convicted".)<br><br>Druecker was steadfast in his identification for over twenty years. Druecker admitted that, when CM first contacted him, they showed up unannounced at his door, stated that they helped the "wrongly accused" and that they were trying to help Plaintiff get his conviction overturned. (*See*, Defendants' Addl. MSJ Ex. AJ at pp. 67:14-68:1 (P001286–P001287:1).<br><br>Druecker even testified that Germond told him that "she believed [Plaintiff] was falsely accused." (See Defendants' MSJ Ex. Q at 122: 21–25; Defendants' MSJ Ex. O at D2334: 20–D2335: 1.) |
| 252. After the 2008 phone call, Druecker had "several" meetings with Germond and a CM attorney named Peter Camiel ("Camiel"). | Objection. Lacks foundation, no personal knowledge, FRE 602. Misrepresents the witnesses testimony. Druecker testified that he didn't "know" how many meetings there were, could only "guess," and that, to the best of his recollection | Plaintiffs fail to create a genuine issue of material fact.<br><br>Kate Germond admitted that CM works to free wrongfully convicted people. During Germond's deposition, she reviewed a letter sent to a witness with |

| Uncontroverted Material Facts | Plaintiffs' Response: | Defendants' Replay and/or Objections |
|---|---|---|
| | there was **more than one** meeting. *Defs* Ex. Q, pp. 138:6 – 139:16.<br><br>Undisputed, but immaterial to any legal issue presented by Defendants' motion. Insofar as this is relevant at all, it is relevant to the trier of fact's assessment of the *credibility* of Druecker's habeas testimony. The Court's function is "not to weigh the evidence…but *to determine whether there is a genuine issue* for trial…Credibility determinations the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249-255 (1986) (emphasis added). For summary judgment purposes, the question is whether Plaintiffs have established a genuine dispute of fact as to whether Detectives caused the introduction an impermissibly suggestive and unreliable identification testimony. The credibility of Druecker's testimony regarding his interactions with police in 1984 has no | her signature at the bottom which said, "I am writing to you because our organization works to free wrongly convicted people and we believe that in 1983 in South Pasadena a man was murdered and the police and prosecutors arrested and prosecuted the wrong man." (Defendants' MSJ Ex. R at 72: 8–20, CM000324.)<br><br>Germond admitted that such a tactic would not only be "heavy handed", but also taint witnesses. (*See*, Defendants' Randy Smith MSA Addl. Ex. C (Germond Depo.) at 62:20–74:13 and CM 00324 (October 20019 letter from CM investigator Germond to "Mr. Redman" asserting that CM was trying to undo Plaintiff's conviction because he was "wrongly convicted".)<br><br>Druecker was steadfast in his identification for over twenty years. Druecker admitted that, when CM first contacted him, they showed up unannounced at his door, stated that they helped the "wrongly |

| Uncontroverted Material Facts | Plaintiffs' Response: | Defendants' Replay and/or Objections |
|---|---|---|
| | bearing on this inquiry.<br><br>Disputed insofar as this fact suggests that CM pressured Druecker into recanting his identification. Neither the Centurion investigator nor Mr. O'Connell's attorney pressured him to recant his testimony, made Druecker feel guilty, or attempted to convince him that Mr. O'Connell was innocent. He agreed to talk to them because he'd done something wrong and he wanted to right it. **Dkt. 265, Litt Decl., Ex. 201.01**, p. 42:1-24 (Druecker testimony at O'Connell habeas). | accused" and that they were trying to help Plaintiff get his conviction overturned. (*See*, Defendants' Addl. MSJ Ex. AJ at pp. 67:14-68:1 (P001286–P001287:1).<br><br>Druecker even testified that Germond told him that "she believed [Plaintiff] was falsely accused." (See Defendants' MSJ Ex. Q at 122: 21–25; Defendants' MSJ Ex. O at D2334: 20–D2335: 1.) |
| 253. During these meetings, Druecker, Germond, and Camiel talked, for "several hours" at a time, about Plaintiff's conviction of the January 5, 1984 murder, the underlying trial, and Druecker's testimony. | Undisputed, but immaterial to any legal issue presented by Defendants' motion. Insofar as this is relevant at all, it is relevant to the trier of fact's assessment of the *credibility* of Druecker's habeas testimony. The Court's function is "not to weigh the evidence…but *to determine whether there is a genuine issue* for trial…Credibility determinations the weighing of the evidence, and the drawing of legitimate inferences from the facts are | Plaintiffs fail to create a genuine issue of material fact.<br><br>Kate Germond admitted that CM works to free wrongfully convicted people. During Germond's deposition, she reviewed a letter sent to a witness with her signature at the bottom which said, "I am writing to you because our organization works to free wrongly convicted people and we believe that in 1983 in South Pasadena a man |

| Uncontroverted Material Facts | Plaintiffs' Response: | Defendants' Replay and/or Objections |
|---|---|---|
| | jury functions." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249-255 (1986) (emphasis added). For summary judgment purposes, the question is whether Plaintiffs have established a genuine dispute of fact as to whether Detectives caused the introduction an impermissibly suggestive and unreliable identification testimony. The credibility of Druecker's testimony regarding his interactions with police in 1984 has no bearing on this inquiry.

Disputed insofar as this fact suggests that CM pressured Druecker into recanting his identification. Neither the Centurion investigator nor Mr. O'Connell's attorney pressured him to recant his testimony, made Druecker feel guilty, or attempted to convince him that Mr. O'Connell was innocent. He agreed to talk to them because he'd done something wrong and he wanted to right it. **Dkt. 265, Litt Decl., Ex. 201.01**, p. 42:1-24 (Druecker testimony at O'Connell habeas). | was murdered and the police and prosecutors arrested and prosecuted the wrong man." (Defendants' MSJ Ex. R at 72: 8–20, CM000324.)

Germond admitted that such a tactic would not only be "heavy handed", but also taint witnesses. (*See*, Defendants' Randy Smith MSA Addl. Ex. C (Germond Depo.) at 62:20–74:13 and CM 00324 (October 20019 letter from CM investigator Germond to "Mr. Redman" asserting that CM was trying to undo Plaintiff's conviction because he was "wrongly convicted".)

Druecker was steadfast in his identification for over twenty years. Druecker admitted that, when CM first contacted him, they showed up unannounced at his door, stated that they helped the "wrongly accused" and that they were trying to help Plaintiff get his conviction overturned. (*See*, Defendants' Addl. MSJ Ex. AJ at pp. 67:14-68:1 (P001286–P001287:1).) |

| Uncontroverted Material Facts | Plaintiffs' Response: | Defendants' Replay and/or Objections |
|---|---|---|
| | | Druecker even testified that Germond told him that "she believed [Plaintiff] was falsely accused." (See Defendants' MSJ Ex. Q at 122: 21–25; Defendants' MSJ Ex. O at D2334: 20–D2335: 1.) |
| 254. During at least one of these meetings, Germond told Druecker that eyewitness testimony can be unreliable. | Undisputed that Germond told Druecker that eyewitness testimony can be unreliable (though she never suggested that his testimony was unreliable). Defs. Ex. Q, pp. 368:5-13. Immaterial to any legal issue presented by Defendants' motion. Insofar as this is relevant at all, it is relevant to the trier of fact's assessment of the *credibility* of Druecker's habeas testimony. The Court's function is "not to weigh the evidence…but *to determine whether there is a genuine issue* for trial…Credibility determinations the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249-255 (1986) (emphasis added). For summary judgment | Plaintiffs fail to create a genuine issue of material fact.<br><br>Kate Germond admitted that CM works to free wrongfully convicted people. During Germond's deposition, she reviewed a letter sent to a witness with her signature at the bottom which said, "I am writing to you because our organization works to free wrongly convicted people and we believe that in 1983 in South Pasadena a man was murdered and the police and prosecutors arrested and prosecuted the wrong man." (Defendants' MSJ Ex. R at 72: 8–20, CM000324.)<br><br>Germond admitted that such a tactic would not only be "heavy handed", but also taint witnesses. (*See,* |

| Uncontroverted Material Facts | Plaintiffs' Response: | Defendants' Replay and/or Objections |
|---|---|---|
| | purposes, the question is whether Plaintiffs have established a genuine dispute of fact as to whether Detectives caused the introduction an impermissibly suggestive and unreliable identification testimony. The credibility of Druecker's testimony regarding his interactions with police in 1984 has no bearing on this inquiry.<br><br>Disputed insofar as this fact suggests that CM pressured Druecker into recanting his identification. Neither the Centurion investigator nor Mr. O'Connell's attorney pressured him to recant his testimony, made Druecker feel guilty, or attempted to convince him that Mr. O'Connell was innocent. He agreed to talk to them because he'd done something wrong and he wanted to right it. **Dkt. 265, Litt Decl., Ex. 201.01**, p. 42:1-24 (Druecker testimony at O'Connell habeas). | Defendants' Randy Smith MSA Addl. Ex. C (Germond Depo.) at 62:20–74:13 and CM 00324 (October 20019 letter from CM investigator Germond to "Mr. Redman" asserting that CM was trying to undo Plaintiff's conviction because he was "wrongly convicted".)<br><br>Druecker was steadfast in his identification for over twenty years. Druecker admitted that, when CM first contacted him, they showed up unannounced at his door, stated that they helped the "wrongly accused" and that they were trying to help Plaintiff get his conviction overturned. (*See*, Defendants' Addl. MSJ Ex. AJ at pp. 67:14–68:1 (P001286–P001287:1).)<br><br>Druecker even testified that Germond told him that "she believed [Plaintiff] was falsely accused." (See Defendants' MSJ Ex. Q at 122: 21–25; Defendants' MSJ Ex. O at D2334: 20–D2335: 1.) |
| 255. Eventually, over | Undisputed that Druecker | Plaintiffs fail to create a |

| Uncontroverted Material Facts | Plaintiffs' Response: | Defendants' Replay and/or Objections |
|---|---|---|
| two years after CM had initially contacted him and after multiple meetings with Germond and Camiel, Druecker recanted his identification testimony in a declaration. | recanted his identification testimony a declaration signed approximately two years after CM contacted him. Disputed insofar as this characterization suggests that Druecker *first* recanted his identification testimony after multiple meetings with Germond and Camiel. As evidence by the testimony cited by Defendants, in May 2006, Druecker told Germond that he did not want to relive the incident. He did not speak with her again until calling her two years later. During his first communication about the case (phone call), he advised that he had never been sure of his identification: "When I first called Kate, I basically told her everything that I had been suppressing, that I could not really identify the shooter. I was guessing all along, and I believed the police had found the right person, and that's why I lied in court." Defs. Ex. Q, pp. 139:25 – 140:6. Germond never suggested to him that the police may have engaged in wrongdoing. Defs. Ex. Q, pp. 140:7 – 140:19. | genuine issue of material fact.<br><br>Kate Germond admitted that CM works to free wrongfully convicted people. During Germond's deposition, she reviewed a letter sent to a witness with her signature at the bottom which said, "I am writing to you because our organization works to free wrongly convicted people and we believe that in 1983 in South Pasadena a man was murdered and the police and prosecutors arrested and prosecuted the wrong man." (Defendants' MSJ Ex. R at 72: 8–20, CM000324.)<br><br>Germond admitted that such a tactic would not only be "heavy handed", but also taint witnesses. (*See*, Defendants' Randy Smith MSA Addl. Ex. C (Germond Depo.) at 62:20–74:13 and CM 00324 (October 20019 letter from CM investigator Germond to "Mr. Redman" asserting that CM was trying to undo Plaintiff's conviction because he was "wrongly convicted".) |

| Uncontroverted Material Facts | Plaintiffs' Response: | Defendants' Replay and/or Objections |
|---|---|---|
| | <u>Immaterial</u> to any legal issue presented by Defendants' motion. Insofar as this is relevant at all, it is relevant to the trier of fact's assessment of the *credibility* of Druecker's habeas testimony. The Court's function is "not to weigh the evidence…but *to determine whether there is a genuine issue* for trial…Credibility determinations the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249-255 (1986) (emphasis added).  For summary judgment purposes, the question is whether Plaintiffs have established a genuine dispute of fact as to whether Detectives caused the introduction an impermissibly suggestive and unreliable identification testimony. The credibility of Druecker's testimony regarding his interactions with police in 1984 has no bearing on this inquiry.<br><br><u>Disputed</u> insofar as this fact suggests that CM pressured Druecker into recanting his | Druecker was steadfast in his identification for over twenty years. Druecker admitted that, when CM first contacted him, they showed up unannounced at his door, stated that they helped the "wrongly accused" and that they were trying to help Plaintiff get his conviction overturned. (*See*, Defendants' Addl. MSJ Ex. AJ at pp. 67:14-68:1 (P001286–P001287:1).)<br><br>Druecker even testified that Germond told him that "she believed [Plaintiff] was falsely accused." (See Defendants' MSJ Ex. Q at 122: 21–25; Defendants' MSJ Ex. O at D2334: 20–D2335: 1.) |

| Uncontroverted Material Facts | Plaintiffs' Response: | Defendants' Replay and/or Objections |
|---|---|---|
| | identification. Neither the Centurion investigator nor Mr. O'Connell's attorney pressured him to recant his testimony, made Druecker feel guilty, or attempted to convince him that Mr. O'Connell was innocent. He agreed to talk to them because he'd done something wrong and he wanted to right it. **Dkt. 265, Litt Decl., Ex. 201.01**, p. 42:1-24 (Druecker testimony at O'Connell habeas). | |
| 256. Prior to his recantation in 2008, Druecker never went on the record to suggest that his identification of Plaintiff was based on suggestive tactics by the Detectives. | Objection. Vague as to "never went on the record" and "suggestive tactics by the Detectives." Undisputed that, during the 1984-1985 prosecution, Druecker did not advise the court that he was unable to make an identification, so advised the detectives, felt pressured to make an identification, or that detectives affirmed his selection in his presence. Disputed that Druecker never told law enforcement that he was unable to make an identification. Druecker specifically advised detectives that he "**couldn't identify anyone** on this | Plaintiffs fail to create a genuine issue of material fact. Druecker testified he had no doubt in his mind "at all" about his identification of Plaintiff as the gunman (1) in the six pack, (2) at the preliminary hearing, (3) and at trial. (Defendants' MSJ Ex. N at D1897: 5–D1898: 5.) |

| <u>Uncontroverted Material Facts</u> | <u>Plaintiffs' Response:</u> | <u>Defendants' Replay and/or Objections</u> |
|---|---|---|
| | mug shot because they were front facing and they were not profiles." *Defs* Ex. Q, p. 224:3 – 224:10.<br><br>Immaterial to any legal issue presented by Defendants' motion. Insofar as this is relevant at all, it is relevant to the trier of fact's assessment of the *credibility* of Druecker's habeas testimony. The Court's function is "not to weigh the evidence…but *to determine whether there is a genuine issue* for trial…Credibility determinations the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249-255 (1986) (emphasis added). For summary judgment purposes, the question is whether Plaintiffs have established a genuine dispute of fact as to whether Detectives caused the introduction an impermissibly suggestive and unreliable identification testimony. The credibility of Druecker's testimony regarding his interactions with police in 1984 has no | |

| **Uncontroverted Material Facts** | **Plaintiffs' Response:** | **Defendants' Replay and/or Objections** |
|---|---|---|
| | bearing on this inquiry. | |
| 257. Druecker's recantation led to a *habeas* petition, which was ultimately granted in March of 2012. | Objection. The referenced document does not support the factual contention for which it is cited. Plaintiffs' §1983 Complaint in this matter is not evidence establishing the basis for Plaintiff's habeas petition (or what "led" to the petition). Plaintiff's habeas petition, including his supplemental petition, alleged multiple constitutional violations, including failure to disclosure exculpatory evidence.<br><br>Undisputed that Plaintiff's habeas petition was granted in March 2012. Disputed insofar as this fact suggests that Plaintiff's habeas petition was granted solely or primarily on the basis of Daniel Druecker's recantation. *See* also, **Dkt. 263, Battles Decl.**: **Ex. 225**, 3/29/2012 Order Granting Habeas, pp. 7-8 (finding that the detectives omitted from their police reports material exculpatory information related to the prior attempt and the identifications of Maurice Soucy and Daniel | |

140

| Uncontroverted Material Facts | Plaintiffs' Response: | Defendants' Replay and/or Objections |
|---|---|---|
| | Druecker). | |
| 258. During Germond's deposition, she reviewed a letter sent to a Mr. Redman with her signature at the bottom. | Objection. Kate Germond's letter is irrelevant to any claim in this matter; any probative value is substantially outweighed by the risk of prejudice and confusion of the issues. FRE 401, 403.<br><br>Immaterial to any legal issue presented by Defendants' motion. Insofar as this is relevant to any issue at all, it is relevant to the trier of fact's assessment of the *credibility* of Druecker's habeas testimony. The Court's function is "not to weigh the evidence…but *to determine whether there is a genuine issue* for trial…Credibility determinations the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249-255 (1986) (emphasis added). | Plaintiffs fail to create a genuine issue of material fact.<br><br>Kate Germond admitted that CM works to free wrongfully convicted people. During Germond's deposition, she reviewed the letter mentioned (and acknowledged her signature at the bottom). The letter said, "I am writing to you because our organization works to free wrongly convicted people and we believe that in 1983 in South Pasadena a man was murdered and the police and prosecutors arrested and prosecuted the wrong man." (Defendants' MSJ Ex. R at 72: 8–20, CM000324.)<br><br>Germond admitted that such a tactic would not only be "heavy handed", but also taint witnesses. (*See*, Defendants' Randy Smith MSA Addl. Ex. C (Germond Depo.) at 62:20–74:13 and CM 00324 (October 20019 letter from CM investigator Germond to "Mr. Redman" asserting |

| Uncontroverted Material Facts | Plaintiffs' Response: | Defendants' Replay and/or Objections |
|---|---|---|
| | | that CM was trying to undo Plaintiff's conviction because he was "wrongly convicted".) |
| | | Druecker was steadfast in his identification for over twenty years. Druecker admitted that, when CM first contacted him, they showed up unannounced at his door, stated that they helped the "wrongly accused" and that they were trying to help Plaintiff get his conviction overturned. (*See*, Defendants' Addl. MSJ Ex. AJ at pp. 67:14-68:1 (P001286–P001287:1).) |
| | | Druecker even testified that Germond told him that "she believed [Plaintiff] was falsely accused." (See Defendants' MSJ Ex. Q at 122: 21–25; Defendants' MSJ Ex. O at D2334: 20–D2335: 1.) |
| 259. During her deposition, Germond reviewed the first sentence of the letter, which said, "I am writing to you because our organization works to free wrongly | Objection. Kate Germond's letter is irrelevant to any claim in this matter; any probative value is substantially outweighed by the risk of prejudice and confusion of the issues. FRE 401, 403. | Plaintiffs fail to create a genuine issue of material fact.\n\nWhile Druecker testified that neither the CM investigator nor Plaintiff's attorney engaged in overt |

| Uncontroverted Material Facts | Plaintiffs' Response: | Defendants' Replay and/or Objections |
|---|---|---|
| convicted people and we believe that in 1983 in South Pasadena a man was murdered and the police and prosecutors arrested and prosecuted the wrong man." | Immaterial to any legal issue presented by Defendants' motion. Insofar as this is relevant to any issue at all, it is relevant to the trier of fact's assessment of the *credibility* of Druecker's habeas testimony. The Court's function is "not to weigh the evidence…but *to determine whether there is a genuine issue* for trial…Credibility determinations the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249-255 (1986) (emphasis added). | pressure, he admitted that, when CM first contacted him, they showed up unannounced at his door, stated that they helped the "wrongly accused" and that they were trying to help Plaintiff get his conviction overturned.  (*See*, Defendants' Addl. Ex. B at pp. 67:14-68:1 (P001286-P001287:1). Even Germond admitted that such a tactic would not only be "heavy handed", but also taint witnesses. (*See*, Defendants' Addl. Ex. C (Germond Depo.) at 62:20-74:13 and CM 00324 (October 20019 letter from CM  investigator Germond to "Mr. Redman" asserting that CM was trying to undo Plaintiff's conviction because he was "wrongly convicted".) |
| 260. During her deposition, Germond reviewed the second sentence of the letter, which said, "We are investigators for the wrongly convicted and I have been trying to find you at home to ask you a few simple questions." | Objection. Kate Germond's letter is irrelevant to any claim in this matter; any probative value is substantially outweighed by the risk of prejudice and confusion of the issues. FRE 401, 403.<br><br>Immaterial to any legal issue presented by Defendants' motion. Insofar | Plaintiffs fail to create a genuine issue of material fact.<br><br>While Druecker testified that neither the CM investigator nor Plaintiff's attorney engaged in overt pressure, he admitted that, when CM first contacted him, they showed up unannounced at his door, |

| Uncontroverted Material Facts | Plaintiffs' Response: | Defendants' Replay and/or Objections |
|---|---|---|
| | as this is relevant to any issue at all, it is relevant to the trier of fact's assessment of the *credibility* of Druecker's habeas testimony. The Court's function is "not to weigh the evidence...but *to determine whether there is a genuine issue* for trial...Credibility determinations the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249-255 (1986) (emphasis added). | stated that they helped the "wrongly accused" and that they were trying to help Plaintiff get his conviction overturned. (*See*, Defendants' Addl. Ex. B at pp. 67:14-68:1 (P001286-P001287:1). Even Germond admitted that such a tactic would not only be "heavy handed", but also taint witnesses. (*See*, Defendants' Addl. Ex. C (Germond Depo.) at 62:20-74:13 and CM 00324 (October 20019 letter from CM investigator Germond to "Mr. Redman" asserting that CM was trying to undo Plaintiff's conviction because he was "wrongly convicted".) |
| 261. During her deposition, Germond testified that the language she used in the letter was "heavy-handed." | Objection. Kate Germond's letter is irrelevant to any claim in this matter; any probative value is substantially outweighed by the risk of prejudice and confusion of the issues. FRE 401, 403. Immaterial to any legal issue presented by Defendants' motion. Insofar as this is relevant to any issue at all, it is relevant to the trier of fact's assessment of the *credibility* of | Plaintiffs fail to create a genuine issue of material fact. While Druecker testified that neither the CM investigator nor Plaintiff's attorney engaged in overt pressure, he admitted that, when CM first contacted him, they showed up unannounced at his door, stated that they helped the "wrongly accused" and that they were trying to help Plaintiff get his conviction |

| Uncontroverted Material Facts | Plaintiffs' Response: | Defendants' Replay and/or Objections |
|---|---|---|
| | Druecker's habeas testimony. The Court's function is "not to weigh the evidence…but *to determine whether there is a genuine issue* for trial…Credibility determinations the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249-255 (1986) (emphasis added). | overturned. (*See*, Defendants' Addl. Ex. B at pp. 67:14-68:1 (P001286-P001287:1). |
| 262. During her deposition, Germond agreed that talking about how CM works on behalf of wrongly convicted and that perhaps a man was wrongly convicted "could potentially have tainted" the person with whom she spoke. | Objection. Kate Germond's statement is irrelevant to any claim in this matter; any probative value is substantially outweighed by the risk of prejudice and confusion of the issues. FRE 401, 403.

Immaterial to any legal issue presented by Defendants' motion. Insofar as this is relevant to any issue at all, it is relevant to the trier of fact's assessment of the *credibility* of Druecker's habeas testimony. The Court's function is "not to weigh the evidence…but *to determine whether there is a genuine issue* for trial…Credibility determinations the weighing of the evidence, and the | Plaintiffs fail to create a genuine issue of material fact.

While Druecker testified that neither the CM investigator nor Plaintiff's attorney engaged in overt pressure, he admitted that, when CM first contacted him, they showed up unannounced at his door, stated that they helped the "wrongly accused" and that they were trying to help Plaintiff get his conviction overturned. (*See*, Defendants' Addl. Ex. B at pp. 67:14-68:1 (P001286-P001287:1). Even Germond admitted that such a tactic would not only be "heavy handed", but also taint witnesses. |

145

| Uncontroverted Material Facts | Plaintiffs' Response: | Defendants' Replay and/or Objections |
|---|---|---|
| | drawing of legitimate inferences from the facts are jury functions." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249-255 (1986) (emphasis added). | (*See*, Defendants' Addl. Ex. C (Germond Depo.) at 62:20-74:13 and CM 00324 (October 20019 letter from CM investigator Germond to "Mr. Redman" asserting that CM was trying to undo Plaintiff's conviction because he was "wrongly convicted".) |
| 263. During her deposition, Deborah Zitella ("Zitella"), Jeanne's sister, testified that Germond approached her about Plaintiff's conviction of the 1984 French murder. | Undisputed. | |
| 264. During her deposition, Zitella testified that, when Germond first approached her, Germond said that she "firmly believed" Plaintiff was innocent. | Undisputed, but immaterial to any legal issue presented by Defendants' motion. Insofar as this is relevant to any issue at all, it is relevant to the trier of fact's assessment of the *credibility* of Druecker's habeas testimony. The Court's function is "not to weigh the evidence…but *to determine whether there is a genuine issue* for trial…Credibility determinations the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions." *Anderson v. Liberty Lobby, Inc.*, 477 | Plaintiffs fail to create a genuine issue of material fact.<br><br>Kate Germond has repeatedly said she works to free wrongfully convicted people even though she admitted that using such a tactic would not only be heavy handed," but also taint witnesses. (Defendants' MSJ Ex. R at 72: 8–20, CM000324; s*ee*, Defendants' Randy Smith MSA Addl. Ex. C (Germond Depo.) at 62:20–74:13 and CM 00324 |

| Uncontroverted Material Facts | Plaintiffs' Response: | Defendants' Replay and/or Objections |
|---|---|---|
| | U.S. 242, 249-255 (1986) (emphasis added). | (October 20019 letter from CM investigator Germond to "Mr. Redman" asserting that CM was trying to undo Plaintiff's conviction because he was "wrongly convicted".) |
| 265. During his deposition, Danny Lee "Boone" Maynard ("Maynard"), who knew Jeanne, testified that sometime in the early 2000s (prior to March 2003) people from CM approached him to ask about Jeanne. | Undisputed. | |
| 266. During his deposition, Maynard testified that when Paul Henderson ("Henderson"), a CM investigator, first met with him, Henderson said that "he worked for a place that they help [sic] wrongly convicted people." | Undisputed, but immaterial to any legal issue presented by Defendants' motion. Insofar as this is relevant to any issue at all, it is relevant to the trier of fact's assessment of the *credibility* of Druecker's habeas testimony. The Court's function is "not to weigh the evidence…but *to determine whether there is a genuine issue* for trial…Credibility determinations the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions." *Anderson v. Liberty Lobby, Inc.*, 477 | Plaintiffs fail to create a genuine issue of material fact.

CM investigators have repeatedly said they work to free wrongfully convicted people even though Kate Germond admitted that using such a tactic would not only be heavy handed," but also taint witnesses. (Defendants' MSJ Ex. R at 72: 8–20, CM000324; s*ee*, Defendants' Randy Smith MSA Addl. Ex. C (Germond Depo.) at 62:20–74:13 and CM 00324 |

| Uncontroverted Material Facts | Plaintiffs' Response: | Defendants' Replay and/or Objections |
|---|---|---|
| | U.S. 242, 249-255 (1986) (emphasis added).<br><br>Disputed that CM influenced Boone Maynard in any way. No one put words in Boone Maynard's mouth or told him what to say Boone Maynard was a reluctant witness, and only related what he knew because he "didn't think it was right that an innocent man be in jail", but he "never wanted to do this right here what we're doing right now." **Dkt. 265**, **Litt Decl.**: Ex. 600, p. 46:4-14 (Maynard D. Tr.) | (October 20019 letter from CM investigator Germond to "Mr. Redman" asserting that CM was trying to undo Plaintiff's conviction because he was "wrongly convicted".) |
| 267. During his deposition, Mike Flick ("Flick"), one of Jeanne's ex-husbands, testified that around 1999, Henderson approached him about Plaintiff's conviction of the 1984 French murder. | Undisputed. | |
| 268. During his deposition, Flick testified that when he first met Henderson, Henderson told him, "that he worked for [CM]" and that he was working on a "wrongful | Undisputed, but immaterial to any legal issue presented by Defendants' motion. Insofar as this is relevant to any issue at all, it is relevant to the trier of fact's assessment of the *credibility* of Druecker's habeas testimony. The Court's | Plaintiffs fail to create a genuine issue of material fact.<br><br>CM investigators have repeatedly said they work to free wrongfully convicted people even though Kate Germond |

| Uncontroverted Material Facts | Plaintiffs' Response: | Defendants' Replay and/or Objections |
|---|---|---|
| conviction." | function is "not to weigh the evidence…but *to determine whether there is a genuine issue* for trial…Credibility determinations the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249-255 (1986) (emphasis added).<br><br>Disputed that Mike Flick's testimony was influenced by CM. Before Michael Flick ever met with Centurion Ministries, he told Imogene Paige on a couple of occasions that Jeanne Lyon had had her husband killed and an innocent man was in jail. **Dkt. 265**, **Litt Decl.**: Ex. 612, p. 14:14-25 – 15:20. (Paige D. Tr.). Imogene Paige was present in 1999 when Michael Flick first told Centurion Ministries about Jeanne Lyon's paying to have Jay French killed, and no compensation was offered, and Centurion Ministries did not tell Mr. Flick what to say. *Ibid* at p. 16:2-24, 17:25- 19:12   (Paige D. Tr.). The 1999 declaration Michael Flick signed (Ex. | admitted that using such a tactic would not only be heavy handed," but also taint witnesses. (Defendants' MSJ Ex. R at 72: 8–20, CM000324; s*ee*, Defendants' Randy Smith MSA Addl. Ex. C (Germond Depo.) at 62:20–74:13 and CM 00324 (October 20019 letter from CM  investigator Germond to "Mr. Redman" asserting that CM was trying to undo Plaintiff's conviction because he was "wrongly convicted".) |

| Uncontroverted Material Facts | Plaintiffs' Response: | Defendants' Replay and/or Objections |
|---|---|---|
| | 333) was consistent with what he had previously told Imogene Paige and the Centurion Ministries investigators. *Ibid.* at pp. 21:19-22:17 (Paige D. Tr.). | |
| 269. During his deposition, Flick testified that at some point after they first met, Henderson told Flick "that he thought he knew who the real killer was." | Undisputed, but immaterial to any legal issue presented by Defendants' motion. Insofar as this is relevant to any issue at all, it is relevant to the trier of fact's assessment of the *credibility* of Druecker's habeas testimony. The Court's function is "not to weigh the evidence…but *to determine whether there is a genuine issue* for trial…Credibility determinations the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249-255 (1986) (emphasis added).  For summary judgment purposes, the question is whether Plaintiffs have established a genuine dispute of fact as to whether Detectives caused the introduction an impermissibly suggestive and unreliable identification testimony. | Plaintiffs fail to create a genuine issue of material fact where Flick, one of the witnesses who Jeanne purportedly confessed to and told that an "innocent" man was in jail, testified that he was previously under the impression that he stood to obtain a significant financial gain for his cooperation. (Defendants' MSJ Ex. Z at 113:10-24.)

Pinning the murder on another witness would further Flick's confidence that "an innocent man" was in jail, even though Flick had no personal knowledge of the 1984 French murder. FRE 402. |

| Uncontroverted Material Facts | Plaintiffs' Response: | Defendants' Replay and/or Objections |
|---|---|---|
| **UNDISPUTED MATERIAL FACTS REGARDING NO GENUINE ISSUE AS TO THE ALLEGED SUPPRESSION OF THE DETECTIVES' NOTES.** | | |
| 270. During an investigation, Det. Smith maintained a case file, which included documents, notebooks, hand-written notes, and other evidence he compiled. | Objection. The referenced evidence does not support the fact for which it is cited. Detective Lankford's testimony is insufficient to establish habit with respect to Detective Smith's practices as a homicide detective. FRE 406. Lacks foundation, no personal knowledge, FRE 602. Detective Lankford's habit and custom has no bearing on whether Smith maintained all evidence in a file.<br><br>Undisputed that Detective Smith maintained a case file including documents, notebooks, hand-written notes and other evidence he compiled. | Plaintiffs fail to create a genuine issue of material fact and they fail to comply with Central District of California Local Rules 56-2 and 56-3 which requires a party attempting to dispute a fact "to list genuine issues [of material fact] with appropriate record citations" necessary to "withstand the motion for summary judgment." *Nilsson v. Louisiana Hydroelec*, 854 F.2d 1538, 1545 (9th Cir. 1988) ("when a local rule such as Rule 7.14.3 [the predecessor to the current Local Rule 56-3] has been promulgated, it serves as adequate notice to non-moving parties that if a genuine issue exists for trial, they must identify that issue and support it with evidentiary material").<br><br>With respect to Plaintiffs' foundational objections, they are without merit because Detective Lankford established a foundation |

| Uncontroverted Material Facts | Plaintiffs' Response: | Defendants' Replay and/or Objections |
|---|---|---|
| | | that he is knowledgeable about the standard practices for LASD detectives and, furthermore had an opportunity to review the file that Det. Smith maintained (to see what Det. Smith's practices were with respect to what type of materials Smith maintained as part his case file). Furthermore, the testimony of Det. Smith from the *habeas* proceedings was also cited to (Defendants' MSJ Ex. O at D2485:27-D2486:16 and D2487:9-24) which further supports this undisputed fact. |
| 271. During an investigation, Det. Smith or his partner interviewed key witnesses and gathered evidence about both the incident and potential suspects. | Objection. The referenced evidence does not support the fact for which it is cited. Detective Lankford's testimony is insufficient to establish habit with respect to Detective Smith's practices as a homicide detective. FRE 406. Lacks foundation, no personal knowledge, FRE 602. Detective Lankford's habit and custom has no bearing on whether Smith ensured that either he or his partner interviewed all key witnesses and gathered evidence about the crime. | Plaintiffs fail to create a genuine issue of material fact and they fail to comply with Central District of California Local Rules 56-2 and 56-3 which requires a party attempting to dispute a fact "to list genuine issues [of material fact] with appropriate record citations" necessary to "withstand the motion for summary judgment." *Nilsson v. Louisiana Hydroelec*, 854 F.2d 1538, 1545 (9th Cir. 1988) ("when a local rule such as Rule 7.14.3 [the |

| Uncontroverted Material Facts | Plaintiffs' Response: | Defendants' Replay and/or Objections |
|---|---|---|
| | Disputed. The evidence adduced in this case shows that LASD homicide detectives failed to investigate numerous critical leads reflecting a gross departure from generally accepted police practices. **Dkt. 263, Battles Decl., Ex. 707**, pp. 45 − 51, Expert Report of Russell Fischer. Police reports reflect that detectives failed to: (1) thoroughly investigate the previous attempt on Jay French's life (including obtaining police reports and interview family law attorneys and other witnesses with knowledge of the incident); (2) failed to thoroughly investigate associates of Jeanne Lyon, including James Mack and her sister, Deborah Zitella; (3) failed to obtain phone and financial records for Jeanne Lyon, Ed Lyon and Randy Smith; and (4) failed to investigate Frank O'Connell's alibis. *Id.* | predecessor to the current Local Rule 56-3] has been promulgated, it serves as adequate notice to non-moving parties that if a genuine issue exists for trial, they must identify that issue and support it with evidentiary material"). <br><br> With respect to Plaintiffs' foundational objections, they are without merit because Detective Lankford established a foundation that he is knowledgeable about the standard practice for LASD detectives and, furthermore had an opportunity to review the file that Det. Smith maintained. Furthermore, the testimony of Det. Smith from the *habeas* proceedings was also cited to (Defendants' MSJ Ex. O at D2485:27- D2486:16 and D2487:9-24) which further supports this undisputed fact. <br><br> To the extent Plaintiffs try to play Monday morning quarterback and second guess every aspect of the underlying investigation, there is no basis for liability for a "negligent" |

| Uncontroverted Material Facts | Plaintiffs' Response: | Defendants' Replay and/or Objections |
|---|---|---|
| | | investigation. *Villafuerte v. Lewis*, 75 F.3d 1330, 1341 (9th Cir. 1996); *Simmons v. McElveen*, 846 F.2d 337, 339 (5th Cir. 1988). |
| 272. During the underlying investigation, the Detectives took detailed notes about the Soucy identification. | Undisputed that two detectives took notes regarding the Soucy interview. | |
| 273. During the underlying investigation, the Detectives took detailed notes about the Villareal identification. | Undisputed that detectives took notes regarding the Villareal interview. Disputed that their notes were detailed or accurate. D2997 states "Showed Blk+White 6-pack to Witness Arturo Villareal M/C 18 at Flower Shop," with no additional information regarding the photo identification procedure. **Battles 3/24/17 Decl.: Ex. 8, p. 11.** (It doesn't indicate: (1) whether Villareal was admonished, (2) whether Villareal gave a description before viewing the folder; (3) whether Villareal made any statements during the procedure or even whether (4) whether Villareal made a selection. )  Both notes omit Villareal's | Plaintiffs fail to create a genuine issue of material fact and their cited evidence does not contradict UF 173. |

| Uncontroverted Material Facts | Plaintiffs' Response: | Defendants' Replay and/or Objections |
|---|---|---|
| | statement that, when the detective administered the photo lineup, he told him that the photo he selected "looked like the man [he] saw, but [he] couldn't be positive." **Dkt. 263, Battles Decl.: Ex. 100**, p. 169:12 – 169:21, 1985 Trial Tr. (testimony of Arturo Villareal). The notes are also inconsistent with J.D. Smith's testimony, that in selecting a photo, Villareal stated "that they all looked a lot a like, he said, *but number 3 looked like the person that most likely looked like the person he'd seen*" (indicating that Villareal made a selection based on resemblance *not* recognition) **Ex. 100,** pp. 209:1 – 210:17, 1985 Trial Tr. (testimony of JD Smith) (emphasis supplied). | |
| 274. During the underlying investigation, the Detectives took detailed notes about the Druecker identification. | Objection. Def's Ex. J, D2873, D2878 – 80, consists of notes taken during the original interview of Druecker, not during the 1/9/84 identification.

Undisputed that one detective (JD Smith) took notes. Disputed that the notes were detailed or accurately captured all | Plaintiffs fail to create a genuine issue of material fact and their cited evidence does not include all evidence related to Druecker's identification.

There is **no duty** to "make a complete and detailed accounting to the defense of all police investigatory work on a case." *Moore v.* |

| Uncontroverted Material Facts | Plaintiffs' Response: | Defendants' Replay and/or Objections |
|---|---|---|
| | pertinent statements during the interview and identification procedures. D2904 indicates states that Druecker "pick #3 'Positive'". <br><br> The note did not include, inter alia, (2) Druecker's statement that he could not recognize anyone and needed profile shots when first shown the lineup; (3) detectives suggestive behavior, including telling Druecker to look harder/affirming the call in his presence. <br><br> D2904, D6089 – 91, D6115. | *Illinois*, 408 U.S. 786, 795 (1972). |
| 275. After all initial interviews were completed, if there was sufficient evidence of a crime committed by a particular suspect, information regarding that suspect's involvement in the crime would be included in a report. | <u>Objection</u>. The referenced evidence does not support the fact for which it is cited. Detective Lankford's testimony is insufficient to establish habit with respect to Detective Smith's practices as a homicide detective. Lacks foundation, no personal knowledge, FRE 602. <br><br> <u>Undisputed</u> that Detective Smith's police reports included information regarding a suspect's involvement. | Plaintiffs fail to create a genuine issue of material fact. <br><br> With respect to Plaintiffs' foundational objections, they are without merit because Detective Lankford established a foundation that he is knowledgeable about the standard practice for LASD detectives and, furthermore had an opportunity to review the file that Det. Smith maintained. <br><br> Furthermore, the testimony |

| Uncontroverted Material Facts | Plaintiffs' Response: | Defendants' Replay and/or Objections |
|---|---|---|
| | Disputed that Detective Smith's police reports included "the pertinent" information regarding a suspect's involvement. Evidence adduced in this case shows that Detective Smith's police reports in the Jay French murder investigation omitted substantial evidence relevant to Mr. O'Connell's involvement, including the anonymous tip, which LASD's 30(b)(6) witness has testified was pertinent. **Dkt. 263, Battles Decl.: Ex. 616**, Deposition Testimony of Mike Bumcrot, pp. 140:8 – 140:24. Detective Smith's police reports likewise excluded or mischaracterized highly relevant eyewitness statements (i.e. Maurice Soucy, Daniel Druecker and Thomas Butler). *See* Plaintiffs' AMFs. 92-174. | of Det. Smith from the *habeas* proceedings was also cited to (Defendants' MSJ Ex. O at D2485:27-D2486:16 and D2487:9-24) which further supports this undisputed fact.<br><br>To the extent Plaintiffs try to play Monday morning quarterback and second guess every aspect of the underlying investigation, there is no basis for liability for a "negligent" investigation. *Villafuerte v. Lewis*, 75 F.3d 1330, 1341 (9th Cir. 1996); *Simmons v. McElveen*, 846 F.2d 337, 339 (5th Cir. 1988). |
| 276. During an investigation, it was common for prosecutors to request detectives' notes and other materials. | Objection. Lacks foundation, no personal knowledge, FRE 602. The referenced evidence does not support the fact for which it is cited. Detective Lankford's testimony is insufficient to establish habit with respect to | Plaintiffs fail to create a genuine issue of material fact.<br><br>Plaintiffs fail to create a genuine issue of material fact. Detective Lankford, who has over 30 years of experience, has the |

| Uncontroverted Material Facts | Plaintiffs' Response: | Defendants' Replay and/or Objections |
|---|---|---|
| | Detective Smith's practices as a homicide detective. Relevance, FRE 401, 403. Detective Lankford's characterization of LASD's "standard practice" is irrelevant to whether Smith turned over his notes in this case.<br><br>Disputed that Detective Smith produced all requested materials to the District Attorney's Office. D.D.A. Juan Mejia, responsible for representing the state during the habeas litigation, has testified that he reviewed all materials in the prosecution file and that it did not contain detectives' handwritten notebooks, nor did it contain the memo reflecting the anonymous tip. **Dkt. 263, Battles Decl.: Ex. 232,** Declaration of DDA Juan Mejia, ¶¶3-5. During the habeas, DDA Mejia stipulated to the fact that the handwritten notes were not part of the district attorney's files. *Id.* at ¶4; **Ex. 201.07**, pp. 7:8 – 7:16, Habeas Tr. (stipulating, on the record, that detectives handwritten notes were not included in the | foundation to testify as whether or not it is common for prosecutors to request detectives' notes and other materials.<br><br>Juan Mejia does not indicate that he has any knowledge as to what was in the District Attorney's file in this matter **prior to being assigned to handle the *habeas* petition of September 21, 2009.** Therefore, he has no personal knowledge as what materials were in the District Attorneys' file at the time of the underlying prosecution.<br><br>Tamia Hope, the prosecutor who handled the underlying trial testified at the *habeas* proceedings that "I have a memory of receiving handwritten notes from every detective in every case when I was asked by the defense attorney to provide them." (*See,* Defendants' MSJ Ex. O at D2567:23-25.)<br><br>Moreover, Ms. Hope further testified that, had the notes been provided to her from the LASD and she turned |

| **Uncontroverted Material Facts** | **Plaintiffs' Response:** | **Defendants' Replay and/or Objections** |
|---|---|---|
| | prosecution's files). Further <u>disputed</u> on the basis that the LASD had no formal policy or established procedure to ensure that detectives turned over handwritten notebooks to the district attorney. **Ex. 616**, pp. 80:10 – 83:23, 90:12 – 91:10, Mike Bumcrot Dep. Tr. Plaintiffs' former defense attorney, Adolfo Lara has testified that, based on his strategy during the original trial, the anonymous tip and prior attempt were not disclosed. See AMFs 140 – 147, 150 – 154. | them over to the defense, she would not necessarily have maintained a duplicate copy of the notes in the District Attorneys' Office file. (*See,* Defendants' MSJ Ex. O at D2569:20-D2570:5.)<br><br>Nor was it the Ms. Hope's practice in 1985 to keep any type of inventory of the materials that she produced to defense counsel. (*See,* Defendants' MSJ Ex. O at D2579:9-19.)  Therefore, the fact that the notes may not have been in the portions of the District Attorney's Office file that Mr. Mejia was able to compile sometime after he was assigned to handle the *habeas* proceedings in 2009 is irrelevant and immaterial. |
| 277. Prior to preliminary hearings, Det. Parra (and/or his partner) would allow the defense attorney to go through the entire Homicide investigative folder. | <u>Objection</u>. Lacks foundation, no personal knowledge, FRE 602. Detective Bumcrot's testimony is insufficient to establish habit with respect to Detective Parra's practices as a homicide detective. FRE 406.<br><br>Hearsay, FRE 801 (Bumcrot's statements | Plaintiffs fail to create a genuine issue of material fact. Lt. Bumcrot worked directly with Parra and was trained by him. (*See,* Bumcrot Decl. ¶¶ 14–16, 22, 27–28.) |

| Uncontroverted Material Facts | Plaintiffs' Response: | Defendants' Replay and/or Objections |
|---|---|---|
| | regarding Smith's practices are based on inadmissible hearsay). | |
| 278. Det. Parra (and/or his partner) would make copies of notes for both the prosecution and defense. | Objection. Lacks foundation, no personal knowledge, FRE 602. Detective Bumcrot's testimony is insufficient to establish habit with respect to Detective Parra's practices as a homicide detective. Relevance, FRE 401, 403. Detective Bumcrot's characterization of LASD's Parra's practice is irrelevant to whether Smith or Parra turned over their notes in this case. Hearsay, FRE 801 (Bumcrot's statements regarding Smith's practices are based on inadmissible hearsay). | Plaintiffs fail to create a genuine issue of material fact. Lt. Bumcrot worked directly with Parra and was trained by him. (*See*, Bumcrot Decl. ¶¶ 14–16, 22, 27–28.) |
| 279. During an investigation, Det. Smith would turn over any such requested materials, whether he or his partner deemed them pertinent or not, especially if there was a discovery request from the defense for the investigation notes and materials. | Objection. Lacks foundation, no personal knowledge, FRE 602. The referenced evidence does not support the fact for which it is cited. Detective Lankford's testimony is insufficient to establish habit with respect to Detective Smith's practices as a homicide detective. Relevance, FRE 401, 403. Detective Lankford's characterization of LASD's | Plaintiffs fail to create a genuine issue of material fact. Juan Mejia does not indicate that he has any knowledge as to what was in the District Attorney's file in this matter **prior to being assigned to handle the *habeas* petition of September 21, 2009.** Therefore, he has no personal knowledge as what |

| Uncontroverted Material Facts | Plaintiffs' Response: | Defendants' Replay and/or Objections |
|---|---|---|
| | "standard practice" is irrelevant to whether Smith turned over his notes in this case.<br><br>Disputed that Detective Smith produced all requested materials to the District Attorney's Office. D.D.A. Juan Mejia, responsible for representing the state during the habeas litigation, has testified that he reviewed all materials in the prosecution file and that it did not contain detectives' handwritten notebooks, nor did it contain the memo reflecting the anonymous tip. **Dkt. 263, Battles Decl.: Ex. 232,** Declaration of DDA Juan Mejia, ¶¶3-5. During the habeas, DDA Mejia stipulated to the fact that the handwritten notes were not part of the district attorney's files. *Id*. at ¶4; **Ex. 201.07**, pp. 7:8 – 7:16, Habeas Tr. (stipulating, on the record, that detectives handwritten notes were not included in the prosecution's files). Further disputed on the basis that the LASD had no formal policy or established procedure to ensure that | materials were in the District Attorneys' file at the time of the underlying prosecution. Tamia Hope, the prosecutor who handled the underlying trial testified at the *habeas* proceedings that "I have a memory of receiving handwritten notes from every detective in every case when I was asked by the defense attorney to provide them." (*See,* Defendants' MSJ Ex. O at D2567:23-25.) Moreover, Ms. Hope further testified that, had the notes been provided to her from the LASD and she turned them over to the defense, she would not necessarily have maintained a duplicate copy of the notes in the District Attorneys' Office file. (*See,* Defendants' MSJ Ex. O at D2569:20-D2570:5.) Nor was it the Ms. Hope's practice in 1985 to keep any type of inventory of the materials that she produced to defense counsel. (*See,* Defendants' MSJ Ex. O at D2579:9-19.) Therefore, the fact that the notes may not have been in the portions of the District Attorney's Office file that Mr. Mejia was able to |

| Uncontroverted Material Facts | Plaintiffs' Response: | Defendants' Replay and/or Objections |
|---|---|---|
| | detectives turned over handwritten notebooks to the district attorney. **Ex. 616**, pp. 80:10 – 83:23, 90:12 – 91:10, Mike Bumcrot Dep. Tr. Plaintiffs' former defense attorney, Adolfo Lara has testified that, based on his strategy during the original trial, the anonymous tip and prior attempt were not disclosed. See AMFs  118, 140, 202-221, 233, 235-241, 327, 329, 331 (above). | compile sometime after he was assigned to handle the *habeas* proceedings in 2009 is irrelevant and immaterial. |
| 280. On May 24, 1984, a letter was sent to Det. Smith by the DA's Office, along with an April 30, 1984 discovery order from the underlying criminal proceedings requiring various materials to be produced, specifically including detectives' notes. | Undisputed that the letter was sent; disputed that Detective Smith produced all requested materials to the District Attorney's Office. D.D.A. Juan Mejia, responsible for representing the state during the habeas litigation, has testified that he reviewed all materials in the prosecution file and that it did not contain detectives' handwritten notebooks, nor did it contain the memo reflecting the anonymous tip. **Dkt. 263, Battles Decl.:  Ex. 232, Declaration** of DDA Juan Mejia, ¶¶3-5. During the habeas, DDA Mejia stipulated to the fact that the handwritten notes were | Plaintiffs fail to create a genuine issue of material fact.

Juan Mejia does not indicate that he has any knowledge as to what was in the District Attorney's file in this matter **prior to being assigned to handle the *habeas* petition of September 21, 2009.** Therefore, he has no personal knowledge as what materials were in the District Attorneys' file at the time of the underlying prosecution. Tamia Hope, the prosecutor who handled the underlying trial testified at the *habeas* proceedings that "I have a memory of receiving handwritten notes |

| Uncontroverted Material Facts | Plaintiffs' Response: | Defendants' Replay and/or Objections |
|---|---|---|
| | not part of the district attorney's files. *Id.* at ¶4; **Ex. 201.07**, pp. 7:8 – 7:16, Habeas Tr. (stipulating, on the record, that detectives handwritten notes were not included in the prosecution's files). Plaintiffs' former defense attorney, Adolfo Lara has testified that, based on his strategy during the original trial, the anonymous tip and prior attempt were not disclosed. See AMFs  118, 140, 202-221, 233, 235-241, 327, 329, 331 (above). | from every detective in every case when I was asked by the defense attorney to provide them." (*See,* Defendants' Randy Smith MSA Supplemental Ex. AB at D2567:23-25.) Moreover, Ms. Hope further testified that, had the notes been provided to her from the LASD and she turned them over to the defense, she would not necessarily have maintained a duplicate copy of the notes in the District Attorneys' Office file. (*See,* Defendants' Randy Smith MSA Supplemental Ex. AB at D2569:20-D2570:5.) Nor was it the Ms. Hope's practice in 1985 to keep any type of inventory of the materials that she produced to defense counsel. (*See,* Defendants' MSJ Ex. O at D2579:9-19.)  Therefore, the fact that the notes may not have been in the portions of the District Attorney's Office file that Mr. Mejia was able to compile sometime after he was assigned to handle the *habeas* proceedings in 2009 is irrelevant and immaterial. (Defendants' MSJ Ex. O at D2569: 20– 2570: 10) |

| Uncontroverted Material Facts | Plaintiffs' Response: | Defendants' Replay and/or Objections |
|---|---|---|
| | | Det. Smith testified at the *habeas* that it he practice to turn over his entire file, including all of his notes/notebooks, especially when requested to do so by the prosecutor (Defendants' MSJ Ex. O at D2555: 4–26.).<br><br>Also, the evidence is that the Public Defender did, in fact, have various notes at the time of the underlying trial (including "other notes" he referenced *during* the trial). (Defendants' MSJ Ex. N at D1981: 11 – 23.) When the Public Defender was asked during the *habeas* whether the various notes in issue were in his file at the time of the underlying trial, he testified that he could not recall (Defendants' MSJ Ex. O at D2650: 4–D2650: 6).<br><br>And, by the time of the *habeas* proceedings, the original Public Defender's file was misplaced and was missing various materials. (Defendants' MSJ Ex. P at 229:11 – 230: 3; Defendants' MSJ Ex. W at P2042: 25, P2043: |

| Uncontroverted Material Facts | Plaintiffs' Response: | Defendants' Replay and/or Objections |
|---|---|---|
| | | 26 – 2044:1.) |
| 281. The May 24, 1984 letter from the DA's Office to Det. Smith and the accompanying discovery order were in the Detectives' investigation file. | Undisputed. | |
| 282. There is nothing else in the LASD investigation file indicating any follow-up from the DA's Office regarding the discovery order, or otherwise suggesting that the materials identified in the May 24, 1984 letter were not, in fact, turned over from the Detectives to the DA's Office. | Undisputed that there are no further documents reflecting follow-up efforts to obtain requested materials; disputed that all requested materials were produced to the prosecution. Disputed that Detective Smith produced all requested materials to the District Attorney's Office. D.D.A. Juan Mejia, responsible for representing the state during the habeas litigation, has testified that he reviewed all materials in the prosecution file and that it did not contain detectives' handwritten notebooks, nor did it contain the memo reflecting the anonymous tip. **Dkt. 263, Battles Decl.: Ex. 232, Declaration** of DDA Juan Mejia, ¶¶3-5. During the habeas, DDA Mejia stipulated to the fact that the handwritten notes were | Plaintiffs fail to create a genuine issue of material fact.

Juan Mejia does not indicate that he has any knowledge as to what was in the District Attorney's file in this matter **prior to being assigned to handle the *habeas* petition of September 21, 2009.** Therefore, he has no personal knowledge as what materials were in the District Attorneys' file at the time of the underlying prosecution. Tamia Hope, the prosecutor who handled the underlying trial testified at the *habeas* proceedings that "I have a memory of receiving handwritten notes from every detective in every case when I was asked by the defense attorney to provide them." (*See,* Defendants' Randy Smith MSA Supplemental |

| Uncontroverted Material Facts | Plaintiffs' Response: | Defendants' Replay and/or Objections |
|---|---|---|
| | not part of the district attorney's files. *Id.* at ¶4; **Ex. 201.07**, pp. 7:8 – 7:16, Habeas Tr. (stipulating, on the record, that detectives handwritten notes were not included in the prosecution's files). Plaintiffs' former defense attorney, Adolfo Lara has testified that, based on his strategy during the original trial, the anonymous tip and prior attempt were not disclosed. See AMFs 118, 140, 202-221, 233, 235-241, 327, 329, 331 (above). | Ex. AB at D2567:23-25.) Moreover, Ms. Hope further testified that, had the notes been provided to her from the LASD and she turned them over to the defense, she would not necessarily have maintained a duplicate copy of the notes in the District Attorneys' Office file. (*See,* Defendants' Randy Smith MSA Supplemental Ex. AB at D2569:20-D2570:5.) Nor was it the Ms. Hope's practice in 1985 to keep any type of inventory of the materials that she produced to defense counsel. (*See,* Defendants' MSJ Ex. O at D2579:9-19.)  Therefore, the fact that the notes may not have been in the portions of the District Attorney's Office file that Mr. Mejia was able to compile sometime after he was assigned to handle the *habeas* proceedings in 2009 is irrelevant and immaterial. (Defendants' MSJ Ex. O at D2569: 20– 2570: 10) |
| | | Det. Smith testified at the *habeas* that it he practice to turn over his entire file, including all of his notes/notebooks, especially |

| Uncontroverted Material Facts | Plaintiffs' Response: | Defendants' Replay and/or Objections |
|---|---|---|
| | | when requested to do so by the prosecutor (Defendants' MSJ Ex. O at D2555: 4– 26.). |
| | | Also, the evidence is that the Public Defender did, in fact, have various notes at the time of the underlying trial (including "other notes" he referenced *during* the trial). (Defendants' MSJ Ex. N at D1981: 11 – 23.) When the Public Defender was asked during the *habeas* whether the various notes in issue were in his file at the time of the underlying trial, he testified that he could not recall (Defendants' MSJ Ex. O at D2650: 4–D2650: 6). |
| | | And, by the time of the *habeas* proceedings, the original Public Defender's file was misplaced and was missing various materials. (Defendants' MSJ Ex. P at 229:11 – 230: 3; Defendants' MSJ Ex. W at P2042: 25, P2043: 26 – 2044:1.) |
| 283. The prosecutor who handled the criminal trial, Tamia Hope ("Hope"), testified at the *habeas* | Objection. Lacks foundation, no personal knowledge, FRE 602. Undisputed that Ms. Hope | Plaintiffs fail to create a genuine issue of material fact. Juan Mejia does not |

| Uncontroverted Material Facts | Plaintiffs' Response: | Defendants' Replay and/or Objections |
|---|---|---|
| proceedings that, "I have a memory of receiving handwritten notes from every detective in every case when I was asked by the defense attorney to provide them." | so testified. <u>Disputed</u> that Ms. Hope has a memory of receiving handwritten detective notes in this case. Ms. Hope was directly asked whether she remembered receiving detectives notes in this case and responded "I have a memory of receiving [them] in every case." <br><br> No copy of the such notes could be found in the DA file: D.D.A. Juan Mejia, responsible for representing the state during the habeas litigation, has testified that he reviewed all materials in the prosecution file and that it <u>did not</u> contain detectives' handwritten notebooks, nor did it contain the memo reflecting the anonymous tip. **Dkt. 263, Battles Decl.: Ex. 232, Declaration** of DDA Juan Mejia, ¶¶3-5. During the habeas, DDA Mejia stipulated to the fact that the handwritten notes were not part of the district attorney's files. *Id*. at ¶4; **Ex. 201.07**, pp. 7:8 – 7:16, Habeas Tr. (stipulating, on the record, that detectives handwritten notes were not | indicate that he has any knowledge as to what was in the District Attorney's file in this matter **prior to being assigned to handle the *habeas* petition of September 21, 2009.** Therefore, he has no personal knowledge as what materials were in the District Attorneys' file at the time of the underlying prosecution. <br><br> Ms. Hope further testified that, had the notes been provided to her from the LASD and she turned them over to the defense, she would not necessarily have maintained a duplicate copy of the notes in the District Attorneys' Office file. (*See*, Defendants' Randy Smith MSA Supplemental Ex. AB at D2569:20-D2570:5.) Nor was it the Ms. Hope's practice in 1985 to keep any type of inventory of the materials that she produced to defense counsel. (*See*, Defendants' MSJ Ex. O at D2579:9-19.) Therefore, the fact that the notes may not have been in the portions of the District Attorney's Office file that Mr. Mejia was able to |

| Uncontroverted Material Facts | Plaintiffs' Response: | Defendants' Replay and/or Objections |
|---|---|---|
| | included in the prosecution's files). Plaintiffs' former defense attorney, Adolfo Lara has testified that, based on his strategy during the original trial, the anonymous tip and prior attempt were not disclosed. See AMFs  118, 140, 202-221, 233, 235-241, 327, 329, 331 (above). | compile sometime after he was assigned to handle the *habeas* proceedings in 2009 is irrelevant and immaterial. (Defendants' MSJ Ex. O at D2569: 20– 2570: 10)<br><br>Det. Smith testified at the *habeas* that it he practice to turn over his entire file, including all of his notes/notebooks, especially when requested to do so by the prosecutor (Defendants' MSJ Ex. O at D2555: 4– 26.).<br><br>Also, the evidence is that the Public Defender did, in fact, have various notes at the time of the underlying trial (including "other notes" he referenced *during* the trial). (Defendants' MSJ Ex. N at D1981: 11 – 23.) When the Public Defender was asked during the *habeas* whether the various notes in issue were in his file at the time of the underlying trial, he testified that he could not recall (Defendants' MSJ Ex. O at D2650: 4–D2650: 6).<br><br>And, by the time of the *habeas* proceedings, the original Public Defender's |

| Uncontroverted Material Facts | Plaintiffs' Response: | Defendants' Replay and/or Objections |
|---|---|---|
| | | file was misplaced and was missing various materials. (Defendants' MSJ Ex. P at 229:11 – 230: 3; Defendants' MSJ Ex. W at P2042: 25, P2043: 26 – 2044:1.) |
| 284. Hope further testified that, had the notes been provided to her from the LASD and she turned them over to the defense, she would not necessarily have maintained a duplicate copy of the notes in the DA's Office file. | Undisputed. | |
| 285. Prior to testifying in the *habeas* proceedings, Lara requested from the Public Defender's Office a copy of the Public Defender's file from the underlying prosecution. | Undisputed. | |
| 286. Lara testified that, in response to his request for a copy of the Public Defender's file, the Public Defender's Office informed him that, after an extensive search of the records, the file couldn't be | Undisputed. | |

| Uncontroverted Material Facts | Plaintiffs' Response: | Defendants' Replay and/or Objections |
|---|---|---|
| found. | | |
| 287. Prior to testifying in the 2011 *habeas* proceeding, Lara was provided with what he was told was a "duplicate" copy of the Public Defender's file that the Public Defender's Office obtained from CM. | Undisputed. | |
| 288. After having a chance to review the "duplicate" Public Defender's file he was provided prior to testifying at the habeas proceeding, Lara stated that the "duplicate" file he provided was "missing" documents and "incomplete." | Objection. Lacks foundation, no personal knowledge as to whether the file was actually missing documents. FRE 602.<br><br>Undisputed that Lara said he had a "feeling" the file was not complete (*Defs* Ex. P at 229:11 – 230: 3) and that it was his "belief" that there were documents missing (Defs. Ex. W at P2042: 25, P2043: 26 – 2044:1). | Plaintiffs do not create a genuine issue of material fact. |
| 289. In the middle of the underlying criminal trial, Lara received discovery from Hope, in the form of "rough" notes from the SPPD. | Objection. Vague and ambiguous as to "discovery from hope."<br><br>Undisputed that Lara received Lt. Hatfield's handwritten "rough" notes regarding his interview of Scott Egerer. Disputed that the notes concerned anything other than Hatfield's interview of | During the *habeas* proceedings, when asked "Is it possible that, strategically, you decided not to pursue [the evidence regarding the prior attempt] because it was too remote in time and you knew that you knew that this third-party culpability would not come in in front of the judge?" Mr. Lara |

| Uncontroverted Material Facts | Plaintiffs' Response: | Defendants' Replay and/or Objections |
|---|---|---|
| | Egerer.<br><br>During the 1985 trial, D.D.A. Tamia Hope provided Adolfo Lara, Mr. O'Connell's defense attorney, "rough" handwritten notes received from a SPPD Officer. Upon receiving the notes, Mr. Lara testified"...I believe, <u>it's my understanding, a South Pasadena officer that are still rough notes and I guess were never transcribed into typewritten sheets</u>. Subsequent trial testimony leaves no doubt that the "rough notes" in question were Lt. Hatfield's handwritten notes of his interview of Scott Egerer; they were not J.D. Smith's handwritten notebooks and had nothing to do with the anonymous tip.<br><br>After Scott Egerer testified, Lt. Hatfield was called in an effort to impeach Egerer's testimony. Lara's cross-examination of Egerer addresses Hatfield's "rough notes" and the fact that Hatfield failed to include a date for his interview of Egerer. **Dkt. 263, Battles Decl.: Ex. 100**, pp. 315:16 | responded "I have no recollection." (*See,* Defendants' Addl. MSJ Ex. AJ at pp. 33:23-34:2 (P001129:23-P001130:2).) Mr. Lara further admitted that he had no recollection, one way or another, whether he received the subject notes and, in response to the question "You could have received the notes in this case and proceeded as you did?" Mr. Lara responded "I have no independent recollection." (*Id.* at pp. 37:4-9 (P001133:4-9).)<br><br>Contrary to Plaintiffs' claim that the Detectives' notes were not disclosed, the evidence is that the Public Defender did, in fact, have various notes at the time of the underlying trial (Defendants' MSJ Ex. O at D2649: 11 – D2650: 6); when the Public Defender was asked during the *habeas* whether the various notes in issue were in his file at the time of the underlying trial, he testified that he could not recall (Defendants' MSJ Ex. O at D2650: 4 – 16); and it was discovered that, by the time |

| **Uncontroverted Material Facts** | **Plaintiffs' Response:** | **Defendants' Replay and/or Objections** |
|---|---|---|
| | – 317:8 (1985 Trial Testimony of Louis Hatfield, filed as additioal exhibit to this Response).<br><br>J.D. Smith was subsequently called to testify as to when he directed Hatfield to interview Egerer. During cross, Lara asked J.D. Smith: "…you weren't even aware that Lieutenant Hatfield had any notes until about two days ago, isn't that true?" J.D. Smith answered yes. **Ex. 100**, pp. 319:27 – 320:26. <u>This exchange makes clear that the SPPD "rough" notes that surfaced *in the middle of trial* were rough notes concerning Hatfield's interview of Scott Egerer and Karen Baxter.</u><br><br><u>Disputed</u> that Lara received any other handwritten notes during the course of the prosecution. *Defs* <u>Ex. N at D1980: 10 – 24;</u> Upon receiving the notes, Lara remarked:<br><br>    Since it's such a late hour and the court only has about 15 | of the *habeas* proceedings, the original Public Defender's file was misplaced and was missing various materials (Defendants' MSJ Ex. P at 229:11 – 230: 3; Defendants' MSJ Ex. W at P2042: 25, P2043: 26 – 2044:1). |

| Uncontroverted Material Facts | Plaintiffs' Response: | Defendants' Replay and/or Objections |
|---|---|---|
| | minutes I would request, rather than starting to take testimony, to have the court allow me to at least look briefly over these notes. <u>I may</u> at a later time <u>request more time to either investigate the matter or see what was involved in why these notes were not transcribed and made available much earlier in this case</u>." Defs Ex. N D1980.<br><br>Lara's concern with why the notes had not been earlier transcribed reflects his expectation that all police notes would be transcribed (into the police report) and strongly suggests that all of other materials provided to Mr. Lara from the District Attorney's Office came to him in the format of a typed | |

174

| Uncontroverted Material Facts | Plaintiffs' Response: | Defendants' Replay and/or Objections |
|---|---|---|
| | report. His apparent dismay at receiving "rough" notes also suggests that these were the only rough, handwritten notes he received from the D.A.s office or the police.<br><br>Disputed that Lara received the suppressed exculpatory evidence in this case. See AMFs 118, 140, 202-221, 233, 235-241, 327, 329, 331 (above). | |
| 290. In the middle of the underlying criminal trial, after Lara received SPPD notes from Hope he told the court that he might need more time to investigate the content of the notes before proceeding with the trial. | Undisputed that Lara said he might need more time to investigate or inquire "why these notes were not transcribed and made available much earlier in the case." Ex. N at D1980: 10 – 24. | |
| 291. In response to Lara's request, the court asked Lara if he could briefly examine the notes given to him from Hope to determine whether he could continue with the next witness. | Undisputed that the Court asked Lara to briefly examine the notes to determine whether he could proceed with Alex Sanchez. Defs D1980: 25 – 1981:23.. | |
| 292. After examining the notes per the court's request, Lara told the court that | Disputed that the notes concerned any witness other than Scott Egerer. During the 1985 trial, D.D.A. | Plaintiffs fail to create a genuine issue of material fact and completely ignore Lara's reference to "other" |

| Uncontroverted Material Facts | Plaintiffs' Response: | Defendants' Replay and/or Objections |
|---|---|---|
| there appeared to be "some other notes," so it might be necessary for a short continuance because there was "information about other witnesses[.]" | Tamia Hope provided Adolfo Lara, Mr. O'Connell's defense attorney, "rough" handwritten notes received from a SPPD Officer. Upon receiving the notes, Mr. Lara testified"...I believe, <u>it's my understanding, a South Pasadena officer that are still rough notes and I guess were never transcribed into typewritten sheets.</u> Subsequent trial testimony leaves no doubt that the "rough notes" in question were Lt. Hatfield's handwritten notes of his interview of Scott Egerer; they were not J.D. Smith's handwritten notebooks and had nothing to do with the anonymous tip.<br><br>After Scott Egerer testified, Lt. Hatfield was called in an effort to impeach Egerer's testimony. Lara's cross-examination of Egerer addresses Hatfield's "rough notes" and the fact that Hatfield failed to include a date for his interview of Egerer. **Dkt. 263, Battles Decl.: Ex. 100**, pp. 315:16 – 317:8 (1985 Trial Testimony of Louis Hatfield, filed as additioal | notes, as in additional notes. Defendants are not referencing the "rough" notes but instead referring to Lara's comment about "other notes."<br><br>The evidence is that Lara did, in fact, have various notes at the time of the underlying trial (including "other notes" he referenced *during* the trial). (Defendants' MSJ Ex. N at D1981: 11 – 23.) When the Public Defender was asked during the *habeas* whether the various notes in issue were in his file at the time of the underlying trial, he testified that he could not recall (Defendants' MSJ Ex. O at D2650: 4–D2650: 6).<br><br>And, by the time of the *habeas* proceedings, the original Public Defender's file was misplaced and was missing various materials. (Defendants' MSJ Ex. P at 229:11 – 230: 3; Defendants' MSJ Ex. W at P2042: 25, P2043: 26 – 2044:1.)<br><br>Ms. Hope further testified that, had the notes been |

| Uncontroverted Material Facts | Plaintiffs' Response: | Defendants' Replay and/or Objections |
|---|---|---|
| | exhibit to this Response).<br><br>J.D. Smith was subsequently called to testify as to when he directed Hatfield to interview Egerer. During cross, Lara asked J.D. Smith: "…you weren't even aware that Lieutenant Hatfield had any notes until about two days ago, isn't that true?" J.D. Smith answered yes. **Ex. 100**, pp. 319:27 – 320:26. <u>This exchange makes clear that the SPPD "rough" notes that surfaced *in the middle of trial* were rough notes concerning Hatfield's interview of Scott Egerer and Karen Baxter</u>. | provided to her from the LASD and she turned them over to the defense, she would not necessarily have maintained a duplicate copy of the notes in the District Attorneys' Office file. (*See,* Defendants' Randy Smith MSA Supplemental Ex. AB at D2569:20-D2570:5.) Nor was it the Ms. Hope's practice in 1985 to keep any type of inventory of the materials that she produced to defense counsel. (*See,* Defendants' MSJ Ex. O at D2579:9-19.)<br><br>Det. Smith testified at the *habeas* that it he practice to turn over his entire file, including all of his notes/notebooks, especially when requested to do so by the prosecutor (Defendants' MSJ Ex. O at D2555: 4–26.). |
| 293. During the *habeas* proceedings, Lara confirmed that he had, in fact, received various Detectives' notes prior to the underlying criminal trial. | <u>Undisputed</u> that Lara received rough notes from an SPPD Officer (Lt. Hatfield) concerning Scott Egerer (see No. 289, above). <u>Disputed</u> that Lara received **five** notebooks containing detectives' handwritten notes (none of which appeared in the DA | Plaintiffs fail to create a genuine issue of material fact.<br><br>The evidence is that Lara did, in fact, have various notes at the time of the underlying trial (including "other notes" he referenced *during* the trial). |

177

| Uncontroverted Material Facts | Plaintiffs' Response: | Defendants' Replay and/or Objections |
|---|---|---|
| | file at the time of the habeas). **Dkt. 263, Battles Decl.:  Ex. 232,** Declaration of DDA Juan Mejia, ¶¶3-5. During the habeas, DDA Mejia stipulated to the fact that the handwritten notes were not part of the district attorney's files. *Id*. at ¶4; **Ex. 201.07**, pp. 7:8 – 7:16, Habeas Tr. (stipulating, on the record, that detectives handwritten notes were not included in the prosecution's files). | (Defendants' MSJ Ex. N at D1981: 11 – 23.) When the Public Defender was asked during the *habeas* whether the various notes in issue were in his file at the time of the underlying trial, he testified that he could not recall (Defendants' MSJ Ex. O at D2650: 4–D2650: 6).<br><br>And, by the time of the *habeas* proceedings, the original Public Defender's file was misplaced and was missing various materials. (Defendants' MSJ Ex. P at 229:11 – 230: 3; Defendants' MSJ Ex. W at P2042: 25, P2043: 26 – 2044:1.)<br><br>Ms. Hope further testified that, had the notes been provided to her from the LASD and she turned them over to the defense, she would not necessarily have maintained a duplicate copy of the notes in the District Attorneys' Office file. (*See,* Defendants' Randy Smith MSA Supplemental Ex. AB at D2569:20-D2570:5.) Nor was it the Ms. Hope's practice in 1985 to keep any type of inventory of the |

| <u>Uncontroverted Material Facts</u> | <u>Plaintiffs' Response:</u> | <u>Defendants' Replay and/or Objections</u> |
|---|---|---|
| | | materials that she produced to defense counsel. (*See,* Defendants' MSJ Ex. O at D2579:9-19.) Det. Smith testified at the *habeas* that it he practice to turn over his entire file, including all of his notes/notebooks, especially when requested to do so by the prosecutor (Defendants' MSJ Ex. O at D2555: 4–26.). |
| 294. During the *habeas* proceedings Lara could not recall whether the "other" notes he had in his possession at the time of the underlying trial were from the LASD. | <u>Undisputed</u>. | |
| 295. During the *habeas* proceedings Lara could not recall whether the "other" notes he had in his possession at the time of the underlying trial were about Randy Smith. | <u>Undisputed</u> that Lara so testified. <u>Disputed</u> that the notes were about Randy Smith. As reflected by the 1985 trial transcript, during the trial. D.D.A. Tamia Hope provided Lara, "rough" handwritten notes received from a SPPD Officer. Upon receiving the notes, Mr. Lara advised the court that he would consider "request[ing] more time to either investigate the matter *or see what was* | Plaintiffs fail to create a genuine issue of material fact. The evidence is that Lara did, in fact, have various notes at the time of the underlying trial (including "other notes" he referenced *during* the trial). (Defendants' MSJ Ex. N at D1981: 11 – 23.) When the Public Defender was asked during the *habeas* whether the various notes in issue |

| Uncontroverted Material Facts | Plaintiffs' Response: | Defendants' Replay and/or Objections |
|---|---|---|
| | *involved in why these notes were not transcribed and made available much earlier in this case.*" **Ex. 100**, pp. 136:10-136:24 (emphasis supplied). The notes came up later in the trial when Lt. Hatfield was called to rebut Scott Egerer. Lara's cross-examination of Egerer addresses Hatfield's "rough notes" and the fact that Hatfield failed to include a date for his interview of Egerer. **Ex. 100**, pp. 315:16 – 317:8 (1985 Trial Testimony of Louis Hatfield). J.D. Smith was subsequently called to testify as to when he directed Hatfield to interview Egerer. During cross, Lara asked J.D. Smith: "…you weren't even aware that Lieutenant Hatfield had any notes until about two days ago, isn't that true?" J.D. Smith answered yes. **Ex. 100**, pp. 319:27 – 320:26 (Trial Testimony of Smith). | were in his file at the time of the underlying trial, he testified that he could not recall (Defendants' MSJ Ex. O at D2650: 4–D2650: 6).<br><br>And, by the time of the *habeas* proceedings, the original Public Defender's file was misplaced and was missing various materials. (Defendants' MSJ Ex. P at 229:11 – 230: 3; Defendants' MSJ Ex. W at P2042: 25, P2043: 26 – 2044:1.)<br><br>Ms. Hope further testified that, had the notes been provided to her from the LASD and she turned them over to the defense, she would not necessarily have maintained a duplicate copy of the notes in the District Attorneys' Office file. (*See,* Defendants' Randy Smith MSA Supplemental Ex. AB at D2569:20-D2570:5.) Nor was it the Ms. Hope's practice in 1985 to keep any type of inventory of the materials that she produced to defense counsel. (*See,* Defendants' MSJ Ex. O at D2579:9-19.) |

| Uncontroverted Material Facts | Plaintiffs' Response: | Defendants' Replay and/or Objections |
|---|---|---|
| | | Det. Smith testified at the *habeas* that it he practice to turn over his entire file, including all of his notes/notebooks, especially when requested to do so by the prosecutor (Defendants' MSJ Ex. O at D2555:4–26.). |
| 296. During the *habeas* proceedings Lara could not recall whether the "other" notes he had in his possession at the time of the underlying trial were about Soucy. | Undisputed. Disputed that the notes concerned Soucy. As reflected by the 1985 trial transcript, during the trial. D.D.A. Tamia Hope provided Lara, "rough" handwritten notes received from a SPPD Officer. Upon receiving the notes, Mr. Lara advised the court that he would consider "request[ing] more time to either investigate the matter *or see what was involved in why these notes were not transcribed and made available much earlier in this case*." **Ex. 100**, pp. 136:10-136:24 (emphasis supplied). The notes came up later in the trial when Lt. Hatfield was called to rebut Scott Egerer. Lara's cross-examination of Egerer addresses Hatfield's "rough notes" and the fact that Hatfield failed to include a date for his interview of | Plaintiffs fail to create a genuine issue of material fact. The evidence is that Lara did, in fact, have various notes at the time of the underlying trial (including "other notes" he referenced *during* the trial). (Defendants' MSJ Ex. N at D1981: 11 – 23.) When the Public Defender was asked during the *habeas* whether the various notes in issue were in his file at the time of the underlying trial, he testified that he could not recall (Defendants' MSJ Ex. O at D2650: 4–D2650: 6). And, by the time of the *habeas* proceedings, the original Public Defender's file was misplaced and was missing various materials. (Defendants' MSJ Ex. P at |

| Uncontroverted Material Facts | Plaintiffs' Response: | Defendants' Replay and/or Objections |
|---|---|---|
| | Egerer. **Ex. 100**, pp. 315:16 – 317:8 (1985 Trial Testimony of Louis Hatfield). J.D. Smith was subsequently called to testify as to when he directed Hatfield to interview Egerer. During cross, Lara asked J.D. Smith: "…you weren't even aware that Lieutenant Hatfield had any notes until about two days ago, isn't that true?" J.D. Smith answered yes. **Ex. 100**, pp. 319:27 – 320:26 (Trial Testimony of Smith). | 229:11 – 230: 3; Defendants' MSJ Ex. W at P2042: 25, P2043: 26 – 2044:1.)<br><br>Ms. Hope further testified that, had the notes been provided to her from the LASD and she turned them over to the defense, she would not necessarily have maintained a duplicate copy of the notes in the District Attorneys' Office file. (*See,* Defendants' Randy Smith MSA Supplemental Ex. AB at D2569:20-D2570:5.) Nor was it the Ms. Hope's practice in 1985 to keep any type of inventory of the materials that she produced to defense counsel. (*See,* Defendants' MSJ Ex. O at D2579:9-19.)<br><br>Det. Smith testified at the *habeas* that it he practice to turn over his entire file, including all of his notes/notebooks, especially when requested to do so by the prosecutor (Defendants' MSJ Ex. O at D2555:4–26.). |
| 297. During the *habeas* proceedings, | <u>Undisputed</u>. Vague and ambiguous as to "allegedly | Plaintiffs fail to create a genuine issue of material |

182

| Uncontroverted Material Facts | Plaintiffs' Response: | Defendants' Replay and/or Objections |
|---|---|---|
| Lara could not recall whether he received the allegedly suppressed materials prior to the underlying trial or not. | suppressed materials."<br><br>Disputed that Lara received any of the detectives' handwritten notebooks in this case. No copy of the such notes could be found in the DA file: D.D.A. Juan Mejia, responsible for representing the state during the habeas litigation, has testified that he reviewed all materials in the prosecution file and that it did not contain detectives' handwritten notebooks, nor did it contain the memo reflecting the anonymous tip. **Dkt. 263, Battles Decl.: Ex. 232, Declaration** of DDA Juan Mejia, ¶¶3-5. During the habeas, DDA Mejia stipulated to the fact that the handwritten notes were not part of the district attorney's files. *Id*. at ¶4; **Ex. 201.07**, pp. 7:8 – 7:16, Habeas Tr. (stipulating, on the record, that detectives handwritten notes were not included in the prosecution's files). Plaintiffs' former defense attorney, Adolfo Lara has testified that, based on his strategy during the original | fact.<br><br>Juan Mejia does not indicate that he has any knowledge as to what was in the District Attorney's file in this matter **prior to being assigned to handle the *habeas* petition of September 21, 2009.** Therefore, he has no personal knowledge as what materials were in the District Attorneys' file at the time of the underlying prosecution. Tamia Hope, the prosecutor who handled the underlying trial testified at the *habeas* proceedings that "I have a memory of receiving handwritten notes from every detective in every case when I was asked by the defense attorney to provide them." (*See,* Defendants' Randy Smith MSA Supplemental Ex. AB at D2567:23-25.) Moreover, Ms. Hope further testified that, had the notes been provided to her from the LASD and she turned them over to the defense, she would not necessarily have maintained a duplicate copy of the notes in the District Attorneys' Office file. (*See,* Defendants' |

183

| Uncontroverted Material Facts | Plaintiffs' Response: | Defendants' Replay and/or Objections |
|---|---|---|
| | trial, the anonymous tip and prior attempt were not disclosed. See AMFs 118, 140, 202-221, 233, 235-241, 327, 329, 331 (above). | Randy Smith MSA Supplemental Ex. AB at D2569:20-D2570:5.) Nor was it the Ms. Hope's practice in 1985 to keep any type of inventory of the materials that she produced to defense counsel. (*See,* Defendants' MSJ Ex. O at D2579:9-19.)  Therefore, the fact that the notes may not have been in the portions of the District Attorney's Office file that Mr. Mejia was able to compile sometime after he was assigned to handle the *habeas* proceedings in 2009 is irrelevant and immaterial. (Defendants' MSJ Ex. O at D2569:20–2570:10)  Det. Smith testified at the *habeas* that it he practice to turn over his entire file, including all of his notes/notebooks, especially when requested to do so by the prosecutor (Defendants' MSJ Ex. O at D2555: 4–26.).  Also, the evidence is that the Public Defender did, in fact, have various notes at the time of the underlying trial (including "other notes" he referenced *during* |

| Uncontroverted Material Facts | Plaintiffs' Response: | Defendants' Replay and/or Objections |
|---|---|---|
| | | the trial). (Defendants' MSJ Ex. N at D1981: 11 – 23.) When the Public Defender was asked during the *habeas* whether the various notes in issue were in his file at the time of the underlying trial, he testified that he could not recall (Defendants' MSJ Ex. O at D2650: 4–D2650: 6).<br><br>And, by the time of the *habeas* proceedings, the original Public Defender's file was misplaced and was missing various materials. (Defendants' MSJ Ex. P at 229:11 – 230: 3; Defendants' MSJ Ex. W at P2042: 25, P2043: 26 – 2044:1.) |
| **UNDISPUTED MATERIAL FACTS RELEVANT TO NO GENUINE ISSUE THAT ANY OF THE CONSTITUTIONAL VIOLATIONS WERE CAUSED BY A POLICY, PRACTICE, OR CUSTOM OF "DELIBERATE INDIFFERENCE".** | | |
| 298. The Homicide Bureau of the LASD has the responsibility of conducting investigations into criminal and non-criminal deaths in Los Angeles County, along with officer-involved shootings. | Undisputed. | |
| 299. For nearly the last half century, | Undisputed. | |

185

| Uncontroverted Material Facts | Plaintiffs' Response: | Defendants' Replay and/or Objections |
|---|---|---|
| approximately 49 years, Lt. Mike Bumcrot has been employed by the LASD and approximately 38 of those years he has been assigned to the Detectives Division Homicide Bureau ("the Homicide Bureau"). | | |
| 300. Formed in 1850, the LASD is now the largest sheriff's department in the world, directly servicing an area in excess of 4,000 square miles and providing police services for a population in excess of 10,000,000. | Undisputed, but immaterial to the legal issues presented by Defendants' motion.<br><br>Objection. Relevance, FRE 401, 403. This fact has no bearing on any legal issue in this case. | Plaintiffs do not create a genuine issue of material fact. The breadth and depth of the LASD is foundational to Defendants' response to Plaintiffs' claims. |
| 301. Currently, the LASD consists of over 17,000 employees; including 9,000 sworn peace officers and more than 8,000 civilians. | Undisputed, but immaterial to the legal issues presented by Defendants' motion.<br><br>Objection. Relevance, FRE 401, 403. This fact has no bearing on any legal issue in this case. | Plaintiffs do not create a genuine issue of material fact. The breadth and depth of the LASD is foundational to Defendants' response to Plaintiffs' claims. |
| 302. There are LASD facilities as far north as Antelope Valley, as far south as Lomita, as far east as | Undisputed, but immaterial to the legal issues presented by Defendants' motion.<br><br>Objection. Relevance, FRE | Plaintiffs do not create a genuine issue of material fact. The breadth and depth of the LASD is foundational to Defendants' |

186

| Uncontroverted Material Facts | Plaintiffs' Response: | Defendants' Replay and/or Objections |
|---|---|---|
| San Dimas and as far west as Catalina Island. | 401, 403. This fact has no bearing on any legal issue in this case. | response to Plaintiffs' claims. |
| 303. The LASD is a hierarchical organization that provides multiple levels of supervision to ensure that constitutional protections are observed. | Objection. Relevance, FRE 401, 403. This fact has no bearing on any legal issue in this case. Evidence cited regarding the LASD's current practices and current command structure are entirely irrelevant to any liability in this case.

Disputed insofar as this fact suggests that the LASD provided meaningful supervision of homicide detectives' investigatory activities and Brady compliance during the early-1980's.

According to Mike Bumcrot, LASD's 30(b)(6) witness who has been assigned to the Homicide Bureau for 38 years, LASD had no policy requiring lieutenants to confirm that *Brady* obligations had been met. **Dkt. 263, Battles Decl.: Ex. 616**, pp. 109:24-110:10, Mike Bumcrot Deposition Transcript. Bumcrot testified that, during the early-1980's, **field** lieutenants assigned to | Plaintiffs fail to create a genuine issue of material fact.

Plaintiffs misstate Lt. Bumcrot's testimony where the cited testimony is not specifically referring to "Team" lieutenants.

The Homicide Bureau had a captain and five teams, which each consisted of a Team Lieutenant and 10 to 14 detectives. **The Team Lieutenant would partner the detectives and assign them cases.** The Team Lieutenants were supervised by the Homicide Bureau Captain. In addition to the Team Lieutenants, who directly supervised the detectives' investigations, there were Administrative Lieutenants, who were assigned directly to the Captain.

Plaintiffs misstate the cited testimony from Retired Lt. Gilbert Leslie, who did not testify as a 30(b)(6) witness on behalf of Defendants. |

| Uncontroverted Material Facts | Plaintiffs' Response: | Defendants' Replay and/or Objections |
|---|---|---|
| | supervise homicide investigations were not required to have an understanding of the basic skills and obligations of homicide detectives. **Ex. 616**, pp. 118:1-118:22, Mike Bumcrot Deposition Transcript. Some field lieutenants responsible for supervising homicide investigations are not aware of *Brady* disclosure requirements. **Ex. 616**, pp. 116:3-117:19, Mike Bumcrot Deposition Transcript.<br><br>According to Gilbert Leslie, a Field Lieutenant (not Administrative Lieutenant) in the LASD during the 1980's, who supervised at least part of the French murder investigation, during the early-1980's, lieutenants in the homicide bureau engaged in only minimal supervision of detectives' investigatory activities (i.e. whether they adequately followed specific leads). **Ex. 609**, 176:4-176:19, Dep. of Lt. Gilbert Leslie. Because they did not review notebooks or other contents of the "poor boy," | Fed.R.Evid. 402. Leslie was an Administrative Lieutenant at the Homicide Bureau in the early 1980s until 1985. (*See,* Defendants' Addl. MSJ Ex. AH (Leslie Depo.) at 17:18 – 18:2.)<br><br>Administrative Lieutenants' duties included reviewing and approving reports for form, including insuring correct spelling and grammar and, when relevant, that all criminal elements were addressed. As with other Bureaus and stations, Administrative Lieutenants were also responsible for assisting the Capitan with day-to-day running of the Homicide Bureau. **As stated above, Administrative Lieutenants did not supervise Homicide detectives' investigations, which were supervised by the Team Lieutenants.**<br><br>(*See*, Lt. Bumcrot Decl. at ¶¶6-8, 13-16, 19, 21; Det. Lankford Decl. at ¶12; Defendants' MSJ Ex. AA; Ex. AF; Ex. AG and Ex. AE at D7544.) |

| Uncontroverted Material Facts | Plaintiffs' Response: | Defendants' Replay and/or Objections |
|---|---|---|
| | they would have no way of knowing whether detectives had relayed exculpatory information not memorialized in a police report, unless detectives specifically advised them such information existed. **Ex. 609**, 71:3-71:17, Dep. of Lt. Gilbert Leslie (as a general matter, lieutenants were only aware of information included in the police report). | |
| 304. The LASD provides multiple levels of training for all of its personnel, including Homicide Bureau detectives. | Objection. The LASD's current practices are irrelevant to the LASD's training practices during the early-1980's. FRE 401, 403.<br><br>Disputed insofar as this fact suggests that the LASD provided training on *Brady* disclosure requirements to homicide detectives during the early-1980's. *According to Mike Bumcrot, LASD's 30(b)(6) witness who has been assigned to the Homicide Bureau for 38 years*, during the 1980's, LASD had no mandatory *Brady* training. **Dkt. 263, Battles Decl.: Ex. 616**, pp. 22:11-29:25, 42:24 – 43:2, 87:5-87:25, Mike Bumcrot | Plaintiffs fail to create a genuine issue of material fact.<br><br>Homicide Bureau's practice is/was for its detectives to take detailed notes of all of their observations (regardless as to whether such observations may support or potentially weaken their case).<br><br>Regardless as to whether a particular detective found a particular fact relevant to a report he/she prepared, Homicide Bureau's practice is/was not just to disclose its reports, but everything, including all of the detectives' notes. (*See*, Defendants' MSJ UF 271- |

189

| Uncontroverted Material Facts | Plaintiffs' Response: | Defendants' Replay and/or Objections |
|---|---|---|
| | Deposition Transcript. During the early-1980's academy training did not address *Brady*. *Ibid*, pp. 22:11-23:17, Mike Bumcrot Deposition Transcript. LASD's 30(b)(6) witness, Mike Bumcrot, is aware of no POST training materials from the early-1980's to the present that address *Brady*. *Ibid*, pp. 37:12-37:23, Mike Bumcrot Deposition Transcript.<br><br>LASD's 30(b)(6) witness testified that, between 1980 and 1985, whether a detective received informal training on their constitutional obligation to disclose *Brady* material would depend on whether that person's training officer provided training on their own initiative. *Ibid*, pp. 41:23 – 42:19, Mike Bumcrot Deposition Transcript. | 280, 321.)<br><br>Also, Plaintiffs fail to create a genuine issue regarding any formal policy relating to the *Brady* rule because from at least 1979 and up to the present, it has been the practice of the Homicide Bureau to require detectives to take accurate, detailed notes of all of their observations (regardless as to whether such observations may support or potentially weaken their case), to save their notebooks, keep all notes in the relevant case file, and, if the case was presented for criminal prosecution, to make all of their notes (along with all other investigation evidence) available to the prosecutor assigned to the case.<br><br>Additionally, it has been the practice of the Homicide Bureau to err on the side of caution, and disclose all of the evidence gathered to the prosecutor assigned to the case and let the prosecutor assigned to the case make decisions as to what evidence might or might not be exculpatory; |

| Uncontroverted Material Facts | Plaintiffs' Response: | Defendants' Replay and/or Objections |
|---|---|---|
| | | therefore, training regarding a constitutional obligation to disclose *Brady* material would not change the content of what is turned over.<br><br>(*See*, Lt. Bumcrot Decl. at ¶19, 21; Det. Lankford Decl. at ¶12; Defendants' MSJ Ex. AE at D7544; Defendants' MSJ Ex. AF and Defendants' MSJ Ex. AG.) |
| 305. Training and supervision are provided to Homicide Bureau personnel on a variety of subject matters including: investigating crimes, documenting the investigations, disclosing evidence and utilizing various identification techniques. | <u>Objection.</u> Relevance, FRE 401, 403. Whether the LASD provides training "on a variety of subject matters" is irrelevant to whether the LASD provided constitutionally adequate training on the constitutional protections at issue in this case.<br><br><u>Disputed</u> insofar as this fact suggests that the LASD provided training on *Brady* disclosure requirements to homicide detectives during the early-1980's. *According to Mike Bumcrot, LASD's 30(b)(6) witness who has been assigned to the Homicide Bureau for 38 years*, during the 1980's, LASD had no mandatory | Plaintiffs fail to create a genuine issue of material fact.<br><br>Homicide Bureau's practice is/was for its detectives to take detailed notes of all of their observations (regardless as to whether such observations may support or potentially weaken their case).<br><br>Regardless as to whether a particular detective found a particular fact relevant to a report he/she prepared, Homicide Bureau's practice is/was not just to disclose its reports, but everything, including all of the detectives' notes. (*See*, Defendants' MSJ UF 271- |

| Uncontroverted Material Facts | Plaintiffs' Response: | Defendants' Replay and/or Objections |
|---|---|---|
| | *Brady* training. **Dkt. 263, Battles Decl.: Ex. 616**, pp. 22:11-29:25, 42:24 – 43:2, 87:5-87:25, Mike Bumcrot Deposition Transcript. During the early-1980's academy training did not address *Brady*. ***Ibid***, pp. 22:11-23:17, Mike Bumcrot Deposition Transcript.  LASD's 30(b)(6) witness, Mike Bumcrot, is aware of no POST training materials from the early-1980's to the present that  address *Brady*. ***Ibid***, pp. 37:12-37:23, Mike Bumcrot Deposition Transcript.<br><br>LASD's 30(b)(6) witness testified that, between 1980 and 1985, whether a detective received informal training on their constitutional obligation to disclose *Brady* material would depend on whether that person's training officer provided training on their own initiative. ***Ibid***, pp. 41:23 – 42:19, Mike Bumcrot Deposition Transcript. | 280, 321.)<br><br>Also, Plaintiffs fail to create a genuine issue regarding any formal policy relating to the *Brady* rule because from at least 1979 and up to the present, it has been the practice of the Homicide Bureau to require detectives to take accurate, detailed notes of all of their observations (regardless as to whether such observations may support or potentially weaken their case), to save their notebooks, keep all notes in the relevant case file, and, if the case was presented for criminal prosecution, to make all of their notes (along with all other investigation evidence) available to the prosecutor assigned to the case.<br><br>Additionally, it has been the practice of the Homicide Bureau to err on the side of caution, and disclose all of the evidence gathered to the prosecutor assigned to the case and let the prosecutor assigned to the case make decisions as to what evidence might or might not be exculpatory; |

| Uncontroverted Material Facts | Plaintiffs' Response: | Defendants' Replay and/or Objections |
|---|---|---|
| | | therefore, training regarding a constitutional obligation to disclose *Brady* material would not change the content of what is turned over.<br><br>(*See*, Lt. Bumcrot Decl. at ¶19, 21; Det. Lankford Decl. at ¶12; Defendants' MSJ AE at D7544; Defendants' MSJ Ex. AF and Defendants' MSJ Ex. AG.) |
| 306. At all times relevant to this case, the LASD has had a management and supervision structure that organizes responsibilities and personnel so that the LASD's policies, procedures, and constitutional protections are successfully implemented. | Objection. The LASD's "multi-layer" supervision structure is irrelevant to whether the LASD ensured successful implementation of *Brady's* due process protections in the 1980's. | Plaintiffs do not create a genuine issue of material fact. The supervision structure of the LASD is foundational to Defendants' response to Plaintiffs' *Monell* allegations. |
| 307. The LASD management and supervision structure includes layers of direct supervision, so that every employee is supervised by a higher-ranking member of the LASD, | Objection. Relevance, FRE 401, 403.<br><br>Disputed insofar as this fact suggests that the LASD provided meaningful supervision of homicide detectives' investigatory activities and Brady | Plaintiff does not create a genuine issue of material fact.<br><br>Plaintiffs misstate Lt. Bumcrot's testimony where the cited testimony is not specifically referring to "Team" lieutenants. |

| Uncontroverted Material Facts | Plaintiffs' Response: | Defendants' Replay and/or Objections |
|---|---|---|
| and that those supervisors are overseen by other higher-ranking LASD members, and so on. | compliance during the early-1980's. <u>Bumcrot testified that, during the early-1980's, **field lieutenants assigned to supervise homicide investigations were not required to have an understanding of the basic skills and obligations of homicide detectives.**</u> **Dkt. 263, Battles Decl.: Ex. 616**, pp. 118:1-118:22, Mike Bumcrot Deposition Transcript. Some field lieutenants responsible for supervising homicide investigations are not aware of *Brady* disclosure requirements. **Ex. 616**, pp. 116:3-117:19, Mike Bumcrot Deposition Transcript.<br><br>According to Gilbert Leslie, a Field Lieutenant (not Administrative Lieutenant) in the LASD during the 1980's, who supervised at least part of the French murder investigation, during the early-1980's, lieutenants in the homicide bureau engaged in only minimal supervision of detectives' investigatory activities (i.e. whether they adequately | The Homicide Bureau had a captain and five teams, which each consisted of a Team Lieutenant and 10 to 14 detectives. **The Team Lieutenant would partner the detectives and assign them cases.** The Team Lieutenants were supervised by the Homicide Bureau Captain. In addition to the Team Lieutenants, who directly supervised the detectives' investigations, there were Administrative Lieutenants, who were assigned directly to the Captain.<br><br>Plaintiffs misstate the cited testimony from Retired Lt. Gilbert Leslie, who did not testify as a 30(b)(6) witness on behalf of Defendants. Fed.R.Evid. 402. Leslie was an Administrative Lieutenant at the Homicide Bureau in the early 1980s until 1985. (*See,* Defendants' Addl. MSJ Ex. AH (Leslie Depo.) at 17:18 – 18:2.)<br><br>Administrative Lieutenants' duties included reviewing and approving reports for form, |

| Uncontroverted Material Facts | Plaintiffs' Response: | Defendants' Replay and/or Objections |
|---|---|---|
| | followed specific leads). **Dkt. 263, Battles Decl.: Ex. 609**, 176:4-176:19, Dep. of Lt. Gilbert Leslie. | including insuring correct spelling and grammar and, when relevant, that all criminal elements were addressed. As with other Bureaus and stations, Administrative Lieutenants were also responsible for assisting the Capitan with day-to-day running of the Homicide Bureau. **As stated above, Administrative Lieutenants did not supervise Homicide detectives' investigations, which were supervised by the Team Lieutenants.** <br><br> (*See*, Lt. Bumcrot Decl. at ¶¶6-8, 13-16, 19, 21; Det. Lankford Decl. at ¶12; Defendants' MSJ AA; Ex. AF; Ex. AG and Ex. AE at D7544.) |
| 308. When a supervisor observes a subordinate that she or he believes has committed, that supervisor is obligated by LASD policy to report these violations. | <u>Objection.</u> Relevance, FRE 401, 403. Whether supervisors are required to report rules violations is irrelevant because the LASD has admitted that it had no formal policy or training on *Brady* during the early-1980's, including no formal policies or directives describing the *Brady* rule, "exculpatory evidence" or law | Plaintiffs fail to create a genuine issue of material fact regarding any formal policy relating to the *Brady* rule because from at least 1979 and up to the present, it has been the practice of the Homicide Bureau to require detectives to take accurate, detailed notes of all of their observations (regardless as to whether such observations may |

| Uncontroverted Material Facts | Plaintiffs' Response: | Defendants' Replay and/or Objections |
|---|---|---|
| | enforcement's duty to recognize, memorialize and relay exculpatory information. **Dkt. 263, Battles Decl.: Ex. 616**, pp. 42:20-43:2, Mike Bumcrot Deposition Transcript; **Ex. 609**, 77:3-77:16, Dep. of Lt. Gilbert Leslie.<br><br>Disputed insofar as this fact suggests that the LASD provided meaningful supervision of homicide detectives' investigatory activities and Brady compliance during the early-1980's. Bumcrot testified that, during the early-1980's, **field lieutenants assigned to supervise homicide investigations were not required to have an understanding of the basic skills and obligations of homicide detectives.** **Ex. 616**, pp. 118:1-118:22, Mike Bumcrot Deposition Transcript. Some field lieutenants responsible for supervising homicide investigations are not aware of *Brady* disclosure requirements. **Ex. 616**, pp. 116:3-117:19, Mike Bumcrot Deposition Transcript. | support or potentially weaken their case), to save their notebooks, keep all notes in the relevant case file, and, if the case was presented for criminal prosecution, to make all of their notes (along with all other investigation evidence) available to the prosecutor assigned to the case.<br><br>Additionally, it has been the practice of the Homicide Bureau to err on the side of caution, and disclose all of the evidence gathered to the prosecutor assigned to the case and let the prosecutor assigned to the case make decisions as to what evidence might or might not be exculpatory; therefore, training regarding a constitutional obligation to disclose *Brady* material would not change the content of what is turned over.<br><br>Plaintiffs misstate Lt. Bumcrot's testimony where the cited testimony is not specifically referring to "Team" lieutenants.<br><br>The Homicide Bureau had |

| Uncontroverted Material Facts | Plaintiffs' Response: | Defendants' Replay and/or Objections |
|---|---|---|
| | According to Gilbert Leslie, a Field Lieutenant (not Administrative Lieutenant) in the LASD during the 1980's, who supervised at least part of the French murder investigation, during the early-1980's, lieutenants in the homicide bureau engaged in only minimal supervision of detectives' investigatory activities (i.e. whether they adequately followed specific leads). **Dkt. 263, Battles Decl.:Ex. 609**, 176:4-176:19, Dep. of Lt. Gilbert Leslie. | a captain and five teams, which each consisted of a Team Lieutenant and 10 to 14 detectives. **The Team Lieutenant would partner the detectives and assign them cases.** The Team Lieutenants were supervised by the Homicide Bureau Captain. In addition to the Team Lieutenants, who directly supervised the detectives' investigations, there were Administrative Lieutenants, who were assigned directly to the Captain.<br><br>Plaintiffs misstate the cited testimony from Retired Lt. Gilbert Leslie, who did not testify as a 30(b)(6) witness on behalf of Defendants. Fed.R.Evid. 402. Leslie was an Administrative Lieutenant at the Homicide Bureau in the early 1980s until 1985. (*See*, Defendants' Addl. MSJ Ex. AH (Leslie Depo.) at 17:18 – 18:2.)<br><br>Administrative Lieutenants' duties included reviewing and approving reports for form, including insuring correct spelling and grammar and, |

| Uncontroverted Material Facts | Plaintiffs' Response: | Defendants' Replay and/or Objections |
|---|---|---|
| | | when relevant, that all criminal elements were addressed. As with other Bureaus and stations, Administrative Lieutenants were also responsible for assisting the Capitan with day-to-day running of the Homicide Bureau. **As stated above, Administrative Lieutenants did not supervise Homicide detectives' investigations, which were supervised by the Team Lieutenants.** (*See*, Lt. Bumcrot Decl. at ¶¶6-8, 13-16, 19, 21; Det. Lankford Decl. at ¶12; Defendants' MSJ Ex. AA; Defendants' MSJ Ex. AF; Defendants' MSJ Ex. AG and Defendants' MSJ Ex. AE at D7544.) |
| 309. If, after investigation, corrective action needs to be taken, the LASD disciplines its personnel (which may include various measures up to and including termination.) for violating its policies and procedures. | Objection. Relevance, FRE 401, 403. Whether the LASD has procedures for taking corrective action is irrelevant to LASD's supervision on *Brady* during the 1980's. The LASD has admitted that it had no formal policy or training on *Brady* during the early-1980's, including no formal policies or directives describing the | Plaintiffs fail to create a genuine issue of material fact regarding any formal policy relating to the *Brady* rule because from at least 1979 and up to the present, it has been the practice of the Homicide Bureau to require detectives to take accurate, detailed notes of all of their observations (regardless as to whether such observations may |

| Uncontroverted Material Facts | Plaintiffs' Response: | Defendants' Replay and/or Objections |
|---|---|---|
| | *Brady* rule, "exculpatory evidence" or law enforcement's duty to recognize, memorialize and relay exculpatory information. **Ex. 616**, pp. 42:20-43:2, Mike Bumcrot Deposition Transcript; **Ex. 609**, 77:3-77:16, Dep. of Lt. Gilbert Leslie. | support or potentially weaken their case), to save their notebooks, keep all notes in the relevant case file, and, if the case was presented for criminal prosecution, to make all of their notes (along with all other investigation evidence) available to the prosecutor assigned to the case. |
| | Disputed insofar as this fact suggests that the LASD provided meaningful supervision of homicide detectives' investigatory activities and Brady compliance during the early-1980's. | Additionally, it has been the practice of the Homicide Bureau to err on the side of caution, and disclose all of the evidence gathered to the prosecutor assigned to the case and let the prosecutor assigned to the case make decisions as to what evidence might or might not be exculpatory; therefore, training regarding a constitutional obligation to disclose *Brady* material would not change the content of what is turned over. |
| | Bumcrot testified that, during the early-1980's, **field** lieutenants assigned to supervise homicide investigations were not required to have an understanding of the basic skills and obligations of homicide detectives. **Dkt. 263, Battles Decl.: Ex. 616**, pp. 118:1-118:22, Mike Bumcrot Deposition Transcript. Some field lieutenants responsible for supervising homicide investigations are not aware of *Brady* disclosure | Plaintiffs misstate Lt. Bumcrot's testimony where the cited testimony is not specifically referring to "Team" lieutenants.

The Homicide Bureau had |

| Uncontroverted Material Facts | Plaintiffs' Response: | Defendants' Replay and/or Objections |
|---|---|---|
| | requirements. **Ex. 616**, pp. 116:3-117:19, Mike Bumcrot Deposition Transcript.<br><br>According to Gilbert Leslie, a Field Lieutenant (not Administrative Lieutenant) in the LASD during the 1980's, who supervised at least part of the French murder investigation, during the early-1980's, lieutenants in the homicide bureau engaged in only minimal supervision of detectives' investigatory activities (i.e. whether they adequately followed specific leads). **Ex. 609**, 176:4-176:19, Dep. of Lt. Gilbert Leslie. | a captain and five teams, which each consisted of a Team Lieutenant and 10 to 14 detectives. **The Team Lieutenant would partner the detectives and assign them cases.** The Team Lieutenants were supervised by the Homicide Bureau Captain. In addition to the Team Lieutenants, who directly supervised the detectives' investigations, there were Administrative Lieutenants, who were assigned directly to the Captain.<br><br>Plaintiffs misstate the cited testimony from Retired Lt. Gilbert Leslie, who did not testify as a 30(b)(6) witness on behalf of Defendants. Fed.R.Evid. 402. Leslie was an Administrative Lieutenant at the Homicide Bureau in the early 1980s until 1985. (*See,* Defendants' Addl. MSJ Ex. AH (Leslie Depo.) at 17:18 – 18:2.)<br><br>Administrative Lieutenants' duties included reviewing and approving reports for form, including insuring correct spelling and grammar and, |

| Uncontroverted Material Facts | Plaintiffs' Response: | Defendants' Replay and/or Objections |
|---|---|---|
| | | when relevant, that all criminal elements were addressed. As with other Bureaus and stations, Administrative Lieutenants were also responsible for assisting the Capitan with day-to-day running of the Homicide Bureau. **As stated above, Administrative Lieutenants did not supervise Homicide detectives' investigations, which were supervised by the Team Lieutenants.**<br><br>(*See*, Lt. Bumcrot Decl. at ¶¶6-8, 13-16, 19, 21; Det. Lankford Decl. at ¶12; Defendants' MSJ Ex. AA; Defendants' MSJ Ex. AF; Defendants' MSJ Ex. AG and Defendants' MSJ Ex. AE at D7544.) |
| 310. Efforts to ensure compliance with LASD policies and procedures begin before LASD members are hired, through meeting the required criteria in the application and vetting process, and then successfully completing a Commission on Peace | <u>Objection.</u> Relevance, FRE 401, 403.<br><br>Whether LASD currently takes "efforts to ensure compliance with LASD policies and procedures" is irrelevant to training and supervision on *Brady* during the 1980's. The LASD has admitted that it had no formal policy or training on *Brady* during | Plaintiffs fail to create a genuine issue of material fact regarding any formal policy relating to the *Brady* rule because from at least 1979 and up to the present, it has been the practice of the Homicide Bureau to require detectives to take accurate, detailed notes of all of their observations (regardless as to whether such observations may |

| Uncontroverted Material Facts | Plaintiffs' Response: | Defendants' Replay and/or Objections |
|---|---|---|
| Officer Standards and Training ("POST")-certified academy training. | the early-1980's, including no formal policies or directives describing the *Brady* rule, "exculpatory evidence" or law enforcement's duty to recognize, memorialize and relay exculpatory information. **Dkt. 263, Battles Decl.: Ex. 616**, pp. 42:20-43:2, Mike Bumcrot Deposition Transcript; **Ex. 609**, 77:3-77:16, Dep. of Lt. Gilbert Leslie. | support or potentially weaken their case), to save their notebooks, keep all notes in the relevant case file, and, if the case was presented for criminal prosecution, to make all of their notes (along with all other investigation evidence) available to the prosecutor assigned to the case.

Additionally, it has been the practice of the Homicide Bureau to err on the side of caution, and disclose all of the evidence gathered to the prosecutor assigned to the case and let the prosecutor assigned to the case make decisions as to what evidence might or might not be exculpatory; therefore, training regarding a constitutional obligation to disclose *Brady* material would not change the content of what is turned over.

Plaintiffs misstate the cited testimony from Retired Lt. Gilbert Leslie, who did not testify as a 30(b)(6) witness on behalf of Defendants. Fed.R.Evid. 402. Leslie was an Administrative |

| Uncontroverted Material Facts | Plaintiffs' Response: | Defendants' Replay and/or Objections |
|---|---|---|
| | | Lieutenant at the Homicide Bureau in the early 1980s until 1985. (*See,* Defendants' Addl. MSJ Ex. AH (Leslie Depo.) at 17:18 – 18:2.)<br><br>Administrative Lieutenants' duties included reviewing and approving reports for form, including insuring correct spelling and grammar and, when relevant, that all criminal elements were addressed. As with other Bureaus and stations, Administrative Lieutenants were also responsible for assisting the Capitan with day-to-day running of the Homicide Bureau. **Administrative Lieutenants did not supervise Homicide detectives' investigations, which were supervised by the Team Lieutenants.**<br><br>(*See,* Lt. Bumcrot Decl. at ¶¶6-8, 13-16, 19, 21; Det. Lankford Decl. at ¶12; Defendants' MSJ Ex. AA; Defendants' MSJ Ex. AF; Defendants' MSJ Ex. AG and Defendants' MSJ Ex. AE at D7544.) |

| Uncontroverted Material Facts | Plaintiffs' Response: | Defendants' Replay and/or Objections |
|---|---|---|
| 311. Today, all deputies are required to complete a full-time 22 week POST-certified academy as required by the State of California, which was established by the California Legislature in 1959 to set minimum selection and training standards for California law enforcement. | Objection. The LASD's current practices are irrelevant to the LASD's training practices during the early-1980's. FRE 401, 403. | Plaintiffs do not create a genuine issue of material fact. Current LASD requirements are iterations of past LASD requirements, and foundational to Defendants' response to Plaintiffs' *Monell* claims. |
| 312. At all times relevant to this case, deputy candidates received similar POST training regarding the constitutional policing, LASD's policies and procedures, and well-established law enforcement techniques, including: ethics, eyewitness identification, documenting investigations, and producing exculpatory evidence in criminal prosecutions. | Objection. The cited evidence does not support the factual proposition for which it is referenced. Exhibits AB, AD, AE and AF are excerpts of POST training manuals from the 1980's. None of the corresponding POST training materials address Brady disclosure requirements. None of POST training materials produced in discovery in this case addressed mandatory reporting and testimonial requirements under *Brady*. None of the materials described the *Brady* rule, defined "exculpatory evidence" or explained the affirmative duty of law enforcement to recognize, memorialize and | Plaintiffs fail to create a genuine issue of material fact regarding POST training relating to *Brady* because the Homicide Bureau trains detectives to take accurate, detailed notes of all of their observations (regardless as to whether such observations may support or potentially weaken their case), to save their notebooks, keep all notes in the relevant case file, and, if the case was presented for criminal prosecution, to make all of their notes (along with all other investigation evidence) available to the prosecutor assigned to the case.

Additionally, it has been |

| Uncontroverted Material Facts | Plaintiffs' Response: | Defendants' Replay and/or Objections |
|---|---|---|
| | relay exculpatory information. **Dkt. 263, Battles Decl.: Ex. 707**, Expert Report of Russ Fischer, pp. 51, 52.<br><br>Disputed that POST or academy training addressed producing exculpatory evidence in the early - 1980's. According to Mike Bumcrot, During the early-1980's academy training did not address *Brady*. **Ex. 616**, pp. 22:11-23:17, Mike Bumcrot Deposition Transcript. Bumcrot is aware of no POST training materials from the early-1980's to the present that address *Brady*. **Ex. 616**, pp. 37:12-37:23, Mike Bumcrot Deposition Transcript. | the practice of the Homicide Bureau to err on the side of caution, and disclose all of the evidence gathered to the prosecutor assigned to the case and let the prosecutor assigned to the case make decisions as to what evidence might or might not be exculpatory; therefore, POST training regarding a constitutional obligation to disclose *Brady* material would not change the content of what is turned over.<br><br>(*See*, Lt. Bumcrot Decl. at ¶¶6-8, 13-16, 19, 21; Det. Lankford Decl. at ¶12; Defendants' MSJ Ex. AB at D4792; Defendants' MSJ Ex. AD at D7538–40; Defendants' MSJ Ex. AE at D7544, D7553, and Defendants' MSJ Ex. AF at D7740, D7750; Defendants' MSJ Ex. AG.) |
| 313. In the 1980s, like today, LASD personnel seeking to become Homicide Detectives were also provided in-service or on-duty training after their academy training,   including: documenting criminal | Undisputed that LASD personnel receive on-duty training before entering the homicide division. Disputed that they receive any mandatory training on *Brady*. **Ex. 616**, pp. 22:11-29:25, 42:24 – 43:2, 87:5-87:25 (no mandatory training on *Brady*), Mike | Plaintiffs fail to create a genuine issue of material fact regarding POST training relating to *Brady* because the Homicide Bureau trains detectives to take accurate, detailed notes of all of their observations (regardless as to whether such |

| Uncontroverted Material Facts | Plaintiffs' Response: | Defendants' Replay and/or Objections |
|---|---|---|
| investigations and field criminal investigation techniques, report writing and note taking, eyewitness identification, and constitutional policing. | Bumcrot Deposition Transcript. | observations may support or potentially weaken their case), to save their notebooks, keep all notes in the relevant case file, and, if the case was presented for criminal prosecution, to make all of their notes (along with all other investigation evidence) available to the prosecutor assigned to the case.

Additionally, it has been the practice of the Homicide Bureau to err on the side of caution, and disclose all of the evidence gathered to the prosecutor assigned to the case and let the prosecutor assigned to the case make decisions as to what evidence might or might not be exculpatory; therefore, POST training regarding a constitutional obligation to disclose *Brady* material would not change the content of what is turned over.

 (*See*, Lt. Bumcrot Decl. at ¶¶6-8, 13-16, 19, 21; Det. Lankford Decl. at ¶12; Defendants' MSJ Ex. AB at D4792; Defendants' MSJ Ex. AD at D7538–40; Defendants' MSJ Ex. AE at |

| Uncontroverted Material Facts | Plaintiffs' Response: | Defendants' Replay and/or Objections |
|---|---|---|
| | | D7544, D7553, and Defendants' MSJ Ex. AF at D7740, D7750; Defendants' MSJ Ex. AG.) |
| 314. In the early 1980s, Department of Justice ("DOJ") ran a homicide school in San Jose. | <u>Undisputed.</u> | |
| 315. In the early 1980s, like today, for their probationary period, new detectives at Homicide Bureau were assigned to a training partner, whose responsibilities included: supervision and training ("field training") the new detectives regarding various aspects of homicide investigations. | <u>Undisputed.</u> | |
| 316. From at least 1979 to today, both homicide school and field training cover topics including: ethics, constitutional witness identifications, accurate report writing and note taking, and production of exculpatory evidence to criminal | <u>Objection</u>. The referenced evidence does not support the proposition for which it is cited. Exhibits AB, AD, AE and AF are excerpts of POST training manuals from the 1980's. None of the corresponding POST training materials address Brady disclosure requirements. None of POST training materials produced in discovery in this case addressed | Plaintiffs fail to create a genuine issue of material fact regarding POST training relating to *Brady* because the Homicide Bureau trains detectives to take accurate, detailed notes of all of their observations (regardless as to whether such observations may support or potentially weaken their case), to save their notebooks, keep all notes in |

| Uncontroverted Material Facts | Plaintiffs' Response: | Defendants' Replay and/or Objections |
|---|---|---|
| prosecutors. | mandatory reporting and testimonial requirements under *Brady*. None of the materials described the *Brady* rule, defined "exculpatory evidence" or explained the affirmative duty of law enforcement to recognize, memorialize and relay exculpatory information. **Dkt. 263, Battles Decl.: Ex. 707**, Expert Report of Russ Fischer, pp. 51, 52.<br><br>Disputed in part: The LASD's 30(b)(6) witness, Mike Bumcrot, is aware of no POST training materials from the early-1980's *to the present* that address *Brady*. **Ex. 616**, pp. 37:12-37:23, Mike Bumcrot Deposition Transcript.<br><br>Because there was no formal training, whether a detective received informal training on their constitutional obligation to disclose *Brady* material would depend on whether that person's training officer provided training on their own initiative. **Ex. 616**, pp. 41:23 – 42:19, Mike Bumcrot Deposition Transcript. | the relevant case file, and, if the case was presented for criminal prosecution, to make all of their notes (along with all other investigation evidence) available to the prosecutor assigned to the case.<br><br>Additionally, it has been the practice of the Homicide Bureau to err on the side of caution, and disclose all of the evidence gathered to the prosecutor assigned to the case and let the prosecutor assigned to the case make decisions as to what evidence might or might not be exculpatory; therefore, POST training regarding a constitutional obligation to disclose *Brady* material would not change the content of what is turned over.<br><br>(*See*, Lt. Bumcrot Decl. at ¶¶6-8, 13-16, 19, 21; Det. Lankford Decl. at ¶12; Defendants' MSJ Ex. AB at D4792; Defendants' MSJ Ex. AD at D7538–40; Defendants' MSJ Ex. AE at D7544, D7553, and Defendants' MSJ Ex. AF at D7740, D7750; Defendants' MSJ Ex. AG.) |

| Uncontroverted Material Facts | Plaintiffs' Response: | Defendants' Replay and/or Objections |
|---|---|---|
| | Disputed that homicide detectives were required to attend the homicide school. **Ex. 616**, pp. 17:1 – 17:25, Mike Bumcrot Deposition Transcript. LASD records indicate that Det. JD Smith did not attend basic detective school until 1986. **Ex. 616**, pp. 129:20 – 133:8, Mike Bumcrot Deposition Transcript. | Regarding homicide school, Plaintiffs fail to create a genuine issue of material fact where the police academy consists of extensive POST training (*See*, Defendants' Addl. MSJ Ex. AI (Bumcrot Depo.) at 133:9-15); "most everyone attended . . . a week-long DOJ school," and " a majority of the training . . . consisted of on-the-job training" (*See*, Defendants' Addl. MSJ Ex. AI (Bumcrot Depo.) at 15: 11-20), detectives attended DOJ homicide school and took various training classes including "blood splatter," and classes put on by the "coroner," and the "DA" (*See*, Defendants' Addl. MSJ Ex. AI (Bumcrot Depo.) at 17: 3-20); detectives also attended trainings put on by other agencies (*See*, Defendants' Addl. MSJ Ex. AI (Bumcrot Depo.) at 18: 1-18), additionally, once the homicide school started "everyone who had not attended [the DOJ school] were mandated to attend the homicide school put on by us and LAPD." (*See*, |

| Uncontroverted Material Facts | Plaintiffs' Response: | Defendants' Replay and/or Objections |
|---|---|---|
| | | Defendants' Addl. MSJ Ex. AI (Bumcrot Depo.) at 36: 5-17). |
| 317. During the 1980s, Homicide detectives, in addition to prior academy, in-service/on-duty and field training, would periodically receive legal briefs from the District Attorney's Office ("DA Briefs") that educated and trained the detectives about various issues relevant to homicide prosecutions. | Objection. Vague as to time ("during the 1980's). Undisputed that the D.A. Briefs were placed on a briefing board. Immaterial because the LASD has not produced any evidence to substantiate that any of the DA Briefs addressed *Brady*. | Plaintiffs do not create a genuine issue of material fact. Plaintiffs cannot substantiate a claim of deliberate indifference to support their *Monell* claim. *Adickes v. S.H. Kress & Co.* 398 U.S. 144, 167-68 (1970) (to prove that defendant had a practice or custom of deliberate indifference which caused any of the alleged constitutional violations Plaintiffs must show that the practices are "persistent and widespread . . . permanent and well-settled [and] deeply imbedded.") |
| 318. Originally, the DA Briefs would be placed on a briefing board at the Homicide Bureau and reviewed by the detectives; however, during the 1980s, the Homicide Bureau required each detective to initial the DA Brief to confirm that they had both reviewed and | Objection. Vague as to time ("during the 1980's). Undisputed that the D.A. Briefs were placed on a briefing board. Immaterial because the LASD has not produced any evidence to substantiate that any of the DA Briefs addressed *Brady*. Disputed that there were | Plaintiffs fail to create a genuine issue of material fact and also misstate Lt. Bumcrot's testimony where the cited evidence indicates he testified that the memos were "required reading of everyone in the homicide bureau." |

| Uncontroverted Material Facts | Plaintiffs' Response: | Defendants' Replay and/or Objections |
|---|---|---|
| understood the contents. | any formal guidelines addressing the content of these memos or to ensure that they were reviewed by detectives. **Dkt. 263, Battles Decl.: Ex. 616**, pp. 22:11-29:25, 37:24-38:19, Mike Bumcrot Deposition Transcript. | |
| 319. Currently, the Homicide Bureau holds weekly meetings to discuss current cases, successful tactics, existing challenges, and other related matters, and approximately once a quarter, a Deputy District Attorney ("DDA") attends and presents relevant subjects to the detectives. | Objection. Relevance, 401, 403. The Homicide Bureau's current practice of holding weekly meetings to discuss cases is irrelevant to any issue in this case; any probative value is substantially outweighed by risk of prejudice and confusion. | Plaintiffs cannot substantiate a claim of deliberate indifference to support their *Monell* claim.<br><br>*Adickes v. S.H. Kress & Co.* 398 U.S. 144, 167-68 (1970) (to prove that defendant had a practice or custom of deliberate indifference which caused any of the alleged constitutional violations Plaintiffs must show that the practices are "persistent and widespread . . . permanent and well-settled [and] deeply imbedded."). |
| 320. Since at least 1979, the Homicide Bureau's practice to require detectives to take accurate, detailed notes of all of their observations (regardless as to whether such observations may | Objection. FRE 602, lacks foundation, no personal knowledge. Detectives Lankford's and Bumcrot's testimony is insufficient to establish habit with respect to Smith/Parra's practices homicide detectives. Detectives Lankford and Bumcrot lack foundation to | Plaintiffs fail to create a genuine issue of material fact. Also, Smith/Parra's practices are not relevant to Plaintiffs' *Monell* claim where Plaintiffs must establish that such violation was caused by a policy, practice or custom of "deliberate indifference" of |

| Uncontroverted Material Facts | Plaintiffs' Response: | Defendants' Replay and/or Objections |
|---|---|---|
| support or potentially weaken their case), to save their notebooks, keep all notes in the relevant case file, and, if the case was presented for criminal prosecution, to make all of their notes (along with all other investigation evidence) available to the prosecutor assigned to the case. | describe the practices of all homicide detectives since 1979 regarding the use of notebooks. Vague as to "make all of their notes…available to the prosecutor."  Disputed that, as a matter of practice, detectives leave copies of the handwritten notebooks for the D.A. According to Detective Steve Lankford, currently assigned to the French homicide investigation, Detectives do "not hand [] over [their homicide file] to the D.A.'s office," **Dkt. 263, Battles Decl.: Ex. 615**, pp. 88:3 - 89:20, Deposition of Det. Steve Lankford.  Disputed that Detective Smith took detailed notes in this case. For example, regarding Villareal, the handwritten notes omit Villareal's statement that, when the detective administered the photo lineup, he told him that the photo he selected "looked like the man [he] saw, but [he] couldn't be positive." **Ex. 100**, p. 169:12 – 169:21, 1985 Trial Tr. | **the County**. *Monell v. New York City Department of Social Services*, 436 U.S. 658, 690 (1978).  Plaintiffs mischaracterize Det. Lankford's testimony where the cited evidence indicates Lankford was explaining that Detectives to not physically hand over their poor boy, but "turn over" all materials—meaning making copies and/or giving access to the prosecution and defense. In fact, Lankford testified, "We collect the information, and we give it to the District Attorney's office. We give them everything," (p. 72 at 3–6.) and later testified that "we share the poor boy with the DA that's filing the case." (p. 88 at 11–15.)  From at least 1979 and up to the present, it has been the practice of the Homicide Bureau to err on the side of caution, and disclose all of the evidence gathered to the prosecutor assigned to the case and let the prosecutor assigned to the case make decisions as to what evidence might or |

| Uncontroverted Material Facts | Plaintiffs' Response: | Defendants' Replay and/or Objections |
|---|---|---|
| | (testimony of Arturo Villareal).<br><br>Disputed that the handwritten notebooks were made available to the district attorney's office in this case. There was no copy of the notes in the D.A. file. D.D.A. Juan Mejia, responsible for representing the state during the habeas litigation, has testified that he reviewed all materials in the prosecution file and that it did not contain detectives' handwritten notebooks, nor did it contain the memo reflecting the anonymous tip. **Ex. 232,** Declaration of DDA Juan Mejia, ¶¶3-5. During the habeas, DDA Mejia stipulated to the fact that the handwritten notes were not part of the district attorney's files. *Id*. at ¶4; **Ex. 201.07**, pp. 7:8 – 7:16, Habeas Tr. (stipulating, on the record, that detectives handwritten notes were not included in the prosecution's files). | might not be exculpatory; therefore, training regarding a constitutional obligation to disclose *Brady* material would not change the content of what is turned over. (*See*, Lt. Bumcrot Decl. at ¶19, 21; Det. Lankford Decl. at ¶12; Defendants' MSJ Ex. AE at D7544; Ex. AF and Ex. AG.)<br><br>Det. Smith testified at the *habeas* that it he practice to turn over his entire file, including all of his notes/notebooks, especially when requested to do so by the prosecutor (Defendants' MSJ Ex. O at D2555: 4–26.).<br><br>Juan Mejia does not indicate that he has any knowledge as to what was in the District Attorney's file in this matter **prior to being assigned to handle the *habeas* petition of September 21, 2009.** Therefore, he has no personal knowledge as what materials were in the District Attorneys' file at the time of the underlying prosecution. Tamia Hope, the prosecutor who handled |

| Uncontroverted Material Facts | Plaintiffs' Response: | Defendants' Replay and/or Objections |
|---|---|---|
| | | the underlying trial testified at the *habeas* proceedings that "I have a memory of receiving handwritten notes from every detective in every case when I was asked by the defense attorney to provide them." (*See,* Defendants' Randy Smith MSA Supplemental Ex. AB at D2567:23-25.) Moreover, Ms. Hope further testified that, had the notes been provided to her from the LASD and she turned them over to the defense, she would not necessarily have maintained a duplicate copy of the notes in the District Attorneys' Office file. (*See,* Defendants' Randy Smith MSA Supplemental Ex. AB at D2569:20-D2570:5.) Nor was it the Ms. Hope's practice in 1985 to keep any type of inventory of the materials that she produced to defense counsel. (*See,* Defendants' Randy Smith MSA Supplemental Ex. AB at D2579:9-19.) Therefore, the fact that the notes may not have been in the portions of the District Attorney's Office file that Mr. Mejia was able to compile sometime after he |

| **Uncontroverted Material Facts** | **Plaintiffs' Response:** | **Defendants' Replay and/or Objections** |
|---|---|---|
| | | was assigned to handle the *habeas* proceedings in 2009 is irrelevant and immaterial. (Defendants' MSJ Ex. O at D2569: 20– 2570: 10) |
| 321. At all times relevant to this case, the Homicide Bureau's practice was that the first supplemental report, i.e. scene investigation and witness interviews, should be completed within a couple of weeks of the incident and the murder book should be completed within a month. | <u>Undisputed</u>, but immaterial. | |
| 322. From at least 1979 and up to the present, it has been the practice of the Homicide Bureau to err on the side of caution, and disclose all of the evidence gathered to the prosecutor assigned to the case and let the prosecutor assigned to the case make decisions as to what evidence might or might not be exculpatory. | <u>Objection.</u> FRE 602, lacks foundation, no personal knowledge. Detectives Lankford's and Bumcrot's testimony is insufficient to establish habit with respect to Smith/Parra's practices homicide detectives. Lankford and Bumcrot lack foundation to describe the practices of all homicide detectives since 1979. Vague as to "disclose." <br><br> <u>Disputed</u> that the LASD had any formal policy requiring detectives' notebooks be turned over | Plaintiffs fail to create a genuine issue of material fact. Also, Smith/Parra's practices are not relevant to Plaintiffs' *Monell* claim where Plaintiffs must establish that such violation was caused by a policy, practice or custom of "deliberate indifference" of **the County**. *Monell v. New York City Department of Social Services*, 436 U.S. 658, 690 (1978). <br><br> Even so, Det. Smith testified at the *habeas* that it he practice to turn over |

| Uncontroverted Material Facts | Plaintiffs' Response: | Defendants' Replay and/or Objections |
|---|---|---|
| | the D.A. **Dkt. 263, Battles Decl.: Ex. 616**, Bumcrot Dep. Tr., p. 80:10 – 83:23, 90:6-90:11, 91:7-91:15.<br><br>Disputed that, as a matter of practice, detectives leave copies of the handwritten notebooks for the D.A. According to Detective Steve Lankford, currently assigned to the French homicide investigation, Detectives do "not hand [] over [their homicide file] to the D.A.'s office," **Ex. 615**, pp. 88:3 - 89:20, Deposition of Det. Steve Lankford. | his entire file, including all of his notes, especially when requested to do so by the prosecutor (Defendants' MSJ Ex. O at D2555: 4–26.).<br><br>Plaintiffs mischaracterize Det. Lankford's testimony where the cited evidence indicates Lankford was explaining that Detectives to not physically hand over their poor boy, but "turn over" all materials—meaning making copies and/or giving access to the prosecution and defense. In fact, Lankford testified, "We collect the information, and we give it to the District Attorney's office. We give them everything," (p. 72 at 3–6.) and later testified that "we share the poor boy with the DA that's filing the case." (p. 88 at 11–15.)<br><br>From at least 1979 and up to the present, it has been the practice of the Homicide Bureau to require detectives to take accurate, detailed notes of all of their observations (regardless as to whether such observations may support |

216

| Uncontroverted Material Facts | Plaintiffs' Response: | Defendants' Replay and/or Objections |
|---|---|---|
| | | or potentially weaken their case), to save their notebooks, keep all notes in the relevant case file, and, if the case was presented for criminal prosecution, to make all of their notes (along with all other investigation evidence) available to the prosecutor assigned to the case.<br><br>Additionally, it has been the practice of the Homicide Bureau to err on the side of caution, and disclose all of the evidence gathered to the prosecutor assigned to the case and let the prosecutor assigned to the case make decisions as to what evidence might or might not be exculpatory; therefore, training regarding a constitutional obligation to disclose *Brady* material would not change the content of what is turned over. (*See*, Lt. Bumcrot Decl. at ¶19, 21; Det. Lankford Decl. at ¶12; Defendants' MSJ Ex. AE at D7544; Ex. AF and Ex. AG.)<br><br>Also, the prosecutor who handled the underlying trial testified at the *habeas* |

217

| **Uncontroverted Material Facts** | **Plaintiffs' Response:** | **Defendants' Replay and/or Objections** |
|---|---|---|
| | | proceedings that, "I have a memory of receiving handwritten notes from every detective in every case when I was asked by the defense attorney to provide them." (*See,* UF 283.) |
| 323. Since at least 1979, Homicide Bureau detectives have received on-the-job training regarding various identification procedures, including, but not limited to, conducting photo lineups with six packs. | <u>Objection</u>. Vague as to "on-the-job." <br><br> <u>Disputed</u> that detectives received any formal training on administering six-pack photo-arrays during the early-1980's. According to Mike Bumcrot, LASD's 30(b)(6) witness who has been assigned to the Homicide Bureau for 38 years, during the 1980's, LASD had **no formal training** regarding the administration of six packs. **Ex. 616**, Bumcrot Dep. Tr. , pp. 97:21 – 100:12. Bumcrot testified that the LASD has "never had any formal policy on how to prevent unwitting or subconscious or unconscious influences on eyewitness identifications." ***Ibid.***, at 98:10 – 98:15, 100:4 – 100:12. | Plaintiffs fail to create a genuine issue of material fact and misstate the evidence. <br><br> First, the cited evidence indicates that Lt. Bumcrot testified that he remembered "training memos from the DA's Office," that "everybody was trained," and that "most everybody was trained to use the six pack." <br><br> Since at least 1979, Homicide Bureau detectives have received on-the-job training regarding various identification procedures, including, but not limited to, conducting photo lineups with six packs. Detectives were trained to go through the photos by hand and pick out the "fillers," which were five photos of people of the same race, gender, age, and |

218

| Uncontroverted Material Facts | Plaintiffs' Response: | Defendants' Replay and/or Objections |
|---|---|---|
| | | had the same general facial/hair features as the suspect.<br><br>Detectives were also trained to admonish a witness with the Homicide Bureau's standard admonition, providing, in pertinent part: (1) "You should not conclude or guess that the [photos] contain the picture of the person who committed the crime," (2) "Y]ou are not obligated to identify anyone," (3) the witness should not discuss his/her identification with any other witnesses.<br><br>(*See*, Lt. Bumcrot Decl. at ¶24, 25, 26; Ex. AA at D8108 – 09; Ex. AB; Ex. AG; Ex. I; Det. Lankford Decl. at ¶¶5-6, 10.) |
| 324. In the early 1980s, before the internet was available, the LASD did not have internet, emails, or wider centralized databases that exist today. | <u>Undisputed</u>, but <u>immaterial</u> to the issues presented by Defendants' motion. <u>Objection</u>. The availability of internet and centralized databases for obtaining photos is irrelevant to any claim in this case; Plaintiff does not claim that the selection of 6-pack photos | Plaintiffs do not create a genuine issue of material fact and cannot substantiate a claim of deliberate indifference to support their *Monell* claim.<br><br>*Adickes v. S.H. Kress & Co.* 398 U.S. 144, 167-68 (1970) (to |

| Uncontroverted Material Facts | Plaintiffs' Response: | Defendants' Replay and/or Objections |
|---|---|---|
| was suggestive. | | prove that defendant had a practice or custom of deliberate indifference which caused any of the alleged constitutional violations Plaintiffs must show that the practices are "persistent and widespread . . . permanent and well-settled [and] deeply imbedded."). |
| 325. In the early 1980s, before the internet was available for obtaining photographs, the Homicide Bureau maintained a large file cabinet of booking photos for detectives to use when constructing six packs. | Undisputed, but immaterial to the issues presented by Defendants' motion. Plaintiff does not claim that the selection of 6-pack photos was suggestive.<br><br>Objection. The availability of internet and centralized databases for obtaining photos is irrelevant to any claim in this case. | Plaintiffs do not create a genuine issue of material fact and cannot substantiate a claim of deliberate indifference to support their *Monell* claim.<br><br>*Adickes v. S.H. Kress & Co.* 398 U.S. 144, 167-68 (1970) (to prove that defendant had a practice or custom of deliberate indifference which caused any of the alleged constitutional violations Plaintiffs must show that the practices are "persistent and widespread . . . permanent and well-settled [and] deeply imbedded."). |
| 326. In the early 1980s, before the internet was available, detectives were trained to go through the photos by hand | Undisputed, but immaterial to the issues presented by Defendants' motion. Plaintiff does not claim that the selection of 6-pack photos was suggestive. | Plaintiffs do not create a genuine issue of material fact and cannot substantiate a claim of deliberate indifference to support their *Monell* claim. |

| Uncontroverted Material Facts | Plaintiffs' Response: | Defendants' Replay and/or Objections |
|---|---|---|
| and pick out the "fillers," which were five photos of people of the same race, gender, age, and had the same general facial/hair features as the suspect. | | *Adickes v. S.H. Kress & Co.* 398 U.S. 144, 167-68 (1970) (to prove that defendant had a practice or custom of deliberate indifference which caused any of the alleged constitutional violations Plaintiffs must show that the practices are "persistent and widespread . . . permanent and well-settled [and] deeply imbedded."). |
| 327. In the early 1980s, before the internet was available, once the detective picked out fillers, she or he was trained to place the filler photos and the suspect photo—in random order—in a manila envelope that had six equally-sized windows (to prevent some photos from being larger than others) cut out for the booking photos ("six-pack folder"). | Undisputed, but immaterial to the issues presented by Defendants' motion. Plaintiff does not claim that the selection of 6-pack photos was suggestive. | Plaintiffs do not create a genuine issue of material fact and cannot substantiate a claim of deliberate indifference to support their *Monell* claim.

*Adickes v. S.H. Kress & Co.* 398 U.S. 144, 167-68 (1970) (to prove that defendant had a practice or custom of deliberate indifference which caused any of the alleged constitutional violations Plaintiffs must show that the practices are "persistent and widespread . . . permanent and well-settled [and] deeply imbedded."). |
| 328. In the early 1980s, before | Objection. Lacks foundation, no personal | Plaintiffs fail to create a genuine issue of material |

| Uncontroverted Material Facts | Plaintiffs' Response: | Defendants' Replay and/or Objections |
|---|---|---|
| presenting a six-pack folder to a witness, detectives would be admonish a witness with the Homicide Bureau's standard admonition, providing, in pertinent part: (1) "You should not conclude or guess that the [photos] contain the picture of the person who committed the crime," (2) "Y]ou are not obligated to identify anyone," (3) the witness should not discuss his/her identification with any other witnesses. | knowledge, FRE 602. Detective Bumcrot's testimony is insufficient to establish habit with respect to Detective Smith's practices as a homicide detective.<br><br>Disputed insofar as this fact implies that Detective J.D. Smith issued this admonishment to any witness in this case.<br>Disputed that Det. Smith admonished Daniel Druecker before showing him the six-pack. Druecker has testified that he does not recall being told that the person he saw may not be in the six-pack or that he did not have to choose a photo. **Battles 3/24/17 Decl.: Ex. 201.01**, Habeas Tr. (Daniel Druecker), pp. 28:27 – 29:17 (Druecker did not recall detectives reading anything before they opened the folder, advising that the person he saw may or may not be in the photos, or telling him he was not expected to choose someone) **Ex. 613**, Dep. of Daniel Druecker, pp. 217:8 – 224:24 (does not recall being admonished). | fact. Also, Det. Smith's "habit" is not relevant to Plaintiffs' *Monell* claim where Plaintiffs must establish that such violation was caused by a policy, practice or custom of "deliberate indifference" of the County. *Monell v. New York City Department of Social Services*, 436 U.S. 658, 690 (1978).<br><br>Also, at the *habeas*, Druecker testified the Detectives did advise him prior to showing him the six pack. (Defendants' MSJ Ex. O at D2310: 8–10.)<br><br>Druecker further testified that he did not remember everything the officers told him during the ID procedures. (UF 115–116; Defendants' MSJ Ex. O at D2310: 11–17.) Also, it is undisputed, without objection, that no one from the LASD, DA's Office, or SPPD ever asked Druecker to lie, and specifically asked him to tell the truth. (UF 108–114.)<br><br>While it is Defendants' contention that Druecker was properly admonished, |

| Uncontroverted Material Facts | Plaintiffs' Response: | Defendants' Replay and/or Objections |
|---|---|---|
| | | even, assuming *arguendo*, Druecker was not "properly" admonished, the lack of an admonishment prior to an identification procedure will not render it unconstitutional. *U.S. v. Carr*, 761 F.3d 1068, 1074–75 (9th Cir. 2014). |
| 329. In the early 1980s, detectives were trained to read this admonition to each witness prior to administering a six-pack photographic lineup identification. | Undisputed that detectives were informally trained to admonish witnesses prior to administering a six-pack photographic lineup.<br><br>Disputed that the admonitions provided in this case contained the language in #328, above.<br><br>Disputed that Druecker was admonished in this case.<br><br>Disputed that Det. Smith admonished Daniel Druecker before showing him the six-pack. Druecker has testified that he does not recall being told that the person he saw may not be in the six-pack or that he did not have to choose a photo. **Battles 3/24/17 Decl.: Ex. 201.01**, Habeas Tr. (Daniel Druecker), pp. 28:27 – 29:17 (Druecker did not recall detectives reading anything before they opened | Plaintiffs fail to create a genuine issue of material fact.<br><br>At the *habeas*, Druecker testified the Detectives did advise him prior to showing him the six pack. (Defendants' MSJ Ex. O at D2310: 8–10.)<br><br>Druecker further testified that he did not remember everything the officers told him during the ID procedures. (UF 115–116; Defendants' MSJ Ex. O at D2310: 11–17.) Also, it is undisputed, without objection, that no one from the LASD, DA's Office, or SPPD ever asked Druecker to lie, and specifically asked him to tell the truth. (UF 108–114.)<br><br>While it is Defendants' contention that Druecker was properly admonished, |

| Uncontroverted Material Facts | Plaintiffs' Response: | Defendants' Replay and/or Objections |
|---|---|---|
| | the folder, advising that the person he saw may or may not be in the photos, or telling him he was not expected to choose someone) **Ex. 613**, Dep. of Daniel Druecker, pp. 217:8 – 224:24 (does not recall being admonished).<br><br>Disputed that Druecker was properly admonished. Detective Smith testified, regarding the admonishment of Mr. Villareal in reviewing the photospread, that he told Mr. Villareal both that "We told him that we were going to show him six Pictures that would be close -- that would depict close –facial references of people, and that any one of the people pictured may or may not have been at the scene, and that it was important to pick out the person if he thought the person was possibly the person that he had seen, and it was just as important to not pick out anyone if he wasn't sure." This admonishment improperly suggests that a witness may select a photo based on *resemblance* not *recognition*. **Dkt. 263,** | even, assuming *arguendo*, Druecker was not "properly" admonished, the lack of an admonishment prior to an identification procedure will not render it unconstitutional. *U.S. v. Carr*, 761 F.3d 1068, 1074–75 (9th Cir. 2014). |

| Uncontroverted Material Facts | Plaintiffs' Response: | Defendants' Replay and/or Objections |
|---|---|---|
| | **Battles Decl.: Ex. 100,** p. 209:5 – 209:15 (1984 Trial Tr., J.D. Smith). | |
| 330. At one time, the six-pack photographic lineup identification admonition was in the form of a card that detectives could either carry with them or attach to the back of their six-pack folder. | Objection, vague as to time. Whether deputies, "at one time" had a card printed with the admonition is irrelevant to any issue in this case. FRE 401, 403.

Undisputed, but immaterial to eyewitness identification procedures in 1984-1985. | Plaintiffs do not create a genuine issue of material fact and cannot substantiate a claim of deliberate indifference to support their *Monell* claim.

*Adickes v. S.H. Kress & Co.* 398 U.S. 144, 167-68 (1970) (to prove that defendant had a practice or custom of deliberate indifference which caused any of the alleged constitutional violations Plaintiffs must show that the practices are "persistent and widespread . . . permanent and well-settled [and] deeply imbedded."). |
| 331. From at least 1979 to today, Homicide Bureau detectives are trained to not do anything during the presentation of the six pack (such as tapping on a photograph, mentioning a specific photograph prior to a witness selecting it, staring at a particular photograph, etc.) to | Objection. Vague as to "trained."

Disputed that detectives received any formal training on administering six-pack photo-arrays during the early-1980's. According to Mike Bumcrot, LASD's 30(b)(6) witness who has been assigned to the Homicide Bureau for 38 years, during the 1980's, LASD had **no** | Plaintiffs fail to create a genuine issue of material fact and misstate the evidence.

First, the cited evidence indicates that Lt. Bumcrot testified that he remembered "training memos from the DA's Office," that "everybody was trained," and that "most everybody was trained to use the six pack." |

| Uncontroverted Material Facts | Plaintiffs' Response: | Defendants' Replay and/or Objections |
|---|---|---|
| suggest one photograph over another. | **formal training** regarding the administration of six packs. **Battles 3/24/17 Decl.: Ex. 616**, Bumcrot Dep. Tr. , pp. 97:21 – 100:12. Bumcrot testified that the LASD has "never had any formal policy on how to prevent unwitting or subconscious or unconscious influences on eyewitness identifications." ***Ibid.***, at 98:10 – 98:15, 100:4 – 100:12. | Since at least 1979, Homicide Bureau detectives have received on-the-job training regarding various identification procedures, including, but not limited to, conducting photo lineups with six packs. Detectives were trained to go through the photos by hand and pick out the "fillers," which were five photos of people of the same race, gender, age, and had the same general facial/hair features as the suspect.<br><br>Detectives were also trained to admonish a witness with the Homicide Bureau's standard admonition, providing, in pertinent part: (1) "You should not conclude or guess that the [photos] contain the picture of the person who committed the crime," (2) "Y]ou are not obligated to identify anyone," (3) the witness should not discuss his/her identification with any other witnesses.<br><br>(*See*, Lt. Bumcrot Decl. at |

| Uncontroverted Material Facts | Plaintiffs' Response: | Defendants' Replay and/or Objections |
|---|---|---|
| | | ¶24, 25, 26; Ex. AA at D8108 – 09; Ex. AB; Ex. AG; Ex. I; Det. Lankford Decl. at ¶¶5-6, 10.) |
| 332. Currently, Homicide Bureau detectives must tape or video-record all suspect interviews, including identification procedures, "unless it is not practical to do so." | Objection. Relevance, FRE 401, 403. Evidence that the LASD now requires officers to record identification procedures has no bearing on LASD's policies during the 1980's. There is no evidence the LASD had such a policy during the 1980's. | Plaintiffs fail to create a genuine issue of material fact.

Training currently provided is similar, except for the introduction of modern technology, to the training at times relevant to this case. Detectives are encouraged to tape or video-record all suspect interviews, including identification procedures.

Absent the references to new technology, the current policies and procedures are essentially a codification of Homicide Bureau's practices at times relevant to this case.

(*See*, Lt. Bumcrot Decl. at ¶29; Defendants' MSJ Ex. AG) |
| 333. Currently, whenever an identification procedure is not recorded "the deputy shall advise their | Objection. Relevance, FRE 401, 403. Evidence that the LASD now requires officers to record identification procedures has no bearing on LASD's | Plaintiffs fail to create a genuine issue of material fact.

Training currently provided is similar, except for the |

| Uncontroverted Material Facts | Plaintiffs' Response: | Defendants' Replay and/or Objections |
|---|---|---|
| supervisor of the reason(s) for not doing so." | policies during the 1980's. There is no evidence the LASD had such a policy during the 1980's. | introduction of modern technology, to the training at times relevant to this case. Detectives are encouraged to tape or video-record all suspect interviews, including identification procedures.<br><br>Absent the references to new technology, the current policies and procedures are essentially a codification of Homicide Bureau's practices at times relevant to this case.<br><br>(*See*, Lt. Bumcrot Decl. at ¶29; Defendants' MSJ Ex. AG) |
| 334. Currently, all six packs, witness admonishments, and photo lineup procedure recordings "shall be retained as a permanent part of the investigation and disclosed." | Objection. Relevance, FRE 401, 403. Evidence that the LASD now requires officers to keep a copy of their admonishment in the case file has no bearing on LASD's policies during the 1980's. There is no evidence the LASD had such a policy during the 1980's.<br><br>Undisputed, but immaterial to any issue in this case. This was not the LASD's policy at the time of the investigation in this case. | Plaintiffs fail to create a genuine issue of material fact.<br><br>Training currently provided is similar, except for the introduction of modern technology, to the training at times relevant to this case. Detectives are encouraged to tape or video-record all suspect interviews, including identification procedures. A true and correct copy of LASD's written policies and procedures on photo identifications was |

228

| <u>Uncontroverted Material Facts</u> | <u>Plaintiffs' Response:</u> | <u>Defendants' Replay and/or Objections</u> |
|---|---|---|
| | | previously submitted as Defendants' MSJ Ex. AG. Absent the references to new technology, the current policies and procedures are essentially a codification of Homicide Bureau's practices at times relevant to this case.<br>(*See*, Lt. Bumcrot Decl. at ¶29) |
| 335. From at least 1979 to today, Homicide Bureau detectives are told to request witnesses not share anything about their identification selection to others, to keep all identifications as untainted as possible. | <u>Undisputed</u>, but <u>immaterial</u> to any issue in this case.<br><br><u>Objection</u>. FRE 602, Lacks foundation. Relevance, FRE 401, 403. Whether LASD admonishes witnesses to avoid sharing information is irrelevant to any claim in this case. | Plaintiffs do not create a genuine issue of material fact and cannot substantiate a claim of deliberate indifference to support their *Monell* claim.<br><br>*Adickes v. S.H. Kress & Co.* 398 U.S. 144, 167-68 (1970) (to prove that defendant had a practice or custom of deliberate indifference which caused any of the alleged constitutional violations Plaintiffs must show that the practices are "persistent and widespread . . . permanent and well-settled [and] deeply imbedded."). |
| **UNDISPUTED MATERIAL FACTS REGARDING PLAINTIFFS' FAILURE TO FILE A TIMELY CREDITOR'S CLAIM WITH THE ESTATE OF DET. GILBERT PARRA.** | | |
| 336. Det. Parra started with the LASD in | <u>Undisputed</u>. | |

| Uncontroverted Material Facts | Plaintiffs' Response: | Defendants' Replay and/or Objections |
|---|---|---|
| 1960, was promoted to Sergeant in 1968, and was first assigned to the Homicide Bureau in 1976. | | |
| 337. Det. Parra spent over 16 years at the Homicide Bureau until he retired in 1993. | Undisputed. | |
| 338. Det. Parra passed away on October 19, 2003. | Undisputed. | |
| 339. Plaintiffs have named Eric Parra as a defendant based on their understanding that he was the administrator of his father's estate. | Disputed. Plaintiffs named Eric Parra as a defendant because he was the personal representative of Gilbert Parra's estate. | Plaintiffs fail to create a genuine issue of material fact; this does not create a dispute within the argument that all claims against Eric Parra are time barred. |
| 340. Det. Parra's estate closed around 2005, over ten years ago. | Objection. Relevance, FRE 401, 403. The date on which Det. Parra's estate closed is irrelevant to whether Plaintiff may assert claims under Probate Code §550. The Court has already determined that the one-year statute of limitations specified in §366.2 does not apply in this case. Dkt. 28, p. 5.<br><br>Undisputed. | Plaintiffs fail to create a genuine issue of material fact. The County's duty to indemnify employees pursuant to §§ 825 and 995 is not the equivalent of insurance because "indemnification of [an employee] is neither automatic nor mandatory." *V.W. ex rel. Barber v. Vallejo*, No. WL 3992403, at *5 (E.D. Cal. 2013) ("To obtain indemnification, [employee] must, first, request that the City defend him in writing[.]"), see Hanline v. Ventura, 2006 |

| Uncontroverted Material Facts | Plaintiffs' Response: | Defendants' Replay and/or Objections |
|---|---|---|
| | | WL 3360672 (C.D. CA 2016) ("[t]he practice Plaintiff describes is indemnification, not insurance"); *see DeGrassi v. Glendora*, 207 F.3d 636, 641 (9th Cir. 2000) (distinguishing indemnity from insurance when Councilwoman's claim did not arise under the terms of a liability policy but was "controlled by the [Cal. Gov't Code], which defines the City's indemnity obligation."). |
| 341. At no time did any of the Plaintiffs or any of their representatives ever file a creditor's claim with Det. Parra's estate asserting the potential for the instant lawsuit. | Objection. Relevance, FRE 401, 403. A party bringing a suit under Probate Code §550 does not have a claim against estate property, is therefore not a creditor and is not requirement to comply with claims requirements under Probate Code §9100.<br><br>Undisputed. | Plaintiffs fail to create a genuine issue of material fact.<br><br>*Probate Code* § 550, *et seq.* only applies when a decedent is covered by **insurance** and the County is not an insurance provider. The County's duty to indemnify employees pursuant to §§ 825 and 995 is not the equivalent of insurance because "indemnification of [an employee] is neither automatic nor mandatory." *V.W. ex rel. Barber v. Vallejo*, No. WL 3992403, at *5 (E.D. Cal. 2013) ("To obtain indemnification, [employee] must, first, |

| Uncontroverted Material Facts | Plaintiffs' Response: | Defendants' Replay and/or Objections |
|---|---|---|
| | | request that the City defend him in writing[.]"), see *Hanline v. Ventura*, 2006 WL 3360672 (C.D. CA 2016) ("[t]he practice Plaintiff describes is indemnification, not insurance"); *see DeGrassi v. Glendora*, 207 F.3d 636, 641 (9th Cir. 2000) (distinguishing indemnity from insurance when Councilwoman's claim did not arise under the terms of a liability policy but was "controlled by the [Cal. Gov't Code], which defines the City's indemnity obligation."). |
| 342. At no time has Eric Parra made any written requests for defense or indemnification from the County of Los Angeles. | <u>Undisputed.</u> | |
| 343. Eric Parra has no intention of making any written requests for defense or indemnification from the County of Los Angeles at any time. | <u>Objection.</u> Whether Eric Parra intends to make a request for indemnification from the County of Los Angeles is irrelevant to the claims and defenses in this case. Relevance, FRE 401, 403. | Plaintiffs fail to create a genuine issue of material fact.<br><br>*Probate Code* § 550, *et seq.* only applies when a decedent is covered by **insurance** and the County is not an insurance provider. The County's duty to indemnify employees pursuant to §§ 825 and 995 |

| Uncontroverted Material Facts | Plaintiffs' Response: | Defendants' Replay and/or Objections |
|---|---|---|
| | | is not the equivalent of insurance because "indemnification of [an employee] is neither automatic nor mandatory." *V.W. ex rel. Barber v. Vallejo*, No. WL 3992403, at *5 (E.D. Cal. 2013) ("To obtain indemnification, [employee] must, first, request that the City defend him in writing[.]"), see Hanline v. Ventura, 2006 WL 3360672 (C.D. CA 2016) ("[t]he practice Plaintiff describes is indemnification, not insurance"); *see DeGrassi v. Glendora*, 207 F.3d 636, 641 (9th Cir. 2000) (distinguishing indemnity from insurance when Councilwoman's claim did not arise under the terms of a liability policy but was "controlled by the [Cal. Gov't Code], which defines the City's indemnity obligation."). |

Dated: April 10, 2017        LAWRENCE BEACH ALLEN & CHOI PC

By:   /s/ Lauren T. Krapf
       Lauren T. Krapf
Attorneys for Defendants,
COUNTY OF LOS ANGELES, J.D. SMITH and
ERIC PARRA

233