PAUL B. BEACH, State Bar No. 166265
pbeach@lbaclaw.com
MICHAEL D. ALLEN, State Bar No. 198126
mallen@lbaclaw.com
LAUREN T. KRAPF, State Bar No. 292115
lkrapf@lbaclaw.com
LAWRENCE BEACH ALLEN & CHOI, PC
100 West Broadway, Suite 1200
Glendale, California 91210-1219
Telephone No. (818) 545-1925
Facsimile No. (818) 545-1937

Attorneys for Defendants,
COUNTY OF LOS ANGELES, J.D. SMITH and ERIC PARRA

# UNITED STATES DISTRICT OF COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| FRANK O'CONNELL, NICHOLAS O'CONNELL | Case No. 13-CV-01905-MWF (PJWx) |
| Plaintiffs, | Honorable Michael W. Fitzgerald |
| v. | **DEFENDANTS' MEMORANDUM OF POINTS AND AUTHORITIES IN REPLY TO PLAINTIFFS' OPPOSITION TO MOTION FOR SUMMARY JUDGMENT, OR ALTERNATIVELY, SUMMARY ADJUDICATION OF INDIVIDUAL ISSUES** |
| J.D. SMITH; ESTATE OF GILBERT PARRA; ERIC PARRA, COUNTY OF LOS ANGELES AND DOES 1-10. | |
| Defendants. | |
| | Date: April 24, 2017 |
| | Time: 10:00 a.m. |
| | Crtm: 5A |

TO THE HONORABLE COURT, ALL INTERESTED PARTIES, AND TO
THEIR COUNSEL OF RECORD:

///

///

///

///

///

1

1    Defendants COUNTY OF LOS ANGELES, J.D. SMITH and ERIC

2 PARRA hereby submit the following Memorandum of Points and Authorities in

3 reply to Plaintiffs' opposition to their Motion for Summary Judgment, or

4 Alternatively, Summary Adjudication of Individual Issues.

5

6 Dated:  April 10, 2017            LAWRENCE BEACH ALLEN & CHOI PC

7

8                                By:   /s/ Lauren T. Krapf
                                      Michael D. Allen
9                                     Lauren T. Krapf
                                      Attorneys for Defendants,
10                                    COUNTY OF LOS ANGELES, J.D.
                                      SMITH and ERIC PARRA
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

O'Connell/Reply to Pl's Opp to Deft's MSJ

# TABLE OF CONTENTS

MEMORANDUM OF POINTS AND AUTHORITIES...........................................1

I.     PLAINTIFFS FAIL TO CREATE A GENUINE ISSUE OF MATERIAL FACT THAT THE DETECTIVES' HANDWRITTEN NOTES WERE SUPPRESSED BY THE LOS ANGELES COUNTY SHERIFF'S DEPARTMENT, ESPECIALLY WHERE LARA WAS UNABLE TO DENY AT THE HABEAS THAT THE NOTES HE RECEIVED PRIOR TO TRIAL MAY HAVE BEEN THE SUBJECT NOTES AND ALSO HAD THE MEANS TO OBTAIN THE INFORMATION CONTAINED IN THE SUBJECT MATERIALS. .........................................................................................1

II.    PLAINTIFFS' FABRICATION OF EVIDENCE CLAIM FAILS BECAUSE THERE IS INSUFFICIENT EVIDENCE THAT THE DETECTIVES DELIBERATELY MISQUOTED OR MISREPRESENTED WITNESS STATEMENTS. .....................................3

III.   PLAINTIFFS' CONTENTIONS THAT THE DETECTIVES' TONE CHANGED, CAUSING DRUECKER TO FEEL INTERNAL PRESSURE TO SELECT A SIX PACK PHOTOGRAPH, AND THAT AFTER HE SELECTED PLAINITFF, A DETECTIVE MADE A PHONE CALL TO INFORM THE LASD OF HIS ID, CANNOT BE PURSUED AS A SUGGESTIVE IDENTIFICATION CLAIM. ...........................................6

      A.     Plaintiffs Have Failed To Establish A Genuine Issue Of Material Fact As To A Substantial Likelihood Of Misidentification. .....................................................................6

      B.     It Is Undisputed That Druecker's Identification Had Sufficient ........7

IV.   PLAINTIFF'S FAIL TO CITE LEGAL AUTHORITY AUTHORIZING A "RECKLESS INVESTIGATION" CLAIM IN THE CONTEXT OF THE INSTANT CASE, I.E. "MALICIOUS PROSECUTION" AND, IN ANY EVENT, CANNOT CREATE A GENUINE DISPUTE AS TO SUCH CLAIM.........................................8

V.     THERE IS INSUFFICIENT EVIDENCE TO CREATE A GENUINE ISSUE TO PROVE *MONELL* LIABILITY AGAINST THE COUNTY ...............................................................................11

      A.     Plaintiffs' Failure-To-Train Regarding Brady Is Overreaching. ......12

      B.     Plaintiffs Completely Ignore LASD's Departmental Guidance Structure for Disclosure of Evidence and Eyewitness ID Procedures. ...............................................................................14

i

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

VI.    IN LIGHT OF THE DIFFERENCE IN ISSUES AND BECAUSE
       OF THE EVIDENCE THAT WAS NOT AND COULD NOT
       HAVE BEEN BEFORE THE COURT IN CARRILLO, IT DOES
       NOT PRECLUDE THE APPLICATION OF QUALIFIED
       IMMUNITY TO THE INDIVIDUAL DEFENDANTS.............................15

VII.   BECAUSE ERIC PARRA HAS NOT (AND WILL NOT)
       REQUEST INDEMNIFICATION, THE ONLY WAY FOR
       PLAINTIFFS TO PROCEED WITH THEIR CLAIMS AGAINST
       HIM WOULD BE TO COMPLETELY IGNORE GOVERNMENT
       CODE § 825. .............................................................................16

VIII.  CONCLUSION .........................................................................19

O'Connell/Reply to Pl's Opp to Deft's MSJ

# TABLE OF AUTHORITIES

**Cases**

*Amrine v. Brooks,*
   522 F.3d 823 (8th Cir. 2008)....................................................................9

*Burge v. Par. of St. Tammany,*
   187 F.3d 452 (5th Cir. 1999)................................................................4, 5

*Carrillo v. Cnty of L.A.,*
   798 F.3d 1210 (9th Cir. 2015)................................................................15

*Connick v. Thompson,*
   131 S. Ct. 1350 (2011) ..........................................................................12

*Costanich v. Dep't of Soc. & Health Servs.,*
   627 F.3d 1101 (9th Cir. 2010)..................................................................4

*Daniels v. Williams,*
   474 U.S. 327 (1986) ................................................................................9

*DeGrassi v. Glendora,*
   207 F.3d 636 (9th Cir. 2000)..................................................................17

*Devereaux v. Abbey,*
   263 F.3d 1070 (9th Cir. 2001)..................................................................3

*Emmett v. Ricketts,*
   397 F.Supp. 1025 (N.D. Ga. 1975) ........................................................13

*Erickson v. Pardus,*
   551 U.S. 89 (2007) ................................................................................18

*Haring v. Prosise,*
   462 U.S. 306 (1983) ................................................................................3

*Lombardi v. El Cajon,*
   117 F.3d 1117 (9th Cir. 1997)..................................................................3

*Malley v. Briggs,*
   475 U.S. 335 (1986) ..............................................................................15

*Merritt v. Los Angeles,*
    875 F.2d. 765 (9th Cir. 1989) .................................................................. 11, 12

*Monell v. Dept. of Social Services,*
    436 U.S. 658 (1978) ................................................................................. 11

*Pearson v. Callahan,*
    555 U.S. 223 (2009) ................................................................................. 15

*Pelayo v. Downey,*
    570 F.Supp.2d 1183 (C.D. CA 2008) ...................................................... 17

*Pineda Oliva v. Hedgpeth,*
    375 Fed. Appx. 697 (9th Cir. 2010) ........................................................... 6

*Rhoades v. Henry,*
    638 F.3d 1027 (9th Cir. 2011) ................................................................. 13

*Simmons v. U.S.,*
    390 U.S. 377 (1968) ................................................................................... 6

*Smith v. Almada,*
    640 F.3d 931 (9th Cir. 2011) ..................................................................... 1

*Souliotes v. Modesto,*
    2016 WL 3549266 (E.D. Cal. 2016) .......................................................... 8

*U.S. v. Dupuy,*
    760 F.2d 1492 (9th Cir. 1985) ................................................................... 1

*U.S. v. Field,*
    625 F.2d 862 (9th Cir. 1980) .................................................................. 7, 8

*U.S. v. Mmahat,*
    106 F.3d 89 (5th Cir. 1997) ..................................................................... 13

*U.S. v. Mulderig,*
    120 F.3d 534 (5th Cir. 1997) ................................................................... 13

*U.S. v. Skilling,*
    554 F.3d 529 (5th Cir. 2009) ................................................................... 13

iv

*Wilson v. Lawrence,*

   260 F.3d 946 (8th Cir. 2001) ................................................................. 9

**Statutes**

*Cal. Gov't Code* § 825 ....................................................................... 16, 17, 18

*Cal. Gov't Code* § 995 ................................................................................ 17

**Rules**

Fed.R.Evid. 403 ......................................................................................... 11

Fed.R.Evid. 801 and 802 ............................................................................. 11

O'Connell/Reply to Pl's Opp to Deft's MSJ

1    <u>**MEMORANDUM OF POINTS AND AUTHORITIES**</u>

2    I.    <u>**PLAINTIFFS FAIL TO CREATE A *GENUINE* ISSUE OF**</u>

3        <u>**MATERIAL FACT THAT THE DETECTIVES' HANDWRITTEN**</u>

4        <u>**NOTES WERE SUPPRESSED BY THE LOS ANGELES COUNTY**</u>

5        <u>**SHERIFF'S DEPARTMENT, ESPECIALLY WHERE LARA WAS**</u>

6        <u>**UNABLE TO DENY AT THE *HABEAS* THAT THE NOTES HE**</u>

7        <u>**RECEIVED PRIOR TO TRIAL MAY HAVE BEEN THE SUBJECT**</u>

8        <u>**NOTES AND ALSO HAD THE MEANS TO OBTAIN THE**</u>

9        <u>**INFORMATION CONTAINED IN THE SUBJECT MATERIALS.**</u>

10        As addressed in Defendants' MSJ, there is no "suppression" under *Brady* if

11    the alleged evidence was provided to the defense or "if the means of obtaining the

12    exculpatory evidence has been provided to the defense." *U.S. v. Dupuy*, 760 F.2d

13    1492, 1502 (9th Cir. 1985). There is no *Brady* violation unless the nondisclosure

14    was "so serious that there is a reasonable probability that the suppressed evidence

15    would have produced a different verdict." *Smith v. Almada*, 640 F.3d 931, 939 (9th

16    Cir. 2011).

17        Here, Plaintiffs' Opposition completely misstates the evidence by arguing

18    that, "during the entire prosecution, the only handwritten notes disclosed to Lara

19    were SPPD Lt. Hatfield's rough notes of his interview with Scott Egerer" handed

20    to him at trial. (Pl. Opp. at 8: 5–6.) On May 24, 1984, a letter was sent to Det.

21    Smith from the DA's office, with an accompanying discovery order that explicitly

22    asked for "all notes or memoranda, handwritten or typed" by all investigating

23    officers. (UF 280–81, Ex. L at D3234.) Also, Hope testified she had a memory of

24    receiving handwritten notes "from every detective in every case" when asked by

25    the defense to provide them. (UF 283.)

26        Also, Plaintiffs make a completely speculative assertion that "LASD failed

27    to disclose **all** of detectives' handwritten notebooks." (Pl. Opp. at 7: 26–28,

28    emphasis in original.) During the criminal trial, Lara referenced "other" notes in

1

his file and Plaintiffs are purely speculating that the "other" notes were LASD notes. (UF 294.) If the "other" notes included the subject LASD notes, Plaintiffs' argument that it is "inconceivable" that Hope would have "turned over 212 pages of notes to her opposing counsel …without retaining a copy" (Pl. Opp. at 8:13–15) is flawed because Hope only turning over a portion of the LASD notes (and withholding others) is even less conceivable. Given that it is undisputed that Lara had notes prior to the underlying trial, Hope's testimony that she did not necessarily maintain a duplicate copy of notes she turned over, makes it not only conceivable that she did not retain copies of the subject notes, but also the most likely explanation for the lack of any notes found in the DA's file at the time of the *habeas*. (UF 284.)

Further, with respect to the notes regarding Soucy's selection from the six pack, not only do Defendants deny that there was any suppression of notes regarding Soucy's ID (or other IDs), based on the information that Lara obtained during his interview of the Soucys, there can be no genuine issue as to suppression or materiality. It is undisputed that Soucy's ID was corroborated by Ina Soucy, and further undisputed that Plaintiff was the only male to move into Jeanne's house during the summer of 1983. (UF 148, 170.) Therefore, the male that the Soucys identified had to be Plaintiff. Finally, there was no prejudice because Lara interviewed Soucy days after he met with the Detectives and had an opportunity to gauge the strength of Soucy's ID. (UF 149–153.) Plaintiffs fail to address this in their Opposition.

Finally, Plaintiffs also mischaracterize and discount Villareal's testimony in making their *Brady* argument. Villareal testified that Plaintiff most resembled the person he saw, and even the judge in the underlying trial acknowledged the significance behind Villareal's statement.[1] Though, according to the police report,

---

[1] "[Druecker's] ID is corroborated by Mr. Villareal, who . . . described the person that he saw consistently with the description that was given by Mr. Drucker. They weren't together. They

Butler identified Plaintiff, this has no bearing on Plaintiffs' *Brady* claims because Butler never testified. Moreover, Lara interviewed Butler and Villareal and was able to assess the strength of their IDs. Therefore, Plaintiffs have not and cannot establish a genuine issue of material fact as to the alleged suppression and/or prejudice under *Brady*.[2]

## II. PLAINTIFFS' FABRICATION OF EVIDENCE CLAIM FAILS BECAUSE THERE IS INSUFFICIENT EVIDENCE THAT THE DETECTIVES DELIBERATELY MISQUOTED OR MISREPRESENTED WITNESS STATEMENTS.

Plaintiffs argue that "establishing false evidence" in the police reports would have "raised serious concerns" regarding the reliability of the ID procedures. (Pl. Opp. at 5:8–9.) While Defendants' dispute Plaintiffs' fabrication of evidence claims, what is relevant is whether investigators during the 1984–85 investigation "knew or should have known that the alleged perpetrator was innocent, or that the interview techniques employed were **so coercive** and abusive that the [investigator] knew or should have known that they would yield false information." *Devereaux v. Abbey*, 263 F.3d 1070, 1077 (9th Cir. 2001).

Plaintiffs completely ignore *Devereaux*, alleging that it is "one

---

didn't know each other . . . and they both came up with a similar description. He, too, picked [# 3] as the person who most looked like the person with the gun." (Ex. N at D2208: 14–22.)

[2] Plaintiffs improperly assert that the *habeas* rulings are binding. The *habeas* proceeding did not and could not have addressed any interests of Defendants. "Typically, collateral estoppel will apply 'if (1) the issue necessarily decided at the previous [proceeding] is identical to the one which is sought to be re-litigated; (2) the previous [proceeding] resulted in a final judgment on the merits; and (3) the party against whom collateral estoppel is asserted was a party or in privity with a party at the prior [proceeding].'" *Lombardi v. El Cajon*, 117 F.3d 1117, 1121 (9th Cir. 1997). Here, Defendants had no legal stake in the *habeas* petition and without the commonality of interests, the mandated degree of privity for collateral estoppel cannot exist. *Haring v. Prosise*, 462 U.S. 306, 311 (1983) ("[A]mong the most critical guarantees of fairness in applying collateral estoppel is the guarantee that the party to be estopped had not only a full and fair opportunity but an adequate incentive to litigate 'to the hilt' the issues in question.") (internal citations omitted).

3

circumstantial method of proving deliberate fabrication." (Pl. Opp. at 12:21–24.) Instead, Plaintiffs argue that "such circumstantial evidence is not needed where direct fabrication of falsification exists," citing *Costanich v. Dep't of Soc. & Health Servs.*, 627 F.3d 1101, 1111 (9th Cir. 2010). What Plaintiffs omit is that *Costanich* held that proving a falsification of evidence claim can be substantiated when a plaintiff proves an officer "**deliberately** misquoted and misrepresented witness statements, i.e., **deliberately falsified** statements in her investigative report and declaration." *Id*. at 1111. In *Constanich*, the record "directly reflect[ed]" the defendant social worker's false statements when (1) she falsified her own declaration, (2) she "purposefully report[ed] that she [had] interviewed [34] witnesses, when she [had] actually only attempted to make contact with [18 of them,]" (3) she reported that she interviewed therapists when she actually did not speak to any medical professionals, and (4) she purposefully used quotations in her report to attribute statements to witnesses when they were not the speaker's actual words. *Id*. at 1111–12. Here, there is no genuine issue of material fact substantiating a claim that the officers **deliberately** falsified a declaration or report, or misquoted witnesses.

Further, Plaintiffs' argument that Det. Smith "falsely attributed" a positive ID to Soucy is unsupported by the evidence and by Plaintiffs' cited case law.[3] Plaintiffs cite the out-of-circuit case, *Burge v. Par. of St. Tammany*, 187 F.3d 452, 480 (5th Cir. 1999), where a decedent's mother knowingly lied on the witness stand, testifying that she saw the criminal defendant with decedent (her son) on the night he was murdered. There, the decedent's mother actually told the officer that "she **did not see** the vehicle or the person or persons with whom her son left." *Id*. at 458 (emphasis added). Also, unlike the Detectives in this case, in *Burge*, a Lieutenant testified that the officer admitted "that he had hidden original

---

[3] Plaintiffs' cite to *Robinson v. Cain* should be disregarded because no case is associated with "501 F.Supp.2d 399." (Pl. Opp. at 5: 8–13.) Also, "tending to impeach the credibility of the investigation" is not an element of any of Plaintiffs' claims or a basis for §1983 liability.

statements in the trunk of his car, and that disclosure of these statements would probably affect the outcome of the case." *Id*. at 479. Finally, the *Burge* Court noted that the evidence in that case suggested that the officer assisted in "the suborning of the perjury by [decedent's mother] that conflicted with the first statement she gave to [the officer.]" *Id*. at 480.

Here, Plaintiffs' falsification of evidence argument regarding the ID procedures and testimony therefrom with respect to Soucy (as well as Butler and Villareal) is hyperbole at best. First, unlike the defendant social worker in *Costanich*, Plaintiffs have not (and cannot) show that the Detectives deliberately falsified their reports with made-up witness statements or falsified any declarations with fictitious expert information. (*See* UF 160, UF 272–75.) Plaintiffs grossly mischaracterize the evidence, negating Soucy's ID of Plaintiff because the notes reveal he identified Plaintiff's photo (#3) and "poss. #1" during the six-pack presentation. They also ignore the fact that Soucy identified Plaintiff at trail. (UF 165.) Plaintiffs' claims, in no way, establish the Detectives engaged in **deliberate** fabrication of evidence.

Second, unlike the decedent's mother in *Burge*, here, it is undisputed that Soucy actually saw the driver of the yellow Pinto. (UF 140, 150, 161.) Here, the Detectives' handwritten notes could not have been used to "impeach" Soucy's ID, because Lara interviewed Soucy days after his initial ID. Plaintiffs do not address this in their Opposition. Additionally, it is undisputed that Soucy's ID was corroborated by other witnesses and it cannot be ignored that Plaintiff was the only male to move into Jeanne's house during the summer of 1983. Finally, it is undisputed, without objection, that Lara also talked to Villareal about the Detectives' ID procedures and Villareal stated that the officers did not pressure him or make any leading statements. (UF 159–160.)

///

///

5

III.    **PLAINTIFFS' CONTENTIONS THAT THE DETECTIVES' TONE CHANGED, CAUSING DRUECKER TO FEEL INTERNAL PRESSURE TO SELECT A SIX PACK PHOTOGRAPH, AND THAT *AFTER* HE SELECTED PLAINITFF, A DETECTIVE MADE A PHONE CALL TO INFORM THE LASD OF HIS ID, CANNOT BE PURSUED AS A SUGGESTIVE IDENTIFICATION CLAIM.**

Plaintiffs' thin assertions do not create a genuine issue of material fact that the Detectives used ID procedures that were **so impermissibly suggestive** as to give rise to a very substantial likelihood of irreparable misidentification. *Simmons v. U.S.*, 390 U.S. 377, 384 (1968). As such, Plaintiffs have failed to establish genuine issues of material fact to substantiate their claim that the Detectives' ID procedures were unconstitutionally, impermissibly suggestive and that Druecker's ID lacked indicia of reliability.

A.    **Plaintiffs Have Failed To Establish A Genuine Issue Of Material Fact As To A Substantial Likelihood Of Misidentification.**

Plaintiffs' attempt to compare *Pineda Oliva v. Hedgpeth*, 375 Fed. Appx. 697 (9th Cir. 2010) to the case at hand lacks merit. In *Hedgpeth*, the witness was six years old, was not properly admonished, she believed that she had to pick a photo, the investigators effectively suggested that the first person she chose was not the suspect, and finally, when she tried **a second time** to identify the suspect, the detectives confirmed her ID by telling her (directly) that she did "awesome" work and "a fantastic job." *Id*. at 698. Here, Plaintiffs allege that the Detectives (1) did not admonish Druecker; (2) did not terminate the ID after "a lineup rejection;" and (3) changed their tone and "insisted [Druecker] return to the photos." (Pl. Opp. at 14: 3–22.) These contentions, however, are not supported by admissible evidence or case law.

First, at the *habeas*, Druecker testified the Detectives **did advise** him prior to showing him the six pack. (Ex. O at D2310: 8–10.) Druecker further testified

that he did not remember everything the officers told him during the ID procedures. (UF 115–116; Ex. O at D2310: 11–17.) Importantly, it is undisputed, without objection, that the no one from the LASD or SPPD ever asked Druecker to lie, and specifically asked him to tell the truth.[4] (UF 108–114.)

Second, Defendant is unable to address Plaintiffs argument(s) concerning a "line up rejection" as Plaintiffs failed to define to term and provide legal authority to demonstrate its meaning. Third, Plaintiffs' argument that the Detectives tone changed, so Druecker felt compelled to select a suspect from the six pack fails. It is undisputed, without objection, that the Detectives **never** told Druecker that they weren't going to leave until he selected a photo. (UF 120.) If anything, internal psychological pressure motivated Druecker's ID, and this cannot sustain a suggestive ID claim.

Also, it is undisputed, without objection, that Druecker (who, unlike the witness in *Hedgpeth*, was an adult in his twenties at the time of the ID procedures) **only** selected Plaintiff from the six pack. (UF 122.) Also, unlike *Hedgpeth*, there is no evidence that the Detectives affirmed Druecker's six pack selection by telling him that he made a positive ID. Finally, Druecker identified the suspect correctly three times. (UF 102, 104.) Consistent with binding authority, the ID procedures were not impermissibly suggestive.

## B. **It Is Undisputed That Druecker's Identification Had Sufficient Indicia of Reliability.**

Plaintiffs argue that Druecker's ID lacked indicia of reliability because, according to the evidence, he was somewhere between 20 and 40 feet from the shooter, and cite to *U.S. v. Field*, 625 F.2d 862, 868 (9th Cir. 1980). (Pl. Opp. 15: 4–15.) While in *Field*, the eyewitness lacked indicia of reliability, it was not merely because she was 20 feet from the bank robber. There, the eyewitness

---

[4] It is also undisputed, without objection, that Lara asked Villareal about the Detectives' ID procedures and confirmed they did not pressure him or make leading statements. (UF 159–60.)

1  "described the robber as dark complexioned and Hispanic, not black or white,"

2  but at trial she admitted that the defendant "looked lighter complexioned than the

3  man who had robbed her." *Field, supra.*

4          Also, there, the eyewitness discussed the robbery with other witnesses prior

5  to trial, the FBI agent told the eyewitness that the robbers had been arrested, and

6  the eyewitness was present when the FBI agent identified [plaintiff] as one of the

7  arrested suspects. *Id.* at 868–89. Therefore, the ID in *Field* is completely different

8  from Druecker's ID. Also, unlike the eyewitness in *Field*, Druecker **only** selected

9  Plaintiff from the six pack and was steadfast in his ID of Plaintiff at both the

10  preliminary hearing and at trial. (UF 101, 105–06.) Finally, Plaintiffs arguments

11  that Druecker could not "effectively describe the suspect, beyond his shoulder-

12  length hair," is simply untrue. (Pl. Opp. at 16: 15–19.) Here, Druecker described

13  the shooter's facial features, build, clothing, height, and hair in detail. (UF 40–

14  45.) Based on the foregoing, and the notable undisputed evidence regarding the

15  line-up (*see, e.g.,* UF 116–24), Plaintiffs cannot establish a genuine issue of

16  material fact that Druecker's ID lacked indicia of reliability.

17  **IV.    PLAINTIFF'S FAIL TO CITE LEGAL AUTHORITY**

18  **AUTHORIZING A "RECKLESS INVESTIGATION" CLAIM IN**

19  **THE CONTEXT OF THE INSTANT CASE, I.E. "MALICIOUS**

20  **PROSECUTION" AND, IN ANY EVENT, CANNOT CREATE A**

21  **GENUINE DISPUTE AS TO SUCH CLAIM.**

22          Plaintiffs have failed to cite a single binding case that "reckless

23  investigation" is a separately cognizable cause of action in the context of a due

24  process/fair trial case. As addressed in Defendants' MSJ, as recently as last year,

25  in *Souliotes v. Modesto*, 2016 WL 3549266, at *10 (E.D. Cal. 2016), the court

26  "[could not] find any cases where the Ninth Circuit recognized 'reckless

27  investigation' as an independent cause of action."

28

8

1    Even if, assuming *arguendo*, Plaintiffs' reckless investigation claim is

2    cognizable, it still fails as a matter of law. Plaintiffs rely on *Wilson v. Lawrence*,

3    260 F.3d 946, 956 (8th Cir. 2001). There, the court held that, "[t]he general test of

4    whether executive action denying a liberty interest is egregious enough to violate

5    due process is whether it shocks the conscience." *Id., see Amrine v. Brooks*, 522

6    F.3d 823, 833–34 (8th Cir. 2008) ("As the *Wilson* court noted, the recklessness

7    standard has a subjective component.").[5]

8    In *Wilson*, investigators misled the mentally-impaired criminal defendant to

9    the station into a windowless room, spent over three hours coercing him, used

10    leading questions, and lied about fake eye witnesses to convert "a collection of

11    discombobulated facts about the murder" into a confession. 250 F.2d at 950. The

12    court held that absent extensive evidence of coercion, "failure to investigate

13    [additional leads] would not support a claim of recklessness or deliberate intent"

14    and thus would not rise to the level of a constitutional violation. *Id*. at 955.[6]

15    Plaintiffs cannot set forth a detailed offer of proof of any conscious-

16    shocking behavior in the Detectives' investigation. Here, unlike *Wilson*, there is

17    no evidence of conscious-shocking coercion, especially where the alleged

18    suppression is evidence that (1) Soucy first picked two people from a lineup but

19    ultimately chose Plaintiff (and then corroborated the ID in court), (2) Villareal

20    (who told Lara that the Detectives were professional) could not identify Plaintiff

21    with one-hundred percent certainty, (3) the Detectives "tone" changed with

22    Druecker and **after** he positively selected Plaintiff, the Detectives allegedly called

23    someone to notify them of his ID. Finally, Plaintiffs assert that the information

24

25    [5] Notably, in complete contradiction to *Wilson*, in Plaintiffs' Liability MSJ they attempt to argue that due process claims do not have a subjective intent standard.

26

27    [6] "Negligent failure to investigate other leads or suspects does not violate due process. *Daniels v. Williams*, 474 U.S. 327, 334[](1986) (holding that protections of Due Process are not

28    triggered by negligence and even gross negligence would not trigger a constitutional violation.)

derived from the Detectives' investigation was not turned over because (*twenty-five years later*) the file lacks supplemental hand-written records or notes. Thus, even if reckless investigation is considered a viable claim, Plaintiffs' speculative accusations are inadequate to satisfy their burden of showing any genuine issue of material fact as to conscious-shocking behavior.

With respect to Plaintiffs' argument that the Detectives recklessly disregarded investigating a murder-for-hire theory, even if Plaintiffs could establish reckless investigation as a viable claim, they cannot substantiate a claim that the Detectives' investigation "shocked the conscience." As thoroughly discussed in Defendants' "Randy Smith" MSA, there is ample evidence that notes regarding the prior attempt were not suppressed. Further, Plaintiff's former public defender, Lara, and his investigator independently obtained information about another potential suspect, Randy Smith. (UF 65–66, 68.) During his deposition, Lara agreed that he was "clearly put on notice about the existence of Randy Smith" and that Smith "was an individual worth investigating." (Ex. P at 189:10–22.)

Plaintiffs' claim, that "the [D]etectives obtained this yellow Pinto evidence using objectively reckless techniques," is unavailing. As argued above and in Defendants' moving papers, multiple people connected Plaintiff to the yellow Pinto. Plaintiffs argue that the Detectives omitted "exculpatory" information regarding Jean Wilson, Pamela Wilson, and Brenda Rodgers; however, as a preliminary matter, there are no allegations in the instant lawsuit that Defendants failed to disclose information pertaining to these witnesses' claims. Further, the fact that these witnesses testified during trial is evidence that this information was not suppressed (and the judge in the underlying case heard the testimony).

1    Finally, Plaintiffs' argument that the Detectives did not follow up on the
2 anonymous tip does not nearly rise to the level of conscious shocking behavior.[7]
3 There is evidence that the SPPD had a practice of forwarding information it
4 gathered directly to the DA's Office. In fact, during the underlying criminal trial,
5 the SPPD forwarded notes by Lt. Hatfield (who prepared the subject memo) to
6 the DA's Office, which were in turn immediately produced to Lara. (*See*,
7 Plaintiffs' Ex. 100 at pp. 136:10–137:23 (D3937:10–D3938:23); *See*, Ex. AJ at p.
8 324:3–20 (P001543:3–20) and pp. 326:19-327:5 (P001545:19–P001546:5).) The
9 fact that the SPPD memo was found in an old manila envelope in the LASD file
10 addressed **from the DA's Office to the LASD** is consistent with the SPPD
11 forwarding the memo directly to the DA's Office.[8]

12 **V.    THERE IS INSUFFICIENT EVIDENCE TO CREATE A GENUINE**
13 **ISSUE TO PROVE *MONELL* LIABILITY AGAINST THE COUNTY.**

14    There is no *respondeat superior* liability under § 1983; therefore, to prove
15 their *Monell* claims against Defendant ("County"), Plaintiffs must not only prove
16 a constitutional violation, but also establish that such violation was caused by a
17 policy, practice or custom of "deliberate indifference" of the County. *Monell v.*

18 _____

19 [7] Plaintiffs misstates evidence where Defendants only admitted Bates D2868-2925 "contained"
20 handwritten notes authored by J.D. Smith, and J.D. Smith authored notes with Bates D2926–
2955 (with the exception of D2935 and D2951) and Plaintiffs' cited evidence (AMF 336) does
21 not only cover the admitted materials.

22 [8] All evidence regarding Deborah Zitella and James Mack are inadmissible hearsay evidence
being offered to suggest that Plaintiff was "innocent" of the murder of Jay French.  Fed.R.Evid.
23 801 and 802. Also, there is no evidence that Flick has any first-hand personal knowledge
24 regarding the French murder. If the murder was truly the result of a conspiracy between
Plaintiff and Jeanne, neither of the two had an incentive to point the finger at the other because
25 that would likely result in one dragging the other one down. Thus, any suggestion by Jeanne
that Plaintiff was "innocent" of the murder lacks credibility and should further be excluded on
26 the additional basis that its probative value is substantially outweighed by the danger of unfair
prejudice. Fed.R.Evid. 403. Finally, there is evidence that Flick may have been offered a
27 financial incentive by CM investigator Paul Henderson to assist Plaintiffs, which further
28 undermines the probative value of any of his statements. (*See*, Plaintiffs' Ex. 334; Defendants'
MSJ Ex. Z (Flick Depo.) at 59:12-15, 113:3–114:13).)

11

*Dept. of Social Services*, 436 U.S. 658, 690 (1978). As addressed in Defendants' moving papers, in *Merritt v. Los Angeles*, 875 F.2d. 765, 770 (9th Cir. 1989), the court specifically articulated the elements necessary to prove a failure-to-train claim: (1) an inadequate training program, (2) the county's deliberate indifference in adequately training its law enforcement officers, and (3) evidence that "the inadequate training 'actually caused' a deprivation of plaintiff's constitutional rights." *Id*. "To prove deliberate indifference, [Plaintiffs need] to show that [Defendants were] on notice that, absent additional specified training, it was **'highly predictable'** that [Homicide detectives]" would be confused by gray areas regarding disclosure and "make incorrect *Brady* decisions as a result." *Connick v. Thompson*, 131 S. Ct. 1350, 1365 (2011).

Here, Plaintiffs have not established a genuine issue of material fact that the County had a policy, practice, or custom of "deliberate indifference" and they cannot "show that [any policy, practice, or custom] was *so* predictable that failing to train the [Detectives] amounted to *conscious disregard* for [Plaintiff's] *Brady* rights." *Connick*, *supra*, 135 S.Ct. at 1365. As noted below, the LASD's decision to err on the side of caution and have prosecutors determine what materials constitute *Brady* cannot substantiate Plaintiffs' failure-to-train theory. Finally, Plaintiffs' reliance on a single-incident cannot substantiate their "failure to train" theory of liability. Thus, their claim fails.

### A.    Plaintiffs' Failure-To-Train Regarding *Brady* Is Overreaching.

Plaintiffs' *Monell* argument is based primarily on allegations without supporting case law (or with citations to out-of-circuit, non-binding case law). For example, Plaintiffs argue that "at a minimum, an effective *Brady* policy summarizes the constitutional rule, explains the agency's affirmative duty to report material of possible *Brady* significance, defines key terms (e.g. exculpatory) according to the law," with no support of this contention.

Further, Plaintiffs' unsupported statement that "policies must emphasize

12

the duty of police officers to preserve and relay all potentially exculpatory information in a manner that guarantees it is actually brought to the attention of the prosecutor" is unavailing. (Pl. Opp. at 25: 21–25.) In their Opposition, Plaintiffs characterize Defendants' cautionary production as "dumping" a mass of "hundreds of pages" of "barely decipherable" notes. (Pl. Opp. at 27: 13–17.) This is a complete exaggeration and improperly inflates *Brady* duties. "[W]hen information is fully available to a defendant at the time of his trial and his only reason for not obtaining and presenting the evidence to the court is his lack of reasonable diligence, the defendant has no *Brady* claim." *U.S. v. Mulderig*, 120 F.3d 534, 541 (5th Cir. 1997); *see U.S. v. Mmahat*, 106 F.3d 89, 94 (5th Cir. 1997) (criminal defendants' lack of due diligence in finding documents within a 500,000 page cache foreclosed the possibility of relief under *Brady*); *Rhoades v. Henry*, 638 F.3d 1027, 1039 (9th Cir. 2011) (holding the prosecution has no duty to single out particular segments of discovery).

Plaintiffs' reliance on *U.S. v. Skilling*, 554 F.3d 529, 534, 576 (5th Cir. 2009), a non-binding, out-of-circuit case, further supports Defendants' position. *Skilling* actually found there was **no *Brady* violation** even though the production there involved "several hundred million pages of documents." The court noted that, "the government is under no duty to direct a defendant to exculpatory evidence within a larger mass of disclosed evidence." *Id*. at 576. Additionally, *Emmett v. Ricketts*, 397 F.Supp. 1025, 1029 (N.D. Ga. 1975), another non-binding and out-of-circuit, is also inapplicable here, as it focused on the duty of the **prosecutor** to screen materials to ensure disclosure of exculpatory information. In finding that the prosecution failed to uphold its "duty of spelling out possible areas of materiality," the court in no way took issue with the actions of police officers. *Id*. at 1042–43. As such, reliance on *Skilling* and *Emmett* to suggest that the practice of turning over everything violated *Brady* is erroneous.

From at least 1979 and up to the present, it has been the practice of the

13

Homicide Bureau to require detectives to take accurate, detailed notes of all of their observations (regardless as to whether such observations may support or potentially weaken their case), to save their notebooks, keep all notes in the relevant case file, and, if the case was presented for criminal prosecution, to make all of their notes (along with all other investigation evidence) available to the prosecutor assigned to the case. (UF 320–21.) Additionally, it has been the practice of the Homicide Bureau to err on the side of caution, and disclose all of the evidence gathered to the prosecutor assigned to the case and let the prosecutor assigned to the case make decisions as to what evidence might or might not be exculpatory; therefore, training regarding a constitutional obligation to disclose Brady material would not change the content of what is turned over. (UF 322.) As such, there is no genuine issue of material fact supporting Plaintiffs' *Monell* claims of deliberate indifference on the part of the County.

    **B.    Plaintiffs Completely Ignore LASD's Departmental Guidance Structure for Disclosure of Evidence and Eyewitness ID Procedures.**

In making their allegations that the County lacked "departmental guidance," Plaintiffs completely ignore the multiple levels of training LASD provides for **all of its personnel**. (*See*, Bumcrot Decl. ¶5; Ex. AA.) More extensive training and supervision is provided to Homicide Bureau personnel on a variety of subject matters including: investigating crimes, documenting the investigations, disclosing evidence and utilizing various ID techniques. (Bumcrot Decl. ¶7) As discussed in Defendants' instant moving papers and Defendants' Opposition to Plaintiffs' Liability MSJ, *Section* V (Dkt. 300), LASD training included academy training, additional formal training, and on-the-job training.

Plaintiffs' allegations that the LASD lacked formal policies related to report writing, and that the Detectives "decided for themselves" what information to memorialize in a report, is completely contradicted by the undisputed evidence. (Pl.

Opp. at 28: 21–28.) After their POST academy training, LASD personnel seeking to become Homicide Detectives were provided in-service or on-duty training, including: documenting criminal investigations and field criminal investigation techniques, report writing and note taking, eyewitness ID, and constitutional policing. (*See*, UF 312–322.) Additionally, contrary to Plaintiffs' unsubstantiated claims, the evidence is that Homicide detectives were given specific training on how to prepare six packs and present them to avoid any suggestiveness. (Bumcrot Decl. ¶24–29.)  As such, any lack of additional training on ID procedures and the nuances of what materials would be required to be disclosed under *Brady*—rather than the general duties under *Brady*, which the LASD provided—does not rise to the level of "deliberate indifference" under a failure-to-train theory.

## VI.   IN LIGHT OF THE DIFFERENCE IN ISSUES AND BECAUSE OF THE EVIDENCE THAT WAS NOT AND COULD NOT HAVE BEEN BEFORE THE COURT IN *CARRILLO,* IT DOES NOT PRECLUDE THE APPLICATION OF QUALIFIED IMMUNITY TO THE INDIVIDUAL DEFENDANTS.

As noted above and in Defendants' moving papers, there is no genuine issue of material fact as to a constitutional violation with respect to Plaintiffs' *Brady*, fabrication of evidence, and suggestive ID claims. The Supreme Court has held that a public employee is entitled to qualified immunity if a defendant did not violate the plaintiff's constitutional rights. *Pearson v. Callahan*, 555 U.S. 223, 232 (2009).  Based on this, Defendants Parra and Smith are entitled to qualified immunity. *Malley v. Briggs*, 475 U.S. 335, 341 (1986) (qualified immunity is designed to shield from liability "all but the plainly incompetent or those who knowingly violate the law.").

Plaintiffs' only argument to oppose qualified immunity is a misplaced reliance on *Carrillo v. Cnty of L.A.*, 798 F.3d 1210 (9th Cir. 2015). In *Carrillo*, it was argued that there was no "clearly established" law in 1984/1985 that *Brady*

(which, by its express language, only applied to prosecutors) applied to police officers. Here, however, Plaintiffs are trying to take it a step further and argue that, not only did *Brady* apply to police officers, but it also required them to disclose materials regardless as to whether they were material and exculpatory.  This goes well beyond what "clearly established law" in 1984/1985 required. (*See*, Section V, *infra*.)

Further, unlike the instant motion, *Carrillo* took place at the pleadings stage of the instant litigation; as such, the Court was bound to accept all allegations pled as true and could not have considered any of the evidence submitted in support of the current motions before the Court, including evidence regarding Soucy's interview with Lara and other relevant evidence mentioned above.

Tellingly, this Court denied qualified immunity "without prejudice," and specifically said that, "On summary judgment, if you wish to approach this again, maybe it makes a difference on exactly what the evidence turns out." (Defendants' "Randy Smith" MSA Supplemental Ex. AA at 11:10–21.) Thus, based on the law and evidence set forth in Defendants' "Randy Smith" MSA and Defendants' MSJ, and because it would be inherently unfair to be bound by a the prior decision that had an incomplete record, Smith and Parra are entitled to qualified immunity.

## VII.   BECAUSE ERIC PARRA HAS NOT (AND WILL NOT) REQUEST INDEMNIFICATION, THE ONLY WAY FOR PLAINTIFFS TO PROCEED WITH THEIR CLAIMS AGAINST HIM WOULD BE TO COMPLETELY IGNORE GOVERNMENT CODE § 825.

All claims against Eric Parra are time barred because under § 366.2, a plaintiff must commence an action against the decedent within one (1) year after the date of death. Plaintiffs' argument that *Probate Code* § 550, *et seq.* is applicable in this case fails because it only applies when a decedent is covered by **insurance**; the County is not an insurance provider. Plaintiffs maintain that because under *Cal. Gov't Code* § 825, "if an employee or former employee of a

16

public entity requests the public entity to defend him or her . . . the public entity shall pay any judgment thereon," that those claims are timely. Importantly, under *Cal. Gov't Code* § 995, a public entity shall indemnify an employee, if he/she **requests** indemnification.

Plaintiffs' argument that Defendant Eric Parra's "request for defense" should be sufficient to satisfy the "request for indemnification" requirement would effectively render the written request for indemnification requirement under the California Government Code meaningless.  To the extent Plaintiffs rely on *Shortt v. Los Angeles,* USDC Case No. CV 11-05484 DSF (JCGx), in support of this argument, *Shortt* (which resulted from a Rule 12 motion) is not only distinguishable, but its position has been rejected by more recent authority.

In *Shortt*, the defendants pointed to *Pelayo v. Downey,* 570 F.Supp.2d 1183, 1197 (C.D. CA 2008), where an arrestee could not proceed against the estate of a police officer under the Probate Code on a § 1983 claim, because he had not shown that the officer had any insurance protection. *Shortt* distinguished *Pelayo* because the plaintiff in *Pelayo* sued the decedent officer's estate, not a representative. *Shortt* noted that "if the plaintiff [in *Pelayo*] had sued either a representative of the estate, or a recipient of the decedent's property[,] the estate could then have requested indemnification from the public entity." As such, while *Shortt* relied on *Pelayo* to determine that insurance was similar to indemnification, both cases acknowledged that, unlike insurance, the requirement to indemnify is not automatic and only kicks in if there is a written request. *Pelayo*, 570 F. Supp. 2d at 1195.

Here, as both *Pelayo* and *Shortt* acknowledged, the County's duty to indemnify employees pursuant to §§ 825 and 995 is **not** the equivalent of insurance because "indemnification of [an employee] is neither automatic nor mandatory." *V.W. ex rel. Barber v. Vallejo,* No. WL 3992403, at *5 (E.D. Cal. 2013) ("To obtain indemnification, [employee] must, first, request that the City

17

defend him in writing[.]"); *see DeGrassi v. Glendora*, 207 F.3d 636, 641 (9th Cir. 2000) (distinguishing indemnity from insurance when Councilwoman's claim did not arise under the terms of a liability policy but was "controlled by the [Cal. Gov't Code], which defines the City's indemnity obligation."). Most recently, in 2016, the Central District Court in *Hanline v. Ventura*, 2006 WL 3360672 (C.D. CA 2016) held that the County's duty to indemnify employees pursuant to Gov't Code §§ 825 and 995, is not the equivalent of insurance, and that the County is not an insurance provider.

Any argument that indemnification should be required simply because the County is on notice of the potential need for indemnification, if accepted, would effectively render the requirements of the Gov't Code meaningless in every single case in which the County is named alongside an individual defendant. *See Hanline*, *supra* ("[t]he practice Plaintiff describes is indemnification, not insurance."). Further, this case is distinguishable from *Shortt* because that order resulted from a Rule 12 motion, where "a judge must accept as true all of the factual allegations contained in the complaint," not a motion for summary judgment with a record of admissible evidence and undisputed facts. *See, Erickson v. Pardus*, 551 U.S. 89, 94 (2007). Finally, no indemnification has been or will be requested by Eric Parra, especially where the only purpose that could be served from such a request would be to revive stale and untimely claims against his father. Only Plaintiffs would benefit from such a request. Thus, § 366.2 bars Plaintiffs' claims against Eric Parra.

///
///
///
///
///
///

18

1

## VIII. **CONCLUSION**

2      For the foregoing reasons, Defendants respectfully request this Court grant

3  summary judgment.

4

5  Dated:  April 10, 2017           LAWRENCE BEACH ALLEN & CHOI PC

6

7                          By:   /s/ Lauren T. Krapf

8                              Michael D. Allen
                              Lauren T. Krapf

9                              Attorneys for Defendants,
                              COUNTY OF LOS ANGELES, J.D.

10                           SMITH and ERIC PARRA

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

19