Barrett S. Litt, SBN 45527
Email: blitt@kmbllaw.com
Ronald O. Kaye, SBN 145051
Lindsay Battles, SBN 262862
KAYE, McLANE, BEDNARSKI & LITT
234 East Colorado Boulevard, Suite 230
Pasadena, California 91101
Telephone: (626) 844-7660
Facsimile: (626) 844-7670

Attorneys for Plaintiffs
Frank and Nicholas O'Connell

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| FRANK O'CONNELL, NICHOLAS O'CONNELL, <br><br> Plaintiffs, <br><br> vs. <br><br> J.D. SMITH; ESTATE OF GILBERT PARRA; ERIC PARRA; COUNTY OF LOS ANGELES AND DOES 1-10 <br><br> Defendants. | CASE NO. 13-01905-MWF (PJWX) <br><br> [HONORABLE MICHAEL W. FITZGERALD] <br><br> **Plaintiffs' Reply In Support of Plaintiffs' Motion for Summary Adjudication of Liability Issues** <br><br> Date:  April 24, 2017 <br> Time:  10:00 A.M. <br> Courtroom:  5A |

# TABLE OF CONTENTS

I.    INTRODUCTION ........................................................................1

II.   FACTUAL DISPUTES ARISING FROM THE CRIMINAL
      INVESTIGATION .....................................................................2

III.  ARGUMENT ..............................................................................5

      A.    Defendants' Speculation Regarding the Possibility of Disclosure Does
            Not Create a Genuine Dispute of Fact ...................................5
            1.    *Detectives' Notebooks (Exs. 4-8) Were Not Disclosed* .............5
            2.    *The LASD Failed to Disclose the Anonymous Tip Memo* ..........9

      B.    There Is No Genuine Dispute as to the Exculpatory Value of the
            Suppressed Evidence ..........................................................10
            1.    *There is No Meaningful Dispute that Soucy's Dual-Identification
                  was Material and Exculpatory* ....................................10
            2.    *Defendants Do Not Dispute That Detectives Falsely
                  Characterized Butler's Statements in the Police Report* ..........12
            3.    *The Phone Call Affirming Druecker's Identification Was
                  Material, Impeachment Evidence Subject to Disclosure Under
                  Brady* ...............................................................13
            4.    *Randy Smith and Jeanne Lyon's Prior Murder Attempt Was
                  Material and Exculpatory Regardless of Whether Randy Smith
                  Could Be Excluded as the Shooter* .............................13

      C.    Undisputed Evidence Establishes that Detectives Acted with Deliberate
            Indifference and/or Reckless Disregard.................................14

      D.    Plaintiffs Are Entitled to Summary Adjudication on Their *Monell*
            Claims Based on Undisputed Evidence ...............................16

IV.   CONCLUSION ..........................................................................18

i

1

2

# TABLE OF AUTHORITIES

3

4

**Federal Cases**

5

*Allen v. Scribner,*
  812 F.2d 426 (9th Cir.) ................................................................ 6

6

*Arizona v. California,*
  460 U.S. 605 (1983) ................................................................... 14

7

*Banks v. Dretke,*
  540 U.S. 668 (2004) ..................................................................... 8

8

*Benn v. Lambert,*
  283 F.3d (9th Cir. 2002) ........................................................... 8, 9

9

10

*Burge v. Parish of St. Tammany,*
  187 F.3d 452 (5th Cir. 1999) ...................................................... 12

11

*Carrillo v. Cnty of Los Angeles,*
  798 F.3d 1210 (9th Cir. 2015) ............................................. 1, 11, 13

12

13

*Castro v. County of Los Angeles,*
  833 F.3d 1060 (9th Cir. 2016) .................................................... 16

14

*Christianson v. Colt Industries Operating Corp.,*
  108 C.Ct. 2166 , 486 U.S. 800 (1988) .......................................... 14

15

16

*Dennis v. Secretary, Pennsylvania Dept. of Corr.,*
  834 F.3d 263 (3rd Cir. 2016) ...................................................... 13

17

*Emmett v. Ricketts,*
  397 F. Supp. 1025 (N.D. Ga. 1975) .............................................. 17

18

*In re Third Party Subpoenas Issued to Rambus, Inc.,*
  2014 WL 12616734 (N.D. Cal., Dec. 5, 2014) ................................... 1

19

20

*Kingsley v. Hendrickson,*
  135 S. Ct. 2466 (2015) .............................................................. 16

21

*Manning v. Miller,*
  355 F.3d 1028 (7th Cir. 2004) .................................................... 12

22

*Newsome v. McCabe,*
  256 F.3d 747 (7th Cir. 2001) ...................................................... 13

23

24

*Paradis v. Arave,*
  130 F.3d 385 (9th Cir. 1997) ........................................................ 9

25

*Rainey v. American Forest & Paper Ass'n, Inc.,*
  26 F.Supp.2d 82(D. DC 1998) ...................................................... 1

26

27

*Robinson v. Cain,*
  510 F.Supp.2d 399 (E.D.La. 2007) ............................................... 12

28

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

*Rodman v. Safeway Inc.*,
   125 F. Supp. 3d 922 (N.D. Cal. 2015)...................................................................... 6

*Rosales-Martinez v. Palmer*,
   753 F.3d 890 (9th Cir. 2014) ...................................................................... 14

*Tatum v. Moody*,
   768 F.3d 806 (9th Cir. 2014) ...................................................................... 14

*Tennison v. City and Cnty of San Francisco*,
   570 F.3d 1078 (9th Cir. 2008) ............................................................ 1, 11, 13, 14

*United States v. Skilling*,
   554 F.3d 529 (5th Cir. 2009) ...................................................................... 17

## MEMORANDUM OF POINTS & AUTHORITIES

### I. INTRODUCTION

Defendants argue that handwritten notes and anonymous tip memo were not suppressed and, even if suppressed, would not have qualified as material and exculpatory under *Brady*. These arguments do not withstand scrutiny. Defendants present no competent evidence to demonstrate that the exculpatory materials were disclosed, relying instead on speculation that the materials may have been disclosed to the prosecutor, who may have produced them to Adolfo Lara, despite the absence of any evidence to corroborate this contention. Their speculation is not sufficient to create a dispute of fact sufficient to defeat summary adjudication. Defendants likewise present no reason to conclude the suppressed information was exempt from disclosure under *Brady*. The Ninth Circuit has already held that alternative suspect and eyewitness impeachment evidence qualifies as *Brady* material. *Carrillo v. Cnty of Los Angeles*, 798 F.3d 1210, 1226 – 1227 (9th Cir. 2015) (citing *Tennison v. City and Cnty of San Francisco*, 570 F.3d 1078, 1094 (9th Cir. 2008).

Defendants cannot create a genuine dispute of fact as to whether the LASD provided constitutionally adequate training to homicide detectives regarding *Brady*'s mandatory disclosure requirements. Defendants' 30(b)(6) witness has conceded that, during the 1980's, the LASD had no formal policy regarding the mandatory duty to recognize, memorialize and relay exculpatory information. Defendants' 30(b)(6) witness likewise concede that the LASD had no formal policies or directives describing the *Brady*-rule or defining "exculpatory evidence." This testimony is binding. *In re Third Party Subpoenas Issued to Rambus, Inc.*, 2014 WL 12616734, at *2 (N.D. Cal., Dec. 5, 2014) (30(b)(6) testimony is binding); *Rainey v. American Forest & Paper Ass'n, Inc.*, 26 F.Supp.2d 82, 95(D. DC 1998) (corporate party "bound" by positions taken by its Rule 30(b)(6) witnesses and could not use conflicting affidavits on summary judgment

1

motion).  Defendants argue that the failure to train on *Brady* is not material to the determination of liability in this case because, as a matter of routine practice, homicide detectives made available to the district attorney their complete set of notebooks. Even if detectives could discharge their *Brady* obligations by dumping hundreds of pages of raw, fragmented notes on the district attorney – a contention we strongly dispute – that is not what occurred in this case. Overwhelming evidence demonstrates the notebooks were not disclosed.

## II.    Factual Disputes Arising from the Criminal Investigation

The parties dispute various developments in the criminal investigation. Since the Court is familiar with both parties' assessment of the facts, we only address specific factual issues presented by Defendants' opposition. For a more complete discussion of facts relevant to the investigation, please refer to Dkt. 263 (Plaintiff's moving brief) and Dkt. 247 (Plaintiffs' Opposition to Defendants' Motion for Summary Adjudication regarding Randy Smith).

➢    Jay French's dying declaration does not suggest he knew or recognized the shooter. Gina French testified that, after the shooting, Jay told her that the shooter "looked like somebody Jeanne hangs around with," despite originally reporting to police that Jay said the murder had to be "somebody or something to do with Jeanne." Dkt. 299, Resp. to UMF 39 (undisputed)**.** Jay French told the first officer to arrive, William Gitmed, that he did not know the person who shot him. Officer Gitmed has testified in this case that, had Jay French made any statement indicating that he recognized the shooter, Officer Gitmed would have relayed that information, and certainly would have advised responding officers that the shooter looked like someone his ex-wife spent time with. Dkt. 265, Litt Decl., Ex. 619, Gitmed Dep. Tr., p. 23:4-17. According to handwritten notes, dated 1/6/1984, two other residents, Kimberly Wallach and Carol Gwenn, heard Mr. French say that he did not know the shooter. Dkt. 299, UMF 2**.**

2

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

➢ Contrary to Defendants' assertions, Druecker and Arturo Villareal's identifications were not "fairly consistent" except that they both described the shooter as having shoulder length hair. Shortly after the shooting, Druecker described the shooter to the SPPD as a slim man in his 30's with shoulder-length, dirty, **dark brown** hair and **no** facial hair. UMF 10. Later the same day, Druecker told the LASD that the shooter appeared to be in his mid to *late* 30's, significantly older than Mr. O'Connell, and possibly as tall as 6'3. *See* Dkt. 295, p. 5, AMF 12 (Plaintiffs' Statement of Genuine Disputes in Response to Defendants' Motion for Summary Adjudication on Liability Issues, hereafter "SGD re D's MSA re Liability"). Villareal described the shooter as slim (160-170 lbs.) and about 5'10 (significantly shorter than 6'3). Villareal mentioned shoulder-length hair, but **blonde** not brown hair. Dkt. 295, p. 5, AMF 8 (SGD re D's MSA re Liability). These inconsistencies suggest that neither witness could effectively describe the suspect, beyond his shoulder-length hair. Moreover, Villareal's descriptions were inconsistent with Frank's physical appearance. Frank was 6'4 and 195 lbs. at the time of his arrest. Dkt. 295, p. 5, AMF 29 (SGD re D's MSA re Liability).

➢ During the February 15, 1984 interview, Frank O'Connell told detectives that Jeanne showed him what appeared to be a small gun, which she told him was a mace gun, that shoots out "something" in "gas form." When asked if he touched it, Mr. O'Connell said he didn't think he touched it, and while he couldn't be certain, he "more than likely would say 90 [percent] – I'd put the weight on the side that I didn't touch it." *See* Dkt. 295, pp. 126 – 127, Resp. to Fact Nos. 209, 210 (SGD re D's MSA re Liability).

➢ Though Plaintiff told detectives he had heard Jeanne say she could "kill" her ex-husband, he also said he thought she was "blowing hot air" and he did not take it seriously. Dkt. 295, p. 124, Resp. to D's Fact. No. 204 (SGD re D's MSA re Liability).

3

➢    Defendants misrepresent Frank O'Connell's statements to detectives that he had told Jeanne he "[knew] a guy in San Jose" and that for "200 bucks we can have him killed." Plaintiff expressly told detectives that he made this statement "sarcastically"; the statement was in no way serious. Plaintiff said: "Well one day, I remember saying to her hey, if you really want him killed, but this was sarcastically, I didn't say it – you know, I would never do that --…I said, well I know a guy in San Jose if you know, 200 bucks we can have him killed…that was more or less one of those…expressions, it wasn't serious. *See* Dkt. 295, p. 125, Resp. to D's Fact No. 205 (SGD re D's MSA re Liability).

➢    Though Defendants indicate that four neighbors connected Frank to a yellow Pinto, in fact only Maurice Soucy did. (Ina Soucy never testified, and her statement to police, to the extent there is one, is hearsay.) No other neighbors testified that they saw Frank with a yellow Pinto; three (Pamela Wilson, Brenda Rogers and Jean Wilson) testified they never saw a yellow Pinto at all nor did they ever see Frank with one; one (Michael Lewis) testified he saw a yellow Pinto in early June and not after and did not connect it to Frank; another  (Tom Butler) testified in deposition that he saw a yellow Pinto at some point but only before April 1, 1983 (i.e., before Frank ever met Jeanne Lyon); Jean Wilson testified that she saw Frank drive a large brown station wagon, but it was not a yellow Pinto, and she never saw a yellow Pinto in the area. Thus, Defendants' allegation that several other people saw a yellow Pinto is based on one who left in March (Butler) and one who saw one in early June (Lewis), both before Frank moved into Jeanne's home. The evidence that Frank lived with Jeanne placed the time frame from mid-June to early August, after anyone other than Soucy claimed to have seen him with a yellow Pinto.

➢    There is no evidence that Centurion Ministries pressured Daniel Druecker to recant, made him feel guilty, or attempted to convince him that Mr.

O'Connell was innocent. He agreed to talk to them because he knew he had done something wrong and he wanted to right it. *See* Dkt. 265, Litt Decl., Ex. 201.01, p. 42:1-24 (Druecker testimony at O'Connell habeas).

## III.   Argument

### A.   Defendants' Speculation Regarding the Possibility of Disclosure Does Not Create a Genuine Dispute of Fact

#### 1.   *Detectives' Notebooks (Exs. 4-8) Were Not Disclosed*

Defendants speculate that Tamia Hope *may* have obtained copies of the handwritten notebooks and *may* have produced them to the defense. This contention is wholly unsupported by evidence, except Ms. Hope's testimony that it was her regular practice to obtain copies of notes from homicide detectives (and that she could not remember an instance where detectives had failed to provide their notebooks upon request). Notwithstanding Ms. Hope's alleged practice, at the time of the habeas, the D.A. file contained no copy of any portion of the six suppressed notebooks, totaling 218 pages.[1] Defendants posit that Ms. Hope may have forwarded a copy of the notes to Adolfo Lara without retaining a copy for

---

[1] Complete copies of the suppressed notebooks are attached to Dkt. 263, Ex. 232 (Decl. of Juan Mejia). During the habeas, the LASD produced 5 notebooks from the homicide investigation file (Referred to here as Exs. 4-7). During discovery in this case, the LASD produced an additional notebook (Ex. 8). The County has admitted that the notebooks corresponding to Exhibits 4, 5, and 6 were Detective Smith's notebooks. Dkt. 295, p. 67, AMF No. 336 (SGD re D's MSA re Liability). Ex. 4 includes Smith's notes of the 1/5/1984 interview of Gina French (reflecting Randy Smith's prior attempt).  Exhibit 5 contains Smith's notes concerning his 2/8/1984 interview of Maurice Soucy and his interview of Thomas Butler. Both Exhibits 5 and 6 reference follow-up investigation of the anonymous tip (Ex. 5 references follow-up in February 1984; Ex. 6 references follow-up in November 1984).  In addition to the notebooks, during discovery in this case, the LASD produced various additional materials from the homicide file, including a file reflecting detectives' investigatory trip to Oregon (Ex. 10), stray handwritten notes concerning an interview of Randy Smith (Ex. 11), and the anonymous tip memo. D.D.A. Juan Mejia confirmed that none of these materials were in the D.A. file at the time of the habeas (and that they were not produced from the homicide file during the habeas). *See* Dkt. 263, Ex. 232 (Decl. of Juan Mejia).

herself, citing Ms. Hope's testimony that she would not necessarily have kept an inventory or record of materials she produced to the defense. This assertion lacks credibility. It is implausible that a prosecutor would produce 218 pages of handwritten notes to the defense, including notes reflecting significant impeachment evidence, without retaining a copy for their own use. Regardless, the County's speculation that Hope may have disclosed the notes (without retaining a copy for herself) is insufficient to defeat summary judgment. An assertion that a fact may not have occurred does not create a disputed fact. *See Rodman v. Safeway Inc.*, 125 F. Supp. 3d 922, 934 (N.D. Cal. 2015) (Safeway's argument that some "online store may not have in fact charged a markup" was "speculation," that did not create a disputed fact, citing *Allen v. Scribner,* 812 F.2d 426, 441 (9th Cir.) *amended,* 828 F.2d 1445 (9th Cir.1987) ("Guesswork and speculation [ ] cannot defeat a motion for summary judgment.").

Significantly, Tamia Hope testified that, had she received handwritten notes, she absolutely would have produced them to the defense.  Although Mr. Lara now does not presently recall what discovery materials he received during the 1984 prosecution, he has testified that he would have used the exculpatory information had it been available. Had he known of the prior attempt, he would have argued third-party culpability, *regardless of whether Randy Smith could have been excluded as the shooter*. Lara specifically testified that he would also have cross-examined Gina French about the prior attempt and cross-examined J.D. Smith regarding the omission of the prior attempt from the police report to cast doubt on the integrity of the police investigation. Similarly, had the notes reflecting Soucy's dual-identification been available, he would have used them to impeach Soucy, point to an alternative suspect, and to cast doubt on the integrity of the police investigation. This testimony is not speculative. Lara did not cross-examine Ms. French or Detective Smith regarding the anonymous tip, nor did he examine Maurice Soucy or J.D. Smith regarding Soucy's dual identification. Lara agreed

6

that his failure to cross-examine Soucy regarding the dual identification indicates that he did not have access to the information at trial. The inescapable conclusion is that Lara did not have access to the exculpatory information contained in the notebooks. Hon. Patrick Walsh has reviewed the public defender file (as it now exists), including investigation requests, investigation reports, and Mr. Lara's handwritten notes. None of these materials reference to the prior attempt or Maurice Soucy's dual-identification. Since Lara knew nothing about the prior attempt or Soucy's dual-identification, and he did not have the salient or essential facts necessary to utilize the exculpatory information.

Defendants hypothesize that notes forwarded to Lara mid-trial could have contained the exculpatory information. This argument defies commonsense. Though Lara did receive some notes in the middle of the 1985 trial, the transcript does not support the inference that Lara received a large volume (218 pages) of notes. The transcript reveals that the notes disclosed mid-trial pertained only to SPPD Lt. Hatfield's interview of Scott Egerer, and more importantly, that these were the <u>only</u> handwritten notes Mr. Lara received during the prosecution. According to the transcript, D.D.A. Tamia Hope provided Lara, "rough" handwritten notes received from a SPPD Officer. Upon receiving the notes, Mr. Lara advised the court that he would consider "request[ing] more time to either investigate the matter *or see what was involved in why these notes were not transcribed and made available much earlier in this case*." Dkt. 295, p. 48, AMF 242, 243, (SGD re D's MSA re Liability) (emphasis supplied). Testimony at the criminal trial leaves no doubt that the "rough notes" in question were Lt. Hatfield's handwritten notes of his interview of Scott Egerer; they were not J.D. Smith's handwritten notebooks and had nothing to do with the anonymous tip. After Scott Egerer testified, Lt. Hatfield was called in an effort to impeach Egerer's testimony. Lara's cross-examination of Egerer addresses Hatfield's "rough notes" and the fact that Hatfield failed to include a date for his interview of Egerer. Dkt. 295, p. 48,

7

AMF 244 (SGD re D's MSA re Liability).J.D. Smith was subsequently called to testify as to when he directed Hatfield to interview Egerer. During cross, Lara asked J.D. Smith: "…you weren't even aware that Lieutenant Hatfield had any notes until about two days ago, isn't that true?" J.D. Smith answered yes. Dkt. 295, p. 48, AMF 245(SGD re D's MSA re Liability). <u>This exchange makes clear that the SPPD "rough" notes that surfaced *in the middle of trial* were rough notes concerning Hatfield's interview of Scott Egerer and Karen Baxter.</u>

Lara's concern with why the handwritten notes had not been transcribed reflects his expectation that all police notes would be incorporated into official reports and strongly suggests that all of other materials provided to Mr. Lara from the District Attorney's Office came to him in the format of a typed report. His dismay at receiving "rough" notes also suggests that these were the only rough, handwritten notes he received from the D.A.s office during the O'Connell prosecution. Ms. Hope's own testimony confirms that both prosecutors and defense attorneys expected any significant information, including any exculpatory information, to be incorporated into police reports. <u>During the habeas, Ms. Hope emphasized that she "took the officers at their word that all of the information in their notes was recorded in their typewritten reports" and that she "wouldn't review the notes because [she] relied on the officers to put [everything] in their reports.</u>" Declaration of Lindsay Battles, ¶2. Ex. 201.04.

The County argues there can be no *Brady* violation because Lara could have discovered the exculpatory information by interviewing Gina French and Maurice Soucy. This argument has no merit. As the Supreme Court explained in *Banks v. Dretke*, 540 U.S. 668, 696 (2004), "[a] rule…declaring [the state] may hide, defendant must seek, is not tenable in a system constitutionally bound to accord defendants due process." In *Benn v. Lambert*, 283 F.3d at 1061 (9th Cir. 2002), the Ninth Circuit held that a defendant furnished with inculpatory evidence by the government is not required to assume that the government has concealed

exculpatory information elsewhere. *Benn* involved suppression of expert reports which undermined the prosecution's theory of the case. Defense counsel knew of the existence of the reports, but, much like this case, there was no reason to suspect they contained exculpatory information because subsequent reports omitted the exculpatory information. *Id.* at 1061-1062 ("....the state not only failed to disclose the crucial [exculpatory] information, but it actually mislead the defense by disclosing a part of the experts' findings that, read alone, would lead to a conclusion directly opposite to the one they reached."; it is of no consequence that the defendant could have learned of the exculpatory information by interviewing the experts); *see, also, Paradis v. Arave*, 130 F.3d 385, 392 (9th Cir. 1997) (undisclosed detectives' notes containing medical examiner's conclusion rebutting prosecution's theory of the case constituted impeachment evidence, even where the defendant knew of the expert's existence and could have obtained the suppressed information from him). Lara's reports show that he did interview Gina French and she did **not** mention the prior attempt. Lara's reports also show that he interviewed Soucy, who did not disclose to Lara that he had chosen two photos from the lineup.

### 2.    *The LASD Failed to Disclose the Anonymous Tip Memo*

There is no genuine dispute as to whether the anonymous tip was disclosed. Had Lara known of the anonymous tip, he would have attempted to subpoena Jeanne Lyon's bank records, investigated her and her husband's finances, obtained all available information on the yellow Ford observed at 757 Catalina Street, and interviewed residents of the Catalina street address. During trial, Lara would have cross-examined Lt. Hatfield and J.D. Smith about their follow-up investigation and the omission of the tip from J.D. Smith's police reports in an effort to cast doubt on the competency and integrity of the police investigation. (Lara did not cross-examine Lt. Hatfield or J.D. Smith regarding the anonymous tip or their follow-up investigation).

Defendants speculate that SPPD could have produced the anonymous tip directly to the DA's Office. This contention is entirely unfounded. There is no evidence that SPPD relayed information directly to the D.A.'s office. To the contrary, during the habeas, Detective Smith testified that it was his standard practice to compile all handwritten notes – including information from the SPPD – in preparing his police report (and would have relied on any notes from the SPPD in preparing his notes). Battles Decl., ¶2 (Ex. 201.03). Tamia Hope also testified that she would limit her review of the case file to the police reports because she expected all salient facts to be included in the police report. Battles Decl., ¶2 (Ex. 201.04). The fact that SPPD Lt. Louis Hatfield brought raw notes of his interview of Scott Egerer to Mr. O'Connell's trial does not establish that SPPD had a practice of forwarding material directly to the district attorney. The discussion captured on the record demonstrates that it was highly unusual for raw notes to have not been incorporated into the police report by the time of trial.

The fact that defense counsel purportedly found the anonymous tip in a February 1993 envelope addressed from the D.A.'s office to J.D. Smith is insufficient to create a dispute of fact regarding disclosure. Because the envelope is postmarked February 1993, there can be no argument that it was the vehicle by which the LASD received the tip. It is undisputed that the LASD had the tip in 1984. Detective Smith's February 1984 and November 1984 handwritten notes demonstrate that he conducted follow-up investigation of the anonymous tip during the original murder investigation.

**B.     There Is No Genuine Dispute as to the Exculpatory Value of the Suppressed Evidence**

> ### 1.     There is No Meaningful Dispute that Soucy's Dual-Identification was Material and Exculpatory

The Ninth Circuit has already held that the notes impeaching Soucy's identification were material, exculpatory and subject to disclosure under *Brady*. *Carrillo*, 798 F.3d at 1226 – 1227 (9th Cir. 2015). Defendants nonetheless insist

that Soucy's dual-identification was immaterial because Frank was the only man living at Jeanne's house during the summer of 1983, and thus, there can be no question that Frank was the person Soucy saw. But Soucy's testimony was not significant because he identified Frank as someone who stayed with Jeanne during the summer of 1983 (a fact that has never been in dispute). It was significant because he purported to remember the presence of a specific vehicle from several months earlier and to identify Frank as the driver of that vehicle. Given the specific of his testimony, the strength and reliability of his memory was very much at issue.

Any information demonstrating deficiencies in his memory – with regard to either the car he saw or the person he saw driving it – would have been tremendously valuable to the defense, particularly because his testimony was directly contradicted by three neighbors (Jean Wilson, Pamela Wilson and Brenda Rogers) who knew Frank by sight, kept an eye on cars parked on the street, and were certain Frank was never seen in a yellow Pinto. Accordingly, evidence that Soucy did not remember Frank well enough to pick him out a six-pack lineup, despite the fact he claimed to have seen him repeatedly during his stay at Jeanne's, reflects a serious deficiency in his memory, which in turn, undermines the likelihood that he could reliably identify the driver or car believed to have seen. Evidence of the dual-identification would have been particularly valuable given the detectives use of the dark "look alike" Pinto photos, which were almost certain to cause confusion amongst witnesses given that Frank drove a County Squire LTD. Accordingly, the fact that Lara knew Frank was the only man living at Jeanne Lyon's home during the summer of 1983 does not undermine the exculpatory value of Soucy's dual-identification.

Soucy's dual-identification was also material because it reflected a false statement in the police report, which would have raised serious concerns regarding the reliability and integrity of all identification procedures. *See Robinson v. Cain*, 510 F.Supp.2d 399 (false attribution of an identification tends to impeach the

11

credibility of the investigation); *Burge v. Parish of St. Tammany*, 187 F.3d 452 (5th Cir. 1999) (eyewitness' initial statement that she was unable to identify the murderer was exculpatory). Defense counsel could have used detectives' misrepresentation of Soucy's statements to reinforce Villareal's trial testimony that, contrary to the police report, he could not make an identification and so advised J.D. Smith, despite Smith's testimony to the contrary. Dkt. 299, p. 49, UMF 97. (For a complete discussion of this issue, see Dkt. 293, pp. 5-6, Plaintiffs' Opposition to Defendants Motion for Summary Adjudication of Individual Liability Issues).

### 2.  *Defendants Do Not Dispute That Detectives Falsely Characterized Thomas Butler's Statements in the Police Report*

Defendants do not dispute Thomas Butler's deposition testimony that he "absolutely" told the detectives he could not make an identification, which directly contradicts the police report's statement that he immediately identified Frank as the driver of a yellow Pinto. Though Butler did not testify at trial, this misrepresentation undermines the veracity and credibility of all the identifications, and of the investigating officers. Had the defense known that Butler did not make an identification, it would likely have called him to show the gross unreliability of the police reports, reinforcing the conclusion that detectives misrepresented Soucy's and Villareal's statements. Dkt. 299, UMF 100. Notwithstanding the County's assertions, *Brady* requires officers to disclose when they have presented false or perjured testimony, have fabricated evidence or have undermined the integrity of evidence through investigatory misconduct. *Manning v. Miller*, 355 F.3d 1028, 1032 (7th Cir. 2004) (FBI agents failed to tell prosecutors they induced false witness statements and submitted false written reports); *Newsome v. McCabe*, 256 F.3d 747 (7th Cir. 2001) (withholding from information about officers' coaching of witnesses violated *Brady*).

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

### 3. The Phone Call Affirming Druecker's Identification Was Material, Impeachment Evidence Subject to Disclosure Under Brady

Plaintiffs do not contend that the phone call was sufficient, standing alone, to render Daniel Druecker's identification impermissibly suggestive and unreliable. Plaintiffs' argument is that the affirming phone call constituted impeachment evidence subject to disclosure under *Brady*. The Ninth Circuit has already held that evidence impeaching Druecker's identification was material, exculpatory and subject to disclosure under *Brady*, *Carrillo v. Cnty of Los Angeles*, 798 F.3d at 1226 – 1227 (9th Cir. 2015). Because Defendants submit no evidence to dispute that Detective Smith made a call in Druecker's presence affirming his identification, Dkt. 299, p. 57, UMF 106 (undisputed), Plaintiffs are entitled to summary adjudication on this issue.

### 4. Randy Smith and Jeanne Lyon's Prior Murder Attempt Was Material and Exculpatory Regardless of Whether Randy Smith Could Be Excluded as the Shooter

Defendants incorrectly argue that suppressed evidence violates *Brady* only where it definitively proves innocence. Evidence that *tends* to prove innocence is exculpatory, even where it does not conclusively prove innocence. *Dennis v. Secretary, Pennsylvania Dept. of Corr.*, 834 F.3d 263 (3rd Cir. 2016). Defendants insist that the prior attempt was not exculpatory based on the possibility that Randy Smith was incarcerated at the time of the murder. The Ninth Circuit has firmly rejected Defendants argument that "dead lead" evidence is exempt from *Brady* and squarely found that the State has an obligation to disclose such evidence, regardless of whether detectives consider it a "dead lead." *Carrillo v. Cnty of Los Angeles*, 798 F.3d at 1226 – 1227 (9th Cir. 2015)[2]. Moreover, Randy Smith's

---

[2] Under the law-of-the-case doctrine, that decision is final. *Christianson v. Colt Industries Operating Corp.*, 108 C.Ct. 2166 , 486 U.S. 800, 815 (1988) ("'the doctrine [of the law of the case] posits that when a court decides upon a rule of law, that decision should

13

potential alibi is immaterial in light of the anonymous tip, which indicated that Jeanne had arranged a contract killer through a male friend from Oregon. Notwithstanding Defendants' contentions, involvement of an out-of-state intermediary heavily suggests that the shooter was unknown to Jeanne (and therefore not Frank).

### C.   <u>Undisputed</u> Evidence Establishes that Detectives Acted with Deliberate Indifference and/or Reckless Disregard

Defendants misstate the state of mind required to establish §1983 liability for violations of the right to a fair trial. The Ninth Circuit has held that the requisite state of mind is established with evidence of "deliberate indifference to or in reckless disregard for the accused's rights or for the truth in withholding evidence for prosecutors." *Tatum v. Moody*, 768 F.3d 806, 816, 821 (9th Cir. 2014); *Rosales-Martinez v. Palmer*, 753 F.3d 890, 897 (9th Cir. 2014) (*quoting*, *Tennison v. City & County of San Francisco*, 570 F.3d 1078, 1089 (9th Cir. 2009). In the context of a criminal prosecution, the decision whether to disclose exculpatory evidence occurs in a situation where actual deliberation is practical, and for that reason, deliberate indifference to the risk of an unjustified deprivation of liberty shocks the conscience and is sufficient to establish liability. *Tatum*, 768 F.3d at 821 (9th Cir. 2014); *Tennison*, 570 F.3d at 1089.

It is hard to imagine an investigatory conduct more reckless or deliberately indifferent than what occurred in this case. It is undisputed that, on the day of the murder, Gina French disclosed that Jeanne Lyon had a male friend from Oregon, Randy Smith, with whom she conspired in an attempt to run over Jay French on his motor cycle several years earlier. Dkt. 299, p. 60, Resp. to UMF 111 (undisputed). Detectives did not memorialize this lead and initially investigate the possibility of Randy Smith's involvement, despite his much longer relationship with Jeanne and previous conspiracy with her to kill Jay French (for the purpose of ending the

---

continue to govern the same issues in subsequent stages of the same case,'" *quoting*, *Arizona v. California*, 460 U.S. 605, 618 (1983).

custody dispute).  Undisputed evidence demonstrates that detectives falsely reported that two neighbors, Thomas Butler and Maurice Soucy, identified Frank as the driver of a yellow Pinto parked near Jeanne's home. Detectives reported this false information despite the fact that at least three credible witnesses – Jean Wilson, Pamela Wilson, and Brenda Rogers – told them they knew Frank by sight, had never seen him driving or riding in a yellow Pinto and had never seen a yellow Pinto at Jeanne Lyon's home.

By February 1984, detectives had no credible theory of motive, and only tenuous evidence of guilt. Against this backdrop, in February 1984, the LASD received a call from anonymous, male caller who relayed that Jeanne Lyon paid to have Jay French killed when she learned he received custody of the children; she **paid a male in Oregon $7,000.00**, **who in turn paid someone named Richard Stephens $5,000.00 to do the job**. The caller's knowledge of the custody dispute and ability to provide detailed information provided inherent indicia of reliability. The tip was further corroborated when detectives spotted a yellow Ford with woodgrain sides at one of the addresses supplied in the tip.  Any minimally competent investigator would have thoroughly investigated the murder-for-hire theory, not limiting their efforts to the name supplied by the anonymous caller (because the caller may have been mistaken) or the car observed on Catalina Street. At a minimum, this investigation should have involved surveillance of the car observed on Catalina, interviews of Richard and/or Mark Stevens to determine whether they had access to the car, and photos of the car. More importantly, it should have involved a thorough investigation of Jeanne and Ed Lyon, their friends, family and co-workers, and their finances, including a review of their bank accounts. Police had their bank account information but did not obtain the bank records. Dkt. 295, p. 45, 48, 49, AMF 232, 246 (SGD re D's MSA re Liability).

Deliberate indifference does not require evidence of detectives' subjective awareness of a risk to an unjustified deprivation of liberty. *Kingsley*'s objective

1   deliberate indifference standard is not limited to the excessive force context.

2   *Castro v. County of Los Angeles*, 833 F.3d 1060, 1070 (9th Cir. 2016) (en banc),

3   where the Ninth Circuit explained that, in light of *Kingsley v. Hendrickson*, 135 S.

4   Ct. 2466, 2472 (2015), deliberate indifference in a pretrial inmate's failure to

5   protect claim required only showing a "substantial risk of serious harm to the

6   plaintiff that could have been eliminated through reasonable and available

7   measures that the officer did not take."); *See Moore v. Pineiro* (2nd Cir. 2/21/2017)

8   (objective deliberate indifference standard applies to challenges to conditions of

9   confinement for pretrial detainees).

### D.    Plaintiffs Are Entitled to Summary Adjudication on Their *Monell* Claims Based on <u>Undisputed</u> Evidence

11          Plaintiffs are entitled to summary judgment on their *Monell* claims.

12  Defendants concede that, during the 1980's, the LASD had no formal policy

13  regarding the duty to recognize, memorialize and relay exculpatory information.

14  They concede that the LASD had no formal policies or directives describing the

15  *Brady*-rule or defining "exculpatory evidence." Dkt. 299, pp. 147, 148

16  (Defendants' Resp. to Plaintiffs' UMFs Nos. 203, 204). The LASD similarly does

17  not dispute that it had no mandatory *Brady* training during the 1980's. Dkt. 299,

18  pp. 150-153 (Defendants' Resp. to Plaintiffs' UMFs Nos. 205-207). LASD's

19  30(b)(6) witness, Mike Bumcrot, a homicide detective of 38 years, has conceded

20  that, during the 1980's academy training did not address *Brady*. Dkt. 299, p. 151,

21  Defs. Resp. to UMF No. 206 (undisputed).

22          The LASD insists that its' failure to train on *Brady* disclosure requirements

23  was "immaterial" because homicide detectives had a practice of memorializing all

24  investigatory information in their notebooks and making that information

25  "available" to the district attorney. This argument misses the mark. First, even

26  assuming this was the general practice (which we do not concede given what

27  occurred in this case) such a practice would be nowhere near sufficient to satisfy

28  *Brady* obligations. *Brady* requires police to disclose exculpatory information in a

meaningful way (e.g. memorializing it in official reports). Dumping *hundreds* of pages of barely decipherable scrawl on a prosecutor, without clearly indicating whether exculpatory information is secreted within, does not constitute meaningful disclosure. *See, e.g. United States v. Skilling*, 554 F.3d 529, 577 (5th Cir. 2009), *aff'd in part, vacated in part, remanded,* 561 U.S. 358, 130 S. Ct. 2896, 177 L. Ed. 2d 619 (2010) ("it should go without saying that the government may not hide *Brady* material of which it is actually aware in a huge open file in the hope that the defendant will never find it"); *Emmett v. Ricketts,* 397 F. Supp. 1025, 1043 (N.D. Ga. 1975) (" the prosecutorial duty to produce exculpatory evidence imposed by *Brady* may not be discharged by 'dumping' …. a voluminous mass of files"). Further, a practice of making notebooks available would do nothing to ensure the disclosure of exculpatory information memorialized elsewhere in the poor boy (homicide file), including, for example, the anonymous tip memo in this case.[3]

Even if there were a practice of making notebooks available, that would not ensure the opportunity for the prosecutor to conduct a meaningful review. Detectives do not routinely *leave* the notebooks with the DA to review (the only way in which the D.A. could hope to excavate exculpatory information). LASD's 30(b)(6) witness testified that, during the 1980's, the LASD had no policy and *no established* procedure to ensure detectives turned over their notebooks to the D.A. (See Dkt. 299, pp. 173 -176, D's Resp. to Plaintiffs' UMFs 226, 227). Det. Lankford testified that while homicide detectives "share" their homicide file with the D.A., they do "not hand it over to the D.A.'s office."  Defendants do not dispute this testimony (Dkt. 299, p. 171-172, Resp. to Plaintiffs' UMF No. 224). Tamia Hope testified *in this case* that she did not routinely review handwritten notes because she expected all significant information to be included in the typewritten police reports. Battles Decl., ¶2 (Ex. 201.04)

---

[3] J.D. Smith's notes <u>do not</u> memorialize the (exculpatory) content of the anonymous tip memo, which was buried elsewhere in the "poor boy" (homicide file).

17

Since the notebooks contained hundreds of pages of barely decipherable notes, and since detectives did not "hand over" the complete notebook, the LASD's practice entirely relied on detectives to advise the prosecutor of *Brady* information, which in turn, necessitated formal guidance on the contours of *Brady* disclosure requirements. No such guidance existed. Though district attorneys had to rely on detectives to advise them of exculpatory information not contained in their police reports, underlined undisputed evidence establishes that LASD had no policy addressing how investigators should flag potentially exculpatory information when presenting a case for prosecution. (Dkt. 299, p. 169, 170, Resp. to Plaintiffs' UMF Nos. 222, 223).

In the absence of *Brady* training, there is no sound reason to assume that detectives would, on their own accord, verbally apprise the D.A. of potentially exculpatory information memorialized anywhere outside of the official report, and, as we have explained above, the evidence shows that the exculpatory evidence was not made available here (given its absence in DA or Public Defender file, Public Defender testimony he never saw it, corroborated by the fact that information that would obviously be used by any defense counsel was not used). Undisputed evidence likewise establishes that the LASD had no formal policies and training regarding the content of police reports, meaning that detectives decided for themselves what information to memorialize in their police reports, including whether potentially exculpatory information was sufficiently significant in the detective's view to be incorporated in the police report. Detectives exercised discretion to choose what exculpatory evidence they found significantly persuasive to include in their reports (and likewise had discretion to exclude exculpatory evidence they did not find sufficiently persuasive). (Dkt. 299, p. 160-169, Defs' Resp. to Plaintiffs' UMF Nos. 215-221).

**IV.    Conclusion**

For the forgoing reasons, Plaintiffs' motion should be granted.

18

1

2     DATED: 4/10/2017                  Respectfully Submitted,
                                        Kaye, McLane, Bednarski & Litt, LLP
3

4                                       By: / s /Lindsay Battles
                                        Barrett S. Litt
5                                       Lindsay Battles
                                        Attorneys for Plaintiffs
6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28